ADRMOP

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:12-cv-05324-JSW

Shindelbower et al v. Honeywell International, Inc. et al
Assigned to: Hon. Jeffrey S. White
Case in other court: San Francisco County Superior Court,
                    CGC12-276092
Cause: 28:1441 Petition for Removal- Asbestos Litigation

Date Filed: 10/16/2012
Jury Demand: Defendant
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Federal Question

**Plaintiff**

**Robert Shindelbower**                    represented by    **Alan R. Brayton**
                                                    Brayton Purcell LLP
                                                    222 Rush Landing Road
                                                    PO Box 6169
                                                    Novato, CA 94948-6169
                                                    415-898-1555
                                                    Fax: 415-898-1247
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **David R. Donadio**
                                                    Brayton Purcell LLP
                                                    222 Rush Landing Road
                                                    PO Box 6169
                                                    Novato, CA 94948-6169
                                                    415-898-1555
                                                    Fax: 415-898-1247
                                                    Email: DDonadio@braytonlaw.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Geoff Terrance Sloniker**
                                                    Brayton Purcell LLP
                                                    222 Rush Landing Rd
                                                    Novato, CA 94849
                                                    415-898-1555
                                                    Email: gsloniker@braytonlaw.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Consuelo Shindelbower**                    represented by    **Alan R. Brayton**
                                                      (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**David R. Donadio**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Honeywell International, Inc.**

**Defendant**

**Genuine Auto Parts Company**

**Defendant**

**CSK Auto, Inc.**

**Defendant**

**Goodyear Tire and Rubber Company**          represented by   **Kathryn Jean LaFevers**
275 Battery St., Ste.2000
San Francisco, CA 94111
415-956-5900
Email: klafevers@gordonrees.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Meggitt Aircraft Braking Systems**          represented by   **Kathryn Jean LaFevers**
**Coporation**                                                  (See above for address)
*formerly known as*                                             *ATTORNEY TO BE NOTICED*
Aircraft Braking Systems Corporation

**Defendant**

**General Electric Company**

**Defendant**

**Metropolitan Life Insurance**
**Company**

**Defendant**

**IMO Industries, Inc.**          represented by   **Ryan Cooper Kujawski**
Howard Rome Martin and Ridley
1775 Woodside Rd Ste 200
Redwood City, CA 94061
650-365-7715
Fax: 650-364-5297
Email: rkujawski@hrmrlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Boeing Company, The**

**Defendant**

**Hawker Beechcraft Corporation**

**Defendant**

**Kawasaki Motors Corp., USA**

**Defendant**

**Nissan North America, Inc.**

**Defendant**

**United Technologies Corporation**       represented by **Ferlin Peregrino Ruiz**
Tucker Ellis LLP
135 Main Street
Suite 700
San Francisco, CA 94105
415-617-2400
Email: ferlin.ruiz@tuckerellis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Karry Son**
Tucker Ellis & West LLP
515 S. Flower St.
Forty Second Floor
Los Angeles, CA 90071
213-430-3310
Fax: 213-430-3409
Email: john.son@tuckerellis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lance Douglas Wilson**
Tucker Ellis LLP
135 Main Street
Suite 700
San Francisco, CA 94105
415-617-2400
Fax: 415-617-2409
Email: lance.wilson@tuckerellis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Curtiss-Wright Corporation**       represented by **Deborah Ann Smith**
Gordon & Rees LLP
275 Battery Street
Suite 2000
San Francisco, CA 94111

SUM-100

# SUMMONS
## (CITATION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
HONEYWELL INTERNATIONAL, INC.
AND **SEE ATTACHED LIST.**

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ROBERT SHINDELBOWER and CONSUELO SHINDELBOWER

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. *AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucort.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SAN FRANCISCO COUNTY SUPERIOR COURT
400 McAllister Street
San Francisco, CA 94102

CASE NUMBER:
*(Número del Caso):*
**CGC 12-276092**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección de teléfono del abogado del demandante, o del demandante que no tien abogado, es):*
DAVID R. DONADIO, ESQ., STATE BAR NO. 154436
BRAYTON✦PURCELL LLP
222 Rush Landing Road, Novato, CA 94948-6169      (415) 898-1555

DATE: **SEP 1 1 2012**      **CLERK OF THE COURT**   Clerk, by _M.A. MORAN_, Deputy
*(Fecha)*       *(Secretario)*     *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association of partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| ROBERT SHINDELBOWER and CONSUELO SHINDELBOWER v. HONEYWELL INTERNATIONAL, INC., et al. | |

### INSTRUCTIONS FOR USE

▸ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
▸ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (*Check only one box.  Use a separate page for each type of party.*):

☐ Plaintiff   [X] Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

GENUINE PARTS COMPANY;
CSK AUTO, INC.;
THE GOODYEAR TIRE & RUBBER COMPANY;
MEGGITT AIRCRAFT BRAKING SYSTEMS CORPORATION (FKA AIRCRAFT BRAKING SYSTEMS CORPORATION);
GENERAL ELECTRIC COMPANY;
METROPOLITAN LIFE INSURANCE COMPANY;
IMO INDUSTRIES, INC.;
THE BOEING COMPANY;
HAWKER BEECHCRAFT CORPORATION;
KAWASAKI MOTORS CORP., USA;
NISSAN NORTH AMERICA, INC.;
UNITED TECHNOLOGIES CORPORATION;
CURTISS-WRIGHT CORPORATION;
NORTHROP GRUMMAN SYSTEMS CORPORATION (FKA NORTHROP GRUMMAN CORPORATION);
and DOES 1 through 800, inclusive.

Page _1_ of _1_

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

*LexisNexis® Automated California Judicial Council Forms*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| DAVID R. DONADIO, ESQ., STATE BAR NO. 154436<br>BRAYTON❖PURCELL LLP<br>222 Rush Landing Road<br>Novato, California 94948-6169<br>TELEPHONE NO.: (415) 898-1555   FAX NO.: (415) 898-1247<br>ATTORNEY FOR (NAME): Plaintiff(s) | SUMMONS ISSUED<br>**F I L E D**<br>San Francisco County Superior Court<br><br>SEP 1 1 2012<br><br>CLERK OF THE COURT<br>M.A. MOHAN<br>BY: _____<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME:
ROBERT SHINDELBOWER and CONSUELO SHINDELBOWER vs. HONEYWELL INTERNATIONAL, INC., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CGC 12-276092 |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below of the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☒ Asbestos (04)
☐ Product Liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental / Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☒ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☒ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination and related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. ☐ Substantial post-judgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☒ punitive
4. Number of causes of action *(specify)*: 8
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 9-10-12

David R. Donadio
(TYPE OR PRINT NAME)                                           ▶ _____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet shall be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov<br>LexisNexis® Automated California Judicial Council Forms |

1   ALAN R. BRAYTON, ESQ., S.B. #73685
2   DAVID R. DONADIO, ESQ., S.B. #154436
    BRAYTON❖PURCELL LLP
    Attorneys at Law
3   222 Rush Landing Road
    P.O. Box 6169
4   Novato, California 94948-6169
    (415) 898-1555
5
    Attorneys for Plaintiffs
6

7

SUMMONS ISSUED
**FILED**
San Francisco County Superior Court

SEP 1 1 2012

CLERK OF THE COURT
BY: M.A. MOHAN Clerk

8                **SUPERIOR COURT OF CALIFORNIA**

9                   **COUNTY OF SAN FRANCISCO**

10

11   ROBERT SHINDELBOWER and          )   ASBESTOS CGC 12-276092
     CONSUELO SHINDELBOWER,            )   No.
12                                     )
              Plaintiffs,              )   COMPLAINT FOR PERSONAL INJURY
13                                     )   AND LOSS OF CONSORTIUM -
     vs.                               )   ASBESTOS
14                                     )
                                       )   _____
15   HONEYWELL INTERNATIONAL, INC.;    )   (Pursuant Case Management Order, Filed
     GENUINE PARTS COMPANY;            )   June 29, 2012)
16   CSK AUTO, INC.;                   )
     THE GOODYEAR TIRE & RUBBER        )
17      COMPANY;                       )
     MEGGITT AIRCRAFT BRAKING SYSTEMS  )
18      CORPORATION (FKA AIRCRAFT BRAKING )
        SYSTEMS CORPORATION);          )
19   GENERAL ELECTRIC COMPANY;         )
     METROPOLITAN LIFE INSURANCE       )
20      COMPANY;                       )
     IMO INDUSTRIES, INC.;             )
21   THE BOEING COMPANY;               )                                          )
     HAWKER BEECHCRAFT CORPORATION;    )
22   KAWASAKI MOTORS CORP., USA;       )
     NISSAN NORTH AMERICA, INC.;       )
23   UNITED TECHNOLOGIES CORPORATION;  )
     CURTISS-WRIGHT CORPORATION;       )
24   NORTHROP GRUMMAN SYSTEMS          )
        CORPORATION (FKA NORTHROP      )
25      GRUMMAN CORPORATION);          )
     and DOES 1 through 800, inclusive, )
26                                     )
              Defendants.              )
27   _____)
28

BRAYTON❖PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

**THIS CASE IS SUBJECT TO
MANDATORY ELECTRONIC FILING
PURSUANT TO AMENDED G.O. 158**

K:\Injured\117176\PLD\cmp-piIcpMet.wpd            1
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

## FIRST CAUSE OF ACTION
(Negligence)

PLAINTIFF ROBERT SHINDELBOWER COMPLAINS OF DEFENDANTS HEREINBELOW NAMED IN PARAGRAPH 3, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

1.    The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants DOES 1 through 500, inclusive, are unknown to plaintiff at this time, who therefore sues said defendants by such fictitious names.  When the true names and capacities of said defendants have been ascertained, plaintiff will amend this complaint accordingly.  Plaintiff is informed and believes, and thereon alleges, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the plaintiff, as hereinafter alleged.

2.    At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture.

3.    Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, defendants:  HONEYWELL INTERNATIONAL, INC.; GENUINE PARTS COMPANY; CSK AUTO, INC.; THE GOODYEAR TIRE & RUBBER COMPANY; MEGGITT AIRCRAFT BRAKING SYSTEMS CORPORATION (FKA AIRCRAFT BRAKING SYSTEMS CORPORATION); GENERAL ELECTRIC COMPANY; METROPOLITAN LIFE INSURANCE COMPANY; IMO INDUSTRIES, INC.; THE BOEING COMPANY; HAWKER BEECHCRAFT CORPORATION; KAWASAKI MOTORS CORP., USA; NISSAN NORTH AMERICA, INC.; UNITED TECHNOLOGIES CORPORATION; CURTISS-WRIGHT CORPORATION; NORTHROP GRUMMAN SYSTEMS CORPORATION (FKA NORTHROP GRUMMAN CORPORATION); and DOES 1 through 300, inclusive, were individuals, or corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and

1  each of them, were and are authorized to do and are doing business in the State of California, and

2  that said defendants have regularly conducted business in the County of San Francisco, State of

3  California.

4       4.    At all times herein mentioned, each of the named defendants and DOES 1 through

5  300 was the successor, successor in business, successor in product line or a portion thereof,

6  assign, predecessor, predecessor in business, predecessor in product line or a portion thereof,

7  parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in

8  an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling,

9  assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting,

10  servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding,

11  manufacturing for others, packaging and advertising a certain substance, the generic name of

12  which is asbestos and other products containing said substance.  Said entities shall hereinafter

13  collectively be called "alternate entities."  Each of the herein named defendants is liable for the

14  tortious conduct of each successor, successor in business, successor in product line or a portion

15  thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or

16  partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded,

17  that researched, studied, manufactured, fabricated, designed, modified, labeled, assembled,

18  distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed,

19  contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others and

20  advertised a certain substance, the generic name of which is asbestos and other products

21  containing said substance.  The following defendants, and each of them, are liable for the acts of

22  each and every "alternate entity," and each of them, in that there has been a virtual destruction of

23  plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have

24  acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such

25  "alternate entity"; defendants, and each of them, caused the destruction of plaintiff's remedy

26  against each such "alternate entity"; each such defendant has the ability to assume the risk-

27  spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill

28  originally attached to each such "alternate entity."

K:\Injured\117176\PLD\cmp-pilcpMet.wpd                     3
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| HONEYWELL INTERNATIONAL, INC. | HONEYWELL, INC. |
| | HONEYWELL CONTROLS |
| | ALLIEDSIGNAL, INC. |
| | AIRESEARCH DOMESTIC INTERNATIONAL SALES |
| | CORPORATION |
| | ALLIED-SIGNAL, INC. |
| | THE BENDIX CORPORATION |
| | BENDIX PRODUCTS AUTOMOTIVE DIVISION |
| | BENDIX PRODUCTS DIVISION, BENDIX AVIATION CORP. |
| | BENDIX HOME SYSTEMS |
| | ALLIED CORPORATION |
| | ALLIED CHEMICAL CORPORATION |
| | GENERAL CHEMICAL CORPORATION |
| | FRAM |
| | FRICTION MATERIALS OF LOS ANGELES |
| | NORTH AMERICAN REFRACTORIES COMPANY |
| | EM SECTOR HOLDINGS INC. |
| | UNIVERSAL OIL PRODUCTS COMPANY |
| | BOYLSTON CORPORATION |
| | EHRHART & ASSOCIATES, INC. |
| | EHRHART & ARTHUR, INC. |
| | GARRETT AIR RESEARCH CORP. |
| | STANLEY G. FLAGG & CO. |
| | MERGENTHALER LINOTYPE COMPANY |
| | ELTRA CORPORATION |
| | BUNKER RAMO-ELTRA CORPORATION |
| | UNION TEXAS NATURAL GAS CORPORATION |
| | UNION OIL AND GAS OF LOUISIANA |
| | UNION SULPHUR AND OIL CORPORATION |
| | UNION SULPHUR COMPANY, INC., THE |
| | MINNEAPOLIS-HONEYWELL REGULATOR COMPANY |
| | SIGNAL COMPANIES, INC., THE |
| | HANCOCK OIL COMPANY |
| | BARRETT DIVISION,  ALLIED CHEMICAL & DYE |
| | CORPORATION |
| | SIGNAL COMPANIES, INC., THE |
| | SIGNAL OIL & GAS CO. |
| | BANKLINE OIL COMPANY |
| GENUINE PARTS COMPANY (GPC) | NAPA AUTO PARTS |
| | GENUINE PARTS COMPANY OF MICHIGAN, INC. |
| | RAYLOC BRAKES |
| | AUTHORIZED MOTOR PARTS CORP. |
| | GENUINE PARTS COMPANY OF WISCONSIN, INC. |
| | AUTOMOTIVE PARTS COMPANY |
| | COLYEAR MOTOR SALES COMPANY |
| | GENERAL AUTOMOTIVE PARTS CORPORATION |
| | STANDARD UNIT PARTS CORPORATION |
| | DIGERUD AUTO PARTS |
| | FANCHER AUTO-TRUCK PARTS CO. |
| | VALLEY AUTO |
| | REDWOOD AUTO SUPPLY |

///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| CSK AUTO, INC. | KRAGEN AUTO SUPPLY CO. |
| | NORTHERN AUTOMOTIVE CORPORATION |
| | CHECKER AUTO PARTS, INC. |
| | TBDPC CORPORATION |
| | PACCAR AUTOMOTIVE, INC. |
| | GRAND AUTO, INC. |
| | AL'S AND GRAND AUTO SUPPLY, INC. |
| | SCHUCK'S AUTO SUPPLY |
| | TOPPS AUTOMOTIVE |
| | TRAK AUTO PARTS |
| | AL'S AUTO SUPPLY |
| THE GOODYEAR TIRE & RUBBER COMPANY | GOODYEAR AEROSPACE CORP. |
| | LOCKHEED MARTIN TACTICAL SYSTEMS, INC. |
| | LORAL CORPORATION |
| | AIRCRAFT BRAKING SYSTEMS CORP. |
| MEGGITT AIRCRAFT BRAKING SYSTEMS CORPORATION (FKA AIRCRAFT BRAKING SYSTEMS CORPORATION) | LOCKHEED MARTIN TACTICAL SYSTEMS, INC. |
| | LORAL CORPORATION |
| | GOODYEAR AEROSPACE CORP. |
| | THE GOODYEAR TIRE & RUBBER COMPANY |
| GENERAL ELECTRIC COMPANY | MATTERN X-RAY |
| | HOTPOINT ELECTRIC APPLIANCE COMPANY LIMITED |
| | TRUMBULL ELECTRIC MANUFACTURING COMPANY |
| | G E INDUSTRIAL SYSTEMS |
| | CURTIS TURBINES |
| | PARSONS TURBINES |
| | GENERAL ELECTRIC JET ENGINES |
| | HOTPOINT, INC. |
| | GENERAL ELECTRIC SUPPLY CORPORATION |
| IMO INDUSTRIES, INC. | TRANSAMERICA DELAVAL, INC. |
| | ENTERPRISE ENGINE & MACHINERY CO. |
| | DE LAVAL STEAM TURBINE, INC. |
| | DELAVAL STEAM TURBINE |
| | DELAVAL INDUSTRIES INC. |
| | DE LAVAL TURBINE, INC. |
| | GENERAL METALS CORPORATION |
| | CROW CENTRIFUGAL PUMPS |
| | ADEL PRECISION PRODUCTS CORP. |
| HAWKER BEECHCRAFT CORPORATION | RAYTHEON AIRCRAFT COMPANY |
| | BEECH AIRCRAFT CORPORATION |
| KAWASAKI MOTORS CORP., USA | KAWASAKI MOTORCYCLE |
| NISSAN NORTH AMERICA, INC. | NISSAN MOTOR CORPORATION IN U.S.A. |
| | INFINITI MOTOR CORPORATION |
| | DATSUN |

///

///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| THE BOEING COMPANY | BOEING NORTH AMERICAN, INC. |
|  | BOECON CORPORATION |
|  | McDONNELL DOUGLAS CORPORATION |
|  | DOUGLAS AIRCRAFT COMPANY |
|  | COLLINS RADIO COMPANY |
|  | ROCKWELL INTERNATIONAL CORPORATION |
|  | ROCKWELL INTERNATIONAL CORPORATION, |
|  |   MEASUREMENT AND FLOW CONTROL DIVISION |
|  | AUTONETICS, INC. |
|  | ROCKETDYNE |
|  | ROCKWELL MANUFACTURING COMPANY |
|  | ROCKWELL-STANDARD, INC. |
|  | ROCKWELL SPRING & AXLE CO. |
|  | ROCKWELL SPRING & AXLE CO., |
|  |   TIMKEN-DETROIT AXEL DIVISION |
|  | NORTH AMERICAN ROCKWELL |
|  | NORTH AMERICAN AVIATION, INC. |
|  | NAVION |
|  | VERTOL CORPORATION |
|  | BOEING VERTOL COMPANY |
|  | BOEING AIRPLANE COMPANY |
|  | STEARMAN AIRCRAFT COMPANY |
| UNITED TECHNOLOGIES | UNITED AIRCRAFT CORPORATION |
|   CORPORATION | UNITED AIRCRAFT & TRANSPORT CORPORATION |
|  | PRATT & WHITNEY |
|  | HAMILTON STANDARD CO. |
|  | SIKORSKY AIRCRAFT CORP. |
| CURTISS-WRIGHT CORPORATION | WRIGHT AERONAUTICAL |
|  | WRIGHT AERO |
|  | CURTIS AIRCRAFT |
|  | CURTISS-WRIGHT FLOW CONTROL CORPORATION |
|  | FARRIS ENGINEERING COMPANY |
| NORTHROP GRUMMAN SYSTEMS | NORTHROP CORPORATION |
|   CORPORATION (FKA NORTHROP | CALIFORNIA SHIPBUILDING CORPORATION |
|   GRUMMAN CORPORATION) | GRUMMAN AEROSPACE CORPORATION |
|  | LITTON INDUSTRIES, INC. |
|  | LITTON APPLIED TECHNOLOGY |
|  | LITTON MARINE SYSTEMS INC. |

5.      At all times herein mentioned, defendants, their "alternate entities," and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising a certain substance, the generic name of which is asbestos and other products containing said substance.

6.      At all times herein mentioned, defendants, their "alternate entities" and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain substance, the generic name of which is asbestos and other products containing said substance, in that said substance proximately caused personal injuries to users, consumers, workers, bystanders and others, including the plaintiff herein (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by "exposed persons."

7.      Defendants, their "alternate entities," and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

8.      Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons," including plaintiff herein, would use or be in proximity to and exposed to said asbestos fibers.

9.      Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and asbestos-containing products would be used or handled as specified in Exhibit A, which is attached hereto and incorporated by reference herein, resulting in the release of airborne asbestos fibers, and that through such

///

K:\Unjured\117176\PLD\cmp-pilcpMet.wpd

7

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  foreseeable use and/or handling "exposed persons," including plaintiff herein, would be in

2  proximity to and exposed to said asbestos fibers.

3      10.    Plaintiff ROBERT SHINDELBOWER has used, handled or been otherwise

4  exposed to asbestos and asbestos-containing products referred to herein in a manner that was

5  reasonably foreseeable.  Plaintiff's exposure to asbestos and asbestos-containing products

6  occurred at various locations as set forth in Exhibit A, which is attached hereto and incorporated

7  by reference herein.

8      11.    As a direct and proximate result of the conduct of the defendants, their "alternate

9  entities," and each of them, as aforesaid, plaintiff's exposure to asbestos and asbestos-containing

10  products caused severe and permanent injury to the plaintiff, the nature of which, along with the

11  date of plaintiff's diagnosis, are set forth in Exhibit B, which is attached hereto and incorporated

12  by reference herein.

13      12.    Plaintiff is informed and believes, and thereon alleges, that progressive lung

14  disease, cancer and other serious diseases are caused by inhalation of asbestos fibers without

15  perceptible trauma and that said disease results from exposure to asbestos and asbestos-

16  containing products over a period of time.

17      13.    Plaintiff ROBERT SHINDELBOWER suffers from a condition related to

18  exposure to asbestos and asbestos-containing products.  Plaintiff was not aware at the time of

19  exposure that asbestos or asbestos-containing products presented any risk of injury and/or

20  disease.

21      14.    As a direct and proximate result of the aforesaid conduct of defendants, their

22  "alternate entities," and each of them, plaintiff has suffered, and continues to suffer, permanent

23  injuries and/or future increased risk of injuries to his person, body and health, including, but not

24  limited to, asbestosis, other lung damage, and cancer, and the mental and emotional distress

25  attendant thereto, from the effect of exposure to asbestos fibers, all to his general damage in the

26  sum in excess of the jurisdictional limits of the Municipal Court.

27      15.    As a direct and proximate result of the aforesaid conduct of the defendants, their

28  "alternate entities," and each of them, plaintiff has incurred, is presently incurring, and will incur

K:\Injured\117176\PLD\cmp-pilcpMet.wpd

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, X-rays

2  and other medical treatment, the true and exact amount thereof being unknown to plaintiff at this

3  time, and plaintiff prays leave to amend this complaint accordingly when the true and exact cost

4  thereof is ascertained.

5      16.     As a further direct and proximate result of the said conduct of the defendants,

6  their "alternate entities," and each of them, plaintiff has incurred, and will incur, loss of income,

7  wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses,

8  the full nature and extent of which are not yet known to plaintiff; and leave is requested to amend

9  this complaint to conform to proof at the time of trial.

10      17.     Defendants, their "alternate entities," and each of them, and their officers,

11  directors and managing agents participated in, authorized, expressly and impliedly ratified, and

12  had full knowledge of, or should have known of, each of the acts set forth herein.

13      18.     Defendants, their "alternate entities," and each of them, are liable for the

14  fraudulent, oppressive, and malicious acts of their "alternate entities," and each of them, and each

15  defendant's officers, directors and managing agents participated in, authorized, expressly and

16  impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their

17  "alternate entities" as set forth herein.

18      19.     The herein-described conduct of said defendants listed in this paragraph below,

19  their "alternate entities," and each of them, was and is willful, malicious, fraudulent, outrageous

20  and in conscious disregard and indifference to the safety and health of "exposed persons."

21  Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive

22  damages according to proof against the following defendant only: HONEYWELL

23  INTERNATIONAL, INC.

24      WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities,"

25  and each of them, as hereinafter set forth.

26  ///

27  ///

28  ///

## SECOND CAUSE OF ACTION
(Products Liability)

AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR STRICT LIABILITY, PLAINTIFF ROBERT SHINDELBOWER COMPLAIN OF DEFENDANTS NAMED IN PARAGRAPH 3 HEREINABOVE, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

20.     Plaintiff incorporates herein by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 5 and 8 through 16 of the First Cause of Action herein.

21.     Defendants, their "alternate entities," and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

22.     Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, their "alternate entities," and each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to "exposed persons," including plaintiff herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

23.     "Exposed persons" did not know of the substantial danger of using said products. Said dangers were not readily recognizable by "exposed persons." Said defendants, their "alternate entities," and each of them, further failed to adequately warn of the risks to which plaintiff and others similarly situated were exposed.

24.     In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos

1   and asbestos-containing products, defendants, their "alternate entities," and each of them, did so

2   with conscious disregard for the safety of "exposed persons" who came in contact with said

3   asbestos and asbestos-containing products, in that said defendants, their "alternate entities," and

4   each of them, had prior knowledge that there was a substantial risk of injury or death resulting

5   from exposure to asbestos or asbestos- containing products, including, but not limited to,

6   asbestosis, other lung disabilities and cancer.  Said knowledge was obtained, in part, from

7   scientific studies performed by, at the request of, or with the assistance of, said defendants, their

8   "alternate entities," and each of them, and which knowledge was obtained by said defendants,

9   their "alternate entities," and each of them on or before 1930, and thereafter.

10       25.    On or before 1930, and thereafter, said defendants, their "alternate entities" and

11   each of them, were aware that members of the general public and other "exposed persons," who

12   would come in contact with their asbestos and asbestos-containing products, had no knowledge

13   or information indicating that asbestos or asbestos-containing products could cause injury, and

14   said defendants, their "alternate entities," and each of them, knew that members of the general

15   public and other "exposed persons," who came in contact with asbestos and asbestos-containing

16   products, would assume, and in fact did assume, that exposure to asbestos and asbestos-

17   containing products was safe, when in fact said exposure was extremely hazardous to health and

18   human life.

19       26.    With said knowledge, said defendants, their "alternate entities," and each of them,

20   opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy,

21   offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market,

22   warrant, rebrand, manufacture for others, package and advertise said asbestos and asbestos-

23   containing products without attempting to protect "exposed persons" from or warn "exposed

24   persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-

25   containing products.  Rather than attempting to protect "exposed persons" from, or warn

26   "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

27   asbestos-containing products, defendants, their "alternate entities," and each of them,

28   intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed

1   and suppressed said knowledge from "exposed persons" and members of the general public, thus

2   impliedly representing to "exposed persons" and members of the general public that asbestos and

3   asbestos-containing products were safe for all reasonably foreseeable uses.  Defendants, their

4   "alternate entities," and each of them, engaged in this conduct and made these implied

5   representations with the knowledge of the falsity of said implied representations.

6          27.    The above-referenced conduct of said defendants, their "alternate entities," and

7   each of them, was motivated by the financial interest of said defendants, their "alternate entities,"

8   and each of them, in the continuing, uninterrupted research, design, modification, manufacture,

9   fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale,

10  inspection, installation, contracting for installation, repair, marketing, warranting, rebranding,

11  manufacturing for others, packaging and advertising of asbestos and asbestos-containing

12  products.  In pursuance of said financial motivation, said defendants, their "alternate entities,"

13  and each of them, consciously disregarded the safety of "exposed persons"  and in fact were

14  consciously willing and intended to permit asbestos and asbestos-containing products to cause

15  injury to "exposed persons" and induced persons to work with and be exposed thereto, including

16  plaintiff.

17         28.    Plaintiff alleges that the aforementioned defendants, their "alternate entities," and

18  each of them impliedly warranted their asbestos and asbestos-containing products, to be safe for

19  their intended use but that their asbestos and asbestos-containing products, created an

20  unreasonable risk of bodily harm to exposed persons.

21         29.    Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos

22  and various asbestos-containing products manufactured, fabricated, inadequately researched,

23  designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered

24  for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired,

25  marketed, warranted, rebranded, manufactured for others, packaged and advertised by the

26  aforementioned defendants, their "alternate entities," and each of them and that plaintiff cannot

27  identify precisely which asbestos or asbestos-containing products caused the injuries complained

28  of herein.

30.     Plaintiff relied upon defendants', their "alternate entities'," and each of their representations, lack of warnings, and implied warranties of fitness of asbestos and their asbestos-containing products.  As a direct, foreseeable and proximate result thereof, plaintiff has been injured permanently as alleged herein.

31.     As a direct and proximate result of the actions and conduct outlined herein, plaintiff has suffered the injuries and damages previously alleged.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

## THIRD CAUSE OF ACTION
### (Premises Owner/Contractor Liability)

AS AND FOR A FURTHER AND THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFF ROBERT SHINDELBOWER COMPLAINS OF DEFENDANT DOES 301 THROUGH 500 (hereinafter "Premises Owner/Contractor Liability Defendants") AND ALLEGES AS FOLLOWS:

32.     Plaintiff, by this reference, incorporates the allegations contained in paragraphs 12 through 18 of the First Cause of Action.

33.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, the Premises Owner/Contractor Liability Defendants and DOES 301 through 500, were individuals, or corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California.

34.     At all times herein mentioned, each of the Premises Owner/Contractor Liability Defendants was a successor, successor-in-business, assign, predecessor, predecessor-in-business, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced and/or repaired on the respective premises owned, leased, maintained, managed and/or controlled by them.  Said

13
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   entities shall hereinafter collectively be called "alternate entities."  Each of the herein-named

2   defendants is liable for the tortious conduct of each successor, successor-in-business, assign,

3   predecessor-in-business, parent, subsidiary, whole or partial owner, or wholly or partially owned

4   entity, that caused the presence as aforesaid of said asbestos- and silica-containing insulation and

5   other toxic substances.  Said defendants, and each of them, are liable for the acts of each and

6   every "alternate entity,"  and each of them, in that there has been a virtual destruction of

7   plaintiff's remedy against each such  alternate entity; defendants, and each of them, have acquired

8   the assets, or a portion thereof, of each such alternate entity; defendants, and each of them, have

9   caused the destruction of plaintiff's remedy against each such alternate entity; each such

10  defendant has the ability to assume the risk-spreading role of each such alternate entity, and that

11  each such defendant enjoys the goodwill originally attached to each such alternate entity.

12          35.     At all times mentioned herein, the Premises Owner/Contractor Liability

13  Defendants, and each of them, respectively, owned, leased, maintained, managed, and/or

14  controlled premises where plaintiff ROBERT SHINDELBOWER was present.  The following

15  information provided is preliminary, based on recall over events covering many years and further

16  investigation and discovery may produce more reliable information.

17          36.     Prior to and at said times and places, said Premises Owner/Contractor Liability

18  Defendants, and each of them, respectively, caused certain asbestos- and silica-containing

19  insulation, other building materials, products and toxic substances to be constructed, installed,

20  maintained, used, supplied, replaced, and/or repaired on each of the aforesaid respective

21  premises, by their own workers and/or by various contractors, and caused the release of

22  dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and

23  thereby created a hazardous and unsafe condition to plaintiff and other persons exposed to said

24  asbestos fibers and toxic substances while present at said premises.

25          37.     At all times mentioned herein, said Premises Owner/Contractor Liability

26  Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should

27  have known, that the foregoing conditions and activities created a dangerous, hazardous, and

28  ///

1  unsafe condition and unreasonable risk of harm and personal injury to plaintiff and other workers

2  or persons so exposed while present on each of the aforesaid respective premises.

3      38.    At all times relevant herein, plaintiff entered said premises and used or occupied

4  each of said respective premises as intended and for each of the respective Premises

5  Owner/Contractor Liability Defendants' benefit and advantage and at each of the respective

6  Premises Owner/Contractor Liability Defendants' request and invitation.  In so doing, plaintiff

7  was exposed to dangerous quantities of asbestos fibers and other toxic substances released into

8  the ambient air by the aforesaid hazardous conditions and activities managed, maintained,

9  initiated, and/or otherwise created, controlled, or caused by said Premises Owner/Contractor

10  Liability Defendants, and each of them.

11      39.    Plaintiff at all times was unaware of the hazardous condition or the risk of

12  personal injury created by the aforesaid presence and use of asbestos products and materials and

13  other toxic substances on said premises.

14      40.    At all times mentioned herein, said Premises Owner/Contractor Liability

15  Defendants, and each of them, remained in control of the premises where plaintiff was

16  performing his work.

17      41.    At all times mentioned herein, the Premises Owner/Contractor Liability

18  Defendants owed to plaintiff and others similarly situated a duty to exercise ordinary care in the

19  management of such premises in order to avoid exposing workers such as plaintiff to an

20  unreasonable risk of harm and to avoid causing injury to said person.

21      42.    At all times mentioned herein, said Premises Owner/Contractor Liability

22  Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should

23  have known, that the premises that were in their control would be used without knowledge of, or

24  inspection for, defects or dangerous conditions and that the persons present and using said

25  premises would not be aware of the aforesaid hazardous conditions to which they were exposed

26  on the premises.

27      43.    At all times mentioned herein, said Premises Owner/Contractor Liability

28  Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control

1  said premises or to abate or correct, or to warn plaintiff of, the existence of the aforesaid

2  dangerous conditions and hazards on said premises.

3       44.    Prior to and at the times and places aforesaid, said Premises Owner/Contractor

4  Liability Defendants, and each of them, respectively, caused certain asbestos- and silica-

5  containing insulation, other building materials, products and toxic substances to be constructed,

6  installed, maintained, used, replaced, and/or repaired on each of their aforesaid respective

7  premises, by their own workers and/or by employing various contractors, and caused the release

8  of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air

9  and thereby injured plaintiff.

10      45.    At all times mentioned herein, said Premises Owner/Contractor Liability

11  Defendants, and each of them:

12        a.  Should have recognized that the work of said contractors would create during

13  the progress of the work, dangerous, hazardous, and unsafe conditions which could or would

14  harm plaintiff and others unless special precautions were taken;

15        b.  Knew or had reason to know, that the contractors it had selected and hired to

16  install, remove, abate or otherwise handle asbestos-containing materials were unfit, unskilled or

17  otherwise unqualified to do so;

18        c.  Failed to use reasonable care to discover whether the contractors it selected and

19  hired to install, remove, abate or otherwise handle asbestos-containing materials were competent

20  or qualified to do so.

21      46.    In part, plaintiff was exposed to dangerous quantities of asbestos fibers and other

22  toxic substances by reason of such contractors' failure to take the necessary precautions.

23      47.    The work of contractors on premises controlled by the Premises

24  Owner/Contractor Defendants created an unsafe premise and an unsafe work place by reason of

25  the release of dangerous quantities of toxic substances including but not limited to asbestos.

26      48.    The unsafe premise or work place was created, in part, by the negligent conduct of

27  the contractors employed by the Premises Owner/Contractor Defendants. Said negligent conduct

28  includes but is not limited to:

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

a.    Failure to warn of asbestos and other toxic dusts;

b.    Failure to suppress the asbestos-containing or toxic dusts;

c.    Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

d.    Failure to provide adequate breathing protection, i.e., approved respirators or masks;

e.    Failure to inspect and/or test the air;

f.    Failure to provide medical monitoring.

g.    Failure to select and hire a careful and competent contractor or subcontractor.

49.    The Premises Owner/Contractor Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code § 1714, and Labor Code § 6400, et seq., or Health and Safety Code § 40.200, et seq., and regulations promulgated thereunder.  Therefore, the Premises Owner/Contractor Defendants are responsible for any breach of said duties whether by themselves or others.

50.    Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code § 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§ 4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code § 40.200, et seq., which empowers the South Coast Area Air Quality Management District to promulgate regulations including but not limited to S.C.A.A.Q.M.D., Rule 1403; Title 40 Code of Federal Regulations, Chapter 1, Part 61, et seq. -- The National Emission Standards for Hazardous Air Pollutants, which required said

1   Premises Owner/Contractor Liability Defendants to provide specific safeguards or precautions to

2   prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said

3   Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and

4   precautions, or contractors employed by the Premises Owner/Contractor Liability Defendants

5   failed to provide the required safeguards and precautions.  Defendants' violations of said codes

6   include but are not limited to:

7           (a)     Failing to comply with statutes and allowing ambient levels of airborne

8   asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned

9   statutes;

10          (b)     Failing to segregate work involving the release of asbestos or other toxic

11  dusts;

12          (c)     Failing to suppress dust using prescribed ventilation techniques;

13          (d)     Failing to suppress dust using prescribed "wet down" techniques;

14          (e)     Failing to warn or educate plaintiff or others regarding asbestos or other

15  toxic substances on the premises;

16          (f)     Failing to provide approved respiratory protection devices;

17          (g)     Failing to ensure "approved" respiratory protection devices were used

18  properly;

19          (h)     Failing to provide for an on-going health screening program for those

20  exposed to asbestos on the premises;

21          (i)     Failing to provide adequate housekeeping and clean-up of the work place;

22          (j)     Failing to properly warn of the hazards associated with asbestos as

23  required by these statutes;

24          (k)     Failing to properly report renovation and disturbance of asbestos-

25  containing materials, including but not limited to S.C.A.A.Q.M.D. Rule 1403;

26          (l)     Failing to have an asbestos removal supervisor as required by regulation;

27          (m)     Failing to get approval for renovation as required by statutes; and

28          (n)     Failing to maintain records as required by statute.

51. Premises Owner/Contractor Liability Defendants, and each of them, were the "statutory employer" of plaintiff as defined by the California Labor Code and California case law.

52. Plaintiff at all times was unaware of the hazardous condition or the risk of personal injury created by defendants' violation of said regulations, ordinances or statutes.

53. At all times mentioned herein, plaintiff was a member of the class of persons whose safety was intended to be protected by the regulations, statutes or ordinances described in the foregoing paragraphs.

54. At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises, and that such persons were unaware of the aforesaid violations of codes, regulations and statutes.

55. As a legal consequence of the foregoing, plaintiff ROBERT SHINDELBOWER developed an asbestos-related illness, which has caused great injury and disability as previously set forth, and plaintiff has suffered damages as herein alleged.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

### FOURTH CAUSE OF ACTION
Aiding and Abetting Battery
[Against Metropolitan Life Insurance Company
and Does 750-790, Inclusive]

AS AND FOR A FURTHER, FOURTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR AIDING AND ABETTING BATTERY, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, DOES 750-790, THEIR ALTERNATE ENTITIES AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

56. Plaintiff incorporates herein by reference, as though fully set forth hereat, each and every allegation of the First and Second Causes of Action as though fully set forth herein.

57.     This cause of action is for the aiding and abetting of battery by METROPOLITAN LIFE INSURANCE COMPANY ("MET LIFE"), primarily through its assistant medical director Anthony Lanza, M.D., of a breach of duty committed by Johns-Manville Corporation ("J-M").

58.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned defendant MET LIFE was and is a corporation organized and existing under and by virtue of the laws of the State of New York or the laws of some other state or foreign jurisdiction, and that this defendant was and is authorized to do and/or was and is doing business in the State of California, and regularly conducted or conducts business in the County of San Francisco, State of California.  At times relevant to this cause of action, MET LIFE was an insurer of J-M.

59.     Plaintiff, was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by J-M. This exposure to the asbestos or asbestos-related products supplied by J-M caused Plaintiff's asbestos-related disease and injuries.

60.     Starting in 1928, MET LIFE sponsored studies of asbestos dust and asbestos-related disease in Canadian mines and mills, including those of J-M.  Those studies revealed that miners and mill workers were contracting asbestosis at relatively low levels of dust.  McGill University, which conducted the studies, sought permission from MET LIFE to publish the results but they were never published.  MET LIFE prepared its own report of these studies.

61.     Between 1929 and 1931, MET LIFE studied dust levels and disease at five U.S. plants manufacturing asbestos-containing products, including a J-M plant.  Those studies showed that workers in substantial numbers were contracting asbestosis, at levels less than what became the Threshold Limit Value ('TLV") of 5mppcf.  The MET LIFE report was never published or disseminated except to plant owners, including J-M.

62.     In 1932, MET LIFE studied dust levels and disease at the J-M plant at Manville, New Jersey.  Results were consistent with those of the Canadian and previous U.S. plant studies.  They were never published.

63.     In 1934, J-M and others whose plants MET LIFE had studied agreed with MET LIFE that it should issue a report of its studies.

K:\Injured\117176\PLD\cmp-pilcpMet.wpd

20

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

64.     MET LIFE submitted a draft of its report to J-M.  J-M requested, for legal and business reasons, that certain critical parts of the draft be changed.  MET LIFE's official in charge was Lanza.  MET LIFE through Lanza did make changes that J-M requested, including:

(a)     Deletion of MET LIFE's conclusion that the permissible dust level for asbestos should be less than that for silica;

(b)     Addition of the phrase that asbestosis clinically appeared to be milder than silicosis.

The report, thus altered, was published in 1935.  It was misleading, and intentionally so, because it conveyed the incorrect propositions that asbestosis was a less serious disease process than silicosis and that higher levels of asbestos dust could be tolerated without contracting diseases than was the case for silica dust.

65.     MET LIFE had a close relationship with J-M.  It invested money in J-M.  It provided group health and life insurance to J-M.  MET LIFE IN 1934 agreed to supply industrial hygiene services to J-M, including dust counts, training employees to monitor dust levels, examining employees, and recommending protective equipment.  MET LIFE and Lanza were viewed as experts on industrial dusts.

66.     In 1933, MET LIFE through Lanza issued the following advice to J-M:

(a)     Disagreeing with the recommendation of a J-M plant physician, MET LIFE advised against warning workers of the fact that asbestos dust is hazardous to their health, basing its advice in view of the extraordinary legal situation;

(b)     When the plant physician judged the best disposition of an employee with asbestosis was to remove him from the dust, MET LIFE advised instead that disposition should depend on his age, nature of work and other factors and to leave him alone if he is old and showing no disability, for, MET LIFE stated, economic and production factors must be balanced against medical factors.

67.     J-M followed the MET LIFE advices and did not warn its workers, including plaintiff, of the hazards of asbestos dust, and J-M also intentionally refrained from notifying workers of their disease.

68.     In 1936, MET LIFE, J-M and others founded the Air Hygiene Foundation ("AHF"). One of the AHF purposes was to develop standards for dust levels that would serve as a defense in lawsuits and workers' compensation claims.

69.     MET LIFE funded partially another study that tentatively recommended in 1938 a TLV for asbestos dust of 5mpccf, the same as for silica dust. MET LIFE was aware of data from its own, unpublished reports that showed that level was too high for asbestos dust. MET LIFE nonetheless promoted that TLV as proper.

70.     In June 1947, the Industrial Hygiene Foundation ("IHF") which succeeded to the AHF, issued a report of studies by Dr. Hemeon of U.S. asbestos plants, including a J-M plant. That report showed that workers exposed to less than the recommended maximum levels of dust were developing disease. MET LIFE was a member of the IHF and Lanza was on its medical committee. The Hemeon report, which was supplied to J-M and other owners, never was published.

71.     In 1936, J-M and other asbestos companies agreed with a leading medical research facility, Saranac Laboratories, that Saranac would research asbestos disease, but J-M and the others retained control over publication of the results. In 1943 Saranac's Dr. Leroy Gardner, in charge of the research, sent a draft to J-M that revealed that 81.8% of mice exposed to long fiber asbestos contracted cancer.

72.     Dr. Gardner died in 1946. J-M and other companies wanted parts of the Saranac results published and enlisted the assistance of MET LIFE's Lanza. J-M and other companies decided that Saranac's findings of cancer caused by asbestos in mice must be deleted, as well as Saranac's critique of existing dust standards. Lanza directed Saranac to delete the offending materials. Saranac did so, and the altered report was published in 1951 by Saranac's Dr. Vorwald, in the *AMA Archives of Industrial Hygiene*.

73.     Lanza left MET LIFE at the end of 1948, and took a position at New York University, funded by MET LIFE. He continued to misrepresent that asbestos does not cause cancer into the 1950s.

///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

74.    The IHF (formerly AHF), of which MET LIFE was a member and MET LIFE official was on its medical committee, through Drs. Braun and Truan conducted a study of Canadian miners.  The original report, in 1957, found an increased incidence of lung cancer in persons exposed to asbestos.  The sponsors, including J-M, caused those findings to be stricken, and the report published in 1958 contained the false conclusion that asbestos exposure alone did not increase the risk of lung cancer.

75.    The false and misleading reports that a link between asbestos exposure and cancer was not proven influenced the TLV, for if a substance causes cancer the TLV must be very low or zero.

76.    J-M not later than 1933 was inflicting asbestos dust on its workers in its plants knowing that the dust was hazardous and was causing workers to contract disease that could and would disable and kill them.  As MET LIFE advised, J-M did not warn its workers of the hazard. J-M committed battery on workers in its plants, including plaintiff, by that conduct.

77.    MET LIFE knew that J-M's conduct constituted a breach of its duties to its workers.  MET LIFE gave substantial assistance to J-M in committing batteries on its workers, including plaintiff, through MET LIFE's conduct described above, including by:

(a)    Affirmatively urging J-M not to warn workers of the hazards of asbestos dust, in view of the extraordinary legal situation, such that J-M did not warn its workers, including plaintiff;

(b)    Deleting the findings of its own draft report that the allowable limits for asbestos dust should be less than those for silica dust, and promoting a false and unsafe TLV which specified maximum levels of silica dust, and promoting a false and unsafe TLV which specified maximum levels of dust for workers, including plaintiff, which MET LIFE knew was wrong through its own studies;

(c)    Advising J-M to keep certain workers continuing to work at dusty areas in the plant even after J-M was aware that their lungs showed asbestos-induced changes, lest other workers including plaintiff be alerted to the dangers of working in the dust.

K:\Unjured\117176\PLD\cmp-pilcpMet.wpd

23

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

2  ENTITIES, and each of them, as hereinafter set forth.

3                          FIFTH CAUSE OF ACTION
                              (Concert of Action)
4

5    AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

6  CONCERT OF ACTION IN THE COMMISSION, ENCOURAGEMENT, AND ASSISTANCE

7  OF BREACH OF DUTY TO WARN, PLAINTIFF COMPLAINS OF DEFENDANTS

8  METROPOLITAN LIFE INSURANCE COMPANY, HONEYWELL INTERNATIONAL, INC.,

9  DOES 451-471, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter

10  CONCERT OF ACTION DEFENDANTS), AND ALLEGES AS FOLLOWS:

11    78.    Plaintiff incorporates herein by reference, as though fully set forth hereat each and

12  every allegation of the First, Second and Fourth Causes of Action.

13    79.    The concerted action (hereinafter referred to as "concerted action" or

14  "conspiracy") engaged in by the above-named CONCERT OF ACTION DEFENDANTS was

15  facilitated through trade and other organizations including the Friction Materials Standards

16  Institute (FMSI), which was a successor to similar trade organizations known as the Brake Lining

17  Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.

18  CONCERT OF ACTION DEFENDANTS were, during the times relevant to this cause of action,

19  members of FMSI.

20    80.    The Friction Materials Standards Institute was originally incorporated under the

21  name of Clutch Facing and Brake Lining Standards Institute in 1948 as a membership

22  corporation. It included among its avowed purposes: the maintenance and raising of standards of

23  all products manufactured by its members; the collection, assembly and dissemination to

24  members of the friction materials industry scientific, engineering, technological and other

25  relevant information pertaining to the industry; and to cooperate with governmental agencies for

26  the general benefit of the public and the enhancement of the industry.

27    81.    Before 1971, CONCERT OF ACTION DEFENDANTS knew that exposure to

28  asbestos dust created grave health risks for those exposed.  From 1971 forward, CONCERT OF

1 ACTION DEFENDANTS received additional information distributed through the Friction

2 Materials Standards Institute and through independent sources further confirming and elaborating

3 the serious health risks associated with exposure to airborne asbestos dust.

4      82.    CONCERT OF ACTION DEFENDANTS knew that routine practices utilized in

5 the handling and machining of their friction products during their installation and replacement

6 created significant and dangerous quantities of airborne asbestos dust that would expose workers

7 and bystanders to hazardous levels of asbestos.

8      83.    CONCERT OF ACTION DEFENDANTS knew that the magnitude of danger

9 posed by asbestos was not widely known by their consumers.  CONCERT OF ACTION

10 DEFENDANTS knew that exposure to asbestos dust among their consumers could be eliminated

11 or greatly reduced by adopting different and discrete practices in the handling and machining of

12 products and by instituting specific dust control procedures in their consumers' workplaces.

13      84.    Notwithstanding their knowledge of the dangers posed by exposure to asbestos,

14 and notwithstanding their chartered ostensible purpose to cooperate with government agencies

15 for the benefit of the public, CONCERT OF ACTION DEFENDANT members of the Friction

16 Materials Standards Institute undertook concerted action to thwart, avoid, undermine, defeat,

17 compromise, evade, and otherwise dilute regulations, standards, and procedures designed to

18 reduce levels of exposure to asbestos dust and to raise awareness of the hazards of asbestos by

19 consumers and friction materials workers.  Such activities include, but are not limited to the

20 following:

21      (a) CONCERT OF ACTION DEFENDANTS, at the urging and encouragement

22 of the Friction Materials Standards Institute presented to the Illinois Pollution Control Board

23 false and unsupportable opposition to a proposed prospective ban on the use of asbestos in

24 friction materials.

25      (b) CONCERT OF ACTION DEFENDANTS continuously undertook concerted

26 action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute OSHA

27 regulations, standards, and procedures aimed at reducing levels of ambient asbestos dust,

28 requiring the use of safety equipment and procedures, and notification of potentially exposed

1   persons of the dangers presented by asbestos dust.  CONCERT OF ACTION DEFENDANTS

2   consistently misrepresented the state of science and knowledge to distort and confound public

3   understanding and appreciation of the asbestos hazard, urging a higher level of airborne asbestos,

4   less stringent requirements in the use of safety equipment and procedures, and a reduction in the

5   scope and extent of any required notification regarding the hazards posed by asbestos.

6          (c) CONCERT OF ACTION DEFENDANTS expressly undertook to adopt

7   uniform interpretations of regulations among their membership, which interpretations

8   consistently took the stance of performing at the lowest possible level which could be considered

9   compliant.

10         85.    CONCERT OF ACTION DEFENDANT members of the Friction Materials

11  Standards Institute, despite their avowed purpose to encourage and support research into

12  materials and manufacturing processes, expressly declined to pursue a proposed initiative to

13  sponsor jointly funded research into feasible alternatives to asbestos in friction products.

14         86.    Even though they knew of the substantial risks and dangers to those who would

15  use or come into contact with their asbestos-containing products, defendants took concerted

16  action by means of explicit and tacit agreements, to delay for a period of years providing

17  notification and adequate warning of these risks and dangers, and to otherwise suppress

18  information about said hazards or otherwise compromise and confound informed consumer

19  appreciation of the asbestos hazards posed by their products.

20         87.    Defendants knew that the users of their friction products would handle such

21  products or their by-products in ways that enhanced the risks of dangerous asbestos exposure.

22  Defendants failed to discharge their duty to provide timely and adequate notice of these hazards

23  or of steps that could be taken to eliminate or ameliorate the risks and dangers.  Each defendant,

24  in failing to warn of these dangers, gave assistance and encouragement to every other member

25  defendant to likewise fail to warn.

26         88.    Defendants provided substantial assistance to one another in maintaining

27  ignorance among consumers as to the full nature and extent of hazards posed by asbestos, and

28  individually breached their duty to warn the consumers and users of their products.

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

89.     In addition to the above named defendants in this cause of action, the term CONCERT OF ACTION DEFENDANTS as used herein includes but is not limited to: DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Arthur Vorwald, M.D., Leroy Gardner, M.D., Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), Russell Manufacturing (whose liabilities have been assigned by H.K. Porter Company), Union Asbestos and Rubber Company, Thermoid Company (whose assets and liabilities have been purchased by H.K. Porter Company), Carey-Canada, Quebec Asbestos Corporation, Celotex Corporation, Industrial Hygiene Foundation, Mellon Institute, all members of the Asbestos Textile Institute [ATI], all members of the Friction Materials Standards Institute and its predecessors, and the other entities and individuals identified in this Cause of Action.

90.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the CONCERT OF ACTION DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of San Francisco, State of California.

91.     Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed, and/or supplied by one or more of the CONCERT OF ACTION DEFENDANTS named herein.  The exposure to the asbestos or asbestos-related products supplied by the one or more of the CONCERT OF ACTION DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

92.     The CONCERT OF ACTION DEFENDANTS, individually, and as agents of one another and as co-conspirators, agreed and conspired among themselves, with other asbestos manufacturers and distributors, and with certain individuals including, but not limited to Anthony Lanza, M.D. (Lanza) and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the wrongful acts of the conspirators, but a representative list):

1        (a)    Beginning in 1929, MET LIFE entered agreements with Johns-Manville

2 and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners.

3 When the data from these studies proved that Canadian asbestos miners were developing

4 asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony

5 Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian

6 study for many years thereafter to meetings of health care professionals seeking information

7 regarding asbestos exposure.

8        (b)    In approximately 1934, CONCERT OF ACTION DEFENDANTS Johns-

9 Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and

10 conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J.

11 Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville

12 and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively

13 misrepresent material facts and conclusions about asbestos exposure; including but not limited to

14 descriptions of the seriousness of the disease process of asbestosis.  The misrepresentation was

15 accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as

16 "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a

17 disease process less serious than it was known to be by the CONCERT OF ACTION

18 DEFENDANTS.  As a result, Lanza's study was published in the medical literature containing

19 said misleading statements in 1935.  The CONCERT OF ACTION DEFENDANTS were

20 motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by

21 the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in

22 lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use

23 of their asbestos products.

24        (c)    The above-described conspiracy continued in 1936, when additional

25 CONCERT OF ACTION DEFENDANTS American Brakeblok Corporation (defendant

26 PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant

27 GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to

28 conspirator Turner & Newall, T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing

1   (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber

2   Company and defendant USG, entered into an agreement with a leading medical research facility

3   named Saranac Laboratories.  (The following conspirators also joined the Friction Materials

4   Standards Institute portion of the conspiracy alleged below: American Brake Block Corporation

5   (now defendant Pneumo Abex), defendant Asbestos Manufacturing Company, defendant Gatke

6   Corporation, Johns-Manville, Keasbey & Mattison Company (through Turner & Newall (T&N)

7   alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell Manufacturing (whose liabilities

8   have been assumed by H.K. Porter Company).)  Under the agreement, the CONCERT OF

9   ACTION DEFENDANTS acquired the power to decide what information Saranac Laboratories

10  could publish regarding asbestos disease and could also control in what form such publications

11  were to occur.  Their agreement provided these CONCERT OF ACTION DEFENDANTS the

12  power and ability affirmatively to misrepresent the results of the work at Saranac, and also gave

13  these CONCERT OF ACTION DEFENDANTS power to suppress material facts included in any

14  study.  On numerous occasions thereafter, the CONCERT OF ACTION DEFENDANTS

15  exercised their power to prevent Saranac scientists from disclosing material scientific data,

16  resulting in numerous misstatements of fact regarding the health affects of asbestos exposure

17  being made at scientific meetings.

18          (d)     The conspiracy was furthered when on November 11, 1948, when

19  representatives of the following CONCERT OF ACTION DEFENDANTS met at Johns-

20  Manville headquarters:  Johns-Manville, American Brakeblok Division of American Brake and

21  Shoe Foundry (defendant Pneumo Abex), defendant Gatke Corporation, Garlock Sealing

22  Technologies, LLC; Keasbey & Mattison Company (then an alter-ego to conspirator Turner &

23  Newall (T&N)), Raybestos (now Raymark), Thermoid Company (whose assets and liabilities

24  were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company,

25  defendant USG and MET LIFE.  Defendant U.S. Gypsum did not send a company employee to

26  the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at

27  the meeting and to take action on its behalf.

28  ///

1      (e)     At the November 11, 1948 meeting, these CONCERT OF ACTION

2   DEFENDANTS, and their representatives, decided to exert their influence to materially alter and

3   misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at

4   the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity

5   of asbestos in mice and also included an evaluation of the health effects of asbestos on humans

6   with a critical review of the then-existing standards for asbestos dust exposure.

7      (f)     At this meeting, these CONCERT OF ACTION DEFENDANTS

8   intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete

9   material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on

10  humans and the critique of the dust standards.  The CONCERT OF ACTION DEFENDANTS

11  then published these deceptive and fraudulent statements in the medical literature as edited by

12  Dr. Arthur Vorwald, also of the Saranac Laboratories.  These CONCERT OF ACTION

13  DEFENDANTS thereby fraudulently misrepresented the risks of asbestos exposure to the public,

14  in general, and the class of persons exposed to asbestos, including the plaintiff.

15     (g)     As a direct result of influence exerted by the CONCERT OF ACTION

16  DEFENDANTS, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial

17  Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that

18  stressed those portions of Dr. Gardner's work that the CONCERT OF ACTION DEFENDANTS

19  wished stressed, but which omitted reference to human asbestosis and cancer, thereby

20  fraudulently and affirmatively misrepresenting the extent of the risks.  The CONCERT OF

21  ACTION DEFENDANTS affirmatively and deliberately disseminated this deceptive and

22  fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

23     (h)     Such actions constitute a material affirmative misrepresentation of the

24  total context of material facts involved in Dr. Gardner's work and resulted in creating an

25  appearance that inhalation of asbestos was less of health problem than Dr. Gardner's unedited

26  work indicated.

27     (i)     When Dr. Vorwald subsequently tried to publish more complete

28  information regarding Dr. Gardner's animal studies, the CONCERT OF ACTION

K:\Injured\117176\PLD\cmp-pilcpMet.wpd
                                                        30
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   DEFENDANTS required his discharge from the Saranac Laboratories, denied him permission to

2   publish or complete Gardner's work, and actively discouraged institutions of higher learning from

3   hiring or retaining Dr. Vorwald in any capacity.

4           (j)     The following CONCERT OF ACTION DEFENDANTS were members

5   of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-

6   Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos

7   Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National

8   Gypsum Company (now known as defendant Asbestos Claims Management Corporation), and

9   Turner & Newall (T&N), individually and successor to defendant Bell Asbestos Mines Ltd.

10   These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation

11   of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald in the <u>AMA Archives of</u>

12   <u>Industrial Health</u> in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation

13   arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as

14   correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and

15   9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan

16   Sabourin, acting on behalf of all Q.A.M.A. members.

17           (k)    As a furtherance of the conspiracy commenced in 1929, CONCERT OF

18   ACTION DEFENDANTS who were members of the Q.A.M.A. as described above, began on or

19   about 1950 to formulate a plan to influence public opinion about the relationship between

20   asbestos and cancer by influencing the medical literature on this subject and then touting and

21   disseminating this literature to the public and to organizations and legislative bodies responsible

22   for regulatory control of asbestos with the specific intent of misrepresenting the existing

23   scientific information and suppressing contrary scientific data in their possession and control.

24           (l)     This plan of misrepresentation and influence over the medical literature

25   began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac

26   Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary

27   report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship

28   ///

31
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   might exist in experimental animals, these Q.A.M.A. members refused to further fund the study,

2   terminated the study, and prevented any public discussion of dissemination of the results.

3           (m)    As a result of the termination of Q.A.M.A./Saranac study, the CONCERT

4   OF ACTION DEFENDANTS fraudulently withheld information from the public and

5   affirmatively misrepresented to the public and responsible legislative and regulatory bodies that

6   asbestos did not cause cancer, including affirmative misrepresentations by CONCERT OF

7   ACTION DEFENDANTS and CONCERT OF ACTION DEFENDANTS' agents K.W. Smith,

8   M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan

9   Sabourin, said misrepresentations being directed to <u>inter alia</u>, U.S. Government officials,

10  Canadian government officials, U.S. National Cancer Institute, medical organizations, health

11  professionals, and the general public, including plaintiff.

12          (n)    Subsequently, the Q.A.M.A. CONCERT OF ACTION DEFENDANTS

13  contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the

14  relationship between asbestos exposure, asbestosis and lung cancer.  In 1957, Drs. Braun and

15  Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of

16  incurring lung cancer.

17          (o)    The Q.A.M.A. CONCERT OF ACTION DEFENDANTS as a furtherance

18  of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by

19  Braun and Truan in which the findings regarding increased incidence of cancer in persons with

20  asbestosis was edited out (stricken) by agents of the Q.A.M.A.  The published version of

21  Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the

22  incidence of lung cancer, a conclusion known by the conspirators to be false.

23          (p)    By falsifying and causing publication of studies concluding that asbestos

24  exposure did not cause lung cancer and simultaneously omitting documented findings that

25  asbestosis did increase the risk of lung cancer, the CONCERT OF ACTION DEFENDANTS

26  affirmatively misrepresented to the public and concealed from the public the extent of risks

27  associated with inhalation of asbestos fibers.

28  ///

1      (q)    In furtherance of the ongoing 1929 conspiracy, in approximately 1958,

2  these Q.A.M.A. CONCERT OF ACTION DEFENDANTS publicized the fraudulently edited

3  works of Drs. Braun and Truan at a symposium in an effort to misrepresent fraudulently to the

4  public and persons exposed to asbestos that the inhalation of asbestos dust would not cause

5  cancer.

6      (r)    The fraudulent misrepresentations beginning in 1929 as elaborated above

7  and continuing with the publication of the 1958 Braun/Truan study influenced the standards set

8  for asbestos exposure.  The developers of such standards failed to lower the maximum exposure

9  limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

10      (s)    In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. CONCERT OF

11  ACTION DEFENDANTS decided, at their trade association meeting, that they would

12  intentionally mislead consumers about the extent of risks involved in inhalation of asbestos

13  products.

14      (t)    In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the

15  health effects of asbestos was held at the Saranac Laboratories.  The following CONCERT OF

16  ACTION DEFENDANTS were in attendance: MET LIFE, Lanza, Johns-Manville, Turner &

17  Newall (T&N),  Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their

18  agents, Cartier, Sabourin and LaChance.

19      (u)    At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis

20  in product users was discussed and the carcinogenic properties of all fiber types of asbestos was

21  also discussed.  In an affirmative attempt to mislead the public about the extent of health risks

22  associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these

23  CONCERT OF ACTION DEFENDANTS conspired to prevent publication of the record of this

24  1952 Saranac Symposium and it was not published.  In addition, the CONCERT OF ACTION

25  DEFENDANTS induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal

26  studies showing excess cancers in animals which thereby fraudulently misrepresented existing

27  secret data which could not be publicized owing to the secrecy provisions contained in the 1936

28  Saranac agreement heretofore described.

K:\Injured\117176\PLD\cmp-pilcpMet.wpd

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1     (v)     The following CONCERT OF ACTION DEFENDANTS were members

2  of the trade organization known as the Asbestos Textile Institute (ATI):  Raybestos (now

3  Raymark), Johns-Manville, H.K. Porter, Gatke Corporation; Garlock Sealing Technologies, LLC

4  ; Keasbey & Mattison, individually and through its alter-ego Turner & Newall (T&N) and

5  National Gypsum (defendant Asbestos Claims Management Corporation), Uniroyal, Inc.,

6  individually and through its alter-egos, CDU Holding Company, Uniroyal Holding Company and

7  Uniroyal Goodrich Tire Company.

8     (w)     In furtherance of the forgoing conspiracy, in 1947, these CONCERT OF

9  ACTION DEFENDANTS, members of the ATI, received a report from industrial hygienist

10  W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-

11  existing maximum exposure limits for asbestos exposure.  These CONCERT OF ACTION

12  DEFENDANTS caused the Hemeon report not to be published and thereby fraudulently

13  concealed material facts about asbestos exposure from the public and affirmatively

14  misrepresented to the public and class of persons exposed to asbestos that the then existing

15  maximum exposure limit for asbestos was acceptable.  Thereafter, these CONCERT OF

16  ACTION DEFENDANTS withheld additional material information on the dust standards from

17  The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further

18  influencing evaluations of their Threshold Limit Values for asbestos exposure.

19     (x)     In furtherance of the forgoing conspiracy, in 1953, CONCERT OF

20  ACTION DEFENDANT National Gypsum (Asbestos Claims Management Corporation),

21  through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene

22  regarding health hazards of asbestos spray products, refused to mail a proposed response to that

23  division indicating that respirators should be worn by applicators of the products.  National

24  Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos

25  spray products to wear respirators and fraudulently concealed from such applicators the need for

26  respirators and thereby misrepresented the risks associated with asbestos exposure.

27     (y)     In furtherance of the forgoing conspiracy, in 1955, CONCERT OF

28  ACTION DEFENDANT Johns-Manville, through its agent Dr. Kenneth Smith, caused to be

K:\Injured\117176\PLD\cmp-pilcpMet.wpd                    34
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  published in the <u>AMA Archives of Industrial Health</u>, an article entitled "Pulmonary Disability in

2  Asbestos Workers." This published study materially altered the results of an earlier study in

3  1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a

4  fraudulent and material misrepresentation about the extent of the risk associated with asbestos

5  inhalation.

6        (z)      In furtherance of the forgoing conspiracy, in 1955, the National Cancer

7  Institute held a meeting at which CONCERT OF ACTION DEFENDANT Johns-Manville,

8  individually and as an agent for other co-conspirators and Dr. Vorwald, as agent of CONCERT

9  OF ACTION DEFENDANTS, affirmatively misrepresented that there was no existing animal

10  studies concerning the relationship between asbestos exposure and cancer, when, in fact, the

11  CONCERT OF ACTION DEFENDANTS were in secret possession of several suppressed

12  studies, which demonstrated that positive evidence did exist.

13        (aa)     In furtherance of the forgoing conspiracy, in 1957, these CONCERT OF

14  ACTION DEFENDANTS and members of the ATI, jointly rejected a proposed research study on

15  cancer and asbestos and this resulted in fraudulently concealing from the public material facts

16  regarding asbestos exposure, and also constituted an affirmative misrepresentation of the then-

17  existing knowledge about asbestos exposure and lung cancer.

18        (bb)     In furtherance of the forgoing conspiracy, in 1964, CONCERT OF

19  ACTION DEFENDANTS who were members of the ATI met to formulate a plan for rebutting

20  the association between lung cancer and asbestos exposure that had been recently published by

21  Dr. Irving J. Selikoff of the Mount Sinai Research Center. Thereafter, these members of the ATI

22  embarked upon a campaign to further misrepresent the association between asbestos exposure

23  and lung cancer.

24        (cc)     CONCERT OF ACTION DEFENDANT Mellon Institute and CONCERT

25  OF ACTION DEFENDANT Industrial Hygiene Foundation (IHF) were institutes whose

26  functions included involvement in research regarding the health effects of inhaling asbestos dust.

27        (dd)     Beginning in the early 1940's, the IHF was involved in a study by Hemeon

28  entitled <u>Report of Preliminary Dust Investigation for Asbestos Textile Institute</u>, June 1947. This

1  study was done in connection with members of the Asbestos Textile Institute (ATI).  This study

2  found that workers exposed to less than the recommended maximum exposure level for asbestos

3  were nonetheless developing disease.  As a part of the conspiracy, the IHF never published this

4  study.

5         (ee)    Beginning in the mid 1950's, the IHF and the Mellon Institute were

6  involved in the publication of works by Braun and Truan entitled An Epidemiological Study of

7  Lung Cancer in Asbestos Miners.  In its original, unedited form in September, 1957, this study

8  had concluded that workers with asbestosis had an increased incidence of lung cancer and that

9  the Canadian government had been under-reporting cases of asbestosis.  The final, published

10  version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered

11  an increased incidence of lung cancer and that the Canadian government had been under-

12  reporting asbestosis cases.  The IHF and the Mellon Institute conspired with the members of the

13  Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and

14  other CONCERT OF ACTION DEFENDANTS to delete the above-describe information

15  regarding asbestos and cancer.

16         (ff)    The above-described actions of the IHF and the Mellon Institute

17  constituted intentional deception and fraud in actively misleading the public about the extent of

18  the hazards connected with breathing asbestos dust.

19         (gg)    The above-described conspiratorial and fraudulent actions of the IHF and

20  the Mellon Institute substantially contributed to retarding the development of knowledge

21  about the hazards of asbestos and thereby substantially contributed to injuries suffered by the

22  plaintiff.

23         (hh)    All CONCERT OF ACTION DEFENDANTS identified above, approved,

24  ratified, and furthered the previous conspiratorial acts of CONCERT OF ACTION

25  DEFENDANTS Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the

26  alleged co-conspirators during the date and circumstances set forth above, acted as agents, and

27  co-conspirators for the other CONCERT OF ACTION DEFENDANTS.

28  ///

1         (ii)    As evidence of Raymark's fraud, concealment, suppression, and

2    conspiratorial misconduct and of the referenced CONCERT OF ACTION DEFENDANTS, and

3    each of them, as herein set forth, Raymark's President and/or other senior executives

4    corresponded with other senior executives of Raymark's co-conspirators, which series of

5    correspondence and related documents and papers are commonly referenced as "The Sumner

6    Simpson Papers."

7         (jj)    Further as evidence of the fraud, concealment, suppression, and

8    conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the

9    ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions,

10   resolutions, and related actions, recorded in "The ATI Minutes."

11        (kk)    MET LIFE was an active participant in the foregoing conspiracy and

12   benefitted thereby.  MET LIFE benefitted from its involvement, because of the following non-

13   exclusive list:

14            (1)    by providing workers' compensation insurance to the CONCERT OF

15                   ACTION DEFENDANTS;

16            (2)    by providing life insurance for employees of the CONCERT OF ACTION

17                   DEFENDANTS;

18            (3)    by providing health insurance or health care for the employees of the

19                   CONCERT OF ACTION DEFENDANTS;

20            (4)    by providing health information and resources;

21            (5)    by purchasing substantial stock in asbestos-related companies, including

22                   stock of CONCERT OF ACTION DEFENDANTS; and

23            (6)    by developing information by which asbestos-related claims for

24                   compensation could be defeated.

25       93.    The foregoing conspiracy was furthered through the formation of the Friction

26   Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers'

27   Association, and the Clutch Facing and Brake Lining Standards Institute.  The members thereof

28   joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators.

1          (1)     The Friction Materials Standards Institute, and its predecessors, the Brake

2  Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards Institute, were

3  formed to be the ears and mouthpiece of the friction materials industry.  The initial members of

4  the Friction Materials Standards Institute between 1950 and 1953 included CONCERT OF

5  ACTION DEFENDANTS Asbestos Manufacturing Company, T&N, PLC. (through its alter-ego

6  Atlas Asbestos Company), Brassbestos Brake Lining Company, Fibre & Metal Products

7  Company, Gatke Corporation, Maremont (through its predecessor-in-interest Grizzly

8  Manufacturing), H. Krasne Manufacturing Company, Lasco Brake Products, HONEYWELL,

9  INC.  (successor-in-interest to ALLIEDSIGNAL INC. -- then known as Bendix Aviation

10  Corporation), L. J. Miley Company, Raymark (then known as Raybestos-Manhattan), Riteset

11  Manufacturing Company, Rossendale-Ruboil Company, Russell Manufacturing Company,

12  Scandura (then known as Scandinavian Belting Company), Southern Friction Materials

13  Company, U.S. Spring & Bumper Company, Pneumo Abex (Through its Predecessor-in-interest,

14  S.K. Wellman Company) and Lear-Siegler, Inc. (now Lear-Siegler Diversified Holdings Corp.)

15  And Bridgestone/Firestone, Inc. (through their predecessor-in-interest World Bestos

16  Corporation).  By 1973, the following joined the Friction Materials Standards Institute:

17  CONCERT OF ACTION DEFENDANTS Auto Friction Corporation, Auto Specialties

18  Manufacturing Company, Chrysler Corporation, Emsco Asbestos Company, Forcee

19  Manufacturing Corporation, General Motors Corporation, H.K. Porter Company (through its

20  Thermoid division), Johns-Manville Corporation, Lear-Siegler, Inc. (now Lear-Siegler

21  Diversified Holdings Corp.) (Through its Predecessor-in-interest Royal Industries), Molded

22  Industrial Friction Corporation, Morton-Thiokol (Through its Predecessor-in-interest Thiokol

23  Chemical Corporation), National Transport Supply Inc., Parker-Hannifin Corporation (through

24  its predecessor-in-interest Pick Manufacturing Company), Pneumo Abex's American Brakeblok

25  division, Silver Line Products Inc., Standco Inc., Universal Friction Materials Company, and

26  Wheeling Brake Block Manufacturing Company.  On information and belief, plaintiff alleges

27  that the following manufacturers and/or distributors of asbestos-containing automotive friction

28  products joined with, ratified, and furthered the conspiratorial actions of the above-identified

1    conspirators, including the conspirators who were members of the FMSI and its predecessors:

2    CONCERT OF ACTION DEFENDANTS, The Budd Company, Dana Corporation, Ford Motor

3    Company, General Motors Corporation, Lear-Siegler, Inc. (now Lear-Siegler Diversified

4    Holdings Corp.), Morton-Thiokol (now Morton International, Inc. ), Standard Motor Products,

5    Inc. (EIS Brand Brakes); and Borg-Warner.

6           (2)    Even though they disseminated materials and information to the contrary,

7    The Friction Materials Standards Institute conspirators knew, and suppressed, that:

8               (i)    OSHA regulations, even if enforced and complied with, would not

9               prevent asbestos disease in workers exposed to their products;

10              (ii)    chrysotile asbestos caused mesothelioma and other incurable

11              disease;

12              (iii)   brake workers suffered "considerable exposures" to respirable

13              asbestos fibers during the intended use, installation, and expected

14              replacement of friction materials;

15              (iv)   there was no "safe" level of occupational exposure to respirable

16              asbestos; and

17              (v)    there was a substantial risk and danger suffered by bystanders and

18              family members of brake mechanics, because of the release of respirable

19              asbestos in the use of friction materials, as herein described.

20          (3)    Even though they knew of the substantial risks and dangers to those who

21   would use or come into contact with their asbestos-containing products, CONCERT OF

22   ACTION DEFENDANTS took concerted action by means of explicit and tacit agreements, to

23   delay for a period of years providing notification and adequate warning of the risks and dangers.

24   CONCERT OF ACTION DEFENDANTS knew that the users of their products would handle

25   such products or their by-products in ways that enhanced the risks of dangerous asbestos

26   exposure, but they conspired to give each other assistance and encouragement in failing to

27   provide timely and adequate notices of the hazards or of steps that would be taken to eliminate or

28   ameliorate the risks and dangers.

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

94.     The acts and omissions of the CONCERT OF ACTION DEFENDANTS, as described above, and each of them, constitute fraudulent concealment and/or fraudulent misrepresentation, which caused injury to the plaintiff, including, but not limited to, the following manner:

(a)     The material published or caused to be published by the CONCERT OF ACTION DEFENDANTS was false and incomplete in that the CONCERT OF ACTION DEFENDANTS, knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b)     The CONCERT OF ACTION DEFENDANTS, with intent to defraud, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that the publication of false and misleading reports to the general public and individuals therein, and/or the intentional suppression and nondisclosure of documented reports of health hazards of asbestos:

(1)     maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)     assist in the continued pecuniary gain of CONCERT OF ACTION DEFENDANTS, through the sale of their products;

(3)     influence in the CONCERT OF ACTION DEFENDANTS' favor proposed legislation to regulate asbestos exposure and;

(4)     provide a defense in law suits brought for injury resulting from asbestos disease.

(c)     The CONCERT OF ACTION DEFENDANTS, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control.  The CONCERT OF ACTION DEFENDANTS, knowingly, and intentionally breached this duty through their fraudulent concealment as described herein.

(d)     Plaintiff and others reasonably relied, both directly and indirectly, upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-

1 related products, and in the absence of published medical and scientific reports of the hazards of

2 asbestos continued exposure to asbestos.  Plaintiff believed asbestos to be safe and was unaware

3 of the hazards due to conspiratorial and fraudulent conduct.  Plaintiff was not warned of the

4 hazards of asbestos dust as a direct result of the above-described conspiracy and fraudulent

5 concealment.  If plaintiff had known of the health hazards of asbestos, of which plaintiff was

6 unaware as a direct result of the conspirator's fraudulent concealment, plaintiff would have acted

7 differently regarding plaintiff's exposure to asbestos and asbestos-related products.

8     (e)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

9 conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that

10 plaintiff rely on the deceptive and fraudulent reports that the conspiracy caused to be published

11 throughout the United States regarding the safety of asbestos and asbestos-related products and to

12 rely on the absence of published medical and scientific data (because of the CONCERT OF

13 ACTION DEFENDANTS's suppression) regarding the hazards of asbestos and asbestos-related

14 products and thereby caused plaintiff and others to continue their exposure to asbestos products.

15     (f)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

16 conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS were and are in a

17 position of superior knowledge regarding the health hazards of asbestos and therefore the

18 plaintiff reasonably relied, both directly and indirectly, on the published reports commissioned by

19 the CONCERT OF ACTION DEFENDANTS, regarding the health hazards of asbestos and the

20 absence of published information (because of the suppression by the CONCERT OF ACTION

21 DEFENDANTS) regarding the hazards of asbestos and asbestos-related products.

22     (g)    As a direct result of the continuing and on-going conduct of the

23 CONCERT OF ACTION DEFENDANTS, as alleged herein, the plaintiff contracted asbestos-

24 related disease and suffered injuries and incurred damages, which are described in greater detail

25 in the forgoing Paragraphs.

26     95.    MET LIFE acted in concert with the foregoing described parties (the CONCERT

27 OF ACTION DEFENDANTS) and pursuant to a common design, as previously described, to

28 cause injury to plaintiff.

96.     MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark),
defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-
Mattison Company (now T&N), and the other CONCERT OF ACTION DEFENDANTS was
coercive, fraudulent, and deceitful towards others (including plaintiff) and that CONCERT OF
ACTION DEFENDANTS' conduct was a breach of duties owed to plaintiff; and MET LIFE gave
substantial assistance and encouragement to Johns-Manville and the other CONCERT OF
ACTION DEFENDANTS in breaching their duties to plaintiff and others.

97.     MET LIFE provided substantial assistance to the foregoing CONCERT OF
ACTION DEFENDANTS in accomplishing their tortious result and their breach of duties to
plaintiff.

98.     Plaintiff was insured, directly or indirectly, by MET LIFE and as such was owed a
fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy
which thereby caused plaintiff's asbestos-related injuries.

99.     The CONCERT OF ACTION DEFENDANTS made representations to plaintiff
and others concerning asbestos-containing products including but not limited to:

(a)     the statements set forth and summarized in the foregoing paragraphs

(b)     that asbestos in commercially used insulation products was not hazardous
(this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

(c)     the amount of asbestos in the air necessary to cause disease was five
million particles per cubic foot (this statement was known to be false by the CONCERT OF
ACTION DEFENDANTS)

(d)     that asbestos does not cause cancer (this statement was known to be false
by the CONCERT OF ACTION DEFENDANTS);

(e)     in addition, the CONCERT OF ACTION DEFENDANTS actively and
fraudulently concealed facts from the plaintiff and others including, but not limited to:

(1)     that asbestos-related disease can be a fatal disease,

(2)     that asbestos causes various forms of lung cancer,

///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

(3)    that individuals should protect themselves from breathing asbestos dust,

(4)    the extent of asbestos disease in exposed populations,

(5)    information regarding the levels of airborne asbestos that can cause disease,

(6)    their experience with workers' compensation claims related to asbestos exposure,

(7)    the statements set forth in foregoing paragraphs.

100.    Further, the CONCERT OF ACTION DEFENDANTS knew that their foregoing statements were false and that, by their acts, they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the CONCERT OF ACTION DEFENDANTS made the false statements and concealed the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

101.    The asbestos-containing products that CONCERT OF ACTION DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the CONCERT OF ACTION DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

102.    Additionally and alternatively, as a direct result of MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

SIXTH CAUSE OF ACTION
(Fraud and Deceit/Concealment)

AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/CONCEALMENT, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, DOES 472-480, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter FRAUD DEFENDANTS), AND ALLEGES AS FOLLOWS:

103.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each and every allegation of the First, Second, Fourth and Fifth Causes of Action as though fully set forth herein.

104.    The term FRAUD DEFENDANTS as used herein includes but is not limited to: METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), United States Gypsum Company [USG]), American Brakeblok Corporation (now Pneumo Abex Corporation [Pneumo Abex]), Keasbey-Mattison Company (now T&N, Ltd. [T&N]), all members of the Asbestos Textile Institute [ATI], American Conference of Industrial Hygienists, Inc., and the other entities and individuals identified in this Cause of Action.

105.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the FRAUD DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of San Francisco, State of California.

106.    FRAUD DEFENDANT American Conference of Governmental Industrial Hygienists, Inc. (ACGIH) sets guidelines for occupational health called Threshold Limit Values (TLVs).  These guidelines are relied on by OSHA (the Occupational Safety and Health Administration) in the United States and similar agencies around the world.  Criticisms of the guide-line setting process have pointed to problems with data collection, inadequate research,

1  overwhelming dependence on data supplied by financially interested corporations, and slow

2  response to advances in medical information.  In carrying out the aforesaid acts, the ACGIH was

3  negligent in their failure to analyze or critically evaluate previously published literature, or

4  review and incorporate current literature, failure to adequately assess the financially motivated

5  scientific data provided by asbestos corporations, their insurers, and medical consultants, and

6  their limited review process, including but not limited to the following representative list:

7          (a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL

8  HYGIENISTS (NCGIH) was formed in 1938.  In 1942, the NCGIH began to develop a list of

9  proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric

10 Concentrations, for various hazardous atmospheric substances, including asbestos.  In the

11 minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the

12 MPC's were "not to be construed as recommended safe concentrations."  In 1946, the NCGIH

13 was renamed the American Conference of Governmental Industrial Hygienists, Inc. (ACGIH),

14 and despite the internally acknowledged inadequacy of the asbestos MPC or the lack of any

15 research by the ACGIH, they adopted, circulated, represented, and otherwise promulgated a 5

16 million particles per cubic foot (mppcf) asbestos guideline based on a faulty study performed by

17 Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

18          (b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor,

19 fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily

20 function, either immediate or after years of exposure."  In 1948, they changed the name of the

21 guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the

22 guideline or verify its propriety or scientific justification.  In 1953, they issued a new conflicted

23 definition, describing the guideline as both an "average" and a "maximum".  Despite their failure

24 to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of

25 the TLV as a "time-weighted average concentration".  While arbitrarily adopting and changing

26 the definition of the TLV, the ACGIH never performed any studies to test the scientific validity

27 of the 5 mppcf TLV guideline.

28 ///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    (c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2

2    mppcf guideline.  However, the ACGIH negligently published the new guideline as 12 mppcf,

3    never intending said numeric figure to be the actual recommended guideline.  Despite internally

4    acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

5    (d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH

6    ignored the carcinogenic dangers of asbestos until 1974.

7    107.    Plaintiff was exposed to asbestos-containing dust created by the use of the

8    asbestos products manufactured, distributed and/or supplied by one or more of the

9    FRAUD DEFENDANTS.  The exposure to the asbestos or asbestos-related products supplied by

10   the FRAUD DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

11   108.    Plaintiff incorporates herein by reference, as though fully set forth hereat at, each

12   and every paragraph of the Fifth Cause of Action, which describes the allegations against, and

13   actions of the CONSPIRACY DEFENDANTS.

14   109.    Further, the FRAUD DEFENDANTS knew that their foregoing statements were

15   false and that by their acts they were actively and fraudulently concealing adverse information

16   regarding the health affects of asbestos including the facts set forth above; the FRAUD

17   DEFENDANTS made the false statements and concealed the information with the intent to

18   deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements

19   and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing

20   asbestos-related injuries and damages as more fully set forth herein.

21   110.    The asbestos-containing products that FRAUD DEFENDANTS manufactured,

22   marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to

23   asbestos from the FRAUD DEFENDANTS' products which caused his asbestos-related injuries

24   as more fully set forth in the foregoing paragraphs.

25   111.    Additionally and alternatively, as a direct result of FRAUD DEFENDANT MET

26   LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of

27   asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the

28   true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself

1   whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity

2   to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

3         WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

4   ENTITIES, and each of them, as hereinafter set forth.

5   SEVENTH CAUSE OF ACTION<br>(Fraud and Deceit/Intentional Misrepresentation)

6

7         AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF

8   ACTION FOR FRAUD AND DECEIT/INTENTIONAL MISREPRESENTATION, PLAINTIFF

9   COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY,

10  DOES 740-750, THEIR ALTERNATE ENTITIES AND EACH OF THEM (hereinafter

11  INTENTIONAL MISREPRESENTATION DEFENDANTS), AND ALLEGES AS FOLLOWS:

12        112.   Plaintiff incorporates herein by reference, as though fully set forth hereat, each

13  and every allegation of the First and Second Causes of Action, and each and every paragraph of

14  the Fourth, Fifth and Sixth Causes of Action that describes the allegations against, and actions of

15  the CONSPIRACY DEFENDANT MET LIFE as though fully set forth herein.

16        113.   Plaintiff is informed and believes, and thereon alleges, that at all times herein

17  mentioned, the INTENTIONAL MISREPRESENTATION DEFENDANTS were and are corpor-

18  ations organized and existing under and by virtue of the laws of the State of California, or the

19  laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do

20  and/or were and are doing business in the State of California, and that said defendants regularly

21  conducted and/or conducts business in the County of San Francisco, State of California.

22        114.   Plaintiff incorporates herein by reference, as though fully set forth hereat, each

23  and every paragraph of the Fifth Cause of Action that describes the allegations against, and

24  actions of the CONSPIRACY DEFENDANT MET LIFE.

25        115.   Further, the INTENTIONAL MISREPRESENTATION DEFENDANTS knew

26  that their foregoing statements were false and that by their acts they were actively and

27  fraudulently concealing adverse information regarding the health affects of asbestos including the

28  facts set forth above; the INTENTIONAL MISREPRESENTATION DEFENDANTS made the

1  false statements and misrepresented the information with the intent to deceive; plaintiff and

2  others relied both directly and indirectly on the foregoing false statements and their lack of

3  knowledge resulting from their intentional misrepresentation, resulting in and causing asbestos-

4  related injuries and damages as more fully set forth herein.

5       116.   The asbestos-containing products that INTENTIONAL MISREPRESENTATION

6  DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were

7  defective; plaintiff was exposed to asbestos from the INTENTIONAL MISREPRESENTATION

8  DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in

9  the foregoing paragraphs.

10       117.   Additionally and alternatively, as a direct result of INTENTIONAL

11  MISREPRESENTATION DEFENDANTS MET LIFE's actions and omissions, plaintiff was

12  caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents,

13  employers and the general public to be aware of the true and full dangers of asbestos, deprive

14  plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being

15  exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of

16  asbestos and caused plaintiff's damages herein.

17       WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

18  ENTITIES, and each of them, as hereinafter set forth.

19  EIGHTH CAUSE OF ACTION<br>(Loss of Consortium)

20

21       AS AND FOR A FURTHER, SEPARATE, FURTHER AND DISTINCT CAUSE OF

22  ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF CONSUELO SHINDELBOWER

23  COMPLAINS OF DEFENDANTS,  DOES 1-500, THEIR "ALTERNATE ENTITIES," AND

24  EACH OF THEM, AND ALLEGES AS FOLLOWS:

25       118.   Plaintiff incorporates by reference each and every paragraph of the First through

26  Seventh Causes of Action herein.

27  ///

28  ///

119.    Plaintiffs ROBERT SHINDELBOWER and CONSUELO SHINDELBOWER were married on May 29, 1982, and at all times relevant to this action were, and are now, husband and wife.

120.    Prior to plaintiff ROBERT SHINDELBOWER's injuries as alleged, he was able and did perform duties as a spouse.  Subsequent to the injuries and as a proximate result thereof, ROBERT SHINDELBOWER has been unable to perform the necessary duties as a spouse and the work and service usually performed in the care, maintenance and management of the family home, and he will be unable to perform such work, service and duties in the future.  As a proximate result thereof, plaintiff CONSUELO SHINDELBOWER has been permanently deprived and will be deprived of the consortium of her spouse, including the performance of duties, all to her damages, in an amount presently unknown but which will be proved at the time of trial.

121.    Plaintiff's discovery of the cause of her loss of consortium, as herein alleged, first occurred within one year of the date this complaint was filed.

122.    As a direct and proximate result of the acts of defendants, their "alternate entities," and each of them, and the severe injuries caused thereby to plaintiff ROBERT SHINDELBOWER as set forth in this complaint, plaintiff CONSUELO SHINDELBOWER has suffered, and for a long period of time will continue to suffer loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as follows:

Plaintiff ROBERT SHINDELBOWER:

1.    For plaintiff's general damages according to proof;

2.    For plaintiff's loss of income, wages and earning potential according to proof;

3.    For plaintiff's medical and related expenses according to proof;

///

1  Plaintiff CONSUELO SHINDELBOWER:

2      4.      For plaintiff's damages for loss of consortium according to proof;

3  Plaintiffs ROBERT SHINDELBOWER and CONSUELO SHINDELBOWER:

4      5.      For plaintiffs' cost of suit herein;

5      6.      For exemplary or punitive damages according to proof against defendant

6  HONEYWELL INTERNATIONAL, INC., only;

7      7.      For damages for fraud according to proof; and

8      8.      For such other and further relief as the court may deem just and proper, including

9  costs and pre-judgment interest as provided in C.C.P. § 998, C.C.P. § 1032, and related

10  provisions of law.

11  Dated: _9/10/2012_                 BRAYTON❖PURCELL LLP

12

13                                        By: _____

14                                          David R. Donadio
                                        Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

50

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1

<u>EXHIBIT A</u>

2

3        Plaintiff's exposure to asbestos and asbestos-containing products occurred at various

4   locations both inside and outside the State of California, including but not limited to:

5

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| US Navy | Naval Air Technical Training Center Memphis, TN | Trainee | 6/1968 (10 weeks) |
| US Navy | Naval Air Station South Weymouth South Weymouth, MA | Aircraft Engine Mechanic | 1968 - 1969 (6 months) |
| US Navy | Naval Air Station North Island San Diego, CA | Aviation Machinist Mate | 1969 - 1974 |
| | <u>TICONDEROGA</u> (CVS-14) | Aviation Machinist Mate | 1973 (9 months) |
| US Navy | <u>MIDWAY</u> (CVA-41) | Aviation Machinist Mate | 1974 - 1975; 1983 - 12/12/1985 |
| | Naval Repair Facility Yokosuka, Japan | | 1974 - 1975 |
| US Navy | Marine Corps Air Station Miramar, CA | Aviation Machinist Mate | 1976 - 1979 |
| US Navy | Naval Station (32nd Street) San Diego, CA | Aviation Machinist Mate | 1979 - 1982 |
| | Puget Sound Naval Shipyard Bremerton, WA | | |
| | <u>NEW ORLEANS</u> (LPH -11) | | |
| Rockwell International | US Air Force Plant 42 Palmdale, CA | Aircraft Mechanic | 1986 - 1987 |

25   <u>NON-OCCUPATIONAL EXPOSURE</u>:

26   <u>Automobile Repair</u>:  Plaintiff performed brake repairs and engine gasket work on various personal vehicles from 1969 to 1988.  When performing brake jobs, plaintiff used the same

27   routine on each occasion.  Plaintiff recalls removing old asbestos-containing brakes, cleaning the

28   ///                                                                              EXHIBIT A

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    <u>EXHIBIT A (cont'd.)</u>

2

3   brake assemblies with a brush, a rag and compressed air and installing new asbestos-containing
    brakes. Plaintiff recalls scraping and chipping old burned out asbestos-containing gaskets from
4   the engines. Plaintiff purchased his asbestos-containing replacement brakes and gaskets from
    KRAGEN AUTO PARTS (CSK AUTO, INC.), NAPA AUTO PARTS (GENUINE PARTS
5   COMPANY) and GRAND AUTO PARTS (CSK AUTO, INC.) in Southern California.

6   Plaintiff performed repair work on the following vehicles:
    1963 CHEVROLET (GENERAL MOTORS CORPORATION) Impala, purchased used with low
7   mileage. Plaintiff performed a brake job on this vehicle in 1969 including removing the original
    manufacturer's equipment asbestos-containing brakes. Plaintiff purchased asbestos-containing
8   replacement parts manufactured by GENERAL MOTORS CORPORATION from the US Navy
    Exchange in San Diego, California.
9
    1963 DATSUN (NISSAN NORTH AMERICA, INC.) pickup truck purchased used with low
10  mileage. Plaintiff performed  brake jobs and repaired the clutch on this vehicle in 1973 and 1974
    including removing the original manufacturer's equipment asbestos-containing brakes and
11  clutch. Plaintiff purchased asbestos-containing replacement parts manufactured by DATSUN
    (NISSAN NORTH AMERICA, INC.) from the US Navy Exchange in San Diego, California.
12
    1970 PONTIAC (GENERAL MOTORS CORPORATION) Grand Prix purchased used with low
13  mileage. Plaintiff performed brake jobs on this vehicle in 1977 and 1978 including removing the
    original manufacturer's equipment asbestos-containing brakes. Plaintiff purchased asbestos-
14  containing replacement brakes manufactured by BENDIX (HONEYWELL INTERNATIONAL,
    INC.) from the US Navy Exchange in San Diego, California.
15
    1978 FORD MOTOR COMPANY Granada  purchased used with low mileage. Plaintiff
16  performed brake jobs on this vehicle in 1981 and 1983 including removing the original
    manufacturer's equipment asbestos-containing brakes. Plaintiff purchased asbestos-containing
17  replacement parts from a FORD MOTOR COMPANY  dealership in San Diego, California.

18  1980 KAWASAKI (KAWASAKI MOTORS CORP., USA) motorcycle purchased new.
    Plaintiff performed  brake jobs and repaired the clutch on this motorcycle in 1980 and 1982
19  including removing the original manufacturer's equipment asbestos-containing brakes and
    clutch. Plaintiff purchased asbestos-containing replacement parts from a KAWASAKI MOTORS
20  CORP., USA dealership in San Diego, California.

21  1981 FORD MOTOR COMPANY Ranger pick-up purchased used with low mileage. Plaintiff
    performed a brake job and repaired the clutch on this vehicle in 1986 and 1987 including
22  removing the original manufacturer's equipment asbestos-containing brakes and clutch. Plaintiff
    purchased asbestos-containing replacement parts from a FORD MOTOR COMPANY  dealership
23  in San Diego, California.

24

25

26

27

28                                                                        EXHIBIT A

1

2

<u>EXHIBIT B</u>

3

4

5

Plaintiff retired from his last place of employment as a result of becoming disabled due to an illness not related to asbestos.  He has therefore suffered no disability from his asbestos-related disease as "disability" is defined in California Code of Civil Procedure § 340.2.

6

7

8

Plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the plaintiff, including, but not limited to breathing difficulties and/or other lung damage.  Plaintiff was diagnosed with asbestosis on or about May 2012.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B