Cat08,Vecchiar

# U.S. District Court
## Northern District of Ohio (Cleveland)
## CIVIL DOCKET FOR CASE #: 1:13-cv-10001-DAP
## Internal Use Only

Karen McVay v. Armstrong International Inc., et al.
Assigned to: Judge Dan Aaron Polster
Referred to: Magistrate Judge Nancy A. Vecchiarelli
Demand: $25,000
Case in other court: Cuyahoga County Court of Common Pleas, CV12784281
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 02/22/2013
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

### Plaintiff

**Karen McVay**
*Individually and as Executrix of the Estate of*
*other*
Carl L. Wiehe

represented by **John D. Mismas**
Mismas Law Firm
Suite 104
38052 Euclid Ave.
Willoughby, OH 44094
440-942-0235
Fax: 440-306-2609
Email: mismas1@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE*
*NOTICED*
Bar Status: Active

V.

### Defendant

**Armstrong International, Inc.**

**Defendant**

**Armstrong Pump, Inc.**

**Defendant**

**Air and Liquid Systems, Inc.**
*Individually and as Successor to*
*other*
Buffalo Pumps

**Defendant**

**Alfa Laval, Inc.**
*Individually and as Successor in Interest to*
*other*
Sharples Corporation

**Defendant**

**A.O. Smith Corporation**

**Defendant**

**Aqua-Chem, Inc.**
*and its Division*
*other*
Cleaver Brooks

**Defendant**

**Coca-Cola Company**
*As Liable for*
*other*
Cleaver Brooks Boilers

**Defendant**

**BAE Systems Norfolk Ship Repair, Inc.**

*formerly known as*
Norshipco
*formerly known as*
Norfolk Shipbuilding and
Drydock Corporation

**Defendant**

**Clark Industrial Insulation
Company**
*formerly known as*
Clark Asbestos

**Defendant**

**F.B. Wright Company of
Pittsburgh**

**Defendant**

**Honeywell International,
Inc.**
*Individually and as Successor
in Interest to*
*other*
Bendix Honeywell Inc.
*other*
Allied Signal

**Defendant**

**Goulds Pump, Inc.**

**Defendant**

**Cameron International
Corporation**
*Sued Individually and as
Successor in Interest to*
*other*
Cooper Bessemer
Corporation
*formerly known as*

Cooper Cameron Corporation

**Defendant**

**Crane Company**
*Individually and as Successor to*
*other*
Stockham Valve and Fittings Inc.
*other*
Deming Pump
*other*
Cochrane Corp.

**Defendant**

**Champlain Cable Corporation**
*as Successor in Interest to*
*other*
Hercules Inc.

**Defendant**

**Dana Corporation**

**Defendant**

**Cooper Industries, Inc.**

**Defendant**

**Flowserve (US), Inc.**
*sued individually and as*
*successor-in-interest to*
*other*
Edward Valve & Manufacturing
*formerly known as*
Flowserve FSD Corporation
*formerly known as*
Durametallic, Durco

International
*other*
Duriron Company

**Defendant**

**Goodyear Tire & Rubber
Company**

**Defendant**

**Hopeman Brothers, Inc.**

**Defendant**

**Ingersoll-Rand Company**

**Defendant**

**Pneumo Abex Corporation**
*Successor in Interest to*
*other*
Abex Corp.

**Defendant**

**Georgia-Pacific, LLC**

**Defendant**

**Sterling Fluid Systems
(USA), LLC**
*formerly known as*
Peerless Pump Company

**Defendant**

**Union Carbide Corporation**

**Defendant**

**Weil McClain Division of
the Marley Company**

**Defendant**

**Yarway Corporation**

**Defendant**

**Warren Pumps, Inc.**
*Individually and as Successor to*
*other*
Quimby Pump Company

**Defendant**

**3M Company**
*formerly known as*
Minnesota Mining &
Manufacturing Company

**Defendant**

**Greene Tweed & Company**

**Defendant**

**Compudyne Corporation**
*Individually and as Successor to*
*other*
York-Shipley

**Defendant**

**Gardner Denver, Inc.**

**Defendant**

**Old Orchard Industrial Corp.**

**Defendant**

**Parker Hannifan Corporation**
*successor in interest to*
*other*
Sinclair-Collins
*other*
Parker Packing Division

**Defendant**

**Radiator Specialty
Company**

**Defendant**

**Rockwell Automation, Inc.**
*and its division*
*other*
Allen-Bradley Corporation

**Defendant**

**Sealite, Inc.**

**Defendant**

**J.A. Sexauer, Inc.**
*formerly known as*
J.A. Sexauer Manufacturing
Company

**Defendant**

**Sepco Corporation**
*A California Corporation*

**Defendant**

**Borg-Warner Corporation**
*A Delaware Corporation*

**Defendant**

**Baltimore Ennis Land
Company, Inc.**
*also known as*
Belci
*formerly known as*
Gibson Homan's

**Defendant**

**BW/IP, Inc.**
*in its own right and as parent*

*corporation to*
*other*
Byron Jackson Pump
Division
*formerly known as*
BW/IP International, Inc.

**Defendant**

**Taco, Inc.**

**Defendant**

**McWane, Inc.**
*In its own right and as*
*successor in interest to*
*other*
Clow Valve Co.
*other*
Yoemans Pump

**Defendant**

**Illinois Tool Works, Inc.**
*Individually and as successor*
*in Interest to*
*other*
Devcon Corporation

**Defendant**

**ITT Corporation**
*Individually and as successor*
*to*
*other*
Grinnell and Bell
*other*
Gosset Pumps
*formerly known as*
ITT Industries, Inc.

**Defendant**

**General Electric Company**

**Defendant**
**RSCC Wire & Cable, Inc.**
*as successor in interest to*
*other*
Cerro Corporation
*other*
Cerro Wire and Cable
Company
*formerly known as*
Rockbestos Suprenant Cable
Corporation

**Defendant**
**Carver Pump Company**

**Defendant**
**Burnham LLC**

**Defendant**
**Hydrotherm Inc.**

**Defendant**
**Mestek Inc.**
*Individually, and as*
*Successor in Interest to*
*other*
HydroTherm National
Corporate Research Ltd.

**Defendant**
**Pecora Corporation**
*Individually and as Successor*
*to*
*other*
New Pecora Corporation
*other*
New Pecora Corporation, Inc.

**Defendant**

**Rite Engineering & Manufacturing Corp.**

**Defendant**

**Lochinvar, LLC**
*formerly known as*
Lochinvar Corporation

**Defendant**

**Rheem Manufacturing Company**
*Individually, and as Successor in Interest to other*
Ruud Manufacturing Company
*other*
Richmond Radiator Company

**Defendant**

**Amtrol Inc.**

**Defendant**

**Spirax Sarco Inc.**

**Defendant**

**Clyde Union Inc.**
*formerly known as*
Union Pump Company

**Defendant**

**Viking Pump Inc.**
*a Unit of other*
Idexcorp

**Defendant**

**Eaton Corporation**
*Individually and as successor*
*in interest to*
*other*
Cutler Hammer and Vickers
Inc.

**Defendant**

**Nash Engineering Company**

**Defendant**

**Spence Engineering Co. Inc.**

**Defendant**

**Nibco Inc.**

**Defendant**

**J-M Manufacturing
Company, Inc.**

**Defendant**

**Alsco, Inc.**
*Individually and as Successor*
*to*
*other*
National Service Industries,
Inc.
*other*
North Brothers, Inc.

**Defendant**

**National Service Industries,
Inc.**
*Individually and as Successor*
*in Interest to*
*other*
North Brothers, Inc.

**Defendant**

**CBS Corporation**
*Individually and as Successor*
*in Interest to*
*other*
Westinghouse Electric
Corporation

represented by **Reginald S. Kramer**
Oldham & Kramer
Ste. 300
195 South Main Street
Akron, OH 44308
330-761-6457
Fax: 330-762-7390
Email:
rkramer@oldhamkramer.com

*ATTORNEY TO BE*
*NOTICED*
*Bar Status: Active*

**Defendant**

**A.W. Chesterton Company**

**Defendant**

**Crown Cork and Seal**
**Company, Inc.**
*Individually and as Successor*
*to*
*other*
Mundet Cork Corporation

**Defendant**

**Trane U.S., Inc.**
*Individually and as successor*
*in interest to*
*other*
American Standard, Inc.

**Defendant**

**Loftus Engineering**
**Corporation**

**Defendant**

**Elliott Turbomachinery**

Co., Inc.

**Defendant**

**IMO Industries, Inc.**
*formerly known as*
Delaval, Inc.

**Defendant**

**Rapid American**
**Corporation**
*in its Own Right as as*
*Successor in Interest to and*
*liable for*
*other*
Philip Carey Corporation

**Defendant**

**Square D Company**

**Defendant**

**Velan Valve Corporation**

**Defendant**

**Weir Valves & Controls**
**USA, Inc.**
*formerly known as*
Atwood & Morrill

**Defendant**

**William Powell Company**

**Defendant**

**York International**
**Corporation**

**Defendant**

**John Does 1 though 100**
*inclusive Manufacturers,*
*Sellers or Installers of*

*Asbestos and Asbestos-Containing Products*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 02/22/2013 | 1 | **Notice of Removal** from Cuyahoga County Court of Common Pleas, case number CV-12-784281 with jury demand. Filing fee $ 350, receipt number 0647-5848149. Filed by CBS Corporation. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A-Complaint, # 3 Exhibit B-Interrogatories, # 4 Exhibit C-Pierce PID, # 5 Exhbit D-Transcript excerpts, # 6 Exhibit E-Transcript Excerpts, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit) (Kramer, Reginald) Modified to remove double wording on 2/25/2013 (S,HR). (Entered: 02/22/2013) |
| 02/22/2013 | 🔒 | (Court only) Case office code changed to 1. (S,HR) (Entered: 02/22/2013) |
| 02/22/2013 | 🔒 | (Court only) Utility Event adding attorney John D. Mismas for Karen McVay. (S,HR) (Entered: 02/22/2013) |
| 02/25/2013 | | Judge Lesley Wells assigned to case. (S,HR) (Entered: 02/25/2013) |
| 02/25/2013 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Nancy A. Vecchiarelli. (S,HR) (Entered: 02/25/2013) |
| 02/25/2013 | 2 | Magistrate Consent Form issued. (S,HR) (Entered: 02/25/2013) |
| 02/25/2013 | 3 | **Order** of recusal. Case is returned to the Clerk for reassignment. Signed by Judge Lesley Wells on |

| | | |
|---|---|---|
| | | 2/25/2013. (B,B) (Entered: 02/25/2013) |
| 02/25/2013 | | Judge Solomon Oliver, Jr assigned to case. Judge Lesley Wells terminated. (C,B) (Entered: 02/25/2013) |
| 02/28/2013 | 4 | **Order** of Recusal. This case is returned to the Clerk for reassignment to another judge. Signed by Judge Solomon Oliver, Jr on 2/28/2013. (D,M) (Entered: 02/28/2013) |
| 02/28/2013 | | Judge Dan Aaron Polster assigned to case. Judge Solomon Oliver, Jr terminated. (C,BA) (Entered: 02/28/2013) |
| 03/14/2013 | 5 | **Motion** an Order Classifying Case as an Asbestos Case filed by Defendant CBS Corporation. (Attachments: # 1 Proposed Order)(Kramer, Reginald) (Entered: 03/14/2013) |
| 03/14/2013 | 6 | **Order** granting Defendant CBS Corporation's Motion to Reclassify as Asbestos Case (Related Doc # 5 ). Judge Dan Aaron Polster on 3/13/13.(M,M) Modified signed on date on 3/15/2013 (S,HR). (Entered: 03/14/2013) |
| 03/14/2013 | 7 | Attorney Appearance by John D. Mismas filed on behalf of Karen McVay. (Mismas, John) Modified text on 3/15/2013 (S,HR). (Entered: 03/14/2013) |
| 03/14/2013 | 8 | **Motion** to stay *Transfer to MDL 875 Pending Plaintiffs' Motion to Remand* filed by Plaintiff Karen McVay. (Mismas, John) (Entered: 03/14/2013) |
| 03/14/2013 | 9 | **Motion** for attorney Charles S. Siegel to Appear Pro Hac Vice. Filing fee $ 120, receipt number 0647-5884162, filed by Plaintiff Karen McVay. (Attachments: # 1 Exhibit Supreme Court of Texas Certificate of Good Standing)(Mismas, John) Modified text on 3/15/2013 (S,HR). (Entered: 03/14/2013) |
| 03/15/2013 | | (Court only) Staff Note re Attorney: Attorney John D. Mismas address on document 7 did not match docket. |

| | | Address updated on current case. (S,HR) (Entered: 03/15/2013) |
|---|---|---|
| 03/15/2013 | 🔒 | (Court only) Case was originally filed as standard civil action 1:13cv394. Per 7 Order, case re-classified as asbestos and assigned a 10000 series case number. (S,HR) (Entered: 03/15/2013) |

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO [EASTERN DIVISION]

KAREN McVAY., Individually and as )
Executrix of the Estate of Carl L. Wiehe, )
)
     Plaintiff, )
)     Case No. _____
vs. )
)     State Court Case No. CV-12-784281
ARMSTRONG INTERNATIONAL, INC., )
*et al.*, )
)
     Defendants. )
_____ )

## CBS CORPORATION'S NOTICE OF REMOVAL

### TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO [EASTERN DIVISION]

**PLEASE TAKE NOTICE** that Defendant CBS Corporation ("Westinghouse")[1] hereby files its Notice of Removal of the above-styled state civil action, removing said matter to this Court pursuant to 28 U.S.C. §§ 1442 and 1446.

### BACKGROUND

1.     Plaintiff's complaint (Case No. CV-12-784281) was filed in the Court of Common Pleas for Cuyahoga County, Ohio on or around June 4, 2012. Westinghouse was served with said Complaint on or about June 28, 2012[2]

2.     Plaintiff generally alleged therein that her decedent, Carl L. Wiehe ("Mr.

---

[1] CBS Corporation (a Delaware corporation f/k/a Viacom Inc.) is a successor by merger to CBS Corporation (a Pennsylvania corporation f/k/a Westinghouse Electric Corporation).

[2] A copy of Plaintiff's complaint and of all other documents required to be furnished herewith by 28 U.S.C. § 1446(a) are attached collectively as "Exhibit A."

Wiehe"), was injured by asbestos exposure attributable to eighty-one (81) named Defendants and an additional one hundred (100) "John Doe" Defendants while serving in the United States Navy aboard the *U.S.S. Lowry*, while employed by Cincinnati Gas & Electric Company ("CG&E"), and at "other places in the State of Ohio and/or other States in the United States of America." (*Complaint*, ¶ 3). Neither the site nor the source of the alleged exposure to Westinghouse-attributable asbestos was specified in Plaintiff's complaint.

3.     In interrogatory responses served with her complaint, Plaintiff admitted her lack of personal knowledge as to the nature or source of Mr. Wiehe's alleged asbestos exposure but stated "upon information and belief" that Mr. Wiehe was exposed to asbestos aboard the *Lowry* and while employed by CG&E. (*Answers to Defendants' Second Amended Master Consolidated Discovery Requests to Plaintiffs for Death Cases*, Responses to Interrogatories ## 16(i) and 30) (excerpts attached as "Exhibit B"). Again, neither the site nor the source of the alleged Westinghouse-attributable asbestos exposure was specified. Quite the contrary, no item of Westinghouse equipment or any other Westinghouse product was included in Plaintiff's list of the specific items believed to have contributed to Mr. Wiehe's alleged asbestos exposure. (*Id.*, Response to Interrogatory #30(f)).

4.     Also in conjunction with her complaint, Plaintiff served Westinghouse with a document (attached as Exhibit C") identifying Robert Pierce ("Mr. Pierce") as one of Mr. Wiehe's shipmates aboard the *Lowry*. This document appeared to indicate that Mr. Pierce would testify as to the presence of turbines, "turbine blowers," pumps, valves, insulation, gaskets, steam traps, and packing aboard the *Lowry*, but failed to note which,

2

if any, of those items Mr. Pierce specifically associated with Mr. Wiehe. The document also failed to identify the manufacturer or supplier of any of those items. Consistent with these shortcomings, a transcript supplied of a deposition given by Mr. Pierce in his own asbestos-related personal injury lawsuit on October 1, 2003 reflected Mr. Pierce's admissions that – at least as of that date – he could not remember the names of any of his *Lowry* shipmates and that he could not identify the supplier or manufacturer of any of the equipment installed aboard the *Lowry*. (*Oct. 1, 2003 Deposition of Bobby Pierce*, 66:19-23 and 78:9-17) (excerpts attached as "Exhibit D").

5.     Contrary to his prior deposition testimony, Mr. Pierce affirmatively testified upon deposition in this case on January 24, 2013 that Westinghouse was the supplier of the ship-service turbine-generator installed in the No. 1 engine room of the *Lowry* and that Mr. Wiehe was present when insulation affixed to that turbine-generator was removed and reinstalled during the course of repair work, thus providing Westinghouse with its first unequivocal notice of an allegation that Mr. Wiehe was exposed to asbestos associated with an item of equipment which was designed, manufactured, and supplied by Westinghouse to the Navy for use aboard a Navy warship. (*Jan. 24, 2013 Videotaped Trial Deposition of Robert Pierce*, 59:13-24, 60::17-61:9, 62:20-63:4, 63:25-64:15, 65:25-66:24 and 67:15-68:11) (excerpts attached as "Exhibit E").

6.     In accordance with 28 U.S.C. §1446(b), this Notice of Removal has been field within thirty days of Westinghouse's first notice of Plaintiff's claim that Mr. Wiehe was injured due, in part, to contact with asbestos-insulated Westinghouse Navy equipment.

7.     While vague and ambiguous, Plaintiff's complaint appears to assert claims against Westinghouse both for the mere use of asbestos in or on its equipment as well as for a failure to warn Mr. Wiehe of asbestos-related health hazards. More specifically, Plaintiff asserts: common law negligence claims against Westinghouse based both on the mere use of asbestos rather than "readily available substitutes" (*Complaint*, ¶ 14(c)) and based on Westinghouse's failure to Warn Mr. Wiehe of asbestos-related health hazards (*Id.*, ¶¶14(a and e); a common law strict liability claim arising from an unspecified defect in Westinghouse's products (*Id.*, ¶¶ 17-24); a breach of express warranty claim based on an unspecified defect in Westinghouse's products (*Id.*, ¶¶ 25-29); a breach of implied warranty claim based on an unspecified defect in Westinghouse's products (*Id.*, ¶¶ 30-34); and a "statutory products liability" claim brought pursuant to Ohio Revised Code § 23071.71, *et seq.*, based solely on Westinghouse's failure to warn of asbestos-related health hazards (*Id.*, ¶¶ 35-38).[3]

**FEDERAL OFFICER REMOVAL IS APPROPRIATE UNDER 28 U.S.C. §1442(a)**

8.     The basis for this removal is that this action involves a person, *i.e.*, Westinghouse, who – as to one or more claims stated against it in this case[4] – was acting under the authority, direction, and control of an officer or agency of the United States for

---

[3] Notably, ¶ 6 of Plaintiff's complaint provides in relevant part that, "to the extent that Plaintiff [sic] was exposed to asbestos aboard a vessel of the United States Navy, Plaintiffs' [sic] *product liability claims* are based solely on the failure to warn, and not on any defects in design." (*Complaint*, ¶ 6) (emphasis added). While ¶ 6 does not define what differentiates her "product liability claims" from other claims stated in her complaint, the only other portion of that complaint to use the term "products liability" is Plaintiff's Fifth Cause of Action stating a "statutory products liability" claim under O.R.C. § 2307.71, *et seq.* (*Id.*, ¶¶ 35-38).

[4] "[I]f one claim cognizable under [§ 1442(a)(1)] is present, the entire action is removed, regardless of the relationship between the [§ 1442(a)(1)] claim and the non-removable claims." *National Audubon Soc'y v. Department of Water & Power*, 496 F. Supp. 499, 507 and 509 (E.D. Cal. 1980). *See also, e.g.*, *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1182 (7th Cir. 2012); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.7 (6th Cir. 2010).

purposes of 28 U.S.C. § 1442(a)(1), and who can state at least a colorable federal law-based "government contractor" defense to said claim or claims.

9.      While expressly reserving the right to respond more fully in writing to any motion for remand filed in this case, Westinghouse offers the following statements of fact and citations to authority in satisfaction of its obligation under 28 U.S.C. § 1446 to provide a short and plain statement of the legal and factual basis for its removal.

10.     Removal is proper under § 1442(a)(1) whenever it is shown that: 1) the defendant is a "'person'" who "'act[ed] under [a federal] officer[.];'" 2) a causal nexus exists in that the defendant has been sued for conduct "'under color of [federal] office;'" and 4) the defendant can assert at least a colorable federal law-based defense to one or more of the plaintiff's claims. *Bennett*, 607 F.3d at 1085 (*quoting*, § 1442(a)(1)). *See also*, *Mesa v. California*, 489 U.S. 121, 132-34 (1989); *Ruppel*, 701 F.3d at 1180-81; *Ferguson v. Lorillard Tobacco Co.*, 475 F. Supp. 2d 725, 729 (N.D. Ohio 2007).

11.     Westinghouse, a corporation, is a "person" for purposes of § 1442(a)(1). *Bennett*, 606 F.3d at 1085. *See also*, *Ruppel*, 701 F.3d at 1181; *Ferguson*, 475 F. Supp. 2d at 729.

12.     Westinghouse's design, manufacture, and supply of Navy equipment (including the turbine-generator installed in the *Lowry*'s No. 1 engine room) – as well as its design, production, and supply of all written materials to be furnished with such equipment – was subject to the detailed and ongoing supervision, direction, and control of one or more federal officers, satisfying the "acting under" requirement of § 1442(a)(1).

13.     More specifically, and as detailed in the affidavits of Mr. James M. Gate (*Nov. 23, 2010 Affidavit of James M. Gate*, hereinafter "*Gate Aff.*") (attached as "Exhibit

F") and retired Navy Rear Admiral Roger B. Horne, Jr. (*Nov. 26, 2010 Affidavit of United States Navy Rear Admiral [Ret.] Roger B. Horne, Jr.*, hereinafter "*Horne Aff.*") (attached as "Exhibit G"), Westinghouse designed, manufactured, and supplied said equipment in accordance with precise, detailed, design specifications (or "MilSpecs") which were promulgated and/or heedfully reviewed and approved by the Navy through one or more of its officers. Moreover, at all times relevant to this case, one or more Navy officers were stationed in residence at Westinghouse's manufacturing facility, personally overseeing the manufacturing process and enforcing Westinghouse's full compliance with the Navy's MilSpecs. Further, Westinghouse's Navy equipment was subject to various inspections, tests, and trials supervised by the Navy through its officers before it was approved for use on military vessels.

14.     In particular, and as again attested to by both Mr. Gate (*Gate Aff.*, ¶¶ 8 and 11) and Admiral Horne (*Horne Aff.*, ¶ 25), the use of asbestos in and on Westinghouse's Navy equipment was required by the Navy's own MilSpecs. By way of a specific non-exhaustive example of such MilSpecs, Westinghouse has tendered herewith a copy of the Navy's *General Specifications for Machinery*, § S39-1 (Heat Insulation and Lagging for Piping and Machinery) (Feb. 1, 1939) (attached as "Exhibit H"), which was in effect at the time of the *Lowry*'s construction.

15.     As noted by Mr. Gate (*Gate Aff.*, ¶ 8) and Admiral Horne (*Horne Aff.*, ¶ 24), Westinghouse did not supply or install the insulation used by the Navy with its equipment; rather, such insulation was installed by the Navy or its shipbuilder after the delivery of Westinghouse's equipment. Nonetheless, and as Plaintiff's claims relate in whole or in part to Mr. Wiehe's alleged contact with such insulation, Westinghouse notes

that, as exemplified by § S39-1-h-11 and § S39-1-l, the Navy's own MilSpecs in effect at the time of the *Lowry*'s construction affirmatively required use of asbestos cement and asbestos cloth as lagging/insulation materials on all propulsion and auxiliary turbines.

16. As further described by Mr. Gate (*Gate Aff.*, ¶¶ 30-33) and Admiral Horne (*Horne Aff.*, ¶¶ 29-33), the scope of the Navy's supervision and control extended to the specific issue of the permissible contents of all warnings and/or other verbal or written communications furnished by Westinghouse with its Navy equipment, with the Navy: expressly reserving final authority over the contents of all such communications; promulgating detailed guidelines governing Westinghouse's drafting of any writings to be supplied in or on its equipment; carefully reviewing and approving all such equipment-related writings in outline, draft, and final form; and specifically prohibiting any unilateral equipment-related communications by Westinghouse absent the Navy's prior express approval. Again, simply by way of specific non-exhaustive examples of such MilSpecs, Westinghouse has tendered herewith copies of MIL-M-15071E(SHIPS) (Manuals, Equipment and Systems) (attached as "Exhibit I") and MIL-I-15024(SHIPS) (Interim Military Specification: Identification Plates, Information Plates and Marking Information for Identification of Electrical, Electronic and Mechanical Equipment) (attached as "Exhibit J").

17. MIL-M-15071E exemplifies the key jurisdictional fact attested to by both Mr. Gate and Admiral Horne – *i.e.*, the fact of the Navy's direct, ongoing, participation in developing, reviewing, and approving the contents of all writings supplied with Westinghouse's Navy equipment. In this regard, even as late as the mid-1960s, MIL-M-15071E § 3.11.1 required prior Navy approval of the contents of all equipment technical

manuals and expressly forbade unilateral modifications to such manuals by the equipment supplier once Navy approval had issued. Prior Navy review and approval of all direct-surface equipment markings (such as "information plates" or "identification plates") was likewise required by MIL-I-15024 § 3.4.1.

18.    In sum, and as attested to by both Mr. Gate and Admiral Horne, all relevant aspects of the design, manufacture, and supply of the Westinghouse Navy equipment at issue in this case – including the contents of all warnings or other written or verbal communications to be supplied therewith – were subject to close, detailed, and ongoing supervision and control by Navy officers. As previously held by numerous federal courts in light of such evidence, Westinghouse was thus "acting under" a federal officer in its design, manufacture, and supply of that equipment and of any writings furnished therewith. *Ruppel*, 701 F.3d at 1181 (considering the removability of similar asbestos-related claims involving Westinghouse Navy equipment under § 1442(a)(1); noting that Westinghouse "worked hand-in-hand with the government, assisting the federal government in building warships;" and holding that "'[a]cting under' covers situations, like this one where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete"). *See also, e.g., Shepherd v. Air & Liquid Sys. Corp.*, 2012 WL 5874781 at *8-9 (D.R.I. [Mag. Div.] Nov. 20, 2012); *Vedros v. Northrop Grumman Shipbuilding*, 2012 WL 3155180 at *6 (E.D. Pa. Aug. 2, 2012); *Najolia v. Northrop Grumman Ship Sys.*, 2012 WL 1886119 at *5-7 (E.D. La. May 23, 2012); *Morgan v. Bill Vann Co.*, 2011 WL 6056083 at *3, n.3 (S.D. Ala. Dec. 6, 2011); *Kite v. Bill Vann Co.*, 2011 WL 4499345 at *4 (S.D. Ala. Sept. 29, 2011); *Dupre v. Todd Shipyards Corp.*, 2011 WL 4551439 at *6 (E.D. La. Sept. 29, 2011); *Ellis*

*v. Pneumo Abex Corp.*, 798 F. Supp. 2d 985, 990 (C.D. Ill. 2011); *Corley v. Long-Lewis, Inc.*, 2010 WL 723628 at \*19 (N.D. Ala. Jan. 28, 2010); *Allen v. CBS Corp.*, 2009 WL 4730747 at \*2 (D. Conn. Dec. 1, 2009); *Mitchell v. AC&S, Inc.*, 2004 WL 3831228 at \*2 (E.D. Va. Dec. 15, 2004); *Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 700-01 (S.D. Tex. 2002); *Carter v. ACandS, Inc.*, 2002 WL 31682352 at \*4-5 (E.D. Tex. 2002); *Crocker v. Borden, Inc.*, 852 F. Supp. 1322, 1326 (E.D. La. 1994); *Pack v. ACandS, Inc.*, 838 F. Supp. 1099, 1103 (D. Md. 1993). *Cf.*, *Nesbiet v. General Elec. Co.*, 399 F. Supp. 2d 205, 212-13 (S.D.N.Y. 2005) (reaching an identical conclusion based on similar evidence of Navy control as to marine turbines designed and manufactured by General Electric Company); *Machnik v. Buffalo Pumps*, 506 F. Supp. 2d 99, 103 (D. Conn. 2007) (same); *Fink v. Todd Shipyards*, 2004 WL 856734 at \*3 (E.D. La. April 20, 2004) (same). This Court has, in fact, previously reached an identical conclusion based on similar evidence in the context of a § 1442(a)(1)-based removal of asbestos-related claims brought against the supplier of an asbestos-insulated evaporator used aboard a Navy ship. *Ferguson*, 475 F. Supp. 2d at 729. *Compare*, *In re Welding Prods. Liab. Litig.*, 2004 WL 1179454 at \*11 (N.D. Ohio May 21, 2004).

19.    Plaintiff's claims against Westinghouse (including any claims arising from the mere use of asbestos in or on Westinghouse's Navy equipment and any claims arising from Westinghouse's purported failure to warn of asbestos-related health hazards) necessarily arise solely and completely within the context of Westinghouse's performance of its contractual obligation to the Navy to design, manufacture, and supply the equipment at issue in this case. As such, there is a "causal nexus" between each of those claims and Westinghouse's conduct under color of its federal office as a military

equipment designer, manufacturer, and supplier. *Willingham v. Morgan*, 395 U.S. 402,
406 (1969); *Bennett*, 607 F.3d at 1088; *Stein-Sapir v. Birdsell*, 673 F.2d 165, 166 (6th Cir.
1982); *Ferguson*, 475 F. Supp. 2d at 731. *See also, Ruppel*, 701 F.3d at 1181
(considering the removability of similar asbestos-related claims involving Westinghouse
Navy equipment under § 1442(a)(1) and holding that the "causal connection" required by
that statute existed as "the gravamen of [the plaintiff's] complaint occurred while
[Westinghouse] acted under color of federal authority"). Stated differently, where, as
here, a defendant has been sued for asbestos-related injuries in relation to equipment it
manufactured and supplied to the Navy under the Navy's direction and control, that
defendant's satisfaction of the "causal nexus" jurisdictional requirement of § 1442(a)(1)
is "axiomatic." *Madden*, 205 F. Supp. 2d at 701-02. *See also, e.g., Najolia*, 2012 WL
1886119 at *11; *Morgan*, 2011 WL 6056083 at *8.

20.     As to the jurisdictional requirement of the existence of a colorable federal
law-based defense, Westinghouse hereby gives notice of its assertion of a "government
contractor" defense to each of Plaintiff's claims under *Boyle v. United Technologies
Corp.*, 487 U.S. 500, 512 (1988) in that: 1) it designed, manufactured, and supplied the
Navy equipment at issue in this case (and all warnings or other writings furnished
therewith) in accordance with "reasonably precise specifications" promulgated, adopted,
or heedfully approved by the Navy; 2) said equipment (and all warnings or other writings
furnished therewith) conformed with those specifications; and 3) at all times relevant to
this suit, the Navy was independently aware of health hazards associated with asbestos.
*See generally*, *Bennett*, 607 F.3d at 1089; *Ferguson*, 475 F. Supp. 2d at 730.

21.     The mere fact of the Navy's mandated use of asbestos-containing

insulation more than suffices to satisfy the "reasonably precise specifications" requirement as to any claim arising from the mere use of asbestos in or own Westinghouse's Navy equipment. *Ruppel*, 701 F.3d at 1184-85. *Compare, Glassco v. Miller Equip. Co.*, 966 F.2d 641, 642-43 (11th Cir. 1992); *In re Welding Prods. Liab. Litig.*, 2004 WL 1179454 at *10-12.

22.     Similarly, Westinghouse has made at least a colorable showing as to the "reasonably precise specifications" requirement as to Plaintiff's warnings-based claims in light of its evidence that the Navy: carefully reviewed all writings to be furnished with Westinghouse's equipment; approved of those materials despite the lack of any warning addressing known[5] asbestos-related health hazards; and precluded Westinghouse from communicating any equipment-related safety information outside the scope of that Navy review and approval process. *Ruppel*, 701 F.3d at 1185-86. *Compare, Tate v. Boeing Helicopters*, 140 F.3d 654, 658 (6th Cir. 1998); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995); *Ferguson*, 475 F. Supp. 2d at 730; *In re Welding Prods. Liab. Litig.*, 2004 WL 1179454 at *10-12.

23.     The Navy's acceptance and use of Westinghouse's Navy equipment (and of all warnings or other writings furnished therewith) after careful inspection, examination and testing suffices to establish the conformity with the Navy's relevant specifications. *See, e.g., Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir. 2001); *Morgan*, 2011 WL 6056083 at *6; *Allen*, 2009 WL 4730747 at *5; *Machnik*, 506 F. Supp. 2d at 103-04.

24.     As attested to by Samuel A. Forman, M.D. (*Nov. 23, 2010 Affidavit of*

---

[5] The fact of the Navy's independent knowledge of asbestos-related health hazards at all times relevant to Plaintiff's claims is discussed below.

*Samuel A. Forman*, hereinafter "*Forman Aff.*," ¶¶ 20 and 24) (attached hereto as "Exhibit K"), the Navy was independently aware of health hazards associated with asbestos no later than 1922 and, by 1941, had a sufficient enough understanding of those hazards to promulgate a number of internal rules and regulations intended to control such exposures and to prevent asbestos-related illnesses. Conversely, the Navy was not open to external assistance in monitoring or addressing asbestos-related hazards, rejecting offers of such assistance (including an offer by several insulation suppliers to include asbestos warnings with their products contemporaneous with the 1940s construction of the *Lowry*) based, in part, on a policy determination that drawing attention to such hazards might cause unrest among shipyard workers and, thus, impede ship production. (*Id.* ¶¶ 25-28 and 33-34).

25. In short, Dr. Forman's exhaustive review of the Navy's historical documents failed to reveal a single occasion through the 1960s of the Navy requiring, authorizing or even allowing a Navy equipment supplier to furnish an asbestos-related warning with or on its equipment. (*Id.* ¶ 36). Rather, and consistent with Admiral Horne's personal recollection, Dr. Forman's document review revealed a pattern in "the Navy's handling of . . . workplace safety and hazard communication, as [it] related to asbestos and other issues" that "reflected the Navy's balance of various considerations, including combat readiness, maintenance of the necessary command structure, the needs of discipline and the hierarchy of risks presented by life and work aboard a combat vessel." (*Id.* ¶ 55). As to "long-term workplace health issues" such as those arising from asbestos exposure, the Navy chose to address such hazards through "training for various trades and jobs, rather than using labeling or other written materials to accompany products into the workplace." (*Id.*).

26. In light of these facts, Westinghouse can state a "government contractor" defense to asbestos-related "design defect" and "failure to warn" claims involving its Navy equipment that is, at the very least, sufficient to satisfy the colorability test for jurisdiction under § 1442(a)(1). *Ruppel*, 701 F.3d at 1183-86; *See also, e.g., Najolia*, 2012 WL 1886119 at *9-10; *Morgan*, 2011 WL 6056083 at *6; *Kite*, 2011 WL 4499345 at *4; *Dupre*, 2011 WL 4551439 at *7; *Corley*, 2010 WL 723628 at *18-19; *Allen*, 2009 WL 4730747 at *5; *Mitchell*, 2004 WL 3831228 at *4; *Crocker*, 852 F. Supp. at 1327; *Pack*, 838 F. Supp. at 1103.

27. In sum, the removal of this civil action is proper as – consistent with the short and plain statement of the law and facts offered herein – the federal district courts have original jurisdiction over the subject matter of this suit under § 1442(a)(1) given that Westinghouse was acting under an officer or agency of the United States relative to one or more of the claims stated against it and can state at least a colorable federal law-based defense to said claim or claims.

28. Westinghouse need not notify, or obtain the consent of, any other defendant to this action in order to remove this entire suit under § 1442(a)(1). *See, e.g., Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Ely Valley Mines v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981); *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 152 (5th Cir. 1965); *Allman v. Hanley*, 302 F.2d 559, 562 (5th Cir. 1962).

29. In addition to the exhibits described above, Westinghouse has attached those documents required by 28 U.S.C. § 1446(a) and/or the local rules of the Court of

Common please of Cuyahoga County, Ohio.

WHEREFORE, PREMISES CONSIDERED, Westinghouse, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action from the Court of Common Pleas of Cuyahoga County, Ohio on this 22nd day of February, 2013.

Respectfully submitted,

Reginald S. Kramer (0024201)
Oldham Kramer
195 South Main Street
Akron, OH 44308-1314
Telephone: (330) 762-7377
Facsimile: (330) 762-7390

Attorney for Defendant CBS Corporation

## CERTIFICATE OF SERVICE

A copy of the foregoing Notice of Removal was served on Plaintiff's counsel and all counsel of record this 22nd day of February, 2013.

Reginald S. Kramer

14

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

**COMPLAINT**
(ASBESTOS PERSONAL INJURY, LOSS OF CONSORTIUM, AND WRONGFUL DEATH)
(TRIAL BY JURY DEMANDED)

Karen McVay, Individually and as Executrix of )
The Estate of Carl L. Wiehe )
1485 Sportsmanclub Road )
Newark, OH 43055 )
)
)
Plaintiffs, )
)
)
)
vs. )
)
ARMSTRONG INTERNATIONAL, INC. )
2081 SE Ocean Blvd. )
4th Floor, Stuart, FL 34996 )
)
ARMSTRONG PUMP, INC. )
Hodgson, Russ, Andrews, Woods & Goodyear )
140 Pearl St., Suite 100 )
Buffalo, NY 14202 )
)
Air and Liquid Systems Inc. )
Individually and as Successor to Buffalo Pumps )
1680 S. Livernois, Suite 200 )
Rochester Hills, MI 48307 )
)
ALFA LAVAL INC )
Individually and as Successor in Interest to )
SHARPLES Corporation )
c/o Statutory Agent )
C.T. Corporation System )
1300 E. Ninth St., #1010 )
Cleveland, OH 44114 )
)
A.O. Smith Corporation )
c/o Prentice_Hall Corp. System )
50 West Broad Street, Suite 1800 )

Case No. CV-12-784281

**COMPLAINT**

(Asbestos Personal Injury, loss of
Consortium and Wrongful Death)

Jury Trial Demanded

Judges: Spellacy
Hanna


EXHIBIT
A

Columbus, OH 43215 )
)
Aqua-Chem, Inc. and its Division )
Cleaver Brooks )
7800 N. 113th St. )
Milwaukee, WI 53224 )
)
THE COCA-COLA COMPANY )
As Liable for Cleaver Brooks Boilers )
C.T. Corporation System )
1300 E. Ninth St., #1010 )
Cleveland, OH 44114 )

BAE Systems Norfolk Ship Repair, Inc. )
FKA NORSHIPCO and Norfolk Shipbuilding & )
Drydock Corporation )
750 West Berkley Avenue )
Norfolk, Virginia 23523 )
)
Clark Industrial Insulation Company )
Formerly known as Clark Asbestos )
HI Statutory Agent, Inc. )
200 Public Square, Suite 2800 )
Cleveland, OH 44103 )
)
F.B. Wright Company of Pittsburgh )
98 Vanadium Rd. )
Bridgeville, PA 15017 )
)
Honeywell International, Inc. )
Individually and as Successor in Interest to )
Bendix, Honeywell Inc. and Allied Signal )
Csc-Lawyers Incorporating Service )
50 West Broad Street, Suite 1800 )
Columbus, OH 43215 )
)
Goulds Pumps, Inc. )
Corporation Trust Company )
1209 Orange Street )
Wilmington, Delaware 19801 )
)
CAMERON INTERNATIONAL CORPORATION )
FKA COOPER CAMERON CORPORATION, )
Sued Individually and as Successor in Interest to )
THE COOPER BESSEMER CORPORATION )

2

c/o Statutory Agent )
C.T. Corporation System )
1300 E. Ninth St., #1010 )
Cleveland, OH 44114 )
)
Crane Company )
Individually and as Successor to STOCKHAM )
VALVE AND FITTINGS INC., DEMING )
PUMP, and COCHRANE CORP. )
c/o Statutory Agent )
C.T. Corporation System )
1300 E. Ninth St., #1010 )
Cleveland, OH 44114 )
)
CHAMPLAIN CABLE CORPORATION, )
as successor-in-interest to Hercules Inc. )
175 Hercules Drive )
Colchester, VT 05446 )
)
Dana Corporation )
c/o CT Corporation System )
1300 East 9th Street, #1010 )
Cleveland, OH 44114 )
)
Cooper Industries, Inc. )
c/o Statutory Agent )
C.T. Corporation System )
1021 Main #1150 )
Houston, Texas 77002-6505 )
)
FLOWSERVE (US), INC. (sued individually and )
as successor-in-interest to EDWARD )
VALVE & MANUFACTURING, FKA )
FLOWSERVE FSD CORPORATION FKA )
DURAMETALLIC, DURCO INTERNATIONAL )
AND THE DURIRON COMPANY )
c/o Statutory Agent )
C.T. Corporation System )
1300 E. Ninth St., #1010 )
Cleveland, OH 44114 )
)
THE GOODYEAR TIRE & RUBBER COMPANY)
Csc-Lawyers Incorporating Service )
50 West Broad Street, Suite 1800 )
Columbus, OH 43215 )

3

HOPEMAN BROTHERS, INC.                          )
435 Essex Avenue                                )
Suite 101                                       )
Waynesboro, VA  22980                           )
                                                )
Ingersoll-Rand Company                          )
c/o Statutory Agent                             )
C.T. Corporation System                         )
1300 East Ninth St., #1010                      )
Cleveland, Ohio  44114                          )
                                                )
Pneumo Abex Corporation                         )
Successor in Interest to Abex Corp.             )
c/o Prentice Hall Co., Statutory Agent          )
Prentice Hall Corporation                       )
50 West Broad St., Suite 1800                   )
Columbus, OH  43215                             )
                                                )
Georgia-Pacific, LLC                            )
c/o Statutory Agent                             )
C.T. Corporation System                         )
1300 East Ninth St., #1010                      )
Cleveland, Ohio  44114                          )
                                                )
STERLING FLUID SYSTEMS (USA), LLC               )
f/k/a Peerless Pump Company                     )
2005 Drive Martin Luther King Jr                )
Indianapolis, IN 46202-1182                     )
                                                )
Union Carbide Corporation                       )
c/o Statutory Agent                             )
C.T. Corporation System                         )
1300 East Ninth St., #1010                      )
Cleveland, Ohio  44114                          )
                                                )
The Weil McClain Division                       )
of the Marley Company                           )
c/o United Dominion Industries, Inc.            )
C/O C.T. Corporation System                     )
1300 E. Ninth St.  #1010                        )
Cleveland, OH  44114                            )
                                                )
YARWAY CORPORATION                              )
c/o Statutory Agent                             )

C.T. Corporation System )
1300 East Ninth St., #1010 )
Cleveland, Ohio 44114 )
)
Warren Pumps, Inc., Individually and as )
Successor to the Quimby Pump Company )
Corporation Service Company )
2711 Centreville Road )
Wilmington, Delaware 19809 )
)
3M Company, f/ka/ Minnesota Mining and )
Manufacturing Company )
c/o CT Corporation Systems )
1300 E. Ninth St., #1010 )
Cleveland, OH 44114 )
)
Greene Tweed & Company )
P.O. Box 305 )
Kulpsville, PA 19443 )
)
COMPUDYNE CORPORATION, )
Individually and as Successor to York-Shipley )
2530 Riva Road, #201 )
Annapolis, Maryland 21401 )
)
Gardner Denver, Inc. )
c/o CSC Lawyers Incorporating Service )
50 W. Broad St. )
Suite 1800 )
Columbus, OH 43215 )
)
Old Orchard Industrial Corp. )
Stat Agent: CT Corporation System )
208 SO LASALLE ST, SUITE 814 )
Chicago, IL 60604-1101 )
)
Parker Hannifin Corporation )
successor in interest to )
Sinclair-Collins and Parker Packing Division )
6035 Parkland Blvd. )
Cleveland, OH 44124 )
)
RADIATOR SPECIALTY COMPANY )
600 Radiator Rd. )
Indian Trail, NC 28079-5225 )

5

Rockwell Automation, Inc., and its division )
Allen-Bradley Corporation )
c/o CT Corporation System )
1300 East 9th Street, #1010 )
Cleveland, OH 44114 )
)
SEALITE, INC. )
c/o Mitchell and Courts, LLP )
1001 Marina Village Pkwy, #400 )
Alameda, CA 94501-6401 )
)
J.A. Sexauer, Inc. )
F/K/A: J.A. Sexauer Manufacturing Company )
570 Taxter Road )
Elmsford, NY 10523 )
)
Sepco Corporation )
A California Corporation )
7301 Orangewood Ave. )
Garden Grove, CA 92841-1411 )
)
Borg-Warner Corporation )
A Delaware Corporation )
c/o The Corporation Trust Co. )
Corporation Trust Center )
1209 Orange St. )
Wilmington, DE 19801 )
)
Baltimore Ennis Land Company, Inc. )
a/k/a Belci, f/k/a Gibson Homan's )
c/o CT Corporation System )
1300 E. 9th Street #1010 )
Cleveland, OH 44114 )
)
BW/IP, INC. )
f/k/a BW/IP International, Inc., in its own right and )
as parent corporation to Byron Jackson Pump )
Division )
5215 N. O'Connor Blvd., Suite 2300 )
Irving, TX 75039 )
)
Taco, Inc. )

6

c/o Kyle A. Adamonis )
1160 Cranston Street )
Cranston, RI 02920-7335 )
)
McWane, Inc. )
In its own right and as successor in interest to )
Clow Valve Co. and Yeomans Pump; )
c/o The Corporation Trust Company )
1209 Orange Street )
Wilmington, DE 19801-1196 )
)
Illinois Tool Works, Inc. )
Individually and Successor in Interest to )
Devcon Corporation )
30 Endicott Street )
Danvers, MA 01923 )
)
ITT CORPORATION f/k/a ITT INDUSTRIES, INC)
Individually and as successor To Grinnell and )
Bell & Gosset Pumps )
1133 Westchester Avenue )
White Plains, NY 10604 )
)
General Electric Company )
c/o CT Corporation System )
1300 East Ninth Street, Suite 1010 )
Cleveland, OH 44114 )
)
RSCC WIRE & CABLE, INC. )
f/k/a Rockbestos Suprenant Cable )
Corporation and as successor in in interest to Cerro )
Corporation and Cerro Wire and Cable Company )
c/o United States Corporation Company )
50 West Broad Street, Suite 1800 )
Columbus, Ohio 43215 )
)
CARVER PUMP COMPANY )
2415 Park Avenue )
Muscatine, IA 52761-5691 )
)
Burnham LLC )
1239 Harrisburg Ave )
Lancaster, PA 17604-3939 )
)
Hydrotherm Inc. )

7

15114 Oak Canyon Rd. )
Poway, CA 92064 )
)
MESTEK INC. )
Individually, and as Successor in Interest to )
HydroTherm National Corporate Research Ltd. )
10 Milk Street, Suite 1055 )
Boston, MA 02108 )
)
Pecora Corporation, Individually and as )
Successor to Pecora Corporation, New )
Pecora Corporation, and New Pecora )
Corporation, Inc. )
165 Wambold Rd. )
Harleysville, PA 19438 )
)
Rite Engineering & Manufacturing Corp. )
5832 Garfield Ave. )
Commerce, CA 90040 )
)
Lochinvar, LLC )
FKA Lochinvar Corporation )
300 Maddox Simpson Pkwy. )
Lebanon, TN 37090 )
)
Rheem Manufacturing Company )
Individually, as Successor in Interest to Ruud )
Manufacturing Company and Richmond Radiator )
Company )
1100 Abernathy Road, Suite 1400 )
Atlanta, GA 30328 )
)
AMTROL Inc. )
1400 Division Road )
West Warwick, R.I. 02893 )
)
Spirax Sarco Inc. )
1150 Northpoint Blvd. )
Blythewood, SC 29016 )
)
CLYDE UNION INC )
FKA Union Pump Company )
C/O Christina Corrett )
4600 W DICKMAN RD )
BATTLE CREEK, MI 49037-7325 )

8

```
                                                    )
VIKING PUMP INC                                     )
A UNIT OF IDEXCORP                                  )
406 STATE STREET                                    )
CEDAR FALLS, IA 50613                               )
                                                    )
Eaton Corporation, Individually and as              )
SUCCESSOR IN INTEREST TO CUTLER                     )
HAMMER AND VICKERS INC                              )
1111 Superior Ave.                                  )
Cleveland, OH 44114                                 )
                                                    )
Nash Engineering Company                            )
9 Trefoil Drive                                     )
Trumbull, CT 06611                                  )
                                                    )
Spence Engineering Co. Inc.                         )
150 Coldenham Rd.                                    )
Walden, NY 12586                                    )
                                                    )
NIBCO INC.                                          )
1516 Middlebury Street                              )
Elkhart, IN 46516-4740                              )
                                                    )
J-M Manufacturing Company, Inc.                     )
Csc-Lawyers Incorporating Service                   )
50 West Broad Street, Suite 1800                    )
Columbus, OH 43215                                  )
                                                    )
ALSCO, INC., Individually and as Successor to       )
NATIONAL SERVICE INDUSTRIES, INC.,                  )
and as Successor in Interest to                     )
NORTH BROTHERS, INC.                                )
4111 Pleasantdale Road                              )
Doraville, GA 30340                                 )
                                                    )
NATIONAL SERVICE INDUSTRIES, INC.,                  )
Individually and as Successor in Interest to        )
NORTH BROTHERS, INC.                                )
4111 Pleasantdale Road                              )
Doraville, GA 30340                                 )
                                                    )
CBS Corporation, Individually and as Successor      )
In Interest to Westinghouse Electric Corporation    )
Csc-Lawyers Incorporating Service                   )
```

9

50 West Broad Street, Suite 1800 )
Columbus, OH 43215 )
  )
A.W. Chesterton Company )
500 Unicorn Park Drive )
Woburn, MA 01801-3345 )
  )
CHAMPLAIN CABLE CORPORATION, )
as successor-in-interest to Hercules Inc. )
175 Hercules Drive )
Colchester, Vermont 05446 )
  )
Crown Cork and Seal Company, Inc., Individually )
And as Successor to Mundet Cork Corporation )
One Crown Way )
Philadelphia, PA 19154 )
  )
Trane U.S., Inc., individually and as successor in )
In interest to American Standard, Inc. )
c/o Statutory Agent )
C.T. Corporation System )
1300 E. Ninth St., #1010 )
Cleveland, Ohio 44114 )
  )
LOFTUS ENGINEERING CORPORATION )
C/O C.T. Corporation System )
1515 MARKET ST, STE 1210 )
Philadelphia PA 19102 )
  )
Elliott Turbomachinery Co., Inc. )
c/o Corporate Trust Systems )
111 8th Avenue, 13th Floor )
New York, New York 10011 )
  )
IMO Industries, Inc., f/k/a Delaval, Inc. )
Corporation Service Company )
2711 Centreville Road )
Wilmington, Delaware 19809 )
  )
Rapid-American Corporation, in its )
Own Right and as Successor in Interest )
to and liable for Philip Carey Corporation )
2711 CENTERVILLE RD., SUITE 400 )
WILMINGTON, DE 19808-0000 )
  )

Square D Company                              )
CSC Lawyers Corporation Service               )
50 West Broad Street, Suite 1800              )
Columbus, OH 43215                            )
                                              )
VELAN VALVE CORPORATION                       )
94 Avenue C                                   )
Williston, VT 05495                           )
                                              )
WEIR VALVES & CONTROLS USA, INC. f/k/a        )
ATWOOD & MORRILL                              )
285 Canal Street                              )
Salem, MA 01970                               )
                                              )
THE WILLIAM POWELL COMPANY                    )
c/o Statutory Agent                           )
D.R. Cowart                                   )
2503 Spring Grove Ave.                        )
Cincinnati, OH 45214                          )
                                              )
YORK INTERNATIONAL CORPORATION                )
C.T. Corporation System                       )
1300 E. Ninth St., #1010                      )
Cleveland, Ohio 44114                         )
                                              )
JOHN DOES, 1 through 100, inclusive           )
Manufacturers, Sellers, or Installers of      )
Asbestos and Asbestos-Containing Products     )
(Names & Addresses Unknown),                  )
                                              )
                                              )
            Defendants                        )

## PLAINTIFFS' COMPLAINT AND JURY DEMAND

1.  Plaintiff Karen McVay, Individually and as Executrix of Carl L. Wiehe ("Decedent),

is a resident of the State of Ohio. Plaintiff Karen McVay is Decedent's one and only child. On or

about June 21, 2011 Plaintiff's decedent passed away from mesothelioma.

2.  Plaintiffs are informed and believe that Defendants are corporations organized and

existing under the laws of the State of Ohio, or of some other state of the United States of America,

11

or of some foreign jurisdiction, and that said Defendants are conducting and have regularly conducted, business in the State of Ohio. Each Defendant used, manufactured, supplied and/or distributed asbestos in the State of Ohio, or other states in such a manner that caused injury to Plaintiff's Decedent. John Does 1-100 are manufacturers, installers, and/or sellers of asbestos products or asbestos who are unknown to Plaintiff at this time.

3. Upon information and belief, Plaintiffs' Decedent was exposed to asbestos while working for the Cincinnati Gas & Electric, The U.S Navy, and other places in the State of Ohio and/or other States in the United States of America.

4. At all times mentioned herein, Defendants were the agents, servants, employees, and/or joint ventures of their Co-Defendants and were acting within the scope, course, and authority of said agency, employment, and/or joint venture. Each Defendant ratified and approved the acts of its agents, servants, employees, and/or joint ventures, and was responsible in some manner for the injuries and damages to Decedent as set forth hereinafter.

5. At all times mentioned herein, Defendants were and are engaged in the business of manufacturing, fabricating, designing, using, assembling, distributing, leasing, buying, selling, inspecting, installing, servicing, repairing, marketing, and/or advertising asbestos and/or other products or components of products containing asbestos. Defendants owed Plaintiff's Decedeny a duty to conduct their business with due care for Plaintiff's safety.

6. Plaintiffs hereby disclaim any cause of action or claim for recovery that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. § 1442, subdivision (a)(1) (federal officer). Specifically, Plaintiff disclaims any cause of action or claim for recovery based on any exposure to asbestos on land that is, or was, a "federal enclave" pursuant to Article I, section 8, clause 17 of the United States Constitution. Finally, to

12

the extent that Plaintiff was exposed to asbestos aboard a vessel of the United States Navy, Plaintiffs' product liability claims are based solely on the failure to warn, and not on any defects in design.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

8.     Plaintiff re-alleges and incorporates each and every paragraph set forth above, as though fully set forth herein.

9.     Plaintiff's Decedent used, handled, and was otherwise exposed to asbestos and/or asbestos-containing products of one, all, or a combination of Defendants for a substantial period of years, in a manner that was reasonably foreseeable to Defendants, while on the premises of his employers or work sites during his respective periods of employment and at other times.

10.     Within two years prior to the filing of this Complaint, Plaintiff and Plaintiff's Decedent, learned for the first time, as a result of medical examinations, that Decedent's exposure to Defendants' products or premises had directly and proximately caused him to suffer from some form of disease or disability associated with exposure to asbestos and/or asbestos-containing products of the Defendants or on the Defendants' premises. As a direct and proximate result of said exposure, Plaintiff's Decedent sustained permanent and serious injuries to his body, lungs, respiratory system, and cardiovascular system, suffered pain and suffering, was unable to perform life sustaining activities and incurred medical bills for his care and treatment.

12.     Defendants knew, or in the exercise of reasonable care should have known, that their products or premises were and are unreasonably harmful to the body, lungs, respiratory system, and cardiovascular system of any person installing, handling, and/or working with or around Defendants' asbestos products or asbestos-containing products located on Defendants'

13

premises, and of any person or family member of any person in the immediate vicinity of the products installation, handling, and use.

13.     Defendants negligently researched, tested, used, manufactured, designed, developed, distributed, labeled, advertised, marketed, inspected, repaired, modified, serviced, installed, and/or sold the asbestos and/or asbestos-containing products to which Plaintiff was exposed.

14.     As set forth above, Plaintiff's Decedent injuries and damages were directly and proximately caused by the negligence of each Defendant and by each Defendant's:

    a.     negligent failure to adequately warn Decedent of the dangers and harms inherent in the exposure to its products and the products on its premises;

    b.     negligent failure to coat, treat, encapsulate, or otherwise process, package, or label its products and/or the products on its premises so as to prevent the generation of particulates and dust which are unreasonably dangerous to persons exposed to such products;

    c.     negligent failure to specify, recommend, supply, install, sell, and use readily available substitutes for their unreasonably dangerous products and/or products on its premises that would not pose hazards to human health;

    d.     negligent failure to warn and protect its employees and frequenters of its business premises from the dangers of exposure to asbestos and asbestos-containing products that were present on its premises;

    e.     negligent failure to warn Decedent of the dangers of exposure to its asbestos products and asbestos-containing products that were present on

14

its premises and the dangers that such products posed to household members.

15. As a direct and proximate result of the conduct of one, all, or a combination of the Defendants, Plaintiff's Decedent sustained permanent injuries to his person and body, lungs, respiratory and cardiovascular system, suffered great physical, mental, and nervous pain and suffering, mental anguish, was unable to perform life sustaining activities and suffered from reasonable and justifiable fears of progressive and irreversible incapacity, increasing discomfort, cancer, shortened life-span, impairment to his quality of life, and mesothelioma.

16. As a direct and proximate result of the Defendants' conduct, Plaintiffs have incurred medical, hospital, professional, and incidental expenses, and has been prevented from attending to his usual activities. Plaintiffs believe and therefore aver that Plaintiff's' injuries are permanent in nature.

## SECOND CAUSE OF ACTION
### (STRICT LIABILITY)

17. Plaintiffs re-allege and incorporate each and every paragraph set forth above, as though fully set forth here.

18. Plaintiffs state there was, in fact, a defect in the asbestos-containing products manufactured, sold, distributed, marketed, supplied, advertised, designed, developed, labeled, researched, and/or installed by the Defendants.

19. Plaintiffs state that the aforementioned defect(s) was/is dangerous to the health and well being of the Plaintiff and others exposed to such products and that such defect existed at the time the products left the Defendants' hands.

15

20. Plaintiffs state that the aforementioned defect(s) was/is dangerous to the health and well being of Plaintiff and others exposed to such products and that such defect was the direct and proximate cause of Plaintiff's injuries and/or losses as described above.

21. Defendants researched, tested, manufactured, designed, developed, distributed, labeled, advertised, marketed, inspected, repaired, modified, used, serviced, installed, and sold to the public, Plaintiff's employers, and to others working in the vicinity of Plaintiff, asbestos and asbestos-containing products, and Defendants knew that these products would be used and handled by Plaintiff and others similarly situated without any knowledge of their defects and inherent danger, and without any inspection for defects and dangers.

22. Plaintiff, in the course and scope of his employment and otherwise, used, handled, and was otherwise exposed to asbestos and asbestos-containing products, sold or otherwise supplied by Defendants, without receiving any warnings from Defendants of the defects and inherent dangers of the products.

23. The products which were sold and/or supplied by Defendants, and to which Plaintiff was exposed, were defective and unsafe for their intended uses and purposes in that they were more dangerous than what an ordinary consumer or user would expect and the risks incident to the use of the products outweighed any benefits of the products' utility.

24. As a direct and proximate result of the defective condition of these products, Plaintiffs have been injured and damaged.

16

### THIRD CAUSE OF ACTION
### (BREACH OF EXPRESS WARRANTY)

25.    Plaintiffs re-allege and incorporate each and every paragraph set forth above, as though fully set forth herein.

26.    Defendants expressly warranted the asbestos products and/or asbestos-containing products they manufactured, sold, or supplied, and to which Plaintiff was exposed, were reasonably fit for their intended uses without endangering human life and safety.

27.    Defendants breached these express warranties, in that their asbestos products and asbestos-containing products were defective and dangerous to reasonably foreseeable users like Plaintiff who was exposed to these products.

28.    Plaintiffs did rely upon the express warranties and representations of Defendants regarding the fitness and safety of their products, and as a result, used, handled, and were otherwise exposed to these products.

29.    As a direct and proximate result of the Defendants' breach of their express warranties, Plaintiffs were and are permanently injured and damaged.

### FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTY)

30.    Plaintiffs re-allege and incorporate each and every paragraph set forth above, as though fully set forth here.

31.    Defendants impliedly warranted that the asbestos products and asbestos-containing products they sold or supplied, and to which Plaintiff was exposed, were of merchantable quality, reasonably safe, and reasonably fit for use in a work place environment for the particular purposes for which they were sold or supplied, without endangering human life and safety.

17

32. Defendants breached these implied warranties of merchantability, safety, and fitness for a particular purpose because Defendants' asbestos products and/or asbestos-containing products were defective and dangerous to reasonably foreseeable users and consumers like Plaintiff.

33. Plaintiff did rely upon Defendants' implied warranties and representations regarding their asbestos products and/or asbestos-containing products, and as a result used, handled, and were otherwise exposed to these products.

34. As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs were and are permanently injured and damaged.

## FIFTH CAUSE OF ACTION
## (STATUTORY PRODUCTS LIABILITY)

35. Plaintiffs re-allege and incorporate each and every paragraph set forth above, as though fully set forth here.

36. Plaintiffs bring this claim for relief against Defendants and John Does 1-100 and their predecessors in interest for product liability under Ohio Revised Code Section 2307.71, et seq. At all times pertinent hereto the aforementioned Defendants and John Does were "manufacturers" and "suppliers" of asbestos and asbestos as those terms are defined under Ohio Revised Code Section 2307.71.

37. "The Products" as manufactured and supplied by the aforementioned Defendants and John Does were defective in manufacture and construction as described in Ohio Revised Code Section 2307.73, were defective in design or formulation as described in Ohio Revised Code Section 2307.75, were defective due to inadequate warnings and instructions as described in Ohio Revised Code Section 2307.76, and were defective because they did not conform to

representations made by their manufacturers and suppliers as described in <u>Ohio Revised Code</u> <u>Section 2307.77.</u>

38.     Each of the defective conditions of "the Products" as described above, pursuant to <u>Ohio Revised Code</u>  Section 2307.73, were singularly a proximate cause of the harm for which Plaintiffs seek to recover compensatory damages as previously set forth. Furthermore, each of the aforementioned Defendants are liable as if they were the manufacturers in accordance with <u>Ohio Revised Code</u> Section 2307.78.

## SIXTH CAUSE OF ACTION
## (PUNITIVE DAMAGES)

39.     Plaintiffs re-allege and incorporate each and every paragraph set forth above, as though fully set forth here.

40.     Plaintiffs are informed and believes that Defendants and their predecessors in interest researched, tested, manufactured, labeled, marketed, used, distributed, and sold their asbestos and asbestos-containing products with conscious disregard for the safety of Plaintiffs and other users of said products, in that said Defendants had specific prior knowledge that there was a high risk of injury or death resulting from exposure to their products or products on their premises, including but not limited to lung cancer, mesothelioma, other forms of cancer, and asbestosis. Said knowledge was obtained, in part, from scientific studies and medical data to which Defendants had access, as well as scientific studies performed by, at the request of, or with the assistance of Defendants, and which knowledge was obtained by Defendants during the time they manufactured, distributed, used, or sold their products.

41.     During the time Defendants manufactured, distributed, used, or sold their products, Defendants were aware that Plaintiff and other members of the general public who

19

would use or be exposed to their products had no knowledge or information that the products could cause injury. Further, Defendants knew that Plaintiff and the general public who used or were exposed to these products would, and in fact did assume their exposure to the products was safe, when in fact it was extremely hazardous to human life.

42. Despite this knowledge, Defendants opted to manufacture, distribute, use, and sell asbestos and asbestos-containing products without protecting and/or warning Plaintiff and other users of the high risk of injury and death that resulted from exposure to these products. Rather than protecting and/or warning Plaintiff and other users of these dangers, Defendants actively concealed their knowledge from Plaintiff, Plaintiff's employers, and members of the general public. By their acts and/or omissions, Defendants implied their asbestos and asbestos-containing products were safe for all reasonably foreseeable use. Defendants' implications were particularly egregious because they were aware the implied representations were false. Defendants' conduct exemplifies their conscious disregard of the rights and safety of Plaintiff and the general public as a whole.

43. Defendants were motivated by their financial interests in the uninterrupted distribution, use, and marketing of their asbestos and asbestos-containing products. In furtherance of this financial motivation, Defendants consciously disregarded the safety of Plaintiff and other users of their asbestos and asbestos-containing products, and were willing to permit their asbestos and asbestos-containing products to cause injury to Plaintiff, and other frequenters, users, and bystanders.

44. Defendants' conduct was and is willful, malicious, outrageous, indifferent, and in conscious disregard of the safety of Plaintiff and other users of their asbestos and asbestos-containing products. Therefore, Plaintiffs seek punitive damages to punish and deter Defendants.

20

## SEVENTH CAUSE OF ACTION
## (LOSS OF CONSORTIUM)

45.     Plaintiffs reallege and incorporate each and every paragraph set forth above, as though fully set forth here.

46.     Plaintiffs have suffered a loss of consortium and has been deprived of the society, companionship, and assistance of Decedent who was exposed to the asbestos or asbestos containing products as described above, and further that said loss is the direct and proximate result of the acts and/or omissions of the Defendants as described above

## EIGHTH CAUSE OF ACTION
## Wrongful Death

47.     Plaintiff states that they became aware of the fact that Decedent, passed away as a direct and proximate result of an asbestos-related and/or caused disease within two (2) years of the filing of this complaint.

48.     As a direct and proximate result of the negligent acts and/or omissions of the Defendants as described above, decedents, their spouses, families and estates have incurred reasonable and necessary medical and funeral expenses.

49.     As a direct and proximate result of the wrongful death of Plaintiff's Decedent, their families and survivors have lost their support, services and society, companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education and inheritance and were further caused extreme mental and emotional anguish as a result of their deaths. The family and survivors of Decedents expect to continue to suffer severe mental anguish and emotional distress indefinitely into the future.

WHEREFORE, Plaintiffs demand judgment joint and severally against each Defendant on all causes of action in an amount greater than Twenty-Five Thousand Dollars

21

Respectfully submitted,

THE MISMAS LAW FIRM, LLC

/s/ John D. Mismas
John D. Mismas (0077434)
The Mismas Law Firm, LLC
38118 Second Street
Willoughby, Ohio 44094
Toll Free: (855) 556-2500
Local: 440-527-8602
Cell: 440-463-0676
Fax: 440-306-2609
www.mismaslawfirm.com

## JURY DEMAND

Plaintiffs, by and through counsel, demand a trial by jury of the instant action.

/s/ John D. Mismas
JOHN D. MISMAS (0077434)

**ATTORNEY FOR PLAINTIFFS**

STATE OF CALIFORNIA   )
                             )

COUNTY OF SANTA CLARA   )

### AFFIDAVIT OF JAMES M. GATE

     I, James M. Gate, being under penalty of perjury, declare and say:

1.     I am the former manager of Design Verification of the Marine Division of Westinghouse Electric Corporation ("Westinghouse"), located in Sunnyvale, California.

2.     I joined Westinghouse in 1953, immediately after receiving a Bachelor of Science degree in Marine Engineering from the United States Merchant Marine Academy at King's Point, New York. Except for the period of 1971 to 1976, I was involved in marine engineering during my entire career at Westinghouse and, during that time, was stationed principally at Westinghouse's Marine Division, initially in Lester, Pennsylvania and subsequently in Sunnyvale, California. My work involved both United States Navy ("Navy") and Merchant Marine vessels. I retired from Westinghouse in December 1994.

3.     I submit this affidavit to attest to the level of supervision and control exercised by the Navy and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by Westinghouse of turbines, turbine-generators, propulsion equipment, and auxiliary equipment intended for installation on Navy vessels generally.

4.     I am personally familiar with the extent of the Navy's control over the design and production of such equipment as a general matter because I personally participated in the design, manufacture, testing, and sea trials of Westinghouse's Navy equipment and personally interacted with the Navy's machinery inspectors – officers such as Capt. A. L. Rosenstein and Capt. O. Earle, Chief INMs formerly stationed at Westinghouse's Lester, Pennsylvania plant. As test engineer at Westinghouse's Lester plant, I also interfaced with Navy Inspector James Moodie. At the Navy Bureau of Ships, ("BuShips") and its successor, Naval Sea Systems Command ("NAVSEA") (hereinafter referred to collectively as "NAVSEA"), I would meet with the Head of the Navy's Steam Turbine Branch, Turbine & Gear Desk, Howard Ball, to discuss the Navy's requirements for turbines to be built by Westinghouse. Under the authority of the Turbine & Gear Desk were the Navy's Main Turbine Section and Auxiliary Turbine Section. Other Westinghouse personnel and I worked under the direction of Walter Sharp in the Main Turbine Section. We also worked under the direction of Robert Trout in the Navy's Auxiliary Turbine Section, a division of the Turbine & Gear Desk until 1982, when it was folded into the Main Turbine Section. Mr. Trout wrote the Navy's turbine generator and auxiliary steam turbine specifications for several Navy vessels.



1

5.     Westinghouse made and supplied turbines, turbine-generators, propulsion equipment, and auxiliary equipment for use aboard Navy ships under contracts between Westinghouse and the constructing shipyards and/or the United States of America, specifically the Navy Department, which administered such contracts through NAVSEA, which acted under authority of the Secretary of the Navy. From World War II forward, the contracts for equipment orders Westinghouse received were "rated orders" containing priority clauses. Under rated order contracts, Westinghouse was compelled to prioritize Navy contracts by performing at dictated schedules even to the extent of breaking commitments to other customers. Attached hereto as Exhibits 1 through 4 are true and correct copies of exemplar Navy contracts demonstrating priority ratings for Westinghouse purchase orders during and following World War II.

6.     NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed regulations and specifications for all shipboard equipment, and its officers supervised, enforced, and approved the vendor's compliance with the plans, regulations and specifications. Changes to the plans and specifications could only be authorized by the Navy through one of its officers. Westinghouse's production of turbines, turbine-generators, propulsion equipment, and auxiliary equipment for Navy vessels was immediately supervised by the INM, a naval officer subordinate to various levels of command within NAVSEA. The INM, who worked on-site at Westinghouse's Marine Division plants in Lester, Pennsylvania and Sunnyvale, California, exercised immediate, direct and detailed control over all aspects of Westinghouse's production of turbines, turbine-generators, propulsion equipment, and auxiliary equipment for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications.

7.     All aspects of the design, performance requirements, and materials used for the construction of main propulsion turbines, turbine generators and related equipment, including thermal insulation, were specified by NAVSEA, which acted under authority of the Secretary of the Navy. Compliance with the specifications, which could not be changed without direct approval of Auxiliary Turbine Section personnel, was directly enforced at Westinghouse's plant by the INM, although the Turbine & Gear Desk officials ultimately controlled these details.

8.     Military specifications affirmatively required the use of asbestos-containing thermal insulation in relation to that equipment. I can attest that, as a general rule, Westinghouse did not supply thermal insulation. With rare exception, the Navy or its contract shipbuilder provided the thermal insulation to be used with the Westinghouse equipment aboard Navy ships.

9.     Westinghouse, during all aspects of its turbine, turbine-generator, propulsion equipment, and auxiliary equipment work (i.e., design, manufacture, testing and sea trials) for Navy vessels performed such work under immediate supervision by the Navy through NAVSEA officers, regardless of whether the construction of the particular vessel in question was to occur at a shipyard owned and operated by the Navy (a "Navy shipyard") or at a private or civilian shipyard which contracted with the Navy to construct

2

Navy vessels (a "contract shipyard"). This supervision and control was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Westinghouse's work by ship design engineers and machinery specialists employed by the Navy. The chain of Navy authority between Westinghouse and the Secretary of Navy was multi-tiered and staffed by officers of varying levels of responsibility, and virtually no aspect of the development, manufacture, and testing of such equipment escaped this close control.

10.     Before the construction of a particular Navy vessel, an extensive set of General Specifications for Navy ships – as well as Navy specifications or military specifications known as "MilSpecs" – were already in place which governed all aspects of the ship's construction. The specifications totaled tens of thousands of pages, governed all aspects of a vessel's design and construction, and specified the materials to be used, including asbestos-containing thermal insulation.

11.     The Navy specifications for the main propulsion turbines and related equipment and turbine generators supplied by Westinghouse for use aboard Navy ships incorporated several lower-level specifications, including those governing the components or materials used for or with such equipment – items such as metals, bearings, packing, gaskets, insulation, etc. Particularly through the early 1970s, some of these specifications required the use of asbestos-containing materials, such as thermal insulation, in conjunction with Westinghouse Navy equipment.

12.     By way of specific example, a more detailed description of the design and production of Westinghouse turbines for use aboard Navy vessels – whether constructed at a Navy shipyard or at a contract shipyard – provides an illustrative example of the level of detailed supervision and control exercised by the Navy over its equipment suppliers such as Westinghouse.

13.     The turbines manufactured and supplied by Westinghouse for use aboard any Navy vessel were required to meet detailed and precise Navy specifications. Additionally, each such turbine was specifically designed for the vessel or class of vessels in question. In other words, the turbines for a vessel or class were not interchangeable, but were, instead, custom built – i.e, they were not "off the shelf" products.

14.     NAVSEA developed the initial conceptual design for all classes of naval vessels. By the time an outside design consultant began to participate in the design phase of a new turbine, the Navy had specified at least the weight, size, power output, speed, and other design parameters of that turbine.

15.     In the design phase of a turbine project, as in all other phases, the Navy retained ultimate decision authority over the design of the turbines. If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express Navy approval and adoption.

3

16.     Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype vendor would begin tooling and construction under continuing Navy supervision and oversight. During manufacture of a turbine at sites such as Westinghouse's former Lester, Pennsylvania facility, the Navy had an on-site INM. In the 1950s and 1960s, the INM was typically a Naval Captain (the rank immediately below Admiral). Captains Rosenstein and Earle noted above, are examples. In later years, the INM was typically a Commander (the rank immediately below Captain). The INM was on-site full time in a separate set of offices called the Defense Contract Management Office. Later, after Westinghouse transferred its turbine manufacturing operations to its plant in Sunnyvale, California, the INM worked on-site in Sunnyvale. Frequently, Westinghouse engineers such as myself dealt directly with the Navy's Main Turbine and Auxiliary Turbine sections in Washington, D.C. A number of Navy civilian employees, including inspectors and engineers, supported the INM on site. At the Lester facility, for example, the INM's staff would typically include more than ten full-time civilian Navy inspectors and several mechanical engineers. One of the individuals who supervised Westinghouse's work was James Moodie, noted above. All members of the INM staff were Navy employees and had access to all areas of the production facility at all times.

17.     During the construction of the prototype turbine, all drawing approvals and any report of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

18.     Many steps of the production process required in-process testing. For example, all welds were tested. All weld testing reports were reviewed and approved by the INM on site. The INM also approved the procedures used to test welds. Similarly, other test results (e.g. balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM. Any reports which resulted in the replacement of a component part were also sent to NAVSEA, the Department of the Navy in Washington, D.C., for its review and approval.

19.     Before shipment, the turbine typically was tested at the site of manufacture. A detailed test agenda for on-site testing was approved by the Navy. The agenda included tests for power output at various levels of steam pressure, vibration and noise tests, bearing temperature tests and the like. The test agenda was then conducted on the turbine. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him. The manufacturer then prepared a final report on the prototype turbine, including all test reports. This final report then was submitted for approval by the on-site INM. Following INM approval, the final report was forwarded to NAVSEA in Washington, D.C., where further approval was required before the manufacturer could ship the turbine.

20.     Following the completion of the test agenda, the turbine was typically fully disassembled and inspected. This disassembly and inspection was carried on in the personal presence of the on-site INM. One or more of the INM's mechanical engineers would also attend the disassembly inspection. Any abnormalities discovered at this point

would lead to rejection of the turbine or to modifications and re-testing. A report of each tear down was prepared and was then approved and signed by the INM.

21. Paralleling the manufacture of the prototype, the Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit. The resulting quotations would then be subject to a similar review as that described above with respect to the prototype unit, including quotation review meetings. Approval of the quotation would eventually be given to one or more vendors. Often two or more vendors were selected to supply production units. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

22. The manufacturing process for the production units then proceeded under the same level and intensity of Navy supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers as described above, would oversee and approve virtually every aspect of the manufacture and testing of the turbine. As before, a test agenda for the production units was approved by the Navy and all reports from the tests were approved by the on-site INM. Following the completion of the test series, each individual turbine was fully torn down in the presence of mechanical engineers working for the INM. Any abnormalities were noted and resolved. A final report was prepared for each individual turbine, incorporating these test reports, and was approved both by the on-site INM, headed up by Captain Rosentein and by the Department of the Navy in Washington, D.C., Robert Trout. Re-assembly of each turbine was then approved by the Navy civilian inspectors, headed up by James Moodie, prior to shipment.

23. The first production unit was then shipped to the Navy or contract shipyard with construction responsibilities for the first vessel. The turbine was typically installed by shipyard personnel acting under supervision of engineers from the Supervisor of Shipbuilding, who was subordinate to the Commander of Naval Sea Systems. Typically, the involvement of the turbine vendor at this stage of the process (i.e., from delivery of the turbine to completion of the sea trials) was the presence on-site of an engineer acting in liaison and troubleshooting capacity.

24. Once the turbine was installed, it was typically tested in place by the shipyard using an artificial load and under less than full power. This testing was reviewed and approved by Navy personnel at the shipyard. Any deficiencies discovered at this stage were required to be remedied by Westinghouse.

25. Once the ship was launched and outfitted, sea trials followed. The first test was called the "builder's trial" and was conducted by the shipyard using its personnel with senior Navy personnel on board for observation and approval. Representatives from the major component vendors would also attend such trials. (I have participated personally on two occasions as the Westinghouse turbine representative on the builder's trial on the initial vessels of a new class.)

5

26. Following successful completion of the builder's trials, the Navy would conduct its own sea trial, called an "acceptance trial." Acceptance trials were fully conducted and staffed by Navy officers, civilian employees and crew, with shipyard and manufacturers' representatives along to observe. As before, any deficiencies discovered in the turbine during acceptance trials would be the responsibility of Westinghouse to correct.

27. Following the acceptance trials, the vessel was commissioned and would typically embark on a "shakedown cruise." During this cruise, the operation of all components of the vessel were further evaluated and tested under the widest possible range of operating conditions.

28. During the launching, outfitting, and sea trials of the first vessel in the new class, other vessels in the class may be under construction on a trailing schedule. Each and every vessel would go through essentially the same construction, inspection, testing, sea trials, and shakedown procedure as described above for the first vessel for the class.

29. All Westinghouse Navy equipment, including the main propulsion turbines and related equipment and turbine generators supplied by Westinghouse was built in accordance with the Navy specifications in existence at the time and was approved and accepted by the Navy as being in accordance with those specifications.

30. Westinghouse and its employees ordinarily would have had no substantive contact with Navy sailors or Navy civilian employees who were assigned to work aboard vessels for which Westinghouse supplied equipment following the Navy's acceptance of such vessels. With regard to any contact between Westinghouse and Navy, Navy shipyard, or contract shipyard personnel during the initial construction of a Navy vessel, the Navy established and enforced precise chains of communication between Westinghouse and such personnel that Westinghouse was required to follow. Westinghouse was not authorized to discuss safety issues (or any substantive issues) with such personnel except with the prior express permission of the Navy.

31. Regardless of whether a particular Navy vessel was constructed at a Navy shipyard or at a contract shipyard, the Navy had precise specifications as to the nature of any communication affixed to equipment supplied by Westinghouse to the Navy. Westinghouse would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to affix any type of warning or caution statement to equipment intended for installation onto a Navy vessel, beyond those required by the Navy, without prior discussion with, and approval by, the Navy.

32. Similarly, regardless of whether a particular Navy vessel was constructed at a Navy shipyard or at a contract shipyard, the Navy had precise specifications as to the nature of written materials to be delivered with its turbines, turbine-generators, propulsion equipment, and auxiliary equipment which included engineering reference materials to assist the engineering staff to service and maintain the turbines, which could

6

generically be called "instruction books" or "technical manuals." The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. These manuals included safety information to the extent – and only to the extent – directed by the Navy.

33. Some naval equipment, such as main reduction turning gears, have warning or caution plates, which are in a standardized format and set by the Navy. Both under the specifications and regulations, and in practice, the Navy had ultimate control over the nature of the warnings communicated to Navy, Navy shipyard and/or contract shipyard personnel in relation to shipboard equipment and materials.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Executed this day _____ 23 _____ day of November, of 2010.

_signature_
JAMES M. GATE

THE STATE OF CALIFORNIA            §
                                   §
COUNTY OF SANTA CLARA              §

Personally appeared before me this _____ 23^ord _____ day of _____ NOV _____, 2010,
James M. Gate, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this _____ 23^ord _____ day of _____ NOV _____, 2010.

My Commission expires: _Sep. 26, 2013_

State of CA
County of Santa Clara } ss.
        JURAT
Subscribed & sworn before me on this 23^ord day of NOV 2010
By JAMES M. GATE
        proved to me on the basis of
Satisfactory evidence to be the person who appeared before me
        Rajwinder kaur
        NOTARY PUBLIC

_Rajwinder Kaur_

Notary Public

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

In Re: Asbestos Products Liability          )          Civil Action No. MDL 875
    Litigation                              )
                                            )
All Actions                                 )

## **AFFIDAVIT OF ROGER B. HORNE JR. RADM USN (RET)**

1.      I am a retired Rear Admiral of the United States Navy, in which I served
between 1956 and 1991. I began my Navy Career in 1956, immediately after receiving a
Bachelor of Science degree in Naval Engineering from the Unites States Naval Academy
at Annapolis, Maryland. I have also received extensive post-graduate education in naval
engineering, including a Master of Science Degree in Mechanical Engineering from the
U.S. Naval Postgraduate School, and have taught Naval Engineering as a Visiting
Professor at the University of Michigan. Throughout my Navy career, I concentrated in
areas of ship design, engineering, construction, overhaul and inspection. Ultimately, I
achieved the rank of Chief Engineer and Deputy Commander, Naval Sea Systems
Command ("NAVSEA") for Ship Design and Ship Systems Engineering. Prior to that, I
served as Deputy Commander, NAVSEA for Facilities and Industrial Management;
Commander, Puget Sound Naval Shipyard; Commander, Engineering Duty Officer
School; Production and Repair Officer, Mare Island Naval Shipyard; Nuclear
Engineering Manager, Puget Sound Naval Shipyard; Nuclear Submarine Inspection
Officer, Supervisor of Shipbuilding Office, Ingalls Shipyard and Chief Engineer in the
USS Ozbourn (DD 846).

I have been involved in the construction or overhaul of over 80 ships and submarines and
served at sea. I am proud that these vessels have performed many activities vital to the
national defense. Examples of these activities during my tenure include at sea task force
operations following the Korean war while doing joint operations with ships of the
Southeast Asia Treaty Organization ("SEATO"); shipyard positions including command
with significant responsibilities concerning vessels with vital missions during the Cold
War and Viet Nam war, as well as, senior positions later in my career with significant

1



responsibility concerning the overall management of industrial facilities in both private and public shipyards as well as the design of new ships.

2. While in the Navy, I was recognized for achievements in the field of marine machinery and engineering, and I have received three National Legion of Merit Awards and three Meritorious Service Awards for Engineering and Industrial Achievement and an award from the Marine Machinery Association.

3. In addition to my training and experience in Navy ship construction as outlined above, upon retirement, I taught part-time at the University of Michigan as a visiting professor in ship construction. Further, in civilian life, I had responsibility for the Marine and Aviation Section at Failure Analysis Associates located in Menlo Park California. On retirement from Failure Analysis Associates I have been involved with many asbestos related legal cases. Exhibit 1 is a true, complete and correct copy of my curriculum vitae.

4. Based on my naval experience and training, general knowledge and review of the materials supplied me, I submit this Affidavit to attest to (a) the Navy's mission and the relevance of equipment design, engineering, construction, repair, overhaul and inspection to that mission; (b) the centrality of equipment and materials such as propulsion turbines, turbine-generator sets and related equipment ("turbines") and asbestos thermal insulation to the Navy's ability to successfully wage wars in the 20th Century; and (c) the importance of Navy designed and Navy controlled asbestos warning procedures.

5. Stated simply, the mission of the Navy is to win wars, deter aggression and maintain freedom of the seas. In the interests of the national defense, the Navy has four primary areas of responsibility concerning ships and submarines: (1) the design and construction of naval forces necessary for effective prosecution of national defense; (2) the maintenance of naval ships and equipment essential to readiness for naval operations; (3) the development of new equipment and weapon systems; and (4) support for its sailors.

6. The country requires a Navy with offensive capability that can project power to discourage aggressive action by other nations. There is never a time when the Navy is not either engaged in combat or preparing for combat by readying its primary war weapons – ships and sailors – for battle. Even in times of "peace" (when the Country is not officially at war or when ships are not engaged in combat), the Navy provides important combat-related services. For example, Navy submarines patrolling international waters have been credited with assisting in the collapse of Soviet Russia during the nuclear arms race between the United States and Russia commonly referred to as the Cold War.

7. Retaining a trained base of personnel, continually introducing state-of-the-art equipment and materials, and keeping in good repair its ships, aircraft and auxiliary equipment are essential, inextricable aspects of the Navy's national responsibilities. For this reason, the Navy's effort to design, engineer, construct, repair, and inspect its ships, aircraft and auxiliary vessels, whether during operations or in shipyards, was and is critical to the Navy's mission. Without continual training of personnel and construction and repair of its ships and auxiliary equipment, the Navy would not be capable of deterring aggression and fighting wars.

8. The Navy has a chain of command which establishes reporting authority from junior to senior officers and provides for the communication of instruction and orders among Navy personnel. To ensure that all Navy personnel know and understand the chain of command, enlisted personnel are taught it in boot camp and officers learn about it in the Naval Academy and other schools and college programs. This chain of command is crucial to mission success because it provides a single, uniform and effective method of communication. The Navy's chain of command enables the Navy to effectively organize its sailors and prepare them to respond to combat situations and perform a variety of strategic operations at a moment's notice. Obviously discipline is a key element supporting the Navy's mission. Personnel at all levels must be relied upon to carry out the lawful orders of their senior officers. Failure to have this ingrained in the Navy culture would lead to chaos and mission failure in battle.

3

9.      The Navy chain of command concerning ship construction involves several layers of authority related to technical and contractual control over Navy shipbuilding. The Secretary of the Navy has ultimate authority over the Navy and Navy shipbuilding; immediately below the Secretary, as has been the case since the creation of NAVSEA is the Chief of Naval Operations ("CNO") to whom NAVSEA reports. Prior to the establishment of NAVSEA, the Bureau of Ships ("BUSHIPS") controlled all combat ship design and construction and reported to the CNO as well as a civilian Assistant Secretary of the Navy. Since the creation of NAVSEA, NAVSEA reports to the CNO for all military ship design and construction.

10.      The CNO is the top military official in the Navy. The CNO has lead responsibility for all matters of strategy, tactics and operations. Typically, the CNO will identify a threat or a special need, and NAVSEA will design ships and equipment to address the CNO's requirement. Designing a new ship is complex and involves the coordination of many engineering disciplines knowledgeable in the technical state-of-the-art in their individual professional areas. It is easy to understand Navy ships must satisfy a variety of missions and, although some ships can carry out multiple missions, there will be a need for a variety of ships with different designs. Generally the need for ships with specific mission capability will be conveyed to the NAVSEA by the CNO. NAVSEA will respond with concept designs. From this phase NAVSEA will go through a series of design iterations ("design spiral") in coordination with the CNO's staff until finally a detailed and a contract design is reached for the ship. The design will set the needs for turbines along with other equipment and weapon systems. The Navy has its own engineers who specialize in turbines (machinery experts) and who are familiar with the state of the art for commercial turbines. The Navy's machinery experts do not actually design turbines themselves, but they use their expertise to develop a turbine design concept that contemplates emerging technology and new materials, as well as military tactical needs. Once a turbine design concept has been established, the Navy's machinery experts will consult with commercial turbine manufacturers concerning their turbine concept. Through a complex, iterative process the Navy works closely with turbine manufacturers to attain an ultimate turbine design that meets its new military requirements.      The Navy will use previously developed military specifications

4

("MilSpecs"), create any additional specifications that may be required, and then issue a request for bids from qualified contractors in an effort to identify a contractor with the capability and capacity to create a design and to manufacture a turbine that satisfies its new military requirements.

11.    The design of turbines and development of turbine military specifications are essential aspects of the Navy's shipbuilding program. These designs and specifications are built on the totality of the Navy's experience in fighting and planning for wars – what works, what is reliable, operation cycles, maintenance problems, and a multitude of other factors uniquely related to combat conditions. The ultimate design and military specifications for turbines developed by the Navy reflect the existing state-of-the-art and demonstrate the Navy's operational experience in a variety of circumstances. They reflect the turbine design characteristics that directly impact the combat effectiveness of Navy ships and include among many other attributes the following:

a.   Reliability:    Turbines must be designed so that they are efficient and provide reliable power to enable the ships to travel long distances over extended periods without undue maintenance.

b.   Quietness:    Turbines aboard surface ships and, particularly, submarines must operate quietly to help protect the ships from enemy detection.

c.   "Battle" Hardness:    Turbines must be able to withstand the substantial shock sometimes experienced in battle. Material selection under shock requirements often dictates the use of special materials not found in commercial turbines.

d.   Maintainability:    Turbines must be designed so that they can be easily maintained at sea and require infrequent repair and overhaul. Turbines also must be designed so that they are compatible with standardized, replacement parts (consumable items) carried in the Navy's stock system.

12.    Further, regarding the Navy's organization for controlling material as well as ship construction and maintenance, under the command of NAVSEA (as was the case with BUSHIPS) the Navy's shipbuilding structure is comprised of several divisions and levels of authority concerning equipment design, construction, repair and inspection. The

5

Commander of Naval Sea Systems and the Commander of Naval Supply direct technical
and contractual control over shipboard construction, as well as, equipment and material.
Both organizations have oversight responsibility concerning, among other things,
equipment built for Navy vessels, as well as, the Navy vessel itself. Compliance with the
standards and specifications required for ships and equipment built for Navy use was and
is directly monitored by Naval Machinery Inspectors (some specializing in turbines)
under both of these divisions. The Naval Machinery Inspectors are responsible to the
Head of the Inspection Department for assuring that contractors follow the required
military specifications as they relate to naval machinery. Further, the Naval Machinery
Inspectors report to their superiors any violations or failures to comply with
specifications.

      13.     At times the machinery inspectors under Naval Supply have worked on-
site at the vendors' manufacturing facility for equipment, and the Supervisor of
Shipbuilding (reporting to BUSHIPS) had Navy inspectors that carried out their
inspection and contractual responsibilities at the shipbuilding yards. At one time in my
career, the offices of the Supervisor of Shipbuilding reported to me for administration of
the contracts for which they were responsible. Inspectors within the Supervisor of
Shipbuilding offices would report to their superiors any violations or failures to comply
with specifications.

      14.     Whether aboard ship or in a shipyard, the Navy Commander is the
ultimate authority in all things related to the ship's operation or ship's construction, repair
and overhaul, including instructions that might impact the health and safety of Navy
sailors or civilian workers engaged in these activities. The role of civilians both in Navy
yards and in private yards was to carry out work in accordance with military
specifications. At a Navy Yard, the Navy itself was directly involved in assuring the
specifications are followed because everyone in a Navy yard is either an officer or a
government contract worker. In a private yard, the Navy would have a local office of the
Supervisor of Shipbuilding staffed with Navy officers who are responsible for
supervising all civilian activities and for inspecting and verifying purchasing documents
and receiving equipment and material to ensure the ship construction and repair in the

6

private yard conforms to Navy specifications. The Supervisor has to follow the requirements specified or get formal waivers to the specifications of interest from BUSHIPS. Through these means, the Navy has assurance that its ships meet the rigorous requirements of wartime vessels.

15.     The attached exhibits illustrate the organizational lines of command for technical and contractual control over Navy shipbuilding. (See Exhibits 2 and 3). For a description of the responsibilities of each of the parties reflected on the attached organizational charts, refer to Exhibit 4, a document I prepared which describes in detail each individual's authority and responsibilities and explains how each level of command interrelates in the collective Navy effort to design, build and maintain our Navy fleet. In addition, this description identifies the several federal officers who exercised control over equipment manufacturers, including Westinghouse Electric Corporation ("Westinghouse") and General Electric Company ("GE"), whenever they built and supplied turbines to the Navy during the past 50 or 60 years.

16.     As noted, turbines built for Navy vessels, including Westinghouse and GE turbines, were manufactured according to plans and specifications prepared, written and issued exclusively by the Navy, specifically NAVSEA or BUSHIPS. This is my experience having served as Chief Engineer and Deputy Commander for NAVSEA's Ship Design and Engineering Division. I was responsible to the Commander of NAVSEA for developing ship designs and for overall technical support to the operating fleet, maintenance of ships, and ships under construction. Additionally, I was responsible for the maintenance of Navy ship military specifications and for monitoring compliance with the specifications by all vendors and contractors of Navy equipment.

17.     The MilSpecs for Navy equipment were drafted, approved and maintained by the Navy, specifically NAVSEA, to address shipboard equipment and materials requirements, and any changes to those specifications were made by the Navy. NAVSEA maintained and controlled the MilSpecs largely because it had superior knowledge of the demands and requirements of combat-ready vessels. NAVSEA or BUSHIPS also prepared contract specifications which incorporated the MilSpecs. These

7

specifications reflected the state-of-the-art and the special needs of combat and combat support vessels destined to deter or engage in war.

18.     The specifications were communicated to Westinghouse, GE and other similar vendors when the Navy issued its Request for Proposal for certain equipment. Attached hereto as Exhibit 5 is a brief summary of Navy Ship Design and Naval Machinery Military Specifications, as well as a brief summary of the Navy Ship Design/Construction Procedures, which explains how the Navy's machinery vendors were governed by the Navy's specifications.

19.     An illustration of the control the Navy exercised over production of its turbines is the process by which turbines were made for the U.S.S. Kitty Hawk, a Navy aircraft carrier. Examples of the specifications which applied to shipboard equipment for the U.S.S. Kitty Hawk are attached hereto as Exhibits 6 and 7. Exhibit 6 is an excerpt of a Military Specification concerning Turbine, Steam and General Auxiliary equipment (Naval Shipboard Use) identified as MIL-T-17523A (SHIPS) dated 1 August 1955. Exhibit 7 is Bureau of Ships Contract Specification for Generator Set, Steam Turbine, also identified as "SHIPS-G-1956" dated 25 April 1955. Exhibit 8, attached hereto, is a copy of Westinghouse's purchase order for the turbines for the Kitty Hawk. This is evident based on the following information:  the reference on page 1 of Exhibit 8 to "CVA 63" is to the ship number assigned by the Navy to the Kitty Hawk (CVA indicates it is an aircraft carrier, and 63 is this carrier's number). The Customer Order No. "NOBS-67530" is a reference to the Navy's contract number, i.e. the contract issued by BUSHIPS to Westinghouse to build the equipment described on page 1 of Exhibit 8. On page 4 of Exhibit 8, there is a reference to "Bureau of Ships Contract Specification SHIPS-G-1956, dated 25 April 1955," which is Exhibit 7. On page 2 of Exhibit 8 is a reference to "MIL-T-17523," which is Exhibit 6, the military specification described above. These documents mean that the Navy ordered from Westinghouse the turbine equipment described in Exhibit 8, which incorporates the specifications in Exhibits 6 and 7, for use aboard the U.S.S. Kitty Hawk. As referenced throughout Exhibit 8, Westinghouse was to perform its work under control of the Navy:  e.g. "Inspection: At Contractor's Plant, Essington, Pennsylvania, By the Inspector of Machinery, USN,

8

Essington, Pennsylvania, except Item 2 shall be inspected . . . by the Assistant Inspector of Naval Material, East Pittsburgh, Pennsylvania" (Note #4, p. 3); "Engineering service shall be performed . . . as directed by the Chief, Bureau of Ships or his duly authorized representative" (p. 4); "Contractor agrees to enter into a standard government contract . . . from the Bureau of Ships or Department of the Navy" (p. 5); "Contractor shall furnish the services of competent engineer(s) . . . as directed by the Chief, Bureau of Ships, or his duly authorized representatives." (Item 7, p. 5.)

20.     As illustrated by the Kitty Hawk documents, all Navy vessel equipment, including Westinghouse and GE turbines, was built according to Navy specifications and approved for installation aboard these vessels exclusively by the Navy and its designated officers.

21.     It should be easy to understand, and it is my experience, that the Navy retained the "final say" over the design attributes of naval ships and their equipment. As the purchaser, and having the engineering expertise and experience as to what was needed for naval combat vessels, the Navy retained final responsibility for the ultimate decision regarding how to resolve any disagreement between the Navy and a shipbuilder or an outside equipment supplier. In the case of private yards the Supervisor of Shipbuilding Office provided the link between the shipbuilder and BUSHIPS in settling any disputes over Navy requirements. If Navy specifications were not followed by the shipbuilder the Supervisor's inspectors would reject the shipbuilder's involved work. All such disputes were handled formally and any changes required change orders to the contract or formal waivers to the specifications.

22.     Considering the above, any and all work performed in the construction and repair of Navy ships noted in this case, as well as, the equipment built and supplied for these vessels was performed to combat requirements developed and specified by the Navy. Further, such work was typically reviewed and inspected by Navy personnel in the vendors' plants and in shipbuilding and repair yards.   Such rigid conformance to requirements was absolutely necessary for the construction of a warship which was to take our sailors in harm's way.

9

23.    The military specifications for turbines ensured that each and every turbine ordered by the Navy, regardless of the identity of the specific contract manufacturer, was uniform, complied with the Navy's combat requirements and would operate in the manner demanded by the Navy. This uniformity was critical because the Navy cannot take a ship into battle unless it knows that each component of the ship will satisfy precisely its specifications including those for reliability, quietness, battle hardness and maintainability. These characteristics are vital in total to the success of the ship's mission. The Navy cannot put a ship into harm's way and have it "dead in the water" due to a limitation in its turbines' capabilities. The consequences of such problems -- which can include death, loss of ship or mission failure -- are unacceptable to the Navy. Certainly the ship's propulsion plant, including turbines, are as important as the ships' weapons during combat.

24.    Based on my experience and knowledge, the Navy required that all turbines be delivered "bare metal," meaning that the turbines were not to be accompanied by any type of insulation at the time of delivery. Pursuant to Navy military specifications, the turbines were designed by the Navy to include only metal rails and hooks, the means through which insulation could be attached. It would not have been possible for contract manufacturers to deliver turbines to the Navy without these rails and hooks because such turbines would not conform to military specifications. Moreover, the Navy did not permit individual turbine manufacturers to insulate their equipment prior to installation because it was more economical, efficient and allowed preoperational inspection and testing to have the ship's entire plant insulated at one time than to have each piece of equipment come with its own insulation. Additionally, the Navy was concerned that pre-installed insulation on turbines could be easily damaged during shipment.

25.    It was the Navy, not contract manufacturers, that required the use of asbestos thermal insulation with turbines intended for installation on Navy ships. The Navy had its own engineers with expertise in insulation and heat transfer. These engineers developed their own plans and standards for the insulation of Navy equipment and, with respect to turbine insulation, these Navy engineers determined that asbestos

10

thermal insulation best met the Navy's military requirements. Asbestos thermal
insulation had characteristics that were essential to the proper operation of turbines on
Navy ships including: optimum heat retention, low weight, fire resistance, resistance to
water damage and insect infestation, and cost-efficiency. Weight, in particular, was a
significant factor in the Navy's determination to use asbestos insulation. Although
specific amounts varied according to the particular class of ship and propulsion plant
design at issue, in general, Navy destroyers overall required approximately 22 tons of
asbestos thermal insulation and Navy aircraft carriers as much 300 tons of asbestos
thermal insulation. Because asbestos had all of the characteristics critical to insulation on
a Navy ship, the Navy had difficulty identifying satisfactory substitutes. Until acceptable
substitutes were identified by the Navy beginning in the late-1970s, asbestos thermal
insulation was critical to naval ship design and operation. Without proper insulation of
the ship's propulsion plant (including turbines, boilers and auxiliary equipment), the
ship's plant would be inefficient due to loss of heat and sailors would be burned or unable
to operate in engineering spaces due to heat levels. Also, every pound of heavier
insulation would displace the amount of weapons or fuel that could be placed aboard
ship. For these reasons, Navy specifications demanded the use of asbestos thermal
insulation with its turbines and auxiliary equipment for most of the 20th Century. If not
for the presence of asbestos thermal insulation, the ship's efficiency would not allow it to
operate properly including in combat.

26.     In pursuing competitive bids from equipment vendors such as turbine
manufacturers or asbestos suppliers, cost was never the only or over-riding factor in
equipment and material selection. All essential equipment placed aboard a Navy ship,
including turbines and asbestos thermal insulation, had to meet the requirements of a ship
intended to be placed in harm's way.

27.     There is no way to battle harden a ship to the extent that no losses to
personnel or equipment are ever sustained. For this reason, the Navy continually
evaluated the combat benefits of specified equipment and materials against the potential
risk to the health and safety of Navy personnel and civilian workers. Under the Navy's
command structure, the responsibility for health and safety fell under separate divisions.

11

The CNO was responsible for, and concerned with, issues seen as immediate threats to safety, and the Bureau of Medicine (BUMED) was responsible for medical treatment and issues related to long-term health hazards. The CNO and BUMED and their staffs communicate and coordinate on heath issues. At times Navy personnel have to operate in harms way, and the Navy has to use the best material available to that end and control with procedures  some health risks if necessary to fulfill its mission. For most of the 20th Century, it is clear that the Navy considered turbines to be "vital" to its combat mission (see MIL-T-17600A (SHIPS)) and that asbestos thermal insulation was essential to safe and efficient operation of its ships (see Bureau of Ships Manual, Ch. 39, Thermal Insulation (Aug. 24, 1945, Sec. 39-2).

     28.    The Navy has been aware of the health risk of exposure to asbestos dust since at least the 1920s. Until 1975, when it issued a policy aimed at eliminating the use of asbestos materials where possible, the Navy believed that it had instituted adequate controls to protect personnel working with or around asbestos materials. However, even as the Navy moved toward elimination of asbestos materials in the late 1970s, the Navy could not immediately eliminate all asbestos and had to place additional measures believed to be necessary to control the health risks understood at the time. Capital steam driven ships had many tons of insulation and to immediately implement a program of total asbestos removal would immobilize the Navy for a lengthy period. Further, replacement material meeting the Navy's stringent military specifications was not available. Rather, the Navy instituted a careful and deliberate asbestos removal program that continued to protect personnel health to the greatest extent possible in light of operational demands including cost concerns. This program provided for replacing asbestos-containing insulation with non-asbestos insulation when repairs were required; leaving in place fixed or intact asbestos-containing insulation but painting the insulation (magenta with a white overlay) to identify the presence of potentially hazardous asbestos materials to workers; continuing to use existing stocks of asbestos-containing insulation in the Navy supply system; and  continuing to accept new ships delivered with asbestos-containing insulation into the late 1970s, when a transition could be made commensurate with material availability and ship construction schedules.

29.    The Navy's military specifications, which were enforced through the Navy's command structure, were designed to provide clear, concise, directions to all Navy personnel and civilian contractors working under Navy direction. Not only did military specifications describe the physical equipment and material to be used in Navy ships but they also addressed the instructions considered essential by the Navy to warn individuals working with that equipment and material about potential hazards. For example, military specifications included directions for the painting and labeling of ship systems and equipment as well as the content of instruction manuals to be used in the operation and maintenance of equipment.

30.    Military Specifications for technical manuals (MIL 15071) prior to 1957 did not mention warnings. Even when later revisions of the specification did mention warnings (Mil - M- 15071C of 10 Sep. 1957), it was the Navy's intent to include only warnings concerning how someone might be immediately physically injured by their actions or cause serious damage to equipment. It was also specifically noted that such warnings were to be used sparingly as was consistent with real need. These instructions were universally understood by the Navy not to include long-term health hazards such as those presented by asbestos. Even after the hazard of asbestos was more fully understood by the Navy beginning in the mid to late 1960s, the Navy did not require changes to the technical manuals. Instead, the Navy invoked effective internal instructions for the safe handling of asbestos. The Navy had final say, approved the content of technical manuals and had state-of-the-art medical understanding of the dangers of asbestos. Clearly if the Navy thought it necessary it could have required a warning concerning asbestos.

31.    Further, the Navy controlled labeling that went on all equipment and materials. It should be noted that, even with increased knowledge concerning asbestos after the mid to late 1960's, the Navy did not require everything containing or associated with asbestos materials to be labeled as hazardous. In addition to the asbestos thermal insulation used in a ship's plant (turbines, boilers and auxiliary equipment), there were miles and miles of insulated pipe and cable; hundreds, if not thousands, of valves; and other equipment that involved asbestos in some way. Once the additional hazard of asbestos was understood, the Navy developed procedures to control work involving

13

asbestos and to monitor exposure to asbestos dust while, at the same time, seeking and testing new materials to be used.

32.     I served in shipyards before and after the Navy's internal asbestos control instructions came out, and was in ships under construction and overhaul daily for many years. It is my opinion that the military specifications and naval instructions were effective in controlling the asbestos hazard while maintaining the benefits associated with asbestos insulation. Labeling of systems or components containing asbestos, even with the Navy's increased understanding of the hazards, was not considered practical for combat and combat support operations and, therefore, was not directed or allowed by the Navy. Instead, the Navy chose to control and make personnel aware of the hazards of asbestos exposures through the strict, effective, procedures required by military specifications and personnel training.

33.     In summary, the Navy exercised rigid control over the design, manufacture and installation of essential plant equipment and materials, such as turbines and asbestos insulations, to ensure that this equipment and material would perform as expected during battle conditions. The Navy also developed and imposed requirements for warnings and documentation necessary for the maintenance of this equipment and material to ensure that personnel, particularly in combat conditions, received only one clear set of instructions that had been approved by the chain of command. Finally the Navy had in place a formal organization at building and repair facilities, and also available to inspect at supplier's plants, in order to assure its combat requirements were met.

34.     I can attest that any and all work performed on turbines built and supplied for Navy ships by vendors such as Westinghouse and GE was performed to the requirements specified by the Navy and that the work was reviewed and inspected by Navy personnel in the vendor's plant and in the shipbuilding yards to ensure that the turbines met the Navy's combat needs. As noted earlier, in many instances during my career I personally inspected equipment to verify conformance with the requirements specified, although more immediate supervision typically was exercised by officers and

14

other Navy personnel under my command or the command of NAVSEA or its predecessor, BUSHIPS.

35.     Further in summary, I have general knowledge and extensive Navy experience with the comprehensive plans, specifications and requirements that governed the construction of Navy ships and the equipment placed on them. At one time, the engineers that prepared specifications and accomplished ship designs worked under me at NAVSEA. The Navy had general specifications and detailed specifications, as well as, plans that were invoked by contract. The general and detailed specifications and contract plans also invoked more detailed specifications for the ship design, as well as, for the equipment and material to be used in its construction. Frequently, the more detailed specifications and contract plans noted above would invoke even further specifications so that a shipbuilder had to comply in all aspects of the construction. Such direction also included material referenced in the plans and stocked by the Navy. The Navy developed detailed requirements for the construction, maintenance and operation of warships and auxiliaries in order to ensure the ship's continued ability to operate in combat zones and be maintained with material specified and stocked by the Navy. Adherence to the Navy's specifications was mandatory because lives depended on it.

36.     I have extensive experience and knowledge concerning the control exercised by the Navy during the construction, repair and overhaul of ships in Navy yards and private yards.  Later in my career, all the Supervisor of Shipbuilding Offices inspecting Navy ships and other contracts reported to me (15 offices nationwide). I have personally inspected ships and equipment during construction, repair or overhaul, to verify conformance with the requirements specified and have given instructions to Navy employed inspectors as to how inspections were to be made. At times I and my inspectors have rejected items that failed to meet specifications. For example, I recall rejecting various piping integrity systems (including valves and gaskets) for failure to meet specifications because they proved to leak during system hydrostatic tests.  In another case, testing during sea trials revealed a turbine bearing leaked oil due to faulty oil seals. These type of rejections occurred frequently during ship construction and repair.

15

37.     Based on my experience, knowledge and research, my opinions are that:

    a. The fundamental first step to the Navy's ability to successfully fight wars
is the design and construction of its combat and combat support vessels as
an integrated weapons system. The design of the propulsion plants aboard
these vessels, including turbine design and manufacture and material
selection such as insulation, represent vital military combat-related
decisions commensurate with state-of-the-art knowledge and industrial
capability at the time. Each military specification developed by the Navy
related to turbines and asbestos insulation aboard ship were necessary to
meet the tactical and strategic military characteristics ultimately required
by the CNO, the highest Navy officer. These specifications reflected the
state-of-the-art and the special needs of vessels destined to either engage
in or support combat activities.

    b. Because of the Navy's superior knowledge of the tactical demands and
operational requirements of combat vessels and of the availability of
processes and materials in support of those needs, the Navy exclusively
controlled the detailed specifications for its equipment in its propulsion
plants and the type of insulation materials to be used with that equipment.
It also exclusively controlled warnings related to health and safety
implications of its selected insulation materials. The Navy could not, and
did not, permit any equipment manufacturer or material supplier to
interfere with mission success by supplying turbines or insulation that did
not expressly comply with Navy specifications or by placing warnings on
equipment (or in instructions or manuals accompanying the equipment)
without Navy approval.

    c. The Navy made calculated decisions on the allocation of its resources in
light of its knowledge of the hazards of asbestos insulation and the
technical and operational demands of war. The Navy instituted a
comprehensive program, both aboard ship and in shipyards, to address the
hazards of asbestos in a manner consistent with the unique circumstances

16

of combat and combat-support ships that require the sensitive military
balancing of tactical, strategic, and technical needs and budgetary
constraints against the placing of sailors and civilian workers in harm's
way in the defense of the Country.

I declare under penalty of perjury under the laws of the State of Virginia that the
foregoing is true and correct, and that if called as a witness, I could competently testify to the
foregoing facts, all of which are within my own personal knowledge.

Executed this _26th_ day of _November_, 2010 at _Stafford, Virginia_.

_Roger B. Horne_
**ROGER B. HORNE, JR.**

State of Virginia
County of _Stafford_

Subscribed and sworn to before me
this _26th_ day of _November_, 2010.

_Dorothy A. Rutledge_
Notary Public

My commission expires: _July 31, 2011_

17



### Roger B. Horne, Jr.
### Rear Admiral, USN (Ret.)

**Professional Competence**
Design engineering, construction and operation of ships and ship systems. Shipyard operations including contract administration and major ship construction, overhaul and inspection. Industrial processes and inspection techniques related to shipyard and other major industrial work. Nuclear power plant design, construction, refueling, maintenance, and quality control. Development and interpretation of industrial specifications contract administration and financial management of large industrial projects.

**Background and Professional Honors**
B.S. (Naval Engineering), U.S. Naval Academy
M.S. (Mechanical Engineering), U.S. Naval Postgraduate School
M.B.A. (Executive), Golden Gate University
Shipyard Nuclear Shift Test Engineering School
Ship Construction School, Portsmouth Naval Shipyard
Dynamic Shock Analysis Course, Princeton
Navy Destroyer Engineering Course, Damage Control Course, and Fire Fighting Course
Qualified Naval Surface Ships and Submarines (Engineering Duty)
Recipient, Institute of Industrial Engineering Outstanding Achievement in Industrial
  Management Award
Recipient, Jack Flannigan award for Contributions to the Quality of Marine Machinery
  given by the Marine Machinery Association
Three Navy Legion of Merit awards and three Meritorious Service Awards for
  Engineering and Industrial Achievements
Patent for Timber Sterilization

**Professional Profile**
Principal Engineer and Head of the Marine and Aviation Practice Area.
  Exponent, Failure Analysis Associates, Inc.
Visiting Professor,
  Ship Construction, University of Michigan
Chief Engineer and Deputy Commander
  Naval Sea Systems Command for Ship Design and Engineering
Deputy Commander
  Naval Sea Systems Command for Facilities and Industrial Management
Commander,
  Puget Sound Naval Shipyard
Commander,
  Engineering Duty Officer's School
Production and Repair Officer,
  Mare Island Naval Shipyard
Nuclear Engineering Manager,
  Puget Sound Naval Shipyard
Nuclear Submarine Inspection Officer, Supervisor of Shipbuilding Office,
  Ingalls Shipbuilding
Chief Engineer
  USS OZBOURN DD 846
Past Member of the American Bureau of Shipping Technical Committee
Member, Society of Naval Engineers

Past Member Society of Naval Architects and Marine Engineers
Past member Society of Industrial Engineers
Past member American Bureau of Shipping



# Technical and Contractual Control

## Recent Organization






# Technical and Contractual Control



Navy Department 1946

Secretary of the Navy

Assistant Secretary Material

Chief of Naval Operations

Chief Bureau of Naval Supply

Assistant Chief Ship Design

Chief Bureau of Ships

Resident Contract Administration Offices

Director Ships Technical

Ship Specifications

Director Contract Division

Inspectors

Head Turbine and Gear Section

Hull and Machinery Purchasing



## Definition of Key Position Responsibilities

Chief of Naval Operations (CNO): Overall responsibility for accomplishment of the mission of the Navy in the defense of the United States. This includes recommendations for the Naval ship building programs and the readiness of the Operating forces to meet the threat at hand.

Commander of the Naval Sea Systems Command (COMNAVSEA): Responsible to the CNO for technical support of Naval ships, ship designs, and ship construction. Responsible for management of the Naval Shipyards and contract administration of ships under construction in private yards.

Deputy Commander for Ship Design and Ship Systems Engineering: Responsible to COMNAVSEA and specific project officers for developing ship designs and for overall technical support to the operating fleet, maintenance of ships, and ships under construction. Responsible for the maintenance of Naval ship military specifications. Monitors contractor performance to requirements in the development of new naval machinery being built to specifications developed by his design personnel.

Director of the Machinery Group: Responsible to the Deputy Commander for Ship Design and Ship Systems Engineering for technical support of projects involving ship machinery. This includes the development of new designs as well as support of on going ship construction and ships in maintenance and at sea. Responsible for the maintenance of military specifications related to naval machinery. Naval machinery involves auxiliary machinery, as well as, propulsion machinery.

Director of the Propulsion Branch: Responsible to the Director of the Machinery Group for propulsion machinery. Is responsible for the technical effort associated with the development and integration of new propulsion systems into ship designs and related support to the operating fleet. Propulsion systems involve steam, diesel and gas turbine. Has cognizance of specifications related to propulsion systems.

Head Steam Turbine Branch: Responsible to the Director of the Propulsion Branch for the development on naval turbines and maintenance of life cycle technical support of turbines used in ship designs. Responsible for the maintenance of and designation of specifications to be used in turbine designs being developed by contractors.

Deputy Commander for Facilities and Industrial Management: Responsible to COMNAVSEA for oversight of the Naval Shipyards and the Supervisor of Shipbuilding offices located in the private shipyards where naval ships are under construction.

Supervisor of Shipbuilding(SUPSHIP): Responsible to COMNAVSEA via the Deputy Commander for Facilities and Industrial Management for the administration of the ship building contracts in the shipyard(s) he is responsible for. Assures ships are built to required specifications. Approves changes to specifications as authorized by the appropriate cognizant NAVSEA technical code and Project Officer.

Head Inspection Department: Responsible to the Supervisor of Shipbuilding for the Inspection of Naval ships under construction in the shipyard. Assures by on scene inspections and audits that the navy specifications for the ship are followed. Comments on contractor requests for changes in the contract specifications as requested by other SUPSHIPS departments. Is not authorized to change specifications.

Naval Machinery Inspectors: Specialized inspectors qualified in Naval machinery that are responsible to the Head of the Inspection Department for assuring the contractor follows the required contract specifications as they relate to Naval machinery. Inspects ship installations and received material from subcontractors including government furnished material such as propulsion equipment. Reports violations to specifications.

Head Contracts/Supply Dept. Progresses government furnished material and manages contract changes. Is authorized after appropriate technical and project management approval to sign contract change documents.

Commander Naval Supply System (COMNAVSUP): Is responsible to the Chief of operations for supply support of the operating fleet and supply functions related to the shipbuilding programs. This includes the maintenance and distribution of repair parts for ships at sea.

Resident Contract Administration Offices: Located in the manufacturing plants of contractors under contract with the US Navy to supply equipment. In some cases equipment is under development. Offices are responsible to COMNAVSUP for assurance that equipment is built to the contract technical specifications. In the case of naval machinery these are specified by NAVSEA. Takes part in visits by the Deputy Commander for Ship Design and Ship Systems Engineering to assure contractor performance. Does not have the authority to allow contractor change to technical specifications without approval from NAVSEA and proper contract modification.

Machinery Inspectors: Depending on the size and complexity of contracts administered the resident Office may have a staff of inspectors some of which specialize in certain areas such as propulsion machinery. These inspectors follow the contractor's effort and formally report violations to specifications.



## Ship Design and Naval Machinery Military Specifications

Certain military specifications relate to ship and ship equipment. These are maintained by the Naval Sea Systems Command (NAVSEA) formerly the Bureau of Ships. NAVSEA has in its command engineers highly qualified in specialty areas such as steam turbines, gas turbines, reductions gears etc. These engineers have control over the military specifications that concern their area of expertise. In addition, NAVSEA has had an Engineering Standards Sub Group and a Combatant Ship Specifications and General Specifications Division to help manage the large number of specifications (thousands) and contract plans that exist. Changes to specifications are continually under review as new technology and construction techniques evolve.

Changes to specifications must be coordinated with the cognizant technical engineer. Once a contract which references certain specifications is signed with a contractor the cognizant engineer will resolve any questions of interpretations. There must be clear assignment of responsibility for resolving questions. If this does not occur, different interpretations are liable to occur. Once a specification is invoked in a contract no technical changes can be made that violate that specification without the cognizant engineers review.

The reasons for such control is that specifications are frequently very subtle and what is perceived as a minor change can have a disastrous impact. The safety and effectiveness of combatant ships depends to a large extent on adherence to specifications that have evolved by a process of experience and technology advancement. Since ships are very complex, and subject to various opinions as to what are proper requirements, special care is taken to assure proper technical reviews are made before any waivers to the specifications are approved. Such changes are formal, that is in writing.

## The Ship Design/Construction Process

Once a ship is to be designed there are four design phases that take place: feasibility design, preliminary design, contract design and detailed design. A Ship Design and Engineering Director is assigned along with support from cognizant technical codes.

During the feasibility design phase the outlines of several ship configurations will be considered. For the machinery plant, different types of propulsion plants will be considered, and an outline of the space and weight required for each plant determined. There are now four basic plants and several combinations plants that can be put together.

Once a ship concept has been selected as a result of the feasibility study the preliminary design phase will be started. This design phase is done by NAVSEA and results in an engineering description of the ship and its major subsystems. Performance characteristics

and system diagrammatics are developed during this phase. During this phase, for the machinery plant, each cognizant engineer will do tradeoff studies to determine the best combination of machinery that can be used.

Following the preliminary design phase is the contract design phase. During this phase the designers develop a technical package of drawings and specifications that the various shipbuilders can bid on. This process is done in great detail and the cognizant engineers use the appropriate specifications and contract plans at their disposal to convey to the prospective builders how the ship will be built. By using the contract specifications incorporated during the contract design phase NAVSEA solicits for bids to perform the detail design and ship construction. In some cases detail design or part of it may not be done by the final ship builder selected.

During the detail design phase NAVSEA does not relinquish control. NAVSEA is involved in the development and purchasing of government furnished equipment such as the that used in the propulsion plant. They will review and approve change proposals to specifications and monitor progress and performance to requirements in detail through design reviews, by visits to the design agency, and by approving plans and calculations that have been developed.

Once construction of the ship has been started or new machinery development started by a contractor NAVSEA (the Engineering Directorate) will continue to monitor performance by on site visits and reviews to assure work is proceeding in a proper manner, as specified, and to resolve any technical problems that might come up. Any technical changes to the specifications are reviewed for approval by NAVSEA.



OBSOLETE

MIL-T-17523A(SHIPS)
1 August 1955
SUPERSEDING
MIL-T-17523(SHIPS)
1 July 1953

## MILITARY SPECIFICATION

### TURBINE, STEAM, GENERAL AUXILIARY

### (NAVAL SHIPBOARD USE)

### 1. SCOPE

1.1 This specification covers steam turbines for all Naval shipboard application except propulsion.

### 2. APPLICABLE DOCUMENTS

2.1 The following specifications, standards and drawings, of the issue in effect on date of invitation for bids, form a part of this specification:

SPECIFICATIONS

FEDERAL

FF-B-171 - Bearings, Ball, Annular (General Purpose).
FF-B-185 - Bearings, Roller, Cylindrical; and Bearings, Roller, Self-Aligning.
QQ-A-561 - Aluminum Alloy 2S; Plate and Sheet.
QQ-S-00763 - Steel, Corrosion-Resisting: Bars and Forgings (Except for Reforging).
QQ-T-390 - Tin Alloy Ingots and Castings, and (Anti-Friction Metal) for Bearing Applications.
GGG-P-781 - Pullers, Bushing, Bearing, Gear, Wheel Hub and Cylinder Sleeve, Installing and Removing.

MILITARY

JAN-W-562 - Wire, Nickel-Alloy, Spring (Heat-Resistant and Age Hardenable).
MIL-T-656 - Thermometers, Self-Indicating Liquid-In-Glass (Navy Type).
MIL-S-854 - Steel, Corrosion-Resisting: Plates, Sheets, Strips and Structural Shapes.
MIL-B-857 - Bolts, Nuts, Studs and Tap Rivets (and Material for Same).
MIL-S-860 - Steel: Forging for Turbine Rotors (Heat Treated).
MIL-S-861 - Steel, Corrosion-Resisting (for Turbine Parts).
MIL-S-867 - Steel Castings, Corrosion-Resisting Austenitic.
MIL-S-870 - Steel Castings, Molybdenum Alloy.
MIL-S-871 - Steel, Molybdenum Alloy; Plates.
MIL-S-872 - Steel, Alloys, Molybdenum, Wrought.
MIL-S-890 - Steel, Forgings and Bars for Hulls, Engines and Ordnance (Heat Treated).
MIL-T-940 - Thermometers, Indicating Dial, for Super-Heated Steam.
MIL-D-963 - Drawings, Production (for Electrical and Mechanical Equipment for Naval Shipboard Use).
MIL-B-1222 - Bolt-Studs, Nuts and Bars, Round: Steel (for Service at Temperatures Up to 850°F.).
MIL-G-3087 - Generator Sets, Steam Turbine (Direct and Alternating Current) (Naval Shipboard Use).

FED. SUP. CLASS
2835

3.2.3.1 All auxiliary turbines, except generator turbines and forced draft blower turbines, shall be designed as standardized turbines. They shall be designed to operate over a definite range of horsepowers and speeds, as applicable (see table II). To meet any requirements within the range, it shall be necessary to change only a few parts such as nozzle blocks and steam inlet valves, and this change shall be capable of accomplishment without any alteration to other parts of the turbine.

### 3.2.4 Rated power. -

3.2.4.1 The rated power of a turbine shall be the horsepower required to drive the connected auxiliary (plus gear, if installed) when delivering its maximum output. Rated output for combined alternating current (a.c.) and direct current (d.c.) generator sets shall be the sum of the rated alternating current plus direct current output plus excitation. All turbines shall deliver their rated power under the specified steam and exhaust conditions at the speed of the driven auxiliary corresponding to its maximum output.

### 3.2.5 Emergency power. -

3.2.5.1 Turbines shall be capable of delivering rated power at the corresponding speed of the driven auxiliary, with satisfactory operation in all respects, including governing, under the following emergency conditions:

      (a) Steam pressure 10 percent greater than normal, other conditions as specified.
      (b) Steam pressure 20 percent less than normal, other conditions normal. This does not apply to generator or forced draft blower turbines, unless specifically required (see 6.1).
      (c) Exhaust pressure 20 p.s.i.g. This does not apply to condensing turbines or forced draft blower turbines.

### 3.2.6 Definition of turbine speeds. -

3.2.6.1 The speed of the turbine at which the connected auxiliary is required to deliver its rated output shall be defined as the "normal operating speed".

3.2.6.2 The speed of the turbine at which the connected auxiliary is required to deliver its specified overload output shall be defined as the "maximum operating speed".

### 3.2.7 Steam consumption. -

3.2.7.1 Turbines driving generators shall be designed for maximum economy at 60 percent of rated power unless otherwise specified in the contract or order. The turbine manufacturer shall furnish estimated condition lines for 100 percent load, 75 percent load, 60 percent and 25 percent load. The temperature and pressure for each stage shall be clearly indicated.

3.2.7.2 Turbines other than those driving generators, shall be designed for maximum economy, under the specified steam and exhaust conditions, at rated power of the driven auxiliary.

3.2.7.3 Steam consumption determinations shall include all losses through the throttle valves, if used, steam strainers and governor valves, as well as through the turbine proper.

### 3.2.8 Hand-controlled nozzle valves. -

3.2.8.1 All auxiliary turbines shall be designed to deliver rated output of the driven unit at normal operating speed and under specified steam and exhaust conditions without the use of hand-controlled nozzle valves. One hand-controlled nozzle valve may be furnished for meeting the low steam pressure requirement of 3.2.5.1 (b). Nozzle valves in a multivalve steam chest which are under the control of a single handwheel or automatic combustion control are acceptable.

MIL-T-17523A(SHIPS)

3.2.8.2 Turbines driving generators shall be fitted with automatic nozzle control.

3.2.9 Critical speeds. -

3.2.9.1 The critical speed of any variable speed turbine rotor shall be at least 25 percent above the maximum operating speed. Turbine rotors designed for constant speed operation may pass through one critical speed, which shall be 20 to 25 percent below the normal operating speed, in which case the second critical shall be at least 25 percent above the maximum operating speed.

3.2.9.2 Critical speeds shall be stated on turbine outline drawings.

3.2.10 Mounting and installation. -

3.2.10.1 Each auxiliary unit, turbine, reduction gear (if installed), and driven auxiliary, complete with all appurtenances, oil coolers, and piping (other than ship's piping connections), shall be mounted on a single bedplate.

3.2.10.2 Turbines driving generators shall be provided as package units comprising turbines, generators, reduction gears (if used), condensers, air ejectors, and oil coolers. Integral hand lubricating oil pumps for starting shall be included in the package. Component parts in the package shall be arranged to occupy a minimum of space and reduce total weight to the lowest practicable figure consistent with other specification requirements.

3.2.10.3 Package units shall employ the principle of three-point support wherein the bedplate is supported by the ship at three points only. The condenser shall be integrated into the bedplate in such a manner that the bedplate may derive torsional rigidity from it. The condenser and bedplate shall be stress relieved after fabrication.

3.2.10.4 Bedplate shall be sufficiently rigid to permit handling, shipment, and installation of the unit onboard ship, without disturbing the alinement of the machinery installed thereon. The installation onboard ship shall be such that normal distortion, weaving, or vibration of the supporting structure cannot cause misalinement between the turbine, reduction gears (if installed), and the driven auxiliary.

3.2.10.5 In special cases for horizontal turbines, the bedplate may be omitted, and the turbines, reduction gears (if installed), and driven auxiliaries mounted directly on structural steel foundations built up in the vessel. In such cases all bearing surfaces shall be machined and the machinery secured with body-bound bolts. Turbines for vertical applications may be mounted on the driven unit.

3.2.10.6 All bearing and seating surfaces of bedplates shall be finish machined.

3.2.10.7 Each component part of an assembled machine supported directly by the bedplate shall be doweled thereto to facilitate reassembly and maintenance of alinement.

3.2.10.8 The design and installation of turbine driven auxiliaries shall be such that alinement will not be distrubed or undue stresses set up in any part by normal vibration, contraction, and expansion of piping attached thereto in service.

3.2.11 Welding and allied processes. -

3.2.11.1 Welding and allied processes shall be in accordance with Appendix VII of the General Specifications for Inspection of Material and Section S1-4 of the General Specifications for Machinery.

3.2.12 Threaded parts. -

3.2.12.1 Threaded parts shall conform to Handbook H28.

MIL-T-17523A(SHIPS)

3.2.13 Heat insulation and lagging. -

3.2.13.1 Means for holding insulation shall be attached to the casing by the turbine manufacturer.

3.2.14 Lubrication and cooling. -

3.2.14.1 A simple, positive, and self-contained lubrication system shall be provided on each auxiliary turbine driven assembly to supply oil to all bearings at not less than 10 pounds pressure at rated speed. Ring or disc lubrication will not be approved.

3.2.14.2 The design shall be based on the use of Navy symbol 2190T oil with a viscosity of approximately 180-200 Saybolt seconds universal (S.S.U.) at 130° F.

3.2.14.3 The maximum temperature rise of the oil passing through any bearing of a forced-feed lubrication system under any operating condition shall not exceed 50° F., nor shall the final temperature of the outgoing oil exceed 180° F., as measured by thermometer.

3.2.14.4 Each turbine shall have its own oil sump with a capacity double the flow per minute of the lubricating oil pump when operating at rated speed. The sump shall be so located that oil shall drain by gravity from the bearings. Each sump shall be fitted with oil level indicator, with low, normal, and high levels clearly marked thereon. Internal heating or cooling coils are not permitted. No paint shall be allowed on surfaces contacting oil.

3.2.14.5 Pumps shall be completely submerged, driven by gearing from the turbine shaft or direct connected thereto. The same pump may be used for high-pressure oil for hydraulic control, provided that means for reducing oil pressure for bearing supply are added. Lubrication shall be adequate at idling speeds and above; idling speed shall in no case be greater than 1/3 maximum operating speed. Idling speed for forced draft blowers shall be 5 percent at maximum operating speed.

3.2.14.6 For turbine generators and other turbines where specifically required, a hand oil pump shall be provided to supply oil to all bearings prior to starting the turbine. It shall not be necessary to run this pump when the turbine is being shut down.

3.2.14.7 Turbines driving generators shall be fitted with external duplex basket type magnetic oil strainers. Other auxiliary turbines shall be fitted with either external duplex basket type magnetic oil strainer or cleanable metal edge oil strainers, with internal bypass.

3.2.14.8 A relief valve shall be provided at the discharge of positive displacement pumps and arranged to relieve back to the oil sump.

3.2.14.9 Oil coolers shall be furnished in accordance with Specification MIL-C-15730 (see 6.1).

3.2.14.10 A four-way cross cock shall be installed in the oil lines ahead of the cooler and designed so that the oil will bypass the cooler without interruption of the unit being served. The valve shall be designed so that oil to the bearings cannot be completely cut off in any position.

3.2.14.11 Type JDH turbines and turbines driving generators shall be provided with a low oil pressure alarm which shall be installed at the point of lowest pressure.

3.2.14.12 Auxiliary turbines above 100 horsepower shall be fitted with sight flow fittings and thermometers which indicate flow and temperature of oil discharge from each journal and thrust bearing, except those having internal drains to the reservoir. Thermometers shall be of the stem type (range 30° to 240° F.), located so that they are accessible and readable from the operating station.

MIL-T-17523A(SHIPS)

3.2.14.13 A diagrammatic drawing of the proposed lubrication system shall be furnished, on which shall be shown the location of the sump, strainer or filter, pump, cooler, and all fittings, such as valves, cocks, gages, thermometers, sight-flow fittings, low pressure alarm contact makers, and any other special fittings required by the proposed system. In addition, this drawing shall state the sizes of all pipes, valves, fittings, the capacities of pumps, oil sump, and of the complete system, pressures throughout the system, quantity and temperature of oil supply to each individual bearing and gear spray header, bearing pressures, surface speeds of journals, and other information as necessary.

3.2.14.14 For type JDH turbine, a motor driven auxiliary oil pump shall be provided, in addition to the direct connected pump and the hand operated pump, to be used for bearing lubrication during shut-down.

3.2.14.15 In cases where it is impractical to lower the sump, sufficient access holes shall be provided to facilitate cleaning.

3.2.14.16 Fixed orifices shall be fitted in the oil supply to each journal and thrust bearing, where practicable. Each fixed orifice shall be of a design which will permit removal without takedown of the pipe line.

3.2.15 Piping, valves, joints, and root connections. -

3.2.15.1 Piping, valves, and joints shall conform to Drawing 5000-S4800-3000. Root connections shall conform to Drawing B-214.

3.2.15.2 Consideration will be given to positive sealing steel screwed fittings. Specific approval from the bureau or agency concerned, shall be obtained for each fitting of this type which is proposed. Use of such fittings shall be confined to gland steam piping of turbine generator sets.

3.2.15.3 Steel socket welding fittings in accordance with A.S.A. B16.11, schedule 40 are suitable for 50 p.s.i. self contained lube oil systems.

3.2.16 Steam and exhaust connections. -

3.2.16.1 The design of all turbines and their connections shall be such that with full load and normal steam conditions the inlet steam velocity will not exceed 9,000 feet per minute. Steam passages shall be smooth and free from burrs or other obstructions likely to cause eddies. The exhaust velocity shall not exceed 15,000 feet per minute for noncondensing or 18,000 feet per minute for condensing operation.

3.2.16.2 The outline drawing shall contain a graphic presentation of the range of allowable forces and moments on the steam inlet and exhaust pipe connections. The graph shall be constructed in such a manner that the shipbuilder can compare various combinations of calculated forces and moments of the external piping systems with the allowable values on the graph and readily arrive at a piping layout which will not impose undue strain on these connections. The outline drawing shall also specify the thermal movement of the steam inlet and exhaust connections (see 3.2.10.5).

3.2.16.3 Steam connections, together with steam chests, necessary valves, piping, governors and safety devices shall be so arranged that they need not be disturbed in lifting of the turbine casings, unless otherwise approved by the bureau or agency concerned.

3.2.16.4 Exhaust connections shall be circular for noncondensing turbines.

3.2.16.5 Condensing turbines shall be provided with direct downward exhaust connections. The turbine manufacturer shall supply the gasket (if required), at the exhaust connection between turbine and condenser.

3.2.16.6 Noncondensing turbines shall be provided with direct downward or side outlet exhaust con-

REPRODUCED AT THE NATIONAL ARCHIVES

S39-1

GENERAL SPECIFICATIONS FOR MACHINERY

Bureau of Engineering, Navy Department

Subsection S39-1. – HEAT INSULATION AND LAGGING FOR PIPING AND MACHINERY

1 February 1939

(Superseding Subsection S39-1. Heat Insulation and Lagging for Piping and
Machinery, dated 1 February 1938)

GENERAL REQUIREMENTS

S39-1-a. Reference subsections:

Issue in effect, including changes in effect, on date of invitation for
bids shall govern. (Copies obtainable from the Bureau of Engineering.)

1. General requirements........................................ A1
2. Plans........................................................ S1-1
3. Materials, workmanship, and welding......................... S1-2
4. Bolts, studs, screws, nuts, etc............................. S1-3
5. Painting and preservation................................... S19-1
6. Fire-tube boilers........................................... S51-1
7. Water-tube boilers.......................................... S51-1
8. Boiler breechings and uptakes.............................. S52-1
9. Refrigerating plants, carbonic anhydride, $CO_2$ .......... S59-1
10. Refrigerating plants, dichlorodifluoromethane (F-12)....... S59-2

NOTE.– Details concerning the installation of insulation and lagging are
specified in most cases under the specifications covering the item of apparatus
in question.

S39-1-b. Reference Navy Department Specifications (N. D. Specs.):

Issue in effect on date of invitation for bids shall govern. (Copies obtain-
able from the Bureau of Supplies and Accounts, Navy Department, Washington, D. C.)

1. Aluminum alloy, sheet (class B, type II)................... 47A4
2. Aluminum foil (grade B).................................... 47A5
3. Brick, insulating, high temperature....................... 32B4
4. Cement, insulation......................................... 52C8
5. Cement, insulation, high-temperature...................... 32C14
6. Cloth, asbestos............................................ 32C11
7. Cork, compressed (corkboard).............................. 32C5


EXHIBIT
exhibit
H

| 8. | Cork, pipe covering, and segmental........................... | 32C12 |
| 9. | Duck, cotton, light weight.................................. | 24D3 |
| 10. | Felt, insulation, amosite asbestos........................... | 32F3 |
| 11. | Felt, hair................................................. | 32F2 |
| 12. | Insulation, high temperature, blocks, cement pipe covering.... | 32P3 |
| 13. | Magnesia, pipe covering, block, and cement................... | 32M2 |
| 14. | Packing, asbestos rope, and wick............................ | 33P5 |
| 15. | Pipe covering, rock wool, blanket and loose fill............. | 32P5 |
| 16. | Pipe covering, molded asbestos.............................. | 32P6 |
| 17. | Screws, machine............................................ | 42S5 |
| 18. | Steel, sheet, galvanized, Type II, class D.................. | 47S10 |
| 19. | Tape, insulating, thermal................................... | 32T1 |

S39-1-c.  General insulating requirements.

1.  The external surfaces of all steam, heated water, and certain fuel oil containing parts of piping, (see subpar. S39-1-m-1) flanges, valves, fittings, main and auxiliary machinery, boilers, evaporators, heaters, etc., from which heat may be lost by radiation under operating conditions shall be covered with heat-insulating material as hereinafter specified.  These provisions shall be considered as applying where the temperature of the surface is normally 100° F. or above, except as modified by subparagraph S39-1-m-2.

2.  All external heat-radiation surfaces of boiler-combustion spaces, tube nest, and uptakes shall be insulated by a method and with material of a type and thickness satisfactory to the Bureau of Engineering.  This material shall be such as will not deteriorate under the temperature to which it is exposed.

3.  All cold-water piping above floor level shall be covered with anti-sweat clothing as hereinafter specified, which shall be protected against moisture absorption, rotting, and disintegration under service conditions.  Cold water piping below floor level need not be covered except in dry storerooms or other locations where condensed moisture may be undesirable.  Any temperature normally less than 100° F. shall be considered as "cold".

4.  All piping and refrigerant-containing surfaces of refrigerating equipment shall be covered with a type and a thickness of insulating material satisfactory to the Bureau of Engineering; see Subsections S59-1 and S59-2.

5.  All Diesel engine exhaust piping, valves and fittings located in positions where exposed to the weather or to salt spray shall not be insulated or lagged but shall be coated on the outside with a suitable heat and corrosion resisting paint.  Suitable guards shall be installed to protect personnel.

S39-1

-3-

6. All steam piping, valves and fittings located in positions where exposed to the weather or to salt water spray shall be insulated watertight. Where this is not feasible the insulation and lagging shall not be applied but the exterior surfaces shall be coated with a corrosion and heat resisting paint. Suitable guards shall be installed to protect personnel.

S39-1-d. Installation.

1. Heat insulation, wherever applied, shall be protected against wear, abrasion, or displacement with lagging of sheet metal, stitched cotton duck, asbestos cloth, or by other material satisfactory to the Bureau of Engineering.

2. Particular consideration shall be given to the installation of insulating materials and lagging to insure ready removal and replacement as necessary for service maintenance and repair of the insulated apparatus without destruction or deterioration of such covering.

3. All insulating coverings shall be protected on the outside against moisture absorption in service, and the method of securing insulation shall be such as to prevent crushing or otherwise reducing the insulating value of the material used.

4. For painting of surfaces prior to applying insulating material, see Sub-section S19-1.

S39-1-e. General design.

1. Where the detailed specifications which follow hereafter do not specifically cover any surface requiring insulation, such surface shall be insulated in a manner similar to the requirements covering a condition which most nearly approximates that of the surface in question.

2. The following table gives the permissible temperature difference between the external surface of the finished insulation and the room temperature for the various piping sizes of piping temperature differences, and insulation thicknesses; such values are applicable to straight runs of piping, and where the average temperature difference over a given length of piping exceeds such figure the work shall be considered unsatisfactory and the matter referred to the Bureau for action. For method of taking temperature difference see paragraph S39-1-u, Acceptance Tests.

Case MDL No 875 Document 2233-1 Filed 02/15/13 Page 93 of 177 95

Table I — Table of limiting temperature differences between room and external surface of covering, °F. (For intermediate insulation thicknesses, exact difference may be taken from curves plotted from the table)

Outside diameter of piping, inches

| Thick-ness : Tem-cover- : perature ing : differ-pipe : ence, to room | .84:1.05:1.315:1.66:1.9:2.375:2.875:3.5: 4 :4.5: 5 :5.563:6.625:7.625:8.625:9.625:10.75:12.75: 14: 16: 18: |
|---|---|
| 1-inch : 200: | 27: 28: 30: 32: 33: 35: 36: 38: 39: 40: 41: 42: 43: 44: 45: 46: 47: 49: 50: 51: 52: |
| : 300: | 39: 41: 43: 46: 47: 50: 53: 54: 55: 56: 57: 58: 60: 61: 62: 64: 65: 67: 68: 69: 70: |
| : 400: | 51: 54: 57: 60: 62: 65: 67: 69: — : — : — : — : — : — : — : — : — : — : — : — : — : |
| 1-1/2 : 200: | 18: 19: 20: 22: 23: 24: 26: 27: 28: 29: 30: 31: 32: 33: 34: 35: 36: 37: 38: |
| inches: 300: | 27: 28: 30: 33: 34: 35: 37: 39: 40: 41: 42: 43: 45: 46: 47: 49: 50: 51: 52: 53: |
| : 400: | 36: 38: 40: 43: 45: 47: 49: 51: 53: 54: 56: 57: 59: 61: 62: 64: 65: 67: 68: 69: |
| 2- : 200: | 13: 14: 15: 16: 17: 18: 19: 20: 21: 22: 23: 24: 25: 26: 27: 28: 29: 30: |
| inches: 300: | 20: 22: 23: 25: 26: 28: 29: 30: 31: 32: 33: 34: 36: 37: 38: 39: 40: 41: 42: 43: |
| : 400: | 27: 29: 31: 33: 34: 36: 38: 40: 42: 43: 44: 45: 48: 50: 51: 52: 55: 56: 57: |
| : 500: | 35: 37: 39: 41: 43: 46: 48: 50: 52: 53: 55: 57: 58: 60: 62: 63: 64: 66: 68: 69: 70: |
| 3- : 200: | 9: 9: 10: 11: 11: 12: 13: 14: 14: 15: 15: 16: 17: 18: 19: 20: 20: 21: |
| inches: 300: | 13: 14: 16: 17: 18: 19: 20: 21: 22: 23: 24: 26: 27: 28: 29: 30: 31: |
| : 400: | 18: 20: 21: 24: 25: 27: 28: 29: 30: 32: 33: 34: 35: 36: 37: 38: 39: 40: 41: |
| : 500: | 23: 25: 27: 30: 31: 33: 36: 37: 38: 39: 41: 43: 44: 45: 47: 48: |
| : 600: | 28: 30: 33: 36: 37: 40: 42: 46: 47: 49: 51: 53: 54: 55: 57: 59: 61: 62: |
| 4- : 200: | 6: 7: 7: 8: 8: 9: 10: 10: 11: 11: 12: 13: 13: 14: 15: 16: |
| inches: 300: | 10: 11: 12: 14: 15: 16: 17: 18: 19: 20: 21: 22: 23: 24: |
| : 400: | 14: 16: 17: 18: 20: 21: 22: 23: 24: 25: 26: 27: 28: 30: 31: 32: |
| : 500: | 18: 19: 21: 26: 28: 29: 30: 32: 33: 34: 36: 37: 38: 39: 40: |
| : 600: | 21: 23: 25: 30: 32: 33: 34: 35: 37: 39: 40: 41: 45: 47: 48: 49: |
| : 700: | 24: 27: 30: 32: 33: 35: 37: 39: 41: 43: 45: 50: 52: 54: 56: 57: |
| : 800: | 28: 31: 34: 38: 40: 43: 44: 46: 48: 50: 52: 55: 58: 60: 62: 64: 65: |

NOTE. — For larger diameters the average temperature difference shall not exceed by more than 5 percent those given in the table for 18-inch pipe.

S39-1-f.  Materials.

1.  Magnesia, 85 percent (N. D. Spec. 32M2) or molded asbestos (N. D. Spec. 32P6) shall be used for insulating steam, hot water, and hot fuel oil containing sur-. faces to prevent loss of heat by radiation wherever the temperature of the insulated surface will be above 100° F. and will not exceed 500° F.

2.  High temperature insulation (N. D. Spec. 32P3), high temperature insulation cement (N. D. Spec. 32C14), or woven asbestos felt (N. D. Spec. 32F3) shall be used where the temperature of the insulated surface will be above 500° F. and will not exceed 850° F. (see subparagraph S39-1-f-9).  Molded asbestos (N. D. Spec. 32P6) may be used when the temperature does not exceed 750° F.

3.  High temperature insulation blocks (N. D. Spec. 32P3) shall be used for the insulation of combustion surfaces where the normal full-power operating tempera- .ture will exceed 500° F. and will not be in excess of 1500° F. (see subsection S51-1 and S51-2).

4.  High temperature insulating bricks and mortar (N. D. Spec. 32B4) shall be used for the insulation of combustion surfaces such as in oil-fired furnaces in general, where the normal full-power operating temperature will exceed 1,500° F. and will not be in excess of 2,500° F.

5.  In lieu of the materials specified in subparagraphs 1 and 2 above, "crinkled" aluminum foil (N. D. Spec. 47A5, grade B), or rock wool (N. D. Spec. 32F5) may be used, subject to all of the following conditions:

    (a) Where weight saving is a consideration and where definite saving in weight will result.
    (b) Where the temperature does not exceed 850° F.
    (c) When specifically approved by the Bureau.

6.  In addition to the optional materials listed in subparagraph 5, above, where irregular surfaces are to be covered, asbestos cloth pads of convenient size may be used when specifically approved by the Bureau.  The asbestos cloth shall be in accordance with N. D. Spec. 32C11, type B.  The pads shall be filled with magnesia asbestos cement, pulverized magnesia block (N. D. Spec. 32M2), amosite or chryso- tile asbestos fiber, or rock wool (N. D. Spec. 32F5) where the temperature will not exceed 500° F.  Where the temperature is above 500° F. and not in excess of 850°F. asbestos cloth (N. D. Spec. 32C11, type C) shall be used on the inside and asbestos cloth (N. D. Spec. 32C11, type B or A) on the outside surface.  For these tempera- tures the pads shall be filled with asbestos fiber or rock wool fiber (N. D. Spec. 32F5).  Pads shall be sewed and quilted with fine nickel-copper or brass wire or with asbestos twine (N. D. Spec. 32C11, type D) in such a manner as to provide a uniform thickness of insulation.

839-1

7. All refrigerant and refrigerated liquid containing surfaces, including piping, shall be insulated with cork (N. D. Specs. 3205 or 32012). Refrigerated drinking water piping shall be insulated with hair felt (N. D. Spec. 32F2) or molded cork (N. D. Spec. 32012).

8. Cold-water piping where insulated to prevent sweating shall be covered with a combination of hair felt (N. D. Spec. 32F2) and plain, asphaltum-duplexed waterproofed kraft paper.

9. Corrugated piping shall be insulated as follows:

(a) The corrugations shall be filled with asbestos rope (N. D. Spec. 33P5) applied in single lengths or turns, stitched or wired together at the ends, and of sufficient diameter so that when flattened it will completely fill the corrugations.

(b) Tailored asbestos pads of suitable thickness (see subparagraph S39-1-g-1) composed of asbestos cloth and filled with felted asbestos fiber (N. D. Spec. 32F3) or felted rock wool (N. D. Spec. 32P5) shall be applied and securely fastened by lacing wires. When the confined temperature exceeds 500° F., the asbestos cloth (N. D. Spec. 32011) next to the pipe shall be type C. On the outer side and for temperatures less than 500° F. it shall be type A or B.) Lagging as required by the service shall be applied.

(c) Creased piping shall be insulated in the same manner as corrugated piping except that the asbestos rope may be omitted from the creases.

S39-1-g. Forms, types, and thickness of insulating materials.

1. Heat-insulating materils shall be furnished in the various forms shown by the specifications in the following table as required:

    (a) Temperature below 100° F.............N. D. Specs. 32F2, 3205, or 32012.
    (b) Temperature 100° to 500° F...........N. D. Specs. 32M2, 32P6 or 47A5*.
    (c) Temperature 500° to 850° F**........N. D. Specs. 32P3, 47A5, 32P5* or
                                    32F3.
    (d) Temperature 850° to 1,500° F.........N. D. Spec. 32P3.
    (e) Temperature 1,500° to 2,400° F.......N. D. Spec. 32B4.

     * See subparagraph S39-1-f-5.
    ** When the temperature does not exceed 750° F. N. D. Spec. 32P6 may be used.

2. Where the operating temperature is less than 100° F., the type and thickness of insulating material shall conform to the following requirements for the temperature and applications indicated:

| Maximum Operating Temperature | Character of insulation | | | |
|---|---|---|---|---|
| | Pipe covering | | Coolers, tanks, etc. | |
| | N. D. Specs.: | Type | N. D. Specs.: | Thickness |
| | | | | Inches |
| (a) - 30° to 0° F. | 32C12 | C | 3205 | 4 |
| (b) 1° to 35° F. | 32C12 | B | 3205 | 3 |
| (c) 36° to 49° F. | 32C12 | A | 3205 | 1-1/2 |
| (d) 50° to 99° F. | 32F2 | - | 32F2 | 1 |

3. The type and thickness of insulating material for covering piping shall conform to the following requirements for piping four inches and larger and for the temperatures indicated unless otherwise approved.

| Maximum operating temperature | Character of insulation | |
|---|---|---|
| | Regular | |
| | Type | N. D. Specs. |
| (a) 100° to 267° F. | I | 32M2 or 32P6 |
| (b) 268° to 338° F. | 1-1/2-inch | 32M2 or 32P6 |
| (c) 339° to 388° F. | II | 32M2 or 32P6 |
| (d) 389° to 500° F. | 3-inch | 32M2 or 32P6 |
| (e) 501° to 850° F. (Note 1) | B | 32P3 or 32P5 |

NOTE 1. - When the temperature does not exceed 750° F. N. D. Spec. 32P6 may be used.

4. For piping 2-inches to 3-1/2-inches inclusive, the following requirements shall apply unless otherwise approved.

(a) 100° F. to 338° F., type I, N. D. Spec. 32M2 or 32P6 (see subpar. S39-1-f-1).

(b) 339° F. to 388° F., 1-1/2-inch, N. D. Spec. 32M2 or 32P6 (see subpar. S39-1-f-1).

(c) 389° F. to 500° F., 3-inch, N. D. Spec. 32M2 or 32P6 (see subpar. S39-1-f-1).

(d) 501° F. to 850° F., type B, N. D. Spec. 32P3, or type A, N. D. Spec. 32P5, (see subpar. S39-1-f-5) when the temperature does not exceed 750° F., N. D. Spec. 32P6 may be used.

REPRODUCED AT THE NATIONAL ARCHIVES

S39-1

-8-

5. For piping smaller than 2-inches, the following requirements shall apply unless otherwise approved.

    (a) 100° F. to 388° F., type I, N. D. Spec. 32M2 or 32P6 (see subparagraph S39-1-f-1).
    (b) 389° F. to 500° F., type II, N. D. Spec. 32M2 or 32P6 (see subparagraph S39-1-f-1).
    (c) 501° F. to 850° F., type A, N. D. Spec. 32P3 - Note 2.
    (d) 100° F. to 750° F., for piping less than 1/2-inch size, a single layer of insulating tape (N. D. Spec. 32T1.) at least 1/4-inch thick may be used in place of the materials required under (a) and (b) above.

    NOTE 1. - Gage lines need not be insulated.
    NOTE 2. - When the temperature does not exceed 750° F. N. D. Spec. 32P6 may be used.

6. The type and thickness of insulating block materials for surfaces of large extent, such as boiler and superheat drums, turbines, feed-water heaters, evapora-tors, tanks, etc., shall conform to the following requirements for the temperatures indicated, unless otherwise approved.

    (a) 100° F. to 338° F., N. D. Spec. 32M2 or 32F3 1-1/2-inches in thickness. (See subparagraph S39-1-f-5).
    (b) 339° F. to 500° F., N. D. Spec. 32M2 or 32F3, 3-inches in thickness. (See subparagraph S39-1-f-5).
    (c) 501° F. to 850° F., type C, N. D. Spec. 32P3, 32F3, or type B, N. D. Spec. 32P5, 4-inches in thickness.

7. The thickness of aluminum-foil (grade B, N. D. Spec. 47A5) insulation for surfaces of large extent shall conform to the following requirements for the temperature indicated. One layer of "crinkled" foil shall occupy approximately 3/8 inch of insulation thickness.

| Maximum operating temperature: | Thickness of insulation: |
|---|---|
| (a) 100° F. to 338° F.........: | 4 layers |
| (b) 339° F. to 500° F.........: | 8 layers |
| (c) 501° F. to 850° F.........: | 10 layers |

S39-1-h. Lagging.

1. Lagging shall be provided to protect insulated coverings.

2. Where sheet steel (N. D. Spec. 47S10) is used as the lagging material for piping, flanges, valves, and fittings, it shall be hot dipped galvanized sheet 0.014-inch nominal thickness.

-9-

3.  Where aluminum foil is used as the insulating material for piping, flanges, valves, and fittings, steel laggings shall be hot dipped galvanized sheet 0.025-inch nominal thickness.

4.  Hot dipped galvanized sheet steel not less than 0.025-inch nominal thickness shall be used for applications where the thickness of metal lagging is not specified.

5.  Sheet aluminum (N. D. Spec. 47A4, class B, type II) may be used in lieu of steel lagging provide the thickness of the sheet aluminum is at least double the thickness of the steel.

6.  Metal lagging shall be secured by using lap joints with a bead on the exposed edge, fastened with hardened self-tapping screws in punched holes, making their own thread, or by polished brass bands (N. D. Spec. 32M2 or 32P3) fastened with round head brass screws (N. D. Spec. 42S5).

7.  Soft texture cotton duck lagging (N. D. Spec. 24D3) or asbestos cloth (N. D. Spec. 32C11) shall be installed where specified. It shall be fitted smooth and be well sewed on using not less than three stitches to the inch. (See metal cuffs required, subparagraph S39-1-i-7.)

8.  Cotton duck or asbestos cloth lagging is not required where insulation is lagged with metal and shall not be used with aluminum-foil insulation.

9.  Care shall be taken in fitting lagging to insure that insulation is not crushed.

10.  All galvanized steel metal lagging shall be painted on the inside surface with two coats of aluminum paint before installation. For painting of lagging and identification striping of piping, see Subsection S19-1.

11.  On all boiler feed and feed heater drain booster pumps and on all auxiliary turbines except those for forced draft blowers and turbo-generators, the metal lagging may be omitted and the following substituted; a coating 1/2-inch thick of insulating cement (N. D. Spec. 32C14) tempered with portland cement (4 parts insulating cement to 1 part portland cement) trowel-rubbed to a smooth finish over the insulation. After drying 24 hours a insulation cement (N. D. Spec. 52C8) shall be applied to the hard finish cement and allowed to dry for 1 hour, after which a second coat of the same cement shall be applied and allowed to dry. The insulation shall then be covered with asbestos cloth (N. D. Spec. 32C11) which shall be coated on the underside with the insulation cement and allowed to dry for 72 hours. The asbestos cloth shall be painted as required by subparagraph S19-1-g-2 of Subsection S19-1. The edges of the asbestos cloth shall be bevelled with asbestos and portland cement as a protection against being torn away at the edge.

S39-1

–10–

S39-1-1. Methods of securing insulation.

1. Each layer of sectional or segmental pipe covering shall be applied with joints tightly butted together and except for rock wool and cork, shall be held in place with not less than three separate loops per section of 0.049-inch diameter annealed hot dipped galvanized iron, nickel-copper, or brass wire. The second layer of multiple pipe covering when two layers are used shall be applied over the first so that both circumferential and axial joints are broken.

2. Rock wool sectional pipe covering shall be held in place by drawing it sufficiently tight to prevent working or chafing of the fibrous material and by securing it in this condition with hog rings or wire lacing. Each end of each run of rock wool sectional pipe covering shall be beveled and finished with insulating cement (N. D. Spec. 32C14).

3. For cork sectional pipe covering, see Subsection S59-1 and S59-2.

4. Aluminum foil insulation for large surfaces shall be applied in accordance with Bureau standard B-155, unless exceptions are authorized by the Bureau of Engineering. Special care shall be observed to prevent the crushing of the foil to less than approximately 3/8-inch per layer both during and after installation. Any foil that is crushed materially beyond this set limit shall be replaced.

5. Hair felt shall be applied in the following manner. The piping or surface shall first be covered with one or more layers of plain, asphaltum-duplexed waterproofed kraft paper or fabric; this layer shall be lapped 3-inches in each direction and secured with single jute twine spirally wrapped on 4-inch centers. The hair felt covering shall then be applied over the paper, closely wrapped with no spacing and secured with heavy jute twine spaced on 1-inch centers. The outside shall be protected by a plain asphaltum-duplexed waterproofed kraft paper before the lagging is applied.

6. For surfaces of large extent, such as boilers and superheaters, evaporators, feed-water tanks, and heaters, etc., the block or woven asbestos felt covering shall be held in place with 1/8-inch flexible hot-dipped galvanized steel cable spaced on 9-inch maximum centers; 1-inch mesh galvanized wire netting with wire 0.049-inch in diameter shall then be spread over the surface and shall be held by wiring to the steel cable.

7. Insulating cement (N. D. Spec. 32M2 or 32C14) shall be used to fill all crevices, to smooth all surfaces, and to completely coat the wire netting before lagging sectional, segmental and block insulation in all cases.

Case 1:14-cv-00075-DAP Document 1983-1 Filed 02/22/13 Page 100 of 177

-11-

8.  The insulation of continuous surfaces broken by flanges, valves or
fittings shall be stopped off by bevelling the end of the insulation at an angle
of 45 degrees with the surface so that the bolts or fittings may be removed easily.
When the method in S39-1-t-11 is used, the insulation shall be stopped off square.
If the piping is more than 1-1/2-inches in diameter and in any case if the tempera-
ture of the piping exceeds 100° F., the bare surface of flanges, valves or fittings
shall be covered by easily removable insulation or by insulating cement (N. D.
Specs. 32M2 or 32C14).

9.  Insulation and lagging on manhole covers, handhole covers, screwed
fittings, and other openings in general as may be required for accessibility shall
be readily removable and replaceable without injury.

10.  Where it is necessary to install readily removable and replaceable in-
sulation on flanges, valves and fittings, tailored pads shall be used.  These shall
be made and filled as described in subparagraph S39-1-f-6.

11.  In lieu of the method described in the preceding paragraph flanges may be
insulated as shown in Bureau of Engineering standard drawing 2419 Sk.

12.  Where readily removable and replaceable insulation of heated flanges,
valves and fittings is not required, insulation cement (N. D. Spec. 32C14, type B)
shall be applied in plastic form to a thickness equal to that of the adjacent in-
sulation.  The metal cuffs, (see subparagraph S39-1-i-13), installed adjacent to
each flange, valve or fitting will serve as a form for the plastic material.  Heat
shall be applied from within to dry out the insulation and avoid corrosion of the
metal as soon as practicable and within 24 hours after installation of the plastic
insulation.  After drying, a coating 1/2-inch thick of cement tempered with port-
land cement (4 parts cement to 1 part portland cement) shall be applied over the
insulation and trowel-rubbed to a smooth finish.  For lagging, when it is consider-
ed necessary, see subparagraph S39-1-m-3.

13.  The insulation of flanges with plastic material should not be undertaken
until all heated lines have been tested and the final setting up of all bolts
accomplished.

14.  Where cotton duck or asbestos cloth is used on any heated piping above
1-1/2-inch in diameter, light galvanized sheet steel detachable cuffs 2 to 6 inch-
es in width depending upon pipe size shall be fitted over the lagging and bevelled
ends where the insulation ends, adjacent to flanges, valves or fittings.  The metal
cuff shall not come in contact with the heated metal surface.

S39-1

-12-

15. When metal lagging is required on removable and replaceable covers for flanges, valves and fittings (see subparagraph S39-1-m-3), the covers shall be made up with two bolted halves each consisting of galvanized sheet steel. Amosite asbestos felt (N. D. Spec. 32F3) shall be attached to the metal cover with silicate of soda. Additional layers of felt shall be cemented to each other to make up the desired thickness. An inside layer of asbestos cloth (N. D. Spec. 32C11, type B) shall be cemented to the felt with silicate of soda.

16. In the case of large flanges, such as on turbines, steam chests, etc., insulating pads made and filled as described in subparagraph S39-1-f-6 shall be used. The pads shall be shaped to fit accurately to the flange projection and shall have suitable hooks for lacing wire so that they may be drawn tightly over the flange. It is preferred that the pads be made with metal eyes along the edges through which wire puckering strings may be run for drawing it tightly around the flange or other part to be covered. The pads shall be installed so as to project well over the insulation of the adjacent surface.

## DETAILED REQUIREMENTS

S39-1-j. Reciprocating engines, propulsion.

1. The cylinders, valve chests, and steam-containing surfaces of main propulsion reciprocating engines shall be insulated with block or segmental, 85 percent magnesia (N. D. Spec. 32M2), secured as described in subparagraph S39-1-i-6, smoothed and pointed with insulating cement of the same material, and neatly lagged all over with galvanized sheet iron 0.025-inch nominal thickness.

2. Insulating material shall have the following thicknesses:

High-pressure cylinders and valve chests, 3-inches.
Intermediate-pressure cylinders and valve chests, 2-inches.
Low-pressure cylinders and valve chests, 1-inch.

3. Upper cylinder heads shall be insulated in the same manner as the corresponding cylinders and valve chests, but instead of sheet-metal lagging shall be arranged with cast-iron plates with diamond checked non-slip upper surfaces.

S39-1-k. Reciprocating engines, auxiliary.

1. All auxiliary reciprocating engine steam cylinders, valve chests, covers, etc., shall be insulated and lagged as specified in subparagraph S39-1-j-1; except that the type and thickness of the insulating material used shall conform to requirements shown in subparagraph S39-1-g-6. The insulation and lagging shall be so fitted that the whole is readily removable and replaceable without injury.

S39-1

-13-

S39-1-ℓ.  Turbines, propulsion and auxiliary.

1.  All surfaces having a maximum operating temperature of 100° F. or more
shall be insulated as specified herein.  (See also subparagraph S39-1-h-11).  The
principal references are as follows:

    (a) Materials, paragraph S39-1-f.
    (b) Forms, types, and thickness, paragraph S39-1-g.
    (c) Methods of securing, paragraph S39-1-i.

2.  The permanent insulation shall be secured to the turbine by steel hooks
spot-welded to the turbine casings, and cadmium plated steel rings backed up by
galvanized steel washers on both sides of the asbestos cloth with copper lacing
wires 0.08-inch in diameter.

3.  The insulation shall be covered with a coating 1/2-inch thick of insulating
cement (N. D. Spec. 32C14) tempered with portland cement (4 parts insulating
cement to 1 part portland cement) trowel-rubbed to a smooth finish over the in-
sulation.  After drying 24 hours an insulation cement (N. D. Spec. 52C8) shall be
applied to the hard finish cement and allowed to dry for 1 hour, after which a
second coat of the same cement shall be applied and allowed to dry.  The insulation
shall then be covered with asbestos cloth (N. D. Spec. 32C11) which shall be coat-
ed on the underside with insulation cement (N. D. Spec. 52C8) and allowed to dry
for 72 hours.

S39-1-m.  Steam, heated-water, and fuel-oil piping insulation.

1.  Steam, heated-water, and fuel-oil piping from fuel oil heater to control
valves, including flanges, fittings, and valves shall be insulated as specified
herein.  The principal references are as follows:

    (a) Materials, paragraph S39-1-f.
    (b) Forms, types, and thickness, paragraph S39-1-g.
    (c) Lagging, paragraph S39-1-h.
    (d) Methods of securing, paragraph S39-1-i.

2.  Flanges, fittings, and valves for the following applications need not be
insulated or lagged unless otherwise specified or approved.

    (a) In fuel-oil suction piping.
    (b) In piping which normally operates with an internal pressure less than
        atmospheric.

REPRODUCED AT THE NATIONAL ARCHIVES

S39-1

-14-

3. The lagging material shall conform to the following:

| Piping, fittings, and valves | Lagging |
|---|---|
| (a) All heated lines, except fuel oil lines. | |
| (1) When the confined temperature is 500° F. or less. | Stitched cotton duck |
| (2) When the confined temperature is higher than 500° F., or when the line is within 18 inches of the lagged surface of superheated steam pipes. | Asbestos cloth |
| (b) When heated lines are exposed to chafing abrasion, or to the weather. | Galvanized sheet steel or sheet aluminum. |
| (c) Fuel oil lines | Galvanized sheet steel or sheet aluminum. |

S39-1-n. Feed-water heaters, fuel-oil heaters, evaporators, separators, tanks, traps, etc.

1. All of the exposed surfaces of feed-water heaters, evaporators, separators, feed tanks, traps, and heaters and tanks in general shall be insulated as specified herein. The principal references are as follows:

   (a) Materials, paragraph S39-1-f.
   (b) Forms, types and thickness, paragraph S39-1-g.
   (c) Lagging, paragraph S39-1-h.
   (d) Methods of securing, paragraph S39-1-i.

2. The lagging shall conform to the following requirements:

   (a) The insulation shall be covered and lagged as described in subparagraph S39-1-ℓ-3.
   (b) Traps shall be lagged with cotton duck (N. D. Spec. 24D3).
   (c) For other equipment subject to abrasion, the lagging shall be galvanized sheet steel 0.014-inch nominal thickness; where equipment is not subject to abrasion, cotton duck (N. D. Spec. 24D3) may be used. (See paragraph S39-1-h).

S39-1-o. Main, auxiliary, and distilling condensers, and exhaust trunks.

1. All main, auxiliary, and distilling condensers, including connections thereto, shall be insulated when the normal operating vacuum is 26 inches of mercury or less (approximately 126° F. or more). Where the normal operating vacuum is more than 26-inches of mercury (approximately 125° F. or less), such equipment shall not be insulated, unless otherwise specified or approved.

-15-

2. If insulation is required, it shall be as specified herein. The principal references are as follows:

    (a) Installation, paragraph S39-1-d.
    (b) Materials, paragraph S39-1-f.
    (c) Forms, types, and thickness, paragraph S39-1-g.
    (d) Lagging, paragraph S39-1-h.
    (e) Methods of securing, paragraph S39-1-i.

3. Insulation material shall be covered and lagged as described in subparagraph S39-1-l-3.

4. The flanges and joints of apparatus operating below atmospheric pressure shall in general not be covered with insulation or lagging in order that inspection for leaks can readily be made.

S39-1-p. Cold-water piping, coolers, etc.

1. Cold-water piping shall be insulated as specified herein. The principal references are as follows:

    (a) General, paragraph S39-1-c.
    (b) Materials, paragraph S39-1-f.
    (c) Forms, types and thickness, paragraph S39-1-g.
    (d) Lagging, paragraph S39-1-h.
    (e) Methods of securing, paragraph S39-1-i.

2. Flanges, valves and fittings on cold-water piping shall be insulated with hair felt (N. D. Spec. 32F2) not less than 3/4-inch in thickness and secured in place with a close wrapping of heavy jute twine. Hard finish insulating cement shall be applied over the hair felt and troweled to a smooth and uniform finish. The whole shall then be covered with a plain asphaltum-duplexed waterproofed kraft paper lagging.

S39-1-q. Boiler drums, heads, etc.

1. Boiler drums, heads, and all external steam or water-containing surfaces not exposed to the heat of combustion shall be insulated as specified herein. The principal references are as follows:

    (a) General; paragraph S39-1-c.
    (b) Installation; paragraph S39-1-d.
    (c) Materials; paragraph S39-1-f.
    (d) Forms, types and thickness; paragraph S39-1-l.
    (e) Lagging; paragraph S39-1-h.
    (f) Methods of securing; paragraph S39-1-i.

THE NATIONAL ARCHIVES

S39-1

-16-

2. The whole of the above insulation shall be covered and lagged as described in subparagraph S39-1-l-3.

S39-1-r. Boiler-combustion surfaces.

1. See Subsection S51-1 and S51-2.

S39-1-s. Boiler breechings and uptakes.

1. See Subsection S52-1.

S39-1-t. Refrigerating equipment.

1. For the insulation of refrigerating containing surfaces, the type and thickness of insulation shall be as specified in paragraph S39-1-g. The insulation material shall be secured and lagged as specified in Subsections S59-1 and S59-2.

TESTS

S39-1-u. Acceptance tests.

1. If doubt exists as to the quality of the insulating material used, the Bureau's inspector may require samples for chemical analysis.

2. Acceptance after installation shall be based on careful inspection of the workmanship and finish. However, on important equipment such as high-pressure high temperature steam lines, boilers, turbines, casings, pumps, etc., the efficiency of the insulation shall be determined by tests to be made by the contractor and witnessed by the inspector, the results to be checked against the data in the table given in paragraph S39-1-e; a report of these tests shall be made to the Bureau of Engineering by the inspector, the report to include all the data taken during the tests. Such test should not be started until steam at normal temperature has been flowing in the line or equipment for at least 6 hours, and readings should be continued until no increase in external temperature is noted. The piping temperature should be determined by suitable thermometer wells or the thermocouples. The insulation surface temperature should be obtained against the lagging, preferably by means of copper constantan thermocouples protected from drafts and covered with paper labels or other suitable covering. The average temperature should be taken from four thermocouples spaced about 90° apart. These couples should not be placed over cracks or joints in the insulation. Where pipe-line covering is being checked, the couples should be placed in horizontal runs of at least 10 feet and not less than 1-1/2 feet from either end of the section. This test shall be conducted in such a manner as not to interfere unduly with the completion of the vessel and, preferably, should be made during the preliminary trials thereof.

Case 1:14-cv-00075-DAP Document 1983 Filed 02/23/15 Page 106 of 177 Page ID #7108

REPRODUCED AT THE NATIONAL ARCHIVES

N. Eng. &-O
(Rev. 7-38) S1-4 (1-38-Ds)

A
B
K
G
P
W
N
F
D

**3 FEB 1939**

From:    Bureau of Engineering.
To   :    All Navy Yards, Naval Stations, Naval Inspectors,
        Fleet Commanders, Tenders, Repair Ships, and
        Shipbuilders and Manufacturers in possession of
        complete copies of the General Specifications for
        Machinery.

Subject:  General Specifications for Machinery - Subsection S39-1.

    1.  The Bureau forwards, herewith, revised Subsection S39-1,
of the General Specifications for Machinery, dated 1 February 1939,
relative to Heat Insulation and Lagging for Piping and Machinery.
This revised Subsection should be inserted in the copies of the
General Specifications for Machinery in your possession in place
of the present subsection.

    2.  Current contracts are not affected by the changes from
the old edition, unless agreed to by the contractor concerned. If
current contracts are based on the old edition, copies thereof
should be retained by inspectors and others concerned.

    3.  In the event that a file is not being kept of the various
subsections of the General Specifications for Machinery which have
been furnished in the past by this Bureau, it is requested that
the enclosed subsection be returned. Should the number of subsec-
tions furnished be more than required for such files as are kept,
it is requested the excess be returned.

Da
Db
Dc
Dd
Dk
Do
Dr
Ds
Dv

DYe
DYf
DYg
DYh
DYi
DYl
DYn
DYp
DYq
DYt
DYu
DYx
YDz

Y

Yo
Ym
Yr

R

Rc

J. M. Irish
Assistant Chief of Bureau

MIL-M-15071E(SHIPS)
16 April 1962
SUPERSEDING
MIL-M-15071D(SHIPS)
6 June 1961
MIL-M-16616(SHIPS)
4 February 1966

## MILITARY SPECIFICATION

## MANUALS, EQUIPMENT AND SYSTEMS

### 1. SCOPE

1.1 Scope. – This specification sets forth Bureau of Ships requirements for manuals necessary for installation, operation, maintenance, and repair (without the services of manufacturer's representatives) of equipment and systems.

1.2 Classification. – Manuals shall be of the following types, as specified (see 3.1):

Type I – Electrical and mechanical equipment manuals.
Type II – Electronic and specialized equipment manuals.
Type IIa – Experimental equipment manuals.
Type III – Systems manuals.

### 2. APPLICABLE DOCUMENTS

2.1 The following documents, of the issue in effect on date of invitations for bids, form a part of this specification to the extent specified herein:

SPECIFICATIONS

MILITARY
MIL-D-963 – Drawing, Electrical, Hull and Mechanical Equipment for Naval Shipboard Use.
MIL-M-21741 – Manual, Technical, Maintenance Standard Book.
MIL-D-23140 – Drawing, Installation Control and Preliminary Data (for Electronic and Related Equipment).

STANDARDS

MILITARY
MIL-STD-12 – Abbreviations for Use on Drawings and in Technical-Type Publications.
MIL-STD-15-1 – Graphical Symbols for Electrical and Electronic Diagrams, Part 1.
MIL-STD-15-2 – Electrical Wiring Symbols for Ships' Plans, Part 2.
MIL-STD-15-3 – Electrical Wiring Symbols for Architectural and Electrical Layout Drawings, Part 3.

MIL-STD-16 – Electrical and Electronic Reference Designations.
MIL-STD-17 – Mechanical Symbols.
MIL-STD-806 – Graphic Symbols for Logic Diagrams.

PUBLICATIONS

DEPARTMENT OF DEFENSE
DD Form 441 (Attachment) – Industrial Security Manual for Safeguarding Classified Information.

BUREAU OF SHIPS
NAVSHIPS 250-000 – Bureau of Ships Technical Manual
NAVSHIPS 94500 – Preparation Guide for Electronic Equipment Technical Manuals.
NAVSHIPS 900,000,102 – Handbook of Electronic Circuits.

(Copies of specifications, standards, and publications required by contractors in connection with specific procurement functions may be obtained from the bureau or activity concerned or as directed by the contracting officer.)

2.2 Other publications. – The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids shall apply.

AMERICAN STANDARDS ASSOCIATION (ASA)
Y14,15 – Electrical Diagrams.

(Applications for copies should be addressed to the American Standards Association Inc., 10 East 40th Street, New York 16, N.Y.)

OFFICIAL CLASSIFICATION COMMITTEE
Uniform Freight Classification Rules.

(Applications for copies should be addressed to the Official Classification Committee, 1 Park Avenue at 33rd Street, New York 16, N.Y.)

FSC 7610

THIS DOCUMENT CONTAINS _____ PAGES.

Provided by IHS
No reproduction or networking permitted without license from IHS

**EXHIBIT**

I

MIL-M-15071E(SHIPS)

## 3. REQUIREMENTS

3.1 Level of writing. - As a general guide, the level of writing should be that for a high school graduate having specialized training as a technician through Navy training courses. Operating instructions shall be written to the level of an operator having previous experience in the operation of similar or related equipment. The level of writing for other portions of the manual shall be to that of a technician having previous maintenance experience with similar or related equipment. These manuals are required to be written to the level of understanding of a Navy Technician Third Class. Technical manuals for experimental equipment (type IIa) should be written to the level of understanding of an engineer. To help contractors determine the nature, content and level of training given in the Navy Class A schools, manufacturers may request Inspectors of Naval Material to requisition training material on loan for the duration of the need.

3.2 References. - The Bureau of Ships Technical Manual, NAVSHIPS 250-000, describes the theory, operation and maintenance of many equipments and systems. Common electronic circuits are described in the Handbook of Electronic Circuits, NAVSHIPS 900,000,102. Accordingly, it will not be necessary to repeat this type of data in equipment or systems manuals except by reference. New or unique applications shall be fully described, to acquaint the technician with their principles of operation and maintenance.

3.3 Contents. - Manuals shall contain the following data, as applicable, arranged in an appropriate order to provide adequate instruction for installation, operation and maintenance of the equipment or system:

> Front matter
> General information
> Installation
> Operation
> Trouble shooting
> Maintenance
> Parts list
> Index

3.3.1 Front matter. - Standard front matter, listed in the normal sequence of appearance, shall consist of the following:

3.3.1.1 Cover and title page. - The cover shall contain the information shown in figure 1. The title page shall contain the information shown in figure 2.

3.3.1.2 Approval and procurement record page. - For type I manuals only, the approval and procurement record (APR) page shall follow the title page, and shall conform to figure 3.

3.3.1.3 List of effective pages. - The list of effective pages shall list all pages of the manual and shall indicate the issue information of each page (see 3.10.2.3). In multi-volume manuals, this page shall be included in volume 1 only.

3.3.1.4 Table of contents. - The table of contents shall list all primary divisions (chapters, sections, and paragraphs), with their corresponding page numbers. In multi-volume manuals, volume 1 shall contain a complete table of contents for all volumes; each subsequent volume shall contain its own table of contents.

3.3.1.5 List of illustrations. - The list of illustrations shall contain a complete listing of figures, titles, and page numbers. In multi-volume manuals, volume 1 shall contain a complete list of illustrations; each subsequent volume shall contain its own list of illustrations.

3.3.1.6 List of tables. - The list of tables shall contain a complete listing of all tables, titles, and page numbers. In multi-volume manuals, volume 1 shall contain a complete list of tables; each subsequent volume shall contain its own list of tables.

3.3.2 General information. - The manual shall include an over-all description of the functions and purpose of the equipment. This information is intended for use at the command level and others requiring a general summary of the equipment or system and its performance, advantages and limitations. It should not include information on operation and maintenance.

3.3.2.1 Description. - The functioning of the equipment or system as a whole and of its interrelated units shall be described. The functional description shall be non-technical in nature and shall describe the intended use (why, where, when, and with what), capabilities, and limitations of the equipment or system. Text covering physical descriptions or structural arrangements shall be brief, with special attention given to avoiding the inclusion of unnecessary or repetitious details that are easily illustrated. If the manual covers more than one model equipment or system, a statement or table pointing out the differences shall be provided. A list of equipment supplied, together with the approximate volume, weight, and over-all dimensions of each unit, if applicable, shall also be included. A list of equipment or publications required but not supplied and a compilation of quick reference data shall also be included. The quick reference data shall consist of pertinent technical or design characteristics of the equipment. Examples of such data are:

> (a) Descriptive (nameplate) data necessary to identify manufacturer, type, model,

2

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01432852
Not for Resale,2006/04 20:22:11 GMT

MIL-M-15071E(SHIPS)

(b) Functional characteristics, such as:
    Power requirement
    Types of operation
    Power output
    Frequency
    Pulse characteristics
    Sensitivity; selectivity
(c) Capabilities, such as:
    Rated ranges
    Coverage
    Resolution
    Accuracy
(d) Rated outputs, such as:
    Wattages
    Voltages
    Horsepower
    Gallons per minute
(e) Special characteristics, such as:
    Operating temperatures
    Heat dissipation per unit
    Pressure
    Humidity
    Tolerances
(f) Other pertinent characteristics

3.3.3 Installation. - Installation information, as necessary to summarize installation drawings (conforming to MIL-D-963 or MIL-D-23140, as applicable), such as: site selection, unpacking and handling (where abnormal procedures or precautions are required), preparation of foundations, power requirements, mechanical assembly procedures, mounting instructions, bolting diagrams, safety precautions or guards, grounding and bonding, clearances for access, ventilation, motion under shock, methods of testing to assure satisfactory installation, and other recommendations for reduction of electrical or radio interference shall be provided. Information shall also be included to describe and illustrate, as necessary, the procedures to prepare the equipment for reshipment, taking into account complicated disassembly or dismantling procedures and known requirements for special handling of the equipment.

3.3.4 Operation. - Operating instructions shall include routine and emergency procedures (manual, automatic, local, and remote), safety precautions, quantitative and qualitative limits to be observed in the starting, operating, stopping, or shutting down of the equipment or systems. Where operating procedures or adjustments are to be performed in a specific sequence, step-by-step procedures shall be given; tables or charts, as necessary, are preferred for the presentation of such procedures. Adequate illustrative material shall supplement the text, to identify and locate all operating control and indicating devices. Tables which present the function of each operating control and indicating device, as well as the normal in-use position or indication, shall be included. Operating and stand-by cycling time for

maximum over-all equipment life shall also be included. Emergency operating instructions shall describe procedures to be followed when normal operation is not possible because of emergency conditions, such as: power failure, "battle short" operation, control air failure, lube-oil failure, partial failure of equipment, and so forth.

3.3.4.1 Operator's maintenance. - It is the intent of this specification that the operator's information include any maintenance procedures within the capability of an operator. This capability is limited to procedures governing periodic inspection, cleaning, servicing, preservation, lubrication, adjustment, and minor parts replacement (fuses, dry batteries, indicator lamps, and so forth) which do not require the need for internal alignment or complex adjustment.

3.3.5 Trouble shooting. - The manual shall provide the maintenance technician with adequate details for quickly and efficiently locating the cause of an equipment malfunction. The discussions shall contain concise information (to the extent needed) on how the equipment operates. The discussions shall be in order of operational or data sequence, as applicable. Block diagrams, simplified schematic diagrams of electrical, mechanical, hydraulic, pneumatic, and electronic circuits or systems, performance curves, and nomographs shall be used to support the discussions wherever necessary. Trouble-shooting information required to localize any trouble to a particular functional division (or unit) shall be included, to serve as a guide in isolating faults.

3.3.6 Additional specific requirements for types I, II, and III manuals are set forth in paragraphs (3.4), (3.5) and (3.6), respectively.

3.3.7 Parts list. - The parts list shall include identification data covering all maintenance parts, to facilitate ready identification of the parts for replacement and ordering purposes. Standard hardware, structural parts, or other parts which have no maintenance significance shall not be listed. A brief introduction and the applicable tables listed below shall be included:

3.3.7.1 List of units. - The units shall be listed by unit number in numerical order; the list shall also indicate the quantity per equipment and the official name and designation.

3.3.7.2 Maintenance parts list. - The maintenance parts list shall list all of the units and their maintenance parts. The listing shall be arranged by units in numerical sequence. Maintenance parts for each unit shall be listed alphabetically-numerically by class of part following the unit designation:

    (a) The tabulation shall consist of the following data: reference designation (military

3

Provided by IHS
No reproduction or networking permitted without license from IHS

MIL-M-15071E(SHIPS)

or commercial, as applicable) and the
name and description of the parts, keyed
to an illustration. (If a cross reference
list to provide parts location data is in-
cluded with the repair material, the
parts list can omit cross reference to an
illustration.) Those parts which are not
covered by military designation shall in-
clude sufficient characteristics to allow
identification of the part within the
equipment.

(b) A separate list of any special tools sup-
plied with the equipment shall be pro-
vided at the end of the parts list tabula-
tion.

3.3.7.3 <u>List of manufacturers</u>. - A list of manu-
facturers shall be supplied unless the manufacturers
are identified within the parts list tabulation by name
and not by code.

3.3.8 <u>Index</u>. - An alphabetical index by subject
shall be included if the manual contains more than
100 pages. In multi-volume manuals, the index
shall be included in volume 1 only.

3.3.9 <u>User activity comment sheet</u>. - The man-
ual production source shall include in each bound copy
of final equipment and systems manuals one user
activity comment sheet. This sheet shall be located
immediately following the last page of each manual.
In multi-volume manuals the sheet shall be located
immediately following the last page of each volume.
Figure 4 shall be used as reproduction copy for the
production of these sheets.

3.4 Specific requirements for type I manuals. -

3.4.1 Maintenance and repair. -

3.4.1.1 <u>Preventive maintenance</u>. - Instructions
shall include all maintenance procedures, inspec-
tions, tests, and adjustments which should be per-
formed periodically under shipboard conditions for
the purpose of preventing failure or impairment of
the equipment. A one page summary and time
schedule for maintenance procedures, including a
check-off table where appropriate, shall be pro-
vided. The summary sheet shall identify any items
required by the Navy, as indicated at time of ap-
proval action, to be included in the ship's perma-
nent history cards. Where necessary, instructions
shall include procedures for obtaining access to the
sub-components for maintenance. Maintenance in-
structions shall include, where appropriate, but
shall not be limited to the following:

(a) A tabulation of periodic, routine, mechanical,
and electrical tests and checks which should be
accomplished regularly to show that subcom-
ponents are operating properly and to insure
continuity of service at optimum performance.

(b) Table or charts, including "wear-limit"
charts when appropriate, to indicate what
is to be done, when it is to be done based
on inspection, and how to do it.

(c) Utilization of the test facilities which may
be incorporated in the various compo-
nents.

(d) Instructions for the care, inspection, and
cleaning of all pertinent parts.

(e) Instructions stressing the importance of
properly maintaining all safety devices
and interlocks provided to prevent dam-
age to equipment or injury to personnel.

(f) Instructions on lubrication at shipboard
operating temperatures shall be provided
as applicable, preferably in chart form.
They shall include information regarding
lubrication recommended by the manu-
facturer and the type of lubricant to be
used. Lubricants shall be described by
symbol number, Federal stock number,
Military specification and industry stand-
ard numbers where applicable and known.

(g) Instructions on in-place-balancing or other
means of reducing noise level if equip-
ment specifications and shipboard appli-
cation require quiet operation.

3.4.1.2 <u>Trouble shooting, overhaul and repair</u>. -
Instructions shall include all information necessary
to permit a technician to locate trouble, and to make
repairs, adjustments and conduct tests of each com-
ponent, assembly or sub-assembly of the equipment.
The following shall be included:

(a) Trouble shooting guides for the localiza-
tion of faults giving possible sources of
trouble, the symptoms, probable cause,
and instructions for remedying the faults.

(b) Complete instructions on signal tracing for
electric circuits, use of special test in-
struments and unusual servicing tech-
niques.

(c) Ample figures and sectional views giving
details of mechanical assemblies, and
simplified schematic diagrams of elec-
trical, mechanical, hydraulic and pneu-
matic circuits. Figures contained else-
where in the manual may be used and re-
ferred to under this heading without du-
plicating them.

3.5 Specific requirements for type II manuals. -

3.5.1 <u>Preparation guide</u>. - NAVSHIPS 94500
provides guidance as to a desired level of
organizing, illustrating, and expressing technical
material required by this specification. Any major
deviation from this guide shall be approved by
the bureau or agency concerned.

4

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01425832
Not for Resale,2004/07/1 20:25:11 GMT

### 3.5.2 Trouble shooting. -

3.5.2.1 Trouble-shooting guides for localizing faults, giving sources of trouble, the symptoms, and probable cause, and instructions for remedying the faults shall be included for equipment or systems if adequate historical data is readily available.

3.5.2.2 Trouble shooting where adequate historical data is not readily available shall be based on the following "logical trouble-shooting procedure" (see 8.2):

(a) Step 1 - Symptom recognition. - The technician must be able to recognize when the equipment is malfunctioning or when performance has deteriorated beyond acceptable limits. This requires that the technician have available data similar to the following:
 (1) Expected performance or design characteristics for the equipment as a whole.
 (2) Performance limits for individual units of an equipment.
 (3) Other factors which can cause a deterioration in equipment performance but are not the direct result of an equipment malfunction.

(b) Step 2 - Symptom elaboration. - After a trouble has been verified, the technician must use the available aids designed into the equipment to further define the trouble. As an aid to this step, the technician needs:
 (1) A list of all front panel indicating devices (listing normal indications) and the controls which govern their operation.
 (2) A list of all critical adjustments or alignment procedures which affect equipment operation.
 (3) Programmed or automatic testing procedures.

(c) Step 3 - Listing probable faulty function. - After the technician has further defined the equipment trouble, he makes several "logical choices" covering the general location of the trouble, based upon the symptoms, his knowledge of the equipment, and the information available in the manual. In making these "logical choices", the technician will limit the location of the fault to those functional divisions which, if defective, could reasonably cause the trouble. For this he needs:
 (1) A complete functional description of the equipment, and a detailed description of the operation of

each functional division of the equipment and an explanation of critical circuits and reasons for adjustments.
 (2) Block diagrams of the equipment broken down into its functional divisions.

(d) Step 4 - Localizing the faulty function. - After "Choosing" the functional division that could be faulty, the technician performs certain tests or checks which will either eliminate or pinpoint the functional division under consideration. In order to perform these tests, the technician needs:
 (1) A list of test equipment and any special tools required.
 (2) A complete and comprehensive servicing block diagram for each functional division of the equipment.
 (3) Illustrations calling out significant test-point locations.

(e) Step 5 - Localizing trouble to the assembly (or circuit). - After the faulty functional division has been isolated, further "logical choices", together with additional tests and checks, enable the technician to isolate and pinpoint the part(s) causing the trouble. In order to accomplish this degree of isolation, the technician needs:
 (1) An over-all equipment schematic diagram, or, if the equipment is large or complex, individual unit schematics.
 (2) A listing of pertinent measurements (end play, backlash, clearances, temperatures, resistances, waveforms, and so forth) to be used as they apply in checking individual assembly or circuit conditions.
 (3) Illustrations showing the location of all parts.

(f) Step 6 - Failure analysis. - This is simply a review step in which the technician retraces the procedures he used in arriving at the corrective measure he is about to take. It allows the technician to broaden his background by giving him practice in determining the effect of the faulty part on the functional division, and on the equipment.

### 3.5.3 Maintenance. -

3.5.3.1 Preventive maintenance. - All preventive maintenance procedures that must be performed by a maintenance technician, tests, inspections, and adjustments which should be performed periodically to maintain proper operation shall be included if they are not described in a separate maintenance publication (such as a Maintenance

9

Provided by IHS
No reproduction or networking permitted without license from IHS

BOISE PAPER TRIALS HISTORICAL, 01433962
Not for Resale, 26/04/06 20:32:11 GMT

MIL-M-15071E(SHIPS)

Standards Book as covered by MIL-M-21741). The instructions shall include, where appropriate:

    (a) A maintenance procedures summary and time schedule chart.

    (b) A tabulation of periodic performance, mechanical and electrical tests and checks, cleaning and inspections, and lubrication. Each of the checks or procedures shall be properly illustrated, and a regular time interval of performance shall be established (such as daily, weekly, monthly, and so forth). Acceptable limits of performance shall also be included within the tabulations. In general, the information shall indicate when it is to be done, what is to be done, how to do it, and the expected result.

    (c) Lubrication instructions shall include manufacturer's recommendations on types of lubricant to use, specific time intervals for lubrication, and, where necessary, any special instructions covering lubricating procedures. Lubricants shall be identified by military or commercial standard numbers, as available.

    (d) Cleaning instructions shall include information on the types of solvents to use and the cleaning periods. The cleaning solvents shall be identified by military or commercial standard numbers, as available.

3.6.3.2 Repair. - Instructions shall be provided for the removal, repair, adjustment, and replacement of all items which are within the ability of a technician to perform. Schematic diagrams of electrical, mechanical, hydraulic, pneumatic, and electronic circuits; parts location illustrations or other methods of parts location information; photographs, inter-connection cabling, piping plans, intra-rack wiring data (diagrams or tabular listings), and exploded and sectional views giving details of mechanical assemblies shall be provided, as necessary, to supplement the test. For mechanical items, information on tolerances, clearances, wear limits, maximum bolt-down torques, and in-place balancing or other means of reducing noise level shall be supplied. Information on the use of special tools and test equipment supplied with the equipment, as well as any cautions or warnings which must be observed to protect personnel and equipment, shall also be covered. The presentation should be arranged on a unit-by-unit basis; however, extensive material, procedures, or illustrations which are common to more than one assembly or sub-assembly need not be repeated, but may be referenced.

3.6.4 Operators' handbook. - When the thickness of the manual exceeds approximately 1/2 inch, the

operators' information required in 3.3.4 shall be bound as a separate "Operators' Handbook". When bound separately, the standard front matter specified in 3.3.1 shall be included in the handbook.

3.6 Specific requirements for type III manuals. - Systems manuals shall contain data required for type I or type II manuals arranged in an appropriate order to provide system oriented instructions for overall operation, checkout, and maintenance of the system. Detailed requirements for these manuals shall be as specified in the contract, order, or ship specification. Parts lists of units involved with systems not already covered in equipment manuals shall be included.

3.7 Format. -

3.7.1 Volumes. - When the thickness of a manual exceeds approximately 2 inches, the manual shall be divided functionally into volumes and chapters or sections, as necessary, to provide easy handling and to present orderly instructions.

3.7.2 Text. - The text shall be specific, concise, and clearly worded to be readily understandable by personnel involved in the operation, maintenance, and repair of the equipment.

3.7.3 Emphasis. - The Bureau of Ships is mainly interested in the adequacy and completeness of contents and the clarity and readability of the information rather than the format. The manual shall be oriented toward operation, maintenance and repair of the equipment by the forces afloat, without the services of a manufacturer's representative. The portions devoted to descriptive matter and theory shall be limited to those which are essential to a proper understanding of the equipment for satisfactory operation, maintenance and repair. The text need not duplicate information which is adequately shown on the photographs, drawings and illustrations incorporated in the manual.

3.7.4 Security classification. - The security classification of a manual shall be as designated by the bureau or agency concerned. The Security Requirements Check list DD Form 254, which constitutes a part of the contract for all classified material, identifies and indicates the classified features. All pages of classified manuals shall be marked in accordance with Industrial Security Manual for safeguarding classified information. Whenever possible, the installation, operation, and parts list information shall be kept unclassified.

3.7.4.1 Additional security markings. - When a manual contains information of a higher classification than that of the equipment it concerns, the appropriate classification of all classified data

6

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to PAPER TRAIL2 HISTORICAL, 01401852
Not for Resale,2014/01/20 22:11 GMT

MIL-M-15071E(SHIPS)

contained within that manual shall be identified by a classification letter(s) enclosed in parentheses (see 3.7.4.2) and positioned as follows:

(a) Paragraphs and subparagraphs. - At the beginning and end of the text.
(b) Tables and illustrations. - At the upper-left and lower-right corners.
(c) Subjects and titles. - At the end of the subject or title.

3.7.4.2 Classification letters. - The classification letters assigned to the various levels are: (TS) Top Secret, (S) Secret, (C) Confidential, and (CMH) Confidential-Modified Handling Authorized, and (CRD) Confidential Restricted Data. Although it is not intended that each and every item of information bear a classification letter, the latter (U) shall be used to denote unclassified data when so directed by the bureau or agency concerned.

3.7.5 Notes, cautions, and warnings. - Notes, cautions, and warnings shall be used to emphasize important and critical instructions, consistent with the used. Notes, cautions, and warnings shall immediately precede the applicable instructions, and shall be selected in accordance with the following:

(a) "NOTE" - Concerns an operating procedure or condition which should be high-lighted.
(b) "CAUTION" - Concerns an operating procedure or practice, which if not strictly observed, will result in damage to or destruction of equipment.
(c) "WARNING" - Concerns an operating procedure or practice which, if not strictly observed, will result in injury to personnel or loss of life.

3.7.6 Numbering and identification. - Any chapter, section, page, and paragraph numbering system is acceptable if it facilitates adequate indexing and location of information.

3.7.7 Illustrations. - Illustrations perform the function of graphically presenting required information. They shall be so planned and laid out as to portray complete pertinent information in a clear and accurate manner. Contractors may use available illustrations (photographs, diagrams, and so forth) prepared for other publications if the illustrations conform to this specification.

3.7.8 Abbreviations. - Abbreviations for use on drawings shall conform to MIL-STD-12, or MIL-D-963, as applicable.

3.7.9 Graphical symbols. - For type I manuals, use graphical symbols from MIL-D-963. For type II manuals, use graphical symbols for electronic diagrams from MIL-STD-15-1; electronic wiring equipment symbols from MIL-STD-15-2; electronic wiring symbols for architectural and electronic layout drawings from MIL-STD-15-3; mechanical symbols from MIL-STD-17; and logic diagram symbols from MIL-STD-806. For required details on the application of graphical symbols refer to ASA Y14.15.

3.7.10 Reference designations. - Electronics reference designations shall conform to MIL-STD-16.

3.8 Production. -

3.8.1 Detail materials, reproduction procedures and assembly shall be approved at time of submission of manuscript for approval. Acceptable production details are set forth in this specification. Alternate methods will be approved if equivalent performance and durability are provided.

3.8.2 Use of color. - Color shall only be used to clarify functional operations. Such methods as cross-hatching or shading shall be used in lieu of color when there will be no loss in comprehension. Color shall not be used for backgrounds or for other decorative purposes. If color is used, a legend shall be included to explain the colors used. Colors shall be held to a minimum.

3.8.3 Typography. - It is not the intent of this specification to state the different methods or composing equipment to be used, but rather to state the results required. All manuals are subject to 35mm microfilming. Letters, lines, and symbols shall be of a uniform contrast throughout the publication. Blurred or smudged printing or drop-out of characters or lines shall be cause for rejection. Characters shall be no smaller than 8-point type. When revisions are made, the typography shall conform as nearly as possible to the original manual. Preferred typography is set forth in table I.

(a) Table I indicates the final point size of the type. When oversize pages are used for composition, the type shall approximate these sizes when reduced.
(b) The type families listed below are most preferred, and can be closely matched by cold composition processes; .

### Book face (Roman)

| | |
|---|---|
| Garamond | Bookman |
| Century | Modern Roman |
| Modern | Baskerville |

(c) Leading and spacing may be relaxed where circumstances require such alterations.

7

Provided by IHS
No reproduction or networking permitted without license from IHS

Case 1:19-cv-00075-DAP Document 1283-1 Filed 02/23/18 Page 114 of 177

MIL-M-15071E(SHIPS)

Table I—Typography

| Use | Type Face and Point Size | Capitalization | Leading | Spacing Between Lines |
|---|---|---|---|---|
| Security classification | Same type family as text, 14 pt | Capitals | 6 pt | |
| Body text | Book face (roman), 10 pt | Capitals and lower case | 1 pt | 12 pt preceding illustration or following figure title |
| Chapter and section titles | Same as body text | Capitals | 6 pt | 48 pt following marginal copy, text, or illustration |
| Primary side heads | Same as body text | Capitals | 2 pt | 6 pt preceding or following text |
| Subordinate side heads | Same as body text | Capitals | 1 pt | 6 pt preceding or following text |
| Marginal copy | Same as body text | Capitals and lower case | Solid | |
| Tables: Titles | Same as body text | Capitals | 2 pt | 6 pt to preceding text and following rule |
| Column heads | Same as body text | Capitals | | |
| Body | Same as body text | Capitals and lower case | 1 pt | 6 pt preceding bottom rule or following headings |
| Parts listing | Book face (roman) 8 pt, or EAM print-out | Capitals and lower case | 1 pt | 6 pt preceding bottom rule or following headings |
| Note (word only) | Same as body text | Capitals and lower case | | 4 pt preceding and and following text (text of Note set same as body text) |
| Caution (word only) | Same as body text | Capitals | | Same as for Notes |
| Warning (word only) | Same as body text | Capitals | | Same as for Notes |
| Figure titles | Same as body text | Capitals and lower case | 2 pt | 6 pt following illustration |
| Keys or legends | Same as body text | Capitals and lower case | 1 pt | 5 pt following figure title or following illustration |
| Footnotes | Same as body text | Capitals and lower case | 1 pt | Fit to space available |

8

Provided by IHS
No reproduction or networking permitted without license from IHS

Copyright AFTER TRAILG HISTORICAL, 01490092
Not for Resale,2004/04 26:22:11 GMT

3.8.4 Layout. - Recommended page layout is set forth below:

(a) Single pages. - The preferred layout follows:

| Page size (inches) | Columns | Column Width (picas) | Gutter Width (picas) | Binding Edge (picas) | Image* Depth (picas) |
|---|---|---|---|---|---|
| 8-1/4 x 10-3/4 | 1 | 42 | --- | 7 | 60 |
| 7-3/4 x 10-1/4 | 1 | 38 | --- | 6 | 57 |
| 8-1/4 x 10-3/4 | 2 | 20 | 2 | 7 | 60 |
| 7-3/4 x 10-1/4 | 2 | 19 | 1-1/2 | 6-1/2 | 57 |
| 3-3/8 x 6-3/4 | 1 | 20 | --- | 5 | 31-1/2 |

* Exclusive of security classification and page numbers.

Blanks and spaces shall be avoided except on fold-ins. The first major division of the publication (chapter or section) shall begin on a new odd page.

(b) Fold-ing. - Fold-in pages shall be used only for diagrams, drawings, and charts which cannot be reduced for satisfactory presentation on a single page, or when frequent reference is required from other pages of the book. Page-size aprons are required. When fold-in pages are used, they should be held to a two-page fold-in whenever practicable, and shall not exceed an overall length of 34 inches from the binding edge, including the apron. The apron may contain information pertaining to the diagram, drawing or chart.

3.8.5 Illustrations. - Illustrations shall be prepared by the most economical method which will result in clear, legible illustrations.

(a) Lettering. - Lettering height in final reproduced form shall not be less than 0.060 inch.

(b) Continuous-tone artwork. - Continuous-tone artwork (photographs and renderings) shall provide a clear definition of shapes, tonal values, and surface texture. The subjects shall be well-lighted, detailed, and brilliant.

(c) Line artwork. - Line artwork shall be prepared with line weights of sufficient strength to reproduce sharply and clearly at the final reproduction size, and shall be suitable for reduction to 35mm microfilm.

3.8.6 Paper stock. - Paper stock for text pages and fold-ins shall be as follows:

(a) Lithography. - Paper stock shall be white offset book, free from unbleached or

ground woodpulp, and shall have a substance weight of not less than 100 pounds per 1000 sheets, basis 25 by 38 inches.

(b) Letterpress. - Paper stock shall be equivalent to white supercalendered book, the content of which shall not exceed 5 percent unbleached chemical wood or ground woodpulp, the remainder to be bleached chemical woodpulp, and shall have a substance weight of not less than 90 pounds per 1000 sheets, basis 25 by 38 inches.

3.8.7 Cover stock. - Cover stock shall be of plastic or pressboard. Information to be imprinted on the covers shall not be stamped in gold or any other metal foil. Cover colors for unclassified manuals shall be of any color except red or yellow. Covers for CONFIDENTIAL manuals shall be red. Covers for SECRET and TOP SECRET manuals shall be yellow.

3.8.8 Binding. - Manuals shall be prepared in looseleaf form, and shall facilitate the insertion of replacement pages. Commercial metal-type fasteners are to be used. The manual pages shall be punched or drilled as follows (all dimensions in inches):

| Hole-type binders | 4-3/8 x 6-3/4 | 7-3/4 x 10-1/4 (3-1/4 x 10-3/4) |
|---|---|---|
| Number of holes | Two | Three |
| Hole size | 1/4 | 1/4 |
| Distance, center-to-center | 4-1/2 | 4-1/4 |
| Distance to binding edge | 5/16 | 7/16 |

Multi-slot binders

| | Number of slots | Twelve | Eighteen (Nineteen) |
|---|---|---|---|
| Slot size | | 3/16 x 5/16 | 3/16 x 5/16 |

9

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAIL® HISTORICAL, 01401905
Not for Resale,2004/014 20:23:11 GMT

MIL-M-15071B(SHIPS)

Multi-slot binders (cont'd)

| | | |
|---|---|---|
| Distance, center-to-center | 9/16 | 9/16 |
| Distance to binding edge after trim | 3/16 | 3/16 |

Punching or drilling of revision pages shall be the same as for the original manuals. Fillers shall be used to build up binding edge to same thickness as right-hand edge of manuals.

### 3.8.9 Preliminary, experimental manuscript and service test manuals. -

3.8.9.1 Typography. - Manuals shall be type-written, single-spaced. The copy shall be such that clear, readable reproductions may be obtained. Any method of duplication which will provide the necessary quantity of black legible copies will be acceptable. When the method of duplication permits, the manual shall be reproduced on both sides of the paper.

3.8.9.2 Layout. - Layout shall conform to the requirements for final manuals (see 3.8.4) except that horizontal and vertical folds are acceptable on fold-in pages.

3.8.9.3 Illustrations. - Illustrations for preliminary, experimental manuscript and service test manuals shall be prepared by the most economical method which will result in clear, legible illustrations when reproduced.

3.8.9.4 Paper and cover stock. - Any good-quality paper stock which is suitable for the intended method of reproduction will be satisfactory for text and fold-in pages. Cover stock satisfactory for the intended use is acceptable; however, the color shall conform to the requirements for final manuals (see 3.8.7).

3.8.9.5 Binding. - Binding shall conform to the requirements for final manuals (see 3.8.5). Covers need not include any printed matter (other than the security classification) if suitable out-cut windows are provided.

### 3.9 Applicability of manuals. -

3.9.1 Identical manuals. - When a manual that is already available is applicable in its entirety to the equipment being procured, the applicability is to be extended to include the additional ships by the contractor issuing a new approval and procurement record page.

3.9.2 Modified manuals. - When existing manuals are applicable to the equipment being procured, except for minor differences, the contractor

shall modify the manual to cover the differences by the issue of a revision.

### 3.10 Revisions. -

3.10.1 Changes. - Information amending, correcting or modifying a manual shall be issued either as a temporary or permanent change. Change numbers will be assigned by the bureau or agency concerned when the submitted review copy is returned to the contractor.

3.10.1.1 Temporary changes. - Temporary changes shall be supplied when there is insufficient time to publish the information in the manual prior to delivery of the equipment, when making minor pen-and-ink corrections, or when revising preliminary manuals (see 3.11.3). A temporary change shall consist of detailed instructions for revising the manual.

3.10.1.1.1 Instructions. - The instruction portion of a temporary change shall be prepared as follows:

(a) The publication number and the temporary change (T-) number shall appear in the upper left-hand corner of each page.

(b) The total number of pages shall be indicated on the first page only.

(c) The security notice shall appear on the first page of all classified temporary changes (see figure 1).

(d) A statement shall be made indicating when the temporary change is in effect. If it supersedes an earlier temporary change or permanent change, a statement to that effect shall be given.

(e) A statement shall be made indicating the purpose of the change and the extent (or conditions of application) to which it applies.

(f) Instructions shall be given for making specific pen-and-ink corrections. The instructions shall be terse, yet clear. Illustrations and diagrams shall be used where needed. Specific data to be changed shall be set off in quotation marks. Pen-and-ink changes shall not be allowed when the time required is more than one minute per page and where the space available does not permit the insertion without affecting the clarity of the text.

(g) Instructions shall be given for inserting new or revised pages, for the disposition of superseded material, and for correcting the list of effective pages.

(h) The instructions shall be followed by a statement that the temporary change

10

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01459662
Not for Resale,2004/0/M 22:28[1 GMT

shall be inserted in the manual immediately behind the front cover, preceding any previous changes.

(1) Printed matter shall be arranged on the pages so that none of the copy will be obscured when the pages are inserted into the affected publication.

**3.10.1.1.2** Production of temporary changes. - Temporary changes shall be produced by the most economical method.

**3.10.2** Permanent changes. - A permanent change shall consist of detailed instructions and revised pages for revising the manual. If more than 25 percent of the total pages of the manual (or volume if the manual consists of more than one volume) is affected, the manual (or volume) shall be issued as a completely revised manual (see 3.10.4). If, as a result of an equipment change, a manual covers only modified items or material, a note shall be included in the first paragraph of the instruction sheet to the effect that maintenance support activities should not dispose of the superseded pages until it can be established that all of the equipment population has been modified. Other activities should update their publications when the modification has been accomplished. If an equipment change does not affect the entire equipment population, the change shall be prepared in such a manner that the manual will describe both the affected and the unaffected equipment.

**3.10.2.1** Instructions. - A permanent change shall include and supersede all previous changes. A permanent change shall include an instruction sheet prepared to the same requirements as a temporary change (see 3.10.1.1), and shall contain the following:

(a) A new cover (for each volume affected) if the change includes too many new pages to fit in the original cover.

(b) A revised title page, including the original date of the publication and the date of the change. When approved by the bureau or agency concerned, the title page may be revised by pen-and-ink corrections.

(c) A revised list of effective pages. When a new title page is not required, the list of effective pages may be revised by pen-and-ink corrections.

(d) Instructions for inserting the new or revised pages.

(e) Instruction for disposing of superseded pages.

(f) Revised pages of the table of contents, list of illustrations, list of tables, index, and so forth, when applicable.

**3.10.2.2** Copy, serial, or register numbers. - Changes for non-registered publications shall not bear copy, serial, or register numbers.

**3.10.2.3** Issue information. - Changed pages shall include the number of the change of which they are a part. For example: If a page is revised in Change 3, "CHANGE 3" shall be substituted for the publication issue information (Change 1, and so forth) in lower binding-edge corner of the page. On unrevised sides of revised pages, the number of the change in which they were first issued (such as Change 1) shall be included, as applicable.

**3.10.2.4** Production of permanent changes. - Permanent changes shall be produced in the same method as the manual.

**3.10.3** Parts list revisions. - Corrections or additions to parts lists tables shall be made either by revised pages or by providing supplementary tables, provided that such tables do not exceed 25 percent of the size of the parts list. In subsequent revisions, the parts list tables shall be revised until they exceed 25 percent of the parts list. When more than 25 percent of the parts list is affected, the list shall be completely revised or corrected by a permanent change (see 3.10.2). Supplementary tables shall appear at the front of the parts list tabulation. The style and format shall be equivalent to that of the basic parts list. The supplementary parts list shall have a note equivalent to the following included in the introduction

"This parts list has been corrected by means of the following supplementary tables. For any given item, always refer first to the appropriate supplementary table, since it completely supersedes any corresponding listing in the basic table. If no information is shown for a given item, refer to the basic table for the required information."

**3.10.3.1** The supplementary parts lists shall be entitled: "SUPPLEMENTARY PARTS LIST". If applicable, each table of the supplementary parts list shall be numbered the same as the basic parts list, followed by the letter "A". All supplementary parts lists for previous changes shall be incorporated in the new supplementary parts list.

**3.10.4** Revised manuals. - A revised manual shall be supplied when the number of pages required to supply corrected and additional information for the manual is more than 25 percent of the total pages of the manual (or volume). This includes pages affected by the current change (including backup pages), plus pages affected by previous changes.

11

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01435862
Not for Resale,2004/04/4 20:32:11 GMT

MIL-M-15071E(SHIPS)

## 3.11 Approval. -

3.11.1 Basic equipment manuals. - Whenever an equipment lends itself to the preparation of a manual covering a family of equipments of the same basic design, and one which can be made applicable to specific equipments of that design by completing sheets and blanks, the contractor may submit to the Bureau of Ships four copies of the basic manual, together with examples of the completing sheets and blanks which will represent the detailed information to be provided for a specific equipment. Approval of such a manual will be by the Bureau of Ships only, and once approved, the basic manual shall not be modified without the approval of the Bureau of Ships. At the time of manual approval, the Bureau will assign a NAVSHIPS number to the basic manual and forward one copy to the cognizant inspector for future comparison and inspection with manuals furnished for specific equipments. If any subsequent issue of a basic manual is not equivalent to the approved manual, such approval may be withdrawn. Once approval of such a manual is granted for a particular basic design of equipment (and size range, if appropriate), the basic manual with the specific detailed information required for the unit of the family being furnished shall be supplied in the quantities required by the order, without further approval. Copies of the manual prepared for the specific equipments shall be marked by the contractor with the publication number of the basic manual, followed by a "-1", "-2", and so forth. Each dash number shall be assigned numerically by the contractor for each specific equipment of that family.

3.11.2 Specific equipment manuals. - Manuals for a specific equipment that are not prepared from a basic manual shall be approved by the Bureau of Ships or its field representative. (The term "field representative" is limited to field representatives of the Bureau of Ships, that is, Supervisors of Shipbuilding, USN, U.S. Naval Shipyards; and Industrial Managers, USN.) Once such a manual has been approved by the Bureau of Ships or its field representative, the manual shall not be modified without approval of the Bureau.

3.11.2.1 Manuals for a specific equipment not previously approved shall be submitted for approval to the appropriate activity, as follows:

  (a) Manuals procured under Bureau of Ships contracts. - The contractor shall forward four copies of the manual to the Bureau of Ships for approval.

  (b) Manuals procured under contracts issued by Naval activities. - The contractor shall forward four copies to the Naval activity for approval.

  (c) Manuals procured for the Bureau of Ships by a commercial activity (such as a private shipbuilder). - The contractor shall forward four copies of the manual to the commercial activity for approval of both the commercial activity and the cognizant Bureau of Ships representative.

3.11.2.2 The Bureau of Ships will assign a publication number to each specific equipment manual as follows:

  (a) Manuals procured under Bureau of Ships contracts. - The publication number will be included in the Bureau of Ships approval letter.

  (b) For manuals procured for the Bureau of Ships by Naval or commercial activities, the contractor shall request a publications number from the ordering activity at the time of submission for approval.

3.11.3 Preliminary manual approval. - When there is insufficient time to permit approval by the bureau or agency concerned and still provide manuals with the first equipment delivered, a review copy shall be submitted to the cognizant Government inspector for approval.

3.11.3.1 The review copy shall be submitted (prior to shipment of the first equipment) to the Government inspector simultaneously with four copies of the manual to the bureau or agency concerned. Publications numbers for preliminary manuals shall be requested from the local Navy representative.

3.11.3.2 A self-addressed (contractor) postal card containing information equivalent to the notice indicated below shall be attached to the title page of all preliminary manuals which accompany equipment.

  IMPORTANT NOTICE: This is a preliminary manual for (insert nomenclature of equipment), publication (insert number), supplied under contract (insert number). A copy of the FINAL manual will be forwarded when published. Return this card IMMEDIATELY, indicating ship or shore activity and mailing address.

When postal cards are received by the contractor after shipment of the bulk quantity of manuals has been completed, they shall be forwarded to the cognizant Government inspector with a request to process the cards into the supply system.

3.11.4 Revisions. - Four copies of changes or revised manuals shall be submitted to the bureau or agency concerned for approval and assignment of a publication number. However, temporary changes

12

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 04413852
Not for Resale,2004/8/4 10:22:11 GMT

are approved by the Government inspector only. Publication numbers of temporary changes shall be obtained from the bureau or agency concerned prior to publication.

3.12 Quantity and distribution. - The quantity of manuals shall be as specified in the contract, order or ship specification. Unless otherwise specified, the contractor shall be responsible for the distribution of all manuals procured on the contract or order.

3.12.1 Preliminary manuals. - The quantity shall be 2 per equipment, and a bulk quantity up to the bulk required for final manuals. The actual quantity to be supplied will depend upon the need at the time and the expected delay in production of final manuals. Distribution will be as directed. Distribution of bulk shall be not later than two weeks prior to the shipment of the first equipment.

3.12.2 Revisions. - The quantity of changes or revised manuals shall be as specified in the contract, order or ships specification. The distribution of such material shall be to all activities receiving the original manual and in the same quantity or as directed by the bureau or agency concerned.

3.12.3 Replenishment material. - One glossy, unscreened photographic print of each half-tone illustration used in manuals shall be furnished, along with two copies of the final manual. This material shall be forwarded as directed, with a covering letter advising that the material is for replenishment purposes.

3.14 Reproduction rights. - Reproduction rights shall be as established by the provisions of the contract pertaining to data or copyright. When material is copyrighted, the publication shall include a statement adjacent to the copyright notice as to the rights of the Government thereunder.

4. QUALITY ASSURANCE PROVISIONS

4.1 The supplier is responsible for the performance of all inspection requirements as specified herein. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure that supplies and services conform to prescribed requirements.

4.2 Inspection. - Manuals shall be inspected to determine compliance with the requirements of this specification, and for equivalence with the approved manuscript (sample manual or basic manual) and the approval letter.

4.3 Content. - The content of the manual shall be checked against the equipment being furnished to assure that it depicts accurately and adequately the equipment and the operating and maintenance procedures required.

5. PREPARATION FOR DELIVERY

5.1 Packaging and packing. -

5.1.1 Individual and multi-volume manuals. - Individual copies and multi-volume manuals shall be packed to preclude the possibility of damage in transit. Multi-volume manuals shall be furnished as complete sets except for the manuals shipped for stock. Stock copies of identical volumes shall be packed and shipped in common container(s).

5.1.2 Manuals shipped with equipment. - When copies of the manual are packed with the equipment, they shall be packed within the shipping container holding the main unit of equipment. The manuals shall be so placed that they are readily accessible prior to removing the equipment, and shall not be placed within the vapor-proof barrier material used to enclose the equipment. Manuals accompanying equipment shall be packaged in a waterproof container. The invoice, packing list or bill of lading shall include the publication number of the manuals, and the quantity; it shall also indicate which container includes the manual.

5.1.3 Bulk shipment. - Manuals shipped in bulk shall not be individually wrapped. Containers shall comply with the Uniform Freight Classification Rules or other carrier regulations, as applicable to the mode of transportation.

5.2 Marking. - On bulk shipments, interior packages and exterior shipping containers shall be marked with the following information for each item enclosed, except for shipment of an individual copy or an individual set of manuals:

    Box (number) of (number) (to be listed on multiple container shipments)
    Publication number
    Quantity (in packages)
    Contract or order number

The words "FOR STOCK" shall be marked on the package or packages destined for stock. The publication numbers shall be indicated on the shipping documents. When a contract or order requires manuals having different publication numbers, the stock copies of each manual number shall be shipped separately. All bulk shipments shall be in accordance with security requirements.

6. NOTES

6.1 Ordering data. - Procurement documents shall specify the following:

    (a) Title and number of this specification
    (b) Security classification (see 3.7.4)

13

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PUTRA YAMUS HISTORICAL, 01433462,
Not for Resale,2004/04/4 20:23:11 GMT

MIL-M-15071E(SHIPS)

(g) Quantity of manuals (revisions or APR pages) required (see 8, 12, 3, 12, 1)

6.2 The purpose of the detail requirements for the "logical trouble-shooting procedure" is to insure that the maintenance technician will have sufficient trouble-shooting information to enable him to efficiently locate equipment troubles, using the steps outlined. The objective of the method is to develop the technician's ability to decide what checks should be performed and where to make them. The information presented in the manual should not act as a "crutch" for the technician, but rather should serve as one of his most important maintenance tools.

6.3 Applicability of manuals. - Copies of manuals previously supplied covering a specific equipment in its entirety, required for ship(s) and local use, shall be requisitioned from stock by the cognizant Naval supervising activity.

6.4 Manuals procured by other activities for the Bureau of Ships. - The field approving activities shall obtain publication numbers from the Bureau of Ships by one of the following methods:

(1) Submit two copies of the manual either prior to or subsequent to the review and approval.

(2) Permit the contractor to forward two copies of the manual to the Bureau of Ships simultaneously with the copies for approval.

(3) In urgent cases, submit a letter containing the nameplate data of the equipment, the ship applicability, and the contract or order data.

6.4.1 Regardless of the method used for obtaining publication numbers, the accompanying letter shall state the expected delivery date of the final manuals and the quantity of manuals being furnished for stock.

Notice. - When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever, and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Preparing activity:
Navy. - Ships .
(Project 7610-N001 6Sh)

14

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to: PAPER TRAILS HISTORICAL, 01458082
Not for Resale,2004/04/04 20:22:11 GMT

MIL-M-15071E(SHIPS)

```
┌──────────────SECURITY  CLASSIFICATION──────────┐
│                                                │
│      (Publication number)                      │
│                                                │
│                                                │
│              VOLUME  (number)                  │
│                                                │
│                                                │
│           TYPE OF PUBLICATION                  │
│                                                │
│                    for                         │
│                                                │
│           NOMENCLATURE                         │
│         OF EQUIPMENT(U)                        │
│                                                │
│                                                │
│        (Manuals Bearing Classified Restricted Data Only) │
│                 RESTRICTED DATA                │
│                                                │
│        "This document contains restricted data as defined in the │
│        Atomic Energy Act of 1954.  Its transmittal or the disclosure │
│        of its contents in any manner to an unauthorized person │
│        is prohibited."                         │
│                                                │
│               (Other Classified Manuals)       │
│                                                │
│        "This document contains information affecting the national │
│        defense of the United States within the meaning of the │
│        Espionage Laws, Title 18, U.S.C., Sections 793 and 794, │
│        the transmission or the revelation of which in any manner to │
│        an unauthorized person is prohibited by law."  │
│                                                │
│          DEPARTMENT OF THE NAVY                │
│             BUREAU OF SHIPS                     │
│                                                │
│                                                │
└──────────────SECURITY  CLASSIFICATION──────────┘
```

Figure 1.  Sample Cover

15

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER, FRANK E NESTIJUCAL, 01453402
Not for Resale,2004/05/4 20:22:11 GMT

MIL-M-15071E(SHIPS)

```
----------SECURITY CLASSIFICATION----------

(Publication number)


        VOLUME (number)


    TYPE OF PUBLICATION

            for

    NOMENCLATURE

    OF EQUIPMENT(U)




        For classified manuals, place applicable
        rationale, Hand-phased downgrading and
        de-classification notice here.




    DEPARTMENT OF THE NAVY
        BUREAU OF SHIPS



----------SECURITY CLASSIFICATION----------
```

Publication: (DATE)
Change (number): (DATE)

Figure 2. Sample Title Page

16

Provided by IHS
No reproduction or networking permitted without license from IHS

IHS IMPAPER TRAILS HISTORICAL, 01420062
Not for Resale,2004/3/4 22:22:11 GMT

# APPROVAL AND PROCUREMENT RECORD PAGE

APPROVAL DATA FOR NAVSHIPS _____
TITLE OF MANUAL _____

APPROVAL AUTHORITY:

| CONTRACT OR PURCHASE ORDER | SHIPS APPLICABLE | QUANTITY OF MANUALS | QUANTITY OF EQUIPMENT | BUILDING YARD |
|---|---|---|---|---|
| | | | | |

REMARKS:

CERTIFICATION:

DATE

CHANGE NO.

MANUFACTURER'S SIGNATURE
MANUFACTURER'S NAME AND ADDRESS
FEDERAL CODE NUMBER (FROM OFFICE)

Figure 3 Approval and procurement record page.

---

Approval Authority shall indicate the applicable letters or correspondences granting approval in conformance with approval procedures.

Remarks space shall be used for necessary comments and the inclusion of information regarding the extension of a manual by minor revisions.

Certification: One of the following certification paragraphs shall be typed in this space, as appropriate:

Basic equipment manuals.
It is hereby certified that NAVSHIPS ___ is identical to the basic manual NAVSHIPS ___ approved by the approval data shown above except for the detailed information required for the equipment provided under contract or purchase order ___.

Specific equipment manuals.
It is hereby certified that NAVSHIPS ___ to be provided under contract or purchase order ___ has been approved by the approval data shown above.

For identical manuals covering basic equipment and specific manuals.

It is hereby certified that the manuals to be provided under contract or purchase order ___ are exactly identical to NAVSHIPS ___ approved by authority of approval data shown above.

For basic equipment manuals covering specific equipment and specific equipment manuals which have been previously distributed but required minor modification.

It is hereby certified that the manuals to be provided under contract or purchase order ___ are exactly identical to NAVSHIPS ___ approved by the approval data shown above except for the necessary modification as shown in the above remarks space.

NOTE: This page may be typed and reproduced by any economical method and shall be included in specific equipment manuals and copies of final manuals.

17

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to PANSY TRAILS HISTORICAL, 01458662
Not for Resale,2004/04 22:22:11 GMT

MIL-M-15071B(SHIPS)

NAVSHIPS NO. _____

USER ACTIVITY COMMENT SHEET,

VOL. NO. _____

(Fold on dotted lines on reverse side,
staple in corner, and send to Bureau
of Ships, Code 240, Washington 25, D. C.)

PROBLEM AREA:

Both sides of this form to be reproduced locally as required.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to PAPER TRAILS HISTORICAL, 01493032
Not for Resale,02/03/04 20:22:11 GMT

■■ 9999906 2046568 650 ■■

MIL-I-15024(SHIPS)
19 September 1952
Used IN LIEU OF
MIL-N-2716
23 August 1951
SUPERSEDING
RE13A516C
15 August 1943

### INTERIM MILITARY SPECIFICATION

### IDENTIFICATION PLATES, INFORMATION PLATES AND MARKING INFORMATION FOR

### IDENTIFICATION OF ELECTRICAL, ELECTRONIC AND

### MECHANICAL EQUIPMENT

1. SCOPE

1.1 Scope. — This specification covers the material requirements for "identification plates" and "information plates" and the marking information for "identification plates" mounted on "major units" and "sets" of Bureau of Ships equipment.

1.2 Classification. — "Identification plates" and "information plates" shall be furnished in the following type plates as specified (see 6.1):

    Type A - Etched
    Type B - Engraved
    Type C - Stamped
    Type D - Cast
    Type E - Stenciled
    Type F - Graphic
    Type G - Decalcomanias
    Type H - Photographic

2. APPLICABLE SPECIFICATIONS, STANDARDS, DRAWINGS, AND PUBLICATIONS

2.1 The following specifications and standards, of the issue in effect on date of invitation for bids, form a part of this specification:

SPECIFICATIONS

    FEDERAL
        TT-P-141 — Paint, Varnish, Lacquer, and Related Materials; Methods of Inspection,
                Sampling and Testing.
        TT-C-595 — Colors; (for) Ready-Mixed Paints.

    MILITARY
        MIL-P-76 - Plastic-Material, Laminated, Thermosetting (for Designation Plates).
        MIL-S-854 - Steel, Corrosion-Resisting; Plates, Sheets, Strips, and Structural Shapes.
        MIL-N-894 - Nickel-Copper-Alloy; Wrought.
        MIL-P-15037 - Plastic-Material, Laminated Thermosetting, Sheets, Glass-Cloth
                Melamine-Resin.

    NAVY DEPARTMENT
        General Specifications for Inspection of Material.
        47A11 — Aluminum-Alloy (A1-52) (Aluminum-Magnesium-Chromium): Plates, Sheets, and
                Strips.

GPO—O—NAV—K- 4)A

1051     \   `\ \


EXHIBIT
tabbies

▆▆ 9999906 2046569 597 ▆▆

MIL-I-15024(SHIPS)

STANDARDS

MILITARY
MIL-STD-12 - Abbreviations for Use on Drawings.

(Copies of specifications, standards, and drawings required by contractors in connection with specific procurement functions should be obtained from the procuring agency or as directed by the contracting officer.)

3   REQUIREMENTS

3.1   Definitions. -

3.1.1   "Identification plates". - The words "identification plates" wherever used herein shall refer to the identification of "major units" or "sets" of Bureau of Ships equipment.

3.1.2   "Information plates". - The words "information plates" wherever used herein shall refer to instruction plates, wiring diagrams, graphic charts and other designation plates.

3.1.3   "Major unit". - A major unit shall be an electrical, mechanical or hydraulic grouping of parts, subassemblies, assemblies or accessories fixed or joined together into one item.

Examples:

| | |
|---|---|
| Radar transmitters | Laundry washers |
| Reduction gears | Dish washers |
| Internal combustion engines | Garbage grinders |
| Gyro compass | Printing and photolitho equipment |
| Loudspeakers | Flatwork ironers |
| Sonar receivers | Food mixers |
| Motor generators | Laundry extractors |

3.1.4   "Set". - A set shall be a grouping of two or more major units which are electrically, mechanically or hydraulically connected or associated together to perform their intended function.

Examples:

Public address set
Radar set
Diesel generator set

3.2   Materials. -

3.2.1   General. - Identification plates and information plates shall be made of a material that shall withstand the same environmental conditions as the item to which the plates are to be attached.   The individual equipment specification shall specify what material is to be used for each application.   The general guide for the selecting of material for plates shall be (in order of preference):

   (a) Nickel copper alloy (monel) (Specification MIL-N-894).
   (b) Brass (commercial).
   (c) Corrosion resisting steel (class 9, condition a, finish 1, Specification MIL-S-854).
   (d) Aluminum alloy (Specification 47A11).
   (e) Plastic (for a, .lication not directly exposed to weather)(Specification MIL-P-78 or MIL-P-15037).
   (f) Decalcomanias, rubber stamping, stencilling, etc. (for non-metal applications).

2





Case 1:10-cv-00175-DAP Document 9233 Filed 02/23/13 Page 127 of 129

■ 9999906 2046570 209 ■

MIL-I-15024(SHIPS)

. 3.2.1.1  Where the scarcity of critical materials prevent the use of nickel-copper alloy, other materials in the order listed shall be used.  Brass plates shall not be mounted directly on aluminum. Edges of plastic plates shall be beveled.  The surfaces of plastic plates shall have a gloss factor of 25 ± 10 units (Spec. TT-P-141).

3.2.1.2  Color of laminations for plastic plates. -  Except for type GMG laminates, the color values of the various lamination for types B, E, and F plastic plates shall conform to Specification MIL-P-78.  Colors of cores and cover sheets shall be as specified (see 6.1).

3.2.1.3  Background. -  When specified (see 6.1) the background of the plate shall be lusterless orange 3205, conforming to Specification TT-C-595.

3.3  Dimensions for plates. -

3.3.1  Identification plates. -  Identification plate dimensions shall depend upon the size of the major unit or set and shall be selected from the standard sizes listed in table I.  Adequate space shall be provided to accommodate the information arrangement necessary to suit the format (see 3.7).  Standard dimensions for identification plates shall be indicated by size numbers as specified (see 6.1).

Table I - Standard dimensions, identification plates.

| Size-number | Length (in.) | Width (in.) | Diameter of holes (in.) | Hole center to edge (in.) | Number of holes |
|---|---|---|---|---|---|
| 1 | 2 | 3/4 | 1/8 | 3/16 | 2 |
| 2 | 2 | 1 | 1/8 | 3/16 | 2 |
| 3 | 2 | 2 | 1/8 | 3/16 | 4 |
| 4 | 3 | 1 | 1/8 | 3/16 | 2 |
| 5 | 3 | 2 | 1/8 | 3/16 | 4 |
| 6 | 3 | 3 | 1/8 | 3/16 | 4 |
| 7 | 4 | 1-1/2 | 1/8 | 3/16 | 4 |
| 8 | 4 | 2 | 1/8 | 3/16 | 4 |
| 9 | 4 | 3 | 1/8 | 3/16 | 4 |
| 10 | 4 | 4 | 1/8 | 3/16 | 4 |
| 11 | 5 | 2 | 5/32 | 3/16 | 4 |
| 12 | 5 | 3 | 5/32 | 3/16 | 4 |
| 13 | 5 | 4 | 5/32 | 3/16 | 4 |
| 14 | 5 | 5 | 5/32 | 3/16 | 4 |
| 15 | 6 | 2 | 5/32 | 3/16 | 4 |
| 16 | 6 | 3 | 5/32 | 3/16 | 4 |
| 17 | 6 | 4 | 5/32 | 3/16 | 4 |
| 18 | 6 | 5 | 5/32 | 3/16 | 4 |
| 19 | 6 | 6 | 5/32 | 3/16 | 4 |
| 20 | 7 | 2 | 5/32 | 3/16 | 4 |
| 21 | 7 | 3 | 5/32 | 3/16 | 4 |
| 22 | 7 | 4 | 5/32 | 3/16 | 4 |
| 23 | 7 | 5 | 5/32 | 3/16 | 4 |
| 24 | 7 | 6 | 5/32 | 3/16 | 4 |
| 25 | 7 | 7 | 5/32 | 3/16 | 4 |

3.3.2  Information plate dimensions shall be submitted by the contractor to the bureau or agency concerned for approval.

3

Case 2:09-cv-70626-ER   Document 105-18   Filed 01/29/10   Page 5 of 22

■■ 9999906 2046571 145 ■■

MIL-I-15024(SHIPS)

### 3.4 Marking information. -

3.4.1 Identification plates. - Marking information to appear on identification plates shall be in accordance with the following subparagraphs outlined and shall be submitted to the bureau or agency concerned for approval. Information which does not pertain to the major unit or set shall be omitted. When the size of the major unit or set restricts the inclusion of the information listed below, only the most essential information shall be included as approved by the bureau or agency concerned.

3.4.1.1 Major unit name and Government type designation. - The major unit name shall be the approved Munitions Board Catalog Agency (MBCA) item name. In the absence of such an approved name, the name in official use may be used. Where a Government type designation includes a name which does not coincide with the MBCA item name, the Government type designation shall prevail. Where space precludes use of the entire major unit name, or set name words, (except the principle noun) may be abbreviated in accordance with Standard MIL-STD-12.

3.4.1.2 Stock number. - The stock number shall be as specified (see 8.1). The source of the stock number shall be indicated. The use of a stock number on an identification plate shall be at the discretion and as specified by the bureau or agency concerned.

3.4.1.3 Serial number. - The serial number shall be entered when required (see 6.1). If a Government serial number is not assigned, the contractor's serial number may be entered upon the approval of the bureau or agency concerned or prime contractors.

3.4.1.4 Manufacturer's or prime contractor's data. - The manufacturer's name, part and drawing or model number shall be entered as applicable when required (see 6.1). This information shall refer to the actual manufacturer or prime contractor. The location of manufacture shall not appear on plates.

3.4.1.5 Contract number. - The procuring activity's contract or purchase order number shall be entered as the contract number. When an order shows both a contract number and a purchase order number, the purchase order number shall be used.

3.4.1.8 U.S. property. - The words "U.S. PROPERTY" shall be inserted at the bottom of the plate

3.4.1.7 Operating characteristics. - Under this heading shall be entered the information necessary for the safe handling, operation and maintenance of the major unit or set. An additional space or an additional block may be provided as shown on figure 1 for inclusion of this information. The typical operating characteristics for electrical, electronic and mechanical major units and sets shall be as specified in figures 2, 3, and 4 and shall be subject to the approval of the bureau or agency concerned.

3.4.2 Information plates. - Marking information to appear on information plates shall be submitted by the contractor to the bureau or agency concerned for approval.

3.4.3 Marking information, together with views of the complete plate, shall be shown on the working drawings of the equipment concerned.

3.5 Type of marking for plates. - Letters shall be of Gothic capitals, and numerals and other characters shall be of similar appearance. Letters, numerals, and other characters shall be of such size as to be clearly legible. The principal words or group of words and the Government type identification (name of the major unit or set to which identification plate and information plate is to be attached) shall be emphasized by the use of larger letters.

3.5.1 Methods of marking. - The marking shall be made by a method which shall produce permanent and durable markings on identification plates and information plates to withstand the environmental conditions of the major units or sets to which the plates are to be attached. Serial numbers and other designations which vary on each identification plate and information plate may be etched, impression-stamped or punched into the area provided.

4

■ 9999906 2046572 081 ■ 

MIL-I-15024(SHIPS)

3.5.2  Temporary markings. - The use of decalcomanias, rubber stampings, stencilings or other markings of information of a temporary nature will not be allowed without the specific approval of the bureau or agency concerned, in which case the markings shall be covered with a coat of clear lacquer. Unless otherwise specified in the contract or order, decalcomanias, rubber stampings, stencilings or other markings of information of a temporary nature are not required to withstand the same environmental conditions as the major unit or set to which they are to be attached.

3.5.3  Legibility. - Legibility of the letters, numerals and other characters shall be as necessary for easy readability.

3.5.4  Filling of markings. -

3.5.4.1  All engraved, stamped, or etched letters, numerals and other characters on metal plates shall be well filled with a hard paint, enamel, or lacquer of a contrasting color, as specified (see 6.1) and the face of the plates shall be covered with a moisture-resistant varnish.

3.5.4.2  Plastic plates engraved through one lamination so as to show a lamination of a contrasting color shall not have the letters, numerals and other characters filled.

3.6  Mounting and location. - Identification plates and information plates shall be mounted in a conspicuous place generally on the front panel of the major unit or set.  Plates shall be mounted on major units or sets either externally or internally in locations easily accessible to for normal operation and in the event of an emergency.  The mounting and location of plates shall be shown on the mechanical assembly drawing of the equipment.  In the event the size or nature of the major unit or set precludes the mounting of an identification plate or information plate, information may be marked directly on the major unit or set by means of decalcomanias, rubber stamping, stenciling or other means upon the specific approval of the bureau or agency concerned.  The plates shall not be positioned so as to interfere with controls or obscure other required information.  Plates shall not be mounted by means of rivets, self tapping screws or welding.  Unless otherwise specified in the contract or order, provision shall be made for securely fastening plates with machine screws or hardened steel drive screws.  Plates of nickel-copper alloy material in locations exposed to the weather shall be mounted by nickel-copper alloy machine screws.  Plates to be mounted on refrigerator major units or sets shall be soft soldered to tank or receiver.

3.7  Format for plates. -

3.7.1  Identification plates. - For guidance purposes only, the arrangement of the marking information for electrical, electronic and mechanical major units or sets shall be as suggested in figures 2, 3, and 4 and shall be submitted by the contractor to the bureau or agency concerned for approval.  The format may be varied to suit the major unit or set to which the identification plate is to be attached.

3.7.2  Information plates. - The arrangement of the marking information shall be submitted by the contractor to the bureau or agency concerned for approval.

3.8  Type A (etched). -

3.8.1  Material. - Type A plates shall be of one of the following materials:

Corrosion-resisting steel.
Nickel-copper alloy.
Aluminum alloy.
Brass.

3.8.2  Marking. - Letters, numerals, and other characters shall be etched.  Additional information if necessary may be stamped on the plate.

5

■■ 9999906 2046573 T18 ■■

MIL-I-15024(SHIPS)

3. 8. 3 Dimensions. - Etched letters, numerals and other characters shall not be less than 0. 003 inch deep. Stampings of additional information shall not be less than 0. 003 inch deep. The thickness of the A plates shall be as follows:

> Corrosion resisting steel - 0. 03 inch
> Nickel copper alloy - 0. 03 inch
> Aluminum alloy - 0. 05 inch
> Brass - 0. 05 inch

3. 9 Type B (engraved). -

3. 9. 1 Materials. - Type B plates shall be of one of the materials specified in 3. 8. 1 or of plastic material conforming to type NDP of Specification MIL-P-78 or Specification MIL-P-15037. Other types of plastic material for a specific purpose may be used upon the approval of the bureau or agency concerned.

3. 9. 2 Marking. - Letters, numerals and other characters shall be engraved. Additional information if necessary may be stamped on the plate.

3. 9. 3 Dimensions. - The depth of engraving and thickness shall be as specified hereinafter. Stampings of additional information shall not be less than 0. 003 inch deep.

| Plate material | Minimum depth of engraving (inch) | Thickness (inch) |
|---|---|---|
| Plastic | 0. 003 | 0. 0625 |
| Brass or aluminum alloy | . 003 | . 05 |
| Nickel-copper alloy | . 003 | . 03 |
| Corrosion-resisting steel | . 003 | . 03 |

3. 10 Type C (stamped). -

3. 10. 1 Materials. - Type C plates shall be of one of the following materials:

> Brass.
> Nickel-copper alloy.
> Corrosion-resisting steel.

3 10. 2 Marking. - Letters, numerals and other characters shall be stamped on the plate. Embossing or relief stamping is not acceptable.

3. 10. 3 Dimensions. - Stamping shall not be less than 0. 003 inch deep. Thickness of type C plates used shall be in accordance with 3. 8. 3.

3. 11 Type D (cast). -

3. 11. 1 Materials. - Type D plates shall be of cast brass or bronze of commercial quality.

3. 11. 2 Marking. - Letters, numerals and other characters shall be raised above the body of the plate and shall be polished, the balance of the plate to have a roughened or stippled finish. Additional information if necessary may be stamped on the plate.

3. 11. 3 Dimensions. - Letters, numerals .d other characters shall be raised to 0. 03 inch. Thickness of type D plates shall be as specified (see 6. 1).

3. 12 Type E (stenciled). -

3. 12. 1 Material. - Type E plates shall be of plastic material conforming to type HSP of Specification MIL-P-78 or Specification MIL-P-15037. Other types of plastic material for a specific purpose may be used upon the approval of the bureau or agency concerned.

6






Case 2:14-cv-00075-APG Document 9-33 Filed 02/23/15 of Page 131 of 177 133

■■ 9999906 2046574 954 ■■

MIL-I-15024(SHIPS)

3.12.2 Marking. - Letters, numerals and other characters shall be stenciled on the plate. Marking shall be applied by lithographing, by the silk screen method (method of printing through a stencil that is bonded to a silk screen) or a similar process.

3.12.3 Dimensions. - Thickness of type E plates shall be 0.0625 inch.

3.13 Type F (graphic). -

3.13.1 Material. - Type F plates shall be of plastic material, type GCP-H (Specification MIL-P-78). Other types of plastic material for a specific purpose may be used upon the approval of the bureau or agency concerned.

3.13.2 Marking. - The printed information shall be included between the laminations and shall be clearly legible through a transparent outer layer.

3.13.3 Dimensions. - Thickness of type F plates shall be 0.0625 inch.

3.14 Type G (decalcomanias). -

3.14.1 General. - Decalcomanias shall be mounted on major units normally considered expendable and which do not require permanent marking information to withstand the environmental conditions of the major unit or set. Decalcomanias in general unless otherwise specified in the contract or order, shall be used to indicate the information necessary for delivery, handling, preliminary and/or final installation and/or operation of the major unit or set. Decalcomanias may also be used upon specific approval of the bureau or agency concerned on major units or sets subject to radioactive contamination.

3.14.2 Materials. - The plates shall be made of materials supplied by manufacturer's of decalcomanias approved by the bureau or agency concerned. Decalcomania materials shall depend upon the type of material, surface finish and exposure of the major unit or set to which the decalcomania is to be affixed.

3.14.3 Marking. - Letters, numerals and other characters shall be of the open letter design or solid letter design. The open letter design shall have the background omitted and the solid letter design shall have the letters, numerals and other characters integral with the background. Additional markings may be rubber stamped or lettered directly on the decalcomania before mounting.

3.14.4 Dimensions. - Thickness of type C plates shall depend upon the material and the expected life endurance of the decalcomania necessary for the delivery, handling, preliminary or final installation, and operation of the major unit or set to which the decalcomania is to be affixed.

3.14.5 Mounting. - Decalcomanias shall be designed for mounting on metallic, phenolic or organic surface finishes. Mounting of decalcomanias shall be in accordance with standard application procedures specified by the manufacturer of decalcomanias and approved by the bureau or agency concerned. Properly applied decalcomanias shall be firmly adhered and free of bubbles or loose edges. Should a transfer be damaged beyond usefulness after its application, a second transfer may be applied directly over the first transfer.

3.15 Type H (photographic). -

3.15.1 Materials. - Type H plates shall be of one of the following materials depending upon the photographic process used:

> Corrosion-resisting steel
> Aluminum

3.15.2 Marking. - Letters, numerals and other characters shall be integrated into the plate by a photographic process approved by the bureau or agency concerned and as specified (see 6.1). Stamping of additional marking information will not be permitted on type H plates.

7

■ 9999906 2046575 890 ■

MIL-I-16024(SHIPS)

3.15.3 Dimensions. - Thickness of type H plates shall be as follows:

| Plate material | Thickness (inch) |
|---|---|
| Corrosion-resisting steel | 0.0156 |
| Aluminum | 0.02 |

3.16.   Workmanship. - Identification plates and information plates shall be furnished with smooth edges and shall be free from sharp corners.  Unless otherwise specified in the contract or order, identification plates and information plates shall be suitable for mounting on finished major units or sets.

4.  SAMPLING, INSPECTION, AND TEST PROCEDURES

4.1 Inspection procedures. - For Naval purchases, the general inspection procedures shall be in accordance with General Specifications for Inspection of Material.

4.2  Inspection and tests shall be conducted to determine that the material employed is in accordance with the requirements of the applicable material specification.  Inspection and tests shall also be conducted to determine that the letters, numerals and other characters are of the specified height on cast identification plates and information plates or are stamped, etched, or engraved to the depth required.  In determining the depth of stamping, etching, or engraving, care should be exercised in removing the filling material to insure that all material is removed.  Surface inspection shall also be conducted to insure that the identification plates and information plates furnished comply with the requirements of the contract or order regarding dimensions, thickness, format, life endurance and finish.  No chemical analysis will be required for brass or bronze plates.  Plates necessary for proper inspection shall be furnished in addition to those required by the contract or order and without charge to the Government.  One production run sample of each type of identification plate or information plate being supplied on the contract or order shall be furnished for inspection.  At the request of the bureau or agency concerned the contractor shall furnish a photographic print of each type identification plate or information plate being supplied in lieu of a production run sample.

5.  PREPARATION FOR DELIVERY

5.1 There are no packaging, packing, and marking requirements applicable to this specification.

6.  NOTES

6.1 Ordering data. - Procurement documents should specify the following:

(a)  Title, number, and date of this specification.
(b)  Whether an identification or information plate is required and the type (see 1, 2).
(c)  Material required (see 3.2.1, 3.8.1, 3.9.1, 3.10.1, 3.11.1, 3.12.1, 3.13.1, 3.14.1 and 3.15.1.
(d)  Color of cores and cover sheets (see 3.2.1.2).
(e)  Whether an orange background is required (see 3.2.1.3).
(f)  Size number (see 3.3.1).
(g)  Stock number (see 3.4.1.2).
(h)  Serial number if required (see 3.4.1.3).
(i)  Manufacturers or prime contractor's data if required (see 3.4.1.4).
(j)  Color of filler for metal plates (see 3.5.4.1).
(k)  Photographic process for type H plates (see 3.15.2).

Notice. - When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever; and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data, is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

8

▓▓ 9999906 2046576 727 ▓▓



Figure 1.— Identification plates— General use, format showing typical
operating characteristics.

1059

9999906 2046577 663

**MAJOR UNIT**



LOUDSPEAKER  TYPE  IC/SHA-12
BU. SHIPS STOCK NO. 17-L-7785-500
MODEL  2946                    SERIAL    782
VOLTS  70  CYCLES  100-6000 WATTS 10
NAVY DEPARTMENT – BUREAU OF SHIPS
ABC MANUFACTURING COMPANY, INC.
CONTRACT NObs– 23745
INSP.
U. S.  PROPERTY

Figure 2 A.– Typical  IC/FC equipment.

**MAJOR UNIT FOR SET**

UNDERWATER LOG EQUIPMENT
MASTER SPEED TRANSMITTER
BU. SHIPS STOCK NO. S17-S-7246-302
MODEL  1976                    SERIAL   169
VOLTS  115   CYCLES   60      AMPS  5
NAVY DEPARTMENT – BUREAU OF SHIPS
ACE MANUFACTURING COMPANY, INC.
CONTRACT NObs– 23456
INSP.
U. S. PROPERTY

Figure 2 B.– Typical IC/FC equipment.

Figure 2.– Identification plates, electrical, format showing
typical operating characteristics.

🔳 9999906 2046578 5TT 🔳

Figure 3.—Identification plates—Electronic, format showing
typical operating characteristics



SA-500/URQ-IO
MOTOR STARTER
3.5 HP   440 VOLTS   3 PHASE   60 CYCLES
SERIAL ☐

A MAJOR UNIT OF RADIO SET AN/URQ-IO

MANUFACTURED FOR
NAVY DEPARTMENT-BUREAU OF SHIPS
BY CONTRACTOR
JOHN DOE MANUFACTURING CO.
SALEM          MASS
CONTRACT          NObsr 99999
U S PROPERTY

Space for inspectors stamp

Figure 3A.—Major unit (typical ship, shore and amphibious equipment.)

1061

9999906 2046579 436



NOTE - Dimensions shown are typical to show proportions and spacing.

Figure 3B. - Set

▓ 9999906 2046580 158 ▓



Figure 3 C.- Set and major unit–combination.

██ 9999906 2046583 094 ██



Figure 3 D.– Set.



Figure 3 E.– Major unit (Airborne Equipment)

1064

■■ 9999906 2046582 T20 ■■

Figure 4.— Identification plates—Mechanical, format showing
typical operating characteristics.

GENERATOR SET, TURBINE

SERIAL NO. [            ]

STD. GOVT STOCK NO. [        ]

MANUFACTURED BY

[                                        ]

CONTRACT NO. [          ]

INSP

TURBINE DATA

MODEL [          ]        RPM [          ]

STEAM, PSIG [          ]    VACUUM HG [          ]

STEAM TEMP [          ]

GENERATOR DATA

MFR [          ]    MODEL [          ]    RPM [      ]

KW [              ]    VOLTS [          ]    AC or DC [      ]

U. S. PROPERTY

Figure 4 A: Set.

1065

9999906 2046583 967



Figure 48.– Typical reduction gears major unit

▓ 9999906 2046584 8T3 ▓



Figure 4 C.— Major unit typical turbines.

1067

9999906 2046585 73T



Figure 4 D. - Major unit typical boilers

■ 9999906 2046586 676 ■



Note: Identification plates shall be soft
soldered to tank or receiver.

Figure 4 E.— Major units typical condensers.

1069

9999906 2046587 502



Figure 4 F.

Note: Identification plate shall be
soft soldered to tank or receiver,

Figure 4 G.

1070

████ 9999906 2046588 449 ████



Figure 4 H

FORCED DRAFT BLOWER
SERIAL NO. ☐
STD. NAVY STOCK NO. ☐
MANUFACTURED BY

INSP   CONTRACT NO. ☐

PSIG ☐        EXH PRESS. ☐
°F TEMP ☐        BHP ☐
TYPE ☐        SIZE ☐
RELIEF VALVE SETTING ☐

OPERATING CONDITIONS
MAXIMUM                    NORMAL
CAP. ☐ CFM        CAP ☐ CFM
☐ RPM                    ☐ RPM
SP ☐ IN. WATER        SP ☐ IN. WATER
OVERSPEED TEST ☐ RPM
U. S. PROPERTY

Figure 4 J

1071

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

In Re: Asbestos Products Liability )     Civil Action No. MDL 875
Litigation )
                           )
All Actions )

## AFFIDAVIT OF SAMUEL A. FORMAN, M.D.

1.      I am a medical doctor specializing in preventive medicine and occupational medicine. I received a B.A. degree from the University of Pennsylvania majoring in history and biology, graduating *magna cum laude* in 1973. I attended Cornell Medical School, graduating with an M.D. degree in 1977. I also received a degree in public health in 1977 as a result of a joint program with the Harvard School of Public Health. Thereafter, I became board certified in occupational medicine after attending a residency at the Harvard School of Public Health.

2.      From 1973 to 1977, I participated in Ensign 1975, a Navy program that permitted me to engage in active duty service and obtain hands-on training during the summers between medical school sessions. My participation in this program gave me background and experience different from that of many other prospective medical officers at that time, because very few medical officers engage in operational and administrative rotations as part of their service and training. In the summer of 1974, I engaged in a midshipmen cruise aboard the USS Shreveport (LPD-12) for the purpose of obtaining a general understanding of ship operations outside the medical department. I attended training classes and observed activities in all parts of the ship including the engineering



department, command information center, commissary department, supply and repair divisions, and aviation division. In the summer of 1975, I did a rotation at the Navy Bureau of Medicine and Surgery ("BUMED"), known at times as the Naval Medical Command. While there, I participated in medical administration in the office overseeing all medical training for the Navy and worked directly with a number of high-ranking officers in BUMED, including William M. McDermott, who at that time held the rank of Captain but who later became Deputy Commander of the Naval Medical Command. During this rotation, I had an extended assignment to analyze Navy expenditures for medical education at civilian universities to ensure the Navy's needs were being met. In the summer of 1976, I did a clinical rotation on the general and internal medicine wards at San Diego Naval Hospital, the largest military hospital in the world. By the time I graduated medical school, I had already accumulated approximately six months of active duty service from my summer internships. These internships gave me a fundamental understanding of the needs of sailors at sea, a general understanding of ship operations, including ship propulsion systems, and insight into the leadership and administrative side of the Navy.

     3.    In 1977, I graduated medical school and went on full-time active duty in the Navy. I performed my internship at the Bethesda Naval Medical Center in Bethesda, Maryland during 1977 and 1978. I remained on active duty in the Navy until 1983. Thereafter, I continued to work for the Navy as a civilian employee until 1986. My qualifications and credentials are more fully described in my curriculum vitae (Exhibit A).

4.      Over the course of my active duty service in the Navy, I served aboard Navy ships whose primary purpose was to fulfill national defense missions of the United States. Assignments aboard ship, involving duty at sea, included *USS Shreveport* (LPD-12) in the North Atlantic, *USS Duluth* (LPD-6) in the Eastern Pacific, and *USS St. Louis* (LKA-116) in the Western Pacific oceans. At all times, these ships were performing missions and activities aimed at preparing for or deterring combat. In the military setting, a major goal of training is combat readiness. This training is intended to simulate combat and combat conditions. For example, the Navy hands out "battle efficiency" ribbons to ships that perform well in war exercises. Even combat support ships are required to remain ready to assist ships and sailors on the front line and, at times, these support ships must themselves go into harm's way. To achieve its mission, the Navy had to be willing to put life and limb at risk not just on the front line but also in support operations. One of the highest profile operations in which I was involved occurred aboard the *USS St. Louis* (LKA-116), which was an amphibious attack transport ship deployed at the time to the Western Pacific for the purpose of carrying Marines, cargo (including heavily armored Marine Corps vehicles used in amphibious assault), equipment and supplies to Navy shore-based facilities. In March 1979, President Carter ordered the Navy to rescue a wave of Vietnamese and Southeast Asian refugees who were escaping communist Vietnam and local pirates into the South China Sea. The *St. Louis* was the first ship of the Seventh Fleet to arrive on the scene. Fortunately the *St. Louis* was able to perform this mission without exchanging hostile fire; however,

3

in order to perform this humanitarian rescue operation, the *St. Louis* had to travel just outside the twelve mile international limit and sail directly into an area threatened by actively hostile Communist interests. This situation represented an intense Cold War scenario, one of but many types of hazardous scenarios and missions for which the Navy must be prepared.

5.     In the course of my active duty service, I also worked in Navy shore facilities, including shipyards such as the Long Beach Naval Shipyard. These facilities contributed to the defense of the Country by engaging in industrial efforts to construct, repair and overhaul the Navy's combat and combat support vessels. My role was to ensure that the Navy personnel and civilians involved in these efforts performed their duties as safely as possible.

6.     From 1980 to 1982, I ran an occupational health clinic at the Naval Weapons Station at Seal Beach, California, and assisted in the medical programs at the Long Beach Naval Shipyard. Among other responsibilities, I assisted in the asbestos medical surveillance program for over 2,000 federal Civil Service employees and uniformed sailors. At any one time, I was following 200 cases of asbestos disease.

7.     From 1982 to 1986, I was assigned to the Naval Environmental Health Center at Norfolk, Virginia. While stationed there, I designed occupational medicine programs with regard to Navy-specific occupational diseases, performed health hazard evaluations, inspected the occupational health programs of government facilities as part of the Navy Occupational Safety and

4

Health, or "NAVOSH," program, carried out epidemiologic studies, and trained Navy doctors and nurses in occupational medicine.

8.    In 1983, a Navy JAG officer for the Naval Medical Command requested that I become part of a team to locate, digest and organize government documents for production in asbestos litigation. Over the next year and a half, I investigated the Navy's historical handling and knowledge of various industrial hygiene issues, including asbestos disease.

9.    In 1985, pursuant to Navy orders, I completed my review of Navy knowledge and practice in industrial hygiene, including its awareness of and response to health hazards of asbestos, as a formal assignment. My search for documents took me to the National Archives, other warehouses and storage facilities for records of the Navy's Bureau of Medicine and Surgery. I was given full security clearances for and access to these facilities. I also conducted research at private facilities such as Harvard University's Countway Library of Medicine's section for rare books and manuscripts.

10.   From my review of countless Navy documents and my studies while employed by the Navy, I acquired extensive knowledge as to the state of Navy knowledge and awareness regarding the hazards of asbestos.

11.   Following my research, and with the approval of the U.S. Navy's Bureau of Medicine and Surgery, I published an article entitled "U.S. Navy Shipyard Occupational Medicine Through World War II" in the *Journal of Occupational Medicine*, Vol. 30, No. 1 (Jan. 1988).

12.    Though I no longer hold any formal position with the Navy, since I
left I have been asked on a number of occasions to speak to Navy medical and
safety personnel on issues relating to the history of occupational medicine and
industrial hygiene in the Navy.

13.    I am currently a Visiting Scientist in the Department of
Environmental Health at the Harvard University School of Public Health.

14.    The Navy has always taken responsibility for the health and safety
of its uniformed and civilian personnel. It has consistently exercised its discretion
regarding hazard recognition and appropriate controls in Navy workplaces. As
Navy Captain Ernest W. Brown, M.D., recognized as the architect of the Navy's
formal occupational health program prior to World War II, wrote in 1940: "One of
the most important concerns of the Medical Department of the United States
Navy today is industrial hygiene, especially in navy yard practice."

15.    This commitment was reflected in numerous other Navy statements
and documents. In 1943, Secretary of the Navy, Frank Knox, in a statement co-
signed by the Chairman of the U.S. Maritime Commission, E. S. Lamb, stressed
the Navy's commitment in this regard:

> The necessity for conserving manpower and promoting the physical
> welfare, health, and safety of what shortly will amount to one million
> workers in shipyards required that careful observance of standards
> for the prevention of accidents and protection of health be
> accorded. Aside from the weight which must be given humanitarian
> consideration, it is simply good common sense that as much care
> and attention be given to protecting the human factors in the war
> production program as is given machines.

"Minimum Requirements for Safety and Industrial Health in Contract Shipyards."
Similarly, in a 1955 Naval Institute publication called *The Human Machine*,

6

Captain Charles W. Shilling of the Navy Medical Corps described the "paramount importance" of Navy health: "[T]he medical component of the Navy has a heavy responsibility" with a mission to promote physical fitness, prevent and control diseases and injuries and treat the sick and injured.

16.    The most senior Medical Corps officer in the Navy is the Navy Surgeon General, who is also the Chief of BUMED and who reports to the Chief of Naval Operations ("CNO"). The Navy Surgeon General has responsibility to spell out health programs, including prevention and injury care, for sailors and civilian workers (as appropriate). Medical Corps, allied health professions and enlisted hospital corpsmen are responsible for advising operational line commands to carry out preventive practices and to provide specialized industrial hygiene services. It is the responsibility of the Navy line authorities (the operational chain of command) to carry out these recommendations. The Navy Surgeon General's objective is that all personnel receive the highest level of services that the Navy can deliver and that these services are appropriate to the environments in which the personnel work. The Navy Surgeon General achieves this objective through the development of standardized programs for medical care. As a General Medical Officer, I was not permitted to deviate from the programs developed by the Navy Surgeon General without approval from a more senior Navy officer except in extraordinary circumstances, such as if a ship was isolated or out of contact with more senior, knowledgeable and experienced officers.

7

17.    All Navy personnel including medical officers must follow their chain of command to maintain good order and discipline. Enlisted personnel are indoctrinated during boot camp and training with the understanding that they must conduct all activities "the Navy way," meaning that Navy orders and instructions supersede any information or directions received from any source outside the Navy. Sailors must follow orders trusting that their chain of command will have the mission of the Navy in mind and will address safety as best as possible. Unlike in the civilian community, all military personnel who refuse to perform an order could be subject to various penalties pursuant to the Uniform Code of Military Justice ("UCMJ"). Absent extraordinary circumstances, the Navy demands and enforces rigid adherence to the chain of command. It does so because it is the military's method for institutionalizing strategic considerations, highly specialized expertise, and prior experience and then transforming this information in an effective and predictable way into programs and orders for all personnel to follow.

18.    Collective and uniform communication and implementation of Navy programs and orders are key to the Navy's operational flexibility. The Navy has numerous sailors with specialized capabilities. The Navy also maintains many ships and multiple shipyards with specialized capabilities. The Navy strives to ensure that each sailor is consistently trained and that each ship in its fleet is predictably constructed so that it can rely on both the sailors and the ships to perform critical operations without endangering sailors any more than is necessary to achieve mission success.

8

19.     Consistent with the Navy's interpretation of the importance of industrial hygiene and occupational health, the Navy's programs in these areas have paralleled, and at times led, the development of occupational medicine and industrial hygiene in general, and asbestos-related issues in particular. The Navy's knowledge in the areas of asbestos and associated health conditions has been quite complete when compared to available knowledge over time, and at least by the early 1940s, the Navy had become a leader in the field of occupational medicine relating to, among other things, asbestos exposure.

20.     As early as 1922, the Navy recognized, as exemplified by its instructions to officers published in the *Navy Medical Bulletin*, the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure. These included the use of water to dampen dust, exhaust systems to remove dust, enclosed chambers to prevent escape of dust and respirators. The Navy's knowledge of potential asbestos-related health problems, and of the means to control against them, continued to expand throughout the following decades, as senior Navy officers actively assessed, evaluated, controlled, and made recommendations concerning Navy policy regarding disease and injury prevention, including asbestos related occupational health hazards.

21.     The Navy's health and safety apparatus on the eve of World War II was described in the 1939 Handbook of the Navy Hospital Corps published by the Bureau of Medicine and Surgery under the direction of the Secretary of the Navy:

9

The United State Navy is one of the largest of the industries maintained by this Government. An organization has been set up in the Navy to protect its personnel, both civilian and naval. A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy. He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations and the like. He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities. A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented. Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization. It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of the medical personnel for such purposes. Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea. In each of these places a variety of health hazards exist. It is therefore necessary that this [sic] personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.

22. The Handbook of the Navy Hospital Corps explained that all Navy yards have a commandant who "is responsible to the Navy Department for the protection of employees, as well as Navy personnel, under his command. He is familiar with . . . the health and accident hazards presented." Thus, the Commandant was "responsible for the appointment of the safety engineers [who will] make inspections and recommend proper protective measures." The Handbook further called for the Navy medical officer to "advise the safety engineer and instruct the employees in safety measures and encourage them to cooperate in protective measures." These safety measures included required "masks for asbestos workers."

10

23. Also in 1939, the Annual Report of the Surgeon General of the Navy addressed the "Hazard of Asbestos," and described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods." The Report noted the risk from "continued exposure to present occupational conditions" at Navy facilities, and directed appropriate methods for preventing such exposures, recommending the use of local exhaust ventilation to control asbestos dust exposure for insulators in the fabrication shop.

24. At about the same time, Navy Captain E.W. Brown undertook an assessment of asbestos exposure, and its prevention, in Navy yards. In an article entitled "Industrial Hygiene and the Navy in National Defense" published in 1941, Captain Brown prescribed appropriate measures for the prevention of asbestos exposure. These included use of respirators, local exhaust ventilation, and wetting of asbestos containing materials.

25. The Navy has historically directed all aspects of policy and procedure addressing the health and safety of Navy personnel. This direction has encompassed policies, practices and procedures to protect workers from dangers posed by exposure to asbestos. Indeed, the Navy has on several occasions over time rejected offers of assistance from other leaders in the field.

26. For example, in 1941, the U.S. Labor Department's Bureau of Labor Standards offered to conduct inspections of health and safety conditions in Navy shipyards. Navy leaders rejected this offer. In a memorandum to Navy Surgeon General McIntire, Commander Charles S. Stephenson, head of the

11

Division of Preventive Medicine within the Navy's Bureau of Medicine and

Surgery, offered "[n]otes for consideration when you call on Assistant Secretary

[of the Navy Ralph A.] Bard." Commander Stephenson advised Admiral McIntire

that Assistant Secretary Bard:

> asks specifically what the policy is concerning invitation of...the Bureau of Labor Standards, Labor Department into the Navy Yards to make a survey of the welding and other hazards. I told him that we had never done that sort of work and recommended against it, as I know who [the Bureau of Labor Standards] intends to send if it should be done.

Navy leaders recognized that other government departments had a high level of

expertise, while rejecting the offers of assistance:

> I gave Mr. Bard and the two officers present a complete story of the beginning of this controversy from the Federal Administrator's letter: that is, that the United States Public Health Service had four teams of traveling scientists alleged to be able to make surveys of all of the Navy Yards and make recommendations for the correction of such hazards as were discovered.

He then emphasized:

> I told Mr. Bard that this was not considered the best policy, due to the fact that we had medical officers in the Yards and that in practically all instances recommendations of sound character had been made by medical officers. We saw no need of inviting the United States Public Health Service on its own invitation to do this job.

> 27.    The Navy's reluctance to accept these offers of assistance was

based on concerns regarding possible upset of labor relations, and also for

security at Navy facilities. Stephenson's memorandum makes clear that these

concerns originated at the highest levels of Government:

> Likewise, I told him that I had spoken to you and that you had indicated that President Roosevelt thought that this might not be the best policy, due to the fact that they might cause disturbance in the labor element.

(President Roosevelt was familiar with the structure and operation of the Navy's shipyards and other facilities – and in particular with the functioning of the Navy during wartime – from his tenure as Assistant Secretary of the Navy from 1913 until 1920. Admiral McIntire was President Roosevelt's personal physician in addition to being the Surgeon General of the Navy.)

28.     Stephenson's positions were taken even in light of knowledge that not all industrial hazards were adequately controlled at Navy facilities: "I doubt if any of our foundries would be tolerated if the State industrial health people were to make surveys of them." Asbestos, too, was discussed as an issue: "I am certain that we are not protecting the men as we should."

29.     Health and safety issues, including those relating to asbestos exposure, continued to be a major focus of the Navy and the United States Maritime Commission, throughout World War II. In 1943, the Navy, along with the Maritime Commission declared its responsibility for the safety and health of their workers and took charge of implementing and staffing safety and health programs for those workers. Following extensive discussion with various constituencies, the Navy and the Maritime Commission jointly issued "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" ("Minimum Requirements"). The specific requirements imposed by the document enunciated for private and contract shipyards expectations that were already in effect and implemented at the Navy's own facilities.

30.     The Minimum Requirements identified asbestos-related disease as a potential hazard of shipyard work, explaining that exposure could result from

13

handling, sawing, cutting, molding and welding rod salvage around asbestos or asbestos mixtures. The document advised that such jobs "can be done safely with:

    1.    Segregation of dusty work and,

    2.    (a)    Special ventilation: Hoods enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or

        (b)    Wearing of special respirators.

    3.    Periodic medical examination."

The 1943 Minimum Requirements document also warns that jobs involving exposure to asbestos require "respiratory protective equipment," in particular a "dust respirator." A ventilation supervisor (the safety engineer) was required to be trained to handle the entire ventilation program in the yard, which was to include classes, demonstrations and short talks on proper procedures.

    31.    The Minimum Requirements document further called for employee safety training: "the time for the safety training of an employee to start is at the inception of his employment." "Employees shall have in their possession, and be instructed in the proper use of, all necessary personal protective equipment before being started on any job." Safety bulletin boards were to be located at each hull and shop, with "[s]afety posters and other material on the bulletin boards" changed at least semi-monthly. The type of safety posters used in these worker educational campaigns included materials reinforcing the use of masks for protection against disease-causing dusts. One such poster stated, "His mask keeps him on the job."

32.     This commitment by the Navy to address the asbestos-related health concerns of Navy workers, as set forth in the 1939 Handbook of the Hospital Corps and the Minimum Requirements document, is further evidenced by dozens of other documents generated by the Navy and consultants it retained during the war years.

33.     Later in the war, following extensive study of asbestos-related health issues, Dr. Philip Drinker, a Harvard professor and Chief Health Consultant to the Division of Shipyard Labor Relations and consultant to the Navy Surgeon General since 1941, wrote on January 31, 1945 to Captain Thomas J. Carter at the Navy's Bureau of Medicine and Surgery. In his letter, he reported on analyses of airborne dust collected at Bath Iron Works, a leading contractor for construction of Navy vessels. Dr. Drinker summarized the results of the analysis: "This evidence is enough to indicate a fairly serious dust risk at Bath and to make it very probable that the same sort of thing will be found in other plants and yards where the same type of [asbestos] pipe covering materials are used."

34.     In addition to asbestos health concerns revealed at Bath Iron Works, experience in some of the contract shipyards also came to the attention of Dr. Drinker and Navy authorities. For example, union and worker complaints regarding asbestos-containing insulation at New York Shipbuilding led Dr. Drinker to meet with manufacturers of asbestos pipe insulating materials used by the Navy. Dr. Drinker recorded that "they would be glad to get out a brief statement of precautions which should be taken in the light of their own

experience." However, Dr. Drinker wrote that he "underst[oo]d that neither Navy nor Maritime [Commission] wants any change in the specifications as the performance with the present materials is entirely satisfactory."

These sentiments reflect the Navy's commitment to maintaining complete control over existing military specifications, policies and procedures with respect to asbestos-containing materials and worker practices with those materials. The Navy maintained a fierce autonomy over hazard recognition and control, because the Navy considered itself the ultimate authority on naval systems and military workplaces. Regardless of the source of other information, the Navy viewed its unique knowledge as a strategic advantage in addressing hazard identification and control in its workplaces.

35.     In the effort to achieve its mission, the Navy made trade-offs between the use of asbestos and the potential health impact on personnel. In the Navy's judgment, the beneficial aspects of asbestos from an engineering standpoint (technical performance, cost, weight, etc.) made it the best thermal insulation available and a critical war material. As knowledge of asbestos health risks evolved, the Navy made sensitive military mission-related decisions about deriving the benefits of asbestos while controlling its risks. Moreover, when the hazards of asbestos became more fully known to the Navy and the scientific community in the late 1960s, the Navy determined not to do an immediate fleet-wide elimination of asbestos. At the time, Navy leaders were concerned that a large scale, immediate asbestos removal program would pose at least three

16

problems: excessive cost; mission impairment; and increased health hazards to removal crews from disturbing fixed, in-place asbestos.

36.     In my research, I have not located a single instance in which the Navy, at any time during the 1930s through the 1960s, instructed or permitted a supplier of engineering equipment to a vessel or facility to affix or provide any asbestos-related warning with its equipment. The Navy has not depended on equipment warnings in its workplaces concerning long-term occupational health issues. Rather than depending on equipment signage or labeling, the Navy put its efforts into work practice training, specifications for materials being used in its unique workplaces, and the hierarchy of industrial hygiene controls.

37.     The Navy asserted for itself the role as final arbiter of what was best with respect to industrial hygiene in its unique workplaces to carry out its national defense mission. The Navy's reasons for this approach include: harmonizing industrial hygiene with its overall operations; maintaining security of its facilities; and unifying communications to its workers.

The Navy rejected participation from manufacturers in its efforts to alert its personnel to potential asbestos hazards in Navy operations. The Navy pursued the issue in its own way. Professor Drinker recorded:

> I met with the manufacturers of the materials used at Bath and they stated they would be glad to get out a brief statement of precautions which should be taken in the light of their own experience and that they would inform their competitors that I had asked them to do so. I understand that neither Navy nor Maritime wants any change in the specifications as the performance with the present materials is entirely satisfactory. From a health standpoint we do not believe any specification changes are needed.
>
> I suggested to Admiral Mills that it would be very desirable for Navy to examine men handling the preparation of [asbestos] pipe

coverings and their installation in at least two Navy Yards and two Navy contract yards as this is much more a Navy than a Maritime problem because the materials are used especially on Navy vessels with high pressure steam power plants. Admiral Mills agreed that such studies would be wise before Navy or Maritime accepted this asbestos risk as being significant in our general ship construction program.

38. Dr. Drinker and his Navy colleagues published the results of the study he had suggested in W.E. Fleischer, et al., "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels," 28 *Journal of Industrial Hygiene & Toxicology* 9-16 (Jan. 1946). The study reaffirmed the Navy's position regarding acceptable occupational dust exposure levels and dust control strategies. They offered the conclusion that "[asbestos] pipe covering is not a dangerous trade."

39. The conclusions of this study were carried into practice in Navy workplaces following World War II. The January 1947 issue of the Navy's *Safety Review* publication noted that "[e]xposure to asbestos dust is a health hazard which cannot be overlooked in maintaining an effective industrial hygiene programs."

40. Also during the second half of the 1940s, the American Conference of Governmental Industrial Hygienists ("ACGIH") evaluated the issue of asbestos exposures. This entity, comprised entirely of industrial hygienists with links to the government and academia, published threshold limit values for acceptable exposures to asbestos dust in the workplace. These standards were periodically updated over the years. Representatives of the Navy, trained as industrial hygienists, participated in the ACGIH. In recognition of the potential hazards associated with exposure to asbestos dust, a 1955 Navy Bureau of Medicine

instruction adopted the ACGIH's threshold limit value for exposure to asbestos dust among Navy personnel. The 1955 threshold limit value as promulgated in the Navy instruction was the same level to which the Navy had sought to control exposures during World War II.

41. During the 1950s, the Navy continued to prescribe safe work practices to address potential shipyard hazards associated with exposure to asbestos dust. In 1957, the Navy convened at the Boston Naval Shipyard a "Pipe and Copper Shop Master Mechanics' Conference" to address issues of concerns to those in the pipefitters' trade. At the conference were personnel from all twelve Navy shipyards and the Navy's Bureau of Ships in Washington, D.C.

42. The prepared remarks of a Long Beach Naval Shipyard official, included in the Minutes of the Conference reflect the Navy's stated policy that pipe insulators and laggers who handle asbestos products should wear respirators:

> Asbestos, when handled dry, produces vast amounts of silica dust. . . . [T]he material can be dampened to reduce the amount of dust liberated. However, the specified type of amosite [asbestos] for use on cold water piping is water repellent. Also material which must be removed from an existing installation is dry and powdery, being an excellent dust producer. . . .
>
> [D]uring 1956 eleven deaths from asbestosis were reported on the Pacific Coast alone. . . .
>
> I know that two of my insulators are now afflicted with this condition. How many more will become afflicted is something which I hesitate to predict.
>
> Again the solution is obvious. Remove the cause by substituting other products. . .

19

In the meantime, the answer is the wearing of respirators by all who handle asbestos products.

43.     A New York Naval Shipyard official added that if those working with asbestos insulation have not been "told . . . to put on masks, you are more or less the cause of their trouble." That same official added:

> I think everyone, who has people doing this type work, should warn
> their people regarding the handling of this material. With the proper
> handling of it on the job, and it has always posed a very big
> problem, because the men don't want to wear the masks, or get
> this dread disease. It is difficult to protect them. After a couple of
> years of mandatory wearing masks, I think they should realize the
> danger. I think everyone ought to enforce the wearing of masks.
> Don't forget this is something that injures people's health. We
> should do something about it – and fast, and I am convinced that
> what we are doing is not enough. We should not have people
> handle this material withou[t] protection.

44.     On January 7, 1958, the Department of the Navy issued a "Safety Handbook for Pipefitters," which explicitly addressed the asbestos hazard and again set forth Navy policy for controlling this hazard. This handbook – one of many safety handbooks issued by the Navy – stressed that "[a]sbestos dust is injurious if inhaled," and warned those working with asbestos insulation materials to "[w]ear an approved dust respirator for protection against this hazard."

45.     The early 1960s brought still further development of the Navy's policies and practices to protect workers from asbestos-related health concerns. Captain H.M. Robbins, a Navy physician, and W.T. Marr, a Navy industrial hygienist from the Long Beach Naval Shipyard, published the article entitled "Asbestosis" in the October 1962 issue of the Navy's internal *Safety Review* publication. The article addressed the potential for exposure to asbestos aboard ships:

> Aboard ship, a great variety of insulation is performed. Insulation blocks are shaped with a saw, pads are supplied to fittings, insulation cement is applied to blocks and covered with asbestos cloth. These and other operations take place in nearly all compartments; however, most work is done in the machinery spaces. By far the greatest potential exposure to asbestos fibers occurs during ripout of old insulation for ship overhaul or reconversions.

The article concluded that "[t]he worker's best protection is to avoid careless creation of dusty conditions, use damp material when possible, and wear respiratory protection constantly."

46.     In 1968, the Navy came under scrutiny for its handling of asbestos-related health issues. On July 30, 1968, Murray C. Brown, Medical Director of the Public Health Service, wrote to Vice-Admiral R.B. Brown, the Chief of the Navy's Bureau of Medicine and Surgery, stating that "[o]ne of our grantees, Dr. Irving Selikoff of New York University, has recently completed a study of non-insulation shipyard workers' exposure to asbestos," and that "Dr. Selikoff reports he has some interesting data and has requested that we arrange an information meeting with your Department and the U.S. Department of Labor to discuss his findings." On December 5 of that same year, Admiral Brown reported to others in the Navy health establishment that "Doctor I.J. Selikoff of Mount Sinai Hospital, through the news media, stated that he has warned the Navy and other Federal departments of his findings relating to the unusual incidence of asbestosis among shipyard asbestos workers. The newspaper articles stated that the Federal agencies including the Navy have not publicized the hazards."

47.     In a "Hazard Analysis" commissioned in response to this external

criticism of the Navy's safety practices, Commander Rosenwinkel of the Navy's

Bureau of Medicine assured that:

> [T]he Navy's shipyards have for many years been aware of the hazards of asbestos and have initiated appropriate safety precautions. Insofar as possible, all fabrication work [with insulation] is performed in the shops where adequate safety precautions can be observed. These precautions include controlled ventilation, use of respirators, and wetting down of the material. During "rip out" operations, respirators are worn and ventilation is controlled as far as possible.

Similar language was prepared "for inclusion in a statement to be issued by Rear

Admiral J.J. Stilwell, Shipyard Management Directorate":

> The United States Navy is well aware of the hazards of asbestos to its employees engaged in ship construction and ship repair at naval shipyards. Hazard control measures implemented by the shipyard medical departments and practices in the United States. Stringent efforts are directed at keeping the concentration of air borne asbestos dust below the level recommended by the American Conference of Governmental Industrial Hygienists. An energetic periodic physical examination program insures the health of personnel exposed to this hazard.
>
> For more than two years, the Naval Ship Systems Command and the Commander of Boston Naval Shipyard have been cooperating with a prominent investigator in a study whose ultimate goal is to define safe working conditions with respect to air borne asbestos. Upon the development of further objective, well founded recommendations for the control of this hazard, the Naval Ship Systems Command, in cooperation with the Bureau of Medicine and Surgery, will take the necessary steps to implement them at the naval shipyards and all naval activities.

The message was clear, and consistent: the Navy would handle asbestos issues

in its own way and through its own channels.

48.     The development of the Navy's policy towards asbestos-related

health issues, and of its program for addressing asbestos exposure to Navy

22

personnel, continued into the 1970s. On February 9, 1971, the Commander of the Navy's Ship Systems Command issued to numerous Navy bureaus and commands its Instruction 5100.26. That document began by recognizing that:

> [t]he most critical use of asbestos in the Navy from a safety viewpoint is in the fabrication, installation, repair or removal of pipe and boiler insulation materials. Some workers sustain accidental contacts either while employed in various capacities where asbestos products are processed or when working in plant areas in which an environmental pollution of the air exists due to asbestos.

In light of these concerns, the purpose of the document was "to prescribe appropriate safety precautions during the use of asbestos," and it decreed that:

> [t]he following safety precautions will be observed by all supervisors and workers engaged in the fabrication, installation and/or removal (ripout) of asbestos-containing insulation material. The provisions of this instruction will be effective as of this date. The provisions in this instruction are considered as minimum health and safety requirements. More stringent restrictions may be applied by local commanders.

The document then listed nearly fifty specific work practices to be employed to protect workers from asbestos exposure in handling or working in the vicinity of asbestos-containing products.

49. With specific reference to potential hazards associated with the handling of asbestos-containing gaskets and packing, I am aware from my research and from my personal experience in the Navy that these materials were regarded as negligible sources of asbestos exposure. For example, a December 9, 1968 U.S. Department of the Navy Memorandum regarding "Hazards of Asbestos" stated that

> [a]ll of the asbestos in [gasket and packing materials] is fabricated as cloth, rope or compressed sheet with binders, so that the items are not friable when they are cut. Thus, these items do not cause dust in shipboard applications. In addition, in many instances, they

23

are received already incorporated in the finished assembly such as a valve, and do not require fabrication by the shipyard. For these reasons, packings and gaskets containing asbestos are not considered to be a significant health hazard.

50. This conclusion was reaffirmed in the published literature by P.G. Harries, who made extensive study of asbestos exposure in shipyards in the United Kingdom. In "Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards," *Ann Occup Hyg 14:* 241-254 (1971), Harries concluded that asbestos-containing gaskets, which he referred to as "high temperature jointing and packing materials," presented "[n]o health hazard in forms used in shipyard applications." He also noted that "[n]o substitute heat-resistant material is available" for asbestos in these applications.

51. A 1973 publication of the International Agency for Research on Cancer – *Biological Effects of Asbestos*, p. 325 – stated that "[t]here is no conceivable health risk in the use of asbestos-based gasket materials." Well-known asbestos researcher and health advocate Dr. Irving Selikoff wrote, in his 1978 book *Asbestos and Disease* (p. 467) that "[h]igh temperature jointing and packing materials" containing "[a]sbestos fiber" and "[c]ompressed asbestos fiber" present "[n]o health hazard in forms used in shipyard applications."

52. The lack of concern for asbestos exposure from asbestos-containing gaskets and packing expressed in Navy documents and the writings of researchers such as Harries and Selikoff are entirely consistent with my experience as a uniformed and civilian Navy occupational medicine physician during the late 1970s and early and mid-1980s.

24

53.     In addition to the documents referenced and discussed above, the development of the Navy's knowledge of asbestos-related health issues and of appropriate workplace practices and controls to prevent exposure to elevated levels of airborne asbestos also is reflected, among others, in the documents listed on Exhibit B, which comprise part of the bases for my opinions on these topics.

54.     The Navy made its decisions with respect to the use of asbestos in accordance with Navy operating requirements and in furtherance of Navy missions, and in light of the Navy's knowledge of associated health hazards at the time and of its perception of the requirements of federal law. The Navy's extensive and evolving knowledge of the hazards of exposure to asbestos and the means to control those hazards were weighed by the Navy against the benefits provided by its use. These benefits included meeting national defense needs in a standardized, efficient and low-cost manner that would not delay or hinder ship availability, especially during times of war. The Navy was informed in this decision-making by close contacts and liaison with relevant academic communities, professional organizations and other government agencies.

55.     Similarly, the Navy's handling of and programs regarding workplace safety and hazard communication, as they related to asbestos and other issues, reflected the Navy's balance of various considerations, including combat readiness, maintenance of the necessary command structure, the needs of discipline and the hierarchy of risks presented by life and work aboard a combat vessel. In general, the Navy chose to address long-term workplace health issues

in the course of training for various trades and jobs, rather than using labeling or other written materials to accompany products into the workplace.

56.     The U.S. Navy's occupational health program in no way depended upon, required or sought advice from equipment manufacturers regarding long-term occupational health issues, including those posed by exposure to asbestos dust. I have not uncovered – nor would I have expected to based on my research and experience and the extent of the Navy's knowledge in these areas – situations in which the Navy solicited from suppliers of shipboard equipment any information or guidance regarding the appropriate methods for the prevention of exposure to asbestos. Given the Navy's state-of-the-art knowledge concerning asbestos related hazards and its robust safety and health program, it would be unreasonable to assume that the Navy would have accepted any advice pertaining to asbestos related safety precautions from a manufacturer of equipment.

57.     My opinions set forth herein are held to a reasonable degree of scientific certainty.

I declare under penalty of perjury under the laws of the State of Massachusetts that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Executed this 23rd day of _November_, 2010 at _Brookline, MA_

_[signature]_

SAMUEL A. FORMAN, M.D.

STATE OF MASSACHUSETTS

COUNTY OF Norfolk

Subscribed and sworn to before me
this 23 day of November 2010.

_[signature]_

Notary Public

My commission expires

RAYSA I ORTIZ
Notary Public
COMMONWEALTH OF MASSACHUSETTS
Commission Expires
January 17, 2014

## EXHIBIT B

| | |
|---|---|
| 1922-03-00 | Naval Medical Bulletin |
| 1922-11-00 | L.I. Dublin et al., Naval Medical Bulletin, "Instruction to Medical Officers" |
| 1928-10-11 | Navy Department Memorandum re Safety Engineering |
| 1939-00-00 | Navy Handbook of the Hospital Corps |
| 1939-00-00 | Navy, Annual Report of the Surgeon General |
| 1939-06-18 | Letter from International Association of Heat and Frost Insulators and Asbestos Workers |
| 1939-07-07 | Navy Memorandum |
| 1939-07-13 | Navy Memorandum re Hazards to Health of Insulating Materials |
| 1940-09-16 | Selective Service Act |
| 1941-00-00 | Ernest W. Brown, M.D., Captain, Medical Corps, United States Navy, "Industrial Hygiene and the Navy in National Defense" |
| 1940-12-16 | Navy Memorandum re Amosite; dangers from |
| 1941-00-00 | Navy Annual Report of the Surgeon General |
| 1941-03-11 | Navy Memorandum from C.S. Stephenson to Admiral McIntire |
| 1941-12-19 | U.S. Office of Production Management Informational Bulletin |
| 1942-01-20 | Conservation Order No. M-79 Curtailing the Use of Certain Types of Asbestos |
| 1942-09-22 | Report to Maritime Commission re Industrial Health Survey of Bath Iron Works |
| 1942-11-10 | Letter from p. Drinker to Bath Iron Works |
| 1942-12-07 | Minutes of Proceedings before the United States Maritime Commission, Meeting in Regard to Minimum Requirements for Industrial Health and Safety in Shipyards |
| 1943-00-00 | Navy Department Routing Slip |
| 1943-05-18 | New York Shipbuilding Corporation Memo re Insulating Material for Cold Water Piping |
| 1943-05-31 | Navy Department Memo re Insulation |
| 1943-05-31 | Navy Department Memo re Insulation and Lagging of Cold Water Systems |
| 1943-07-02 | Navy Department Memo re Insulation |
| 1943-08-06 | Navy Department Memo re Insulation |
| 1943-09-18 | Navy Department Memo re Asbestos Insulating Felt (Amosite) |
| 1943-00-00 | Maritime Commission, Shipyard Health and Safety Bulletin No. 28 |
| 1943-01-15 | Navy Memorandum re Minimum Requirements |
| 1943-01-20 | Navy Department, Maritime Commission, "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" |
| 1942-01-21 | Federal Register – Asbestos |

1943-07-09   Letter to Navy Department from p. Drinker
1943-08-11   Memo from Bureau of Ships to Supervisor of Shipbuilding
1943-08-20   War Board Compliance Order
1943-12-10   Memorandum to Secretary of the Navy
1944-00-00   Outline of the Minimum Standards for the Control of Health and Safety in Contract Shipyards
1944-01-01   Safety Engineering, Chapter 24B, Bureau of Navy
1944-01-05   Navy Memorandum re Amosite Lagging
1944-01-08   Maritime Commission Letter to Navy
1944-01-19   Navy Memorandum re Amosite Lagging, toxic effects of
1944-11-02   Letter from p. Drinker to Industrial Union of Marine and Shipbuilding Workers of America
1944-12-19   Safety and Industrial Health Program Report on Investigation Asbestosis from Amosite Pipe Covering at Bath Iron Works
1945-01-31   Letter to Navy from p. Drinker
1946-01-00   W.E. Fleischer, et al., "A Health Survey of Pipe Covering Operations In Constructing Naval Vessels"
1946-08-00   Safety Review
1947-01-00   Safety Review
1947-07-00   Safety Review
1955-00-00   C. Shilling, Naval Institute, The Human Machine
1955-00-00   Navy Memorandum re List of Occupational Hazards
1955-07-05   Navy Instruction 88, Industrial Health Program
1955-10-19   Minutes of Meeting
1955-11-07   Navy Instruction re Threshold Limit Values
1956-00-00   Navy – All Hands
1956-06-00   Navy Bureau of Medicine List of Occupational Health Hazards
1957-00-00   Navy – All Hands
1957-04-00   Long Beach Naval Shipyard Poster
1957-05-08   Boston Naval Shipyard, Minutes of Pipe and Copper Shop Master Mechanics Conference
1957-06-04   Navy Report on Naval Shipyard Pipe Shop Masters Conference
1958-01-07   NAVORD Instruction 5100.21
1958-09-03   Memorandum re Dirty Money for Pipe Laggers
1959-10-15   Navy Department Memorandum re Occupational Health Hazards: Release No. 21
1960-00-00   Safety and Health Regulations for Ship Building
1958-01-07   NAVORD Instruction 5100.21
1959-07-15   Navy Department Memorandum re Occupational Health Hazards: Release No. 20
1960-00-00   Navy Memorandum re Occupational Health Hazards
1961-02-01   Navy Department Memorandum re Occupational Health Hazards: Release No. 26

| | |
|---|---|
| 1961-05-00 | Puget Sound Naval Shipyard, Shop 56, "Marine Pipe Covering and Insulating" |
| 1961-05-01 | Navy Department Memorandum re Occupational Health Hazards: Release No. 27 |
| 1961-10-19 | Navy Department Memorandum re Occupational Health Hazards: Release No. 29 |
| 1961-11-10 | 26 Federal Register 10583 |
| 1962-10-00 | Safety Review "Asbestos" |
| 1963-09-00 | Navy Department Memorandum re Occupational Health Hazards: Release No. 38 |
| 1964-05-00 | W.T. Marr, "Asbestos Exposure During Naval Vessel Overhaul" |
| 1965-05-15 | Navy, Safety Precautions for Shore Activities |
| 1965-06-22 | Navy Department Memorandum re Occupational Health Hazards: Release No. 43 |
| 1966-02-08 | Navy Department Memorandum re Occupational Health Hazards: Release No. 44 |
| 1967-07-24 | Navy Department Memorandum re Occupational Health Hazards: Release No. 50 |
| 1967-10-23 | Letter from Pipe Coverers Department re Respirators |
| 1968-00-00 | Department of the Navy Memorandum re December 4 Washington Post Article |
| 1968-02-09 | Navy Department Memorandum re Occupational Health Hazards: Release No. 54 |
| 1968-06-18 | Navy Department Memorandum re Occupational Health Hazards: Release No. 56 |
| 1968-07-30 | USPHS Letter to Navy Department |
| 1968-08-00 | C. Mangold, "Asbestos Exposure and Pulmonary X-Ray Changes to Pipe Coverers and Insulators at Puget Sound Naval Shipyard" |
| 1968-12-04 | Department of Navy Memorandum re December 4 Washington Post Article on Asbestos Peril |
| 1968-12-04 | Department of the Navy Memorandum re Asbestos |
| 1968-12-06 | Navy Memorandum re Asbestos Hazard to Shipyard Employees |
| 1968-12-09 | Navy Memorandum re Asbestos Hazard to Shipyard Employees |
| 1968-12-19 | Navy Memorandum re Newspaper articles appearing on shipyard asbestos workers |
| 1969-01-16 | Navy Department Memorandum re Occupational Health Hazards: Release No. 62 |
| 1969-01-22 | Navy Memorandum re Asbestos Hazard |
| 1969-03-14 | NAVSHIPS Notice 5100 |
| 1969-04-07 | Navy Memorandum re Hazards of Asbestos |
| 1969-04-23 | Navy Memorandum re Shipyard Practices in Combating the Hazards Attending Use of Insulating Materials |

| | |
|---|---|
| 1969-04-24 | Navy Memorandum re Asbestos, Hazards of |
| 1969-04-30 | Navy Memorandum re Shipyard Practices in Combating the Hazards Attending Use of Insulating Materials |
| 1969-05-00 | E. Cherowbrier, "Preventing Asbestos Inhalation" |
| 1969-05-05 | Navy Department Letter to Owens-Corning |
| 1969-05-06 | Navy Department Memorandum re Shipyard Practices in Combatting Hazards Attending Use of Insulating Materials |
| 1969-05-16 | Navy Department Memorandum re Shipyard Practices in Combatting Hazards Attending Use of Insulating Materials |
| 1969-05-21 | U.S. Navy Department Memorandum re Shipyard Practices in Combatting Hazards Attending Use of Insulating Materials |
| 1969-07-30 | Navy Memorandum re Asbestos Hazards of |
| 1969-08-15 | Navy Memorandum re Asbestos Dust Exposure, measures to control |
| 1969-08-20 | Department of Navy Memorandum re Asbestos, hazards of |
| 1969-09-24 | Navy Memorandum re Survey of Asbestos, final report of |
| 1969-10-16 | Navy Department Memorandum re Occupational Health Hazards: Release No. 61 |
| 1970-00-00 | Insulation Hygiene Progress Reports, "The U.S. Navy Joins Battle with Shipyard Dust" |
| 1970-03-00 | Navy Memorandum re Elimination of High Asbestos Content Insulation |
| 1970-03-02 | Navy Memorandum re Recommendations for Asbestos Dust Control |
| 1970-05-22 | NAVSEC Notice 9390 |
| 1970-11-00 | Puget Sound Naval Shipyard, "Asbestos Exposure and Control" |
| 1971-00-00 | P.G. Harries, "Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards" |
| 1971-02-09 | NAVSHIPS Instruction 5100.26: Asbestos Exposure Hazards; control of |
| 1971-02-17 | Newport News Shipbuilding and Dry Dock Company Memo |
| 1971-02-24 | Navy Letter re Asbestos Exposure Hazards; Control of |
| 1971-12-07 | Navy Memorandum re Asbestos Control |
| 1972-00-00 | Navy Occupational Health Manual |
| 1972-03-30 | Navy Department Report of Occupational Health Services Narrative Release No. 68 |
| 1972-10-13 | Navy Memo re Draft Reply to Sen. Fong |
| 1972-12-00 | Navy Department Memorandum re Occupational Health Hazards: Release No. 70 |
| 1973-00-00 | IARC, *Biological Effects of Asbestos* |
| 1973-06-07 | BUMED Instruction 6260.14 |
| 1973-07-17 | NAVSHIPS Presentation – Asbestos Workplace Controls and Substitutes |
| 1974-00-00 | Fathom – Surface Ship and Submarine Safety Review |

| 1974-01-02 | Navy Memo re QPLs and Color-Coding Asbestos Free Insulation Products |
| 1974-01-23 | Navy Department Report of Occupational Health Services Narrative |
| 1974-02-21 | Navy Department Memo re Proposed OPNAVINST 6260.__ |
| 1974-04-09 | OPNAVINST 6260.1 |
| 1974-08-12 | Navy Memorandum re Asbestos Dust Counts During Shipboard Asbestos Operations |
| 1974-04-09 | OPNAV Instruction 6260.1 |
| 1975-10-24 | NAVSEA Instruction 5100.2 |
| 1976-03-12 | Winer & Holtgren, A Case Study of the Navy's Response to Upgraded Safety and Health Requirements — Asbestos |
| 1978-00-00 | I. Selikoff et al., Asbestos and Disease |
| 1978-00-00 | Navy Training Course — Machinist's Mate 3 & 2 |
| 1978-05-00 | L.R. Liukonen et al., "Asbestos Exposure from Gasket Operations" |
| 1979-01-05 | Navy Department Letter to R.F. Hughes |
| 1979-08-20 | Memo from Department of the Navy re Asbestos Elimination Program |
| 1979-09-26 | Navy Department Letter re USS Enterprise Sampling |
| 1979-10-18 | Letter from Comptroller General to Hon. G.A. Anderson re Navy's Efforts to Protect Workers from Asbestos Exposure |
| 1983-09-21 | Navy Department Memorandum re Shipboard Workers, asbestos exposure of |
| 1985-07-30 | Request and Authorization for TDY Travel of DOD Personnel |
| 1985-08-00 | Memo re Use of Naval Medical Command Archival Materials |
| 1985-08-13 | Request and Authorization for TDY Travel of DOD Personnel |
| 1985-09-16 | Request and Authorization for TDY Travel of DOD Personnel |
| 1985-12-20 | Department of Navy Letter |
| 1986-01-10 | Department of Navy Letter |
| 1988-01-00 | S. Forman, "US Navy Shipyard Occupational Medicine through World War II" |
| 0000-00-00 | Navy Report of Travel |
| 0000-00-00 | Navy Dust Mask Poster |
| 0000-00-00 | Navy Get First Aid Poster |
| 0000-00-00 | Navy Another Naval Victory Poster |
| 0000-00-00 | Navy Needs Ships Poster |
| 0000-00-00 | Navy Needs You Poster |
| 0000-00-00 | Navy On the Job Poster |
| 0000-00-00 | Ships for Victory Poster |
| 0000-00-00 | CV of Samuel A. Forman |
| 0000-00-00 | Navy Photos |