# EXHIBIT A

ADRMOP

# U.S. District Court
# California Northern District (San Francisco)
# CIVIL DOCKET FOR CASE #: 3:13-cv-01641-EDL

Dorl et al v. Asbestos Corporation Limited et al
Assigned to: Magistrate Judge Elizabeth D. Laporte
Case in other court: San Francisco County Superior Court,
    CGC-13-276132
Cause: 28:1331 Fed. Question

Date Filed: 04/11/2013
Jury Demand: None
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Federal Question

## Plaintiff

**Charles Dorl**                    represented by  **David R. Donadio**
Brayton Purcell LLP
222 Rush Landing Road
PO Box 6169
Novato, CA 94948-6169
415-898-1555
Fax: 415-898-1247
Email: DDonadio@braytonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan R. Brayton**
Brayton Purcell LLP
222 Rush Landing Road
PO Box 6169
Novato, CA 94948-6169
415-898-1555
Fax: 415-898-1247
Email: abrayton@braytonlaw.com
*ATTORNEY TO BE NOTICED*

## Plaintiff

**Shirley Dorl**                    represented by  **David R. Donadio**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan R. Brayton**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Asbestos Corporation Limited**

**Defendant**

**Crown Cork & Seal Company, Inc.**

**Defendant**

**Crane Co.**                                      represented by **Bogdan-Alexandru Albu**
K&L Gates LLP
Four Embarcadero Center, Suite 1200
San Francisco, Ca 94111
415-882-8200
Fax: 415-882-8220
Email: bogdan.albu@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michele Cherie Barnes**
K&L Gates LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
415-249-1011
Fax: 415-882-8220
Email: michele.barnes@klgates.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ingersoll-Rand Company**

**Defendant**

**Metropolitan Life Insurance Comany**

**Defendant**

**National Dynamics Corporation**

**Defendant**

**Oakfabco, Inc.**

**Defendant**

**Owens-Illinois, Inc.**

**Defendant**

**Parker-Hannifin Corporation**

**Defendant**

**CBS Corporation**
*formerly known as*
Viacom Inc.
*formerly known as*
Westinghouse Electric Corporation

**Defendant**

Yarway Corporation

**Defendant**

Atlas Valve Company, Inc.

**Defendant**

Associated Insulation of California

**Defendant**

Thomas Dee Engineering Company

**Defendant**

Hopeman Brothers, Inc.

**Defendant**

J.T. Thorpe & Son, Inc.

**Defendant**

Western MacArthur Company

**Defendant**

MacArthur Company

**Defendant**

Western Asbestos Company

**Defendant**

J.T. Thorpe, Inc.

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/11/2013 | 1 | NOTICE OF REMOVAL (Part 1 of 2) from San Francisco County Superior Court. Their case number is CGC-13-276132. (Filing fee $350 receipt number 34611085032) No Process. Copy of Complaint attached. Filed byCrane Co. (mclS, COURT STAFF) (Filed on 4/11/2013) (Entered: 04/11/2013) |
| 04/11/2013 | 2 | NOTICE OF REMOVAL (Part 2 of 2). Filed byCrane Co. (mclS, COURT STAFF) (Filed on 4/11/2013) (Entered: 04/11/2013) |
| 04/11/2013 | 3 | Certificate of Interested Entities by Crane Co. (mclS, COURT STAFF) (Filed on 4/11/2013) (Entered: 04/11/2013) |
| 04/11/2013 | 4 | NOTICE of Tag Along Action by Crane Co. (mclS, COURT STAFF) (Filed on 4/11/2013) (Entered: 04/11/2013) |
| 04/11/2013 | 5 | CERTIFICATE OF SERVICE by Crane Co. re 1 Notice of Removal. (mclS, COURT STAFF) (Filed on 4/11/2013) (Entered: 04/11/2013) |
| 04/11/2013 | 6 | **ADR SCHEDULING ORDER: Case Management Statement due by 7/2/2013. Case Management Conference set for 7/9/2013 10:00 AM.** |

|  |  | **(Attachments: # 1 Standing Order)(mclS, COURT STAFF) (Filed on 4/11/2013) (Entered: 04/11/2013)** |
|---|---|---|
| 04/12/2013 | 7 | CLERKS NOTICE REQUESTING ALL PARTIES FILE CONSENT OR DECLINATION BY 4/26/2013. (knm, COURT STAFF) (Filed on 4/12/2013) (Entered: 04/12/2013) |
| 04/16/2013 | 8 | NOTICE by Crane Co. *Notice of Manual Filing* (Albu, Bogdan-Alexandru) (Filed on 4/16/2013) (Entered: 04/16/2013) |
| 04/16/2013 | 9 | *Defendant Crane Co.'s* ANSWER to Complaint *for Personal Injury by* Crane Co.. (Albu, Bogdan-Alexandru) (Filed on 4/16/2013) (Entered: 04/16/2013) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/16/2013 11:07:49 | | |
| **PACER Login:** | kl0203 | **Client Code:** | 0213660.00934/27000 |
| **Description:** | Docket Report | **Search Criteria:** | 3:13-cv-01641-EDL |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**SUMMONS**
**(CITATION JUDICIAL)**

SUM-100

| | FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE) |
|---|---|

MAR 1 2 2013

1055a

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ASBESTOS CORPORATION LIMITED
AND SEE ATTACHED LIST.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDANTE):*
CHARLES DORL and SHIRLEY DORL

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. *AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SAN FRANCISCO COUNTY SUPERIOR COURT
400 McAllister Street
San Francisco, CA 94102

| CASE NUMBER:
*(Número del Caso):* | CGC 13-276132 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección de teléfono del abogado del demandante, o del demandante que no tien abogado, es):*
DAVID R. DONADIO, ESQ., STATE BAR NO. 154436
BRAYTON✦PURCELL LLP
222 Rush Landing Road, Novato, CA 94948-6169          (415) 898-1555

DENNIS TOYAMA

DATE: FEB 2 0 2013     CLERK OF THE COURT     Clerk, by _____, Deputy
*(Fecha)*                                      *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Crane Co.

    under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
              ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
              ☐ CCP 416.40 (association of partnership)   ☐ CCP 416.90 (authorized person)
              ☐ other *(specify):*
    MAR 1 2 2013
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| CHARLES DORL and SHIRLEY DORL v. ASBESTOS CORPORATION LIMITED, et al. | CGC 13 276132 |

### INSTRUCTIONS FOR USE

► This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
► If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (*Check only one box. Use a separate page for each type of party.*):

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

CROWN CORK & SEAL COMPANY, INC.;
CRANE CO.;
INGERSOLL-RAND COMPANY;
METROPOLITAN LIFE INSURANCE COMPANY;
NATIONAL DYNAMICS CORPORATION;
OAKFABCO, INC.;
OWENS-ILLINOIS, INC.;
PARKER-HANNIFIN CORPORATION;
CBS CORPORATION (FKA VIACOM INC., FKA WESTINGHOUSE ELECTRIC CORPORATION);
YARWAY CORPORATION;
ATLAS VALVE COMPANY, INC.;
ASSOCIATED INSULATION OF CALIFORNIA;
THOMAS DEE ENGINEERING COMPANY;
HOPEMAN BROTHERS, INC.;
J.T. THORPE & SON, INC.;
WESTERN MacARTHUR COMPANY;
MacARTHUR COMPANY;
WESTERN ASBESTOS COMPANY;
J.T. THORPE, INC.;
and DOES 1 through 800, inclusive.

Page _1_ of _1_

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

*LexisNexis® Automated California Judicial Council Forms*

CASE NUMBER: CGC-13-276132  CHARLES DORL et al VS. ASBESTOS CORPORATION LIM

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

DATE:   **FEB-20-2014**

TIME:   **1:30PM**

PLACE:  **Department 503**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

**All parties must appear and comply with California Rules of Court 3.110**

> **CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.**

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint.  Proof of service subsequently filed with this court shall so state.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| DAVID R. DONADIO, ESQ., STATE BAR NO. 154436<br>BRAYTON✦PURCELL LLP<br>222 Rush Landing Road<br>Novato, California 94948-6169<br>TELEPHONE NO: (415) 898-1555  FAX NO: (415) 898-1247<br>ATTORNEY FOR (NAME): Plaintiff(s) | **ENDORSED**<br>**F I L E D**<br>*San Francisco County Superior Court*<br>**FEB 2 0 2013**<br>CLERK OF THE COURT<br>DENNIS TOYAMA<br>BY: _____<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME:
CHARLES DORL and SHIRLEY DORL vs. ASBESTOS CORPORATION LIMITED, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☒ Unlimited ☐ Limited<br>(Amount (Amount<br>demanded demanded is<br>exceeds $25,000) $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CGC 13 276132 |
| | | JUDGE: |
| | | DEPT.: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | (Cal. Rules of Court, rules 3.400-3.403) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Antitrust/Trade regulation (03) |
| Other PI/PD/WD (Personal Injury/Property | ☐ Other Collections (09) | ☐ Construction defect (10) |
| Damage/Wrongful Death) Tort | ☐ Insurance coverage (18) | ☐ Mass tort (40) |
| ☒ Asbestos (04) | ☐ Other contract (37) | ☐ Securities litigation (28) |
| ☐ Product Liability (24) | Real Property | ☐ Environmental / Toxic tort (30) |
| ☐ Medical malpractice (45) | ☐ Eminent domain/Inverse | ☐ Insurance coverage claims arising from the |
| ☐ Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case types (41) |
| Non-PI/PD/WD (Other) Tort | ☐ Wrongful eviction (33) | Enforcement of Judgment |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | Unlawful Detainer | Miscellaneous Civil Complaint |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint (not specified above) (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | Miscellaneous Civil Petition |
| ☐ Professional negligence (25) | Judicial Review | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition (not specified above) (43) |
| Employment | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☒ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. ☒ Large number of separately represented parties      d. ☐ Large number of witnesses
b. ☐ Extensive motion practice raising difficult or novel      e. ☐ Coordination and related actions pending in one or more courts
   issues that will be time-consuming to resolve         in other counties, states or countries, or in a federal court
c. ☐ Substantial amount of documentary evidence      f. ☐ Substantial post-judgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary      b. ☐ nonmonetary; declaratory or injunctive relief      c. ☒ punitive
4. Number of causes of action (specify): 8
5. This case ☐ is ☒ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: 2/18/13

David R. Donadio
(TYPE OR PRINT NAME)                                         ► _____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet shall be used for statistical purposes only.
Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov<br>LexisNexis® Automated California Judicial Council Forms |

ALAN R. BRAYTON, ESQ., S.B. #73685
DAVID R. DONADIO, ESQ., S.B. #154436
BRAYTON✛PURCELL LLP
Attorneys at Law
222 Rush Landing Road
P.O. Box 6169
Novato, California  94948-6169
(415) 898-1555

Attorneys for Plaintiffs

ENDORSED
F I L E D
San Francisco County Superior Court

FEB 2 0 2013

CLERK OF THE COURT
DENNIS TOYAMA
Deputy Clerk

THIS CASE IS SUBJECT TO
MANDATORY ELECTRONIC FILING
PURSUANT TO AMENDED G.O. 158

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| CHARLES DORL and SHIRLEY DORL, | ASBESTOS No.   C G C  13 - 276132 |
| Plaintiffs, | COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS |
| vs. | (Pursuant Case Management Order, Filed June 29, 2012) |
| ASBESTOS CORPORATION LIMITED; CROWN CORK & SEAL COMPANY, INC.; CRANE CO.; INGERSOLL-RAND COMPANY; METROPOLITAN LIFE INSURANCE  COMPANY; NATIONAL DYNAMICS CORPORATION; OAKFABCO, INC.; OWENS-ILLINOIS, INC.; PARKER-HANNIFIN CORPORATION; CBS CORPORATION (FKA VIACOM INC., FKA  WESTINGHOUSE ELECTRIC  CORPORATION); YARWAY CORPORATION; ATLAS VALVE COMPANY, INC.; ASSOCIATED INSULATION OF CALIFORNIA; THOMAS DEE ENGINEERING COMPANY; HOPEMAN BROTHERS, INC.; J.T. THORPE & SON, INC.; WESTERN MacARTHUR COMPANY; MacARTHUR COMPANY; WESTERN ASBESTOS COMPANY; J.T. THORPE, INC.; and DOES 1 through 800, inclusive, | |
| Defendants. | |

BRAYTON✛PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD,
P.O. BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

K:\Injured\111844\EVPLD\temp-pilcpMet.wpd

1

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1

2

## FIRST CAUSE OF ACTION
### (Negligence)

3   PLAINTIFF CHARLES DORL COMPLAINS OF DEFENDANTS HEREINBELOW

4   NAMED IN PARAGRAPH 3, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM,

5   AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

6        1.      The true names and capacities, whether individual, corporate, associate,

7   governmental or otherwise, of defendants DOES 1 through 500, inclusive, are unknown to

8   plaintiff at this time, who therefore sues said defendants by such fictitious names. When the true

9   names and capacities of said defendants have been ascertained, plaintiff will amend this

10  complaint accordingly. Plaintiff is informed and believes, and thereon alleges, that each

11  defendant designated herein as a DOE is responsible, negligently or in some other actionable

12  manner, for the events and happenings hereinafter referred to, and caused injuries and damages

13  proximately thereby to the plaintiff, as hereinafter alleged.

14       2.      At all times herein mentioned, each of the defendants was the agent, servant,

15  employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each

16  defendant was acting in the full course and scope of said agency, service, employment and/or

17  joint venture.

18       3.      Plaintiff is informed and believes, and thereon alleges that at all times herein

19  mentioned, defendants: ASBESTOS CORPORATION LIMITED; CROWN CORK & SEAL COMPANY,

20  INC.; CRANE CO.; INGERSOLL-RAND COMPANY; METROPOLITAN LIFE INSURANCE COMPANY;

21  NATIONAL DYNAMICS CORPORATION; OAKFABCO, INC.; OWENS-ILLINOIS, INC.; PARKER-

22  HANNIFIN CORPORATION; CBS CORPORATION (FKA VIACOM INC., FKA WESTINGHOUSE ELECTRIC

23  CORPORATION); YARWAY CORPORATION; ATLAS VALVE COMPANY, INC.; ASSOCIATED

24  INSULATION OF CALIFORNIA; THOMAS DEE ENGINEERING COMPANY; HOPEMAN BROTHERS, INC.;

25  J.T. THORPE & SON, INC.; WESTERN MacARTHUR COMPANY; MacARTHUR COMPANY; WESTERN

26  ASBESTOS COMPANY; and DOES 1 through 300, inclusive, were individuals, or corporations,

27  partnerships and/or unincorporated associations organized and existing under and by virtue of the

28  laws of the State of California, or the laws of some other state or foreign jurisdiction, and that

1 said defendants, and each of them, were and are authorized to do and are doing business in the

2 State of California, and that said defendants have regularly conducted business in the County of

3 San Francisco, State of California.

4       4.      At all times herein mentioned, each of the named defendants and DOES 1 through

5 300 was the successor, successor in business, successor in product line or a portion thereof,

6 assign, predecessor, predecessor in business, predecessor in product line or a portion thereof,

7 parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in

8 an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling,

9 assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting,

10 servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding,

11 manufacturing for others, packaging and advertising a certain substance, the generic name of

12 which is asbestos and other products containing said substance. Said entities shall hereinafter

13 collectively be called "alternate entities." Each of the herein named defendants is liable for the

14 tortious conduct of each successor, successor in business, successor in product line or a portion

15 thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or

16 partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded,

17 that researched, studied, manufactured, fabricated, designed, modified, labeled, assembled,

18 distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed,

19 contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others and

20 advertised a certain substance, the generic name of which is asbestos and other products

21 containing said substance. The following defendants, and each of them, are liable for the acts of

22 each and every "alternate entity," and each of them, in that there has been a virtual destruction of

23 plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have

24 acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such

25 "alternate entity"; defendants, and each of them, caused the destruction of plaintiff's remedy

26 against each such "alternate entity"; each such defendant has the ability to assume the risk-

27 spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill

28 originally attached to each such "alternate entity."

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| ASBESTOS CORPORATION LIMITED | GENERAL DYNAMICS CORPORATION |
| CROWN CORK & SEAL COMPANY, INC. | MUNDET CORK COMPANY |
| CRANE CO. | BARKSDALE CONTROL PRODUCTS |
| | CHAPMAN VALVE CO. |
| | COCHRANE CORP. |
| | CRANE CO. VALVE DIVISION |
| | CRANE PLUMBING & HEATING AKA CRANE PLUMBING-HEATING SHEETMETAL, INC. |
| | CRANE PUMPS & SYSTEMS, INC. |
| | CRANE SUPPLY |
| | CYCLOTHERM |
| | JENKINS BROS. |
| | JENKINS VALVES |
| | MIDWEST PIPING & SUPPLY |
| | PACIFIC STEEL BOILER CORPORATION |
| | PACIFIC VALVES |
| | REPCAL BRASS MANUFACTURING CO. |
| INGERSOLL-RAND COMPANY | INGERSOLL-DRESSER PUMP |
| | DRESSER-RAND CO. |
| | COPPUS ENGINEERING CORPORATION |
| | FLOWSERVE CORPORATION |
| | INGERSOLL ROCK DRILL COMPANY |
| | TERRY STEAM TURBINE CO. |
| | WHITON MACHINE COMPANY |
| | RAND DRILL COMPANY |
| | RAND & WARING DRILL AND COMPRESSOR COMPANY |
| | INGERSOLL-SERGEANT |
| | VON DUPRIN |
| | THE TORRINGTON COMPANY |
| | ALDRICH COMPANY, INC., THE |
| | HUSSMANN CORPORATION |
| | WESTERN LAND ROLLER COMPANY |
| NATIONAL DYNAMICS CORPORATION | NEBRASKA BOILER COMPANY |
| OAKFABCO, INC. | KEWANEE BOILER CO., INC. |
| | AMERICAN STANDARD, INC. |
| OWENS-ILLINOIS, INC. | OWENS-ILLINOIS GLASS COMPANY |
| PARKER-HANNIFIN CORPORATION | SACOMA-SIERRA, INC. |
| | SACOMA MANUFACTURING COMPANY |
| | E.I.S. AUTOMOTIVE CORPORATION |
| | CONDREN CORPORATION, THE |
| | PARKER SEAL COMPANY |
| | DENISON HYDRAULICS INC. |
| | GREER HYDRAULICS CORPORATION |

///

| DEFENDANT | ALTERNATE ENTITY |
|-----------|------------------|
| CBS CORPORATION (F/K/A VIACOM INC., F/K/A WESTINGHOUSE ELECTRIC CORPORATION) | VIACOM, INC.<br>CBS CORPORATION<br>WESTINGHOUSE ELECTRIC CORPORATION<br>WESTINGHOUSE ELECTRIC AND MANUFACTURING COMPANY<br>B.F. STURTEVANT<br>KPIX TELEVISION STATION<br>PARAMOUNT COMMUNICATIONS, INC<br>GULF & WESTERN INDUSTRIES, INC.<br>NORTH & JUDD MANUFACTURING COMPANY |
| YARWAY CORPORATION | YARNALL-WARING COMPANY<br>YARNALL-WARING CO. |
| ASSOCIATED INSULATION OF CALIFORNIA | OSCAR E. ERICKSON, INC. |
| THOMAS DEE ENGINEERING COMPANY | THOMAS DEE ENGINEERING CO., INC.<br>DEE ENGINEERING COMPANY |
| HOPEMAN BROTHERS, INC. | HOPEMAN BROTHERS MARINE INTERIORS, LLC |
| J.T. THORPE & SON, INC. | THE THORPE COMPANY<br>THORPE PRODUCTS CO.<br>J.T. THORPE NORTHWEST |
| WESTERN MacARTHUR COMPANY | WESTERN ASBESTOS CO.<br>F.K. PINNEY, INC.<br>MACARTHUR COMPANY |

5.     At all times herein mentioned, defendants, their "alternate entities," and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising a certain substance, the generic name of which is asbestos and other products containing said substance.

6.     At all times herein mentioned, defendants, their "alternate entities" and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain substance, the generic

1  name of which is asbestos and other products containing said substance, in that said substance

2  proximately caused personal injuries to users, consumers, workers, bystanders and others,

3  including the plaintiff herein (hereinafter collectively called "exposed persons"), while being

4  used in a manner that was reasonably foreseeable, thereby rendering said substance unsafe and

5  dangerous for use by "exposed persons."

6    7.    Plaintiff's claims against defendant CBS CORPORATION (FKA VIACOM INC.,

7  FKA WESTINGHOUSE ELECTRIC CORPORATION) exclude plaintiff's asbestos exposure at

8  military and federal government jobsites or from U.S. Military vessels, aircraft or equipment.

9    8.    Defendants, their "alternate entities," and each of them, had a duty to exercise due

10  care in the pursuance of the activities mentioned above and defendants, and each of them,

11  breached said duty of due care.

12    9.    Defendant MacARTHUR COMPANY is and at all times herein was a corporation

13  organized and existing under the laws of the State of Minnesota with its principal place of

14  business in St. Paul, County of Ramsey, Minnesota.

15    10.    Defendant WESTERN MacARTHUR COMPANY is a corporation organized and

16  existing under the laws of the State of California with its principal place of business in Hayward,

17  County of Alameda, California.

18    11.    Defendant MacARTHUR COMPANY from May 1967 to present was the parent

19  corporation of WESTERN MacARTHUR COMPANY and the owner of 100% of all shares of

20  stock of WESTERN MacARTHUR COMPANY.

21    12.    There exists, and at all times herein mentioned there existed, a unity of interest

22  and ownership between MacARTHUR COMPANY and WESTERN MacARTHUR COMPANY

23  such that any individuality and separateness between MacARTHUR COMPANY and

24  WESTERN MacARTHUR COMPANY have ceased and MacARTHUR COMPANY is the alter

25  ego of WESTERN MacARTHUR COMPANY in that:

26    a.    WESTERN MacARTHUR COMPANY is and at all times herein

27  mentioned was a mere shell or sham without adequate capital assets or stockholders. WESTERN

28  MacARTHUR COMPANY was conceived, intended and used by defendant

1   MacARTHUR COMPANY as a device to avoid liability and for the purpose of substituting a
2   financially insolvent corporation in the place of defendant MacARTHUR COMPANY;

3           b.   WESTERN MacARTHUR COMPANY is and at all times herein
4   mentioned was so inadequately capitalized that compared with the business done by WESTERN
5   MacARTHUR COMPANY and the risks of loss attendant thereto, this capitalization was illusory
6   or trifling;

7           c.   MacARTHUR COMPANY used the assets of WESTERN MacARTHUR
8   COMPANY for its own uses and caused assets of WESTERN MacARTHUR COMPANY to be
9   transferred without adequate consideration and withdrew funds from WESTERN MacARTHUR
10  COMPANY's bank accounts for its own use;

11          d.   MacARTHUR COMPANY completely controlled, dominated, managed
12  and operated both WESTERN MacARTHUR COMPANY and MacARTHUR COMPANY,
13  intermingled the assets of each unit to suit the convenience of MacARTHUR COMPANY which
14  resulted in the concentration of assets in MacARTHUR COMPANY and the liabilities in
15  WESTERN MacARTHUR COMPANY to the detriment of plaintiff and creditors;

16          e.   WESTERN MacARTHUR COMPANY was a mere shell, instrumentality
17  and conduit through which MacARTHUR COMPANY carried on its business in the corporate
18  name of WESTERN MacARTHUR COMPANY exactly as it had conducted the previous
19  incorporation, exercising complete control and dominance of WESTERN MacARTHUR
20  COMPANY to such an extent that any individuality or separateness of WESTERN
21  MacARTHUR COMPANY and MacARTHUR COMPANY does not and at all times herein
22  mentioned, did not exist.

23      13.   WESTERN MacARTHUR COMPANY is and at all times herein was controlled,
24  dominated and operated by MacARTHUR COMPANY as its own business and alter ego in that
25  the activities and business of WESTERN MacARTHUR COMPANY were carried on without
26  the holding of directors' or shareholders' meetings, no records or minutes of any corporate
27  proceedings were maintained, and defendant MacARTHUR COMPANY entered into beneficial
28  transactions with WESTERN MacARTHUR COMPANY without the approval of its directors.

14.     Adherence to the fiction of the separate existence of WESTERN MacARTHUR COMPANY as an entity distinct from MacARTHUR COMPANY would permit abuse of the corporate privilege and would produce an inequitable result in that MacARTHUR COMPANY made loans to WESTERN MacARTHUR COMPANY and guaranteed certain of its obligations thereby enabling WESTERN MacARTHUR COMPANY to continue active business without adequate financing and without capital stock which business continuation invited the public generally to deal with defendant WESTERN MacARTHUR COMPANY and allowed it to continue in business as a going concern.

15.     Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons," including plaintiff herein, would use or be in proximity to and exposed to said asbestos fibers.

16.     Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and asbestos-containing products would be used or handled as specified in Exhibit A, which is attached hereto and incorporated by reference herein, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons," including plaintiff herein, would be in proximity to and exposed to said asbestos fibers.

17.     Plaintiff CHARLES DORL has used, handled or been otherwise exposed to asbestos and asbestos-containing products referred to herein in a manner that was reasonably foreseeable. Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations as set forth in Exhibit A, which is attached hereto and incorporated by reference herein.
///

18.    As a direct and proximate result of the conduct of the defendants, their "alternate entities," and each of them, as aforesaid, plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the plaintiff, the nature of which, along with the date of plaintiff's diagnosis, are set forth in Exhibit B, which is attached hereto and incorporated by reference herein.

19.    Plaintiff is informed and believes, and thereon alleges, that progressive lung disease, cancer and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

20.    Plaintiff CHARLES DORL suffers from a condition related to exposure to asbestos and asbestos-containing products. Plaintiff was not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.

21.    As a direct and proximate result of the aforesaid conduct of defendants, their "alternate entities," and each of them, plaintiff has suffered, and continues to suffer, permanent injuries and/or future increased risk of injuries to his person, body and health, including, but not limited to, asbestosis, other lung damage, and cancer, and the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to his general damage in the sum in excess of the jurisdictional limits of the Municipal Court.

22.    As a direct and proximate result of the aforesaid conduct of the defendants, their "alternate entities," and each of them, plaintiff has incurred, is presently incurring, and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, X-rays and other medical treatment, the true and exact amount thereof being unknown to plaintiff at this time, and plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained.

23.    As a further direct and proximate result of the said conduct of the defendants, their "alternate entities," and each of them, plaintiff has incurred, and will incur, loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses,

///

1    the full nature and extent of which are not yet known to plaintiff; and leave is requested to amend

2    this complaint to conform to proof at the time of trial.

3        24.    Defendants, their "alternate entities," and each of them, and their officers,

4    directors and managing agents participated in, authorized, expressly and impliedly ratified, and

5    had full knowledge of, or should have known of, each of the acts set forth herein.

6        25.    Defendants, their "alternate entities," and each of them, are liable for the

7    fraudulent, oppressive, and malicious acts of their "alternate entities," and each of them, and each

8    defendant's officers, directors and managing agents participated in, authorized, expressly and

9    impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their

10    "alternate entities" as set forth herein.

11        26.    The herein-described conduct of said defendants listed in this paragraph below,

12    their "alternate entities," and each of them, was and is willful, malicious, fraudulent, outrageous

13    and in conscious disregard and indifference to the safety and health of "exposed persons."

14    Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive

15    damages according to proof against the following defendants only: ASBESTOS

16    CORPORATION LIMITED; CRANE CO.; OWENS-ILLINOIS, INC.

17        WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities,"

18    and each of them, as hereinafter set forth.

19                    SECOND CAUSE OF ACTION
                        (Products Liability)

20

21        AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF

22    ACTION FOR STRICT LIABILITY, PLAINTIFF CHARLES DORL COMPLAINS OF

23    DEFENDANTS NAMED IN PARAGRAPH 3 HEREINABOVE, AND EACH OF THEM, AND

24    ALLEGES AS FOLLOWS:

25        27.    Plaintiff incorporates herein by reference, as though fully set forth herein, the

26    allegations contained in Paragraphs 1 through 5 and 9 through 23 of the First Cause of Action

27    herein.

28    ///

K:\Injured\11844\PLD\cmp-plicpMst.wpd                      10
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

28.    Defendants, their "alternate entities," and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

29.    Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, their "alternate entities," and each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to "exposed persons," including plaintiff herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

30.    "Exposed persons" did not know of the substantial danger of using said products. Said dangers were not readily recognizable by "exposed persons." Said defendants, their "alternate entities," and each of them, further failed to adequately warn of the risks to which plaintiff and others similarly situated were exposed.

31.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products, defendants, their "alternate entities," and each of them, did so with conscious disregard for the safety of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in that said defendants, their "alternate entities," and each of them, had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos- containing products, including, but not limited to, asbestosis, other lung disabilities and cancer. Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, their "alternate entities," and each of them, and which knowledge was obtained by said defendants, their "alternate entities," and each of them on or before 1930, and thereafter.

32.     On or before 1930, and thereafter, said defendants, their "alternate entities" and each of them, were aware that members of the general public and other "exposed persons," who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and said defendants, their "alternate entities," and each of them, knew that members of the general public and other "exposed persons," who came in contact with asbestos and asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

33.     With said knowledge, said defendants, their "alternate entities," and each of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said asbestos and asbestos-containing products without attempting to protect "exposed persons" from or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products, defendants, their "alternate entities," and each of them, intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said knowledge from "exposed persons" and members of the general public, thus impliedly representing to "exposed persons" and members of the general public that asbestos and asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their "alternate entities," and each of them, engaged in this conduct and made these implied representations with the knowledge of the falsity of said implied representations.

34.     The above-referenced conduct of said defendants, their "alternate entities," and each of them, was motivated by the financial interest of said defendants, their "alternate entities," and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale,

1    inspection, installation, contracting for installation, repair, marketing, warranting, rebranding,

2    manufacturing for others, packaging and advertising of asbestos and asbestos-containing

3    products. In pursuance of said financial motivation, said defendants, their "alternate entities,"

4    and each of them, consciously disregarded the safety of "exposed persons" and in fact were

5    consciously willing and intended to permit asbestos and asbestos-containing products to cause

6    injury to "exposed persons" and induced persons to work with and be exposed thereto, including

7    plaintiff.

8         35.    Plaintiff alleges that the aforementioned defendants, their "alternate entities," and

9    each of them impliedly warranted their asbestos and asbestos-containing products, to be safe for

10   their intended use but that their asbestos and asbestos-containing products, created an

11   unreasonable risk of bodily harm to exposed persons.

12        36.    Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos

13   and various asbestos-containing products manufactured, fabricated, inadequately researched,

14   designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered

15   for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired,

16   marketed, warranted, rebranded, manufactured for others, packaged and advertised by the

17   aforementioned defendants, their "alternate entities," and each of them and that plaintiff cannot

18   identify precisely which asbestos or asbestos-containing products caused the injuries complained

19   of herein.

20        37.    Plaintiff relied upon defendants', their "alternate entities'," and each of their

21   representations, lack of warnings, and implied warranties of fitness of asbestos and their

22   asbestos-containing products. As a direct, foreseeable and proximate result thereof, plaintiff has

23   been injured permanently as alleged herein.

24        38.    As a direct and proximate result of the actions and conduct outlined herein,

25   plaintiff has suffered the injuries and damages previously alleged.

26        WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and

27   each of them, as hereinafter set forth.

28   ///

## THIRD CAUSE OF ACTION
(Premises Owner/Contractor Liability)

AS AND FOR A FURTHER AND THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFF CHARLES DORL COMPLAINS OF DEFENDANTS ASSOCIATED INSULATION OF CALIFORNIA; THOMAS DEE ENGINEERING COMPANY; HOPEMAN BROTHERS, INC.; J.T. THORPE & SON, INC.; WESTERN MacARTHUR COMPANY; MacARTHUR COMPANY; WESTERN ASBESTOS COMPANY; J.T. THORPE, INC.; AND DOES 301 THROUGH 500 (hereinafter "Premises Owner/Contractor Liability Defendants") AND ALLEGES AS FOLLOWS:

39.     Plaintiff, by this reference, incorporates the allegations contained in paragraphs 19 through 26 of the First Cause of Action.

40.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, the Premises Owner/Contractor Liability Defendants and DOES 301 through 500, were individuals, or corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California.

41.     At all times herein mentioned, each of the Premises Owner/Contractor Liability Defendants was a successor, successor-in-business, assign, predecessor, predecessor-in-business, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced and/or repaired on the respective premises owned, leased, maintained, managed and/or controlled by them.  Said entities shall hereinafter collectively be called "alternate entities."  Each of the herein-named defendants is liable for the tortious conduct of each successor, successor-in-business, assign, predecessor-in-business, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, that caused the presence as aforesaid of said asbestos- and silica-containing insulation and other toxic substances.  Said defendants, and each of them, are liable for the acts of each and

E:\Injuries\11844\PLD\cmp-pi3cpMdl..wpd
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    every "alternate entity," and each of them, in that there has been a virtual destruction of

2    plaintiff's remedy against each such alternate entity; defendants, and each of them, have acquired

3    the assets, or a portion thereof, of each such alternate entity; defendants, and each of them, have

4    caused the destruction of plaintiff's remedy against each such alternate entity; each such

5    defendant has the ability to assume the risk-spreading role of each such alternate entity, and that

6    each such defendant enjoys the goodwill originally attached to each such alternate entity.

7         42.    At all times mentioned herein, the Premises Owner/Contractor Liability

8    Defendants, and each of them, respectively, owned, leased, maintained, managed, and/or

9    controlled the following premises where plaintiff CHARLES DORL was present. The following

10   information provided is preliminary, based on recall over events covering many years and further

11   investigation and discovery may produce more reliable information:

| CONTRACTOR DEFENDANTS | LOCATION | TIME PERIOD |
|---|---|---|
| J.T. THORPE, INC. | Various | Various |
| ASSOCIATED INSULATION OF CALIFORNIA | Various | Various |
| THOMAS DEE ENGINEERING COMPANY | Various | Various |
| HOPEMAN BROTHERS, INC. | Various | Various |
| J.T. THORPE & SON, INC. | Various | Various |
| WESTERN MacARTHUR COMPANY/MacARTHUR COMPANY/WESTERN ASBESTOS COMPANY | Various | Various |

22        Additionally, plaintiff CHARLES DORL might have been present at these or other

23   Premises Owner/Contractor Liability Defendants' premises at other locations and on other

24   occasions.

25        43.    Prior to and at said times and places, said Premises Owner/Contractor Liability

26   Defendants, and each of them, respectively, caused certain asbestos- and silica-containing

27   insulation, other building materials, products and toxic substances to be constructed, installed,

28   maintained, used, supplied, replaced, and/or repaired on each of the aforesaid respective

1   premises, by their own workers and/or by various contractors, and caused the release of

2   dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and

3   thereby created a hazardous and unsafe condition to plaintiff and other persons exposed to said

4   asbestos fibers and toxic substances while present at said premises.

5       44.   At all times mentioned herein, said Premises Owner/Contractor Liability

6   Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should

7   have known, that the foregoing conditions and activities created a dangerous, hazardous, and

8   unsafe condition and unreasonable risk of harm and personal injury to plaintiff and other workers

9   or persons so exposed while present on each of the aforesaid respective premises.

10      45.   At all times relevant herein, plaintiff entered said premises and used or occupied

11  each of said respective premises as intended and for each of the respective Premises

12  Owner/Contractor Liability Defendants' benefit and advantage and at each of the respective

13  Premises Owner/Contractor Liability Defendants' request and invitation. In so doing, plaintiff

14  was exposed to dangerous quantities of asbestos fibers and other toxic substances released into

15  the ambient air by the aforesaid hazardous conditions and activities managed, maintained,

16  initiated, and/or otherwise created, controlled, or caused by said Premises Owner/Contractor

17  Liability Defendants, and each of them.

18      46.   Plaintiff at all times was unaware of the hazardous condition or the risk of

19  personal injury created by the aforesaid presence and use of asbestos products and materials and

20  other toxic substances on said premises.

21      47.   At all times mentioned herein, said Premises Owner/Contractor Liability

22  Defendants, and each of them, remained in control of the premises where plaintiff was

23  performing his work.

24      48.   At all times mentioned herein, the Premises Owner/Contractor Liability

25  Defendants owed to plaintiff and others similarly situated a duty to exercise ordinary care in the

26  management of such premises in order to avoid exposing workers such as plaintiff to an

27  unreasonable risk of harm and to avoid causing injury to said person.

28  ///

49.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises.

50.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control said premises or to abate or correct, or to warn plaintiff of, the existence of the aforesaid dangerous conditions and hazards on said premises.

51.   Prior to and at the times and places aforesaid, said Premises Owner/Contractor Liability Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced, and/or repaired on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured plaintiff.

52.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them:

a.  Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm plaintiff and others unless special precautions were taken;

b.  Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were unfit, unskilled or otherwise unqualified to do so;

c.  Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were competent or qualified to do so.

53.     In part, plaintiff was exposed to dangerous quantities of asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

54.     The work of contractors on premises controlled by the Premises Owner/Contractor Defendants created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances including but not limited to asbestos.

55.     The unsafe premise or work place was created, in part, by the negligent conduct of the contractors employed by the Premises Owner/Contractor Defendants.  Said negligent conduct includes but is not limited to:

      a.     Failure to warn of asbestos and other toxic dusts;

      b.     Failure to suppress the asbestos-containing or toxic dusts;

      c.     Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

      d.     Failure to provide adequate breathing protection, i.e., approved respirators or masks;

      e.     Failure to inspect and/or test the air;

      f.     Failure to provide medical monitoring.

      g.     Failure to select and hire a careful and competent contractor or subcontractor.

56.     The Premises Owner/Contractor Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code § 1714, and Labor Code § 6400, et seq., or Health and Safety Code § 40.200, et seq., and regulations promulgated thereunder.  Therefore, the Premises Owner/Contractor Defendants are responsible for any breach of said duties whether by themselves or others.

57.     Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code

§ 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§ 4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code § 40.200, et seq., which empowers the South Coast Area Air Quality Management District to promulgate regulations including but not limited to S.C.A.A.Q.M.D., Rule 1403; Title 40 Code of Federal Regulations, Chapter 1, Part 61, et seq. -- The National Emission Standards for Hazardous Air Pollutants, which required said Premises Owner/Contractor Liability Defendants to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and precautions, or contractors employed by the Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and precautions.  Defendants' violations of said codes include but are not limited to:

(a)     Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

(b)     Failing to segregate work involving the release of asbestos or other toxic dusts;

(c)     Failing to suppress dust using prescribed ventilation techniques;

(d)     Failing to suppress dust using prescribed "wet down" techniques;

(e)     Failing to warn or educate plaintiff or others regarding asbestos or other toxic substances on the premises;

(f)     Failing to provide approved respiratory protection devices;

(g)     Failing to ensure "approved" respiratory protection devices were used properly;

(h)     Failing to provide for an on-going health screening program for those exposed to asbestos on the premises;

1          (i)     Failing to provide adequate housekeeping and clean-up of the work place;

2          (j)     Failing to properly warn of the hazards associated with asbestos as

3 required by these statutes;

4          (k)     Failing to properly report renovation and disturbance of asbestos-

5 containing materials, including but not limited to S.C.A.A.Q.M.D. Rule 1403;

6          (l)     Failing to have an asbestos removal supervisor as required by regulation;

7          (m)    Failing to get approval for renovation as required by statutes; and

8          (n)     Failing to maintain records as required by statute.

9     58.   Premises Owner/Contractor Liability Defendants, and each of them, were the

10 "statutory employer" of plaintiff as defined by the California Labor Code and California case law.

11     59.   Plaintiff at all times was unaware of the hazardous condition or the risk of

12 personal injury created by defendants' violation of said regulations, ordinances or statutes.

13     60.   At all times mentioned herein, plaintiff was a member of the class of persons

14 whose safety was intended to be protected by the regulations, statutes or ordinances described in

15 the foregoing paragraphs.

16     61.   At all times mentioned herein, said Premises Owner/Contractor Liability

17 Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should

18 have known, that the premises that were in their control would be used without knowledge of, or

19 inspection for, defects or dangerous conditions, that the persons present and using said premises

20 would not be aware of the aforesaid hazardous conditions to which they were exposed on the

21 premises, and that such persons were unaware of the aforesaid violations of codes, regulations

22 and statutes.

23     62.   As a legal consequence of the foregoing, plaintiff CHARLES DORL developed an

24 asbestos-related illness, which has caused great injury and disability as previously set forth, and

25 plaintiff has suffered damages as herein alleged.

26     WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities,"

27 and each of them, as hereinafter set forth.

·28 ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOURTH CAUSE OF ACTION**
Aiding and Abetting Battery
[Against Metropolitan Life Insurance Company
and Does 750-790, Inclusive]

AS AND FOR A FURTHER, FOURTH, SEPARATE AND DISTINCT CAUSE OF

ACTION FOR AIDING AND ABETTING BATTERY, PLAINTIFF COMPLAINS OF

DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, DOES 750-790, THEIR

ALTERNATE ENTITIES AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

63.     Plaintiff incorporates herein by reference, as though fully set forth hereat, each

and every allegation of the First and Second Causes of Action as though fully set forth herein.

64.     This cause of action is for the aiding and abetting of battery by METROPOLITAN

LIFE INSURANCE COMPANY ("MET LIFE"), primarily through its assistant medical director

Anthony Lanza, M.D., of a breach of duty committed by Johns-Manville Corporation ("J-M").

65.     Plaintiff is informed and believes, and thereon alleges, that at all times herein

mentioned defendant MET LIFE was and is a corporation organized and existing under and by

virtue of the laws of the State of New York or the laws of some other state or foreign jurisdiction,

and that this defendant was and is authorized to do and/or was and is doing business in the State

of California, and regularly conducted or conducts business in the County of San Francisco, State

of California.  At times relevant to this cause of action, MET LIFE was an insurer of J-M.

66.     Plaintiff, was exposed to asbestos-containing dust created by the use of the

asbestos products manufactured, distributed and/or supplied by J-M. This exposure to the

asbestos or asbestos-related products supplied by J-M caused Plaintiff's asbestos-related disease

and injuries.

67.     Starting in 1928, MET LIFE sponsored studies of asbestos dust and asbestos-

related disease in Canadian mines and mills, including those of J-M.  Those studies revealed that

miners and mill workers were contracting asbestosis at relatively low levels of dust.  McGill

University, which conducted the studies, sought permission from MET LIFE to publish the

results but they were never published.  MET LIFE prepared its own report of these studies.

///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

68.     Between 1929 and 1931, MET LIFE studied dust levels and disease at five U.S. plants manufacturing asbestos-containing products, including a J-M plant. Those studies showed that workers in substantial numbers were contracting asbestosis, at levels less than what became the Threshold Limit Value ("TLV") of 5mppcf. The MET LIFE report was never published or disseminated except to plant owners, including J-M.

69.     In 1932, MET LIFE studied dust levels and disease at the J-M plant at Manville, New Jersey. Results were consistent with those of the Canadian and previous U.S. plant studies. They were never published.

70.     In 1934, J-M and others whose plants MET LIFE had studied agreed with MET LIFE that it should issue a report of its studies.

71.     MET LIFE submitted a draft of its report to J-M. J-M requested, for legal and business reasons, that certain critical parts of the draft be changed. MET LIFE's official in charge was Lanza. MET LIFE through Lanza did make changes that J-M requested, including:

(a)     Deletion of MET LIFE's conclusion that the permissible dust level for asbestos should be less than that for silica;

(b)     Addition of the phrase that asbestosis clinically appeared to be milder than silicosis.

The report, thus altered, was published in 1935. It was misleading, and intentionally so, because it conveyed the incorrect propositions that asbestosis was a less serious disease process than silicosis and that higher levels of asbestos dust could be tolerated without contracting diseases than was the case for silica dust.

72.     MET LIFE had a close relationship with J-M. It invested money in J-M. It provided group health and life insurance to J-M. MET LIFE IN 1934 agreed to supply industrial hygiene services to J-M, including dust counts, training employees to monitor dust levels, examining employees, and recommending protective equipment. MET LIFE and Lanza were viewed as experts on industrial dusts.

///

///

73.     In 1933, MET LIFE through Lanza issued the following advice to J-M:

(a)     Disagreeing with the recommendation of a J-M plant physician, MET LIFE advised against warning workers of the fact that asbestos dust is hazardous to their health, basing its advice in view of the extraordinary legal situation;

(b)     When the plant physician judged the best disposition of an employee with asbestosis was to remove him from the dust, MET LIFE advised instead that disposition should depend on his age, nature of work and other factors and to leave him alone if he is old and showing no disability, for, MET LIFE stated, economic and production factors must be balanced against medical factors.

74.     J-M followed the MET LIFE advices and did not warn its workers, including plaintiff, of the hazards of asbestos dust, and J-M also intentionally refrained from notifying workers of their disease.

75.     In 1936, MET LIFE, J-M and others founded the Air Hygiene Foundation ("AHF").  One of the AHF purposes was to develop standards for dust levels that would serve as a defense in lawsuits and workers' compensation claims.

76.     MET LIFE funded partially another study that tentatively recommended in 1938 a TLV for asbestos dust of 5mpccf, the same as for silica dust.  MET LIFE was aware of data from its own, unpublished reports that showed that level was too high for asbestos dust.  MET LIFE nonetheless promoted that TLV as proper.

77.     In June 1947, the Industrial Hygiene Foundation ("IHF") which succeeded to the AHF, issued a report of studies by Dr. Hemeon of U.S. asbestos plants, including a J-M plant. That report showed that workers exposed to less than the recommended maximum levels of dust were developing disease.  MET LIFE was a member of the IHF and Lanza was on its medical committee.  The Hemeon report, which was supplied to J-M and other owners, never was published.

78.     In 1936, J-M and other asbestos companies agreed with a leading medical research facility, Saranac Laboratories, that Saranac would research asbestos disease, but J-M and the others retained control over publication of the results.  In 1943 Saranac's Dr. Leroy

1  Gardner, in charge of the research, sent a draft to J-M that revealed that 81.8% of mice exposed
2  to long fiber asbestos contracted cancer.

3      79.    Dr. Gardner died in 1946. J-M and other companies wanted parts of the Saranac
4  results published and enlisted the assistance of MET LIFE's Lanza. J-M and other companies
5  decided that Saranac's findings of cancer caused by asbestos in mice must be deleted, as well as
6  Saranac's critique of existing dust standards. Lanza directed Saranac to delete the offending
7  materials. Saranac did so, and the altered report was published in 1951 by Saranac's Dr.
8  Vorwald, in the *AMA Archives of Industrial Hygiene*.

9      80.    Lanza left MET LIFE at the end of 1948, and took a position at New York
10  University, funded by MET LIFE. He continued to misrepresent that asbestos does not cause
11  cancer into the 1950s.

12      81.    The IHF (formerly AHF), of which MET LIFE was a member and MET LIFE
13  official was on its medical committee, through Drs. Braun and Truan conducted a study of
14  Canadian miners. The original report, in 1957, found an increased incidence of lung cancer in
15  persons exposed to asbestos. The sponsors, including J-M, caused those findings to be stricken,
16  and the report published in 1958 contained the false conclusion that asbestos exposure alone did
17  not increase the risk of lung cancer.

18      82.    The false and misleading reports that a link between asbestos exposure and cancer
19  was not proven influenced the TLV, for if a substance causes cancer the TLV must be very low
20  or zero.

21      83.    J-M not later than 1933 was inflicting asbestos dust on its workers in its plants
22  knowing that the dust was hazardous and was causing workers to contract disease that could and
23  would disable and kill them. As MET LIFE advised, J-M did not warn its workers of the hazard.
24  J-M committed battery on workers in its plants, including plaintiff, by that conduct.

25      84.    MET LIFE knew that J-M's conduct constituted a breach of its duties to its
26  workers. MET LIFE gave substantial assistance to J-M in committing batteries on its workers,
27  including plaintiff, through MET LIFE's conduct described above, including by:
28  ///

(a)     Affirmatively urging J-M not to warn workers of the hazards of asbestos dust, in view of the extraordinary legal situation, such that J-M did not warn its workers, including plaintiff;

(b)     Deleting the findings of its own draft report that the allowable limits for asbestos dust should be less than those for silica dust, and promoting a false and unsafe TLV which specified maximum levels of silica dust, and promoting a false and unsafe TLV which specified maximum levels of dust for workers, including plaintiff, which MET LIFE knew was wrong through its own studies;

(c)     Advising J-M to keep certain workers continuing to work at dusty areas in the plant even after J-M was aware that their lungs showed asbestos-induced changes, lest other workers including plaintiff be alerted to the dangers of working in the dust.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
(Concert of Action)

AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR CONCERT OF ACTION IN THE COMMISSION, ENCOURAGEMENT, AND ASSISTANCE OF BREACH OF DUTY TO WARN, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, OWENS-ILLINOIS, INC., PARKER-HANNIFIN CORPORATION, DOES 451-471, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter CONCERT OF ACTION DEFENDANTS), AND ALLEGES AS FOLLOWS:

85.     Plaintiff incorporates herein by reference, as though fully set forth hereat each and every allegation of the First, Second and Fourth Causes of Action.

86.     The concerted action (hereinafter referred to as "concerted action" or "conspiracy") engaged in by the above-named CONCERT OF ACTION DEFENDANTS was facilitated through trade and other organizations including the Friction Materials Standards

1 Institute (FMSI), which was a successor to similar trade organizations known as the Brake Lining

2 Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.

3 CONCERT OF ACTION DEFENDANTS were, during the times relevant to this cause of action,

4 members of FMSI.

5       87.    The Friction Materials Standards Institute was originally incorporated under the

6 name of Clutch Facing and Brake Lining Standards Institute in 1948 as a membership

7 corporation. It included among its avowed purposes: the maintenance and raising of standards of

8 all products manufactured by its members; the collection, assembly and dissemination to

9 members of the friction materials industry scientific, engineering, technological and other

10 relevant information pertaining to the industry; and to cooperate with governmental agencies for

11 the general benefit of the public and the enhancement of the industry.

12       88.    Before 1971, CONCERT OF ACTION DEFENDANTS knew that exposure to

13 asbestos dust created grave health risks for those exposed. From 1971 forward, CONCERT OF

14 ACTION DEFENDANTS received additional information distributed through the Friction

15 Materials Standards Institute and through independent sources further confirming and elaborating

16 the serious health risks associated with exposure to airborne asbestos dust.

17       89.    CONCERT OF ACTION DEFENDANTS knew that routine practices utilized in

18 the handling and machining of their friction products during their installation and replacement

19 created significant and dangerous quantities of airborne asbestos dust that would expose workers

20 and bystanders to hazardous levels of asbestos.

21       90.    CONCERT OF ACTION DEFENDANTS knew that the magnitude of danger

22 posed by asbestos was not widely known by their consumers. CONCERT OF ACTION

23 DEFENDANTS knew that exposure to asbestos dust among their consumers could be eliminated

24 or greatly reduced by adopting different and discrete practices in the handling and machining of

25 products and by instituting specific dust control procedures in their consumers' workplaces.

26       91.    Notwithstanding their knowledge of the dangers posed by exposure to asbestos,

27 and notwithstanding their chartered ostensible purpose to cooperate with government agencies

28 for the benefit of the public, CONCERT OF ACTION DEFENDANT members of the Friction

1    Materials Standards Institute undertook concerted action to thwart, avoid, undermine, defeat,

2    compromise, evade, and otherwise dilute regulations, standards, and procedures designed to

3    reduce levels of exposure to asbestos dust and to raise awareness of the hazards of asbestos by

4    consumers and friction materials workers.  Such activities include, but are not limited to the

5    following:

6             (a)  CONCERT OF ACTION DEFENDANTS, at the urging and encouragement

7    of the Friction Materials Standards Institute presented to the Illinois Pollution Control Board

8    false and unsupportable opposition to a proposed prospective ban on the use of asbestos in

9    friction materials.

10            (b)  CONCERT OF ACTION DEFENDANTS continuously undertook concerted

11   action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute OSHA

12   regulations, standards, and procedures aimed at reducing levels of ambient asbestos dust,

13   requiring the use of safety equipment and procedures, and notification of potentially exposed

14   persons of the dangers presented by asbestos dust.  CONCERT OF ACTION DEFENDANTS

15   consistently misrepresented the state of science and knowledge to distort and confound public

16   understanding and appreciation of the asbestos hazard, urging a higher level of airborne asbestos,

17   less stringent requirements in the use of safety equipment and procedures, and a reduction in the

18   scope and extent of any required notification regarding the hazards posed by asbestos.

19            (c)  CONCERT OF ACTION DEFENDANTS expressly undertook to adopt

20   uniform interpretations of regulations among their membership, which interpretations

21   consistently took the stance of performing at the lowest possible level which could be considered

22   compliant.

23        92.    CONCERT OF ACTION DEFENDANT members of the Friction Materials

24   Standards Institute, despite their avowed purpose to encourage and support research into

25   materials and manufacturing processes, expressly declined to pursue a proposed initiative to

26   sponsor jointly funded research into feasible alternatives to asbestos in friction products.

27        93.    Even though they knew of the substantial risks and dangers to those who would

28   use or come into contact with their asbestos-containing products, defendants took concerted

1  action by means of explicit and tacit agreements, to delay for a period of years providing

2  notification and adequate warning of these risks and dangers, and to otherwise suppress

3  information about said hazards or otherwise compromise and confound informed consumer

4  appreciation of the asbestos hazards posed by their products.

5      94.    Defendants knew that the users of their friction products would handle such

6  products or their by-products in ways that enhanced the risks of dangerous asbestos exposure.

7  Defendants failed to discharge their duty to provide timely and adequate notice of these hazards

8  or of steps that could be taken to eliminate or ameliorate the risks and dangers.  Each defendant,

9  in failing to warn of these dangers, gave assistance and encouragement to every other member

10  defendant to likewise fail to warn.

11      95.    Defendants provided substantial assistance to one another in maintaining

12  ignorance among consumers as to the full nature and extent of hazards posed by asbestos, and

13  individually breached their duty to warn the consumers and users of their products.

14      96.    In addition to the above named defendants in this cause of action, the term

15  CONCERT OF ACTION DEFENDANTS as used herein includes but is not limited to:

16  DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D.,

17  Arthur Vorwald, M.D., Leroy Gardner, M.D., Johns-Manville, Raybestos-Manhattan (now

18  Raymark Industries, Inc. [Raymark]), Russell Manufacturing (whose liabilities have been

19  assigned by H.K. Porter Company), Union Asbestos and Rubber Company, Thermoid Company

20  (whose assets and liabilities have been purchased by H.K. Porter Company), Carey-Canada,

21  Quebec Asbestos Corporation, Celotex Corporation, Industrial Hygiene Foundation, Mellon

22  Institute, all members of the Asbestos Textile Institute [ATI], all members of the Friction

23  Materials Standards Institute and its predecessors, and the other entities and individuals

24  identified in this Cause of Action.

25      97.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

26  mentioned, the CONCERT OF ACTION DEFENDANTS were and are corporations organized

27  and existing under and by virtue of the laws of the State of California, or the laws of some other

28  state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and

1   are doing business in the State of California, and that said defendants regularly conducted and/or

2   conducts business in the County of San Francisco, State of California.

3         98.    Plaintiff was exposed to asbestos-containing dust created by the use of the

4   asbestos products manufactured, distributed, and/or supplied by one or more of the

5   CONCERT OF ACTION DEFENDANTS named herein.  The exposure to the asbestos or

6   asbestos-related products supplied by the one or more of the CONCERT OF ACTION

7   DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

8         99.    The CONCERT OF ACTION DEFENDANTS, individually, and as agents of one

9   another and as co-conspirators, agreed and conspired among themselves, with other asbestos

10   manufacturers and distributors, and with certain individuals including, but not limited to Anthony

11   Lanza, M.D. (Lanza) and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET

12   LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the

13   wrongful acts of the conspirators, but a representative list):

14         (a)    Beginning in 1929, MET LIFE entered agreements with Johns-Manville

15   and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners.

16   When the data from these studies proved that Canadian asbestos miners were developing

17   asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony

18   Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian

19   study for many years thereafter to meetings of health care professionals seeking information

20   regarding asbestos exposure.

21         (b)    In approximately 1934, CONCERT OF ACTION DEFENDANTS Johns-

22   Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and

23   conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J.

24   Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville

25   and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively

26   misrepresent material facts and conclusions about asbestos exposure; including but not limited to

27   descriptions of the seriousness of the disease process of asbestosis.  The misrepresentation was

28   accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as

1   "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a

2   disease process less serious than it was known to be by the CONCERT OF ACTION

3   DEFENDANTS. As a result, Lanza's study was published in the medical literature containing

4   said misleading statements in 1935. The CONCERT OF ACTION DEFENDANTS were

5   motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by

6   the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in

7   lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use

8   of their asbestos products.

9                    (c)      The above-described conspiracy continued in 1936, when additional

10  CONCERT OF ACTION DEFENDANTS American Brakeblok Corporation (defendant

11  PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant

12  GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to

13  conspirator Turner & Newall, T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing

14  (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber

15  Company and defendant USG, entered into an agreement with a leading medical research facility

16  named Saranac Laboratories. (The following conspirators also joined the Friction Materials

17  Standards Institute portion of the conspiracy alleged below: American Brake Block Corporation

18  (now defendant Pneumo Abex), defendant Asbestos Manufacturing Company, defendant Gatke

19  Corporation, Johns-Manville, Keasbey & Mattison Company (through Turner & Newall (T&N)

20  alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell Manufacturing (whose liabilities

21  have been assumed by H.K. Porter Company).) Under the agreement, the CONCERT OF

22  ACTION DEFENDANTS acquired the power to decide what information Saranac Laboratories

23  could publish regarding asbestos disease and could also control in what form such publications

24  were to occur. Their agreement provided these CONCERT OF ACTION DEFENDANTS the

25  power and ability affirmatively to misrepresent the results of the work at Saranac, and also gave

26  these CONCERT OF ACTION DEFENDANTS power to suppress material facts included in any

27  study. On numerous occasions thereafter, the CONCERT OF ACTION DEFENDANTS

28  exercised their power to prevent Saranac scientists from disclosing material scientific data,

1  resulting in numerous misstatements of fact regarding the health affects of asbestos exposure

2  being made at scientific meetings.

3        (d)    The conspiracy was furthered when on November 11, 1948, when

4  representatives of the following CONCERT OF ACTION DEFENDANTS met at Johns-

5  Manville headquarters: Johns-Manville, American Brakeblok Division of American Brake and

6  Shoe Foundry (defendant Pneumo Abex), defendant Gatke Corporation, Garlock Sealing

7  Technologies, LLC; Keasbey & Mattison Company (then an alter-ego to conspirator Turner &

8  Newall (T&N)), Raybestos (now Raymark), Thermoid Company (whose assets and liabilities

9  were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company,

10  defendant USG and MET LIFE. Defendant U.S. Gypsum did not send a company employee to

11  the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at

12  the meeting and to take action on its behalf.

13        (e)    At the November 11, 1948 meeting, these CONCERT OF ACTION

14  DEFENDANTS, and their representatives, decided to exert their influence to materially alter and

15  misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at

16  the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity

17  of asbestos in mice and also included an evaluation of the health effects of asbestos on humans

18  with a critical review of the then-existing standards for asbestos dust exposure.

19        (f)    At this meeting, these CONCERT OF ACTION DEFENDANTS

20  intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete

21  material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on

22  humans and the critique of the dust standards. The CONCERT OF ACTION DEFENDANTS

23  then published these deceptive and fraudulent statements in the medical literature as edited by

24  Dr. Arthur Vorwald, also of the Saranac Laboratories. These CONCERT OF ACTION

25  DEFENDANTS thereby fraudulently misrepresented the risks of asbestos exposure to the public,

26  in general, and the class of persons exposed to asbestos, including the plaintiff.

27        (g)    As a direct result of influence exerted by the CONCERT OF ACTION

28  DEFENDANTS, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial

1   <u>Hygiene, AMA Archives of Industrial Hygiene and Occupational Health</u> in 1951 in a form that

2   stressed those portions of Dr. Gardner's work that the CONCERT OF ACTION DEFENDANTS

3   wished stressed, but which omitted reference to human asbestosis and cancer, thereby

4   fraudulently and affirmatively misrepresenting the extent of the risks.  The CONCERT OF

5   ACTION DEFENDANTS affirmatively and deliberately disseminated this deceptive and

6   fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

7          (h)     Such actions constitute a material affirmative misrepresentation of the

8   total context of material facts involved in Dr. Gardner's work and resulted in creating an

9   appearance that inhalation of asbestos was less of health problem than Dr. Gardner's unedited

10   work indicated.

11          (i)     When Dr. Vorwald subsequently tried to publish more complete

12   information regarding Dr. Gardner's animal studies, the CONCERT OF ACTION

13   DEFENDANTS required his discharge from the Saranac Laboratories, denied him permission to

14   publish or complete Gardner's work, and actively discouraged institutions of higher learning from

15   hiring or retaining Dr. Vorwald in any capacity.

16          (j)     The following CONCERT OF ACTION DEFENDANTS were members

17   of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-

18   Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos

19   Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National

20   Gypsum Company (now known as defendant Asbestos Claims Management Corporation), and

21   Turner & Newall (T&N), individually and successor to defendant Bell Asbestos Mines Ltd.

22   These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation

23   of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald in the <u>AMA Archives of</u>

24   <u>Industrial Health</u> in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation

25   arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as

26   correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and

27   9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan

28   Sabourin, acting on behalf of all Q.A.M.A. members.

(k)     As a furtherance of the conspiracy commenced in 1929, CONCERT OF ACTION DEFENDANTS who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

(l)     This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study, terminated the study, and prevented any public discussion of dissemination of the results.

(m)     As a result of the termination of Q.A.M.A./Saranac study, the CONCERT OF ACTION DEFENDANTS fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by CONCERT OF ACTION DEFENDANTS and CONCERT OF ACTION DEFENDANTS' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, medical organizations, health professionals, and the general public, including plaintiff.

(n)     Subsequently, the Q.A.M.A. CONCERT OF ACTION DEFENDANTS contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer.  In 1957, Drs. Braun and Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

///

1        (o)     The Q.A.M.A. CONCERT OF ACTION DEFENDANTS as a furtherance

2   of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by

3   Braun and Truan in which the findings regarding increased incidence of cancer in persons with

4   asbestosis was edited out (stricken) by agents of the Q.A.M.A.  The published version of

5   Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the

6   incidence of lung cancer, a conclusion known by the conspirators to be false.

7        (p)     By falsifying and causing publication of studies concluding that asbestos

8   exposure did not cause lung cancer and simultaneously omitting documented findings that

9   asbestosis did increase the risk of lung cancer, the CONCERT OF ACTION DEFENDANTS

10   affirmatively misrepresented to the public and concealed from the public the extent of risks

11   associated with inhalation of asbestos fibers.

12        (q)     In furtherance of the ongoing 1929 conspiracy, in approximately 1958,

13   these Q.A.M.A. CONCERT OF ACTION DEFENDANTS publicized the fraudulently edited

14   works of Drs. Braun and Truan at a symposium in an effort to misrepresent fraudulently to the

15   public and persons exposed to asbestos that the inhalation of asbestos dust would not cause

16   cancer.

17        (r)     The fraudulent misrepresentations beginning in 1929 as elaborated above

18   and continuing with the publication of the 1958 Braun/Truan study influenced the standards set

19   for asbestos exposure.  The developers of such standards failed to lower the maximum exposure

20   limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

21        (s)     In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. CONCERT OF

22   ACTION DEFENDANTS decided, at their trade association meeting, that they would

23   intentionally mislead consumers about the extent of risks involved in inhalation of asbestos

24   products.

25        (t)     In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the

26   health effects of asbestos was held at the Saranac Laboratories.  The following CONCERT OF

27   ACTION DEFENDANTS were in attendance: MET LIFE, Lanza, Johns-Manville, Turner &

28   ///

1 | Newall (T&N), Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their

2 | agents, Cartier, Sabourin and LaChance.

3 |       (u)    At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis

4 | in product users was discussed and the carcinogenic properties of all fiber types of asbestos was

5 | also discussed. In an affirmative attempt to mislead the public about the extent of health risks

6 | associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these

7 | CONCERT OF ACTION DEFENDANTS conspired to prevent publication of the record of this

8 | 1952 Saranac Symposium and it was not published. In addition, the CONCERT OF ACTION

9 | DEFENDANTS induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal

10 | studies showing excess cancers in animals which thereby fraudulently misrepresented existing

11 | secret data which could not be publicized owing to the secrecy provisions contained in the 1936

12 | Saranac agreement heretofore described.

13 |       (v)    The following CONCERT OF ACTION DEFENDANTS were members

14 | of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos (now

15 | Raymark), Johns-Manville, H.K. Porter, Gatke Corporation; Garlock Sealing Technologies,

16 | LLC; Keasbey & Mattison, individually and through its alter-ego Turner & Newall (T&N) and

17 | National Gypsum (defendant Asbestos Claims Management Corporation), Uniroyal, Inc.,

18 | individually and through its alter-egos, CDU Holding Company, Uniroyal Holding Company and

19 | Uniroyal Goodrich Tire Company.

20 |       (w)    In furtherance of the forgoing conspiracy, in 1947, these CONCERT OF

21 | ACTION DEFENDANTS, members of the ATI, received a report from industrial hygienist

22 | W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-

23 | existing maximum exposure limits for asbestos exposure. These CONCERT OF ACTION

24 | DEFENDANTS caused the Hemeon report not to be published and thereby fraudulently

25 | concealed material facts about asbestos exposure from the public and affirmatively

26 | misrepresented to the public and class of persons exposed to asbestos that the then existing

27 | maximum exposure limit for asbestos was acceptable. Thereafter, these CONCERT OF

28 | ACTION DEFENDANTS withheld additional material information on the dust standards from

1    The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further

2    influencing evaluations of their Threshold Limit Values for asbestos exposure.

3              (x)    In furtherance of the forgoing conspiracy, in 1953, CONCERT OF

4    ACTION DEFENDANT National Gypsum (Asbestos Claims Management Corporation),

5    through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene

6    regarding health hazards of asbestos spray products, refused to mail a proposed response to that

7    division indicating that respirators should be worn by applicators of the products. National

8    Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos

9    spray products to wear respirators and fraudulently concealed from such applicators the need for

10   respirators and thereby misrepresented the risks associated with asbestos exposure.

11             (y)    In furtherance of the forgoing conspiracy, in 1955, CONCERT OF

12   ACTION DEFENDANT Johns-Manville, through its agent Dr. Kenneth Smith, caused to be

13   published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in

14   Asbestos Workers." This published study materially altered the results of an earlier study in

15   1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a

16   fraudulent and material misrepresentation about the extent of the risk associated with asbestos

17   inhalation.

18             (z)    In furtherance of the forgoing conspiracy, in 1955, the National Cancer

19   Institute held a meeting at which CONCERT OF ACTION DEFENDANT Johns-Manville,

20   individually and as an agent for other co-conspirators and Dr. Vorwald, as agent of CONCERT

21   OF ACTION DEFENDANTS, affirmatively misrepresented that there was no existing animal

22   studies concerning the relationship between asbestos exposure and cancer, when, in fact, the

23   CONCERT OF ACTION DEFENDANTS were in secret possession of several suppressed

24   studies, which demonstrated that positive evidence did exist.

25             (aa)   In furtherance of the forgoing conspiracy, in 1957, these CONCERT OF

26   ACTION DEFENDANTS and members of the ATI, jointly rejected a proposed research study on

27   cancer and asbestos and this resulted in fraudulently concealing from the public material facts

28   ///

1   regarding asbestos exposure, and also constituted an affirmative misrepresentation of the then-

2   existing knowledge about asbestos exposure and lung cancer.

3           (bb)    In furtherance of the forgoing conspiracy, in 1964, CONCERT OF

4   ACTION DEFENDANTS who were members of the ATI met to formulate a plan for rebutting

5   the association between lung cancer and asbestos exposure that had been recently published by

6   Dr. Irving J. Selikoff of the Mount Sinai Research Center.  Thereafter, these members of the ATI

7   embarked upon a campaign to further misrepresent the association between asbestos exposure

8   and lung cancer.

9           (cc)    CONCERT OF ACTION DEFENDANT Mellon Institute and CONCERT

10  OF ACTION DEFENDANT Industrial Hygiene Foundation (IHF) were institutes whose

11  functions included involvement in research regarding the health effects of inhaling asbestos dust.

12          (dd)    Beginning in the early 1940's, the IHF was involved in a study by Hemeon

13  entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947.  This

14  study was done in connection with members of the Asbestos Textile Institute (ATI).  This study

15  found that workers exposed to less than the recommended maximum exposure level for asbestos

16  were nonetheless developing disease.  As a part of the conspiracy, the IHF never published this

17  study.

18          (ee)    Beginning in the mid 1950's, the IHF and the Mellon Institute were

19  involved in the publication of works by Braun and Truan entitled An Epidemiological Study of

20  Lung Cancer in Asbestos Miners.  In its original, unedited form in September, 1957, this study

21  had concluded that workers with asbestosis had an increased incidence of lung cancer and that

22  the Canadian government had been under-reporting cases of asbestosis.  The final, published

23  version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered

24  an increased incidence of lung cancer and that the Canadian government had been under-

25  reporting asbestosis cases.  The IHF and the Mellon Institute conspired with the members of the

26  Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel; Ivan Sabourin, and

27  other CONCERT OF ACTION DEFENDANTS to delete the above-describe information

28  regarding asbestos and cancer.

1       (ff)    The above-described actions of the IHF and the Mellon Institute

2   constituted intentional deception and fraud in actively misleading the public about the extent of

3   the hazards connected with breathing asbestos dust.

4       (gg)    The above-described conspiratorial and fraudulent actions of the IHF and

5   the Mellon Institute substantially contributed to retarding the development of knowledge

6   about the hazards of asbestos and thereby substantially contributed to injuries suffered by the

7   plaintiff.

8       (hh)    All CONCERT OF ACTION DEFENDANTS identified above, approved,

9   ratified, and furthered the previous conspiratorial acts of CONCERT OF ACTION

10  DEFENDANTS Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the

11  alleged co-conspirators during the date and circumstances set forth above, acted as agents, and

12  co-conspirators for the other CONCERT OF ACTION DEFENDANTS.

13      (ii)    As evidence of Raymark's fraud, concealment, suppression, and

14  conspiratorial misconduct and of the referenced CONCERT OF ACTION DEFENDANTS, and

15  each of them, as herein set forth, Raymark's President and/or other senior executives

16  corresponded with other senior executives of Raymark's co-conspirators, which series of

17  correspondence and related documents and papers are commonly referenced as "The Sumner

18  Simpson Papers."

19      (jj)    Further as evidence of the fraud, concealment, suppression, and

20  conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the

21  ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions,

22  resolutions, and related actions, recorded in "The ATI Minutes."

23      (kk)    MET LIFE was an active participant in the foregoing conspiracy and

24  benefitted thereby.  MET LIFE benefitted from its involvement, because of the following non-

25  exclusive list:

26      (1)    by providing workers' compensation insurance to the CONCERT OF

27              ACTION DEFENDANTS;

28  ///

1         (2)      by providing life insurance for employees of the CONCERT OF ACTION

2                     DEFENDANTS;

3         (3)      by providing health insurance or health care for the employees of the

4                     CONCERT OF ACTION DEFENDANTS;

5         (4)      by providing health information and resources;

6         (5)      by purchasing substantial stock in asbestos-related companies, including

7                     stock of CONCERT OF ACTION DEFENDANTS; and

8         (6)      by developing information by which asbestos-related claims for

9                     compensation could be defeated.

10      100.     The foregoing conspiracy was furthered through the formation of the Friction

11 Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers'

12 Association, and the Clutch Facing and Brake Lining Standards Institute. The members thereof

13 joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators.

14         (1)      The Friction Materials Standards Institute, and its predecessors, the Brake

15 Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards Institute, were

16 formed to be the ears and mouthpiece of the friction materials industry. The initial members of

17 the Friction Materials Standards Institute between 1950 and 1953 included CONCERT OF

18 ACTION DEFENDANTS Asbestos Manufacturing Company, T&N, PLC. (through its alter-ego

19 Atlas Asbestos Company), Brassbestos Brake Lining Company, Fibre & Metal Products

20 Company, Gatke Corporation, Maremont (through its predecessor-in-interest Grizzly

21 Manufacturing), H. Krasne Manufacturing Company, Lasco Brake Products, HONEYWELL,

22 INC. (successor-in-interest to ALLIEDSIGNAL INC. -- then known as Bendix Aviation

23 Corporation), L. J. Miley Company, Raymark (then known as Raybestos-Manhattan), Riteset

24 Manufacturing Company, Rossendale-Ruboil Company, Russell Manufacturing Company,

25 Scandura (then known as Scandinavian Belting Company), Southern Friction Materials

26 Company, U.S. Spring & Bumper Company, Pneumo Abex (Through its Predecessor-in-interest,

27 S.K. Wellman Company) and Lear-Siegler, Inc. (now Lear-Siegler Diversified Holdings Corp.)

28 And Bridgestone/Firestone, Inc. (through their predecessor-in-interest World Bestos

1 | Corporation).  By 1973, the following joined the Friction Materials Standards Institute:

2 | CONCERT OF ACTION DEFENDANTS Auto Friction Corporation, Auto Specialties

3 | Manufacturing Company, Chrysler Corporation, Emsco Asbestos Company, Forcee

4 | Manufacturing Corporation, General Motors Corporation, H.K. Porter Company (through its

5 | Thermoid division), Johns-Manville Corporation, Lear-Siegler, Inc. (now Lear-Siegler

6 | Diversified Holdings Corp.) (Through its Predecessor-in-interest Royal Industries), Molded

7 | Industrial Friction Corporation, Morton-Thiokol (Through its Predecessor-in-interest Thiokol

8 | Chemical Corporation), National Transport Supply Inc., Parker-Hannifin Corporation (through

9 | its predecessor-in-interest Pick Manufacturing Company), Pneumo Abex's American Brakeblok

10 | division, Silver Line Products Inc., Standco Inc., Universal Friction Materials Company, and

11 | Wheeling Brake Block Manufacturing Company.  On information and belief, plaintiff alleges

12 | that the following manufacturers and/or distributors of asbestos-containing automotive friction

13 | products joined with, ratified, and furthered the conspiratorial actions of the above-identified

14 | conspirators, including the conspirators who were members of the FMSI and its predecessors:

15 | CONCERT OF ACTION DEFENDANTS, The Budd Company, Dana Corporation, Ford Motor

16 | Company, General Motors Corporation, Lear-Siegler, Inc. (now Lear-Siegler Diversified

17 | Holdings Corp.), Morton-Thiokol (now Morton International, Inc. ), Standard Motor Products,

18 | Inc. (EIS Brand Brakes); and Borg-Warner.

19 |         (2)     Even though they disseminated materials and information to the contrary,

20 | The Friction Materials Standards Institute conspirators knew, and suppressed, that:

21 |                (i)     OSHA regulations, even if enforced and complied with, would not

22 | prevent asbestos disease in workers exposed to their products;

23 |                (ii)     chrysotile asbestos caused mesothelioma and other incurable

24 | disease;

25 |                (iii)     brake workers suffered "considerable exposures" to respirable

26 | asbestos fibers during the intended use, installation, and expected

27 | replacement of friction materials;

28 | ///

40

1       (iv)    there was no "safe" level of occupational exposure to respirable

2       asbestos; and

3       (v)    there was a substantial risk and danger suffered by bystanders and

4       family members of brake mechanics, because of the release of respirable

5       asbestos in the use of friction materials, as herein described.

6       (3)    Even though they knew of the substantial risks and dangers to those who

7 would use or come into contact with their asbestos-containing products, CONCERT OF

8 ACTION DEFENDANTS took concerted action by means of explicit and tacit agreements, to

9 delay for a period of years providing notification and adequate warning of the risks and dangers.

10 CONCERT OF ACTION DEFENDANTS knew that the users of their products would handle

11 such products or their by-products in ways that enhanced the risks of dangerous asbestos

12 exposure, but they conspired to give each other assistance and encouragement in failing to

13 provide timely and adequate notices of the hazards or of steps that would be taken to eliminate or

14 ameliorate the risks and dangers.

15       101.   The acts and omissions of the CONCERT OF ACTION DEFENDANTS, as

16 described above, and each of them, constitute fraudulent concealment and/or fraudulent

17 misrepresentation, which caused injury to the plaintiff, including, but not limited to, the

18 following manner:

19       (a)    The material published or caused to be published by the CONCERT OF

20 ACTION DEFENDANTS was false and incomplete in that the CONCERT OF ACTION

21 DEFENDANTS, knowingly and deliberately deleted references to the known health hazards of

22 asbestos and asbestos-related products.

23       (b)    The CONCERT OF ACTION DEFENDANTS, with intent to defraud,

24 individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION

25 DEFENDANTS, intended that the publication of false and misleading reports to the general

26 public and individuals therein, and/or the intentional suppression and nondisclosure of

27 documented reports of health hazards of asbestos:

28 ///

1        (1)    maintain a favorable atmosphere for the continued sale and

2        distribution of asbestos and asbestos-related products;

3        (2)    assist in the continued pecuniary gain of CONCERT OF ACTION

4        DEFENDANTS, through the sale of their products;

5        (3)    influence in the CONCERT OF ACTION DEFENDANTS' favor

6        proposed legislation to regulate asbestos exposure and;

7        (4)    provide a defense in law suits brought for injury resulting from

8        asbestos disease.

9        (c)    The CONCERT OF ACTION DEFENDANTS, individually, as members

10 of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, had a duty to

11 disclose information regarding the health hazards of asbestos within their knowledge and/or

12 control. The CONCERT OF ACTION DEFENDANTS, knowingly, and intentionally breached

13 this duty through their fraudulent concealment as described herein.

14        (d)    Plaintiff and others reasonably relied, both directly and indirectly, upon the

15 published medical and scientific data documenting the purported safety of asbestos and asbestos-

16 related products, and in the absence of published medical and scientific reports of the hazards of

17 asbestos continued exposure to asbestos. Plaintiff believed asbestos to be safe and was unaware

18 of the hazards due to conspiratorial and fraudulent conduct. Plaintiff was not warned of the

19 hazards of asbestos dust as a direct result of the above-described conspiracy and fraudulent

20 concealment. If plaintiff had known of the health hazards of asbestos, of which plaintiff was

21 unaware as a direct result of the conspirator's fraudulent concealment, plaintiff would have acted

22 differently regarding plaintiff's exposure to asbestos and asbestos-related products.

23        (e)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

24 conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that

25 plaintiff rely on the deceptive and fraudulent reports that the conspiracy caused to be published

26 throughout the United States regarding the safety of asbestos and asbestos-related products and to

27 rely on the absence of published medical and scientific data (because of the CONCERT OF

28 ///

1   ACTION DEFENDANTS's suppression) regarding the hazards of asbestos and asbestos-related

2   products and thereby caused plaintiff and others to continue their exposure to asbestos products.

3           (f)      CONCERT OF ACTION DEFENDANTS, individually, as members of a

4   conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS were and are in a

5   position of superior knowledge regarding the health hazards of asbestos and therefore the

6   plaintiff reasonably relied, both directly and indirectly, on the published reports commissioned by

7   the CONCERT OF ACTION DEFENDANTS, regarding the health hazards of asbestos and the

8   absence of published information (because of the suppression by the CONCERT OF ACTION

9   DEFENDANTS) regarding the hazards of asbestos and asbestos-related products.

10           (g)    As a direct result of the continuing and on-going conduct of the

11   CONCERT OF ACTION DEFENDANTS, as alleged herein, the plaintiff contracted asbestos-

12   related disease and suffered injuries and incurred damages, which are described in greater detail

13   in the forgoing Paragraphs.

14         102.    MET LIFE acted in concert with the foregoing described parties (the CONCERT

15   OF ACTION DEFENDANTS) and pursuant to a common design, as previously described, to

16   cause injury to plaintiff.

17         103.    MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark),

18   defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-

19   Mattison Company (now T&N), and the other CONCERT OF ACTION DEFENDANTS was

20   coercive, fraudulent, and deceitful towards others (including plaintiff) and that CONCERT OF

21   ACTION DEFENDANTS' conduct was a breach of duties owed to plaintiff; and MET LIFE gave

22   substantial assistance and encouragement to Johns-Manville and the other CONCERT OF

23   ACTION DEFENDANTS in breaching their duties to plaintiff and others.

24         104.    MET LIFE provided substantial assistance to the foregoing CONCERT OF

25   ACTION DEFENDANTS in accomplishing their tortious result and their breach of duties to

26   plaintiff.

27   ///

28   ///

1   105.   Plaintiff was insured, directly or indirectly, by MET LIFE and as such was owed a
2   fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy
3   which thereby caused plaintiff's asbestos-related injuries.

4   106.   The CONCERT OF ACTION DEFENDANTS made representations to plaintiff
5   and others concerning asbestos-containing products including but not limited to:

6        (a)   the statements set forth and summarized in the foregoing paragraphs
7        (b)   that asbestos in commercially used insulation products was not hazardous
8   (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)
9        (c)   the amount of asbestos in the air necessary to cause disease was five
10  million particles per cubic foot (this statement was known to be false by the CONCERT OF
11  ACTION DEFENDANTS)
12       (d)   that asbestos does not cause cancer (this statement was known to be false
13  by the CONCERT OF ACTION DEFENDANTS);
14       (e)   in addition, the CONCERT OF ACTION DEFENDANTS actively and
15  fraudulently concealed facts from the plaintiff and others including, but not limited to:

16            (1)   that asbestos-related disease can be a fatal disease,
17            (2)   that asbestos causes various forms of lung cancer,
18            (3)   that individuals should protect themselves from breathing asbestos
19                  dust,
20            (4)   the extent of asbestos disease in exposed populations,
21            (5)   information regarding the levels of airborne asbestos that can cause
22                  disease,
23            (6)   their experience with workers' compensation claims related to
24                  asbestos exposure,
25            (7)   the statements set forth in foregoing paragraphs.

26  107.   Further, the CONCERT OF ACTION DEFENDANTS knew that their foregoing
27  statements were false and that, by their acts, they were actively and fraudulently concealing
28  adverse information regarding the health affects of asbestos including the facts set forth above;

1 the CONCERT OF ACTION DEFENDANTS made the false statements and concealed the

2 information with the intent to deceive; plaintiff and others relied both directly and indirectly on

3 the foregoing false statements and their lack of knowledge resulting from their fraudulent

4 concealment, resulting in and causing asbestos-related injuries and damages as more fully set

5 forth herein.

6      108.   The asbestos-containing products that CONCERT OF ACTION DEFENDANTS

7 manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was

8 exposed to asbestos from the CONCERT OF ACTION DEFENDANTS' products, which caused

9 his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

10     109.   Additionally and alternatively, as a direct result of MET LIFE's actions and

11 omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in

12 plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of

13 asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the

14 risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the

15 dangers of asbestos and caused plaintiff's damages herein.

16     WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

17 ENTITIES, and each of them, as hereinafter set forth.

18                         SIXTH CAUSE OF ACTION
                         (Fraud and Deceit/Concealment)
19

20     AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

21 FRAUD AND DECEIT/CONCEALMENT, PLAINTIFF COMPLAINS OF DEFENDANTS

22 METROPOLITAN LIFE INSURANCE COMPANY, OWENS-ILLINOIS, INC., DOES 472-

23 480, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter FRAUD

24 DEFENDANTS), AND ALLEGES AS FOLLOWS:

25     110.   Plaintiff incorporates herein by reference, as though fully set forth hereat, each

26 and every allegation of the First, Second, Fourth and Fifth Causes of Action as though fully set

27 forth herein.

28 ///

111.    The term FRAUD DEFENDANTS as used herein includes but is not limited to: METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), United States Gypsum Company [USG]), American Brakeblok Corporation (now Pneumo Abex Corporation [Pneumo Abex]), Keasbey-Mattison Company (now T&N, Ltd. [T&N]), all members of the Asbestos Textile Institute [ATI], American Conference of Industrial Hygienists, Inc., and the other entities and individuals identified in this Cause of Action.

112.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the FRAUD DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of San Francisco, State of California.

113.    FRAUD DEFENDANT American Conference of Governmental Industrial Hygienists, Inc. (ACGIH) sets guidelines for occupational health called Threshold Limit Values (TLVs). These guidelines are relied on by OSHA (the Occupational Safety and Health Administration) in the United States and similar agencies around the world.  Criticisms of the guide-line setting process have pointed to problems with data collection, inadequate research, overwhelming dependence on data supplied by financially interested corporations, and slow response to advances in medical information.  In carrying out the aforesaid acts, the ACGIH was negligent in their failure to analyze or critically evaluate previously published literature, or review and incorporate current literature, failure to adequately assess the financially motivated scientific data provided by asbestos corporations, their insurers, and medical consultants, and their limited review process, including but not limited to the following representative list:

(a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL HYGIENISTS (NCGIH) was formed in 1938.  In 1942, the NCGIH began to develop a list of proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric Concentrations, for various hazardous atmospheric substances, including asbestos.  In the

minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the MPC's were "not to be construed as recommended safe concentrations." In 1946, the NCGIH was renamed the American Conference of Governmental Industrial Hygienists, Inc. (ACGIH), and despite the internally acknowledged inadequacy of the asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented, and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

(b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor, fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily function, either immediate or after years of exposure." In 1948, they changed the name of the guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted definition, describing the guideline as both an "average" and a "maximum." Despite their failure to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing the definition of the TLV, the ACGIH never performed any studies to test the scientific validity of the 5 mppcf TLV guideline.

(c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2 mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf, never intending said numeric figure to be the actual recommended guideline. Despite internally acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

(d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH ignored the carcinogenic dangers of asbestos until 1974.

114.   Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by one or more of the FRAUD DEFENDANTS. The exposure to the asbestos or asbestos-related products supplied by the FRAUD DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

///

115. Plaintiff incorporates herein by reference, as though fully set forth hereat at, each and every paragraph of the Fifth Cause of Action, which describes the allegations against, and actions of the CONSPIRACY DEFENDANTS.

116. Further, the FRAUD DEFENDANTS knew that their foregoing statements were false and that by their acts they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the FRAUD DEFENDANTS made the false statements and concealed the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

117. The asbestos-containing products that FRAUD DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the FRAUD DEFENDANTS' products which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

118. Additionally and alternatively, as a direct result of FRAUD DEFENDANT MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

<u>SEVENTH CAUSE OF ACTION</u>
(Fraud and Deceit/Intentional Misrepresentation)

AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/INTENTIONAL MISREPRESENTATION, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, OWENS-ILLINOIS, INC., DOES 740-750, THEIR ALTERNATE ENTITIES AND EACH OF

1   THEM (hereinafter INTENTIONAL MISREPRESENTATION DEFENDANTS), AND

2   ALLEGES AS FOLLOWS:

3       119.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each

4   and every allegation of the First and Second Causes of Action, and each and every paragraph of

5   the Fourth, Fifth and Sixth Causes of Action that describes the allegations against, and actions of

6   the CONSPIRACY DEFENDANT MET LIFE as though fully set forth herein.

7       120.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

8   mentioned, the INTENTIONAL MISREPRESENTATION DEFENDANTS were and are corpor-

9   ations organized and existing under and by virtue of the laws of the State of California, or the

10  laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do

11  and/or were and are doing business in the State of California, and that said defendants regularly

12  conducted and/or conducts business in the County of San Francisco, State of California.

13      121.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each

14  and every paragraph of the Fifth Cause of Action that describes the allegations against, and

15  actions of the CONSPIRACY DEFENDANT MET LIFE.

16      122.    Further, the INTENTIONAL MISREPRESENTATION DEFENDANTS knew

17  that their foregoing statements were false and that by their acts they were actively and

18  fraudulently concealing adverse information regarding the health affects of asbestos including the

19  facts set forth above; the INTENTIONAL MISREPRESENTATION DEFENDANTS made the

20  false statements and misrepresented the information with the intent to deceive; plaintiff and

21  others relied both directly and indirectly on the foregoing false statements and their lack of

22  knowledge resulting from their intentional misrepresentation, resulting in and causing asbestos-

23  related injuries and damages as more fully set forth herein.

24      123.    The asbestos-containing products that INTENTIONAL MISREPRESENTATION

25  DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were

26  defective; plaintiff was exposed to asbestos from the INTENTIONAL MISREPRESENTATION

27  DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in

28  the foregoing paragraphs.

1      124.    Additionally and alternatively, as a direct result of INTENTIONAL

2 MISREPRESENTATION DEFENDANTS MET LIFE's actions and omissions, plaintiff was

3 caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents,

4 employers and the general public to be aware of the true and full dangers of asbestos, deprive

5 plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being

6 exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of

7 asbestos and caused plaintiff's damages herein.

8 EIGHTH CAUSE OF ACTION<br>(Loss of Consortium)

9

10     AS AND FOR A FURTHER, SEPARATE, FURTHER AND DISTINCT CAUSE OF

11 ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF SHIRLEY DORL, COMPLAINS OF

12 DEFENDANTS, DOES 1-500, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM,

13 AND ALLEGES AS FOLLOWS:

14      125.    Plaintiff incorporates by reference each and every paragraph of the First through

15 Seventh Causes of Action herein.

16      126.    Plaintiffs CHARLES DORL and SHIRLEY DORL were married on

17 December 13, 2008, and at all times relevant to this action were, and are now, husband and wife.

18      127.    Prior to plaintiff CHARLES DORL's injuries as alleged, he was able and did

19 perform duties as a spouse. Subsequent to the injuries and as a proximate result thereof,

20 CHARLES DORL has been unable to perform the necessary duties as a spouse and the work and

21 service usually performed in the care, maintenance and management of the family home, and he

22 will be unable to perform such work, service and duties in the future. As a proximate result

23 thereof, plaintiff SHIRLEY DORL has been permanently deprived and will be deprived of the

24 consortium of her spouse, including the performance of duties, all to her damages, in an amount

25 presently unknown but which will be proved at the time of trial.

26      128.    Plaintiff's discovery of the cause of her loss of consortium, as herein alleged, first

27 occurred within one year of the date this complaint was filed.

28 ///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

129.    As a direct and proximate result of the acts of defendants, their "alternate entities," and each of them, and the severe injuries caused thereby to plaintiff CHARLES DORL as set forth in this complaint, plaintiff SHIRLEY DORL has suffered, and for a long period of time will continue to suffer loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as follows:

Plaintiff CHARLES DORL:

1.    For plaintiff's general damages according to proof;

2.    For plaintiff's loss of income, wages and earning potential according to proof;

3.    For plaintiff's medical and related expenses according to proof;

Plaintiff SHIRLEY DORL:

4.    For plaintiff's damages for loss of consortium according to proof;

Plaintiffs CHARLES DORL and SHIRLEY DORL:

5.    For plaintiffs' cost of suit herein;

6.    For exemplary or punitive damages according to proof against defendants ASBESTOS CORPORATION LIMITED; CRANE CO.; OWENS-ILLINOIS, INC., only;

7.    For damages for fraud according to proof; and

8.    For such other and further relief as the court may deem just and proper, including costs and pre-judgment interest as provided in C.C.P. § 998, C.C.P. § 1032, and related provisions of law.

Dated: 2/18/17                                BRAYTON✣PURCELL LLP

By: _____
David R. Donadio
Attorneys for Plaintiffs

## EXHIBIT A

Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations both inside and outside the State of California, including but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| U.S. Navy | SALEM (CA-139)<br>Boston Naval Shipyard<br>Boston, MA | Fireman | 11/1954-3/1956<br>(4-6 months total) |
| U.S. Navy | MISSISSIPPI (AG-128)<br>Norfolk Naval Shipyard<br>Portsmouth, VA | Boiler Tender | 4/1956-7/1956 |
| U.S. Navy | IOWA (BB-61)<br>Norfolk Naval Shipyard<br>Portsmouth, VA<br>Philadelphia Naval Shipyard<br>Philadelphia, PA | Boiler Tender | 7/1956-2/1958<br>(4-6 months)<br>2/1958 |
| U.S. Navy | Boilerman Technical School<br>Philadelphia Naval Shipyard<br>Philadelphia, PA | Boiler Tender (Student) | 3/4/1957-4/1/1957 |
| U.S. Navy | BOSTON (CAG-1)<br>Boston Naval Shipyard<br>Boston, MA | Boiler Tender | 3/1958-8/1960<br>(8-12 months total) |
| U.S. Navy | Portsmouth Naval Shipyard<br>Portsmouth, NH<br>THRESHER (SS-593)<br>ALBACORE (AGSS-569) | Maintenance Man | 9/1960-3/1963 |
| U.S. Navy | Boilerman Technical School<br>Philadelphia Naval Shipyard<br>Philadelphia, PA<br>Unknown Destroyer Escort | Boiler tender (Student) | 9/2/1962-3/15/1963<br>(1 day) |

///

EXHIBIT A

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1

EXHIBIT A (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| U.S. Navy | PREBLE (DLG-15) | Boiler Tender | 4/1963-1/1966 |
| | Long Beach Naval Shipyard Long Beach, CA | | |
| U.S. Navy | TURNER JOY (DD-951) | Boiler Tender | 2/1966-5/1966 |
| | Long Beach Naval Shipyard Long Beach, CA | | |
| U.S. Navy | HAVEN (AH-12) | Boiler Tender | 5/1966-8/1966 |
| University of Nebraska Omaha, NE | University of Nebraska Boiler Room Omaha, NE | Maintenance Engineer | 12/4/1966-12/1967 |
| Veterans Administration Hospital Lincoln, NE | Veterans Administration Hospital Lincoln, NE | Boiler Operator | 1968-1972 |
| University of Nebraska Lincoln, NE | University of Nebraska Lincoln, NE | Manager (Boiler Operations) | 1972-1974 |
| Veterans Affairs Administration | Veterans Administration Hospital Fort Lyon, CO | Utility Man (Supervisor) | 1975-1982 |

EXHIBIT A

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT B

Plaintiff retired from his last place of employment as a result of becoming disabled due to an illness not related to asbestos.  He has therefore suffered no disability from his asbestos-related disease as "disability" is defined in California Code of Civil Procedure § 340.2.

Plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the plaintiff, including, but not limited to breathing difficulties and/or other lung damage.  Plaintiff was diagnosed with lung cancer on or about July 2012, and with asbestos-related pleural disease on or about March 2004.

EXHIBIT B

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  DAVID R. DONADIO, ESQ., S.B. #154436
   BRAYTON✦PURCELL LLP
2  Attorneys at Law
   222 Rush Landing Road
3  P.O. Box 6169
   Novato, California  94948-6169
4  (415) 898-1555

5  Attorneys for Plaintiffs

6

7

8              SUPERIOR COURT OF CALIFORNIA

9                COUNTY OF SAN FRANCISCO

10

11 CHARLES DORL and                    )  ASBESTOS
   SHIRLEY DORL,                       )  No.
12                                     )     C G C   13  276132
              Plaintiffs,              )
13                                     )  PRELIMINARY FACT SHEET/NEW
   vs.                                 )  FILING/ASBESTOS LITIGATION
14                                     )
   ASBESTOS CORPORATION LIMITED,       )
15 et al.,                             )  (See Case Management Order,
                                       )  Filed June 29, 2012)
16            Defendants.              )

17

18                       NOTICE

19 TO NEW DEFENDANTS SERVED IN COMPLEX ASBESTOS LITIGATION IN THE
   SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA, CITY AND COUNTY OF
20 SAN FRANCISCO

21       You have been served with process in an action which has been designated by the Court
   as complex litigation pursuant to Standard 19 of the Standards of Judicial Administration.  This
22 litigation bears the caption "In Re:  Complex Asbestos Litigation", [San Francisco Superior
   Court No. 828684].
23
         This litigation is governed by the Case Management Order, filed with this court on June
24 29, 2012, some of which affect the judicial management and/or discovery obligations, including
   the responsibility to answer interrogatories deemed propounded in the case.  You may contact the
25 Court or Designated Defense Counsel, Berry & Berry, P.O. Box 16070, 2930 Lakeshore Avenue,
   Oakland, CA 94610; Telephone:  (510) 835-8330; FAX: (510) 835-5117, for further information
26 and/or copies of these orders, at your expense.

27 ///

28 ///

                                         1
K:\Injured\118448\PLD\nrp-facts.wpd
PRELIMINARY FACT SHEET/NEW FILING/ASBESTOS LITIGATION

BRAYTON✦PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P.O. BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

ENDORSED
F I L E D
San Francisco County Superior Court

FEB 20 2013

CLERK OF THE COURT

BY: _____
        DENNIS TOYAMA  Deputy Clerk

1. State the complete name and address of each person whose claimed exposure to asbestos is the basis of this lawsuit ("exposed person"): Charles Dorl, 1213 West Thomas Avenue, Shenandoah, Iowa 51301.

2. Does plaintiff anticipate filing a motion for a preferential trial date within the next four months?    __X__ Yes                    _____ No

3. Date of birth of each exposed person in item one and, if applicable, date of death:

       Date of Birth:   __9/3/36__

       Date of Death:   ___N/A___

Social Security Number of each exposed person:

       Social Security Numbers are confidential pursuant to Calif. Rule of Court 1.20.

4. Specify the nature or type of asbestos-related disease alleged by each exposed person.

      _____ Asbestosis                    _____ Mesothelioma

      __X__ Pleural Thickening/Plaques          _____ Other Cancer:  Specify: _____

      __X__ Lung Cancer Other Than Mesothelioma      _____ Other:  Specify: _____

5. For purposes of identifying the nature of exposure allegations involved in this action, please check one or more:

      __X__ Shipyard          _____ Construction          _____ Friction-Automotive

      _____ Premises          _____ Aerospace          __X__ Military

      __X__ Other:  Specify all that apply:   __Boiler__

6. If applicable, indicate which exposure allegations apply to which exposed person.

7. Identify each location alleged to be a source of an asbestos exposure, and to the extent known, provide the beginning and ending year(s) of each such exposure.  Also specify each exposed person's employer and job title or job description during each period of exposure.  (For example: "San Francisco Naval Shipyard - Pipefitter - 1939-1948").  Examples of locations of exposure might be a specific shipyard, a specific railroad maintenance yard, or perhaps more generalized descriptions such as "merchant marine" or "construction".  If an exposed person claims exposure during only a portion of a year, the answer should indicate that year as the beginning and ending year (e.g., 1947-1947).

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| U.S. Navy | SALEM (CA-139) Boston Naval Shipyard Boston, MA | Fireman | 11/1954-3/1956 (4-6 months total) |
| U.S. Navy | MISSISSIPPI (AG-128) Norfolk Naval Shipyard Portsmouth, VA | Boiler Tender | 4/1956-7/1956 |
| U.S. Navy | IOWA (BB-61) Norfolk Naval Shipyard Portsmouth, VA | Boiler Tender | 7/1956-2/1958 (4-6 months) |
| | Philadelphia Naval Shipyard Philadelphia, PA | | 2/1958 |
| U.S. Navy | Boilerman Technical School Philadelphia Naval Shipyard Philadelphia, PA | Boiler Tender (Student) | 3/4/1957-4/1/1957 |

(Attach Additional Pages, If Necessary) SEE ATTACHED CONTINUATION

8. For each exposed person who:

a. worked in the United States or for a U.S. agency outside the territorial United States, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Earnings authorization (Exhibit I to Case Management Order dated June 29, 2012);

b. may have had a Social Security disability award or is no longer employed and whose last employment was not with a United States government agency, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Disability authorization (Exhibit I to Case Management Order dated June 29, 2012);

c. served at any time in the United States military, attach to the copy of this fact sheet provided to Designated Defense Counsel two fully executed originals of the stipulation (Exhibit I to Case Management Order dated June 29, 2012);

///

1        d. was employed by the United States government in a civilian capacity, attach to the

2  copy of this fact sheet provided to Designated Defense Counsel two fully executed originals of

3  the stipulation (Exhibit I to Case Management Order dated June 29, 2012);

4  9. If there is a wrongful death claim, attach to the copy of this fact sheet provided to Designated

5  Defense Counsel a copy of the death certificate, if available. If an autopsy report was done, also

6  attach a copy of it to the copy of this fact sheet provided to Designated Defense Counsel.

7  Dated: _____2/19/13_____.         BRAYTON❖PURCELL LLP

8

9                              By: _____

10                                David R. Donadio
                                  Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| U.S. Navy | BOSTON (CAG-1)<br>Boston Naval Shipyard<br>Boston, MA | Boiler Tender | 3/1958-8/1960<br>(8-12 months total) |
| U.S. Navy | Portsmouth Naval Shipyard<br>Portsmouth, NH<br>THRESHER (SS-593)<br>ALBACORE (AGSS-569) | Maintenance Man | 9/1960-3/1963 |
| U.S. Navy | Boilerman Technical School<br>Philadelphia Naval Shipyard<br>Philadelphia, PA<br>Unknown Destroyer Escort | Boiler tender (Student) | 9/2/1962-3/15/1963<br>(1 day) |
| U.S. Navy | PREBLE (DLG-15)<br>Long Beach Naval Shipyard<br>Long Beach, CA | Boiler Tender | 4/1963-1/1966 |
| U.S. Navy | TURNER JOY (DD-951)<br>Long Beach Naval Shipyard<br>Long Beach, CA | Boiler Tender | 2/1966-5/1966 |
| U.S. Navy | HAVEN (AH-12) | Boiler Tender | 5/1966-8/1966 |
| University of Nebraska Omaha, NE | University of Nebraska Boiler Room Omaha, NE | Maintenance Engineer | 12/4/1966-12/1967 |
| Veterans Administration Hospital Lincoln, NE | Veterans Administration Hospital Lincoln, NE | Boiler Operator | 1968-1972 |
| University of Nebraska Lincoln, NE | University of Nebraska Lincoln, NE | Manager (Boiler Operations) | 1972-1974 |
| Veterans Affairs Administration | Veterans Administration Hospital Fort Lyon, CO | Utility Man (Supervisor) | 1975-1982 |

K:\Injured\11344IN\PLD\cmp-factst.wpd
PRELIMINARY FACT SHEET/NEW FILING/ASBESTOS LITIGATION

CIV-050

## — DO NOT FILE WITH THE COURT —
**— UNLESS YOU ARE APPLYING FOR A DEFAULT JUDGMENT UNDER CODE OF CIVIL PROCEDURE § 585 —**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*
DAVID R. DONADIO, ESQ.    (Bar # 154436)
BRAYTON❖PURCELL LLP
222 Rush Landing Road
Novato, California  94948-6169
ATTORNEY FOR *(name):*  Plaintiff(s)

TELEPHONE NO.
(415) 898-1555
FAX NO.
(415) 898-1247

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS:  400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE:  San Francisco 94102
BRANCH NAME:

PLAINTIFF:  CHARLES DORL and SHIRLEY DORL
DEFENDANT:  ASBESTOS CORPORATION LIMITED, et al.

**STATEMENT OF DAMAGES**
(Personal Injury or Wrongful Death)

CASE NUMBER:
CGC-13-276132

To *(name of one defendant only):*  CRANE CO.
Plaintiff *(name of one plaintiff only):*  CHARLES DORL
seeks damages in the above-entitled action, as follows:

**1. General damages**                                                                 AMOUNT
a. [X] Pain, suffering, and inconvenience . . . . . . . . . . . . . . . . . . . . . . $ 1,000,000.00
b. [X] Emotional distress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 1,000,000.00
c. [ ] Loss of consortium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
d. [ ] Loss of society and companionship *(wrongful death actions only)* . . . . . . . $ _____
e. [ ] Other *(specify)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
f. [ ] Other *(specify)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
g. [ ] Continued on Attachment 1.g.

**2. Special damages**
a. [X] Medical expenses *(to date)* . . . . . . . . . . . . . . . . . . . . . . . . . . $ 200,000.00
b. [X] Future medical expenses *(present value)* . . . . . . . . . . . . . . . . . . . $ 200,000.00
c. [ ] Loss of earnings *(to date)* . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
d. [X] Loss of future earning capacity *(present value)* . . . . . . . . . . . . . . . $ 1,500,000.00
e. [ ] Property damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
f. [ ] Funeral expenses *(wrongful death actions only)* . . . . . . . . . . . . . . . . $ _____
g. [ ] Future contributions *(present value) (wrongful death actions only)* . . . . . . $ _____
h. [ ] Value of personal service, advice, or training *(wrongful death actions only)* . $ _____
i. [X] Other *(specify)*  LOSS OF HOUSEHOLD SERVICES . . . . . . . . . . . . . . $ 1,000,000.00
j. [ ] Other *(specify)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
k. [ ] Continued on Attachment 2.k.

**3. [X] Punitive damages:** Plaintiff reserves the right to seek punitive damages in the amount of *(specify)* . . $ 5,000,000.00
when pursuing a judgment in the suit filed against you.
Date:  March 5, 2013

David R. Donadio
(TYPE OR PRINT NAME)
(Proof of service on reverse)

▶ *(SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)*

Form Adopted for Mandatory Use
Judicial Council of California
CIV-050 [Rev. January 1, 2007]

**STATEMENT OF DAMAGES**
(Personal Injury or Wrongful Death) *LexisNexis® Automated California Judicial Council Forms*

Code of Civil Procedure, §§ 425.11, 425.115
www.courtinfo.ca.gov