# EXHIBIT I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| VALERIE K. PRESLEY, as Personal ) <br> Representative for the Estate of ) <br> Cleveland G. Kite, deceased, ) <br> ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> BILL VANN COMPANY, INC., et al., ) <br> ) <br> **Defendants.** ) | Civil Action No. 11-00444-WS-N |

---

### Defendant Cameron International Corporation's Motion
### for Summary Judgment And Evidentiary Submission

---

COMES NOW the Defendant, Cameron International Corporation, as the purchaser of certain engine lines manufactured by Cooper-Bessemer Corporation (hereinafter collectively referred to as "Cameron"), and respectfully moves this Court pursuant to Rule 56, *Federal Rules of Civil Procedure*, for an Order granting Cameron's Motion for Summary Judgment. Cameron submits that there are no genuine issues of material fact and that it is entitled to judgment in its favor, as a matter of law, based upon the application of the "bare metal defense."

1

In support thereof, Cameron relies upon its contemporaneously filed Memorandum of Law in Support of Its Motion for Summary Judgment and upon the following evidentiary submission:

Exhibit A:   Excerpts from Cleveland Kite's July 12, 2011 Deposition;

Exhibit B    Excerpts from Cleveland Kite's January 23, 2012 Deposition;

Exhibit C    Excerpts from Cleveland Kite's November 16, 2011 Deposition; and

Exhibit D    Judge Robreno's August 8, 2014 Order.

Respectfully submitted

\s\ *Christopher S. Rodgers*
Christopher S. Rodgers
Alabama Bar No. ASB-4665-G54C
Stewart W. McCloud
Alabama Bar No. ASB-9656-A50M
Huie, Fernambucq & Stewart, LLP
Three Protective Center
2801 Highway 280 South, Suite 200
Birmingham, AL 35223
**Attorneys for Cameron International Corporation, as the purchaser of certain engine lines manufactured by Cooper-Bessemer Corporation**

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the above and foregoing pleading electronically with the Clerk of Court using the CM-ECF system which will send notification of same to all parties of record on this the 16th day of February 2015.

**Counsel of Record**

G. Patterson Keahey, Esq.
One Independence Plaza, Suite 612
Birmingham, Alabama 35209

\s\ *Christopher S. Rodgers*
Of Counsel

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **VALERIE K. PRESLEY, as Personal** ) | |
| **Representative for the Estate of** ) | |
| **Cleveland G. Kite, deceased,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 11-00444-WS-N** |
| ) | |
| **v.** ) | |
| ) | |
| **BILL VANN COMPANY, INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## CAMERON INTERNATIONAL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Cameron International Corporation, as the purchaser of certain engine lines manufactured by Cooper-Bessemer Corporation (hereinafter collectively referred to as "Cameron"), and respectfully submits this Memorandum of law in Support of its Motion to Motion for Summary Judgment. As grounds for this Motion, Cameron states and shows as follows:

## PROCEDURAL HISTORY

This matter was filed by Cleveland G. Kite (hereinafter "Kite") on May 4, 2011, in the Circuit Court of Marengo County, Alabama. [S.D.A.L. Doc. 1, Ex. E]. On August 5, 2011, certain Defendants removed this action to the Federal District Court

1

for the Southern District of Alabama. [S.D.A.L. Doc. No. 1]. On Aug 15, 2011, a

Conditional Transfer Order was entered conditionally transferring this action to the

MDL, and on November 3, 2011, the transfer to the MDL was made final. [E.D. Pa.

Doc. 1].

Written discovery was exchanged between the parties, and depositions of Kite

and fact witness were conducted. In the fall 2012, following completion of initial fact

discovery and depositions, the defendants, including Cameron, filed motions for

summary judgment based on lack of product identification and/or Alabama's statute of

limitations applicable to claims based on alleged asbestos exposure. On August 8,

2014, the Eastern District of Pennsylvania Court issued Orders on pending summary

judgment motions, granting some summary judgment motions, while denying others[1].

---

1       On July 3, 2012, Cameron moved for summary judgment, asserting that Plaintiff's claims are time-barred
under Alabama's well-established pre-1979 statute of limitations for claims based on alleged asbestos-exposure.
Although available, Cameron did not assert alternative grounds entitling Cameron to summary judgment, as the
undisputed facts and Alabama substantive law dictated that Plaintiff's claims against Cameron were time-barred. In
opposition to Cameron's motion for summary judgment, Plaintiff agreed that Alabama substantive law applied, but
argued that Plaintiff's claims against Cameron were not time-barred by Alabama's pre-1979 statute of limitations for
asbestos-related injuries.

        On August 8, 2014, more than two (2) years after Cameron filed its motion for summary judgment, Judge
Robreno entered an Order denying Cameron's motion for summary judgment. [MDL Doc. 211]. In denying Cameron
and other Defendants' motions for summary judgment, Judge Robreno applied Maritime statute of limitations, rather
than Alabama's well-established statute of limitations for asbestos-related injuries. (August 8, 2014 Order; attached
hereto as Exhibit D). Judge Robreno's August 8, 2014 Order was the first and only notice that Maritime law, rather
than Alabama substantive law, would be apply, despite the fact that Plaintiff's Complaint explicitly disavowed any
and all causes of action based on federal maritime law. (Plaintiff's Complaint, ¶ 16 (f)) ("no claim of admiralty or
maritime law is raised.").

On April 3, 2014, Plaintiff filed a Suggestion of Death notifying the parties and the MDL Court that Kite passed away on January 26, 2014. [E.D. Pa. Doc. 186]. Along with the Suggestion of Death, Plaintiff filed a *Motion to Substitute Valerie K. Presley as Personal Representative of the Estate of Cleveland Kite, Deceased as Party Plaintiff*. [E.D. Pa. Doc. 187]. Plaintiff's Motion to Substitute was granted on May 1, 2014. [E.D. Pa. Doc. 188]. On October 21, 2014, the Eastern District of Pennsylvania entered a Suggestion of Remand. On February 4, 2015, the Judicial Panel for Multidistrict Litigation entered its *Separation of Claims and Remand Order,* remanding the case to the United States District Court for the Southern District of Alabama. [J.P.M.L. Doc. 9939).

## SUMMARY OF ARGUMENT

Cameron is entitled to summary judgment based upon the application of the "bare metal defense." The bare metal defense provides that manufacturers of bare metal equipment (i.e. pumps and valves) cannot be held liable for a third party's asbestos materials used with the manufacturer's equipment, where the equipment manufacturer did not manufacture or distribute the asbestos-containing products themselves. *Morgan v. Bill Vann Co., Inc.,* 969 F. Supp. 2d 1358, 1363 (S.D. Ala. 2013)("[D]efendants who made products that used asbestos insulation, gaskets and packing could not be held liable when they did not manufacture or distribute the

3

asbestos products themselves.") (internal citations and quotations omitted); *see also, Lindstrom v. A-C Product Liability Trust*, 424 F. 3d 488 (6th Cir. 2005); *Conner v. Alfa Laval, Inc.,* 842 F. Supp. 2d 791 (E.D. Pa. 2012).

Viewing the evidence and testimony in the light most favorable to the Plaintiff, it is undisputed that the Cooper-Bessemer engine itself was not made of asbestos, and **Cooper-Bessemer did not manufacturer or distribute** the external insulation or the replacement gaskets, which Kite alleges contained asbestos and which Kite alleges he was exposed. Accordingly, Cameron is entitled to judgment as a matter of law pursuant to the bare metal defense.

## STATEMENT OF UNDISPUTED FACTS

Mr. Kite is the only witness who offered product identification testimony in this case. Kite's deposition was taken over the course of five (5) days, beginning on July 12, 2011, and concluding January 24, 2012. Kite served in the Coast Guard and Navy from 1959 through 1978. (Deposition of Cleveland G. Kite, July 12, 2011; pg. 78-83; excerpts attached as Exhibit A). Kite testified that the only time he worked with or around a Cooper-Bessemer engine was while serving aboard the Coast Guard buoy tender the Salvia, from 1958 through 1960. (Kite Depo., January 23, 2012; pg. 293-294; excerpts attached as Exhibit B).

Q:     And again, just so the record is clean about this, your last military service was in 1978?

A.     Yes.

Q:     Okay. Let me talk to you for just a second about Cooper-Bessemer.

A.     Yes, sir.

Q.     You mentioned in your earlier deposition that you think you recall or did recall seeing a Cooper-Bessemer diesel engine, I believe you said, on the Coast Guard Vessel. **This was the Coast Guard cutter that you served on in 1958. Do you remember that?**

A.     **Yes.**

Q.     **And that is- best I can tell that's the only time you ever worked either with or around a Cooper-Bessemer engine?**

A.     **Yes, sir.**

(Kite Depo., January 23, 2012; pg. 293-294)(emphasis added).

Many portions of Kite's deposition pertain to gaskets, packing, and insulation manufactured and distributed by other defendants to this litigation. Kite did not testify that he changed out or replaced gaskets, packing or insulation that was manufactured, sold or distributed by Cooper-Bessemer. In discussing his alleged asbestos exposure while working on engines in the Navy and Coast Guard, Kite did not testify that the engine's *themselves* contained asbestos, but rather, Kite believed that the external insulation or blankets placed on the engines, as well as replacement gaskets and packing, contained asbestos. (Kite Depo., November 16, 2011; pg. 81-87; excerpts attached as Exhibit C).

5

When asked why he believed the engines, including the Cooper-Bessemer engine, contained asbestos, Kite testified: "Because I know now the **gaskets and things that they used was asbestos gaskets**, and **the lagging**, they called it, **around the pipe systems and things**, where the heat was at *[sic]* was asbestos." (Kite Depo., November 16, 2011; pg. 81-82)(emphasis added). Kite also believed that insulation blankets placed on various engines' exteriors contained asbestos. (Kite Depo., November 16, 2011; pg. 82)("But the blanket and everything that went to these engines was all asbestos blankets.").

With respect to the only Cooper-Bessemer engine that Kite ever worked with or around, aboard the Salvia from 1958 to 1960, Kite speculates that he may have been exposed to asbestos dust from external pipe insulation, external blankets, and from replacing gaskets. (Kite Depo., November 16, 2011; pg. 85-87). Specifically, Kite testified:

> Q: All right. And did you ever --do you recall seeing any dust created in any way when you worked on these Cooper Bessemer engines?
>
> MR. LANKFORD: Object to the form.
>
> A: Yes, sir.
>
> Q: And why was that?
>
> A: Because **the exhaust system had gaskets** and stuff you had to clean off. **The piping system**, anything to do with heat in the engine rooms, **you've got asbestos covering on it.**

6

Q:     All right.

A:     **And all the pipes and things** in a --on a ship, every pipe overhead and everywhere it goes, it's **got an asbestos covering on it to protect it**, plus to keep the heat or the fluid or whatever is running through it cool or-- or keep it from being real hot in the engine room.

(Kite Depo., November 16, 2011; pg. 85)(emphasis added).

*****

Q:     How often, in general, did that happen?

A:     It -- Like I say, the -- the maintenance systems we had to do, you had take all this stuff off, **had to replace the gaskets and the blanket and everything and the piping** a -- **associated with it**.

(Kite Depo., November 16, 2011; pg. 85)(emphasis added).

Based on the undisputed evidence and testimony, Plaintiff has **failed to identify any asbestos-containing product** or material **manufactured or originally sold, supplied or otherwise placed into the stream of commerce by Cooper-Bessemer**. Accordingly, Cameron is entitled to judgment as a matter of law based on the bare metal defense.

## ARGUMENT

### A.     Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c)(2).  The burden of establishing that there is no genuine issue of material fact lies upon the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 320 n.2 (1986).  The Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 310 F. 3d 937, 942 (6th Cir. 2002).  To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor.  Anders*on v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id*.

In the context of an asbestos case with respect to a motion for summary judgment, it has been held that where an "allegation that plaintiff was exposed to defendant's asbestos-containing product is not supported by reasonable inferences arising from the undisputed facts, but is based on speculation and conjecture, that renders them mere guesses or possibilities." *Lee v. Celotex Corp.,* 764 F. 2d 148, 1491 (11th Cir. 1985).  Furthermore, "evidence which affords nothing more than mere speculation, conjecture, or guess is wholly insufficient to warrant submission of the case to the jury." *Turner v. Azalea Box Co.,* 508 So. 2d 253, 254 (Ala. 1987)(citing *Roberts v. Carroll*, 377 So. 2d 944, 946 (Ala. 1979))(citation omitted).

**B.     Cameron is Entitled to Summary Judgment Based on the "Bare Metal Defense"**

The established approach in the majority of jurisdictions across the United States, including Alabama, provides that Cameron's legal duty extends only to those asbestos-containing products that Cooper-Bessemer manufactured, sold or otherwise placed into the stream of commerce. *See, e.g.*, *Morgan v. Bill Vann Co., Inc.*, 969 F. Supp. 2d 1358 (S.D. Ala. 2013); *Lindstrom v. A-C Product Liability Trust*, 424 F. 3d 488 (6th Cir. 2005); *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791 (E.D. Pa. 2012); *O'Neil v. Crane Co.*, 266 P. 3d 987 (Cal. 2012). Under the bare metal defense, a manufacturer of bare metal equipment is not liable for other manufacturers' asbestos-containing components, which are used in connection with the original manufacturer's bare metal.

The bare metal defense was analyzed and explicitly adopted by the Honorable William H. Steele of the United States District Court for the Southern District of Alabama, in the matter of *Ronald Melvin Morgan, as Personal Representative of the Estate of Reuben Morgan v. Bill Vann Company, Inc., et al.*, Civil Action No. 11-0535; 969 F. Supp. 2d 1358 (S.D. Ala. 2013). In adopting the bare metal defense, Judge Steele explained:

9

The packing, not the pump, was the defect. But Alabama River Pulp neither manufactured said packing nor placed it in the stream of commerce. **The clear thrust of the bare metal defense is that a manufacturer cannot be held liable for asbestos-containing products used in conjunction with its bare metal pumps, absent evidence that the manufacturer was part of the chain of distribution for those products**. Accordingly, to the extent that plaintiff would predicate liability on a theory that Flowserve "fail[ed] to warn of the dangers presented by these component parts" despite knowledge that some packing supplied with its pumps "would foreseeably be replaced by comparable asbestos-containing components", those claims fail as a matter of law. Under the bare metal defense, Flowserve is not liable for harm caused by, and owed no duty to warn Morgan [Plaintiff]or anyone else concerning the hazards of, asbestos-containing packing and gaskets that users of Durco pumps might install, **where Flowserve did not manufacture, sell or distribute such asbestos-containing components**.

*Morgan*, 969 F. Supp. 2d 1358, 1363 (S.D. Ala. 2013)(internal citations omitted)(emphasis added).

In *Surre v. Foster Wheeler LLC*, 831 F. Supp. 2d 797 (S.D.N.Y. 2011), the Court granted defendant Crane Co.'s motion for summary judgment, where the defendant boiler manufacturer did not place the asbestos-containing insulation that was applied it its boiler into the stream of commerce, did not specify the use of asbestos insulation, and there was no evidence that the defendant's boiler required the use of asbestos insulation to function properly. As in the present case, the defendant in *Surre* did not manufacture or supply the asbestos-containing insulation that was applied to

defendant's boiler, did not specify the use of asbestos insulation, and there was no evidence that the boiler required the use of asbestos insulation to function properly.

In *O'Neil v. Crane Co.*, 266 P. 3d 987 (Cal. 2012), the plaintiff alleged that he contracted mesothelioma as a result of having been exposed to asbestos during his service as a repairman in the Navy. Plaintiff alleged that he had worked with or around Warren pumps, among other products. The evidence revealed that defendant's pumps had been covered externally with another manufacturer's asbestos insulation and that defendant's pumps contained another manufacturer's asbestos gaskets and another manufacturer's asbestos packing. Warren Pumps moved for non-suit as no evidence had been presented that Warren Pumps manufactured the external insulation, the internal replacement packing or the internal replacement gaskets from which plaintiff claimed asbestos exposure. The trial court granted nonsuit and dismissed all claims against Warren.

The California Supreme Court upheld the trial court's ruling, after finding that the "connection between defendants' [Warren] conduct and O'Neils injury [was] extremely remote **because defendants did not manufacture, sell, or supply any asbestos that may have caused his mesothelioma**." *Id.* at 1007 (emphasis added). Specifically, the Court held that "**a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product**

11

unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products." *Id.* at 991 (emphasis added).

The *O'Neil* Court further opined, that "as alternative insulating materials became available, the Navy could have chosen to replace worn gaskets and seals with parts that did not contain asbestos." Id. at 996. Ultimately, the *O'Neil* Court found that **"the defective product in this setting was the asbestos insulation [and asbestos gaskets and packing], not the pumps and valves to which it [insulation] was applied"**, noting that "the mere compatibility for use with such components is not enough to render them defective." *Id.* at 997 (emphasis added).

In *Braaten v. Saberhagen Holdings*, 198 P. 3d 493 (Wash. 2008), a pipefitter worked with insulation, gaskets and packing associated with pumps; however, there was no evidence that the pump manufacturer actually manufactured or placed into the stream of commerce the specific asbestos-containing materials from which Plaintiff alleged exposure. In other words, there was no evidence that the Plaintiff worked with any original asbestos-containing components supplied with the pumps, nor any evidence that the pump manufacturer supplied any of the replacement asbestos-containing components. Recognizing the majority rule, the court found that the defendant was not liable under any products liability theory, regardless of whether the

12

pump manufacturer could foresee that asbestos-containing materials might be used in connection with its equipment. *Braaten*, 198 P. 3d at 497.

The Honorable Eduardo C. Robreno of the Eastern District of Pennsylvania, presiding judge in MDL-875, formed for the specific purpose of addressing asbestos claims filed in federal courts nationwide, has repeatedly recognized the majority view and in doing so, held that a "manufacturer is not liable for harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute." *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791 (E.D. Pa. 2012)[2].

These cases demonstrate, applying the majority rule, that even where use of another manufacturer's part in conjunction with a defendant's finished product is foreseeable, and the original equipment manufacturer cannot be held liable for injury caused by the defective component part that it neither manufactured nor supplied. In this case, Kite testified that he was exposed to asbestos from insulation, blankets or lagging placed on the outside of the Cooper-Bessemer engine, as well as from gaskets and packing removed from the engine's exhaust system. It is undisputed that any

---

2    *See also Lindstrom v. A-C Prod. Liab. Trust*, 424 F. 3d 488 (6th Cir. 2005) (affirming summary judgment in favor of pump manufacturer that never manufactured or supplied replacement gaskets or packing that caused plaintiff's asbestos exposure); *Stark v. Armstrong World Indus., Inc.*, 21 Fed. Appx. 371, 378, 381 (6th Cir. 2001) (affirming order granting summary judgment in favor of boiler manufacturers where they neither manufactured nor supplied the replacement insulation that plaintiff claimed caused his asbestos exposure.

insulation or blankets that may have been applied to the outside of the Cooper-Bessemer engine was (1) not manufactured, sold, distributed, or supplied by Cooper-Bessemer, (2) not specified for use by Cooper-Bessemer, (3) not necessary to the effective operation of a Cooper-Bessemer diesel engine and (4) applied to the engine by third parties. Thus, Cameron cannot be liable for harms arising from any purported asbestos-containing insulation, blankets or replacement gaskets installed on the Cooper-Bessemer engine by third parties. Accordingly, Cameron's motion for summary judgment is due to be granted.

## CONCLUSION

Cameron is entitled to judgment as a matter of law based upon application of the bare metal defense. There is no evidence before this Court that Mr. Kite was exposed to any asbestos-containing product manufactured or supplied by Cooper-Bessemer. Accordingly, Defendant respectfully requests that this Honorable Court enter an Order granting Cameron International Corporation's Motion for Summary Judgment on all of Plaintiff's claims and to further grant all additional relief the Court deems necessary and proper.

Respectfully submitted this 16th day of February, 2015.

\s\ *Christopher S. Rodgers*
Christopher S. Rodgers

14

Alabama Bar No. ASB-4665-G54C
Stewart W. McCloud
Alabama Bar No. ASB-9656-A50M
Huie, Fernambucq & Stewart, LLP
Three Protective Center
2801 Highway 280 South, Suite 200
Birmingham, AL 35223
**Attorneys for Cameron International
Corporation, as the purchaser of certain
engine lines manufactured by Cooper-
Bessemer Corporation**

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the above and foregoing pleading electronically with the Clerk of Court using the CM-ECF system which will send notification of same to all parties of record on this the 16th day of February 2015.

**Counsel of Record**

G. Patterson Keahey, Esq.
One Independence Plaza, Suite 612
Birmingham, Alabama 35209

\s\ *Christopher S. Rodgers*
Of Counsel

# CLEVELAND G. KITE                    07/12/2011

| Page 1 | Page 3 |
|---|---|
| 1  IN THE CIRCUIT COURT OF | 1  time of the trial, or at the time said |
| 2  MARENGO COUNTY, ALABAMA | 2  deposition is offered in evidence, or prior |
| 3 | 3  thereto. |
| 4  CIVIL ACTION NUMBER: CV-2001-900034.00 | 4  IT IS FURTHER STIPULATED AND AGREED |
| 5 | 5  that notice of filing of the deposition by the |
| 6  CLEVELAND G. KITE, | 6  Commissioner is waived. |
| 7  Plaintiff, | 7 |
| 8 | 8 |
| 9  vs. | 9 |
| 10 | 10 |
| 11  BILL VANN COMPANY, INC., et al.; | 11 |
| 12  Defendants. | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17  DEPOSITION TESTIMONY OF: | 17 |
| 18  CLEVELAND G. KITE | 18 |
| 19 | 19 |
| 20 | 20 |
| 21  JULY 12, 2011 | 21 |
| 22  10:00 A.M. | 22 |
| 23 | 23 |

| Page 2 | Page 4 |
|---|---|
| 1  S T I P U L A T I O N S | 1  I N D E X |
| 2  IT IS STIPULATED AND AGREED by and | 2  EXAMINATION BY:          PAGE NUMBER: |
| 3  between the parties through their respective | 3  Mr. Partridge          11 |
| 4  counsel that the video deposition of CLEVELAND | 4 |
| 5  G. KITE may be taken before Mickey L. Turner, | 5 |
| 6  Certified Shorthand Reporter and Notary | 6  E X H I B I T S |
| 7  Public, at the offices of Freedom Court | 7 |
| 8  Reporting, The O'Gwynn Building, 204 Conti | 8  PLAINTIFF'S EXHIBITS:      PAGE NUMBER: |
| 9  Street, Suite 1C, Mobile, Alabama 36602, on | 9  1 - Interrogatory Responses      11 |
| 10  the 12th day of July, 2011. | 10 |
| 11  IT IS FURTHER STIPULATED AND AGREED | 11  DEFENDANT'S EXHIBITS: |
| 12  that the signature to and the reading of the | 12  1 - Amended Notice of |
| 13  deposition by the witness is not waived, the | 13  Discovery Deposition      205 |
| 14  deposition to have the same force and effect | 14 |
| 15  as if full compliance had been had with all | 15 |
| 16  laws and rules of Court relating to the taking | 16 |
| 17  of depositions. | 17 |
| 18  IT IS FURTHER STIPULATED AND AGREED | 18 |
| 19  that it shall not be necessary for any | 19 |
| 20  objections to be made by counsel to any | 20 |
| 21  questions, except as to form or leading | 21 |
| 22  questions, and that counsel for the parties | 22 |
| 23  may make objections and assign grounds at the | 23 |

**Exhibit A**

**FREEDOM COURT REPORTING   877-373-3660**

**CLEVELAND G. KITE**                                    07/12/2011

| Page 77 | Page 79 |
|---|---|
| 1 that or have to take a breathing test and | 1 Q. All right. And then we'll come back to |
| 2 breathe into a machine? | 2 the Shadbush, but, tell me, let's go through |
| 3 A. No. | 3 your military career briefly. You left the |
| 4 Q. Did you have many x-rays -- I know you | 4 Coast Guard after four years? |
| 5 had some in the '90s when you had some heart | 5 A. Yes, sir. |
| 6 problems, but did you have a lot of chest | 6 Q. And were you honorably discharged? |
| 7 x-rays in your life prior to February of this | 7 A. Yes, sir. |
| 8 year? | 8 Q. Why did you leave? |
| 9 A. When they was working on my lungs, the | 9 A. The bosun mate wouldn't let me go up to |
| 10 fluid and stuff, they had to have an x-ray to | 10 second class. The chief bosun mate that was |
| 11 find it. | 11 in charge of the boat, he wouldn't let me go |
| 12 Q. How many times? | 12 up to second class. First class couldn't put |
| 13 A. Oh, several times, different times. | 13 me up over his head. So I said, I'm getting |
| 14 Q. Did -- has Dr. Sahawneh since told you | 14 out. |
| 15 that the fluid buildup on your lungs was due | 15 Q. So you didn't get along with this |
| 16 to mesothelioma or did he attribute it to some | 16 gentleman? |
| 17 other cause? | 17 A. Right. So I left the service. |
| 18 A. No, sir, that. | 18 Q. And then what did you do? |
| 19 Q. Have you had any fluid buildup since | 19 A. I went home and worked on building |
| 20 then? | 20 fiberglass boats. |
| 21 A. No, sir, so far. | 21 Q. Okay. We'll get into that a little bit. |
| 22 Q. Was it just fluid buildup in your right | 22 Let's stick with your military history for a |
| 23 lung or was it in both? | 23 minute. You reupped at some point, didn't |

| Page 78 | Page 80 |
|---|---|
| 1 A. Right lung. | 1 you? |
| 2 Q. As far as you know, do you have any | 2 A. Yes, sir, after about nine or ten |
| 3 problems with your left lung? | 3 months. |
| 4 A. No, sir. | 4 Q. So less than a year later, you rejoined? |
| 5 Q. Let me go through your military service | 5 A. Right. |
| 6 and career if we can. I understand, and we've | 6 Q. What branch did you join? |
| 7 talked about it a little bit, you started at | 7 A. Navy. |
| 8 age 19 in the Coast Guard. How long did you | 8 Q. Why did you do that? |
| 9 stay in the Coast Guard? | 9 A. Well, I just wanted to travel and see |
| 10 A. Four years. | 10 the world. |
| 11 Q. You got out in '60 or '61? | 11 Q. That's what they say in the TV ads, |
| 12 A. '61. | 12 isn't it? |
| 13 Q. 1961? | 13 A. Yeah. |
| 14 A. Yes. | 14 Q. Did you have to go back to any kind of |
| 15 Q. So the next vessel we were about to talk | 15 boot camp? |
| 16 about was the -- where is it -- the Shadbush. | 16 A. No, sir. |
| 17 Was that your last vessel in the Coast Guard? | 17 Q. What was your rank when you joined the |
| 18 A. At that time, yes, sir. | 18 Navy? |
| 19 Q. That first four years? | 19 A. E-3, fireman again. |
| 20 A. Yes, sir. | 20 Q. But you came back to your old rank, huh? |
| 21 Q. So you were just on the Salvia and the | 21 A. No, sir, I dropped a rank. |
| 22 Shadbush? | 22 Q. Yeah, you dropped a rank, didn't you? |
| 23 A. Yes, sir. | 23 A. Yes, sir. |

**FREEDOM COURT REPORTING    877-373-3660**

**CLEVELAND G. KITE**                                    07/12/2011

Page 81

```
 1    Q.   How long were you then in the Navy and
 2    what year was this, by the way?  '62?
 3    A.   '62.
 4    Q.   '62?  When you reupped, where did you
 5    reup?
 6    A.   In Jacksonville, Florida.
 7    Q.   Had you moved back to Florida?
 8    A.   Yes, sir.
 9    Q.   How long were you in the Navy?
10    A.   The whole time, about eight years.
11    Q.   Eight?
12    A.   About eight years in the Navy.
13    Q.   So you got four years active Coast Guard
14    and you got eight years active Navy.  That's
15    twelve years active, right?
16    A.   Yes, sir.
17    Q.   And then you got discharged from active
18    Navy?
19    A.   Yes, sir.
20    Q.   In around 1970?
21    A.   Something like that, yes.
22    Q.   Does that sound right?
23    A.   I can't remember.
```

Page 82

```
 1    Q.   I'm just going '62 to '70 is eight
 2    years.  And then did you stay in the military
 3    in some capacity?
 4    A.   I went back in the Coast Guard.
 5    Q.   You went back in the Coast Guard,
 6    reupped in the Coast Guard?
 7    A.   Yes.
 8    Q.   Why did you do that?
 9    A.   The ship I was on was going to Guam.
10    Q.   The Navy ship?
11    A.   Navy ship, USS Hunley, a submarine, was
12    going back to Guam.  My wife was seven months
13    pregnant and they wouldn't take dependents.
14    They was going to be there a year.  So I
15    talked to my Coast Guard recruiter, and my
16    enlistment was up.  And he told me they would
17    take me back in the Coast Guard, so I went and
18    joined the Coast Guard.
19    Q.   So after eight years in the Navy, I bet
20    you weren't an E-3 anymore.  What were you?
21    A.   No, sir, I was a E-6, taking the exam
22    for E-7.
23    Q.   So when you reupped in the Navy around
```

Page 83

```
 1    1970, right -- I'm sorry, Coast Guard.  When
 2    you reupped in the Coast Guard around 1970,
 3    you came back in as an E-6?
 4    A.   Right.
 5    Q.   And then how long were you in the Coast
 6    Guard this stint?
 7    A.   I think six years, something like that.
 8    I can't remember the times.  I know it all
 9    totalled out to 20 years.
10    Q.   Okay.  Did you finish your military
11    career in the Coast Guard?
12    A.   Yes, sir.
13    Q.   And was that -- was that about 1978?
14    A.   Yes, sir.
15    Q.   And what was your rank when you retired
16    from the Coast Guard in '78?
17    A.   Chief, E-7.
18    Q.   How long had you been chief before you
19    retired?
20    A.   About a year.
21    Q.   And did you stay in the Naval Reserve in
22    some capacity?
23    A.   In the Coast Guard Reserve.
```

Page 84

```
 1    Q.   I'm sorry.  I keep doing it.  Coast
 2    Guard Reserve?
 3    A.   Yes.
 4    Q.   How long were you in the Coast Guard
 5    Reserve?
 6    A.   Well, you're in there from now on once
 7    you're retired.  They can still call you.
 8    Q.   Are you subject to recall today?
 9    A.   Yes, sir.
10    Q.   Have you thought about maybe dropping
11    out?  What do you have to do in the Coast
12    Guard Reserve?  You don't have to go to camp
13    every couple of months, do you?
14    A.   No, sir, you're just in the Reserve.
15    Q.   Do you get any kind of pay or anything
16    out of being in the Reserve to this day?
17    A.   No, sir.
18    Q.   Did you participate in any kind of
19    military function or job after you retired
20    when you got your 20 years, other than staying
21    in the Reserves?
22    A.   No, sir.
23    Q.   Did you -- have you had to do anything
```

21  (Pages 81 to 84)

# CLEVELAND G. KITE - VOLUME II

---

**254**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE SOUTHERN DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4  CIVIL ACTION NUMBER 2:11-CV-00444
5
6  CLEVELAND G. KITE,
7      Plaintiff,
8  vs.
9  BILL VANN COMPANY, INC.,
   et al.,
10
    Defendants.
11
12
13  VIDEO DEPOSITION TESTIMONY OF:
14  CLEVELAND G. KITE
15  (VOLUME 2, 254-526)
16  FOR TRIAL PRESERVATION
17  The Video Deposition of CLEVELAND G.
18  KITE, was taken before Kimberly B. Dowdy, CSR,
19  RPR, on Monday, January 23, 2012, at the
20  offices of HENDERSON & ASSOCIATES COURT
21  REPORTERS, Five North Royal Street, Suite 200,
22  Mobile, Alabama, commencing at 11:31 a.m.,
23  pursuant to the stipulations set forth herein:
24
25

---

**256**

1  FOR THE DEFENDANTS, DANA, INC. and COOPER
2  INDUSTRIES (presently not served):
3      HAWKINS, PARNELL, THACKSTON &
       YOUNG, LLP
4      BY: Ms. Catherine A. McCormack
5      4000 SunTrust Plaza
       303 Peachtree Street NE
6      Atlanta, Georgia 30308-3243
7  FOR THE DEFENDANT, DANA, INC.:
8      MCDOWELL, KNIGHT, ROEDDER &
       SLEDGE, LLC
9      BY: Mr. Walter T. Gilmer, Jr.
       11 North Water Street
10     Thirteenth Floor
       Battle House Tower
11     Mobile, Alabama 36602
12  FOR THE DEFENDANT, EATON CORPORATION:
13     MAYNARD, COOPER & GALE
       BY: Ms. Katherine A. Collier
14     2400 AmSouth/Harbert Plaza
       1901 6th Avenue North
15     Birmingham, Alabama 35203
16  FOR THE DEFENDANTS, JOHN CRANE, INC.,
    HONEYWELL INTERNATIONAL, and SEPCO:
17     HUIE, FERNAMBUCQ & STEWART
       BY: Mr. Frank E. Lankford, Jr.
18     Three Protective Center, Suite 300
       2801 Highway 280 South
19     Birmingham, Alabama 35223
20  FOR THE DEFENDANT, CBS:
21     HARRIS & HARRIS
       BY: Mr. James A. Harris, III
22     BB&T Bank Building, Suite 450
       2501 20th Place South
23     Birmingham, Alabama 35223
24
25

---

**255**

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      LAW OFFICE OF G. PATTERSON KEAHEY
       BY: Mr. G. Patterson Keahey
5      One Independence Plaza
       Suite 612
6      Birmingham, Alabama 35209
7  FOR THE DEFENDANT, BILL VANN COMPANY, INC.:
8      VICKERS, RIIS, MURRAY & CURRAN,
       LLC
9      BY: Mr. Timothy A. Clarke
       Regions Bank Building
10     56 Saint Joseph Street
       Eleventh Floor
11     Mobile, Alabama 36602-3489
12  FOR THE DEFENDANT, CRANE CO., AND GOULDS:
13     VICKERS, RIIS, MURRAY & CURRAN,
       LLC
14     BY: Mr. Mark L. Redditt
       Regions Bank Building
15     56 Saint Joseph Street
       Eleventh Floor
16     Mobile, Alabama 36602-3489
17  FOR THE DEFENDANT, HONEYWELL:
18     BALCH & BINGHAM
       BY: Jenelle D. Evans, Esquire
19     1901 Sixth Avenue North
       Suite 1500
20     Birmingham, Alabama 35203-4642
21
22  FOR THE DEFENDANTS, BUFFALO PUMPS, SCHNEIDER
    ELECTRIC, and FLOWSERVE/DURIRON, A.W.
23  CHESTERTON CO.:
       LAW OFFICE OF EDWARD B. MCDONOUGH,
24     JR.
       BY: Edward B. McDonough, Jr.
25     107 St. Francis Street

---

**257**

1  FOR THE DEFENDANT, GEORGIA-PACIFIC:
2      BURR & FORMAN
       BY: Mr. Allan R. Wheeler
3      3100 Wachovia Tower
       420 20th Street North
4      Birmingham, Alabama 35203
5  FOR THE DEFENDANT, MOTION INDUSTRIES:
       CAPELL & HOWARD
6      BY: Mr. Robert F. Northcutt
       150 South Perry Street
7      Montgomery, Alabama 36104
8
9  FOR THE DEFENDANT, NORTON COMPANY:
10     SPRAIN LAW FIRM
       BY: Mr. Robert H. Sprain, Jr.
11     1707 29th Court South
       Birmingham, Alabama 35209
12  FOR THE DEFENDANT VIKING & AURORA PUMPS:
13     FORMAN, PERRY, WATKINS, KRUTZ &
       TARDY, LLP
14     BY: Mr. James G. House, III
       City Centre, Suite 100
15     200 South Lamar Street
       Jackson, Mississippi
16     39201-4099
17  FOR THE DEFENDANTS, CATERPILLAR, INC. and
    GOODYEAR TIRE & RUBBER COMPANY VIA TELEPHONE:
18
19     BAKER, DONELSON, BEARMAN,
       CALDWELL & BERKOWITZ
20     BY: William L. Waudby
       1600 Wachovia Tower
21     420 20th Street North
       Birmingham, Alabama 35203
22  FOR THE DEFENDANT, UNION CARBIDE:
23     MAYNARD, COOPER & GALE
       BY: Gregg M. McCormick
24     2400 AmSouth/Harbert Plaza
       1901 6th Avenue North
25     Birmingham, Alabama 35203

---

1 (Pages 254 to 257)

**Exhibit B**

Case: MDL No. 875 Document 9979-9 Filed 02/13/15 Page 25 of 36
Case 2:11-cv-00447-WS-N Document 132-E Filed 02/16/15 Page 26 of 3

CLEVELAND G. KITE - VOLUME II

1  other crafts were using it, and it looked
2  just like the same stuff that we used in the
3  military.
4      Q.   But it could have been from any
5  number of companies, couldn't it?
6      A.   It could have, yes, sir.
7      Q.   And the same question goes with
8  John Crane.  You can't tell me, Frank, I
9  remember putting on a John Crane gasket or
10  installing John Crane packing on the
11  Wisconsin; you can't say that, can you?
12     A.   No, sir.
13         MR. KEAHEY:  Let me object to the
14  form.
15         MR. LANKFORD:  You got his answer
16  out, didn't you?
17         COURT REPORTER:  Yes, I did, sir.
18     Q.   (BY MR. LANKFORD) Mr. Kite, I
19  don't know whether you know this or not, but
20  do you know, or did anybody ever tell you, or
21  did you ever learn that both SEPCO and John
22  Crane quit selling asbestos-containing gaskets
23  or packing in the mid '80s; did you know that?
24     A.   No, sir.
25     Q.   So the gaskets and packing that

290

1  form.
2      Q.   I'm talking about a box that the
3  products came in?
4      A.   Right.
5      Q.   You can't remember that, can you?
6         MR. KEAHEY:  Let me object to the
7  form.  It clearly misstates his prior
8  testimony.
9      A.   They had the boxes and stuff on
10  there, but like I said, I worked -- didn't
11  work with the systems.
12     Q.   Yes, sir.  You never ordered it?
13     A.   No, sir.
14     Q.   And you never read the warnings
15  that might have been on those boxes, did you?
16     A.   No, sir.
17     Q.   If the John Crane or SEPCO box
18  might have had a warning on it, you never saw
19  it, did you?
20     A.   No, sir.
21     Q.   When you remove old gasket
22  material from a pipefitting or flange, you
23  can't tell who made the old gasket, can you?
24  No way to tell by looking at it?
25     A.   Back when I was in the military

292

1  you did remember seeing on the Wisconsin in
2  late 1988, they may not have even contained
3  asbestos; isn't that right?
4         MR. KEAHEY:  Let me object to the
5  form.  Calling for speculation.  He doesn't
6  have to speculate.
7      Q.   If he knows.  Do you know whether
8  they contained asbestos or not?
9      A.   No, sir, I don't --
10     Q.   Fair enough.
11     A.   -- for the simple fact that the
12  military stores things.  They get supplies
13  from years back, so we cannot say that they
14  didn't have it because they come from parts
15  that the military stores and keeps and stores
16  for emergencies.
17     Q.   And there's no telling who -- how
18  many companies supplied the gaskets or
19  packing, is it?
20     A.   No, sir.
21     Q.   And you can't remember, Mr. Kite,
22  ever seeing either a SEPCO or a John Crane
23  packaging container during those six months on
24  the Wisconsin, can you?
25         MR. KEAHEY:  Let me object to the

291

1  I could because we replaced everything the
2  same.
3      Q.   Well, if you had put it on I
4  agree.  If you had put it on and you removed
5  it, you could say, well, that's the same
6  gasket I put on six months ago.
7      A.   Yes, sir.
8      Q.   I understand that.  But if you
9  hadn't put it on there's no way you could tell
10  by looking at old gasket material, is there?
11     A.   Yes, sir, because they had the
12  same thing.  It came the same way in the same
13  packaging, and that was like I said, the
14  supplies that the military had, it came the
15  same way.
16     Q.   And again, just so the record is
17  clean about this, your last military service
18  was in 1978?
19     A.   Yes.
20     Q.   Okay.  Let me talk to you for just
21  a second about Cooper-Bessemer.
22     A.   Yes, sir.
23     Q.   You mentioned in your earlier
24  deposition that you think you recall or did
25  recall seeing a Cooper-Bessemer diesel engine,

293

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969

# CLEVELAND G. KITE - VOLUME II

**Page 294**

1  I believe you said, on the Coast Guard vessel.
2  This was the Coast Guard cutter that you
3  served on in 1958. Do you remember that?
4  　　A.　Yes.
5  　　Q.　And that is -- best I can tell
6  that's the only time you ever worked either
7  with or around a Cooper-Bessemer engine?
8  　　A.　Yes, sir.
9  　　Q.　Let me talk to you for just a
10  second about Gorman-Rupp. I also represent
11  Gorman-Rupp. Gorman-Rupp, Mr. Kite, I don't
12  know whether you know this or not, but they
13  make a number of various pumps. Some of them
14  are water pumps, some of them are sewage pumps
15  and the like.
16  　　Did you know that?
17  　　A.　Yes, sir.
18  　　Q.　And the only time I remember you
19  talking about Gorman-Rupp you telling us
20  that the last time you ever worked with or
21  around any Gorman-Rupp product would have been
22  in 1978 when you left the US Naval service?
23  　　A.　Yes, sir.
24  　　Q.　Okay. And insofar as Gorman-Rupp,
25  you never personally disassembled or serviced

**Page 295**

1  any Gorman-Rupp pump, did you?
2  　　A.　Yes, sir, I did.
3  　　Q.　This was in the Navy years?
4  　　A.　No. It was Coast Guard/Navy
5  years.
6  　　Q.　That's what I mean.
7  　　A.　Yes, sir.
8  　　Q.　Prior to 1978?
9  　　A.　Yes, sir.
10  　　Q.　And you wouldn't know who supplied
11  the gasket material or the packing material on
12  any Gorman-Rupp pump that you may have worked
13  with or around, do you?
14  　　A.　Back then I did. It was SEPCO,
15  and the Chesterton, and also Victor.
16  　　Q.　Okay. Are you saying that on a
17  Gorman-Rupp pump back in the 1970's the gasket
18  material might have been either SEPCO, or
19  Chesterton, or Victor?
20  　　MR. McDONOUGH: Object to the
21  form.
22  　　A.　Not '70. In the '50 --
23  　　Q.　In the '50s?
24  　　A.　Yeah, when I was working on --
25  you talking about when I was working on the

**Page 296**

1  Salvia?
2  　　Q.　Yes, sir. And that is in 1958?
3  　　A.　Yes, sir. These ships, yes,
4  sir.
5  　　Q.　All right, sir. And that's the
6  last time you remember servicing or working on
7  a Gorman-Rupp pump?
8  　　A.　No, sir. All the ships had them
9  on it.
10  　　Q.　I thought you told me in your
11  deposition on page 230 that the last time you
12  worked with a Gorman-Rupp pump was in your
13  prior -- prior to 1978; is that still
14  accurate?
15  　　A.　Yes, sir, it is. We had them on
16  all the ships, all these pumps.
17  　　Q.　And you don't know whether the
18  gasket or packing material on these
19  Gorman-Rupp pumps contained asbestos, do you?
20  　　A.　Yes, sir, I do know it.
21  　　Q.　How do you know that?
22  　　A.　Because when they came they had
23  the coloring to them, the slickness to them,
24  and the manuals that we had, they stated what
25  the material was made of.

**Page 297**

1  　　Q.　Do you remember reading a
2  Gorman-Rupp manual?
3  　　A.　Well, I can't remember
4  everything that I read about, but we had --
5  all these parts on a ship, pumps, engines,
6  everything has got a manual with it.
7  　　Q.　Right.
8  　　A.　And they tell you everything
9  about it. They tell you what is required to
10  use, tell you how to repair it, tells you how
11  to order parts, it has a part list in the
12  back, and everything with that system.
13  　　Q.　Do you remember, Mr. Kite, that
14  Gorman-Rupp pumps, many of them, I'm not
15  saying all of them, but many of them don't
16  even contain or don't even use gaskets but
17  rather are mechanically sealed?
18  　　A.　I don't know what you're talking
19  about. Yes, sir.
20  　　Q.　And a mechanically sealed
21  Gorman-Rupp pump would have no gasket?
22  　　A.　Right. But I never worked on
23  one like that. The one that I worked on had
24  the packing on it.
25  　　Q.　Now, there's a difference between

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969

## CLEVELAND G. KITE

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE SOUTHERN DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4
5    CIVIL ACTION NUMBER
6    2:11-CV-00444
7
8    CLEVELAND G. KITE,
9        Plaintiff(s),
10   vs.
11   BILL VANN COMPANY, INC., et al.,
12       Defendant(s).
13
14
15   VIDEO DEPOSITION TESTIMONY OF:
16       CLEVELAND G. KITE
17       FOR TRIAL PRESERVATION
18
19   November 16, 2011
20   11:24 a.m.
21
22   COURT REPORTER:
23   DEBORAH B. BRADEN, CCR
24
25

1

1    the Alabama Rules of Civil Procedure, as
2    amended, effective May 15, 1988, I, Deborah B.
3    Braden, am hereby delivering to G. Patterson
4    Keahey the original transcript of the oral
5    testimony taken November 16, 2011, along with
6    exhibits.
7        Please be advised that this is the
8    same and not retained by the Court Reporter, nor
9    filed with the Court.
10
11
12
13   EXAMINATION INDEX
14
15   CLEVELAND KITE
16   BY MR. KEAHEY            15
17
18
19
20
21
22
23
24
25

3

1    S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED, by
3    and between the parties through their respective
4    counsel, that the deposition of CLEVELAND G.
5    KITE may be taken before Deborah B. Braden,
6    Certified Court Reporter and Notary Public,
7    State at Large, at the offices of HENDERSON &
8    ASSOCIATES COURT REPORTERS, Mobile, Alabama, on
9    November 16, 2011, commencing at 11:24 a.m.
10       IT IS FURTHER STIPULATED AND
11   AGREED that the signature to and the reading of
12   the deposition by the witness is waived, the
13   deposition to have the same force and effect as
14   if full compliance had been had with all laws
15   and rules of Court relating to the taking of
16   depositions.
17       IT IS FURTHER STIPULATED AND
18   AGREED that it shall not be necessary for any
19   objections to be made by counsel to any
20   questions, except as to form or leading
21   questions, and that counsel for the parties may
22   make objections and assign grounds at the time
23   of trial or at the time said deposition is
24   offered in evidence, or prior thereto.
25       In accordance with Rule 5(d) of

2

1
2
3        EXHIBIT INDEX
4                        PAGE
5    Plaintiff's
6    1    List of Ships and Jobs            22
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25                **Exhibit C**

4

1 (Pages 1 to 4)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

## CLEVELAND G. KITE

1 had that maintenance system scheduled, then you
2 work on it, and you wouldn't try to put
3 everything back in one day. You just go through
4 the whole system and make sure everything is
5 okay.
6   Q.   All right. And did you ever see
7 any kind of dust created when you worked on a
8 Cummins engine?
9   A.   Yes, sir.
10   Q.   And did you breathe that dust?
11   A.   Yes, sir.
12   Q.   And how often did you breathe it?
13   A.   Whenever we worked on them.
14   Q.   Okay. And based on what you know
15 today, do you believe these Cummins engines
16 contained or used asbestos in any -- any manner?
17   A.   Yes, sir.
18     MR. CLARKE: Object to the
19 form.
20   Q.   And why do you say that?
21     MR. CLARKE: Object to the
22 form.
23   A.   Because I know now the gaskets and
24 things that they used was asbestos gaskets, and
25 the lagging, they called it, around the pipe

81

1   A.   Now I know, but back then I
2 didn't.
3   Q.   Okay. And did you ever see other
4 folks working on these Cummins engines in your
5 career?
6   A.   Yes, sir.
7   Q.   All right. And when they would
8 work on the Cummins engines, did you see any
9 dust created?
10   A.   Yes, sir.
11   Q.   And did you breathe that dust?
12   A.   Yes, sir.
13   Q.   And do you believe that those
14 engines also contained asbestos?
15   A.   Yes, sir.
16     MR. CLARKE: Object to the
17 form.
18   Q.   Let's go to Cooper. You mentioned
19 Cooper Bessemer. Can you tell us why you recall
20 the name Cooper Bessemer?
21     MR. LANKFORD: Object to form.
22   A.   Yes, sir.
23   Q.   All right.
24   A.   It was the first ship I worked
25 on. It was the US -- the Coast Guard Cutter

83

1 systems and things, where the heat was at was
2 asbestos.
3     MR. WETZLER: Move to strike
4 (inaudible). Speculation.
5   Q.   And when you worked with these
6 Cummins engines and -- you mentioned one ship.
7 Can you -- Do you recall right now where --
8 where all -- what ships and/or places you ever
9 saw Cummins engines used -- or boats?
10   A.   Yes, sir. It was on the Point
11 Verde off of Dauphin Island, and it was an
12 82-footer. And I was the chief engineer. And
13 the Base of Mobile, they had them on the
14 40-footers, and some of the other bases where --
15 had 40-footers, like in Great Lakes up at Lake
16 Erie. I was at a Coast Guard station. The
17 40-footers had Cummins on them -- I mean,
18 General Motors on them.
19   Q.   Okay.
20   A.   But the blankets and everything
21 that went to these engines was all asbestos
22 blankets.
23   Q.   All right. How did you know they
24 were asbestos blankets that went with the
25 engines?

82

1 Salvia. In 1958 is when I was assigned at the
2 Base of Mobile at Choctaw Point. It had two
3 Cooper Bessemer engines on it.
4   Q.   Well, can you tell us about that,
5 why you -- why you -- what --
6   A.   Well --
7   Q.   Did your job involve working on
8 those engines in any way?
9   A.   Yes, sir. I was a fireman. And
10 the fireman, that's the lowest rate in the
11 service you -- you go, and then learn your rates
12 from working on these engines at schools. And I
13 remember the -- really good about the starboard
14 engine. It kept blowing a piston for some
15 reason. We'd be underway, and I could hear the
16 thing break down. And I know it'd be about 18
17 hours' work when these things blew a piston.
18 You've got to go down and take the heads off and
19 then take the whole assembly out -- piston off
20 of the crank case. Then you had to change all
21 the lube oil because of metals in the lube oil.
22 So it took sometimes 18 hours to do this work.
23   Q.   All right. And how did you know
24 it was a Cooper Bessemer engine?
25   A.   Because it had a nameplate on it,

84

21 (Pages 81 to 84)

CLEVELAND G. KITE

| | |
|---|---|
| 1  and, of course, I studied engines, and the | 1      A.   Yes, sir. |
| 2  training -- people that trained me, you know, | 2           MR. LANKFORD:  Object to the |
| 3  told me what kind they was. | 3  form. |
| 4      Q.   All right.  And did you ever -- do | 4      Q.   And did you ever breathe that |
| 5  you recall seeing any dust created in any way | 5  dust? |
| 6  when you worked on these Cooper Bessemer | 6      A.   Yes, sir. |
| 7  engines? | 7      Q.   How would you quantify?  How often |
| 8           MR. LANKFORD:  Object to the | 8  did that happen? |
| 9  form. | 9      A.   Well, anytime they worked on |
| 10     A.   Yes, sir. | 10 anything.  An engine room on a ship is always |
| 11     Q.   And why was that? | 11 hot; it's always dirty.  And anything you take |
| 12     A.   Because the exhaust system had | 12 off of a piece of equipment that's got asbestos |
| 13 gaskets and stuff you had to clean off.  The | 13 or anything in it, it stays down there.  You |
| 14 piping system, anything to do with heat in the | 14 know, you have blowers coming in to keep the |
| 15 engine rooms, you've got asbestos covering on | 15 engine room cool, but it's still real hot, and |
| 16 it. | 16 it's still dirty and nasty and everything from |
| 17     Q.   All right. | 17 upside.  And then all the engine room -- This |
| 18     A.   And all the pipes and things in | 18 air is always circulating.  Anytime you're |
| 19 a -- on a ship, every pipe overhead and | 19 underway, you've -- you've got dust and dirt. |
| 20 everywhere it goes, it's got an asbestos | 20 And all the equipment that we worked on, the |
| 21 covering on it to protect it, plus to keep the | 21 pipes or sometimes the bulkheads, they had the |
| 22 heat or the fluid or whatever is running through | 22 sheetings on it.  And it'd come aloose, and we'd |
| 23 it cool or -- or keep it from being real hot in | 23 have to cut some out of it or work on it that |
| 24 the engine room. | 24 had asbestos in it. |
| 25     Q.   And when you saw this dust created | 25     Q.   All right.  And let's move on now |
| 85 | 87 |
| 1  in association with the work you did on the | 1  to another company that you said you associated |
| 2  Cooper Bessemer engines, did you breathe that | 2  with engines and diesel engines.  And I think |
| 3  dust? | 3  you called out the name Pratt Whitney -- |
| 4      A.   Yes, sir. | 4      A.   Yes, sir. |
| 5           MR. LANKFORD:  Object to the | 5      Q.   -- is that correct? |
| 6  form. | 6      Now, why do you recall the name Pratt |
| 7      Q.   How often did you breathe it? | 7  Whitney? |
| 8      A.   Whenever we worked on them. | 8      A.   Pratt Whitney is the jet engine we |
| 9      Q.   How often did you -- Did you ever | 9  had on the ship.  We had two of them, one on the |
| 10 see other people work on a Cooper Bessemer | 10 port side and one on the starboard side.  And if |
| 11 engine? | 11 the ship came into an emergency situation |
| 12     A.   Yes, sir. | 12 that -- that we needed to be underway with a lot |
| 13     Q.   Did they do that around you? | 13 more speed, they'd use these gas turbine |
| 14     A.   Yes, sir. | 14 engines. |
| 15     Q.   How often, in general, did that | 15     Q.   All right.  And what type of |
| 16 happen? | 16 engines were these Pratt Whitney engines, if you |
| 17     A.   It -- Like I say, the -- the | 17 know? |
| 18 maintenance systems we had to do, you had take | 18     A.   They're jet engines. |
| 19 all this stuff off, had to replace the gaskets | 19     Q.   All right.  And how did you know |
| 20 and the blanket and everything and the piping | 20 they were Pratt Whitney? |
| 21 a -- associated with it. | 21     A.   Because it has a plate on it, and |
| 22     Q.   And when they worked on these | 22 plus I went to school.  They trained us on it. |
| 23 Cooper -- When these other folks worked on | 23     Q.   All right.  And what kind of |
| 24 Cooper Bessemer engines around you, did you see | 24 school did you go to? |
| 25 the dust created in the -- | 25     A.   A Pratt Whitney -- They had it on |
| 86 | 88 |

22  (Pages 85 to 88)

Case 2:11-cv-00444-WS-N Document 9979-9 Filed 02/13/15 Page 30 of 36
Case 2:11-cv-00444-WS-N Document 132-4 Filed 02/16/159 Page 130 6
Case 2:11-cv-67753-ER Document 211 Filed 08/11/14 Page 1 of 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLEVELAND G. KITE,                    :    CONSOLIDATED UNDER
                                      :    MDL 875
                                      :
    Plaintiff,                        :    Transferred from the
                                      :    Southern District of
    v.                                :    Alabama
                            FILED     :    (Case No. 11-00444)
                                      :
BILL VANN COMPANY, INC., AUG 11 2014       E.D. PA CIVIL ACTION NO.
ET AL.,                                    2:11-67753-ER
                        MICHAEL E. KUNZ, Clerk
                        By___ _____ Dep. Clerk
    Defendants.                       :

                            O R D E R

        **AND NOW**, this **8th** day of **August, 2014**, it is hereby

**ORDERED** that the Motion for Summary Judgment of Defendant Cameron

International Corporation (Doc. No. 33) is **DENIED**.[1]

_____

        [1]    This case was transferred in November of 2011 from the
United States District Court for the Southern District of Alabama
to the United States District Court for the Eastern District of
Pennsylvania as part of MDL-875.

        Plaintiff alleges that Decedent Cleveland Kite
("Decedent" or "Mr. Kite") was exposed to asbestos, inter alia,
while serving in the U.S. Navy and the Coast Guard from 1962 to
1978, and from 1988 to 1989, while Decedent worked on the
restoration of the USS Wisconsin. Defendant Cameron International
Corporation ("Cameron" or "Cameron International") is being sued
in connection with engines manufactured by its predecessor
(Cooper Bessemer). The alleged exposure pertinent to Defendant
Cameron occurred during Decedent's work aboard:

        • USCGC Salvia

        Mr. Kite was diagnosed with mesothelioma in 2011 and
passed away as a result of his disease. Plaintiff asserts that
Mr. Kite developed mesothelioma as a result of asbestos exposure
for which Defendant is liable. Mr. Kite was deposed in this
action in November of 2011.

**Exhibit D**

Plaintiff brought claims against various defendants. Defendant Cameron has moved for dismissal of the case or, in the alternative, summary judgment, arguing that (1) Plaintiff's complaint does not adequately put it on notice that it is pursuing successor liability against it, (2) it is entitled to summary on grounds of the Alabama statute of limitations.

The parties assert that Alabama law applies.

## I. Legal Standard

### A. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

### B. The Applicable Law

The parties assert that Alabama law applies. However, where a case sounds in admiralty, application of a state's law (including a choice of law analysis under its choice of law rules) would be inappropriate. Gibbs ex rel. Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 131-32 (3d Cir. 2002). Therefore, if

2

the Court determines that maritime law is applicable, the analysis ends there and the Court is to apply maritime law. <u>See id.</u>

Whether maritime law is applicable is a threshold dispute that is a question of federal law, <u>see</u> U.S. Const. Art. III, § 2; 28 U.S.C. § 1333(1), and is therefore governed by the law of the circuit in which this MDL court sits. <u>See</u> <u>Various Plaintiffs v. Various Defendants ("Oil Field Cases")</u>, 673 F. Supp. 2d 358, 362 (E.D. Pa. 2009)(Robreno, J.). This court has previously set forth guidance on this issue. <u>See</u> <u>Conner v. Alfa Laval, Inc.</u>, 799 F. Supp. 2d 455 (E.D. Pa. 2011)(Robreno, J.).

In order for maritime law to apply, a plaintiff's exposure underlying a products liability claim must meet both a locality test and a connection test. <u>Id.</u> at 463-66 (discussing <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527, 534 (1995). The locality test requires that the tort occur on navigable waters or, for injuries suffered on land, that the injury be caused by a vessel on navigable waters. <u>Id.</u> In assessing whether work was on "navigable waters" (i.e., was sea-based) it is important to note that work performed aboard a ship that is docked at the shipyard is sea-based work, performed on navigable waters. <u>See</u> <u>Sisson v. Ruby</u>, 497 U.S. 358 (1990). This Court has previously clarified that this includes work aboard a ship that is in "dry dock." <u>See</u> <u>Deuber v. Asbestos Corp. Ltd.</u>, No. 10-78931, 2011 WL 6415339, at *1 n.1 (E.D. Pa. Dec. 2, 2011)(Robreno, J.)(applying maritime law to ship in "dry dock" for overhaul). By contrast, work performed in other areas of the shipyard or on a dock, (such as work performed at a machine shop in the shipyard, for example, as was the case with the Willis plaintiff discussed in <u>Conner</u>) is land-based work. The connection test requires that the incident could have "'a potentially disruptive impact on maritime commerce,'" and that "'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" <u>Grubart</u>, 513 U.S. at 534 (citing <u>Sisson</u>, 497 U.S. at 364, 365, and n.2).

Locality Test

If a service member in the Navy performed some work at shipyards (on land) or docks (on land) as opposed to onboard a ship on navigable waters (which includes a ship docked at the shipyard, and includes those in "dry dock"), "the locality test is satisfied as long as some

3

portion of the asbestos exposure occurred on a vessel on navigable waters." <u>Conner</u>, 799 F. Supp. 2d at 466; <u>Deuber</u>, 2011 WL 6415339, at *1 n.1. If, however, the worker never sustained asbestos exposure onboard a vessel on navigable waters, then the locality test is not met and state law applies.

<u>Connection Test</u>

When a worker whose claims meet the locality test was primarily sea-based during the asbestos exposure, those claims will almost always meet the connection test necessary for the application of maritime law. <u>Conner</u>, 799 F. Supp. 2d at 467-69 (citing <u>Grubart</u>, 513 U.S. at 534). This is particularly true in cases in which the exposure has arisen as a result of work aboard Navy vessels, either by Navy personnel or shipyard workers. <u>See id.</u> But if the worker's exposure was primarily land-based, then, even if the claims could meet the locality test, they do not meet the connection test and state law (rather than maritime law) applies. <u>Id.</u>

It is undisputed that Decedent's alleged exposure to Defendant's product(s) occurred while aboard a ship. Therefore, this exposure was during sea-based work. <u>See</u> <u>Conner</u>, 799 F. Supp. 2d 455. Accordingly, maritime law is applicable to Plaintiff's claims against Defendant. <u>See</u> <u>id.</u> at 462-63.

## II.   Defendant Cameron's Motion for Summary Judgment

### A.  Defendant's Arguments

<u>Successor Liability</u>

In its motion, Defendant argued that it was entitled to dismissal of the case for lack of adequate notice of Plaintiff's intention to pursue successor liability against it.

With its reply brief, it appears that Defendant has abandoned this challenge.

<u>Statute of Limitations</u>

Defendant argues that, under Alabama law, any claims arising from asbestos exposure prior to 1979 are barred by a one-year statute of limitations. Specifically, it contends that since

Case: MDL No. 875 Document 9979-3 Filed 03/13/15 Page 34 of 36
Case 2:11-cv-00474-WS-C Document 132-1 Filed 02/16/15 Page 5 of 6
Case 2:11-cv-67753-ER Document 211 Filed 08/11/14 Page 5 of 6

all of Plaintiff's evidence pertains to alleged exposure that
occurred prior to 1979 - and since this action was not filed
until approximately thirty (30) years later - it is entitled to
summary judgment.

### B. Plaintiff's Arguments

Successor Liability

        In response to Defendant's motion to dismiss for lack
of adequate notice of Plaintiff's intention to pursue successor
liability against it, Plaintiff moved for leave to amend her
complaint to correct the alleged deficiency. (Doc. No. 35.) By
Order dated November 5, 2012, this Court granted Plaintiff's
motion to amend. (Doc. No. 121.)

Statute of Limitations

        Plaintiff contends that the applicable statute of
limitations is that set forth in Comprehensive Environmental
Response, Compensation and Liability Act of 1980 ("CERCLA"),
which Plaintiff contends has pre-empted the Alabama statute of
limitations that would otherwise be applicable.

### C. Analysis

Successor Liability

        It appears from Defendant's reply brief that it has
abandoned its challenge to the adequacy of notice provided by
Plaintiff regarding her intention to pursue successor liability
against Defendant. To be sure, however, the Court has reviewed
the amendment (see Doc. Nos. 35 and 121) and has determined that
Plaintiff's second amended complaint provides adequate notice. As
such, Defendant's motion to dismiss is now denied as moot.

Statute of Limitations

        Defendant contends that Plaintiff's claims are barred
by Alabama's statute of limitations for asbestos-related claims.
Having determined that maritime law - not Alabama law - governs
Plaintiff's claims against Defendant, the Alabama statute of
limitations is inapplicable and Defendant is therefore not
entitled to summary judgment on that basis. See Anderson, 477
U.S. at 248. Accordingly, Defendant's motion for summary judgment
on grounds of the statute of limitations is denied.

Case MDL No. 875 Document 9979-2 Filed 02/13/15 Page 35 of 36
Case 2:11-cv-00445-WS-N Document 132-4 Filed 02/16/15 Page 6 of 6
Case 2:11-cv-67753-ER   Document 211   Filed 08/11/14   Page 6 of 6

E.D. Pa. No. 2:11-67753-ER        **AND IT IS SO ORDERED.**


/ **EDUARDO C. ROBRENO**, J.

---

### D.   Conclusion

      Defendant's motion to dismiss is denied as moot because Plaintiff was granted leave to amend her complaint, providing Defendant with specific notice of Plaintiff's intention to pursue successor liability.

      Summary judgment in favor of Defendant on grounds of the Alabama statute of limitations is denied because Plaintiff's claims are governed by maritime law rather than Alabama law.

6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| **VALERIE K. PRESLEY, as Personal** | ) | |
| **Representative for the Estate of** | ) | |
| **Cleveland G. Kite, deceased,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 11-00444-WS-N |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BILL VANN COMPANY, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## Order Granting Defendant Cameron International
## Corporation's Motion for Summary Judgment

This matter is before the Court on Defendant Cameron International Corporation's Motion for Summary Judgment. Upon consideration of the parties' written submissions, the Court hereby finds that the Defendant's motion is due to be **GRANTED**. Judgment is entered in favor of Cameron International Corporation as to all pending claims. The Court further finds that there is no just reason for delay and expressly enters a **FINAL JUDGMENT** pursuant to Rule 54(b), *Federal Rules of Civil Procedure*.

DONE and ORDERED this ____ day of _____, 2015.

_____
Hon. Katherine P. Nelson
United States Magistrate Judge