# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **VALERIE K. PRESLEY, as Personal** | ) | |
| **Representative for the Estate of** | ) | |
| **Cleveland G. Kite, deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No:** |
| | ) | **11-00444-WS-N** |
| | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **BILL VANN COMPANY, INC., ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## Plaintiff's Motion to Modify Rule 16(b) Scheduling Order
## Pursuant to Fed. R. Civ. P. 16(b)(4)

Comes now the Plaintiff and files her Motion to Modify the Court's Rule 16(b)

Scheduling Order entered on February 27, 2015 (Doc. 140) as follows:

1.      In paragraph 9 of the Rule 16(b) Scheduling Order the court held:

> <u>DISPOSITIVE MOTIONS</u>. Motions for summary judgment and any other
> dispositive motions, especially those that require little or no discovery, are
> to be filed as soon as possible but in no event later than **Friday, July 10,**
> **2015**.  The motions for summary judgment filed by Defendant Cummins,
> Inc. and Cameron International Corp. (Docs. 130 – 132) prior to the entry
> of this Scheduling Order remain subject to the briefing schedule set by
> Chief Judge Steele (Doc. 136).

2.      On March 3, 2015, in response to the Plaintiff's Motion for Clarification of Rule

16(b) Scheduling Order (Doc. 141)[1], the Court entered the following order:

> Accordingly, it is ORDERED that the Plaintiff's motion (Doc. 141) is
> GRANTED and that section 9 of the Court's Scheduling Order (Doc. 140
> at 8-9) is AMENDED to include the following additional provision:

---

[1] The Plaintiff's motion was determined to be a Motion to Modify Rule 16(b) Scheduling Order
pursuant to Fed. R. Civ. P. 16(b)(4).

Case MDL No. 875 Document 10020-15 Filed 03/27/15 Page 2 of 47

> No party is permitted to raise in any dispositive motion any matter or issue that was previously raised and ruled on by the court while this action was pending in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania (MDL No. 875). Notwithstanding this limitation, no party shall be prevented from properly seeking relief from, see Fed. R. Civ. P. 60, or reconsideration of a previous court order or decision, see Fed. R. Civ. P. 54(b) (Unless the court has directed the "entry of final judgment as to one or more, but fewer than all, claims or parties… any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). Any motion for relief from or reconsideration of a previous order or decision must be made by separate motion. The parties are advised to closely review Nelson v. Whirlpool Corp., 668 F. Supp. 2d 1368, 1379-80 (S.D. Ala. 2009) (Steele, J.) regarding the propriety of motions to reconsider.

3.     When this case was in the United States District Court for the Eastern District of Pennsylvania (MDL - 875), the defendants filed numerous motions for summary judgment on a variety of grounds including: (a) the Alabama statute of limitations; (b) insufficient product identification; (c) causation; (d) Bare Metal Defense; and (e) Government Contractor Defense.  The Plaintiff filed oppositions to all of the dispositive motions. J. Robreno (MDL – 875) granted numerous dispositive motions, but denied those filed by the remaining defendants shortly before the case was remanded.  The defendants then filed motions to reconsider the denial of their motions for summary judgment that were considered by the court and denied.  All of the above were filed in accordance with the scheduling order entered by the court requiring that all dispositive motions be filed on or before October 10, 2010.

4.     Defendants Cummins, Inc. and Cameron International Corp. filed motions for summary judgment on the grounds of the Alabama statute of limitations.  Although they

had the same opportunity as all other defendants to conduct discovery and file motions for summary judgment on additional grounds prior to the deadline of October 10, 2012, they chose not to do so and, therefore, waived their right to file said motions. *See, e.g., Dedge v. Kendrick*, 849 F.2d 1398 (11th Cir. 1988).

5.      Without first obtaining leave of court, Cummins, Inc. and Cameron International Corp. filed new dispositive motions in this Court shortly after this action was remanded and prior to the status hearing of February 24, 2015. These motions were filed in direct violation of the transferee court's orders and in direct contradiction to the representations those Defendants made to that court as referenced in the Judicial Panel's Separation of Claims and Remand Order of February 4, 2015.[2]

6.      The fact that these motions were filed shortly after remand, prior to the status conference and even prior to the Court's Rule 16(b) Scheduling Order approving additional, limited discovery by the defendants, serves as clear and convincing evidence that the Defendants' motions could have and should have been filed pursuant to the original scheduling order in this case (on or before October 10, 2012). At the status hearing of February 24, 2015, though, Defendants Cummins, Inc. and Cameron International Corp. asserted that they were surprised by Judge Robreno's application of maritime law to the decedent's claims. They further suggested that they would have filed their motions before J. Robreno prior to the October 10, 2012 deadline but for their lack of knowledge that maritime law would be applied to the decedent's claims.

7.      The Plaintiff, however, has recently learned that the Defendants' representations of genuine surprise as to the application of maritime law by J. Robreno is without merit.

---

[2] *See* Exhibit "A".

Plaintiff attaches hereto a Notice of Intent to Rely on Foreign Law filed by John Crane, Inc., one of the defendants in this case prior to remand.[3] While the motion is filed in state court, John Crane, Inc., like all of the asbestos defendants as well as their counsel, regularly appear in cases pending before J. Robreno. The defendant accurately represents the following:

> Courts have routinely held that federal maritime law applies to tort claims arising from asbestos exposures that allegedly occurred aboard a naval vessel. *See, e.g., Conner v. Alfa Laval, Inc.,* 799 F. Supp.2d 455, 45 8-59 (E.D. Pa. 2011)[4]; (additional citations omitted). In *Conner,* Judge Eduardo C. Robreno addressed the application of federal maritime law to guide all litigants in the federal asbestos multi-district litigation (MDL-875) and held that "the maritime jurisdiction test requires the Court to apply maritime law to those claims involving plaintiffs who were sea-based Navy workers where the allegedly defective product was produced for use on a vessel." *Conner,* 799 F. Supp.2d at 458-59 (emphasis added). Plaintiffs' claims and allegations against John Crane Inc. squarely meet the standard set forth in *Conner* because Mr. Ament was a "sea-based Navy worker" and because the alleged John Crane Inc. products to which Plaintiffs claim Mr. Ament was exposed were clearly "produced for use on a vessel." *Id.* (emphasis original)

> Accordingly, for the foregoing reasons, this Court must apply federal maritime law to all substantive matters, including damages, as to Plaintiffs' allegations against John Crane Inc. in the above-captioned matter.[5]

7.     J. Robreno opined well prior to the summary judgment deadline of October 10, 2012 that MDL - 875 will and, indeed, must apply maritime law to all claims involving "sea-based Navy workers where the allegedly defective product was produced for use on a vessel." Consequently, the Defendant's assertions of genuine surprise that maritime law would be applied by MDL - 875 to the decedent's sea-based exposure while working

---

[3] *See* Exhibit "B".
[4] *Conner v. Alfa Laval, Inc.,* 799 F. Supp.2d 455 (E.D. Pa. 2011) is attached hereto as Exhibit "C".
[5] *See* Exhibit "B" at page 4, paragraphs 6 and 7. *Conner v. Alfa Laval, Inc.,* 799 F. Supp.2d 455 (E.D. Pa. 2011) is attached hereto as Exhibit "C".

for the Navy are without merit. Therefore, their motions for summary judgment filed

prior to this Court's Rule 16(b) Scheduling Order are due to be denied based upon waiver

and/or as untimely. *Id*.

8.      The Defendants Cummins, Inc. and Cameron International Corp. have failed to

establish a justifiable basis to be allowed to file motions for summary judgment in this

Court that they failed to timely file while this action was before MDL - 875. *See, e.g.,*

*Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279-80 (E.D. Pa. 2010).

> By contrast, where a party seeks to amend its pleadings after a deadline set by
> court order, the decision whether to allow the amendment is controlled by Rule
> 16(b).[2] Under Rule 16(b), the party seeking the amendment is effectively asking
> the court not only for leave to amend its pleadings, but also the scheduling order.
> Because the party's request now implicates the effective administration of justice,
> the party must show good cause in order to procure the court's consent. Once the
> court files a pretrial scheduling order, pursuant to Rule 16 which established a
> timetable for amending pleadings, that rule's standards control. *See* Fed.R.Civ.P.
> 16(e).
>
> While the Third Circuit has not explicitly addressed how to reconcile the
> differences in the standards between Rules 15(a) and 16(b) ("prejudice" and
> "good cause"), this Court has held that "once the pretrial scheduling order's
> deadline for filing motions to amend the pleadings has passed, a party must, under
> Rule 16(b), demonstrate 'good cause' for its failure to comply with the scheduling
> order before the trial court can consider, under Rule 15(a), the party's motion to
> amend its pleading." *Chancellor v. Pottsgrove Sch. Dist.,* 501 F.Supp.2d 695, 701
> (E.D.Pa.2007) (Robreno, J.) (citing to seven Circuit courts in applying the " good
> cause" standard to a motion for leave to amend the pleadings after a scheduling
> order deadline had passed); *see also Componentone, L.L.C. v. Componentart, Inc.,*
> No. 05-1122, 2007 WL 2580635, at *2 (W.D.Pa. Aug. 16, 2007) (same). Indeed,
> this Court has already concluded the Third Circuit would likely come to the same
> conclusion. *Chancellor,* 501 F.Supp.2d at 701; *see also E. Minerals & Chem. Co.
> v. Mahan,* 225 F.3d 330, 340 (3d Cir.2000) (affirming district court's denial of
> motion to amend complaint six months after amendment and joinder deadlines
> had expired); *Dimensional Comm'ns, Inc. v. OZ Optics, Ltd.,* 148 Fed.Appx. 82,
> 85 (3d Cir.2005) (non precedential). Under these circumstances, a showing of
> "good cause" by Plaintiff is required in this case.
>
> "Good cause" under Rule 16(b) focuses on the diligence of the party seeking the
> modification of the scheduling order. *See* Fed.R.Civ.P. 16, Advisory Committee
> Note (1983) ("the court may modify the schedule on a showing of good cause if it

cannot reasonably be met despite the diligence of the party seeking the extension"); *Chancellor,* 501 F.Supp.2d at 701 (citing *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 625 (6th Cir.2002)) (holding that Rule 16(b)'s "good cause" standard focuses on a party's diligence); *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir.1992) (" Rule 16(b)'s ' good cause' standard primarily considers the diligence of the party seeking the amendment."). Thus, " if the party was not diligent, there is no ' good cause' for modifying the scheduling order and allowing the party to file a motion to amend its pleading." *Chancellor,* 501 F.Supp.2d at 701 (citing *Johnson,* 975 F.2d at 609) ("If [a] party was not diligent, the inquiry should end.").

WHEREFORE, PREMISES CONSIDERED, the Plaintiff respectfully requests this Court to modify its Rule 16(b) Scheduling Order to limit the grounds for the dispositive motions authorized by Paragraph 9 to those that could not have been filed in accordance with the deadline in the original scheduling order of October 10, 2012.

Respectfully Submitted,

*s/Kevin D. Graham*
Kevin D. Graham
Counsel for Plaintiff
Kevin D. Graham, L.L.C.
3537 Denny Avenue, Suite 306
Pascagoula, Mississippi 39581
E-Mail: dr.k4093@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

Respectfully Submitted,

*s/Kevin D. Graham*

# EXHIBIT "A"

## UNITED STATES JUDICIAL PANEL
### on
## MULTIDISTRICT LITIGATION

## IN RE: ASBESTOS PRODUCTS LIABILITY
## LITIGATION (No. VI)                                    MDL No. 875

### SEPARATION OF CLAIMS AND REMAND ORDER

**Before the Panel:**[*] Defendants[1] move under Panel Rule 10.2 to vacate the Panel's order, issued at the suggestion of the transferee judge, conditionally remanding the action (*Presley*) listed on the attached Schedule A to the Southern District of Alabama, with the exception of any claims for punitive or exemplary damages that the transferee court has already severed.[2] Responding plaintiff opposes the motion.

In opposing remand, defendants principally argue that contrary to the Suggestion of Remand, some discovery remains to be taken in the action. Defendants note that on May 1, 2014, the named plaintiff (Valerie K. Presley) was substituted for the originally named (Cleveland G. Kite), following the latter's death on January 26, 2014. Defendants assert that no discovery has been conducted with respect to Kite's cause of death, and that plaintiff has not yet furnished either a death certificate[3] or expert reports relating the death to exposure of any defendant's products. Defendants also contend that they may need to depose George Pineda, one of plaintiff's experts, who was designated in August 2013, after one of plaintiff's originally identified experts became unable to testify.

Defendants' arguments do not withstand scrutiny. In opposing plaintiff's June 16, 2014, motion to dismiss the then-remaining defendants, moving defendants argued to the transferee court that discovery had closed "long ago," and that the action was "ripe for disposition." Defendants made that argument months after Kite's death, and more than a month after Presley was substituted as plaintiff. Defendants' argument that they might need to depose Pineda is even less persuasive, as he was substituted as plaintiff's expert in the latter half of 2013.

---

[*]     Judge Lewis A. Kaplan took no part in the decision of this matter.

[1]     CBS Corporation, Saint-Gobain Abrasives, Inc., Honeywell International, Inc., Dana Companies, LLC, Crane Co., Cameron International Corporation, and Cummins, Inc.

[2]     *See In re Collins*, 233 F.3d 809, 812 (3d Cir. 2000).

[3]     Plaintiff attached a copy of Kite's death certificate to her response to the Panel.

A TRUE COPY CERTIFIED TO FROM THE RECORD
DATED:
ATTEST:
DEPUTY CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- 2 -

IT IS THEREFORE ORDERED that all claims in *Presley*, except the severed claims for punitive or exemplary damages, are remanded to the Southern District of Alabama.

PANEL ON MULTIDISTRICT LITIGATION

Sarah S. Vance
Chair

Marjorie O. Rendell          Charles R. Breyer
Ellen Segal Huvelle          R. David Proctor
Catherine D. Perry

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (No. VI)**

MDL No. 875

## SCHEDULE A

Southern District of Alabama

PRESLEY v. BILL VANN COMPANY, INC., ET AL., C.A. No. 2:11-00444

PA.E : 2:11-cv-67753

# EXHIBIT "B"

IN RE:  BALTIMORE CITY         *      IN THE

       ASBESTOS LITIGATION     *      CIRCUIT COURT

                                          *      FOR BALTIMORE CITY

\*    \*    \*    \*    \*    \*    \*      \*    \*    \*    \*    \*    \*

RICHARD AMENT, *et al.*       *      May 12, 2015 Mesothelioma
                                                    Trial Group

      Plaintiffs,             *

v.                             *      Consolidated Case No. 24x14000295

ACandS, INC., *et al.*         *

      Defendants.           *

\*    \*    \*    \*    \*    \*    \*      \*    \*    \*    \*    \*    \*

**CASE AFFECTED:**
Richard Ament                  *      Case No.: 24x11000377

\*    \*    \*    \*    \*    \*    \*      \*    \*    \*    \*    \*    \*

## JOHN CRANE INC.'S NOTICE OF INTENT
## TO RELY UPON FOREIGN LAW

     Defendant/Cross-Defendant, John Crane Inc., by and through its undersigned counsel, pursuant to Maryland Code, Courts & Judicial Proceedings, § 10-501, *et seq.*, hereby provides notice that it intends to rely upon substantive maritime laws with respect to all claims and cross-claims pending against it in the above-captioned matter and respectfully requests this Honorable Court take judicial notice thereof.  In support thereof, John Crane Inc. states as follows:

     1.      Plaintiffs, Patricia Ament, Timothy Ament, and Richard Ament ("Plaintiffs"), allege that their decedent, Richard A. Ament ("Mr. Ament"), developed mesothelioma and died as a result of his alleged exposure to asbestos while serving in the U.S. Navy as a fireman/ boiler tender aboard the *USS Kearsarge* and the *USS Ticonderoga* from approximately 1967 to 1970.

2.      The United States Constitution confers upon federal courts the authority to hear "all Cases of admiralty and maritime jurisdiction." U.S. Const. Art. III, § 2.  Congress codified that jurisdiction in the Judiciary Act of 1789. *See* 28 U.S.C. § 1333. The Supreme Court has interpreted these authorities not only to grant jurisdiction in maritime cases but to empower the federal courts to develop substantive maritime law. *See, e.g., East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864-65, 106 S. Ct. 2295, 2298-99 (1986).  The "saving to suitors" clause of 28 U.S.C. § 1333(1) permits state courts to hear maritime cases, provided that they apply the federal law pertaining to maritime liabilities.  *Matthews v. Howell*, 359 Md. 152 (2000).  Accordingly, this Court's concurrent jurisdiction over maritime cases "is constrained by a so-called 'reverse-*Erie*' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards." *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 222-23, 106 S. Ct. 2485, 2494 (1986).  This Court, therefore, is bound by applicable federal maritime law.

3.      The modern test for the applicability of federal maritime law is set forth in two Supreme Court opinions: *Sisson v. Ruby*, 497 U.S. 358, 110 S. Ct. 2892 (1990); and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531, 115 S. Ct. 2043 (1995).  *See Matthews*, 359 Md. at 165-79 (recognizing *Sisson* and *Grubart* as controlling precedent).  A party seeking to invoke federal admiralty law over a tort claim "must satisfy conditions both of location and of connection with maritime activity." *Grubart*, 513 U.S. at 534, 115 S. Ct. at 1048.

4.      The "location" requirement is satisfied where the alleged tort "occurred on navigable water." *Id.*  The Supreme Court has broadly interpreted "navigable waters" to include, among other things, a ship docked at a shipyard. *See Sisson*, 497 U.S. 358.  Here, Plaintiffs allege that Mr. Ament was exposed to products for which John Crane Inc. is legally responsible

2

while he served in the U.S. Navy as a boiler tender aboard the *USS Kearsarge* from June 1967 to February 1970 and aboard the *USS Ticonderoga* from March 1970 to December 1970. According to the testimony of Plaintiffs' fact witnesses, any such alleged exposure occurred while the ships were at sea or while the crew was stationed on the ships during overhauls. There are no allegations that Mr. Ament was exposed to any John Crane Inc. product on land. Accordingly, because Mr. Ament's alleged exposures took place "on navigable waters," the "location" prong of the *Sisson/Grubart* analysis is satisfied in the instant case.

5.      The "connection" requirement of the *Sisson/Grubart* test requires the court to determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. *Sisson*, 497 U.S. at 364-65. In applying the connection test, courts have considered the underlying incident to be an "injury to workers on Navy ships on navigable waters allegedly caused by defective parts" or "exposure to allegedly defective products on or around Navy ships on navigable waters." *See, e.g., Dumas v. ABB Group*, No. 13-229-SLR-SRF, 2014 WL 2514492 (D. Del. June 4, 2014) (citing to *Cabasug v. Crane Co.,* 956 F. Supp. 2d 1178, 1188-89 (D. Haw. 2013)). Recently, in *Dumas*, the U.S. District Court for the District of Delaware found that a substantially strong relationship existed between the instigating activity and traditional maritime activities when the allegedly defective products "were essential for the proper functioning of ships and made for that purpose." *Id.* Here, Plaintiffs allege that Mr. Ament was exposed to asbestos from products John Crane Inc. manufactured for use aboard and "essential for the proper functioning" of the naval vessels on which Mr. Ament served. Accordingly, under the *Sisson/Grubart* test, Plaintiffs' tort claims against John Crane Inc. should be governed by federal maritime law.

3

6.      Courts have routinely held that federal maritime law applies to tort claims arising from asbestos exposures that allegedly occurred aboard a naval vessel.  *See, e.g.*, *Conner v. Alfa Laval, Inc.*, 799 F. Supp.2d 455, 458-59 (E.D. Pa. 2011); *see also Lambert v. Babcock & Wilcox, Co.*, 70 F. Supp.2d 877, 886 (S.D. Ind. 1999); *see also John Crane, Inc. v. Jones*, 650 S.E.2d 851, 854 (Va. 2007).  In *Conner*, Judge Eduardo C. Robreno addressed the application of federal maritime law to guide all litigants in the federal asbestos multi-district litigation (MDL-875) and held that "the maritime jurisdiction test <u>requires</u> the Court to apply maritime law to those claims involving plaintiffs who were sea-based Navy workers where the allegedly defective product was produced for use on a vessel." *Conner*, 799 F. Supp.2d at 458-59 (emphasis added).  Plaintiffs' claims and allegations against John Crane Inc. squarely meet the standard set forth in *Conner* because Mr. Ament was a "sea-based Navy worker" and because the alleged John Crane Inc. products to which Plaintiffs claim Mr. Ament was exposed were clearly "produced for use on a vessel." *Id.*

7.      Accordingly, for the foregoing reasons, this Court must apply federal maritime law to all substantive matters, including damages, as to Plaintiffs' allegations against John Crane Inc. in the above-captioned matter.

WHEREFORE, Defendant/Cross-Defendant, John Crane Inc., respectfully requests this Honorable Court take judicial notice of the application of federal maritime law to all claims pending against it in the above-captioned matter.

Respectfully submitted,


/s/ Katherine A. Lawler
Michael A. Brown
Deborah St. Lawrence Thompson
Timothy M. Hurley
Katherine A. Lawler
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
(410) 727-6464
mbrown@milesstockbridge.com
dstlawrencethompson@milesstockbridge.com
thurley@milesstockbridge.com
klawler@milesstockbridge.com

*Counsel for Defendant/Cross-Defendant,*
*John Crane Inc.*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 18th day of March, 2015, a copy of the foregoing was electronically filed and served pursuant to this Court's First Amended Case Management Order for the Electronic Filing of Pleadings, Papers and Documents in Asbestos Personal Injury Cases.


/s/ Katherine A. Lawler
Katherine A. Lawler

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**FILED**

JUL 22 2011

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

| | | |
|---|---|---|
| LOIS JEAN CONNER, et al., | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-67099 ✕ |
| v. | : | |
| | : | Transferred from the Central |
| | : | District of California |
| ALFA LAVAL, INC., et al., | : | (Case No. 09-02317) |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| JAMES H. PRANGE, et al., | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-91848 ✕ |
| v. | : | |
| | : | Transferred from the Central |
| | : | District of California |
| ALFA LAVAL, INC., et al., | : | (Case No. 09-06698) |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| JAMES W. STONE, et al., | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-93726 - File |
| v. | : | |
| | : | Transferred from the Northern |
| | : | District of California |
| ALFA LAVAL, INC., et al., | : | (Case No. 09-02327) |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| TINA M. WILLIS, | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-91449 ✕ |
| v. | : | |
| | : | Transferred from the District |

```
                              :    of South Carolina
BW IP INTERNATIONAL, INC.,    :    (Case No. 09-02163)
et al.,                       :
                              :
    Defendants.               :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                           JULY 21, 2011

I.   INTRODUCTION...............................................2
II.  BACKGROUND.................................................5
     A.  Conner v. Alfa Laval, Inc.............................5
     B.  Prange v. Alfa Laval, Inc.............................6
     C.  Stone v. Alfa Laval, Inc.............................7
     D.  Willis v. BW IP International, Inc...................8
III. DISCUSSION.................................................8
     A.  Legal Standard for Determining Whether Maritime Law
         Applies..............................................10
         1.   Historical Development..........................10
         2.   Modern Standard.................................14
     B.  Caselaw Treatment in the Asbestos Context............16
         1.   Pre-Sisson/Grubart Cases........................16
         2.   Post-Sisson/Grubart Cases.......................19
     C.  Application..........................................22
         1.   Locality Test...................................22
         2.   Connection Test.................................24
              a.   Potentially disruptive impact on maritime
                   commerce...................................24
              b.   Substantial relationship to traditional
                   maritime activity..........................29
IV.  CONCLUSION................................................30

## I.   INTRODUCTION

Plaintiffs Lois Jean Conner, Jane Prange, James W.

Stone, and Tina M. Willis ("Plaintiffs"), whose respective cases

have been consolidated as part of the MDL-875 litigation, bring

these asbestos products liability cases against several

2

defendants.  Plaintiffs' complaints all plead asbestos-related
injuries stemming from exposure to asbestos-containing products
during service with the United States Navy ("Navy").  Like many
of the cases pending in this Court's MDL-875 docket arising from
such exposure, the allegations concerning where and how the
injuries were sustained are varied; some of the plaintiffs allege
exposure whilst aboard Navy ships at sea while others emphasize
exposure stemming from work in Navy shipyards.

  The defendants, citing a number of bases for disposing
of Plaintiffs' cases without trial, urge that summary judgment
should be granted in their favor.[1]  Plaintiffs disagree.  Central

---

[1]  While not named as defendants in all of the cases
considered in this memorandum, the following parties each seek
summary judgment in at least one of the four cases discussed:
General Electric Company (Conner, Prange), IMO Industries, Inc.
(Prange), Buffalo Pumps, Inc. (Prange), Trane US, Inc. (Prange),
Armstrong International, Inc. (Stone), Foster Wheeler Energy
Corporation (Prange, Stone, Willis), Warren Pumps LLC (Prange,
Stone), Crane Company (Prange, Stone, Willis), CBS Corporation
f/k/a Westinghouse Electric Corporation (Stone, Willis), and
Ingersoll-Rand Company (Willis).  Each of these ten defendants is
alleged to have manufactured defective products that caused
asbestos-related disease.  Specifically, General Electric Company
is alleged to have manufactured defective turbines; IMO
Industries, Inc. is alleged to have manufactured defective
turbines, purifiers, and generators; Buffalo Pumps, Inc. is
alleged to have manufactured defective pumps; Trane US, Inc. is
alleged to have manufactured defective boilers; Armstrong
International, Inc. is alleged to have manufactured defective
steam traps; Foster Wheeler Energy Corporation is alleged to have
manufactured defective boilers; Warren Pumps LLC is alleged to
have manufactured defective pumps; Crane Company is alleged to
have manufactured defective valves, packing, and gaskets; CBS
Corporation is alleged to have manufactured defective turbines;
and Ingersoll-Rand Company is alleged to have manufactured
defective pumps.

to disposition of the pending motions is another issue that the
parties vigorously dispute: what law applies in the first
instance. The defendants ask the Court to apply maritime law in
resolving the pending motions while Plaintiffs contend that
maritime law is inapplicable.[2] Given the complexity and
importance of the maritime law question to these and other cases
in MDL-875, the Court will address it first in this memorandum,
leaving the resolution of the other issues raised in the summary
judgment motions to be addressed separately under the rubric
outlined herein.[3]

        As set forth below, the Court concludes that the
maritime jurisdiction test requires the Court to apply maritime
law to those claims involving plaintiffs who were sea-based Navy
workers where the allegedly defective product was produced for
use on a vessel.[4] By contrast, maritime law does not govern when

---

[2]     At a hearing on the motions for summary judgment in
these cases, the parties presented argument concerning whether
maritime law controls these disputes. Following the hearing, the
Court permitted the parties to submit supplemental legal
memoranda addressing the applicability of maritime law. All but
two of the defendants in these cases, Trane U.S., Inc. and
Ingersoll-Rand Company, filed supplemental legal memoranda with
the Court.

[3]     The Court has previously dealt with this issue, albeit
in more cursory fashion. See, e.g., Ferguson v. Lorillard
Tobacco Co., No. 09-91161, doc. no. 238 (E.D. Pa. Mar. 2, 2011);
Delatte v. A.W. Chesterton Co., No. 09-69578, doc. no. 244 (E.D.
Pa. Feb. 28, 2011).

[4]     The words "maritime" and "admiralty" are used
interchangeably in the caselaw. See, e.g., Sisson v. Ruby, 497

4

the asbestos claims asserted stem from predominantly land-based
Navy work even if the allegedly defective product was produced
for use on a vessel. Applying this standard, the Court finds
that maritime law governs the disputes in Conner, Prange, and
Stone inasmuch as the injured parties in those cases were Navy
sailors who spent the bulk of their time sailing on navigable
waters. Because the injured party in Willis was a land-based
Navy shipyard worker, the Court finds that maritime law does not
apply and that Willis is therefore subject to resolution under
state law.

Thus, the motions for summary judgment in Conner,
Prange and Stone will be granted to the extent that they seek a
ruling that maritime law applies while the motions for summary
judgment seeking such a ruling in Willis will be denied.[5]

## II.  **BACKGROUND**

### A.  Conner v. Alfa Laval, Inc.

Plaintiff Jean Conner brings her action as successor-

---

U.S. 358, 362 (1990) (equivocating between "maritime
jurisdiction" and "admiralty jurisdiction"). For consistency,
this memorandum uses the terms "maritime jurisdiction" and
"maritime law" as opposed to "admiralty jurisdiction" and
"admiralty law."

[5]     The Court rules in these matters via partial summary
judgment because the maritime law issue was raised in the context
of the pending summary judgment motions. Under different
circumstances, this question may be subject to resolution via
Federal Rule of Evidence 104 or a ruling on a motion in limine.

in-interest to Robert Conner, who passed away after contracting
mesothelioma. Conner alleges that Mr. Conner's mesothelioma was
caused by exposure to asbestos while serving as a machinist's
mate aboard various Navy ships from 1962 to 1971. (Pl.'s Resp.
in Opp. to Def.'s Mot. for Summ. J., doc. no. 188, at 2.) In
particular, it is Conner's position that Mr. Conner was exposed
to asbestos aboard the USS Yorktown where he worked in the engine
room, the auxiliary room, and the fire room. (See Def.'s Mot.
for Summ. J., doc. no. 168, Ex. B, at 18-20.) In this capacity,
Mr. Conner "maintain[ed] the equipment," "repair[ed] pumps,"
"remove[d] any gaskets that needed to be removed and replaced"
and "fix[ed] . . . any valves that were leaking from the valve
stems." (Id. at 19.) During Mr. Conner's service aboard the USS
Yorktown, the ship routinely sailed international waters before
returning to dock in the Subic Bay in the Philippines. (Id. at
29-30.)

## B. Prange v. Alfa Laval, Inc.

Plaintiff Jane Prange alleges that James H. Prange
contracted mesothelioma, and died, as a result of exposure to
asbestos while serving in the Navy from 1965 to 1969. From 1965
to 1968, Mr. Prange served aboard the USS Pollux, which sailed
international waters and transported items to other vessels at
sea. (See Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., doc.

6

no. 212, Ex. A, at 33-34.) Whilst aboard the USS Pollux, Mr.
Prange served in the fire room, where he was responsible for
cleaning and maintaining the boilers in addition to the machinery
associated with running the boiler aboard the ship. (See id. at
43-44.) After serving on the USS Pollux, Mr. Prange spent one
year aboard the USS Delta as a boiler tender. (See id. at 37.)
The USS Delta sailed between various ports, during which time Mr.
Prange would board and conduct repairs of other vessels' boilers
and associated equipment. (See id.)

### C.    Stone v. Alfa Laval, Inc.

Plaintiffs James and Elsie Stone allege that Mr.
Stone's mesothelioma was caused by exposure to asbestos-
containing products when he served as a Navy boiler tender from
1959 to 1976. (See Pl.'s Resp. in Opp. to Def.'s Mot. for Summ.
J., doc. no. 217, at 3.) Mr. Stone served aboard the USS Boxer
and the USS Casa Grande. During his period of active Navy
service on the USS Boxer, Mr. Stone was responsible for
"maintaining the main propulsion generators and associated
equipment located in the machinery spaces of the ship." (Id.)
In addition, Mr. Stone "worked on the piping, valves and pumps,
turbines, and reduction gear associated with th[e] generators."
(Id. at 4.)

7

D.   Willis v. BW IP International, Inc.

Plaintiff Tina Willis, individually and as representative of Hiram Peavy's estate, seeks redress for Peavy's ultimately fatal mesothelioma.  Willis alleges that Peavy's mesothelioma was caused by his exposure to asbestos-containing products whilst working as a shipyard worker at the Charleston Naval Shipyard.  (See Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., doc. no. 73, at 2-3, 29.)  Peavy principally served as a machinist, performing land-based repairs to Navy equipment.  (Id. at 2-3.)  He also performed overhauls, and reinstalled equipment on Navy ships.  (Id.)

## III. DISCUSSION

Reasoning that maritime law applies when the Court has maritime jurisdiction, see E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."); Gibbs ex rel. Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 132 (3d Cir. 2002) ("Since we conclude that this case sounds in admiralty, we apply federal admiralty law . . . ."), the defendants urge that maritime jurisdiction exists and ask the Court to apply maritime law to the disputes because the alleged asbestos exposure occurred when Plaintiffs were working on or around Navy ships.  Plaintiffs, on the other hand, contend that

maritime law does not apply in these cases because (1) the
alleged injuries occurred on Navy ships, which are not within the
purview of the Court's maritime jurisdiction; and (2) the work
performed and the injuries sustained are not unique to maritime
commerce or navigation.

This threshold dispute is a question of federal law,
see U.S. Const. art. III, § 2; 28 U.S.C. § 1333(1), that is
therefore governed by the law of the circuit in which the MDL
court sits, see In re Asbestos Prods. Liab. Litig. (Oil Field
Cases), 673 F. Supp. 2d 358, 362 (E.D. Pa. 2009) (Robreno, J.).
And it is an important one requiring cognizance of the balance
between state and federal authority, because the applicability of
maritime jurisdiction results in federal maritime law displacing
state law.[6]  See Transamerica Delaval, Inc., 476 U.S. at 864;
Gibbs, 314 F.3d at 132.  Paying due heed to the federalism
considerations lurking beneath the surface of the maritime
jurisdiction inquiry,[7] the Court turns to survey comprehensively

---

[6]      That is not to say, of course, that maritime law
necessarily differs from state law in every case.  In fact, in
some respects, maritime law incorporates state law.  See
Transamerica Delaval, Inc., 476 U.S. at 864-65 ("Drawn from state
and federal sources, the general maritime law is an amalgam of
traditional common-law rules, modifications of those rules, and
newly created rules." (internal footnote omitted)).

[7]      The potential displacement of state law is not the only
source of tension between state and federal authority in this
area of law; the question of which forum should hear a maritime
dispute has also required careful judicial treatment over the
years.  See, e.g., Eduardo C. Robreno, Learning to do Justice:

9

the development of maritime jurisdiction to determine whether it
exists in these cases and, by extension, whether maritime law
governs the parties' disputes.

### A. Legal Standard for Determining Whether Maritime Law Applies

The United States Constitution confers federal courts
with the authority to hear "all Cases of admiralty and maritime
Jurisdiction." U.S. Const. art. III, § 2. "Congress has
embodied that power in a statute," Jerome B. Grubart, Inc. v.
Great Lakes Dredge & Dock Co., 513 U.S. 527, 531 (1995),
affording district courts original jurisdiction over "[a]ny civil
case of admiralty or maritime jurisdiction, saving to suitors in
all cases all other remedies to which they are otherwise
entitled," 28 U.S.C. § 1333(1).

### 1. Historical Development

Historically, determining whether maritime jurisdiction
existed in a tort case turned on a bright line locality test
under which the only relevant question was the locus of the tort.

---

An Essay on the Development of the Lower Federal Courts in the
Early Years of the Republic, 29 Rutgers L.J. 555, 565 (1998)
(explaining that the constitutional grant of maritime
jurisdiction to the federal courts created questions of "line
drawing, as to which cases could be brought in which courts,"
that "tested the harmony of federal-state relations and required
the expenditure of a good deal of judicial energy for many
years").

10

If the tort occurred on navigable waters, "admiralty jurisdiction
followed; if it did not, admiralty jurisdiction did not exist."
Grubart, 513 U.S. at 531-32; see The Plymouth, 70 U.S. 20, 36
(1865) ("The jurisdiction of the admiralty does not depend upon
the fact that the injury was inflicted by the vessel, but upon
the locality—the high seas, or navigable waters where it
occurred."). Recognizing the limitations of this approach, the
Supreme Court abandoned this paradigm in Executive Jet Aviation,
Inc. v. City of Cleveland, 409 U.S. 249 (1972).

Indeed, noting the number of conceivable "cases where
the maritime locality of the tort is clear, but where the
invocation of admiralty jurisdiction seems almost absurd," the
Court instructed that "reliance on the relationship of the wrong
to traditional maritime activity is often more sensible and more
consonant with the purposes of maritime law." Id. at 255, 261.
Applying this methodology to the facts presented in that case—an
aviation accident in which a plane crashed into navigable waters
after striking a flock of seagulls—the Court deemed maritime
jurisdiction inappropriate because the claims at issue were "only
fortuitously and incidentally connected to navigable waters" with
"no relationship to traditional maritime activity." Id. at 273.

Despite Executive Jet's broad admonishment of strict
adherence to the locality test, its facts left open the question
of whether courts should look beyond locality outside the

11

aviation context. The Supreme Court resolved this issue in

Foremost Insurance Company v. Richardson, 457 U.S. 668 (1982),

unequivocally clarifying that "the Executive Jet requirement that

the wrong have a significant connection with traditional maritime

activity is not limited to the aviation context." Id. at 674.

In doing so, the Court also expanded on Executive Jet's

requirement that the wrong have a relationship to traditional

maritime activity. Rejecting the petitioners' argument that a

substantial relationship with commercial maritime activity was

necessary for maritime jurisdiction to attach, the Court

explained that:

> The federal interest in protecting maritime commerce
> cannot be adequately served if admiralty jurisdiction is
> restricted to those individuals actually engaged in
> commercial maritime activity. This interest can be fully
> vindicated only if all operators of vessels on navigable
> waters are subject to uniform rules of conduct. The
> failure to recognize the breadth of this federal interest
> ignores the potential effect of noncommercial maritime
> activity on maritime commerce.

Id. at 674-75. Thus, although the accident at issue merely

involved a collision between two noncommercial vessels, the Court

held that the requisite relationship was present and that

maritime jurisdiction applied. See id. at 675-77.

Expanding on the principle that potential to disrupt

maritime commerce is integral to the maritime jurisdiction

calculus, the Court laid the foundation for the modern maritime

jurisdiction test in Sisson v. Ruby, 497 U.S. 358 (1990). In

12

Sisson, a fire erupted on a pleasure yacht docked in a navigable waterway. Id. at 360. In addition to the requirement of a maritime locality, the Court explained that determining whether maritime jurisdiction applies requires analysis of two questions pertinent to the accident's maritime nexus: (1) the incident's potential effect on maritime commerce; and (2) the relationship between the activity giving rise to the incident and traditional maritime activity. See id. at 362, 367.

The Court instructed that the first of these two inquiries is resolved by reference to "the potential impact of a given type of incident by examining its general character." Id. at 363. Similarly, the Court stated that the "activity" at issue should be defined generally for the purpose of determining whether there is a sufficient relationship between the activity giving rise to the incident and traditional maritime activity. See id. at 365. And, viewing the facts presented under this methodology, the Court concluded that maritime jurisdiction applied even though the vessel on which the fire started was not engaged in navigation and no commercial vessels had been docked at the marina.

First, the Court concluded that a fire on a vessel "at a marina located on a navigable waterway . . . has a potentially disruptive impact on maritime commerce." Id. at 363. Second, defining the activity in that case as "the storage and

13

maintenance of a vessel at a marina on navigable waters," <u>id.</u> at
365, the Court concluded the requisite substantial connection to
traditional maritime activity was also present because "the need
for uniform rules of maritime conduct and liability is not
limited to navigation, but extends at least to other activities
traditionally undertaken by vessels, commercial or
noncommercial," <u>id.</u> at 367.

### 2.   Modern Standard

The Court most recently articulated the jurisdictional
standard in <u>Grubart</u>, a case in which maritime jurisdiction was
contested after water from the Chicago River flooded the basement
of several buildings when a crane on a barge was used to drive
new pilings into a riverbed.  513 U.S. at 530.  While
acknowledging that <u>Sisson</u>'s standard controlled in instances
"where all the relevant entities are engaged in similar types of
activity," the <u>Grubart</u> petitioners opposed application of the
<u>Sisson</u> test because "most of the victims, and one of the
tortfeasors, [were] based on land."  <u>Id.</u> at 544.

Under these circumstances, the petitioners asked the
Court to adopt a standard more readily limiting the application
of federal jurisdiction, pointing to a test utilized by the Fifth
Circuit that determined the applicability of maritime
jurisdiction by "looking to 'the functions and roles of the

14

parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law.'" Id. (quoting Kelly v. Smith, 485 F.2d 520, 525 (5th Cir. 1973)). The Court recognized that the concerns espoused in support of a new standard were valid ones. See id. However, it emphasized that "the Sisson tests are aimed at the same objectives invoked to support [the] new multifactor test," and concluded that the standard set forth in Sisson adequately furthered those ends, id. at 545-46.

Thus, in the wake of Grubart, it is clear that "a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." Id. at 534. The locality test requires that the tort occur on navigable waters or, for injuries suffered on land, that the injury be caused by a vessel on navigable waters. See id. The connection test, by contrast, contains the abovementioned two components described in Sisson:

> A court, first, must 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'

Id. (internal citations omitted) (quoting Sisson, 497 U.S. at 363, 364 n.2, 365). The second prong of this connection test, as

15

the _Grubart_ court clarified, requires courts to focus on the
tortfeasor's conduct because maritime jurisdiction is only proper
if the tortfeasor's actions relate to maritime activity.[8]  See
_id._ at 539-40 ("In the second _Sisson_ enquiry, we . . . ask
whether a tortfeasor's activity . . . is so closely related to
activity traditionally subject to admiralty law that the reasons
for applying special admiralty rules would apply in the suit at
hand.").

### B.  Caselaw Treatment in the Asbestos Context

#### 1.  Pre-Sisson/Grubart Cases

Before _Sisson_ and _Grubart_ were decided, however,
several courts considered whether maritime jurisdiction applies
to asbestos-related injury claims arising from work on or around
ships.  As in the cases at issue here and scattered across the
Court's MDL-875 docket, the manner in which the alleged exposure
occurred differed.  Some cases involved asbestos exposure that
largely occurred on land or aboard docked ships.  See _Eagle-_

---

[8]      The _Grubart_ court explained, however, that the
necessary relationship is satisfied as to permit maritime
jurisdiction provided "at least one alleged tortfeasor was
engaging in activity substantially related to traditional
maritime activity and such activity is claimed to have been a
proximate cause of the incident."  _Grubart_, 513 U.S. at 541.  And
once maritime jurisdiction is appropriate as to a claim against a
particular party, jurisdiction over other defendants against whom
maritime jurisdiction could not be asserted would be proper under
principles of supplemental jurisdiction.  See _id._ at 548
(O'Connor, J., concurring).

16

Picher Indus., Inc. v. United States, 846 F.2d 888, 891 (3d Cir. 1988) (exposure to asbestos-based insulation products during service as a sheetmetal worker at the Philadelphia Naval Shipyard); Oman v. Johns-Manville Corp., 764 F.2d 224, 226 (4th Cir. 1985) (exposure during work as "land-based shipyard workers for Newport News Shipbuilding and Drydock Company"); Harville v. Johns-Manville Prods. Corp., 731 F.2d 775, 777 (11th Cir. 1984) (exposure to plaintiffs who served as "insulators, pipe-fitters, welders, boilermakers, machinists, foreman, and general laborers in the construction and repair of vessels"). In other cases, at least a portion of the alleged asbestos exposure occurred at sea on navigable waters. See Cochran v. E.I. duPont de Nemours, 933 F.2d 1533, 1535 (11th Cir. 1991) (exposure for a Navy sailor during active Navy service on an aircraft carrier); Petersen v. Chesapeake & Ohio Ry. Co., 784 F.2d 732, 734 (6th Cir. 1986) (exposure while serving as a machinist repairing equipment and machinery on car ferries "sailing between ports on the Great Lakes"); Myhran v. Johns-Manville Corp., 741 F.2d 1119, 1120 (9th Cir. 1984) (asbestos exposure "occurred while [the plaintiff] was employed as a pipefitter engaged in the repair and renovation of vessels on navigable waters").

Although the courts confronted with these fact patterns generally accepted that the locality test was satisfied, see, e.g., Eagle-Picher, 846 F.2d at 896 (noting that "a shipyard

17

worker's claim based on an asbestos-related injury" will "normally satisf[y] the threshold 'situs' test for admiralty jurisdiction"),[9] they determined that application of maritime law was improper on the ground that the asbestos products liability claims asserted did not bear a sufficient connection to traditional maritime activity, see Cochran, 933 F.2d at 1538-39; Eagle-Picher, 846 F.2d at 896-97; Petersen, 784 F.2d at 736; Oman, 764 F.2d at 230-32; Myhran, 741 F.2d at 1122-23; Harville, 731 F.2d at 783-85; see also Woessner v. Johns-Manville Sales Corp., 757 F.2d 634, 643-49 (5th Cir. 1985).

Notably, however, these decisions were made under the Kelly framework (or a variant thereof) that the Grubart court expressly disavowed.[10] And because the courts' analyses hinged on "the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law," Kelly, 485 F.2d at 525, the key reason for rejecting maritime

---

[9] See also Oman, 764 F.2d at 228 (finding the locality test satisfied for primarily land-based shipyard workers); Harville, 731 F.2d at 782 ("[A] plaintiff's claims have met the jurisdictional location requirement if the plaintiff has been exposed to asbestos on navigable waters regardless of whether he has also suffered exposures on land.").

[10] As noted in Part III.A, Grubart confirmed the vitality of the test the Court endorsed in Sisson and rejected the Fifth Circuit's Kelly test. However, although Sisson was decided in 1990, the Eleventh Circuit's 1991 decision in Cochran did not cite Sisson or apply its factors.

18

jurisdiction was invariably the fact that "the tasks performed
and the injuries incurred by the involved workers were identical
to those of asbestos workers who ha[d] never stepped aboard a
vessel," <u>Petersen</u>, 784 F.2d at 736.

### 2. Post-Sisson/Grubart Cases

Of course, the fact that the work performed and the
injuries sustained in sea-based asbestos exposure cases may be
identical to those pertaining to purely land-based work is less
significant under the now-governing <u>Sisson</u>/<u>Grubart</u> test. <u>Sisson</u>
and <u>Grubart</u>, after all, instruct that resolution of the maritime
connection test simply requires inquiry into "whether the
incident has a potentially disruptive impact on maritime
commerce" and whether the tortious acts leading to the injury
demonstrate a "substantial relationship to traditional maritime
activity." <u>Grubart</u>, 513 U.S. at 534 (internal marks omitted)
(quoting <u>Sisson</u>, 497 U.S. at 364 n.2, 365). While this
methodology is designed to weed out cases for which "the
rationale for [maritime] jurisdiction does not support it," <u>id.</u>
at 544-45, its application does not result in finding maritime
jurisdiction inappropriate simply because the tasks performed and
injuries sustained are identical to those "of asbestos workers
who ha[d] never stepped aboard a vessel," <u>Petersen</u>, 784 F.2d at
736. The post-<u>Sisson</u>/<u>Grubart</u> cases reflect as much.

19

In <u>Lambert v. Babcock & Wilcox, Co.</u>, 70 F. Supp. 2d 877
(S.D. Ind. 1999), for example, the court determined that maritime
law governed a dispute in which a former Navy sailor was exposed
to asbestos aboard a Navy vessel. <u>See id.</u> at 886. Rejecting the
logic and reasoning advanced in the cases described in Part
III.B.1, the <u>Lambert</u> court found that the connection test was
satisfied. <u>See id.</u> at 884. Indeed, with respect to the first
prong of the <u>Sisson</u>/<u>Grubart</u> connection test, the court explained
that:

> The incident in the case at bar—asbestos exposure in
> the boiler room of a ship—could potentially disrupt
> maritime commerce by rendering the boiler room too
> hazardous to operate. Unsafe working conditions aboard
> a vessel have consistently been held to pose a
> potentially disruptive impact upon maritime commerce, and
> this case is no exception. The operation of the boiler
> room is a necessary function of a vessel and its shut
> down would certainly disrupt the ship's operation.
> Moreover, asbestos-related illness could afflict other
> members of the crew, causing a labor shortage. Such a
> shortage could be exacerbated by fear of exposure by crew
> members and potential crew members alike.

<u>Id.</u> (internal citations omitted). And, framing the relevant
activity that occurred as the "maintenance and operation of a
ship's boiler room," the court concluded that the second prong of
<u>Sisson</u>/<u>Grubart</u>'s connection test was satisfied because such
action is "clearly . . . substantially related to traditional
maritime activity." <u>Id.</u>

Similarly, in <u>John Crane, Inc. v. Jones</u>, 650 S.E.2d 851
(Va. 2007), the Supreme Court of Virginia ruled that maritime law

20

applied to an asbestos products liability action in which the
plaintiff's asbestos exposure occurred "while repairing and
constructing ships at the Newport News Shipyards." Id. at 854.
After finding the locality prong satisfied due to the locus of
plaintiff's exposure, the court disagreed with the defendant's
contention that neither prong of the Sisson/Grubart connection
test was met. See id. Like the Lambert court, the Jones court
concluded that the "inhalation of asbestos fibers while engaged
in the repair and construction of vessels on navigable waters had
the potential to disrupt maritime commerce" inasmuch as injury
"could potentially slow or frustrate the work being done on the
vessel." Id.

As to the second prong of the connection test, the
Jones court disagreed with the defendant's contention that the
"manufacture and sale of asbestos-containing products into the
stream of commerce is too far removed from traditional maritime
activities to create the necessary relationship." Id. at 854-55.
On the contrary, in fact, the court concluded that the
defendant's involvement in traditional maritime activity was
profound:

> [D]uring the time [the plaintiff] was exposed to
> asbestos-containing products manufactured by Crane, Crane
> marketed gaskets and packing material directly for the
> marine industry and advertised its products for 'marine
> engine and general ship use.' Crane also advertised its
> products in publications about maritime activity. This
> activity bore a substantial relationship to traditional
> maritime activities. The fact that Crane did not

21

directly undertake any activity aboard a marine vessel
does not obviate this connection.

Id. at 855.

Thus, although several courts have rejected the
application of maritime law in asbestos products liability suits,
more recent cases confirm that the earlier decisions so holding
are now in tension with the standard constructed in Sisson and
retooled in Grubart.

## C. Application

With this legal background in mind, the Court turns to
apply the Sisson/Grubart tests to the asbestos products liability
cases at issue, beginning with the locality test and then
addressing the two separate prongs of the maritime connection
test. As outlined below, doing so in these cases results in
maritime law governing those claims involving plaintiffs who were
sea-based Navy workers so long as the allegedly defective product
was produced for use on a vessel. Where the asbestos claims
asserted stem from predominantly land-based Navy work, however,
maritime law does not govern even if the allegedly defective
product was produced for use on a vessel.

### 1. Locality Test

While each of the injured parties in these cases
sustained their asbestos-related injuries while working on or

22

around Navy ships, the locality test's focus on the place of the
injury suggests that inquiry into the precise location in which
the injuries were suffered is necessary. Navy workers like the
injured parties in these cases, however, frequently split at
least some portion of their time between ships on navigable
waters and land. In addition, unlike other torts, asbestos-
related disease has a long latency period and plaintiffs often
rely on expert testimony that all non-trivial exposures to
asbestos contribute to the disease process. See generally
Harville, 731 F.2d at 782. Thus, in the case of asbestos-related
disease arising from work on or around ships, the Court concludes
that the locality test is satisfied as long as some portion of
the asbestos exposure occurred on a vessel on navigable waters.[11]
See id.

In this case, the evidence demonstrates that the
injured parties in Conner, Prange, and Stone performed their Navy
service at sea aboard Navy vessels. Consequently, the locality
test is satisfied as to the plaintiffs in Conner, Prange, and
Stone. In Willis, by contrast, the record is unclear as to

---

[11]    Consequently, the Court declines Plaintiffs' invitation
to apply state law to some exposures and maritime law to others
based on the locus of the exposure. Cf. Bartel ex rel. Estate of
Rich v. A-C Prod. Liab. Trust, 461 F. Supp. 2d 600, 602, 604
(N.D. Ohio 2006) (applying maritime law to sea-based claims and
state law to land-based claims where the plaintiff was exposed to
asbestos in two separate jobs, one of which was entirely land-
based and one of which was entirely sea-based).

23

precisely where the alleged exposure occurred. Instead, the evidence adduced merely reflects that the injured party in <u>Willis</u> was a principally land-based shipyard worker who may or may not have suffered some of the exposure alleged aboard a vessel on navigable waters.

Because the locality test is not satisfied if the exposure alleged occurred exclusively on land, the Court may not exercise maritime jurisdiction unless the party invoking maritime jurisdiction demonstrates, by a preponderance of the evidence, that some exposure occurred on a vessel on navigable waters. <u>See</u> <u>In re Bernstein</u>, 81 F. Supp. 2d 176, 177 (D. Mass. 1999). The sparse evidence concerning the exposure suffered in <u>Willis</u> does not satisfy this burden. Nevertheless, for the sake of completeness, the Court assumes <u>arguendo</u> that some of the exposure in <u>Willis</u> occurred on navigable waters and turns to apply the maritime connection test to Plaintiffs' claims.

## 2. <u>Connection Test</u>

### a. <u>Potentially disruptive impact on maritime commerce</u>

The Court's first task under this test is to determine whether the asbestos exposure Plaintiffs allege had a potentially disruptive impact on maritime commerce when characterizing the

24

incidents generally.[12]  See Grubart, 513 U.S. at 534.  In these

cases, the incidents can be characterized as exposure to

allegedly defective products on or around Navy ships.  Viewed in

this light, the Court concludes that the incidents plainly had a

potentially disruptive impact on maritime commerce as to the

injured parties in Conner, Prange, and Stone.  All three, after

all, served aboard Navy vessels that routinely sailed and docked

on navigable waters.[13]  They were effectively sailors, whose job

was to maintain equipment that was integral to the functioning of

the ships on which they served.  See Tritt v. Atl. Richfield Co.,

709 F. Supp. 630, 632 (E.D. Pa. 1989).  Under such circumstances,

---

[12]    As set forth more specifically supra in note 1,
Plaintiffs allege they sustained asbestos-related injuries due to
defective turbines, pumps, purifiers, generators, boilers,
valves, gaskets, packing, and steam traps manufactured by the
defendants in these cases.

[13]    Plaintiffs, however, pointing to dicta from The Eagle,
75 U.S. 15 (1868), contend that maritime jurisdiction cannot
attach because the injuries were sustained on or around Navy
ships and the Navy is not engaged in maritime commerce.  See id.
at 23 ("[T]he vessels engaged in making the seizure, as prize of
war, which are ships of the navy, or privateers, are not employed
at the time, in the business of commerce and navigation.").  The
Court disagrees.  Indeed, as Sisson and Grubart make clear,
vessels need not be directly involved in maritime commerce at all
for maritime jurisdiction to apply so long as the incident at
issue has a potentially disruptive impact on maritime commerce.
In Sisson, the Court held that this standard was met where a fire
erupted on a noncommercial vessel that was docked in a marina
that contained no commercial vessels.  See Sisson, 497 U.S. at
360.    It is nearly self-evident that, depending on the
circumstances, incidents on Navy ships could also have a
potentially disruptive impact on ships engaged in maritime
commerce.

25

exposure to defective products could "potentially slow or frustrate the work being done on the vessel." <u>Jones</u>, 650 S.E.2d at 854.

Indeed, exposure to defective products creates unsafe working conditions that could cause labor shortages on the ships due to injuries sustained aboard. <u>See</u> <u>Lambert</u>, 70 F. Supp. 2d at 884. And a shortage of this nature "could be exacerbated by fear of exposure by crew members and potential crew members alike."[14] <u>Id.</u> Any such occurrence would disrupt the Navy's ability to protect other commercial ships at sea if called upon to do so.

Moreover, the allegedly defective products in these cases were often insulated with asbestos or incorporated with asbestos-containing component parts to prevent fires aboard ships. <u>See</u> <u>Johns-Manville Corp. v. United States</u>, 855 F.2d 1571, 1571 (Fed. Cir. 1988) ("Due to the heat resistant and fire retardant properties of asbestos it was used in insulating ships' boilers, steam pipes, pumps, and other equipment."); <u>Tritt</u>, 709 F. Supp. at 632. Fire, as the Supreme Court recognized in <u>Sisson</u>, is "one of the most significant hazards facing commercial

---

[14]    Indeed, even if the Court defined the activity more narrowly as exposure to asbestos-containing products on or around Navy ships, it would still conclude that such exposure had a potentially disruptive impact on maritime commerce as to the parties in <u>Conner</u>, <u>Prange</u>, and <u>Stone</u>. While asbestos-related diseases often have long latency periods, any workers with knowledge of the dangers of asbestos may have refused to work thereby causing labor shortages that could potentially disrupt maritime commerce.

26

vessels." Sisson, 497 U.S. at 362. With fewer workers available
to work with equipment in which asbestos was used for heat
resistance, a fire could erupt and disrupt commercial vessels.
See id. at 363.

But while the potentially disruptive impact on maritime
commerce is clear with respect to the injured parties in Conner,
Prange and Stone due to their status as sea-based Navy workers,
the facts in Willis present a much different question. Indeed,
unlike the other injured parties discussed in this memorandum,
Peavy was a predominantly land-based worker. In such instances,
the Third Circuit has instructed that maritime jurisdiction is
inappropriate. See Eagle-Picher, 846 F.2d at 896 ("[A] shipyard
worker's claim based on an asbestos-related injury does not bear
a sufficient connection to traditional maritime activity.").
And, as discussed earlier, several other courts of appeals have
reached the same conclusion.

Of course, as the defendants point out, the Third
Circuit and various other courts decided as much under the Kelly
framework that was rejected by the Supreme Court in Grubart.
Depending on this logic and reasoning that maritime jurisdiction
is appropriate in Willis under the current standard, the
defendants ask the Court to apply maritime law notwithstanding
Eagle-Picher and like cases. The Court agrees with the
defendants that the Sisson/Grubart connection test more readily

27

permits maritime jurisdiction in asbestos products liability cases stemming from work on or near ships than Kelly would allow. Nevertheless, the Court concludes that state law governs claims arising from predominantly land-based Navy work because a predominantly land-based Navy worker's exposure to defective products on or near ships does not have a potentially disruptive impact on maritime commerce.

Indeed, by serving in a Navy shipyard, such workers are more removed from maritime commerce than their sea-based Navy counterparts. For example, the prospect of injuries to predominantly land-based workers is less likely to disrupt maritime commerce because such workers would not be at sea to defend commercial ships if necessary. In fact, some portion of the work performed by such workers is not even undertaken on navigable waters at all. It is, of course, evident that the unsafe working conditions caused by exposure to defective products could conceivably cause some of the same disruptions to maritime commerce described with respect to the sea-based Navy workers in Conner, Prange, and Stone. This is not sufficient for maritime jurisdiction to attach; the exposure must pose "more than a fanciful risk to commercial shipping," Grubart, 513 U.S. at 539, and here the potential impact on maritime commerce is simply too attenuated.

Thus, although the asbestos exposure alleged had a

28

potentially disruptive impact on maritime commerce with respect
to the injured parties in <u>Conner</u>, <u>Prange</u>, and <u>Stone</u>, the Court
concludes that the exposure to the injured party in <u>Willis</u> did
not have a potentially disruptive impact on maritime commerce.
Consequently, maritime jurisdiction does not apply to the claims
asserted in <u>Willis</u>.  To determine whether it does apply in
<u>Conner</u>, <u>Prange</u>, and <u>Stone</u>, the Court turns to examine whether the
activity giving rise to the incident demonstrates a substantial
relationship to traditional maritime activity.

### b.    <u>Substantial relationship to traditional maritime activity</u>

The Court's role in this regard is to assess whether
the "tortfeasor's activity . . . is so closely related to
activity traditionally subject to admiralty law that the reasons
for applying special admiralty rules would apply in the suit at
hand."  <u>Grubart</u>, 513 U.S. at 539-40.  Viewing the activity
generally as the Court must, <u>see</u> <u>Sisson</u>, 497 U.S. at 364, the
Court finds that the activity engaged in by the numerous
defendants in these cases was the manufacture of products for use
on vessels.

Indeed, unlike the asbestos manufacturers who were
defendants in many of the prior cases deciding whether maritime
jurisdiction applies to asbestos products liability claims, <u>see</u>
<u>supra</u> Part III.B.1, the products manufactured in these

29

cases—turbines, pumps, purifiers, generators, boilers, valves, gaskets, packing, and steam traps—were essential for the proper functioning of ships and made for that purpose. The Court therefore concludes that their allegedly defective production bears a substantial relationship to traditional maritime activity. See Jones, 650 S.E.2d at 855 (holding the substantial relationship prong of the connection test was satisfied because the defendant's products were produced and advertised for the marine industry).

Consequently, the claims in Conner, Prange, and Stone are within the Court's maritime jurisdiction and therefore subject to resolution under maritime law.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that maritime law governs the disputes in Conner, Prange and Stone, but not the dispute in Willis. Consequently, the motions for summary judgment in Conner, Prange, and Stone will be granted to the extent they seek application of maritime law and maritime law will be applied in resolving the other issues raised in the summary judgment motions. The motions for summary judgment in Willis will be denied inasmuch as they ask the Court to apply maritime law and Willis will therefore be resolved under applicable state law. An appropriate Order will follow.

30