# U.S. District Court
# Middle District of Louisiana (Baton Rouge)
# CIVIL DOCKET FOR CASE #: 3:16-cv-00455-BAJ-RLB
# Internal Use Only

Zeringue et al v. Allis-Chalmers Corporation et al
Assigned to: Chief Judge Brian A. Jackson
Referred to: Magistrate Judge Richard L. Bourgeois, Jr.
Case in other court: 19th Judicial District Court, 646592
Cause: 28:1442 Notice of Removal

Date Filed: 07/08/2016
Jury Demand: None
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Federal Question

**Plaintiff**

**Bobbie Zeringue**
*Individually and on behalf of her deceased Husband, Howard Zeringue*

represented by **Damon R. Pourciau**
Pourciau Law Firm
2200 Veterans Memorial Blvd
Suite 210
Kenner, LA 70062
504-305-2375
Fax: 504-305-4168
Email: drp@pourciaulaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michael Galante**
Galante & Bivalacqua
650 Poydras Street
Suite 2615
New Orleans, LA 70130
(504) 648-1858
Email: scott@gb-lawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Aaron Zeringue**
*Individually and on behalf of his deceased father, Howard Zeringue*

represented by **Damon R. Pourciau**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michael Galante**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rob Zeringue**
*Individually and on behalf of his deceased father, Howard Zeringue*

represented by **Damon R. Pourciau**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michael Galante**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Harris Zeringue**
*Individually and on behalf of his deceased father, Howard Zeringue*

represented by **Damon R. Pourciau**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Michael Galante**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Allis-Chalmers Corporation**

**Defendant**

**Asbestos Corporation, Ltd.**

**Defendant**

**Bell Asbestos Mines, Ltd.**

**Defendant**

**Cleaver-Brooks Sales and Service, Inc.**

**Defendant**

**CSR, Ltd.**

**Defendant**

**Crane Co.**

**Defendant**

**Fidelity and Casualty Insurance Company of New York**
*as the Insurer of Wayne Manufacturing Company*

**Defendant**

**Flowserve US, Inc.**
*also known as*
Worthington Pump, Inc.

**Defendant**

**Foster Wheeler Boiler Corporation**

**Defendant**

**General Electric Company**                    represented by    **John J. Hainkel , III**
Frilot L.L.C.
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
504-599-8000
Fax: 504-599-8121
Email: jhainkel@frilot.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela M. Bowlin**
Frilot LLC
1100 Poydras Street
Suite 3700
New Orleans, LA 70165
504-599-8000
Fax: 504-599-8271
Email: abowlin@frilot.com
*ATTORNEY TO BE NOTICED*

**James H. Brown , Jr.**
Frilot, Partridge, LC
1100 Poydras Street
Suite 3600
New Orleans, LA 70163
504-599-8000
Fax: 599-8100
Email: jbrown@frilotpartridge.com
*ATTORNEY TO BE NOTICED*

**Meredith Kathryn Keenan**
Frilot LLC
400 Poydras Street
Suite 3700
New Orleans, LA 70163
504-599-8066
Fax: 504-619-4987
Email: mkeenan@frilot.com
*ATTORNEY TO BE NOTICED*

**Peter R. Tafaro**
Frilot, LLC
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
504-599-8060
Fax: 504-599-8152
Email: ptafaro@hotmail.com
*ATTORNEY TO BE NOTICED*

**Kelsey Anne Eagan**
Frilot L.L.C.
1100 Poydras St.
Suite 3700
New Orleans, LA 70163
(504) 599-8173
Fax: 504-599-8100
Email: keagan@frilot.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Huntington Ingalls Incorporated**
*formerly known as*
Northrup Gruman Shipbuilding, Inc.

represented by

**Gary A. Lee**
Lee, Futrell & Perles
201 St. Charles Avenue
Suite 4120
New Orleans, LA 70170-4120
504-569-1725
Fax: 504-569-1726
Email: glee@leefutrell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barbara Bourdonnay O'Donnell**
Lee, Futrell & Perles, LLP
201 St. Charles Avenue
Suite 4120
New Orleans, LA 70170
504-569-1725
Email: bodonnel@hmhlp.com
*ATTORNEY TO BE NOTICED*

**Michael Scott Minyard**
Lee, Futrell & Perles LLP
201 St. Charles Avenue
Suite 4120
New Orleans, LA 70170
504-569-1725
Fax: 504-569-1726
Email: sminyard@leefutrell.com
*ATTORNEY TO BE NOTICED*

**Richard M. Perles**
Lee, Futrell & Perles
201 St. Charles Avenue
Suite 4120
New Orleans, LA 70170-4120
504-569-1725
Fax: 504-569-1726 FAX
Email: rperles@leefutrell.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Hopeman Brothers, Inc.**

**Defendant**

**Liberty Mutual Group, Inc.**
*as the insurer of Wayne Manufacturing
Company*

**Defendant**

**The McCarty Corporation**

**Defendant**

**Metropolitan Life Insurance Company**

**Defendant**

**Owens-Illinois, Inc.**

**Defendant**

**Reilly-Benton Company, Inc.**                    represented by    **Jamie Morain Zanovec**
                                                                    Willingham, Fultz & Cougill LLP
                                                                    85625 Cypress Creek Parkway
                                                                    6th Floor
                                                                    Houston, TX 77069
                                                                    713-333-7600
                                                                    Email: jamiez@willingham-law.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Jennifer H. McLaughlin**
                                                                    Willingham Fultz & Cougill LLP
                                                                    5625 Cypress Creek Pkwy
                                                                    6th Floor
                                                                    Houston, TX 77069
                                                                    713-333-7600
                                                                    Fax: 713-333-70601
                                                                    Email: JenniferM@willingham-law.com
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Jennifer D. Zajac**
                                                                    Willngham, Fultz & Cougill LLP
                                                                    5625 Cypress Creek Parkway, 6th Floor
                                                                    Houston, TX 77069
                                                                    713-333-7600
                                                                    Fax: 504-524-1933
                                                                    Email: jenniferz@willingham-law.com
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Taylor-Seidenbach, Inc.**                        represented by    **Christopher Kelly Lightfoot**
                                                                    Hailey, McNamara, Hall, Larmann &

Papale
One Galleria Boulevard
Suite 1400
Metairie, LA 70001
504-836-6500
Fax: 504-836-6565 FAX
Email: klightfoot@hmhlp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward J. Lassus , Jr.**
Hailey, McNamara, Hall, Larman, Papale
One Galleria Blvd., Suite 1400, Metairie,
LA 70001
2159 Hampshire Dr., Slidell, LA 70461
Metairie, LA 70001
504-836-6500
Fax: 504-836-6565
Email: elassus@hmhlp.com
*ATTORNEY TO BE NOTICED*

**Richard J. Garvey , Jr**
Hailey McNamara Hall Larmann & Papale
LLC
One Galleria Blvd
Suite 1400
Metairie, LA 70001
504-836-6500
Email: rgarvey@hmhlp.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Westinghouse Electric Company
(Delaware), LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/08/2016 | 1 | NOTICE OF REMOVAL from 19th Judicial District Court, Case Number 646592. (Filing fee $ 400 receipt number 053N-1434629), filed by General Electric Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Civil Cover Sheet)(Eagan, Kelsey) (Attachments 4, 5 & 6 replaced on 7/11/2016) (EDC)Modified on 7/11/2016 to rotate pages.(EDC). (Entered: 07/08/2016) |
| 07/08/2016 | 2 | NOTICE of Collateral Proceedings and Refiled Cases Pursuant to Local Civil Rule 3 by General Electric Company (Eagan, Kelsey) (Entered: 07/08/2016) |
| 07/08/2016 | 3 | Corporate Disclosure Statement Rule 7.1 Statement by General Electric Company (Eagan, Kelsey) Modified on 7/12/2016 to edit text.(EDC). (Entered: 07/08/2016) |

| | | |
|---|---|---|
| 07/11/2016 | | (Court only) ***Attorney John J. Hainkel, III,Angela M. Bowlin,James H. Brown, Jr.,Peter R. Tafaro,Meredith Kathryn Keenan for General Electric Company added. (EDC) (Entered: 07/11/2016) |
| 07/11/2016 | | (Court only) ***Attorney Damon R. Pourciau,Scott Michael Galante for Aaron Zeringue,Damon R. Pourciau,Scott Michael Galante for Bobbie Zeringue,Damon R. Pourciau,Scott Michael Galante for Harris Zeringue,Damon R. Pourciau,Scott Michael Galante for Rob Zeringue added. (EDC) (Entered: 07/11/2016) |
| 07/11/2016 | | (Court only) ***Attorney Christopher Kelly Lightfoot,Richard J. Garvey, Jr,Edward J. Lassus, Jr. for Taylor-Seidenbach, Inc. added. (EDC) (Entered: 07/11/2016) |
| 07/11/2016 | | (Court only) ***Attorney Jamie Morain Zanovec,Jennifer D. Zajac,Jennifer H. McLaughlin for Reilly-Benton Company, Inc. added. (EDC) (Entered: 07/11/2016) |
| 07/11/2016 | | (Court only) ***Attorney Gary A. Lee,Richard M. Perles,Michael Scott Minyard,Barbara Bourdonnay O'Donnell for Huntington Ingalls Incorporated added. (EDC) (Entered: 07/11/2016) |
| 07/11/2016 | 4 | Letter to Attorney Gary Lee regarding Daphne M. Lancaster who is Co-Counsel for party Huntington Ingalls Incorporated f/k/a Northrup Gruman Shipbuilding, Inc.. Attorney is not admitted to practice in LAMD. (EDC) (Entered: 07/11/2016) |
| 07/13/2016 | 5 | Letter to Attorney Jamie M. Zanovec regarding Thomas L. Cougill who is Co-Counsel for party Reilly-Benton Company, Inc.. Attorney is not admitted to practice in LAMD. (EDC) (Entered: 07/13/2016) |

**Case #: 3:16-cv-00455-BAJ-RLB**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **BOBBIE ZERINGUE, INDIVIDUALLY AND ON BEHALF OF HER DECEASED HUSBAND, HOWARD ZERINGUE AND AARON ZERINGUE, ROB ZERINGUE, AND HARRIS ZERINGUE, INDIVIDUALLY AND ON BEHALF OF THEIR DECEASED FATHER, HOWARD ZERINGUE,** | * | **CIVIL CASE NO.:** |
| | * | **JUDGE:** |
| **PLAINTIFFS,** | * | **MAG. JUDGE:** |
| **Versus** | * | |
| **ALLIS-CHALMERS CORPORATION, ASBESTOS CORPORATION, LTD., BELL ASBESTOS MINES, LTD., CLEAVER-BROOKS SALES AND SERVICE, INC., CSR, LTD., CRANE CO., FIDELITY AND CASUALTY INSURANCE COMPANY OF NEW YORK (as the insurer of Wayne Manufacturing Company), FLOWSERVE US, INC. (a/k/a Worthington Pump, Inc.), FOSTER WHEELER BOILER CORPORATION, GENERAL ELECTRIC COMPANY, HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop Grumman Shipbuilding, Inc.), HOPEMAN BROTHERS, INC., LIBERTY MUTUAL GROUP, INC. (as the insurer of Wayne Manufacturing Company), THE MCCARTY CORPORATION, METROPOLITAN LIFE INSURANCE COMPANY, OWENS-ILLINOIS, INC., REILLY-BENTON COMPANY, INC., TAYLOR-SEIDENBACH, INC., WESTINGHOUSE ELECTRIC COMPANY (DELAWARE), LLC.,** | * | |
| **DEFENDANTS.** | * | |

*** * * * * * * * * * * * * * * * * * * * * * * * ***

# NOTICE OF REMOVAL

Defendant, General Electric Company (hereinafter "General Electric" or "Defendant"), through the undersigned counsel, hereby removes this action from the 19th Judicial District Court for the Parish of East Baton Rouge, to the United States District Court for the Middle District of Louisiana, pursuant to 28 U.S.C. §§ 1441, 1442, and 1446. General Electric does not waive any defense available and expressly reserves the right to assert any and all defenses in responsive pleadings. In support of this Notice of Removal, Defendant states as follows:

## I. THE STATE COURT ACTION

1. On or about March 14, 2016, Plaintiffs, Bobbie Zeringue, Aaron Zeringue, Rob Zeringue, and Harris Zeringue, individually and on behalf of the decedent, Howard Zeringue, filed their "Original Petition for Damages and Wrongful Death," *Bobbie Zeringue, Individually and on Behalf of Her Deceased Husband, Howard Zeringue and Aaron Zeringue, Rob Zeringue, and Harris Zeringue, Individually and on Behalf of Their Deceased Father, Howard Zeringue v. Allis-Chalmers Corporation, et al*., No. 646592, in the 19th Judicial District Court for the Parish of East Baton Rouge against several defendants, including General Electric. Plaintiffs allege the decedent contracted mesothelioma as a result of exposure to asbestos, which ultimately caused his death. (Petition, Exhibit A, ¶13).

2. Plaintiffs claim the decedent was exposed to asbestos from defendants' products while serving in the United States Navy from June 9, 1952 until June 8, 1960 on board the *USS Clarion River*, the *USS Plumas County*, and the *USS Balduck*. (Petition, Exhibit A, ¶3).

3. Plaintiffs allege that General Electric, among others, manufactured, sold, distributed, and/or supplied asbestos-containing products used at the decedent's jobsites, which includes his Navy service aboard the foregoing vessels. (Petition, Exhibit A, ¶5).

4.      Plaintiffs further allege that General Electric's products were unreasonably dangerous *per se*, defective in design, and that General Electric did not warn the decedent of the dangers of asbestos-exposure. (Petition, Exhibit A, ¶5, 6).

5.      Upon information and belief, to the extent that the deceased may have been exposed to asbestos associated with General Electric products or equipment aboard the *USS Clarion River* and the *USS Balduck*, that asbestos would have been associated with marine turbines designed and manufactured at the direction and pursuant to a contract with the United States Navy and used in the construction of said Navy vessel.

6.      If General Electric equipment was indeed on the *USS Clarion River* and the *USS Balduck*, General Electric manufactured equipment for use by the U.S. Navy pursuant to contracts and specifications executed by the U.S. Navy.   As such, General Electric acted pursuant to the direction of a federal officer, the U.S. Navy, during the performance of agreements to manufacture and sell turbines and other equipment to the U.S. Navy, including all aspects of warnings associated with said equipment.   General Electric was therefore acting under an officer or agency of the United States within the meaning of 28 U.S.C. §1442(a)(1), and any claim against General Electric should properly be heard in federal court.

## II.   THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

7.      Under 28 U.S.C. § 1446(b)(1), a "notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter." The citation to the Plaintiff's Petition for Damages was served on

General Electric through their agent for service of process, CT Corporation System, on June 10, 2016. Copies of all process and pleadings served upon General Electric are annexed hereto in Exhibit A. Accordingly, this Notice of Removal is filed within 30 days of the receipt of said service on General Electric and therefore, the removal is timely pursuant to 28 U.S.C. § 1446(b)(1).

8. This Court embraces the locality in which the state court action is now pending, and, thus, is a proper forum for this action pursuant to 28 U.S.C. § 1441(a). No previous application has been made for the relief requested herein.

9. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiffs' counsel, and a copy is being filed with the Clerk of the 19th Judicial District Court for the Parish of East Baton Rouge.

10. A filing fee of $400.00 has been tendered to the Clerk of the United States District Court for the Middle District of Louisiana.

11. This Notice of Removal is being signed pursuant to Federal Rule of Civil Procedure 11. A copy of the civil cover sheet is attached hereto.

12. Pursuant to 28 U.S.C. § 1447(b), copies of all process, pleadings, orders, and other papers filed in the State Court Action have been requested and will be subsequently submitted upon receipt.

13. General Electric need not notify, or obtain the consent of, any other defendant to this action in order to remove this entire suit under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Ely Valley Mines v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315

(9th Cir. 1981); *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 152 (5th Cir. 1965); *Allman v. Hanley*, 302 F.2d 559, 562 (5th Cir. 1962).

14.    If any question arises regarding the propriety of removal, General Electric respectfully requests the opportunity to present a brief and/or oral argument in support of its position that this case is removable.

## III.   REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§1441 AND 1442

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1442 because, in the manufacture and sale of marine turbines and/or other equipment for and to the Navy, Defendant was acting under the direction of an officer of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

16.    Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party (1) demonstrates that it is a "person" within meaning of the statute; (2) demonstrates that it acted under the direction of a federal officer, meaning there is a nexus or causal connection between Plaintiff's claims and its actions; and (3) raises a colorable federal defense to Plaintiff's claims. *Williams v. Todd Shipyards Co.*, 154 F.3d 416 (5th Cir. 1998) (citing *Mesa v. California*, 489 U.S. 121, 129, 131 (1989)).  Here, all three requirements are satisfied and Defendant is entitled to proceed under the federal officer removal provision.

17.    A corporation such as General Electric is a "person" for purposes of 28 U.S.C. § 1442(a). *See, Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (examining the federal officer removal statute and explaining that "corporate entities qualify as 'persons' under § 1442(a)(1)").

18.    Plaintiffs claim the decedent was exposed to asbestos from products manufactured, sold, used, distributed, or supplied by Defendant while serving in the Navy

onboard the *USS Clarion River*, the *USS Plumas County*, and the *USS Balduck*.  (Petition, Exhibit A, ¶3-5).  In this respect, Plaintiffs' claims are based on Defendant's conduct in compliance with federal regulations and instructions including, but not limited to, those issued by the Department of Defense, the Secretary of the Navy, and the Navy and its officers.  As such, this case is subject to removal pursuant to 28 U.S.C. § 1442(a)(1) because it involves an action against an "officer (or any person acting under that officer) of the United States."  28 U.S.C. § 1442 (a)(1).

19.     Defendant's actions at issue in this suit took place under the direct and detailed control of a federal agency — the Navy — as well as several Navy officers and Navy-employed civilians, all acting under the command of the Secretary of the Navy. These individuals exercised direct control over the construction and installation of General Electric marine turbines, as well as control over all information affixed to equipment supplied to the Navy. Further, the Defendant's products were subject to various tests and trials supervised by the Navy before they were approved for use on military vessels. In sum, virtually no aspect of the design and manufacture of the marine turbines at issue escaped the close control of the Navy and its officers.

20.     David Hobson, a former General Electric employee, describes the Navy's control over the design and manufacture of General Electric's Navy turbines, stating that such turbines were manufactured in compliance with detailed Navy specifications that, at that time, required the use of asbestos.  (*January 28, 2008 Affidavit of David Hobson*, Exhibit B, ¶¶ 5-24). All relevant aspects of turbine design (including the choice of materials used in their manufacture) were specified by the Navy, conformance with those specifications was enforced by Navy officers, and General Electric had no ability to deviate from those specifications without Navy approval.  (*Id.*, ¶¶ 5-10).  Navy control extended throughout the turbines' manufacture, testing,

and acceptance. (*Id.*, ¶¶ 11-18). In short, General Electric's Navy turbines were not "off the shelf" items; to the contrary, the Navy was "intimately involved in, and ha[d] absolute control over, even the smallest details of planning, design, and construction of its ships, as well as all the major equipment that goes into those ships, including Navy turbines." (*Id.*, ¶ 5).

21. The Navy also exercised tight control over the warnings, if any, to be supplied with General Electric's turbines, precluding General Electric from affixing any warnings to its turbines beyond those specifically required by the Navy without the Navy's prior review and approval. (*Id.*, ¶¶ 20, 21, and 24). Similarly, the Navy directly participated in formulating the contents of General Electric's turbine manuals which, like the turbines, "include[d] safety information only to the extent expressly directed by the Navy." (*Id.*, ¶ 23; *see also id.* ¶ 22). In sum, "the Navy, not individual equipment manufacturers like GE, exercised absolute authority to determine precisely what hazards aboard its ships would be subject to warnings and the format and content of any such warnings." (*Id.*, ¶ 24).

22. Mr. Hobson's testimony is echoed by retired United States Navy Rear Admiral Ben J. Lehman, whose Navy career from 1942 until 1982 focused on shipbuilding and marine engineering. (*December 30, 2010 Declaration of Admiral Ben J. Lehman*, Exhibit C, ¶¶ 1-2). The Navy "had complete control over every aspect of each piece of equipment used on Navy ships," including turbines. (*Id.*, ¶ 6). Indeed, the Navy "could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be (1) functionally compatible with every other piece of equipment and with available materials from the Navy Supply System; (2) compatible with shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when the shipyard was unavailable using materials carried onboard." (*Id.*, ¶ 4).

23.     Admiral Lehman has also verified that the Navy's control extended to all writings (*e.g.*, stenciling, identification plates and manuals) associated with Navy turbines.  Such writings were just as subject to the Navy's specifications as were the turbines themselves, and General Electric could not supply any warnings that were not specifically authorized or approved by the Navy.  (*Id.*, ¶¶ 6-9).  In short, the Navy "determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling."  (*Id.*, ¶ 7).  With respect to warnings about asbestos, "given necessary performance needs and capabilities of the shipboard equipment, and the ships and Navy personnel, certain types of warnings were simply not approved by the Navy, such as . . . any warnings associated with the hazards of asbestos."  (*Id.*, ¶ 8).  Such warnings "would have required the Navy to furnish equipment which it did not then have, and which would have been impractical to use under shipboard conditions."  (*Id.*).

24.     This testimony is corroborated by the relevant Navy specifications.  The Navy's specifications dictated that the insulation applied to General Electric turbines was ***not*** to be furnished or installed by General Electric; those tasks were delegated to the shipbuilder by MIL-T-17600C §§ 3.2.2.2(m) and 3.6. (Attached as Exhibit D) (*See also* Exhibit B, ¶ 19) (General Electric's Navy turbines "were shipped 'bare metal,' meaning they had only a coat of paint on the exterior surface.  Any thermal insulation materials that may have been applied to Navy turbines manufactured by GE after they left GE's manufacturing plant would have been supplied and installed later by entities other than GE.")).  General Electric has nonetheless tendered a Navy specification requiring use of asbestos in this regard as well.  Specifically, MIL-STD-769B § 5.3 (Attached as Exhibit E) required the insulation pads used with General Electric's turbines to be fashioned from asbestos cloth, asbestos yarn/thread and asbestos millboard, while § 5.4.3 required the use of asbestos cloth in "semi-removable turbine casing flange covers."

25. As to warnings, MIL-M-15071E § 3.2 (Attached as Exhibit F) strictly limited warnings in equipment manuals to those addressing "[n]ew or unique applications" involving the specific equipment at issue, not common issues of equipment operation or repair covered by other more general specifications. Meanwhile, § 3.1 instructed equipment suppliers that their descriptions of operating/maintenance procedures should not address basic equipment-related procedures; instead, they were to assume use by a person experienced in the operation and maintenance of similar equipment who had received "specialized training as a technician through Navy training courses." Most importantly, Mil-M-15071E reflects the Navy's direct participation in developing the contents of the writings supplied with its equipment. More specifically, § 3.11.1 required prior Navy approval of all manuals and dictated that, upon such approval, the manual could not be altered without the Navy's permission. As further reflected in §§ 4.2 and 4.3, an essential aspect of the Navy's review and approval process was an assessment of whether the manual "depict[ed] accurately and adequately the equipment and the operating and maintenance procedures required."[1]

26. All relevant aspects of the design, manufacture, and supply of General Electric's Navy turbines at issue in this case – including the contents of all warnings or other written or verbal communications to be supplied therewith – were subject to close, detailed, and ongoing supervision and control by the Navy and its officers. As previously held by this Court and by courts across the nation, such facts plainly show that General Electric was "acting under" a federal officer in its design, manufacture, and supply of that equipment and of any writings furnished therewith. *See e.g., Comardelle v. OneBeacon America Ins. Co., et al.*, 13-6555 (E.D.

[1] The Navy's control over turbine-related warnings is also reflected in MIL-T-17600C §§ 3.29.4.1 and 3.29.4.2 which required Navy review and approval of both a general outline and preliminary draft of each turbine manual. With even more specific regard to the issues in this case, MIL-T-17600C § 3.29.3.6 specifically enumerated the turbine components as to which "[d]etailed maintenance procedures" were to be included in General Electric's manuals. Neither gaskets nor insulation (the asbestos-containing components potentially at issue) were included, effectively precluding General Electric from supplying maintenance instructions as to those components.

La. March 18, 2014); *Najolia v. Northrop Grumman Ship Sys*., 2012 WL 1886119 at *5-7 (E.D. La. May 23, 2012); *Dupre v. Todd Shipyards Corp*., 2011 WL 4551439 at *6 (E.D. La. Sept. 29, 2011); *Crocker v. Borden*, Inc., 852 F. Supp. 1322, 1326 (E.D. La. 1994); *Ruppel v. CBS Corp*., 701 F.3d 1176, 1181 (7th Cir. 2012); *Shepherd v. Air & Liquid Sys. Corp*., 2012 WL 5874781 at *8-9 (D.R.I. Nov. 20, 2012); *Vedros v. Northrop Grumman Shipbuilding*, 2012 WL 3155180 at *6 (E.D. Pa. Aug. 2, 2012); *Morgan v. Bill Vann Co*., 2011 WL 6056083 at *3, n.3 (S.D. Ala. Dec. 6, 2011); *Kite v. Bill Vann Co*., 2011 WL 4499345 at *4 (S.D. Ala. Sept. 29, 2011); *Ellis v. Pneumo Abex Corp*., 798 F. Supp. 2d 985, 990 (C.D. Ill. 2011); *Corley v. Long-Lewis, Inc.*, 2010 WL 723628 at *19 (N.D. Ala. Jan. 28, 2010); *Allen v. CBS Corp*., 2009 WL 4730747 at *2 (D. Conn. Dec. 1, 2009); *Mitchell v. AC&S, Inc*., 2004 WL 3831228 at *2 (E.D. Va. Dec. 15, 2004); *Madden v. Able Supply Co*., 205 F. Supp. 2d 695, 700-01 (S.D. Tex. 2002); *Carter v. ACandS, Inc*., 2002 WL 31682352 at *4-5 (E.D. Tex. 2002); *Pack v. ACandS, Inc*., 838 F. Supp. 1099, 1103 (D. Md. 1993); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992)); *Faddish v. General Elec. Co*., No. CIV.A.09-70625, 2010 WL 4146108  (E.D. Pa. Oct. 20, 2010).

27.     Plaintiffs' claims against General Electric – including their "design defect" claims regarding General Electric Navy turbines and their "failure to warn" claims arising from General Electric's purported failure to warn of asbestos-related health hazards – necessarily arise solely and completely within the overall context of General Electric's performance of its contractual obligation to the Navy to design, manufacture, and supply the Navy turbines at issue in this case. As such, there is a "causal nexus" between each of those claims and General Electric's conduct under color of their federal office as a military equipment designer, manufacturer, and supplier. *Ruppel*, 701 F.3d at 1181 (considering the removability of similar asbestos-related claims involving CBS Corporation's Navy equipment under § 1442(a)(1) and holding that the "causal

connection" required by that statute existed as "the gravamen of [the plaintiff's] complaint occurred while CBS acted under color of federal authority"); *see also*, *Akin v. Big Three Indus.*, 851 F. Supp. 819, 823-24 (E.D. Tex. 1994) ("[p]lainly, when a government contractor builds a product pursuant to [military] specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied"). Stated differently, where, as here, a defendant has been sued for asbestos-related injuries in relation to equipment it manufactured and supplied to the Navy under the Navy's direction and control, that defendant's satisfaction of the "causal nexus" jurisdictional requirement of 28 U.S.C. § 1442(a)(1) is "**axiomatic**." *Madden*, 205 F. Supp. 2d at 701-02 (emphasis added). *See also, e.g.*, *Najolia*, 2012 WL 1886119 at *11; *Morgan*, 2011 WL 6056083 at *8.

28. As to the jurisdictional requirement of the existence of a colorable federal law-based defense, General Electric hereby gives notice of its assertion of a "government contractor" defense to each of Plaintiffs' claims under *Boyle v. United Technologies Corp*., 487 U.S. 500, 512 (1988). Under *Boyle*, General Electric enjoys government contractor immunity from liability for injuries arising from any exposure to asbestos related to turbines or other equipment at Navy bases or onboard Navy vessels, insofar as they were constructed or repaired by Defendant. *Id*. at 511-12. The government contractor defense applies if: (1) the Defendant designed, manufactured, and supplied the equipment at issue (and all warnings or other writings furnished therewith) in accordance with "reasonably precise specifications" promulgated, adopted, or expressly approved by the United States; (2) "the equipment [and all warnings or other writings furnished therewith] conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id*. at 512. Here, the Navy provided Defendant with

precise specifications regarding its equipment, and Defendant manufactured and delivered equipment that conformed to those specifications—as shown by testimonies of Mr. Hobson and Admiral Lehman, as well as the MilSpecs tendered herewith. Additionally, the Navy, as one of the world's leaders in industrial hygiene at the time of the decedent's alleged exposure to Defendant's equipment, possessed information equal to or superior to that possessed by Navy contractors such as General Electric. As such, Defendant has a colorable claim that it is entitled to immunity from state tort liability under the government contractor defense.

29. At all relevant times to this suit, the Navy was independently aware of health hazards associated with asbestos exposure. To this point, General Electric tenders a declaration by Lawrence Stilwell Betts, M.D., Ph.D. He ascertained that the Navy knew of asbestos hazards by the early 1920s and had "an active program to identify hazardous exposures and to prevent exposures leading to recognized health effects." (*Betts Declaration*, Exhibit G, ¶ 18). In fact, by 1922, the Navy had identified asbestos "as one of the many inorganic and organic dusts that could cause pulmonary disease." (*Id.).* By 1933, the Navy's "Handbook of the Hospital Corps" specifically instructed hospital corpsmen to evaluate and address asbestos hazards. (*Id.*, ¶ 19). In short, "[t]he information possessed by the US Navy, the Maritime Administration, and other Federal Departments and Agencies with respect to the specification and use of asbestos, and the health hazards associated with its use onboard US vessels, far exceeded any information that possibly could have been provided by an equipment manufacturer." (*Id.*, ¶ 46). This knowledge represented the "state of the art." (*Id.*, ¶ 49).

30. The Navy's recognition of asbestos hazards, however, was not coupled with openness to non-Navy assistance in addressing them. "Simply, the Navy could not operate if various personnel were trained differently and received additional, inconsistent information from

different manufacturers." *(Id.*, ¶ 73). "If every equipment manufacturer (and conceivably even the pipe and structural steel manufacturers) provided its own warning about asbestos insulation that might be used on or around its product, inconsistent warnings from these various sources would certainly have resulted. . . . If each was to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances." (*Id.*, ¶ 80).

31. Notably, Defendant is not required to prove success on its defense for purposes of removal. *Mesa*, 489 U.S. at 133; *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) ("defense need only be plausible; its ultimate validity is not to be determined at the time of removal."); *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) ("defendant need not prove that he will actually prevail on his federal immunity defense in order to obtain removal"). Rather, Defendant is only required to show a causal connection between Plaintiffs' claims and Defendant's performance as a federal contractor. Defendant can and has done so. *See, Williams v. Todd Shipyards Co.*, 154 F.3d 416 (5th Cir. 1998). Defendant needs only to present a colorable claim such that the validity of the defense should be tried in federal rather than state forum. *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) ("In construing the colorable federal defense requirement, we have rejected a 'narrow, grudging interpretation' of the statute, recognizing that 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.' We therefore do not require the officer virtually to 'win his case before he can have it removed.'") (quoting *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969)); *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994). ("Once the federal defendant has a plausible federal defense, removal is appropriate so that the federal court

may determine whether the defense succeeds. A federal defendant need not show that he is entitled to *prevail* in order to have access to the federal forum") (emphasis in the original).

32. Based upon the foregoing, General Electric asserts immunity for the manufacture and sale of equipment to the U.S. Navy used on Naval vessels under the government contractor defense, a widely recognized colorable federal defense that provides immunity to contractors for liability under state law for equipment supplied to the United States. *See e.g., Ferguson v. Lorillard Tobacco Co.*, 475 F. Supp.2d 725, 730 (N.D. Ohio 2007); *Nesbiet v. General Electric Co.*, 399 F. Supp.2d 205 (S.D.N.Y. 2005).

**WHEREFORE**, Defendant, General Electric Company pursuant to these statutes and in conformance with the requirement set forth in 28 U.S.C. § 1446, removes this action from the 19th Judicial District Court for the Parish of East Baton Rouge, Louisiana on this 8th day of July, 2016.

Respectfully submitted,

**FRILOT L.L.C.**

***/s/ Kelsey A. Eagan***

JOHN J. HAINKEL, III – 18246
ANGELA M. BOWLIN – 20714
JAMES H. BROWN, JR. – 3564
PETER R. TAFARO – 28776
MEREDITH K. KEENAN – 29287
KELSEY A. EAGAN – 35764
3700 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163-3600
T: (504) 599-8000; F: (504) 599-8100
keagan@frilot.com
**Counsel for General Electric Company**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY this 8th day of July, 2016, that I electronically filed the foregoing pleading with the Clerk of Court using CM/ECF, which will send notification of such filing to all enrolled counsel of record.

***/s/ Kelsey A. Eagan***

**19th JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

**NO.** 646592 **DOCKET NO.** 24

**BOBBIE ZERINGUE, INDIVIDUALLY AND ON BEHALF OF HER DECEASED HUSBAND, HOWARD ZERINGUE**

**AND**

**AARON ZERINGUE, ROB ZERINGUE, AND HARRIS ZERINGUE, INDIVIDUALLY AND ON BEHALF OF THEIR DECEASED FATHER, HOWARD ZERINGUE**

**VERSUS**

**ALLIS-CHALMERS CORPORATION, ET AL**

**FILED:** ____________________ ____________________
**DEPUTY CLERK**

**ORIGINAL PETITION FOR DAMAGES AND WRONGFUL DEATH**

FILED EAST BATON ROUGE PARISH, LA 2016 MAR 8 P 2:53 DEPUTY CLERK OF COURT

**NOW INTO COURT**, through undersigned counsel, come Petitioners, Bobbie Zeringue, individually and on behalf of her deceased husband, Howard Zeringue, and Aaron Zeringue, Rob Zeringue, and Harris Zeringue, individually and on behalf of their deceased father, Howard Zeringue, who respectfully represent as follows:

1.

Petitioners, Bobbie Zeringue, Aaron Zeringue, Rob Zeringue, and Harris Zeringue are persons of the full age of majority and domiciliaries of Jefferson Parish and East Baton Rouge Parish, respectively.

2.

Made Defendants herein are the following:

A. **ALLIS-CHALMERS CORPORATION,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Delaware and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at The Company Corporation, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

B. **ASBESTOS CORPORATION, LTD.,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of Canada and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at 840 Quellet Boulevard, West, Thetford Mines, Quebec, Canada G6G7A5.

C. **BELL ASBESTOS MINES, LTD.,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of Canada and over which this Honorable Court has personal

FAX COPY FILED 3/8/16
ORIGINAL FILED 3/14/16

EXHIBIT
A

jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at 852 Quellet Boulevard, West, Thetford Mines, Quebec, Canada G6G7A5.

D. **CLEAVER-BROOKS SALES AND SERVICE, INC.**, a foreign corporation currently licensed to do business in the State of Louisiana with its principal business establishment in East Baton Rouge Parish which can be served at Corporation Service Company, 320 Somerulos Street, Baton Rouge, LA 70802.

E. **CSR, LTD.**, a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of Australia and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at 9 Help Street, Chatswood, NSW 2057, Australia.

F. **CRANE CO.**, a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Delaware and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

G. **FIDELITY AND CASUALTY INSURANCE COMPANY OF NEW YORK** (as the insurer of Wayne Manufacturing Company), a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, LA 70809.

H. **FLOWSERVE US, INC. (a/k/a Worthington Pump, Inc.)**, a foreign corporation currently licensed to do business in the State of Louisiana with its principal business establishment in East Baton Rouge Parish and which can be served at CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, LA 70808.

I. **FOSTER WHEELER BOILER CORPORATION**, a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Delaware and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at United States Corporation Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

J. **GENERAL ELECTRIC COMPANY**, a foreign corporation currently licensed to do business in the State of Louisiana with its principal business establishment in Jefferson Parish and which can be served at CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, LA 70808.

K. **HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop Grumman Shipbuilding, Inc.)**, a foreign corporation currently licensed to do business in the State of Louisiana with its principal business establishment in Jefferson Parish and which can be served at CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, LA 70808.

L. **HOPEMAN BROTHERS, INC.**, a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Delaware and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

M. **LIBERTY MUTUAL GROUP, INC.**, (as the insurer of Wayne Manufacturing Company), a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, LA 70809.

N. **THE MCCARTY CORPORATION,** a Louisiana corporation authorized to do and doing business in the State of Louisiana, with its registered office in East Baton Rouge Parish, and whose agent for service of process is Paul H. Spaht, 445 North Boulevard, Suite 300, Baton Rouge, LA 70802.

O. **METROPOLITAN LIFE INSURANCE COMPANY,** a corporation organized, created and existing under and by virtue of the laws of the State of New York with its principal place of business in New York, New York, and which, at all material times relevant hereto, was licensed to do and doing business in the State of Louisiana, and which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, LA 70809.

P. **OWENS-ILLINOIS, INC.,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Delaware and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

Q. **REILLY-BENTON COMPANY, INC.,** a Louisiana corporation authorized to do and doing business in the State of Louisiana, with its registered office in East Baton Rouge Parish, and whose agent for service of process is Thomas Cougill, c/o Willingham, Fultz & Cougil, L.L.P., 8550 United Plaza Blvd., Suite 702, Baton Rouge, LA 70809.

R. **TAYLOR-SEIDENBACH, INC.,** a Louisiana corporation authorized to do and doing business in the State of Louisiana, with its registered office in Orleans Parish, and whose agent for service of process is Robert I. Shepard, 731 S. Scott Street, New Orleans, LA 70119.

S. **WESTINGHOUSE ELECTRIC COMPANY (DELAWARE), LLC,** a foreign corporation currently licensed to do business in the State of Louisiana with its principal business establishment in East Baton Rouge Parish and which can be served at CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, LA 70808.

3.

Decedent, Howard Zeringue, served in the United States Navy from June 9, 1952 until June 8, 1960; including as an active duty sailor during the Korean War from 1952 until June 12, 1956. Mr. Zeringue served aboard three different vessels: USS Clarion River (LSMR 409) from September of 1952 through her mothballing at Tongue Point Naval Shipyard in Astoria, Oregon, in October of 1955; the USS Plumas County (LST 1083) from October of 1955 until she was damaged by a typhoon; and finally the USS Balduck from after the typhoon until June of 1956. He served in several different capacities, including, but not limited to fire watch, ship breakdown crew, and culinary specialist. Regardless of the capacity in which he was serving at the time, each day was virtually the same in that he would wake up in his bunk and swing down to the deck using the deteriorating asbestos covered pipes that ran just above his bed and proceed through the engine/boiler room where asbestos containing products were also regularly and frequently being disturbed. After receiving an Honorable Discharge for his service, Mr. Zeringue

attended the University Southwestern Louisiana (now known as the University of Louisiana at Lafayette) and worked during the summer at Celotex Corporation in Marrero, where he would, among other tasks, catch boards off the conveyer belt and stack them resulting in additional asbestos exposure. Finally, after he finished college, Mr. Zeringue sold insurance for New York Life and The Hartford where he repeatedly attempted to sell to Avondale Shipyard and its employees, resulting in additional asbestos exposures during onsite sales calls, visits, and meetings.

4.

The Defendants are strictly liable unto the Petitioners for allowing dangerous asbestos fibers to escape from their custody, control and guard.

5.

At all times relevant hereto, Allis-Chalmers Corporation, Cleaver-Brooks Sales and Service, Inc., Crane Co., Eagle, Inc., Flowserve US, Inc., Foster Wheeler Boiler Corporation, General Electric Company, Hopeman Brothers, Inc., The McCarty Corporation, Owens-Illinois, Inc., Reilly-Benton Company, Inc., Taylor-Seidenbach, Inc., and Westinghouse Electric Company (Delaware), LLC (collectively referred to as "Defendant Manufacturers") designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's jobsites where he was exposed. These Defendants are strictly liable for selling defective products and holding themselves out as manufacturers in that they would alter products, repackage products, and hold the products out as there own. Additionally, these Defendants were negligent in that they failed to warn employees of the hazards of asbestos and they failed to take steps to make themselves aware of the hazards of asbestos.

Additionally, Mr. Zeringue resided within one and one-half (1.5) miles of Avondale Shipyards where substantial ship construction activities were taking place in the 1960s and 1970s that involved the use of asbestos-containing materials, the use and manipulation of which released significant amounts of dust. Huntington Ingalls Incorporated (f/k/a Northrop Grumman Shipbuilding, Inc.) (Avondale Shipyard) was negligent in that they failed to warn the residents and neighbors of the facility of the hazards of asbestos exposure and the dust(s) emanating from Avondale Shipyards.

6.

Defendant Manufacturers are manufacturers of asbestos-containing products that were sold to and used at Plaintiff's jobsites where he was exposed. These Defendant Manufacturers are strictly liable. The asbestos-containing products manufactured, distributed and/or sold by these Defendants were unreasonably dangerous *per se*, defective and defective in design. The Defendant Manufacturers were negligent and at fault, without limitation, of the following:

a) The hazards associated with the products manufactured by them outweigh the utility of the products;

b) The products manufactured by them were unreasonably dangerous in construction or composition at the time they left the control of these Defendants;

c) They failed to adequately warn about the dangers relating to the use of their products;

d) Alternative products were available to serve the same needs or desires, with less risk of harm;

e) They failed to design the product with less harmful consequences, which were usable at the time of the manufacture of the products;

f) They failed to disseminate knowledge of the hazards of their own products; and

g) They were negligent and/or fraudulent for the reasons set forth in the Original Petition for Damages.

7.

At all times relevant hereto, Defendant Manufacturers designed, manufactured, fabricated, assembled, supplied, sold, marketed, warranted and/or advertised asbestos containing products including, but not limited to, felt, cloth, block insulation, pipe insulation, and other thermal insulation systems, boilers, engines, turbines, pumps, and gaskets, the asbestos fibers and/or dust from which was inhaled or otherwise ingested by Mr. Zeringue.

8.

Howard Zeringue was exposed to the products of the Defendant Manufacturers because he was actually either employed, utilized, or manipulated these products or was in the vicinity in which these products were being employed, utilized or manipulated; thereby forcing the Petitioner to be exposed to asbestos fibers from these asbestos containing products as a result of his work duties.

9.

Defendant Manufacturers, individually, jointly and severally, and in solido, are strictly liable to the Petitioner because the asbestos containing products designed, manufactured, assembled, fabricated, supplied, sold, installed, marketed, warranted, advertised and/or used by Defendants were defective and unreasonably dangerous *per se*, and were the producing cause of injury to Mr. Zeringue.

10.

Defendant Manufacturers are also liable, individually, jointly and severally, and in solido, to the Petitioner for, and are guilty of, the following:

(1)   Manufacturing a product defective in design;

(2)   Failing to properly test their products;

(3)   Failing to properly warn against the dangers inherent in the use of their products;

(4)   Failing to provide proper instructions in the use of their products;

(5)   Failing to furnish proper wearing apparel, masks, respirators, or other devices that might reduce the dangers of the use of their products;

(6)   Failing to instruct or warn of the proper safety devices so as to reduce the dangers of their products; and

(7)   Any other acts of negligence to be shown at the trial of this matter.

11.

Further, the Defendant Manufacturers expressly and impliedly warranted to users and/or consumers, such as the Petitioner, that their products were reasonably fit for their intended use without endangering human life, and that their products were of merchantable quality.

12.

The Defendant Manufacturers breached the expressed and implied warranty in that their products were defective and the defects in their products permitted and/or caused injuries to Petitioner while he was being exposed to their products in a manner that was reasonably foreseeable.

13.

As a direct and proximate result of exposure to the asbestos containing products of the Defendant Manufacturers on the premises of his jobsites, Petitioner suffered injuries resulting in his contraction of mesothelioma and subsequent death on August 22, 2015.

14.

Petitioner further states that each Defendant is jointly and severally, and in solido, strictly liable to him for, but not limited to, the following reasons:

(a)   The products sold, supplied, and/or used by Defendants containing asbestos were defective and unreasonably dangerous *per se*, and were the producing cause of injury to Petitioner;

(b)   The Defendants intentionally failed to warn Petitioner of the known foreseeable dangers of the use of the products manufactured, distributed, utilized, and/or sold by the Defendants;

(c)   The Defendants knew, or in the exercise of reasonable care, should have known that their products were in a defective condition and unreasonably dangerous, and that their use would cause lung cancer, and other asbestos related diseases;

(d)   The Defendants failed to test their products concerning the effect of inhalation of asbestos dust and fibers and the ingestion of other materials contained in the insulation upon the human body;

(e)   The Defendants failed to warn the Petitioner of the dangers of working with or around their asbestos containing products;

(f)    The Defendants failed to either furnish proper wearing apparel, masks, respirators, or other devices that might reduce the dangers of the use of their products, and failed to instruct or warn of the proper safety devices so as to reduce the dangers of their products;

(g)   The Defendants knew that their products would have to be cut, sawed, broken, sprayed, hammered into place, and generally handled in such a manner as to create dust which when ingested or inhaled into the body would cause severe, permanent and disabling diseases such as asbestosis;

(h) The Defendants knew that there were substantially similar products which would serve the purpose of high heat insulation which did not contain asbestos, and further knew that said substitute products would not cause severe, permanent and disabling harm to the body of users or consumers; and

(i) Failure to maintain its premises in a safe condition.

**LIABILITY OF METROPOLITAN LIFE INSURANCE COMPANY**

**SARANAC LABORATORY BACKGROUND**

15.

On January 15, 1935, in Pittsburgh, Pennsylvania, during a symposium sponsored by the Mellon Institute of Industrial Research, a representative of Johns-Manville as representative of the Asbestos Industry, Dr. A.J. Lanza, Assistant Medical Director of the Metropolitan Life Insurance Company, and Dr. Donald E. Cummings, Assistant Director of the Saranac Laboratory for the Study of Tuberculosis, met with other members of U.S. Industry to formulate a plan concerning the "dust problem" attendant to all the industries present. It was recognized at this meeting that only two forms of dust, namely, free silica and asbestos, were definitely known to produce disabling fibrosis of the lung. At this symposium, common problems to all industries were identified and there was discussion on how to best resolve these problems.

16.

In 1936, the Asbestos Industry decided not to cooperate with other industries, but instead concluded that it would be more beneficial to their interest to operate and control an independent and prominent scientific institute, the Saranac Laboratory. The Saranac Laboratory in upstate New York was a leading research facility on industrial and infectious pulmonary diseases in the United States and had previously enjoyed a close and confidential relationship with the Metropolitan Life Insurance Company, a major underwriter of insurance to the Asbestos Industry. Metropolitan Life Insurance Company had made substantial contributions to the Saranac Laboratory for help with medical/legal problems concerning its industry insurance.

17.

In November, 1936, the President of Johns-Manville and its attorney, Mr. Vandiver Brown, had a conference with Dr. Leroy U. Gardner of the Saranac Laboratory along with Dr.

Lanza and Dr. McConnell of the Metropolitan Life Insurance Company to discuss the asbestos medical situation as it related to the Asbestos Industry. It was decided at this meeting that Dr. Gardner's laboratory at Saranac would be used by the Asbestos Industry conspirators to generate and disseminate only favorable information regarding asbestos disease, so that this "independent" favorable information could be submitted to the public health officials and compensation commissions of the various states when the question of asbestosis arose. This move was calculated to combat any adverse publicity. It was decided that the information obtained would also be distributed to the medical community and the public at large provided it was of the "right" type and only if it would not injure the asbestos companies.

18.

On November 10, 1936, Vandiver Brown of Johns-Manville wrote to F.H. Schluter, President of co-conspirator Thermoid Rubber Company concerning this conference with Dr. Gardner and Dr. Lanza at Saranac. Mr. Brown related the information about the asbestos situation in the Asbestos Industry and confirmed the need for studies paid for by the Industry working as a whole which could be used for future compensation suits.

19.

On Tuesday, November 17, 1936, a meeting was held at the Biltmore Hotel with conspirators Johns-Manville, represented by Mr. Brown; Thermoid Rubber Company, represented by Mr. Schluter; Keasbey and Mattison Company, represented by Mr. A.S. Blagden; Asbestos Manufacturing Company, represented by Mr. H.D. Lamont; Russell Manufacturing Company, represented by Mr. G.M. Williams; and Raybestos Manhatten, Inc., represented by its president, Mr. Sumner Simpson. At this meeting, it was decided that Dr. Gardner's Saranac Laboratory would be employed to conduct and disseminate favorable studies for the Asbestos Industry. Additionally, the conspirators agreed that the results obtained from any such studies by Dr. Gardner and Saranac Laboratory would be considered the property of those advancing the required funds for the studies, who would then determine whether, to what extent, and in what manner the results of any such studies would be made public. Finally, these deceptive practices were culminated by the agreement that no information would be published prior to approval of each conspirator.

20.

Johns-Manville Corporation agreed to make the payments for the studies directly to the Saranac Laboratory and be reimbursed by the other Asbestos Industry conspirators.

21.

Dr. A.J. Lanza of Metropolitan Life was selected to coordinate the activities between Dr. Gardner of the Saranac Laboratory and the Asbestos Industry, along with Attorney Vandiver Brown of Johns-Manville.   Mr. Brown in turn enlisted the aid, support, and complicity in the conspiracy of Mr. Ivan Sabourin of the Quebec Asbestos Mining Association.

22.

On November 20, 1936, a memorandum of agreement between Dr. Gardner of the Saranac Laboratory and the asbestos conspirators was executed and signed by the agents of the American Brake Block Corporation, the Asbestos Manufacturing Company, the Keasbey and Mattison Company, Raybestos Manhattan, Inc., Gatke Corporation, Johns-Manville Corporation, Russell Manufacturing Company, Union Asbestos and Rubber Company, and the United States Gypsum Company.  Thermoid Rubber Company did not sign the November 20, 1936 agreement; however, they later contributed annually to support the Saranac studies in furtherance of the conspiracy.

23.

Under this agreement, the above named conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease, in what form, and where such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study.  On numerous occasions thereafter, as will be outlined below, these conspirators exercised this power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of material fact being made at scientific meetings, in scientific journals, at medical schools and universities, and to the United States Public Health Service, and to the public health services of the various states.

24.

On November 23, 1936, Dr. Gardner of Saranac Laboratory confirmed to Vandiver Brown of Johns-Manville the authorization to proceed with his experiment at a $5,000 annual

sum for three years. Dr. Gardner agreed to the secrecy provisions and agreed to obtain approval of the co-conspirators before any publications were made.

25.

Dr. Gardner's agreement concerning secrecy and non-publication of results without prior approval was scrupulously monitored by Dr. Lanza and Attorney Brown on behalf of the Asbestos Industry, throughout the beginning of the conspiracy and continuing into the mid-1950's when the Saranac Laboratory was closed.

26.

Dr. Gardner at Saranac Laboratory informed Vandiver Brown on February 24, 1943, that he had at last succeeded in analyzing most of the experimental data which had been started in 1936. In a letter to Mr. Brown of that date, he attached a report entitled "Outline of Proposed Monograph on Asbestosis", which monograph included as Part I an essay on human asbestosis and as Part II an essay on experimental asbestosis. Dr. Gardner informed Mr. Brown in this letter that as a result of his experiments, the question of cancer susceptibility was more significant than Dr. Gardner had previously believed. In fact, Dr. Gardner believed that he should continue this cancer susceptibility research and hoped to obtain further funding from the National Cancer Institute. Dr. Gardner further informed Mr. Brown that his work on methods of dust determination was important enough to include in his study because he had found that the current method was deceptive. This finding was significant in the prevention of the asbestosis disease because Dr. Gardner had concluded that there was no practical way to prevent the occurrence of asbestosis after exposure to asbestos dust. Thus, the chief means of controlling the disease would be through control of the air and fiber content to which workers were exposed.

27.

On March 8, 1943, Mr. E. Mueleck, agent of Keasbey and Mattison, wrote to Mr. W.F. Shephard, agent of T&N, PLC, forwarding a copy of Dr. Gardner's proposed monograph on asbestosis, telling him that the other conspirators felt that all references to the question of cancer susceptibility should be omitted from the published report.

28.

Dr. Gardner, who was still bound by the secrecy provisions of the original 1936 Saranac agreement, nevertheless felt that his findings concerning the possibility of carcinogenic action of

asbestos fibers was important enough to make a request to Dr. Ludwick Hektoen, Chairman of the Committee on Cancer Research of the National Cancer Institute, for further cancer studies. Dr. Gardner informed Dr. Hektoen that he was startled to discover that a small group of mice showed an excessive incidence (81.8%) of pulmonary cancer. Dr. Gardner explained that he would have attached little importance to this figure except for the fact that scientific literature had now reported ten cases of pulmonary cancer in cases of human asbestosis.

29.

On June 9, 1943, Dr. Gardner again wrote to Vandiver Brown emphasizing his concern with continuing his cancer studies. Dr. Gardner, however, reassured Mr. Brown that until he received the necessary funds from the National Cancer Institute for the confirmatory animal studies that he would maintain the agreement of secrecy and say nothing about his observations of cancer.

30.

On September 29, 1943, Dr. Gardner again wrote to Dr. Hektoen at the National Cancer Institute for an answer to his request for funds. Dr. Gardner described asbestosis as being next to silicosis on the issue of industrial disease importance.

31.

Because of the efforts of the co-conspirators, Dr. Gardner's request for cancer studies was denied. Most notably were the efforts of Dr. Lanza during the proceedings of the twenty-fourth meeting of the National Advisory Council of the National Cancer Institute held on January 8, 1944 and resulted in the denial for further studies.

32.

On October 24, 1946, Dr. Gardner died. After Dr. Gardner's death, Dr. Lanza visited the Saranac Laboratory and took Dr. Gardner's unfinished report about his asbestosis experiments and represented to the other conspirators that he had Dr. Gardner's note typed from the handwritten form.

33.

On January 21, 1947, at the Johns-Manville general headquarters, Dr. Lanza met with various members and officers of the Johns-Manville Corporation to discuss the late Dr. Gardner's asbestos experiments. It was decided at this meeting that Dr. Kenneth Lynch at the medical

school in Charleston, South Carolina would be asked to review the material and to inform the conspirators through Dr. Lanza on whether Dr. Lynch would be able to put Dr. Gardner's material into "publishable" form. Mr. Brown, attorney for Johns-Manville, reminded Dr. Lanza and the others that there would be no publication of the results of the experiments without the conspirators' consent, and further, that no part of the report could include objectional material from the industry point of view, pointing out specifically Dr. Gardner's conclusion about the relationship between asbestos dust and cancer, which Dr. Gardner had previously made in his monograph on asbestosis as cited above.

34.

On June 30, 1947, Dr. Kenneth Lynch, Dean of the Charleston Medical School, informed the conspirators, through a letter to Dr. Lanza, that Dr. Gardner's manuscript should be submitted for publication practically as written. Dr. Lynch pointed out that to corroborate with Dr. Gardner, posthumously, by altering his manuscript, without Dr. Gardner's having contemplated those changes, would not be proper.

35.

Because of Dr. Lynch's refusal to change Dr. Gardner's manuscript, the conspirators decided to use Dr. Arthur Vorwald, the new medical director at the Saranac Laboratory, to make the conspirators' requested changes. On March 15, 1948, Mr. J.P. Woodard of Johns-Manville wrote to Dr. Lanza that he had just paid Dr. Vorwald "our contribution for the current year". Mr. Woodard also requested Dr. Lanza to pressure Saranac Laboratory to get the asbestos diatomaceous earth studies in "publishable" form soon, noting considerable agitation, both in Canada and on the West Coast.

36.

On October 12, 1948, Thomas Durkin of the Saranac Laboratory informed Mr. Woodard of Johns-Manville that Dr. Vorwald had finally produced a new edition of Dr. Gardner's report which Mr. Durkin forwarded to Mr. Woodard with fifteen copies. Mr. Durkin further informed Mr. Woodard that the report was complete except for a minor section devoted to lung cancer, and that Saranac Laboratory and Dr. Vorwald were beginning preparation of the final portion of the report, that portion dealing with human asbestosis.

37.

On October 22, 1948, Mr. Brown wrote to conspirators Ernest Mueleck and J.F.D. Rohrbac of Keasbey and Mattison, forwarding Dr. Vorwald's version of Dr. Gardner's report. Mr. Brown suggested the elimination of all references to tumors and also to pneumonia.  Mr. Brown also stated that this report must be confined to the results of experiments with animals, and not be considered as the first part of a study of the effect of asbestos dust on both animals and human beings, because Dr. Vorwald, who had succeeded Gardner at Saranac Laboratory, and who did not sign the original agreement, would be more difficult to deal with when it came time to making the changes demanded by the conspirators.

38.

On October 27, 1948, Vandiver Brown of Johns-Manville wrote to all of the other conspirators sending them copies of Dr. Vorwald's report.   He admonished his co-conspirators to treat the report with utmost confidence and to make it available to no one outside of the organization.  Mr. Brown also warned his co-conspirators to return all drafts of the report to him because it was obviously undesirable that the report receive any distribution or publicity outside a limited number of people and the respective conspirators' organizations.

39.

On October 28, 1948, Mr. Mueleck, the President of Keasbey and Mattison, replied to co-conspirator Vandiver Brown of Johns-Manville, thanking him for the September 30, 1948 report. Mr. Mueleck outlined his comments about changes that were necessary to be made before the report was published and emphasized to Mr. Brown that the report was confidential and the property of those who advanced the funds for carrying out the experiments at the Saranac Laboratory.

40.

On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation:  American Brake Block, a Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey and Mattison Company (alter ego to conspirator T&N), Raybestos Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber Company and United States Gypsum Company, whose interests were represented at the meeting by Mr. Brown of Johns-Manville.

41.

At this November 11, 1948 meeting, these conspirators and their representatives decided to exert their influence to alter materially and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratory in 1936 as discussed above. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of critical review of the then existing dust standards for the health effects of asbestos on humans with asbestos and asbestos products. The standard sampling techniques of the day and the technique recommended by the co-conspirators to the United States Public Health Service and state public health agencies was the counting of only total particles rather than fiber when the conspirators knew that the harmful portion of asbestos is the fibrous portion rather than the particulate portion. Thus, when Dr. Gardner's research then documented the significance of counting fibers, the conspirators chose to suppress this information rather than inform the public health authorities and employees that existing standards and threshold limit values were established incorrectly and were in fact not providing adequate protection to the workers from exposure to harmful levels of asbestos dust.

42.

On November 12, 1948, Mr. Brown of Johns-Manville wrote to Manfred Bowditch, Field Director of Saranac Laboratory, reminding Mr. Bowditch of the 1936 agreement made by Dr. Gardner with the conspirators, pointing out the secrecy and prior approval provisions.

43.

On November 12, 1948, Mr. Brown also wrote to W.T. Kelly, Jr., Executive Vice President of American Brake Block, Division of the American Brake Shoe Company, and informed him that a meeting had been held to consider the Saranac Laboratory report on November 11, 1948, with all the "interested" parties represented except the Russell Manufacturing Company. Mr. Brown informed Mr. Kelly further that it was the unanimous opinion of the conspirators that all of Dr. Gardner's references in his work to cancer and tumors would be deleted prior to the revised version being published. Mr. Brown told Mr. Kelly that even though he had provided him a copy of the Gardner/Vorwald report, that the reports were numbered and expected to be returned to him because the conspirators wanted no copies of Dr. Gardner's draft report circulating if Dr. Vorwald's version was to be different in any substantial respect.

44.

On December 6, 1948, Dr. Vorwald of Saranac Laboratory wrote to Dr. Lanza, who was now working part time as the Director of the New York University Institute of Industrial Medicine, in addition to his duties at Metropolitan Life. Dr. Vorwald informed Dr. Lanza that his job was to finish editing Dr. Gardner's work concerning the human asbestos material. He reassured Dr. Lanza that he understood that the 1936 Saranac agreement to submit articles for review by the conspirators before any publication.

45.

On December 14, 1948, Dr. Lanza, on behalf of Metropolitan Life and the other conspirators, wrote to Dr. Vorwald outlining the changes the conspirators required Dr. Vorwald to make in his draft of Dr. Gardner's work. Dr. Lanza told Dr. Vorwald that it was the consensus of the group that all references to cancers or tumors should be omitted, including any tables relating to the subject.

46.

On March 3, 1949, Mr. Brown of Johns-Manville wrote to Mr. Sabourin of the Quebec Asbestos Mining Association and forwarded to him a copy of the now "approved" Gardner/Vorwald report. Mr. Brown forwarded the report to Mr. Sabourin because of Mr. Sabourin's complicity and association with the other conspirators. Mr. Brown further suggested that Mr. Sabourin give a copy of their report to the Compensation Commission in Canada through the Ministry of Labor, in order to further the aims of the conspirators with officials in Canada. Mr. Brown warned Mr. Sabourin to otherwise keep the report in confidence until publication.

47.

On March 3, 1949, Mr. Brown also informed his fellow conspirators that he had received the Saranac final revised approved report and informed them that this report had adopted the substance of all the changes suggested by the conspirators. Mr. Brown further informed the conspirators that he had arranged for publication of the report with an appropriate introduction to be made by Dr. Lanza.

48.

In January, 1951, the final version of the Saranac report was published in the AMA Archives of Industrial Hygiene and Occupational Medicine under the title "Experimental Effects

of Asbestosis." The published report wrongfully omitted Dr. Gardner's significant writings on human asbestosis and his critically important criticism of the asbestos dust threshold limit value and all mention of his animal studies on the positive relationship between asbestosis and cancer, and in keeping with the conspirators' original intent to mislead and deceive public health officials and the consuming public as set out above. On June 11, 1951, Dr. K.W. Smith, Medical Director of Johns-Manville Corporation, informed his fellow officers of the corporation that the Saranac report had received a wide and adequate circulation. Dr. Vorwald had sent reprints to a wide circle of interested medical authorities, and Mr. Sabourin had sent the report to all members of the Quebec Asbestos Mining Association. Dr. Smith further noted that the report was now in libraries of universities and medical schools across the United States.

49.

As a result of this conspiracy of silence, Petitioners suffered injuries.

50.

At all times mentioned herein, all Defendants are individually, jointly, severally, and in solido liable to Petitioners for the damages asserted herein.

51.

Defendants are liable to Petitioner for the following damages:

(a)   Physical pain and suffering;

(b)   Mental pain and anguish;

(c)   Wrongful death;

(d)   Loss of enjoyment of life; and

(e)   Medical expenses, past and future.

52.

Howard Zeringue is survived by his spouse, Bobbie Zeringue, and his children, Aaron Zeringue, Rob Zeringue and Harris Zeringue, who request that this Honorable Court allow them to bring this action in the stead of decedent, Howard Zeringue, including all other rights and causes of action available to them.

53.

WHEREFORE PETITIONERS PRAY that Defendants be duly served and cited to appear and answer this petition and after all legal delays and due proceedings be had that there be judgment in favor of the Petitioners and against Defendants for all damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid and all costs of these proceedings.

PETITIONERS FURTHER PRAY for all general and equitable relief required or reasonable in the premises.

Respectfully submitted,
**POURCIAU LAW FIRM**

Damon R. Pourciau (31529)
2200 Veterans Memorial
Suite 210
Kenner, Louisiana 70062
Telephone: (504) 305-2375
Facsimile: (504) 305-4168

And

GALANTE & BIVALACQUA LLC
Scott M. Galante (26890)
650 Poydras Street, Suite 2615
New Orleans, Louisiana 70130
Telephone: (504) 648-1858
Facsimile: (504) 561-0559

**PLEASE SERVE:**

**ALLIS-CHALMERS CORPORATION (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:
Capital Services Inc.
1675 South State Street, Suite B
Dover, DE 19901

**ASBESTOS CORPORATION, LTD (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:
840 Quellet Boulevard,
West, Thetford Mines, Quebec, Canada G6G7A5

**BELL ASBESTOS MINES, LTD (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:
852 Quellet Boulevard,
West, Thetford Mines, Quebec, Canada G6G7A5

FILED 3-14-2016
Signed S/ Meghan Tardes
Deputy Clerk
Certified True and Correct Copy
6-9-2016
Sharon [illegible]
Deputy Clerk

**CLEAVER-BROOKS SALES AND SERVICE, INC.**
Through its agent for service of process:
Corporation Service Company
320 Somerulos Street
Baton Rouge, LA 70802

**CRANE CO. (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**CSR, LTD (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:
9 Help Street
Chatswood, NSW 2057, Australia

**FIDELITY AND CASUALTY INSURANCE COMPANY OF NEW YORK**
Through the Louisiana Secretary of State
East Baton Rouge Sheriff's Office
P.O. Box 3277
Baton Rouge, LA 70821

**FLOWSERVE US, INC.**
Through its agent for service of process:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

**FOSTER WHEELER BOILER CORPORATION (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:
Perryville Corporate Park
Clinton, NJ 08809-4000

**GENERAL ELECTRIC COMPANY**
Through its agent for service of process:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

**HOPEMAN BROTHERS, INC. (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**HUNTINGTON INGALLS INCORPORATED**
Through its agent for service of process:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

**LIBERTY MUTUAL GROUP, INC.**
Through the Louisiana Secretary of State
East Baton Rouge Sheriff's Office
P.O. Box 3277
Baton Rouge, LA 70821

**METROPOLITAN LIFE INSURANCE COMPANY**
Through the Louisiana Secretary of State
East Baton Rouge Sheriff's Office
P.O. Box 3277
Baton Rouge, LA 70821

**OWENS-ILLINOIS, INC. (CERTIFIED MAIL)**
Via the Louisiana Long-Arm Statute:The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**TAYLOR-SEIDENBACH, INC.**
Through its agent for service of process:
Robert I. Shepard
731 S. Scott Street
New Orleans, LA 70119

**THE MCCARTY CORPORATION**
Through its agent for service of process:
Paul H. Spaht
445 North Boulevard, Suite 300
Baton Rouge, LA 70802

**REILLY-BENTON COMPANY, INC.**
Through its agent for service of process:
Thomas Cougil
c/o Willingham, Fultz & Cougil, L.L.P.
8550 United Plaza Blvd. Ste. 702
Baton Rouge, LA 70809

**WESTINGHOUSE ELECTRIC COMPANY (DELAWARE), LLC**
Through its agent for service of process:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

# DECLARATION OF DAVID HOBSON

I, David Hobson, declare as follows:

1. I joined General Electric ("GE") in 1969 and was employed there until 1996. My last position with GE before retirement was Manager of Navy Customer Service for GE's Navy and Small Steam Turbine Department in Fitchburg, Massachusetts. I received a degree in Marine Engineering from the Massachusetts Maritime Academy and was licensed as a second assistant engineer by the United States Coast Guard. I sailed as an engineering officer on steam ships and worked as an engineer in the shipbuilding industry before my employment by GE. I held various product support and managerial positions throughout my career at GE involving steam turbines intended for installation aboard U.S. Navy vessels as "Navy turbines." I have personal knowledge of the facts contained herein.

2. For many years, a significant proportion of Navy ships, especially warships, have been powered by steam. Navy turbines are mechanical devices made of metal, principally alloys of steel that are used on such ships. Their purpose is to convert the heat energy contained in steam into mechanical energy that can be harnessed to drive a ship's propellers or to turn a generator to make electricity for shipboard use. Inside the hull of each ship, the Navy designs and installs a complex steam propulsion system using components procured from numerous manufacturers. Navy turbines are one such component that the Navy incorporates into its overall propulsion system. Navy turbines have been manufactured by various American companies over the years. GE was one such company until it exited the Navy turbine business in 1996.

3. During my 27 years of employment with GE, I had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's

EXHIBIT B

purchase and use of Navy turbines manufactured by GE. I submit this Affidavit to attest to the extensive level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery ("INM"), over GE's design and manufacture of Navy turbines.

4. I have personal knowledge of the great extent of Navy control over GE's design and manufacture of Navy turbines because I was personally involved in the process with respect to numerous such Navy turbines. I interacted with the Navy on behalf of GE and experienced at first hand its control over GE. Additionally, based upon my education, training, and experience accumulated throughout my career in the field of Navy turbines, I have gained specialized knowledge related to such matters that goes beyond my own first hand observations. For example, as part of my career, I have studied military specifications and other Navy documents and drawings concerning Navy turbines dating back to World War II; I have been involved in issues concerning repairs and renewal parts for Navy turbines on WWII era U.S. Navy ships that were still in active service with foreign navies during my employment with GE; I have conferred on numerous occasions with Navy officers and others involved in naval shipbuilding, who shared with me their knowledge concerning older Navy ships and turbines; I have also learned from those at GE whose careers began long before mine and who passed along their accumulated knowledge; and I have made frequent trips to naval commercial shipyards and have been aboard numerous Navy vessels in all stages of construction, testing and operation. Accordingly, in addition to my direct personal experience and observations during my tenure with GE, I have built up as part of my general professional background knowledge an understanding of the historical practices of GE and the Navy with regard to Navy turbines.

5. U.S. Navy ships, especially warships, are not ordinary products like a coffee maker or a TV set that a consumer might purchase off the shelf for use in a

home. They are vital national defense assets intended for the protection of the country and its citizens. Funding for construction of Navy ships can run into the hundreds of millions of dollars (or much more in the case of nuclear aircraft carriers) and is controlled by Congress. Navy warships are designed and built to have life spans measured in decades. Their planning and design takes many years, with additional years devoted to construction. Accordingly, the U.S. Navy is intimately involved in, and has absolute control over, even the smallest details of planning, design, and construction of its ships, as well as all the major equipment that goes into those ships, including Navy turbines. The intense level of Navy control over these small details far exceeds anything seen in the realm of civilian products.

6. Building a Navy warship, or a class of such ships, is an enormously complex enterprise, starting with years of planning by the Navy and the agreement of Congress to enact legislation providing the funding. Among numerous other things, the Navy must determine the mission of the new vessel, then design the vessel to fulfill that mission, and select the shipyard where the vessel will be built (or often multiple shipyards, when a class of ships is involved). For many years, the Navy built ships in its own Navy shipyards, as well as in civilian shipyards that built Navy ships under contract with the Navy. In order to complete the ship, numerous complex systems and pieces of equipment and machinery must be designed, manufactured, procured, and delivered to the shipyard, where they are then installed into the hull at the appropriate point during the construction process. Anyone who has watched from day to day as a new high rise building is constructed in a city can have some appreciation for this process. Every day numerous trucks arrive at the building site carrying materials that are lifted into place by cranes and installed by hundreds of workers. Over time the building takes shape, and after a few years the tenants take possession. The shipbuilding process is somewhat analogous, except that when it is a Navy ship the owner is the

United States and has a degree of control far exceeding that of any civilian building owner at a construction site.

7. Navy turbines are just one component required to complete the ship. Thousands of other vital components are required and are procured by the Navy from hundreds of suppliers, all through government contracts. When GE manufactured Navy turbines, it did so pursuant to government contracts administered by the Secretary of the Navy. The Secretary, in turn, directed GE's performance through the Navy's chain of command, in particular Naval Sea Systems Command ("NAVSEA") (the predecessor of which was the Navy's Bureau of Ships). The chain of authority between the Secretary of the Navy and GE was composed of multiple layers of Navy officers and civilian employees of the Navy, all of whom, in one degree or another, were charged with responsibility for enforcing the Secretary's mandate that GE's work be done in strict conformance with the Navy's dictates. During all aspects of its Navy turbine work, GE performed under the immediate supervision of the Navy through such NAVSEA officers and personnel. Supervision and control were exercised through contract documents, design construction drawings, written specifications, and personal oversight of GE's work by engineers and machinery specialists employed by the U.S. Navy. No aspect of the design, manufacture, and testing of Navy turbines escaped this close control.

8. Of particular note in any discussion of the extensive level of control that the Navy exerted over design and manufacture of Navy turbines are Military Specifications. These are exceptionally detailed specifications promulgated by the government consisting of tens of thousands of pages that spell out in minute detail the Navy's requirements concerning every aspect of the materials and composition of devices like Navy turbines. A government contract for a Navy turbine would incorporate the pertinent Military Specifications, thus binding GE to follow them to the letter. Other Military Specifications dictated and controlled the work of the

Navy's shipbuilder and that of the vendors of virtually every other item that went into the ship.

9.    When a new Navy ship or class of ships was authorized by Congress, NAVSEA developed the performance parameters for both the overall vessel and all of its major equipment.  The Navy turbines for the new ship or class were part of this development process by NAVSEA.  Each Navy turbine was specifically designed and custom manufactured for a vessel or class of vessels, taking into account numerous variables peculiar to that ship or class.  Navy turbines therefore were not interchangeable between classes or types of ships.  For example, a Navy turbine designed and manufactured for an aircraft carrier could not simply be dropped into the hull of a destroyer or vice versa.  Similarly, a Navy turbine designed and manufactured for an earlier class of destroyer could not simply be installed into the hull of a later class of destroyer.

10.    Hence, it was a major undertaking on the part of the Navy to develop Navy turbines for a new ship or class of ships, and such a project would draw scrutiny at the highest levels of command. The Navy exercised intense control over the entire process. In the design phase of a Navy turbine project, as in all other phases, the Navy retained ultimate decision making authority. The initial work was done by Navy personnel, including naval engineers, working on the basis of the planned mission for the new ship and the Navy's own vast accumulated body of knowledge gained from operating warships around the world in all conditions. In due course, the Navy would bring a turbine manufacturer such as GE into the process. By the time a Navy turbine manufacturer began to participate in the design phase of a new turbine, the Navy had already established numerous engineering parameters. Thereafter, the turbine manufacturer and the Navy collaborated on filling in countless additional design details. But in the event any disagreement arose about a particular design issue, the Navy had the final say and controlled the design that was ultimately adopted. All final design drawings

and specifications related to a Navy turbine required express U.S. Navy approval per Military Specifications.

11. Once the Navy had settled upon a Navy turbine design with which it was satisfied, the next step was to manufacture a prototype for testing approval requirements. This was done by a Navy turbine manufacturer such as GE under continuing intense Navy supervision. At each GE plant where Navy turbines were manufactured, the INM was on site full time in a separate office called the Defense Contract Management Office. One of the INM's functions was to control on behalf of the Navy the manufacture and testing of prototype Navy turbines. The INM's staff typically included at least three full-time civilian Navy inspectors and several mechanical engineers. All members of the INM's staff were Navy employees and had access at all times to all areas of the GE plant. During manufacture of the prototype of a new Navy turbine, GE's work had to be approved by the INM or the engineers working under him. If the INM or his staff saw something going on during manufacture of a Navy turbine that did not meet with his approval, he had the power to stop GE's work until the matter was rectified. In addition to this supervision at GE's plant, GE engineers such as me often were required to report directly to the Navy's Turbine Section in Washington, D.C.

12. Many steps during the manufacture of a prototype Navy turbine required in-process testing. All of this testing was done under the direction and control of the Navy. For example, all welds were tested per the Navy's design specifications, and all weld testing reports were reviewed and approved on site by the INM, and in some cases, the NAVSEA cognizant engineer. Similarly, other test results such as those from balance testing, vibration testing, tolerance measurements, and machine variations all had to be reviewed and approved by the INM, and in some cases, the NAVSEA cognizant engineer. Once the prototype was completed, it was subject to further testing to ensure that it fully complied with the Navy's requirements. A detailed test agenda for on-site testing was

approved by the Navy. The agenda included tests for power output at various levels of steam pressure, vibration and noise test, bearing temperature test, and the like. That test agenda was then conducted on the prototype turbine at the GE factory under the Navy's strict supervision. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him.

13. Following the completion of the test agenda, the prototype turbine typically was fully disassembled and inspected. This was carried out in the personal presence of the INM and one or more of the INM's mechanical engineers. Any problems discovered at this point could lead to rejection of the prototype turbine or to modifications and retesting. A report of each such inspection was prepared and was then approved and signed by the INM In due course, the manufacturer prepared a final report on the prototype turbine, including all test reports. The final report was then submitted for approval to the on site INM Following INM approval, the final report was forwarded to NAVSEA in Washington, D.C., where further approval was required. The objective of this painstaking testing and approval process was to yield a prototype that the Navy deemed satisfactory to fulfill its needs and that could then serve as the basis for going forward with manufacture of production units that could be installed aboard the new ship or class of ships.

14. Once the Navy was satisfied with the performance of the prototype after it had been manufactured and tested, the process shifted to manufacture of production units. The manufacturer of those production units would have been selected by the Navy while the manufacture and testing of the prototype was underway. Paralleling the manufacture and testing of the prototype, the Navy would prepare a Request for Quotation on the production models of the Navy turbine, subject to any changes developed during the production and testing of the prototype. Once received, a quotation would then be subject to a similar review as that described above with respect to the prototype unit, including quotation review

meetings. Approval of a quotation would eventually be given to one or more Navy turbine manufacturers. Often two different vendors were selected to supply production units. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract. Once again, all of this was done under the complete control of the Navy.

15.    The manufacturing process for the production units then proceeded under the same level and intensity of Navy scrutiny and supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers, as described above, would oversee and approve virtually every aspect of manufacturing and testing. As before, a test agenda for the production unit was approved by the U.S. Navy and all reports from the tests were approved by the INM. Following completion of the test series, each individual production turbine was fully disassembled in the presence of mechanical engineers working for the INM. Any problems were noted and resolved. Reassembly of each turbine was overseen by Navy inspectors prior to shipment. A final report was prepared for each turbine, incorporating the test series reports, and was approved by the INM and by the Department of the Navy in Washington D.C.

16.    The first production unit of the new Navy turbine was then shipped to the shipyard that had been contracted by the Navy build the first vessel of the new class. After delivery, the Navy turbine was installed into the ship's hull by shipyard personnel acting under supervision of engineers from the Navy's Supervisor of Shipbuilding, who was a subordinate of the Commander of NAVSEA. The involvement of the turbine vendor at this stage of the process was limited to providing an engineer to act in a liaison and troubleshooting capacity in case something unforeseen happened during the installation.

17.    Once the turbine was installed aboard the ship, it was initially tested

by shipyard personnel at the dock at some load. This testing was reviewed and approved by U, S. Navy personnel who were on site at the shipyard. Any deficiencies discovered at this stage were required to be remedied by the turbine vendor. Once the ship was launched and outfitted, sea trials followed. The first sea trial was called the "builder's trial" and was conducted by the shipyard using its personnel with senior U.S. Navy personnel on board for observation and approval. Representatives from the various major equipment vendors would also attend. I have attended more than twelve builder's trials as GE's Navy turbine representative in the builder's trial of the initial vessels in a new class of ship. Prior to working for GE, I had engine room operation and testing responsibility for more than eight Navy ship builder's trials while employed by a major shipyard. Following successful completion of the builder's trial, the Navy would conduct its own separate sea trial sometime later, called an "acceptance trial." Acceptance trials were conducted and staffed by U.S. Navy officers and crew, including some civilian employees of the Navy, with shipyard and equipment manufacturers' representatives along to observe. As before, any deficiencies discovered in the turbine during acceptance trials would be the responsibility of the turbine vendor to correct. Following the acceptance trial, the vessel was commissioned and would typically embark on a "shake-down cruise." During this cruise, the operation of all components and equipment on the vessel were further evaluated and tested under the widest possible range of operating conditions. Again, if any problems were detected in the operation of the ship's Navy turbines, the Navy would direct the turbine manufacturer to correct them.

18. During the launching, outfitting, and sea trials of the first Navy vessel of a new class, other vessels in the class ordinarily would be under construction on a trailing schedule. Each and every vessel would go through essentially the same construction, inspection, testing, sea trials, and shake-down procedure as described above. Each and every Navy turbine on these ships would be subject to

intense Navy direction, control, and scrutiny as described above.

19. As part of the construction of a Navy ship, the Navy directs its shipbuilders to install thermal insulation materials on numerous pieces of equipment, machinery, and piping systems throughout the entire vessel. This includes certain parts of Navy turbines after they have been delivered and installed aboard the ships. This insulation material is external to the Navy turbines and is not part of them. Based upon my experience, Navy turbines did not have any thermal insulation materials (whether containing asbestos or otherwise) installed on them at the time they left GE's control upon being shipped from the GE plant. GE did not manufacture or sell Navy turbines with asbestos-containing thermal insulation. Based upon my experience, Navy turbines manufactured by GE left the GE factory and were shipped "bare metal," meaning they had only a coat of paint on the exterior surface. Any thermal insulation materials that may have been applied to Navy turbines manufactured by GE after they left GE's manufacturing plant would have been supplied and installed later by entities other than GE. Based upon my experience, this means: (a) after a "bare metal" GE Navy turbine arrived at the Navy's designated shipyard, personnel employed by the shipyard would install the turbine aboard the ship at the appropriate stage of the construction process; (b) sometime thereafter, once all the other necessary steam system components were online, such as boilers, condensers, and piping, the turbine would be tested by the shipbuilder; and (c) sometime after that, assuming the test of all systems was satisfactory, thermal insulation materials would be applied to certain components. The nature of those thermal insulation materials would be specified by the Navy through military specifications directed to its shipbuilder. The thermal insulation materials would be supplied by the Navy's shipbuilder in accordance with those specifications, and the application of those materials would be carried out by the Navy's shipbuilder's personnel. GE would not be involved in this process.

20. Apart from the intense control that the Navy exercised over all aspects of design and manufacture of Navy turbines, it also exercised extensive control over communications between equipment manufacturers such as GE and Navy personnel. Because of the need for discipline and good order aboard Navy ships, the Navy had in place established chains of communication that GE was required to follow in dealing with Navy sailors or civilian employees working aboard Navy vessels.

21. Similarly, the Navy had precise specifications, practices, and procedures in place that governed the content of any communication affixed to machinery purchased by the Navy. In my opinion, based upon my experience, unless expressly directed to do so by the Navy, GE was not permitted, under the specifications, associated regulations and procedures, and the actual practice as it existed in the field, to affix any type of warning to a Navy turbine that addressed alleged hazards of products that were not supplied by GE, such as thermal insulation materials that were procured by the Navy's shipbuilder from an insulation vendor pursuant to the Navy specifications. To affix such extraneous matter to a Navy turbine, unless expressly called for in the Navy's specifications for that turbine, would take the turbine out of compliance with the specifications and result in the Navy's rejection of the unit.

22. Additionally, the Navy had precise specifications controlling the nature of written materials that the manufacturer was required to deliver with Navy turbines. The Navy required that each Navy turbine be accompanied by a defined number of copies of a technical manual related to that specific turbine. Navy personnel participated intimately in the preparation of these manuals in a standardized format used by the Navy, and the Navy had final approval over all contents of such manuals. The Navy assigned to each of these manuals a unique NAVSHIPS designator number, and the manual effectively became a Navy publication. As such, the Navy had total control over the manual and its contents,

including the power to designate all or parts of it as "Classified." As an example, attached hereto as Exhibit 1 is page from a typical manual of this nature showing that the Navy has designated an entire section of it as classified and placed it into a separate, confidential volume. As a further example of the Navy's control over such manuals and their contents, attached hereto as Exhibit 2 is an Approval and Procurement Record page from a typical manual of this nature showing that the manual, NAVSHIPS 0941-002-8000, was approved by the Navy's Superintendent of Ships ("SOS") via letter dated 5/24/65. Had GE attempted to include in the manual extraneous matter not expressly called for by the Navy—such as warnings regarding alleged hazards of products that were not supplied by GE—the manual would been out of compliance with the Navy's contract specifications and would have been rejected.

23. Such manuals could include safety information only to the extent expressly directed by the Navy, and that information related directly to the machinery that was actually supplied by GE. As an example, attached hereto as Exhibit 3 is page from a typical manual of this nature showing two "CAUTION" indications that the Navy required with respect to warming-up and cooling-down periods for turbines. One deals with the requirement that no steam be admitted to the turbines while the turning device is engaged, and the other deals with the requirement that all bearings must be supplied with lubricating oil during this period. These are typical caution matters in the General Instruction section I of the Technical Manual. These are the only matters that the Navy, in its judgment, deemed appropriate to warn about in connection with this aspect on this naval warship. The same principle applies to the balance of the manual. Had GE attempted to include in the manual extraneous matter not expressly called for by the Navy—such as warnings regarding alleged hazards of products that were not supplied by GE—the manual would been out of compliance with the Navy's contract specifications and would have been rejected.

24. During my career, while present in shipyards where Navy ships are built and while aboard numerous Navy ships, I have observed many pieces of Navy equipment both before and after installation on ships. A good deal of that equipment had various safety-related notices affixed concerning the operation of the equipment itself, such as warnings not to exceed certain temperatures or pressures. Those notices were in a standardized format, the appearance and content of which clearly was set by the Navy, not at the discretion of the individual equipment manufacturers. Since a Navy warship is a tightly controlled workspace subject to strict military discipline, the obvious intent was to communicate to Navy sailors certain information about those hazards which the Navy deemed significant in the special environment of a warship and to do so in a manner that the Navy judged appropriate to the ship's military mission. Based upon my experience, it is my opinion that the Navy, not individual equipment manufacturers like GE, exercised

///

///

///

///

///

///

///

///

///

///

///

///

///

///

absolute authority to determine precisely what hazards aboard its ships would be subject to warnings and the format and content of any such warnings.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28TH day of January, 2008, at Pocasset, MA.

David Hobson

# EXHIBIT 1

# APPROVAL AND PROCUREMENT RECORD

**BASIC APPROVAL DATA FOR:** NAVSHIPS 0941-002-8000

TITLE: Propulsion Turbines
(GEI-60485, Volumes I & II)

Approved per SOS Ltr DLG(N)35/9410, Serial 261-6070, dated 5/24/65.

| CONTRACT OR ORDER | DATE | VESSELS APPLICABLE | QUANTITY OF MANUALS | QUANTITY OF EQUIPMENT | BUILDING YARD |
|---|---|---|---|---|---|
| NYS 540-9000 | 11/13/62 | DLG(N)35 | 17 | 2 | New York Shipbuilding Corp. |

REMARKS Propulsion Gear Technical Manual NAVSHIPS 342-0157

**CERTIFICATION:**

**DATE** Dec., 1965

It is hereby certified that the manual, NAVSHIPS 0941-002-8000, provided under this contract or order No. NYS 540-9000, has been approved by authority of basic approval data shown above.

C. F. MacCarthy

General Electric Company
West Lynn, Mass.

# EXHIBIT 2

# SECTION 1
## General Description of Propulsion Plant

The propulsion equipment described herein consists of two cross-compound turbine-gear units driving two propellers. Figure 6-1, the main propulsion unit outline, depicts the arrangement of this equipment. During ahead propulsion, when viewed from the aft end of the ship, the port propeller turns counterclockwise and the starboard propeller clockwise.

Each propulsion unit, Fig. 6-1, consists of one high-pressure turbine and one low-pressure turbine, with the rotor of each turbine flexibly coupled to a double-reduction gear unit. In the gear unit, the speeds of the two turbines are reduced to a common value by appropriate first-reduction gear ratios; the second-reduction gear further reduces the speed to the propeller shaft speed. The second-reduction gear is solidly connected to the propeller shaft.

For ahead operation, main steam enters the chest of the high-pressure turbine, Fig. 6-2, where the flow is controlled by the ahead nozzle control valves. The steam passes through the seven pressure (Rateau) stages, and exhausts through twin expansion joints to the lower end of the moisture separator.

After going through the moisture separator, the steam passes from the top of the separator, through the crossover pipe, to the low-pressure turbine, Fig. 6-3. An opening is provided on the top of the moisture separator for the extraction of steam through an extraction check valve.

On entering the low-pressure turbine, the steam flows through two paths of five stages each, and exhausts downward to the condenser.

The reversing elements for astern operation are built into both the forward and aft ends of the low-pressure turbine. Astern steam connections are located on top of the low-pressure turbine casing. During astern propulsion, steam flows through the two reversing elements to the condenser. Each reversing element consists of a nozzle block and intermediate assembly, and a two-row velocity (Curtis) wheel. The intermediate blading is stationary.

# SECTION 2
## Turbine Data and Design Parameters

Section 2, Turbine Data and Design Parameters, being of classified nature, has been placed in its entirety in classified Volume I of this instruction book, as prescribed in Specification MIL-T-17600. Refer specifically to Volume I (CONFIDENTIAL) of NAVSHIPS 0941-002-8000.

Since the transfer of this section to another volume creates a break in the continuity of Chapter 1, refer to the Table of Contents, List of Text Illustrations, and List of Tables, herein, for particulars.

# EXHIBIT 3

# SECTION 1
## General Instructions

### 4.1.1 PRELIMINARY INSPECTIONS

When turbines are started from a cold condition, they are subject to expansive movements caused by the temperature of the incoming steam. Care must, therefore, be exercised in warming up the turbines to obtain uniform heating of the turbine parts. During this warming period, the turbines should be inspected carefully for rubbing, for correct oil flow and bearing temperature, for proper gland-sealing steam flows, and for freedom of operation.

### 4.1.2 USE OF TURNING GEAR

In addition to its use as a jacking gear in turning the turbine-gear set over when performing inspections, the motor-driven turning device can be used for keeping the turbines rotating slowly during warming-up and cooling-down periods.

**CAUTION:** UNDER NO CIRCUMSTANCES SHOULD STEAM BE ADMITTED TO THE TURBINES WHILE THE TURNING DEVICE IS ENGAGED.

### 4.1.3 ROTATING TURBINES DURING WARMING AND COOLING PERIODS

The continued operating efficiency of steam turbines depends on maintenance of the relatively small radial clearances of gland and diaphragm packings. These clearances can be maintained at the approximate design values only by keeping the rotors straight. To obtain this condition, it is necessary to maintain a uniform temperature around the circumference of the rotors. If turbines are warmed up or cooled down with the rotors stationary, uneven heating results. Such uneven heating causes temporary bowing or distortion of the rotors and, to some extent, of the turbine casings. If a turbine is started during this period of distortion, rubbing and wear at the packings take place and, under some conditions, if operation is allowed to continue, this bowing or bending of the rotor is increased by the heat generated through rubbing contact. This results in further wear of packings, with a consequent increase in packing clearances.

It is most desirable, therefore, that rotors and casings be undistorted. This can be accomplished by slowly turning over the rotors of the turbine during warming and cooling periods, either by use of the turning gear or by steam flow to the turbine.

The length of time that the turbines should be kept turning after shutdown depends largely on local conditions. They should, however, be kept turning until the turbines cool off, or as long as there is a possibility that the plant will be called upon for a quick start.

**CAUTION:** LUBRICATING OIL MUST BE SUPPLIED TO ALL BEARINGS AT ALL TIMES DURING THIS PERIOD.

# SECTION 2
## Warming Up

### 4.2.1 PREPARATION FOR WARMING

Before warming up the turbine, prepare a time schedule so that the following steps will be accomplished in sufficient time to permit getting underway at the designated hour.

1. Measure the axial position of the rotors by means of the rotor position indicators at the forward end of each turbine. These positions should be entered in the log and specified as cold readings. It should be noted, however, that these readings will vary by the amount of end play in the thrust bearings.

2. Check the lubricating oil system to make sure that the supply tank has sufficient oil for the system. The oil supply may sometimes become cold and viscous because of the weather or the location of the oil tanks. Check the temperature of the oil before it is circulated through the pumps. In order to flow freely, the temperature of the oil should not be lower than 90 F.

3. Start the oil pumps and make sure that oil is flowing freely to all turbine and gear bearings. It is not necessary to cool the oil during the warming-up period, and the circulating water through the oil cooler does not need to be turned on until

## DECLARATION OF ADMIRAL BEN J. LEHMAN

I, Ben J. Lehman, declare as follows:

1. I am a retired Rear Admiral of the United States Navy. Before joining the Navy in 1942, I received a Bachelor of Science degree in Mechanical Engineering from the College of the City of New York. After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States Post-Graduate School program in Naval Engineering Design. I received a Master of Science in Mechanical Engineering from Harvard University in 1949. I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University.

2. While in the United States Navy, I served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 and 1952, and as a Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1954. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I worked as an engineer at General Electric Company between 1946 and 1948. I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975. During all these periods I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C. I have been an independent consultant since 1975. Attached hereto as Exhibit A is a true and correct copy of my current curriculum vitae.

3. I submit this Declaration to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design and manufacture of equipment intended for installation on Navy vessels. I have personal knowledge of the facts contained herein.

EXHIBIT C

4. During my tenure as a Ship Superintendent in the Navy, I was personally involved with the oversight of ship alterations and equipment overhauls at both the New York Naval Shipyard (formerly the Brooklyn Navy Yard) and at the San Francisco Naval Shipyard (Hunters Point). Any deviation from military specifications of equipment to be installed on ships would result in significant problems and rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be (1) functionally compatible with every other piece of equipment and with available materials from the Navy Supply System; (2) compatible with shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

5. I observed during my service in New York Naval Shipyard in 1943 and 1944 that ships built for service during and after WWII (and later) were built in "classes" and the ships in each "class" were virtually identical, even though they were built in different shipyards. This shows the extent of control exercised by the Navy's Bureau of Construction and Repair and Bureau of Engineering before WWII, and later as the Bureau of Ships, during WWII and all subsequent time periods. I am certain from personal observation that this level of control did exist.

6. Even before the 1940s, and afterward, the Navy had complete control over every aspect of each piece of equipment used on Navy ships. Military specifications governed every characteristic of this equipment, including the instructions and warnings for equipment. Drawings for nameplates, texts of instruction manuals, and every other document relating to the construction, maintenance, and operation of the vessel were approved by the Navy. This control included the decision of what warnings should or should not be included. Thus,

the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

7. Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including pumps and turbines and the accompanying manuals. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information, and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. The "General Specifications" mandated that all equipment manuals must be approved by the Navy's Bureau of Ships and that no changes could be made without the Navy's approval. When issued later, MIL-M-15071D confirmed this. Summarizing: The Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation, and warnings associated with its ships and did not permit deviation by any of its contractors.

8. Based on my experience, professional training, education and research, it is my opinion that equipment suppliers were prohibited from providing any warnings on or to accompany equipment supplied to the Navy without the consent and approval of the Navy. Moreover, given necessary performance needs and capabilities of the shipboard equipment, and the ships and Navy personnel, certain types of warnings were simply not approved by the Navy such as, but not limited to, any warnings associated with hazards from asbestos, which might have included recommendations for various types of respiratory protection and for particular repair and maintenance practices. A requirement for effective respiratory protection equipment or devices would have required the Navy to furnish equipment which it did not then have, and which would have been impractical to use under shipboard conditions. A requirement for special repair and maintenance practices might have required, for example, the use of portable

ventilation equipment for dust removal, which the Navy would have found impossible under many foreseeable shipboard conditions even if it could have procured the equipment. No advice on how to avoid exposure to the hazards of asbestos consistent with the need to operate and maintain the ship is known to me. This is because of the inability to effectively and comprehensively observe, implement, and comply with such recommendations under the multitude of varying conditions likely to be encountered on Navy ships at sea, and especially at war. A Navy warship is a highly regulated workspace, subject to strict military discipline and chain of command, and the Navy -- not equipment manufacturers -- informed sailors of the hazards the Navy deemed significant in the special environment of a warship, and did so in a manner it deemed appropriate to the ship's mission.

9. Navy equipment suppliers like GE simply could not affix warnings about asbestos insulation on its equipment, or include warnings about asbestos insulation in its equipment manuals, because the Navy did not request any such warnings about asbestos insulation from equipment suppliers like GE. If GE were to supply such extraneous information, this action would have taken the item and its manuals out of compliance with the specifications and would have resulted in the rejection of the item and its manual.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30th day of December, 2010, at Stateline-Zephyr Cove, Nevada.

Ben J. Lehman, Rear Admiral U.S. Navy, Ret.

SUPERSEDED

MIL-T-17600C(SHIPS)
21 September 1966
SUPERSEDING:
MIL-T-17600B(SHIPS)
5 April 1961
(See 6.5)

MILITARY SPECIFICATION

TURBINES, STEAM, PROPULSION

NAVAL SHIPBOARD

1. SCOPE

1.1 Scope. - This specification covers propulsion steam turbines for Naval ships.

1.2 Classification. - Steam turbines shall be of the following types and classes, as specified (see 6.2.2):

Type I - Single-casing, single-element (see 3.5.5.1).
Type II-A - Two casings, two-elements, straight-through (see 3.5.5.2).
Type II-B - Two casings, two-elements, external by-pass (see 3.5.5.3).
Type II-C - Two casings, two-elements, internal by-pass (see 3.5.5.4).
Type III - Two casings, three-elements, series-parallel (see 3.5.5.5).
Type IV - Three casings, three-elements, geared-and-vented cruising turbine (see 3.5.5.6).
Class A - Turbines for use in Naval submarines.
Class B - Turbines for use in Naval surface ships (amphibious warships, mine warfare ships and patrol ships).
Class C - Turbines for use in Naval auxiliary ships.

2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein.

SPECIFICATIONS

FEDERAL
FF-B-171 - Bearings, Ball, Annular (General Purpose).
FF-B-185 - Bearings, Roller, Cylindrical; and Bearings, Roller, Self-Aligning.
FF-B-187 - Bearings, Roller, Tapered.
HH-P-96 - Paper, Gasket, Fiber (Animal or Plant), Sheet.
QQ-A-250 - Aluminum Alloy Plate and Sheet, General Specification for.
QQ-A-250/1 - Aluminum Alloy 1100, Plate and Sheet.
QQ-A-596 - Aluminum Alloy Permanent and Semi-Permanent Mold Castings.
QQ-A-601 - Aluminum-Alloy Sand Castings.
QQ-S-624 - Steel Bar, Alloy, Hot Rolled and Cold Finished (General Purpose).
QQ-S-631 - Steel, Bar, Carbon, Hot Rolled (Special Quality).
QQ-S-634 - Steel, Bar, Carbon, Cold Finished (Standard Quality).
QQ-S-635 - Steel Plate, Carbon.
QQ-S-691 - Steel Plate, Carbon-Silicon, Carbon Molybdenum and Manganese-Molybdenum Alloys Hot Rolled (Marine Boiler Quality).
QQ-S-763 - Steel Bars, Shapes and Forgings - Corrosion-Resisting.
QQ-S-766 - Steel Plates, Sheets and Strips - Corrosion-Resisting.
QQ-T-390 - Tin Alloy Ingots and Castings and Lead Alloy Ingots and Castings (Antifriction Metal) for Bearing Applications.
TT-L-201 - Linseed Oil, Heat Polymerized.

MILITARY
MIL-P-77 - Plastic Sheet and Plastic Rod, Thermosetting Cast.
JAN-W-562 - Wire, Nickel-Alloy, Spring (Heat-Resistant and Age-Hardenable).

FSC 2825

DEPOSITION
EXHIBIT
Defense 1

C03324

EXHIBIT
D

MILITARY (Cont'd.)

MIL-B-857 - (Bolts, Nuts and Studs.
MIL-S-860 - Steel: Forgings and Steam Turbine Rotors (Heat-Treated).
MIL-S-861 - Steel Bars; Corrosion-Resisting, Naval Steam Turbine Parts Use.
MIL-S-866 - Steel: Bars and Billets (for Carburizing).
MIL-S-867 - Steel Castings, Corrosion-Resisting, Austenitic.
MIL-S-870 - Steel Castings, Molybdenum Alloy.
MIL-S-871 - Steel Plates, Carbon-Molybdenum Alloy and Manganese-Molybdenum Alloy, Hot Rolled.
MIL-S-872 - Steel Bars, Billets and Forgings-Carbon-Molybdenum Alloy.
MIL-S-890 - Steel, Forgings and Bars for Hulls, Engines, and Ordnance (Heat treated).
MIL-S-901 - Shock Tests, H. I. (High-Impact); Shipboard Machinery, Equipment and Systems, Requirements for.
MIL-A-907 - Antiseize Compound, High Temperature.
MIL-D-963 - Drawings, Electrical, Hull and Mechanical Equipment for Naval Shipboard Use.
MIL-S-1222 - Studs, Continuous Thread (Bolt-Studs); Nuts, Plain, Hexagon; and Steel Bars, Round-High Temperature Service.
MIL-G-2697 - Glasses, Portlight, Circular, Heat Treated.
MIL-S-5000 - Steel, Chrome-Nickel-Molybdenum (4340 or E4340) Bars and Reforging Stock.
MIL-C-5015 - Connectors, Electric, "AN" Type.
MIL-S-5626 - Steel, Chrome-Molybdenum (4140) Bars, Rods and Forging Stock.
MIL-S-6758 - Steel, Chrome-Molybdenum (4130) Bars and Reforging Stock (Aircraft Quality).
MIL-A-7021 - Asbestos Sheet, Compressed, for Fuel, Lubricant Coolant, Water and High Temperature Resistant Gaskets.
MIL-N-7786 - Nickel-Chromium Alloy, Sheet and Strip, Age-Hardenable, Annealed.
MIL-Q-9858 - Quality Program Requirements.
MIL-Q-9868 - Microfilming of Engineering Documents, 35MM, Requirements for.
MIL-P-15024 - Plates, Identification-Information and Marking for Identification of Electrical, Electronic and Mechanical Equipment.
MIL-M-15071 - Manuals, Equipment and Systems.
MIL-S-15083 - Steel Castings.
MIL-P-15137 - Provisioning Technical Documentation for Repair Parts for Electrical and Mechanical Equipment (Naval Shipboard Use).
MIL-S-15204 - Sealing Compound, Joint and Thread, High Temperature.
MIL-C-15345 - Castings, Nonferrous, Centrifugal.
MIL-T-15377 - Temperature Monitor Equipment, Naval Shipboard.
MIL-B-15395 - Brazing Alloys, Silver.
MIL-C-15430 - Condenser, Steam, Surface; Naval Shipboard.
MIL-S-15464 - Steel, Alloy, Chromium-Molybdenum; Castings.
MIL-L-15719 - Lubricating, Grease (High-Temperature, Electric Motor, Ball and Roller Bearings).
MIL-C-15987 - Cable Assembly, Power, Electric (With Grounding for Portable Equipment, Shipboard Use).
MIL-B-16033 - Bronze, Aluminum Castings.
MIL-S-16216 - Steel Plate, Alloy, Structural, High Yield Strength (Hy-80 and Hy-100).
MIL-B-16261 - Bronze, Bearing; Castings.
MIL-G-16265 - Gaskets, Metallic-Asbestos, Spiral-Wound (for Navy Flanged Joints in Piping Systems).
MIL-B-16444 - Bronze, Hydraulic (Ounce Metal); Castings.
MIL-B-16540 - Bronze, Phosphor, Castings.
MIL-S-16993 - Steel Castings (12-Percent Chromium).
MIL-R-17131 - Rods, Welding, Surfacing.
MIL-L-17331 - Lubricating Oil, Steam Turbine (Noncorrosive).
MIL-A-17472 - Asbestos Sheet, Compressed (Gasket Material).
MIL-E-17813 - Expansion Joints, Pipe, Packless.
MIL-V-17848 - Valves, Pressure Regulating, Steam Service.
MIL-G-17859 - Gear Assembly, Speed Decreaser; and Gear Assembly, Reverse (Naval Shipboard Use).
MIL-V-18030 - Valves, Control, Air Diaphragm-Operated.
MIL-S-18410 - Steel Bars, Billets and Forgings-Chromium-Molybdenum-Alloy.

MILITARY (Cont'd.)

MIL-G-18997 - Gages, Pressure, Dial-Indicating, Bourdon Tube.
MIL-V-20065 - Valve, Relief, Naval Shipboard.
MIL-S-20140 - Steel, Forgings for Welding.
MIL-S-20166 - Steel: Bars and Shapes (for Hull Construction) Including Material for Drop and Miscellaneous Forgings.
MIL-G-21032 - Gaskets, Metallic-Asbestos, Spiral Wound (for ASA Commercial Flanged Joints in Piping Systems).
MIL-S-21427 - Strainer Assemblies, Sediment, Steam, High-Pressure.
MIL-T-22051 - Temperature-Element, Resistance, Bearing Babbitt.
MIL-V-22052 - Valves, Globe, Angle, and Y, Cast or Forged Steel and Alloy Steel, Outside Screw and Yoke (Sizes 2-1/2 Inches and Above) (Basically Commercial Valves).
MIL-V-22682 - Valves, Astern (for Submarine Use).
MIL-S-22698 - Steel Plate, Carbon, Structural for Ships.
MIL-C-23233 - Couplings for Propulsion Units, Auxiliary Turbines and Line Shafts, Naval Shipboard.
MIL-S-23966 - Steel Bars, Billets and Forgings-Alloy Nitriding Application.
MIL-S-24093 - Steel Forgings, Carbon and Alloy Heat Treated.
MIL-S-24113 - Steel Plates, Carbon Manganese-Heat Treated by Quenching and Tempering (Q. T. 50).
MIL-N-24129 - Nuts, Self-Locking, (Plastic Insert) Hexagon, 250°F.
MIL-I-24137 - Iron Castings, Nodular, Graphitic (Ductile Iron) and Nodular Graphitic (Corrosion-Resisting, Austenitic-Low Magnetic Permeability (for Shipboard Application).
MIL-N-25027 - Nuts, Self-Locking, 250°F, 450°F and 800°F, 125 KSI, FTU, 60 KSI, FTU and 30 KSI, FTU.

DEPARTMENT OF THE NAVY

General Specifications for Ships of the United States Navy.
Section 9480-0 - General Requirements for Piping Systems.

STANDARDS

MILITARY

MIL-STD-167 - Mechanical Vibrations of Shipboard Equipment.
MIL-STD-271 - Nondestructive Testing Requirements for Metals.
MIL-STD-278 - Fabrication, Welding and Inspection of Machinery, Piping and Pressure Vessels for Ships of the United States Navy.
MIL-STD-438 - Schedule of Piping, Valves, Fittings and Associated Piping Components for Submarine Service.
MIL-STD-777 - Schedule of Piping, Valves, Fittings and Associated Piping Components for Submarine Service.
MIL-STD-792 - Identification Marking Requirements for Special Purpose Components and Equipment.
MIL-STD-804 - Formats and Coding of Tabulating and Aperture Cards for EDMS.
MS21208 - Insert Screw Thread, Coarse and Fine, Free Running.

DRAWINGS

BUREAU OF SHIPS

S4200-864838 - Sight Flow Indicator.
810-1385850 - Piping, Gage for All Services.
810-1385882 - Manual Gland Seal Regulator Manifold and Valves.
810-1385917 - Thermometers, Bulbs and Wells.

PUBLICATIONS

BUREAU OF SHIPS

NAVSHIPS 250-423-30 - Shock Design of Shipboard Equipment-Dynamic Analysis.
NAVSHIPS 250-634-3 - Method for Conducting Drop Weight Test to Determine Nil-Ductility Transition Temperature of Ferritic Steel.
NAVSHIPS 250-644-2 - Bearing Babbitting Procedures.

PUBLICATIONS (Cont'd.)

NAVAL RESEARCH LABORATORY
Report 1396 - Interim Design Values for Shock Design of Shipboard Equipment.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications. - The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

AMERICAN SOCIETY OF MECHANICAL ENGINEERS (ASME)

Power Test Codes for Steam Turbines
Section VIII - Boiler and Pressure Vessel Code

(Application for copies should be addressed to the American Society of Mechanical Engineers, United Engineering Center, 345 East 47th Street, New York, New York 10017.)

AMERICAN STANDARDS ASSOCIATION (ASA)

B1.12 - Class 5 Interference - Fit Thread
B46.1 - Surface Texture

(Application for copies should be addressed to the American Standards Association, Inc., 10 East 40th Street, New York, New York 10016.)

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

A434 - Quenched and Tempered Alloy Steel Bars, Hot-Rolled or Cold-Finished

(Application for copies should be addressed to the American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pa. 19103.)

NATIONAL BUREAU OF STANDARDS

Handbook H28 - Screw-Threads Standards for Federal Services

(Application for copies should be addressed to the Superintendent of Documents, Government Printing Office, Washington, D. C. 20402.)

(Technical society and technical association specifications and standards are generally available for reference from libraries. They are also distributed among technical groups and using Federal agencies.)

3. REQUIREMENTS

3.1 Definitions. - Unless otherwise specified hereinafter, terms and expressions shall be interpreted in accordance with definitions contained in Webster's New International Unabridged Dictionary.

3.1.1 Ahead element(s). - Ahead element(s) is defined as that part of the propulsion unit which delivers power to propel the ship forward.

3.1.2 Astern element(s). - Astern element(s) is defined as that part of the propulsion unit which delivers power to the ship when backing.

3.1.3 Single-flow turbine. - Single-flow turbine pertains to a configuration wherein all of the steam is confined to a single blade path as it expands through the turbine.

3.1.4 Double-flow turbine. - Double-flow turbine pertains to a configuration wherein steam divides at a point in the steam path and flows through two blade paths from that point on.

3.1.5 Impulse element or turbine. - Impulse element or turbine pertains to the basic design where the enthalpy drop across each stage occurs principally in the nozzle or nozzle diaphragm, and essentially no pressure drop occurs across the rotating blades. Predominant rotational effort in this turbine results from the impulse effect of steam directed through nozzles against rotating blades. This design type is identified with wheels integral with rotor and nozzle diaphragms between the wheels.

3.1.6 Reaction element or turbine. - Reaction element or turbine pertains to the basic design where the enthalpy and pressure drops in each stage are divided nearly equally between stationary and rotating blading. Predominant rotational effort in this turbine results from the reaction to steam as it leaves each row of rotating blades. This design is identified with drum-type rotor with radial seals for stationary and rotating blading.

3.1.7 "Hand" (blading). - The "hand" of turbine blading shall be designated as right-hand or left-hand as follows:

(a) Right-hand blading. - Blading is right-hand when turbine rotor rotates clockwise when viewed in the direction of steam flow.
(b) Left-hand blading. - Blading is left-hand when turbine rotor rotates counterclockwise when viewed in the direction of steam flow.

3.1.8 Propulsion unit. - Turbines for one propeller shaft comprise a propulsion unit.

3.1.9 Endurance power. - Endurance power is that partial power at which required cruising radius of the ship is specified.

3.1.10 Government inspector. - Government inspector or "Inspector" as used herein refers to the Government quality assurance representative who has cognizance of the plant at which the part or component is being produced or tested.

3.2 Equipment required. -

3.2.1 Turbines. - Turbines shall be furnished in the quantity and to the specifications set forth herein and in the ordering data (see 6.2.2).

3.2.2 Additional equipment, fittings and accessories. - Additional equipment, fittings and accessories shall be furnished with the turbines as necessary to meet the requirements herein. The items listed in 3.2.2.1 shall be furnished with the turbines unless amended in 6.2.2(o). Items which will be furnished by shipbuilder or other vendors are listed in 3.2.2.2 for information.

3.2.2.1 Items furnished with turbines. - Items to be furnished with turbines shall be as follows:

(a) Astern valve. (See 3.11.8).
(b) Bolts between items furnished and for turbine end of turbine-condenser flexible connection. (See 3.20.9.3).
(c) Control valves (nozzle, by-pass, and transfer) and control mechanisms at turbine. (See 3.11.7).
(d) Cross-over pipe(s) including expansion joint. (See 3.11.3).
(e) Drawings and microfilm. (See 3.28).
(f) Gland seal regulating valves. (See 3.9.1).
(g) Governing and overspeed devices when overspeed protection is required. (See 3.10.9).
(h) Grease fittings. (See 3.11.6).
(i) Devices for attaching insulation and lagging (See 3.6).
(j) Identification plates. (See 3.20.19).
(k) Lifting gear. (See 3.20.11).
(l) Moisture separator for nuclear cross-compound units. (See 3.11.5).
(m) Onboard repair parts. (See 3.27).
(n) Onboard tools. (See 3.26).
(o) Reports. (See 3.31).
(p) Rotor position indicator. (See 3.7.4).
(q) Sentinel valves. (See 3.11.6).
(r) Bearing sight flow fittings and thermometers. (See 3.7).
(s) Singling-up fittings for single shaft ships. (See 3.10.11 and 3.12.6).
(t) Strainer for T-G sets. (See 3.11.4).

(u) Technical data books. (See 3.30).
(v) Technical manuals. (See 3.29).
(w) Mating flanges for lube oil inlet connections. (See 3.8).
(x) Trip throttle valve for T-G sets. (See 3.10.10.1 and 3.11.7.1).

3.2.2.2 Items furnished by shipbuilder or other vendors. - Items to be furnished by the shipbuilder or other machinery vendors include, but are not restricted to, the following:

(a) Ahead handwheel and reach-rod system (including valve position indicator). (See 3.7.6).
(b) Astern handwheel and reach-rod system.
(c) Bearing temperature monitor for RTE'S.
(d) Bolting and chocks to foundation, and bolts and gaskets required for shipbuilder piping connections to turbine. (See 3.7.5).
(e) Desuperheater when required for singled-up operation. (See 3.10.11).
(f) Drain valves, orifices and traps.
(g) Extraction and induction valves. (See 3.3.8 and 3.10.3.1).
(h) Flexible connections for connecting resiliently-mounted turbines to ship systems or other components.
(i) Gages (local and for main gageboard).
(j) Girders for H.P. and H.P.-L.P. turbines (if required). (See 3.5.7.1).
(k) Gland seal and leak-off system (excluding regulating valve(s)). (See 3.9).
(l) Guarding valve.
(m) Insulation (thermal) and lagging. (See 3.6).
(n) Lifting gear. (See 3.20.11.4).
(o) Low-pressure L.O. alarm. (See 3.8.3).
(p) Lubrication system (external to turbine). (See 3.8).
(q) Operating and safety plates for machinery spaces.
(r) Quick-closing inlet valve (if required) for clutched turbines.
(s) Singling-up special steam supply valve and inlet pipe to L.P. turbine.
(t) Strainer, main steam (except for turbine-generator). (See 3.11.4).
(u) Thermometers (steam) for local installation on turbines and for main gageboard. (See 3.7.1).

3.2.3 Engineering services. - For Naval Ship Systems Command (NAVSHIPS) or Naval Ship Engineering Center (NAVSEC) Procurements, the turbine manufacturer shall, to the extent requested by the building yard and approved by the cognizant Supervisor of Shipbuilding or Commander of Naval Shipyard, furnish the services of competent engineer(s) to provide supervisory assistance during assembly, installation, alignment and adjustment of units, as well as attendance at dock and sea trails. The number of man days for this purpose shall be as specified in the contract.

3.3 Design concepts and basic criteria. -

3.3.1 Reliability. - The principle of reliability is paramount and no compromise of this principle shall be made with any other requirements. If the contractor, during the design of the equipment, encounters areas where other requirements are adversely effecting reliability or compromising the design, NAVSEC shall be so notified. It is intended that casings, rotors, diaphragms and blading not be replaced or repaired during the specified life except for damage incurred due to external causes unrelated to design. Planned maintenance actions to be performed will be in accordance with figure 1 with replacement or renewal of parts as found necessary. Turbine casings will normally not be lifted for routine inspection of internal parts unless there are indications of damage or deterioration of performance.

3.3.2 Standardization. - Interchangeability of components and parts with units previously furnished is desired with particular reference to stock repair parts. A specific listing of interchangeability of stock repair parts and reasons for lack of same, where applicable, is required at the time of the Design Release Conference (see 3.28.4.1) to the extent that design details have been established at that time. If not known, information shall be furnished as soon as possible thereafter for comments of the NAVSHIPS.

3.3.3 Accessibility. - Design shall, within space limitations, provide the maximum accessibility to turbine parts which require routine inspection, maintenance and repairs. It is intended that design provide for minimum effort required to accomplish planned maintenance action and to effect repairs.

3.3.4 Cost. - Cost of turbines is to be considered of such importance that, where there is a choice in design with each choice providing full reliability and meeting other criteria herein, the choice representing the least cost to the Navy for initial procurement and maintenance in service be exercised. It is imperative that design eliminate features which are unnecessary and are of marginal value.

3.3.5 Life. - Turbine life requirements shall be as follows: (See 6.2.2(d).)

(a) Classes A, B and C (non-nuclear and nuclear ships)-150,000 hours total, which includes 15,000 hours at design full power and 60,000 hours between 50 percent and 100 percent of design full horsepower.

3.3.6 Margin. - Horsepower rating of the turbines shall be as specified in the contract. Extra capacity beyond the turbine manufacturer's normal margin is not required.

3.3.7 Weight. - In general, weight shall be kept to a minimum consistent with other requirements herein. Unless specific weight limitations are specified (see 6.2.2(g)) the weights given in the bid or proposal shall be met within a 5 percent tolerance of the total weight of the propulsion unit, including accessories.

3.3.8 Extraction, induction and reheat. - Except for the introduction of steam into the blade path of turbine casings from excess gland steam and high pressure valve steam leak-offs (see 3.9.4) no provision shall be made for extraction, induction or reheat unless specifically required in the contract (see 6.2.2(i)). When extraction is specified, means to prevent steam from entering the turbine will be provided by the shipbuilder.

3.3.9 Exceptions to specifications. - Where the turbine manufacturer believes that he can supply turbines of acceptable quality by proposing a substitution for any given design requirement in this specification, he may do so, providing all of the following are satisfied:

(a) The substitution does not compromise reliability or other criteria herein.
(b) The substitution does not increase the contract cost or result in the subsequent higher cost of maintaining the equipment in service after acceptance by the Government.
(c) The substitution represents sound engineering approach to the original specification requirements based upon any of the following:

(1) Previous satisfactory experience in service (Naval or comparable service).
(2) Test results acceptable to NAVSEC.

Request(s) for substitution may also be submitted after award of contract and are encouraged where either design improvements or cost reductions are involved.

3.4 Materials. - The use of materials having low availability and a high strategic index as determined by NAVSEC shall be kept to a minimum. When there is a choice, the non-strategic material which represents the lowest overall cost considering initial cost, service life and future replacement shall be selected.

3.4.1 Material requirements. - Specified materials are listed in table I, parts A, B and C (See 6.2.2(c)). Materials for other turbine parts shall be at the manufacturer's option, however, 12 chrome materials shall be used for internal applications of shims, lugs, keys and similar removable parts exposed to the steam atmosphere. (Bolting for nozzle block and inner casing is not included). Except for piston rings, the use of cast iron will not be permitted (gray iron and close grain semi-steel are for the purposes of this specification, considered to be cast iron). In addition to packing rings, item (o) of table I, consideration will be given to the use of modular (ductile) iron for selected applications.

Table I - Materials

Part A - Materials of principal parts

| Part of service | | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|---|
| (a) Antifriction metal | | QQ-T-390, grade 2 or 3 | Babbitt (tin base) | 280°F, hot-spot metal temperature | --- |
| (b) Bearing ball | Radial locating thrust or combined radial and thrust | FF-B-171 | Steel | | Use heat stabilized bearings above 200°F |
| (c) Bearing oil seals (or deflectors) | | QQ-A-250/1 | Aluminum alloy (plate or strip) | | |
| | | QQ-A-596, alloy No. 750 | Aluminum alloy (casting) | | |
| | | QQ-A-601, alloy No. 750 | Aluminum alloy (casting) | | |
| | | MIL-C-15345, alloy No. 7 | Bearing bronze (casting) | | |
| | | MIL-C-15345 alloy No. 11 | Bearing bronze (84-8-8) (casting) | | |
| | | MIL-B-16261, grade II | Bearing bronze (casting) | | |
| | | MIL-B-16444, grade A | Bearing bronze (ounce metal) (casting) | | |
| (d) Bearing oil sight glass | | MIL-P-77, type G-1 | Plastic | 350°F | |
| | | MIL-G-2697 | Glass (heat treated) | 350°F. | |
| (e) Bearing pedestals, caps and shells | | QQ-S-635 | Carbon steel (plate) | | See notes 1 and 2 |
| | | QQ-S-691, all classes | Carbon steel and alloy boiler plate) | | See notes 1 and 2 |
| | | MIL-S-890, class B | Carbon steel (forged) | | See notes 1 and 2 |
| | | MIL-S-15083, grade B or CW | Carbon steel (casting) | | See notes 1 and 2 |

Table I - Materials

Part A - Materials of principal parts, cont'd

| Part of service | | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|---|
| (e) Bearing, pedestals, caps and shells, cont'd | | QQ-S-634 | Carbon steel, (bar) | | See notes 1 and 2 |
| | | MIL-S-20 140 | Carbon steel, (forged) | | See notes 1 and 2 |
| | | MIL-S-22698 | Carbon steel plate, structural | | See notes 1 and 2 |
| | | MIL-S-24113 | Carbon manganese steel plate | | See note 2 |
| (f) Bearing roller | Alignment cylindrical and self aligning | FF-B-185 | Steel | | Use heat stabilized bearings above 200°F |
| | Taper thrust | FF-B-187 | Steel | | |
| (g) Bearings, thrust | (1) Shoes | QQ-S-631 or QQ-S-634 | C1015-C1025 carbon steel (bar) | | |
| | | QQ-S-635 (SAE 1020) | Carbon steel (plate) | | |
| | | QQ-S-691, class A, B or C | Carbon steel (boiler plate) | | |
| | | MIL-S-890, class B | Carbon steel (bar and forging) | | 180 degree bend test not required |
| | | MIL-S-15083, grade B or CW | Carbon steel (casting) | | |
| | | MIL-B-16033, all classes | Aluminum bronze (casting) | | |
| | (2) Leveling plates | QQ-S-635 (SAE 1020) | Carbon steel plate | | |
| | | MIL-S-866 | Steel bars and billets (for carburizing) | | |
| | | MIL-S-890, Alloy No. 2 | Alloy steel forging | | Magnetic particle inspection required |
| | | MIL-S-5000 | Steel bars and forgings | | |
| | | MIL-S-5626 | Steel bars, rods and forgings | | |
| | | MIL-S-22698 | Carbon steel plate, structural | | |
| | (3) Collar | MIL-S-24093, class A, types I and II | Alloy steel (forging) | | Heat treat to get 300 BHN |

C03332

Table I - Materials, cont'd

Part A - Materials of principal parts, cont'd

| Part of service | Applicable documents | Material and properties | Temperature limit (°F) (maximum) | Remarks |
|---|---|---|---|---|
| (h) Blades and locking pieces | MIL-S-861 class 403, condition HT (machined) (forged or rolled) | 12Cr corrosion-resisting steel (bar and forging) | 900 | |
| | MIL-S-861, class 410 (machined) (forged, or rolled) | 12 Cr corrosion-resisting steel (bar and forging) | 900 | With physical properties of class 403 |
| | QQ-S-763, class 416, condition A | 12 Cr corrosion-resisting steel (bar and forging) | 950 | |
| | MIL-S-861, class 405 | 12 Cr-Al-corrosion-resisting steel (bar and forging) | 950 | |
| | MIL-S-861, class 422, condition HT (machined, forged or rolled) | 12 Cr corrosion-resisting steel (bar and forging) | 1000 | |
| (i) Bolts, studs, and nuts (and other screw-thread fasteners) | MIL-B-857 | To suit service | To suit service. | |
| | MIL-S-1222, type I, symbol B7 and type II, symbol H | Cr-Mo alloy steel (bar) | 775 | |
| | QQ-S-763, Class 416, Condition T | 12 Cr corrosion-resisting steel (bar and forging) | 950 | |
| | MIL-S-1222, type I, symbol B16 and type II, symbol 4 | Cr-Mo V-alloy steel (bar) | 1000 | |
| | MIL-S-861, class 422, condition HT | 12 Cr corrosion-resisting steel (bar) | 1000 | |
| (j) Calking strips (for blades, nozzle blocks, intermediate segments and seal strips) | QQ-S-631 or QQ-S-634 | Carbon steel (bar) | 750 | |
| | MIL-S-20166, type A, grade F | Carbon steel (bar, sheet or strip) | 750 | |
| | MIL-S-871 | Carbon moly steel | 875 | |
| | MIL-S-18410, class A, condition A | Chrome-moly bar | 1050 | When heat treated to obtain desired properties |
| (k) Casings and steam chests | QQ-S-691, class A, B or C | Carbon steel (boiler plate) | 750 | See note 2 |
| | MIL-S-15083, grade B or CW | Carbon steel (casting) | 750 | See note 2 |
| | MIL-S-20140 | Carbon Steel (forging) | 750 | See note 2 |
| | MIL-S-22698 | Carbon steel plate, structural | 750 | See note 2 |
| | MIL-S-870 | Carbon-Mo alloy steel (casting) | 875 | See note 2 |
| | MIL-S-871, class 1 | Carbon-Mo alloy steel (plate) | 875 | See note 2 |

Table I - Materials, cont'd

Part A - Materials of principal parts, cont'd

| Part of service | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|
| (k) Casings and steam chests (cont'd) | QQ-S-763, class 405 | 12 Cr-Al corrosion-resisting steel (bar and forging) | 950 | See note 2 |
| | MIL-S-861, class 405 | 12 Cr-Al corrosion-resisting steel (bar and forging) | 950 | See note 2 |
| | MIL-S-15464, class 1 | 1-1/4 Cr-1/2 Mo-V-alloy steel (casting) | 1000 | See note 2 |
| | MIL-S-16993 | 12 Cr alloy steel (casting) | 950 | See note 2 |
| (l) Diaphragms (excluding partitions and shroud bands) | MIL-S-867, class II | 19-10 chrome nickel | 750 | |
| | MIL-S-15083, grade B or CW | Carbon steel (casting) | 750 | |
| | MIL-S-20166 | Carbon steel (bar) | 750 | |
| | MIL-S-20140 | Carbon steel (forging) | 750 | |
| | MIL-S-22698 | Carbon steel, plate, structural | 750 | |
| | QQ-S-691, classes A, B, C | Carbon steel (boiler plate) | 800 | |
| | QQ-S-691, classes D and E | Carbon moly and manganese moly | 875 | |
| | MIL-S-870 | Carbon-1/2 Mo alloy steel (casting) | 875 | |
| | MIL-S-871, class 1 | Carbon-1/2 Mo alloy steel (plate) | 875 | |
| | MIL-S-872, class A or B | Carbon-1 2 Mo alloy steel (wrought) | 875 | |
| | QQ-S-763, class 405 | 12 Cr-Al corrosion resisting steel (bars and forging) | 950 | |
| | MIL-S-861, class 405 | 12 Cr-Al Corrosion resisting steel (bars and forging) | 950 | |
| | MIL-S-15464, class 1 | 1-1/4 Cr- 1 2 Mo alloy steel (casting) | 950 | |
| | MIL-S-18410, class a | 1-1/4 Cr-1 2 Mo alloy steel (bar, billet, forging) | 950 | |

C03334

Table 1 - Materials, cont'd

Part A - Materials of principal parts, cont'd

| Part of service | | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|---|
| (l) Diaphragms (excluding partitions and shroud bands) (cont'd) | | MIL-S-15464, class 2 | 2-1/4 Cr-1 Mo alloy steel (casting) | 1050 | |
| | | MIL-S-18410, class b | 2/1/4 Cr-1 Mo alloy steel (bar, billet, forging) | 1050 | |
| (m) Diaphragm and nozzle block partitions and shroud bands | | QQ-S-763, class 403 or 410, condition A | 12 Cr corrosion-resisting steel (bar and forging) | 950 | |
| | | QQ-S-763, class 405 | 12 Cr-A, corrosion-resisting steel (bar and forging) | 950 | |
| | | QQ-S-766, class 410 | 12 Cr-corrosion-resisting steel (plate, sheet and strip) | 950 | |
| | | QQ-S-861, class 403, condition HT | 12 Cr-corrosion-resisting steel (bar and forging) | 950 | |
| | | MIL-S-861, class 405 | 12 Cr-Al corrosion-resisting steel (bar and forging) | 950 | |
| | | MIL-S-861, class 410 | 12 Cr-corrosion-resisting steel (strip and bar) | 950 | |
| | | MIL-S-861, class 422, condition HT | 12 Cr-corrosion-resisting steel (bar and forging) | 1000 | |
| | | QQ-S-763, class 304 or 347, condition A | 18 Cr, 8 Ni | 1050 | |
| (n) Nozzle blocks | (1) Fabricated and built up rings, partitions and bands | Same materials, limits and remarks as in (m) | | | |
| | (2) Solid and reamed | | | | |
| (o) Packing, labyrinth (gland or diaphragm) and stationary seal strips | | QQ-S-763, class 416, Se, (maximum hardness 200 BHN) condition A | 12 Cr corrosion-resisting steel (bar and forging) | Use only for 850-950 | |

Table I - Materials, cont'd

Part A - Materials of principal parts, cont'd

| Part of service | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|
| (o) Packing, labyrinth (gland or diaphragm) and stationary seal strips (cont'd) | MIL-C-15345, alloy No. 7 | Leaded-nickel-brass, 6 Pb-13 Ni-65 Cu (casting) | 550 | Sand castings are permitted |
| | MIL-B-16261, grade II | Bearing bronze (casting) | 550 | |
| | MIL-C-15345, alloy No. 8 | Gun metal | 850 | |
| | MIL-C-15345, alloy No. 10 | Gun metal (modified) | 850 | |
| | MIL-B-16540, grade A | Gun metal (modified) | 850 | |
| | MIL-I-24137, grade C | 22 percent ductile iron | 1000 | Centrifugally cast only |
| (p) Packing springs (flat and coil) | ASTM A434, Ni-Cr-Fe alloy | 0.08 carbon (max.) 1.00-1.05 Mo 1.00-2.00 Mn 1.75-2.25 Ti 0.40-1.00 Silicon 0.10-0.5 Vanadium 0.030 (max.) Sulfur 0.35 (max.) Al 0.040 (max) P 0.001-0.01 Boron 13.5-16.0 Cr 24.0-27.0 Ni balance iron | 1000 | |
| | JAN-W-562, Inconel-X, spring temper | 74 Ni-15 Cr-7 FE, 1 Cb (wire) | 1050 | |
| | MIL-N-7786, (Income X) | 74 Ni-15, Cr-7 FE, 1 Cb alloy (sheet and strip) | 1050 | |
| (q) Pins (for notch block and locking blades) | QQ-S-624, FS 4140, FS 4145 | Cr-Mo alloy steel | 775 | |
| | MIL-S-1222, type I, symbol B7 | Cr-Mo alloy steel (bar) | 775 | |
| | MIL-S-1222, type I, symbol B16 | Cr-Mo-V alloy steel (bar) | 1000 | |
| (r) Rotors | MIL-S-860, grade A | Carbon steel (forging) | 650 | When approved |
| | MIL-S-860, grade B | Ni-V alloy steel (forging) | 750 | |
| | MIL-S-860, grade E | Ni-Cr-Mo-V alloy steel (forging) | 750 | |
| | MIL-S-860, grade G | 12 chrome forgings | 750 | |
| | MIL-S-860, grade F | Cr-Mo-V alloy steel (forging) | 1050 | |

Table I - Materials, cont'd

Part A - Materials of principal parts, cont'd

| Part of service | | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|---|
| (s) Shrouding for blading | | MIL-S-861, class 403, condition HT | 12 Cr-corrosion-resisting steel (strip and bar) | 900 | 180 degree bend test required |
| | | MIL-S-861, class 410, condition AN | 12 Cr-corrosion resisting steel (strip and bar) | 900 | |
| | | MIL-S-861, class 422, condition HT | 12 Cr-corrosion-resisting steel (strip and bar) | 1000 | |
| (t) Supports, flexible (for casing) | | QQ-S-691, all classes | Carbon steel and alloy grades | To suit service | See notes 1 and 2 |
| | | MIL-S-5000 | Cr-Ni-Mo alloy steel | To suit service | See notes 1 and 2 |
| | | MIL-S-6758 | Cr-Mo alloy steel | To suit service | See notes 1 and 2 |
| | | MIL-S-24113 | Carbon manganese steel plate | To suit service | See notes 1 and 2 |
| | | MIL-S-16216 | HY-80 | To suit service | |
| (u) Valves control | (1) Discs (poppets and seats) | MIL-S-872, class a or b | Carbon-1/2 Mo (wrought) | 875 | |
| | | MIL-S-861, class 410, condition AN | 12 Cr-corrosion-resisting steel (strip and bar) | 900 | |
| | | MIL-S-861, class 405 | 12Cr-Al-corrosion-resisting steel (bar and forging) | 950 | |
| | | MIL-S-18410, class a | 1-1/4 Cr-1/2 Mo (forging) | 950 | |
| | | MIL-S-23966, class A and B | Alloy steel for nitriding | 950 and 850 respectively | |
| | | QQ-S-763, class 410, condition T and class 416 with or without nitriding | 12 Cr-corrosion-resisting steel (bar and forging) | 950 | |
| | | MIL-S-18410, class b | 2-1/4 Cr-1 Mo (forging) | 1050 | |
| | (2) Lift rods and valve stems | QQ-S-763, class 416, with or without nitriding, condition T | 12 Cr-corrosion-resisting steel (bar and forging) | 950 | |
| | | MIL-S-861, class 422, condition HT | 12 Cr-Corrosion-resisting steel (bar and forging) | 1000 | |
| | | MIL-S-23966, class A or B | Alloy steel for nitriding | 950 and 850 respectively | VDPH 800 (minimum) |
| | (3) Bushings | QQ-S-691, class B | Carbon steel plate | 750 | |
| | | MIL-S-861, class 410, condition AN | 12 Cr-corrosion-resisting steel (strip and bar) | 950 | |
| | | MIL-S-18410, class A | 1-1/4 Cr-1/2 Mo (forging) | 950 | |
| | | QQ-S-763, class 440 with or without nitriding, condition A, B or C | 17 Cr-corrosion-resisting steel (bar and forging) | 1000 | |

Table I - Materials, cont'd

Part A - Materials of principal parts, cont'd

| Part of service | | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|---|
| | (3)Bushing, cont'd | MIL-S-23966, class A or B | Alloy steel for nitriding | 950 and 850 respectively | VDPH 800 (minimum) |
| | (4)Lift bar | QQ-S-691, class B | Carbon steel plate | 750 | |
| | | MIL-S-18410, Class A | 1-1/4 Cr-1/2 Mo (forging) | 950 | |
| | | QQ-S-763, class 416, condition T | 12 Cr-corrosion-resisting steel (bar and forging) | 950 | |
| | | MIL-S-861, class 422, condition AN or HT | 12 Cr-corrosion-resisting steel (bar and forging) | 1000 | |
| | | MIL-S-5626 | 1 Cr alloy steel (bar) | 1000 | |
| | (5)Seating surface | MIL-R-17131, types MIL-RCoCr-A, MIL-RNiCr-B | Rod, welding | 1050 | |
| Part B - Gaskets, compounds and oils | | | | | |
| (v) Gaskets | | HH-P-96 | Paper fiber (animal or plant) sheet | Lube oil 200°F | |
| | | MIL-A-7021 | Sheet asbestos | Lube oil | |
| | | MIL-A-17472 | Asbestos sheet | Saturated steam | |
| | | MIL-G-16265 (for Navy flanges) | Metallic asbestos (spiral wound) | Saturated and super-heated steam | |
| | | MIL-G-21032 (for ASA flanges and valve bonnets) | Metallic asbestos (spiral wound) | Saturated and super-heated steam | |
| (w) Compound antiseize | | MIL-A-907 | Antiseize compound (high temperature) | 1050 | |
| (x) Oil lubricating | | MIL-L-17331, military symbol 2190-TEP | Mineral oil | | |
| (y) Flange coating (for making up casing flanges) | | MIL-S-15204 | Sealing compound | 950 | NAVSEC approval required |
| | | TT-L-201, type II, viscosity Z-7, Z-8 or Z-9 | Bodied linseed | | |
| (z) Grease, lubricating | | MIL-L-15719 | | 300 | |
| Part C - Materials of associated parts | | | | | |
| (aa) Astern valve | | MIL-V-22682 | As required by referenced specifications | As applicable | |
| (bb) Expansion joint (crossover pipe) | | MIL-E-17813 | | | |

C03338

Table I - Materials, cont'd

Part C - Materials of associated parts, cont'd

| Part of service | | Applicable documents | Material and properties | Temperature limit (°F)(maximum) | Remarks |
|---|---|---|---|---|---|
| (cc) Gland seal regulators | | | | | |
| | Manual | Drawing 810-1385862 | | | |
| | Pneumatic | MIL-V-18030 | | | |
| | Self-contained | MIL-V-17848 | | | |
| (dd) Piping | | MIL-STD-438 | | | Submarines |
| | | MIL-STD-777 | | | Surface Ships |
| (ee) Steam strainer | | MIL-S-21427 | | | For TG sets |

Notes to table I:

1. Nil-ductility transition temperature shall not exceed +10°F.
2. Nil-ductility transition temperatures and yield strength data for each heat shall be submitted to NAVSEC for information. Nil-ductility transition temperature shall be determined by the method described in NAVSHIPS-250-634-3. Where material used is under 1/2 inch thickness, the test shall be conducted on a larger size specimen from the same heat. Information may be submitted as a composite report prior to completion of the contract.

3.4.1.1 Special requirements for saturated steam. - Where turbines are to be used with saturated steam at inlet to turbines, 12 chrome materials shall be used for the following items in high pressure and single casing turbines. The use of inlays, inserts or other means to obtain corrosion/erosion protection will be considered if basic design parameters (such as size of casting) preclude the use of a 12 chrome base material.

(a) Casings (carbon steel is acceptable for exhaust end of single casing turbines and for astern steam ring or chamber).
(b) Rotors.
(c) Packing boxes when separate from casing.
(d) Valve chest cover.
(e) Nozzle blocks.
(f) Diaphragms.

Rotor bearing journals shall be either chrome plated or protected by other means as approved by NAVSEC.

3.4.2 Substitute materials. - The use of materials (either additional Government specifications or company materials in lieu of specified Government specifications) differing from those specified in table I will be permitted when all of the following conditions are met:

(a) The substitution of other materials represents no present or predicted cost increase to the Navy.
(b) Approval of substitute material and welding procedures are obtained.
(c) NAVSEC approval is obtained if the minimum safety factors (see 3.15) cannot be met with the materials specified herein.

3.4.2.1 Approval procedure for substitute materials. - The turbine manufacturer shall submit a "List of (Company Name) Preferred Materials for Propulsion Steam Turbines" (see 3.4.2.1.1) to NAVSEC for approval. Approval of the list will be granted on a general basis; the list will be used for approving material substitutions under specific contracts. Once the list is approved, it shall be kept up-to-date and revisions submitted for approval. Application approval is not required for use under each specific contract. As a back-up to the list, material comparison sheets (see 3.4.2.1.2) shall also be submitted in order to judge the acceptability of the proposed substitute material. Where it is not obvious, the forwarding letter shall

indicate justification for departures from the quality control requirements of the applicable Government specification. Approval of the comparison sheets does not constitute an across-the-board approval to substitute the company material for the referenced Government specification but only for the application indicated on the "List of Preferred Materials."

3.4.2.1.1 List of preferred materials. - The "List of Preferred Materials for Propulsion Steam-Turbines" shall be a repeat of table I, parts A, B and C, with four additional vertical columns for company additions as shown below. The use of notes to avoid repetitive comparison sheets differing only in quality control requirements applied to the use of the same material for different applications is acceptable. Material comparison sheet number shall be shown in Remarks Column unless material identification number is identical.

Tabulation

| Temperature limit (maximum) | Remarks | Specification* | | Limiting temperature or parameter | Remarks |
|---|---|---|---|---|---|
| | | Company | Commercial | | |
| EXISTING TABLE I | | (New columns added for completion by company) complete either or both columns, as applicable; substitution is desired. | | manufacturer shall leave blank if no | |

3.4.2.1.2 Material comparison sheets. - For each substitute material which is different from the applicable government specification, the manufacturer shall document on a separate sheet of paper a complete comparison in any of the following areas where any difference exists between the substitute material and the specified material:

(a) Chemical composition.
(b) Mechanical or physical properties.

Only significant differences between the substitute material and the specified material require documentation for the following areas; however, all instances where a requirement of the specified materials is not reflected in the substitute specification shall be included:

(c) Processing (heat treatment, and so forth).
(d) Examination, tests and quality control provisions.

If the substitute material is identical in all respects with the specified material in any of the above areas, a statement shall be made to that effect in lieu of a comparison; the statement "equal or better" is not acceptable. Each of the above documentations shall constitute one or more sheets in a multi-sheet drawing, properly indexed and titled. Parts for which the material will be used shall be listed on the comparison sheet. Each sheet shall be dated when issued and when revised. When a comparison sheet has been approved, it shall be resubmitted for information with NAVSEC approval letter noted thereon.

3.4.2.2 Approval procedure for non-specified materials. - Materials for parts delineated on drawings to be submitted to NAVSEC (see 3.28.3.2) require NAVSEC approval. Materials for other parts not specified in table I shall be self-approved; however, where materials to be used are to non-government specifications, either material comparison sheets or copies of the applicable specification shall be submitted to NAVSEC for information.

3.5 Arrangement. - Arrangement of propulsion unit(s), limiting weight, overall dimensions and shaft rake shall be as specified (see 6.2.2(f)).

3.5.1 Shaft rotation. - Propellers having clockwise rotation when viewed from aft are right-hand propellers; propellers having counterclockwise rotation when viewed from aft are left-hand propellers. Normally, starboard and center-lined propellers are right-hand and port propellers are left-hand. Rotation of turbines will be the same as that of the driven propellers if connected by a double reduction gear, and will be opposite if connected by a single or triple reduction gear. Type I turbine driving generators shall be right-hand rotation.

3.5.2 Shaft identification. - Each propulsion unit shall be identified with either the propeller shaft it drives or by the location in ship. This normally will be "Port" and "Starboard" or by numerical designation starting on starboard side; for example, on a four shaft ship, starboard outer shaft is #1 unit, starboard inner shaft is #2 unit, port inner shaft is #3, and so forth.

3.5.3 Reduction gears. - Each propulsion unit normally will be connected to its propeller through reduction gears conforming to MIL-G-17859.

3.5.4 Couplings. - Turbines normally shall be designed for connection to reduction gears through dental couplings conforming to MIL-C-23233. If required by the gear manufacturer, the turbine manufacturer shall furnish a template for drilling the mating coupling flange.

3.5.5 Types of propulsion units. - Propulsion units (see 3.1.8) shall be identified by the types specified in 3.5.5.1 through 3.5.5.6 based on arrangement of ahead elements. Astern elements shall be as specified in 3.5.6. Ahead elements of L.P. turbines may be either of the impulse or reaction type; all other ahead and astern elements shall be of the impulse type.

3.5.5.1 Type I (single casing). - The type I propulsion unit shall consist of one or more single-casing turbines of equal rating. Each turbine shall contain one ahead element and shall be single flow with the expansion of steam complete within the casing. By-passing of steam will be permitted only when specifically approved by NAVSEC.

3.5.5.2 Type II-A (straight-through). - The type II-A propulsion unit shall consist of one high pressure element and one low pressure element. Each element shall be contained in a separate casing (known as H.P. and L.P. turbines respectively) and shall each deliver power to a separate coupling in a reduction gear. Unless otherwise approved, design shall provide for approximately (plus or minus 2 percent) equal power at the coupling at full power. H.P. turbine shall be single flow; L.P. turbine may be either single or double flow. No row of blading shall be by-passed at any load, except that partial by-passing of the H.P. turbine first stage at high powers will be permitted.

3.5.5.3 Type II-B (external by-pass). - The type II-B propulsion unit shall conform to the type II-A turbine except that provision shall be made for by-passing of steam around the first one or more stages of the H.P. turbine at powers above the specified cruising power.

3.5.5.4 Type II-C (internal by-pass). - The type II-C propulsion unit shall conform to the type II-A unit except that provision shall be made for by-passing steam from the first stage shell around the next one or more stages of the H.P. turbine above the specified cruising power.

3.5.5.5 Type III (series-parallel). - The type III propulsion unit shall consist of one H.P. element, one intermediate pressure (I.P.) element and one L.P. element. The H.P. and I.P. elements shall be combined in a single-casing, and shall be known as the H.P.-I.P. turbine. The L.P. element, together with its casing, shall be known as the L.P. turbine. The H.P.-I.P. turbine and the L.P. turbine shall each deliver power to a separate coupling in a reduction gear. The design shall provide for approximately (plus minus 2 percent) equal power to the couplings at full power. L.P. turbine may be either single or double flow. For powers up to the specified cruising power, only the H.P. element shall receive inlet (chest) steam, with the I.P. element being supplied (in series) with steam from the H.P. element. At powers above the crusing power of operation inlet steam shall flow through the H.P. and I.P. elements (in parallel) in a manner similar to that in a double-flow turbine. Unless otherwise specified (see 6.2.2(b)), the H.P.-I.P. valve sequencing is not restricted. No row of blading shall be by-passed at any power.

3.5.5.6 Type IV (cruising geared and vented unit). - The type IV propulsion unit shall consist of three elements, known as the cruising element, H.P. element and L.P. element. Each element shall be contained in a separate casing, so that there are three turbines; namely, the cruising, H.P. and L.P. turbines. The cruising turbine shall be connected in tandem through a cruising reduction gear to the forward end of the H.P. turbine. The arrangement of the H.P. and L.P. turbines shall be as specified in 3.5.5.2, 3.5.5.3 and 3.5.5.4, respectively, as applicable. The cruising turbine shall contribute power to the propeller shaft for powers up to the specified cruising power, and for higher powers (at propeller) shall, by suitable controls, be idled in a partial vacuum with its exhaust connected to the main condenser through suitable piping. Cruising turbines idling at high power shall be supplied with cooling steam to prevent overheating. For cruising powers, steam shall be admitted to the cruising turbine through suitable controls and shall then exhaust through suitable crossover piping to the H.P. turbine inlet. By-passing within the cruising turbine will be permitted (only internal by-passing is acceptable) for inlet temperatures greater than 900°F. For higher powers inlet steam shall be admitted directly to the H.P. turbine.

3.5.6 Astern element. - Backing or reversing shall be accomplished by an astern element located in each exhaust end of the L.P. turbine casing or in the exhaust end of each single-casing turbine. Unless proven satisfactory by at-sea operation, single-stage astern elements and the last stage of multi-stage astern

C03341

elements shall have symmetrical arrangements of nozzles in upper and lower halves of casing, with total admission as nearly a full circle as practicable.

3.5.7 Foundations and supports. -

3.5.7.1 Methods of support. - Turbines shall be supported by one or more of the following:

(a) Ship's foundations.
(b) A bedplate.
(c) A special box girder or frame.
(d) The main condenser.
(e) A step on the lower-half gear casing.

If required: the girder for H.P. or H.P.-I.P. turbine will be furnished by shipbuilder who will forward drawings of the girder to the turbine manufacturer for comments; L.P. turbine girder or special frame will be furnished by the turbine manufacturer as a part of the L.P. casing or as a support for the same; sub-base for resiliently mounted propulsion unit will be furnished by the manufacturer of the reduction gear.

3.5.7.2 Mounting and bracing. - Turbines shall not be braced, restrained or otherwise restricted, except by bolts or keys securing turbines to their foundations or supports.

3.5.7.3 Condenser support. - L.P. and single-casing turbines shall be located above and attached to the main condenser, which will normally conform to MIL-C-15430. Where a fore-and-aft condenser is used, the condenser will normally support the turbine. Where an athwartship condenser is used, the turbine will be supported by or support the condenser.

3.5.7.4 Expansion and flexibility. - Cruising, H.P., and H.P.-I.P. turbines (and "free" ends of "single" flow L.P. and single-casing turbines not completely supported by the condenser) shall include those supports which are necessary to permit free longitudinal and radial casing expansion sufficient to allow for full power ahead and astern operating temperature.

3.5.7.5 Chocks. - Chocks required between turbines and foundation will be furnished by the shipbuilder to a design acceptable to the turbine manufacturer.

3.5.7.6 Securing turbine to ship's structure and systems. - Bolts and studs for securing turbines to ship's structure and external system connections will be furnished and installed by the shipbuilder. Holes in turbine flanges for such bolting shall be drilled by the turbine manufacturer, except that holes for fitted bolts will be finish-reamed by shipbuilder at installation.

3.6 Thermal insulation and lagging. - The shipbuilder will be responsible for furnishing and installing thermal insulation and lagging. The turbine manufacturer shall advise the shipbuilder of maximum casing temperatures (including windage effects of astern and trial shaft operation). The shipbuilder will inform the turbine manufacturer of the requirements for lagging attachments on casing. Such attachments shall be furnished by the turbine manufacturer and, except for carbon steel casings, shall not involve welding after final heat treatment of the casings. The turbine manufacturer shall also advise the shipbuilder of any areas of insulation that should be shielded to prevent oil soaking with consequent risk of fire.

3.7 Instrumentation. - Turbine instrumentation and responsibility therefor shall be as specified hereinafter.

3.7.1 Pressure and temperature measurements (steam). - Pressure and temperature sensing locations shall be as indicated in table II. Thermometers and gages will be furnished by the shipbuilder. Installation of thermometers will conform to Drawing 810-1385917. Pressure gages will be in accordance with MIL-G-18997. Thermometer wells shall be furnished with the turbine and shall be of the flanged well type.

Table II - Propulsion turbine pressure gage and thermometer requirements (steam)

| Sensing point | Turbine or element for which required | Gages | | | Thermometers location |
|---|---|---|---|---|---|
| | | Dial size (inches) | Type gage | Location | |
| Steam chest | Cruising, single casing, H. P. and HP-IP turbines | 8-1/2 | Pressure | Main gageboard | (None-use main steam line or strainer temperature) |
| First stage shell | Single casing and HP turbines and both elements of HP-IP turbines | 8-1/2 | Compound | Main gage-board | Remote at main gageboard |
| Exhaust shell | HP and cruising turbines both ends of HP-IP turbines | 4-1/2 | Compound | Main gage-board | Local on exhaust casing or crossover pipe |
| | LP turbine (one end of double flow) | (None-use condenser pressure) | | | Local on inspection cover |
| LP turbine inlet | LP turbine of single-shaft ship | 4-1/2 | Compound | Discharge of single-up valve | Local at discharge of desuperheater if used |
| Shell of last stage in by-pass belt | As applicable | 4-1/2 | Compound | Main gage-board | None |
| Each point of ex-traction | As applicable (See note 1) | 4-1/2 | Compound | Main gage-board | Local on casing or in piping |
| Astern inlet bowl | Astern elements (one end of double flow) | 8-1/2 | Compound | Main gage-board | None |

Notes to table II. -

1. Instrumentation not required for extraction in crossover pipe; use exhaust of adjacent turbine.
2. For saturated cycles, thermometers are not required for steam chest and extraction and induction points; other thermometers are required to permit determination of windage heating.
3. For submarines and nuclear ships, additional instruments may be required for warm-up and local control panels.
4. Each shell, extraction and astern bowl pressure gage will be of standard scale-range having a maximum scale reading of 1-2/3 times the normal operating pressure.
5. For pressure gage connections, the shipbuilder will tee off from existing drain connections wherever possible.

3.7.2 Pressure and temperature measurements (oil). - Pressure gages for the lubricating oil system will be furnished by the shipbuilder and will be installed in the shipbuilder's part of the system. Thermometers for sight flow (see 3.8.7) shall be in accordance with Drawing 810-1385917 and shall be furnished with the turbines.

3.7.3 Hot-spot(s) temperature. - Provision shall be made for monitoring temperature (steam or metal) of calculated hot-spot in applicable ahead or astern elements during operation astern or when windmilling as applicable. Permanently installed thermocouples (wired to external terminal block), direct-reading thermometers, existing temperature indications from table II or combinations thereof which can be used to insure that limiting temperatures are not exceeded, may be used for this purpose.

3.7.4 Rotor position indicator. - Each turbine shall be fitted with a rotor position indicator (standard dial-type) at the thrust end, calibrated in not less than 1/8 inch increments of arc each corresponding to 0.001 inch rotor travel. A cover shall be provided to protect the indicator if it extends beyond casing and is susceptible to damage.

3.7.5 Bearing temperatures. - An RTE system shall be furnished for classes A and B turbines (see 3.22.4).

3.7.6 Valve position indicator. - A valve position indicator for ahead control valves and one for the astern valve will be furnished by the shipbuilder.

3.7.7 Nozzle bowl pressure connection. - Nozzle bowl pressure connections are not required; however, if the turbine manufacturer does provide such connections, they shall either be blank flanged or plugged with a pipe plug which is seal welded.

3.8 Lubrication system. - The lubricating system, external to turbine, is the responsibility of the shipbuilder. The responsibilities of the turbine manufacturer are as specified in 3.8.1 through 3.8.10.

3.8.1 Cleaning of systems. - All parts of the turbines which form a part of the internal lubricating oil system shall be thoroughly cleaned in a manner satisfactory to the Government inspector prior to the operating tests specified in 4.5.

3.8.2 Type of lubricating oil. - Turbines shall be designed for use with Navy symbol 2190 TEP lubricating oil conforming to MIL-L-17331.

3.8.3 Low L.O. alarm setting. - The turbine manufacturer shall recommend to the shipbuilder minimum acceptable lube oil pressure in connection with the setting of the low-pressure alarm (shipbuilder furnished) for the lubricating oil system and the low lubricating oil trip setting for throttle (when so designed).

3.8.4 Flow-limiting orifices. - Orifices shall be provided in the oil supply to each journal bearing and in the inlet to or discharge from each thrust bearing. Orifices may be of a design which permits removal but they shall be installed in such a manner as to prevent external adjustment of oil flow.

3.8.5 Test connections. - Test connections (for use of a pressure gage) are not required before each bearing. If such connections are provided for use during shop tests, they shall be plugged tightly and seal welded prior to shipment.

3.8.6 Bearing oil supply and return. - Each turbine journal bearing and thrust bearing shall have separate oil connections and separate oil discharge connections; however, inlet and discharge for thrust bearing may be manifolded with those of adjacent journal bearing to permit a single oil supply connection and a single oil discharge connection to serve both bearings.

3.8.7 Sight-flow fitting. - Each journal bearing cap and each thrust bearing cover or housing shall be fitted with a sight-flow fitting (similar to that shown on Drawing S4200-864838, except that threaded well connections are not acceptable, or of a cylindrical window design) integral therewith or bolted thereto. Bulls-eye type of sight flow is acceptable for thrust bearings. Sight-flows shall provide indication of oil during stand-by and ahead and astern operation. The fittings shall be bronze and shall utilize heat-treated transparent glass or plastic (1/4 inch thick for flat windows and 5/32 inch minimum thickness for cylindrical windows), which may be readily observed from the floor plates. Oil to sight-flow shall be representative of bearing discharge. Where it is not practicable to install sight-flow fitting on the bearing cap, a similar fitting in the oil discharge line from the bearing shall be provided.

3.8.8 Oil inlet temperature. - Turbines shall be capable of operation up to and including full power with inlet oil temperature of 90°F. Normally temperature will be approximately 120°F. and shall not exceed 130°F.

3.8.9 Oil discharge temperature. - The maximum temperature rise of the oil discharged from any turbine bearing under any operating condition shall not exceed 50°F nor shall the temperature exceed 180°F when measured by thermometers in the sight flows.

3.8.10 RTE temperature limits. - Maximum allowable temperature as read by RTE shall not exceed 250°F for journal bearings and 270°F for thrust bearing shoes. Alarm settings should initially be set at maximum limits; however, final alarm setting shall be 20°F higher than the maximum value observed during trials.

3.8.11 Grease fittings. - Grease fittings conforming to type III of MIL-F-3541 shall be provided where grease lubrication is required.

3.9 Gland seal and leak-off (vent) systems. - Gland seal and gland vent connections shall be provided at each gland. Gland seal regulating valves shall be furnished with the turbine. The shipbuilder will furnish the seal and vent piping and vent fan with condenser.

3.9.1 Gland seal regulators. - Two regulating valves shall be furnished - one for supplying steam to the turbine glands and one for unloading excess steam from the glands. These two valves may be separate regulators or incorporated in a common body. All regulating valve bodies shall be provided with takedown (bolted) inlet and outlet ASA flanges for the service intended. Unless specifically stated otherwise in the contract, regulating valves shall be controlled automatically with local manual override. Regulating valves shall conform to the following as applicable (Note: Air pilot-operated valves are not permitted on submarines).

(a) Manual regulation - Drawing 810-1385882.
(b) Automatic (pneumatic) - MIL-V-18030.
(c) Automatic (self-contained) - MIL-V-17848.
(d) Automatic (hydraulic) - As approved by NAVSEC.

A full by-pass (with globe valve) around the supply regulator will be furnished by the shipbuilder.

3.9.2 Gland protection. - Where automatic regulating valves are used, the following shall apply:

(a) Supply valves shall fail open.
(b) Unloading valves may fail either open or closed depending upon the ability of the system to withstand the resultant pressure.

3.9.3 System design. - Regulating system shall be designed to maintain approximately 1/2 to 2 pound gage pressure in the shaft gland seal inlet cavity. A minimum of 5 inches of water will be maintained at the shaft gland leak-off cavity by the gland exhauster condenser furnished by the shipbuilder. The capacity of the gland seal system, the gland exhauster system and leak-off piping shall be based upon the turbine manufacturer's estimate of "Maximum clearance flows" (corresponding to clearances which require replacement of packing) calculated for 2 psig pressure at the shaft gland seal inlet cavity and minimum of 5 inches of water at the shaft gland leak-off cavity. Maximum flows shall be not less than 150 percent nor more than 200 percent of the flows corresponding to "normal clearance" (see 3.16.2). Where valve stem leak-off flows are involved, increased value of flow shall be based on the manufacturer's estimate of increased diametral clearance between stem and bushing. Piping shall be sized to limit velocity of supply steam to a maximum 200 feet per second and of vent steam to a maximum of 100 feet per second.

3.9.4 Excess steam. - Excess leak-off steam from turbine glands may be introduced into the cross-over pipe or into stages of the same turbine by a re-entry line. Steam from low pressure valve stem leak-offs may be used to augment gland sealing steam. Discharge from the gland seal system unloading valve may be piped to the condenser (or lower-half exhaust casing of L. P. or single-casing turbines in such a manner as to least affect temperature measurement in turbine exhaust shell) or to a suitable turbine stage. In such cases, the admission of steam shall be arranged so that the rotating blades and shrouding are protected against direct impingement from the entering steam.

3.10 Control systems. - The control system as used herein represents the combined efforts of the shipbuilder and turbine manufacturer to provide means for translating operator effort into turbine response ahead and astern.

3.10.1 Type of system. - The control system shall be a mechanical type unless power-assist is required to meet handwheel torque limitations or quick reversal times specified herein.

3.10.2 Power-assist. - Power-assist system may utilize hydraulic, pneumatic or electrical means to reduce operator effort, except that pneumatic control is not permitted in submarines. NAVSEC approval for the use of power assist and of the details of system proposed is required.

3.10.3 System component responsibility. -

3.10.3.1 Ahead control. - Nozzle control valves, by-pass valves, check valves, transfer valves and operating mechanism at turbine shall be furnished with the turbines. Extraction and induction valves, handwheels and connecting system to turbine control mechanism will be furnished by the shipbuilder.

3.10.3.2 Astern control. - Astern valve shall be furnished with the turbine. Handwheel and connecting system will be furnished by the shipbuilder.

3.10.3.3 Power assist. - Responsibility for furnishing power assist system shall be based on which part of the control system fails to meet specified torque limitations.

3.10.4 Single handwheel. - Ahead control valves and astern valve shall each be controlled by a single handwheel. Handwheel rotation shall be such that valves close with clockwise motion when facing the handwheel.

3.10.5 Ahead handwheel. -

3.10.5.1 Size. - The handwheel will be 24 inches in diameter.

3.10.5.2 Torque. - The maximum torque permitted (based on highest specified operating steam pressures at applicable valve cracking points) is as follows:

(a) For submarines. - Maximum peak torque in either opening or closing direction is 20 pound-feet (tangential pull of 20 pounds at wheel rim) of which a maximum of 12 pound-feet is allowed for system furnished with turbine and a maximum of 8 pound-feet is allowed for shipbuilder-furnished system.
(b) For surface ships. - Maximum peak torque in either opening or closing direction is 40 pound-feet (tangential pull of 40 pounds at wheel rim) of which a maximum of 30 pound-feet is allowed for system furnished with turbine and a maximum of 10 pound-feet is allowed for shipbuilder furnished system. The mean effort at the handwheel per turbine over the operating range shall not exceed 400 pounds-feet-turns. Mean effort shall be calculated as follows:

$$\text{Mean effort} = \frac{(\Sigma Q + \Sigma U)(T)}{2\ VP}$$

Where: Q = summation of individual valve point upper torques
U = summation of individual valve point lower torques
T = total turns, full closed to full open
VP = number of valve points

3.10.5.3 Number of turns. - Number of turns shall be as follows:

(a) For submarines. - Number of turns shall be not less than 10 nor more than 15.
(b) For surface ships. - Number of turns shall be not less than 10 nor more than 35.

3.10.6 Astern handwheel. -

3.10.6.1 Size. - The handwheel will be 18 inches in diameter.

3.10.6.2 Torque. - The maximum torque permitted (based on highest specified operating steam pressures) is as follows:

(a) For submarines. - 15 pound-feet (tangential pull of 20 pounds at wheel rim) of which a maximum of 15 pounds is allowed for astern valve and a maximum of 5 pounds is allowed for operation system.

(b) For surface ships. - 30 pound-feet (tangential pull of 40 pounds at wheel rim) of which a maximum of 30 pounds is for astern valve and a maximum 10 pounds is allowed for operating system.

3.10.6.3 Number of turns. - Number of turns shall be as follows:

(a) For submarines. - Number of turns shall be not less than 6 nor more than 15.
(b) For surface ships. - Number of turns shall be not less than 12 nor more than 40.

3.10.7 Quick reversal time. - The control system shall be such that it is possible for one man to close the ahead handwheel from F.P. ahead position and to fully open the astern handwheel within 15 seconds for submarine turbines and within 45 seconds for surface ship turbines.

3.10.8 Design details. -

3.10.8.1 Ahead nozzle control. - The number and size of ahead nozzle control valves shall be such as to provide stable speed control over the entire operating range. Negative loops in the power and steam rate curves between valve points require specific NAVSEC approval.

3.10.8.2 Strength of system see 3.15.5. -

3.10.8.3 Self-locking. - For any given handwheel position, the valve position shall remain constant and not creep. External clamps or other friction devices to accomplish this are not permitted.

3.10.8.4 Keyed controls. - Cams and levers as applicable shall be keyed or doweled to their respective shafts (set screws are not acceptable). Dowels shall be locked in.

3.10.8.5 Springs. - Design shall be such that valves are spring-loaded in the closing direction.

3.10.9 Overspeed protection. - Speed-limiting and overspeed trip devices shall be furnished for turbines driving generators and for turbines driving through clutches. Speed sensing elements shall be on one rotor of each propulsion unit in a multi-shaft ship and on all rotors of a single-shaft ship.

3.10.9.1 Control oil. - Control oil for actuating speed limiting and overspeed trip mechanisms will be available from shipbuilder-furnished pumps. Control oil will be 2190 TEP at a pressure specified in contract; however, consideration will be given to selection of a control oil pressure which is recommended by the turbine manufacturer if advantages obtained thereby are judged by NAVSEC to be desirable.

3.10.9.2 Speed-limiter. - The speed-limiting device shall be a self-restoring type which hydraulically actuates ahead control valves and astern valve to limit speed (upon loss of load at any ahead and astern power) to approximately 110 percent of full power rpm. The actuating point shall be such as to permit operation at highest expected revolutions per minute (rpm) due to propeller miss (see 3.12.2).

3.10.9.2.1 Speed sensing impeller. - Speed sensing for the speed-limiting device shall be by the use of a removable pump impeller attached to the end of the rotor, or a separate oil pump driven by rotor. Provision shall be made for a pressure gage (shipbuilder furnished) to measure discharge pressure.

3.10.9.3 Overspeed trip. - Overspeed trip shall be as follows:

(a) The overspeed trip device shall consist of a mechanical speed sensing element which hydraulically shuts-off ahead and astern steam to fully stop turbine rotation. Where there is no shipbuilder-furnished valve in the steam line for this purpose, the trip shall shut the ahead control valves and astern valve to full closed position.
(b) The trip system shall be capable of limiting speed (upon loss of load at any ahead or astern power) to an rpm which will not result in damage to the turbine.
(c) The speed sensing element shall be removable from the rotor and provision shall be made for adjusting tripping point.
(d) The actuating point shall be above the maximum rpm resulting from operation of the speed limiter.
(e) A local manual trip and reset shall be provided. The manual trip device may also function due to loss of oil but shall be self-restoring upon return of oil.

3.10.9.4 Operational checks. - Provision shall be made to test the speed-limiting system at or less than full power rpm. Test of the overspeed trip shall be at overspeed rpm, with provision made to control maximum rpm attainable by use of either the speed limiting device or other special features. Provision shall also be made on either the turbines (or reduction gear, if approved) for the use of a hand tachometer to check rpm.

3.10.9.5 Override feature. - Where either overspeed protection or power assist is furnished, the design shall provide for operation of ahead and astern valves upon loss of control oil or component failures in the power-assist or overspeed system. For submarine turbines, override capability shall be possible without requiring any action by the throttleman other than further opening of the handwheel. For surface ships, local manual control or other means to restore operational capability is acceptable. In override condition, the torque required to operate ahead or astern handwheels shall not exceed 50 pound-feet and number of turns from normal full closed to full open in override shall not exceed 50.

3.10.10 Control of turbines driving generators. - Control system shall provide for manual control of speed during start-up and automatic control of speed during load operation. Speed regulation shall be as specified in the contract. For alternating current (ac) generators the use of one or more levers for combined steam and electrical control will be considered.

3.10.10.1 Overspeed protection. - In addition to the requirements of 3.10.9, the following shall apply:

(a) Speed sensing element. - A centrifugal type fly-weight arrangement connected to rotor either directly or through a geared mechanism is acceptable.
(b) Trip throttle valve. - The overspeed trip shall actuate a trip throttle valve which shall be supplied with the turbine. A local manual trip and reset shall be provided. When resetting, it shall be necessary to manually close the handwheel to within one or two turns of full-closed position. It shall also be possible to reset the throttle valve when turbine rotation has lowered to approximately 50 percent full power rpm and thus not be necessary to wait until rotor has fully stopped.

3.10.11 Control for singled-up condition. - Special orifices, blank flanges and piping from H.P. exhaust shall be furnished with the turbines and shall be permanently installed. The use of spectacle flanges is desired when shock considerations permit their use. Steam piping from strainer to L.P. inlet, singled-up control valve (in accordance with MIL-V-22052) and desuperheater (if required) will be furnished by the shipbuilder. Desuperheater design shall be approved by the turbine manufacturer and NAVSEC. The shipbuilder will also provide blank flanges in H.P. inlet, lube oil system and gland seal system to permit isolation of the H.P. turbine for repairs while operating on L.P. turbine.

3.11 Piping, valves and associated components. -

3.11.1 General requirements. - The General Specifications for Ships of the United States Navy, Section 9480-0 shall be the basis for design, (sizing, wall thickness, flexibility and cold springing requirements) and test of piping, valves and fittings for steam and oil systems. In addition, all piping, valves and related fittings shall conform to the following:

(a) For surface ship applications. -
   (1) MIL-STD-777.
   (2) Drawing 810-1385850.
(b) For submarine applications. -
   (1) MIL-STD-438.
   (2) Drawing 810-1385850.

3.11.2 Connections to shipbuilding systems. -

3.11.2.1 Allowable reactions. - Steam and oil connections at turbine shall be such that unacceptable strains are not imposed on turbine by shipbuilder's piping. Data on allowable force and moment reactions which turbine can safely withstand shall be forwarded to the shipbuilder for confirmation that the limits imposed are acceptable. Shipbuilder piping design will be submitted to the turbine manufacturer for review. Mutual effort is required to arrive at an acceptable arrangement; however, in case of an impasse between the shipbuilder and turbine manufacturer, NAVSEC will be the sole judge in determining corrective action.

3.11.2.2 Flanged connections. - All steam piping connections to which shipbuilder connects shall be flanged and shall terminate at a point outside of turbine lagging line. Male-female flanges (conforming to ASA standards) shall be used for all inlet oil lines and mating flange (of a material comparable with turbine flange) furnished with the turbine.

3.11.3 Crossover pipe. - Crossover pipes and bolting for same shall be furnished with the turbines but will be fitted and installed by the shipbuilder. The crossover pipe shall be furnished either assembled (with flanges unfaced and undrilled) or unassembled (with flanges faced and drilled, and provisions for field weld by the shipbuilder) as desired by the shipbuilder. Expansion joints, in accordance with MIL-E-17813, shall be included with the crossover pipe when required to accommodate thermal expansion.

3.11.4 Main steam strainer. - For gear-driven propulsion units, the main stream strainer will be furnished by the shipbuilder and will be located upstream of ahead and astern valves. For turbine-generator propulsion units, a steam strainer in accordance with MIL-S-21427, shall be furnished with the trip throttle valve.

3.11.5 Moisture separator. - One external moisture separator shall be provided ahead of the L. P. turbine inlet for each cross-compound propulsion unit operating on saturated or wet inlet steam. The separator shall contain or be provided with a strainer on the downstream side. Design shall be as approved by NAVSEC. Internals shall be of 12 chrome material or equivalent; outer casing may be of carbon or alloy steel.

3.11.6 Sentinel valves. - Sentinel valves (1/2 inch size and type A-1 of MIL-V-20065) shall be provided by the turbine manufacturer on crossover pipes and on the exhaust annulus of L. P. and single casing turbines in surface ships. Sentinel valves do not require water sealing. The discharge of each sentinel valve shall be visible to operating personnel and shall be shielded or directed so as to avoid injury to personnel. Piping from sentinel valves shall not be discharged to bilge or drain system. Set points shall be 5 psig for exhaust and 10 percent above expected maximum operating pressure for crossover pipes.

3.11.7 Ahead control valves. -

3.11.7.1 Material. - Materials shall be in accordance with table I. The body for the trip throttle valve, transfer valve or other separate valves furnished with turbine shall be of similar material as specified for the steam chest or casing for comparable operating conditions.

3.11.7.2 Seats. - Valve seats shall be removable from the valve body or steam chest. Threaded connections are not permitted. Provision shall be made for expansion between seat and body or chest. Seats shall be installed with a light interference fit and annulus between valve seat and body or chest shall be seal welded to prevent leakage.

3.11.7.3 Contact area (disc and seat). - The contact area of disc and seat shall be hard-faced with chrome-cobalt material to a minimum thickness of 3/32 inch and an approximate width of 1/2 inch.

3.11.7.4 Stems and bushings. - Soft packing shall not be used. Stems and bushings shall be nitrided or otherwise suitably hardened. Use of piston rings will be considered for large valves but NAVSEC approval is required.

3.11.7.5 Poppet valves. -

3.11.7.5.1 Lift-bar. - The lift-bar may be either solid or split. If split, the halves shall be aligned by two straight dowel pins or fitted bolts, and countersunk bolts shall be installed between each stem hole. All dowels and bolts shall be staked.

3.11.7.5.2 Button heads. - Valve button heads may be either integral with stem or attached to stem by screw threads and shall have a spherical seating surface. (Exception to this will be considered when there is operating experience to indicate other shapes are satisfactory.) Removable button heads shall be locked to their stems in a manner approved by NAVSEC. Welding to stem will not be permitted.

3.11.7.5.3 Contact area. - Lift-bar seat (or seat insert if used) and button head contact surface shall be either hard-faced with chrome-cobalt or be hardened to a minimum hardness of 200 BHN and stress-relieved.

3.11.7.6 Springs. - Valve gear springs shall be cadmium-plated or otherwise corrosion protected by a method approved by NAVSEC. Ends shall be closed and ground flat and square. Nesting is permitted if necessary to obtain the desired characteristics; however, no compression forces shall be present in springs prior to removal of last retaining bolt or securing device.

3.11.7.7 Leakage. - Steam leakage between disc and seat shall not exceed the limits specified for leakage test (see 4.5.2).

3.11.8 Astern valve. - Astern valve shall be in accordance with MIL-V-22682 as modified by the requirements of 3.10.6 and 3.15.5 herein.

3.12 Operating conditions. - Operation of the propulsion units will be limited to design shaft horsepower design shaft torque or design propeller rpm whichever occurs first.

3.12.1 Ahead full power. - Design full power is the maximum power for which each propulsion unit shall be designed. Extra capacity beyond the manufacturer's normal margin is not required.

3.12.2 Ahead full power rpm. - Each propulsion unit shall be designed for continuous operation when developing full power at nominal full power rpm (see 6.2.2(j)) plus or minus 3-1/2 percent for surface ships and plus or minus 5 percent for submarines. Guaranteed steam rate shall be based on the nominal full power rpm.

3.12.3 Steam rates. - Specified steam rates (see 6.2.2(j)) are those which shall be guaranteed to exist after maneuvering (including crash ahead and crash astern) during a laboratory test conducted in accordance with ASME power test code, and shall include the amount of steam used for gland sealing from all sources. The amount of gland steam supplied from the gland seal regulator shall be based on a prorated available-energy basis on the assumption that it is supplied from the main steam line but assuming dry-and-saturated quality. Steam rates over the entire power range shall be the minimum obtainable consistent with the design selected to meet the steam rates specified at particular powers.

3.12.4 Astern operation. -

3.12.4.1 Stopping capability. - To provide adequate stopping ability for the ship, astern elements shall be capable of developing at a specified shaft speed (r.p.m.) a minimum astern torque with a corresponding maximum steam flow, both as specified (see 6.2.2(j), table IX note 1).

3.12.4.2 Astern full power. - Each propulsion unit shall be capable of continuous astern operation without cooling sprays at full power astern or rated astern propeller rpm whichever occurs first. For submarines, astern full power shall be based on surface operation and rated astern rpm is 50 percent of full power ahead rpm.

3.12.5 Maneuvering. -

3.12.5.1 After operation astern at any power up to and including full power for any period of time, the turbines shall be capable of being immediately stopped or reversed and operated for any period of time at any ahead power up to and including full power. Conversely, the above shall apply in going from ahead operation to astern operation. Warmed-up (dockside) turbines shall be capable of going immediately from a stopped condition to either full power ahead or full power astern without damage as the result of differential expansion of stationary and rotating parts within the turbines.

3.12.5.2 During and immediately after quick reversals astern, the turbine shall be capable of operating up to an astern propeller speed equal to full power ahead propeller speed, or the astern propeller speed corresponding to rated astern bowl pressure whichever occurs first, for periods not to exceed 5 minutes.

3.12.6 Singled-up operation. - For single shaft ships with cross-compound propulsion units or two type I turbines connected to a common gear, provision shall be made to operate either turbine independently under design terminal conditions. Desuperheating will be permitted for L. P. turbines when either special materials or increased clearance would otherwise be required. Desuperheater may be combined with main steam strainer. The operating turbine shall be capable of operating at any rpm up to the point where its normal full power torque is developed. (A ship's normal speed power curve shall be assumed.) A maximum of 500 hours under this mode of operation may be used for design purposes. See 3.10.11 for requirements on control and parts to be furnished.

3.12.6.1 Disconnecting damaged turbine. - Provision shall be made, with the shaft locked, to disconnect the damaged turbine from the gear and to secure the rotor against rotation due to gland seal steam or inertia forces. A torque corresponding to 5 percent of the turbines ahead full power torque shall be used as the criterion for design of the rotor locking devices. Time required to accomplish the disconnecting shall be as approved by NAVSEC; however, 15 minutes shall be used as a guide in establishing design for submarine applications.

3.12.7 Trailing shaft operation. - The propulsion units shall be capable of being continuously trailed at a minimum of 40 percent of rated full power ahead rpm with no steam flow and atmospheric pressure in the condenser. Under this condition, cooling water will normally be circulated through the condenser tubes. Cooling sprays to limit temperatures under this mode of operation shall not be used unless approved by NAVSEC. Trailing operation with vacuum will be limited to the rpm recommended by the manufacturer based upon maximum allowable steady-state temperatures but shall be compatible with the maximum rpm required for single shaft operation.

3.12.8 Locked shaft operation. - Propulsion units installed in multi-shaft ships shall be capable of driving their propellers when other propeller shafts are either trailing or locked against rotation. For carriers, it shall be assumed that a maximum of one shaft is either locked or being trailed. Under this condition, the operating unit(s) shall be capable of driving its propeller at any rpm up to the point where it's normal full power torque is developed. A ships normal speed/power curve shall be assumed with a plus 5 percent torque allowed. Total time required for this mode of operation is 2000 hours.

3.12.9 Terminal steam conditions. - Nominal inlet steam conditions and exhaust pressure for ahead and astern operation will be specified in 6.2.2(j). Ahead inlet conditions are at the turbine chest; astern inlet conditions are at the shipbuilders connection to the astern bowl pipe downstream of the astern valve. Exhaust pressures are at the turbine exhaust flange. Specified performance shall be based on nominal conditions; however, design shall be such that continuous operation, within the specified powers and speeds, is not limited by the variations specified in 3.12.9.1 through 3.12.9.3 in terminal conditions.

3.12.9.1 Inlet pressure variations. - For any given load, the steam pressure will not average more than that specified. In maintaining this average, the pressure will not exceed 110 percent of that specified. During abnormal conditions, the pressure may swing momentarily to 120 percent of that specified, but the aggregate of such swings will not exceed 1 percent of the total specified operating life.

3.12.9.2 Inlet temperature variations. - For any given load, the steam temperature will not average more than that specified. In maintaining this average, the temperature will not exceed the specified temperature plus 15°F, except that during abnormal conditions, the temperature will not exceed: (a) the specified temperature plus 25°F. for not more than 5 percent of the total specified operating life, or (b) the specified temperature plus 50°F. for swings of 15 minutes duration or less, aggregating not more than 1 percent of the total specified operating life.

3.12.9.3 Exhaust pressure variations. - Design exhaust pressure is based on an injection temperature of 65°F for submarines and 75°F for surface ships. Variations in exhaust pressure shall be based on injection temperatures from 28°F to 85°F and will be specified in table IX, note 4.

3.12.10 Trim, list, roll and pitch. - Turbines shall be designed to operate satisfactorily when the ship is in other than a normal condition, as shown in table III (trim and list or roll and pitch can occur simultaneously).

Table III - Ship's trim, list, roll and pitch

| Condition | Class B or C (surface ships) | Class A (submarines) |
|---|---|---|
| | Degrees | Degrees |
| Permanent trim (down, bow or stern) | 5 | 30 |
| Permanent list (port or starboard) | 15 | 15 |
| Roll (port or starboard from normal)1/ | 45 | 60 |
| Pitch (up or down from normal)1/ | 10 | 10 |

1/ Pitch and roll time cycle, if required shall be as specified (see 6.2.2(q)).

C03351

3.13 Shock. - Shock requirements shall be as specified in the contract and will involve one or more of the following:

(a) Static method in accordance with figure 2.
(b) Dynamic analysis in accordance with NAVSHIPS 250-423-30 with design criteria as specified in NRL Report 1396.
(c) Shock test in accordance with MIL-S-901.

Propulsion turbines are in shock grade A which is defined as machinery required for the ship to operate at designed speed. The design shall be such that the turbines will be capable of withstanding the specified shock inputs without significant (1 percent) change in performance and without any part of the turbine coming adrift or otherwise creating a hazard to personnel or other components and systems.

3.14 Mechanical vibration and balancing. - Requirements of MIL-STD-167 shall apply except as modified herein.

3.14.1 Allowable vibration. - Unless special noise levels are specified (see 6.2.2.(q)), the maximum allowable levels of forced vibration (Type II of MIL-STD-167) shall be as shown on figure 3.

3.14.2 Shop balance. - Rotors shall be dynamically balanced with all rotating parts installed. Balancing shall be conducted at the maximum safe operating speed of the balancing machine or rated speed of the turbine whichever occurs first.

3.14.3 Special balance. - When contract requires special efforts to obtain noise reduction, maximum efforts shall be made in the production phase and during shop balancing to minimize the amount of corrections required during either spin testing or local balancing if required.

3.14.4 In-field balance. - Provision shall be made for in-field balancing each rotor without lifting the casing.

3.14.4.1 Correction planes. - At least three correction planes for class A turbines and at least two correction planes for classes B and C turbines shall be provided in each rotor. These planes shall not be used during balancing of rotor in balancing machine; however a maximum of 2 holes in each plane may be used if necessary to refine balance during spin tests.

3.14.4.2 Access to correction planes. - Access to correction planes shall be through either existing inspection openings, outer removable gland covers or special flanged access holes. Minimum effort to install weights is desired.

3.14.4.3 Balance weights. - Balance weights shall be either threaded weights for tapped holes (preferably parallel to turbine longitudinal axis) or weights secured in dovetail grooves. Provision shall be made to mechanically lock-in the weights.

3.14.5 Torsional vibration. - The turbine manufacturer shall submit to the shipbuilder information necessary to enable him to prepare and submit the torsional vibration characteristics of the system composed of the propeller, line shafting, gear and turbines. In the case of a turbine-generator unit for electric-drive ships, the turbine manufacturer shall prepare and submit this study. These characteristics shall conform to MIL-STD-167, type III vibration (torsional).

3.14.6 Lateral and longitudinal vibrations. - Shipbuilder will be responsible for conducting the calculations required by MIL-STD-167 for lateral and longitudinal vibration characteristics; however, turbine manufacturer shall, upon request, furnish such turbine data as is necessary for the shipbuilder to conduct the study.

3.14.7 Resonances. - The turbine manufacturer shall closely collaborate with the shipbuilder in an attempt to avoid resonance in turbines and supports in the range of frequencies caused by the propulsion system. When it is known that the turbines of the same design will be used in propulsion systems of different arrangement, this shall also be taken into account. Should it be impracticable for the turbine design to avoid (by detuning or other means) resonances expected to result from ship and other parts of the propulsion system, structural damping may be applied. Environmental testing specified by MIL-STD-167 is not required; however, the turbine manufacturer shall be responsible for corrective action, if necessary, to eliminate unacceptable responses within the specified frequency band.

3.14.8 Noise. - If structureborne noise reduction is desired, requirements will be specified in the contract (see 6.2.2(q)). Airborne noise tests are not required during shop testing, and if conducted onboard ship, will be the responsbility of the shipbuilder.

3.15 Stress criteria and allowable stresses. -

3.15.1 Stress criteria. - Maximum allowable stresses for the specified operating conditions (see 3.12) shall be based on whichever of the following is limiting. Centrifugal stresses shall be based on the highest rpm specified (see 3.12.2).

(a) Yield strength (at maximum temperature with offset of applicable material specification).
(b) Stress rupture (minimum of 40,000 hours).
(c) Creep (0.1 percent) for life specified (see 3.3.5) where temperature exceeds 800°F. (Creep is not applicable to specified factors of safety.)

3.15.2 Blading. - Centrifugal stress (centrifugal load divided by full cross-section area) in the most highly-stressed row shall not exceed stress levels corresponding to a minimum factor of safety of two. Vibratory stress data (see table VIII data category III) shall be submitted for NAVSEC approval.

3.15.3 Bolting. - Turbine casing steam chest bolting shall be designed to provide leak-tight joints for an initial period (following casing assembly) of at least 20,000 hours and, after retightening, for an additional period of 20,000 to 30,000 hours before again retightening based on relaxation strength of the material at maximum temperature involved.

3.15.4 Rotors. - Design primary stresses shall not exceed stress levels corresponding to the following minimum factors of safety:

(a) Centrifugal - 2.0
(b) Average tangential - 2.5
(c) Torsional - 5.0

3.15.5 Valve control system (ahead and astern). - The control system furnished with the turbines shall be designed to withstand (without permanent deformation of any part) stresses equivalent to at least 150 pound force applied on the handwheels at any point throughout the operating range in both opening and closing direction. For cam operated valves, this requirement does not apply in the opening direction for the part of the system between cam and valves. Full-open and full-closed stops are permitted.

3.15.6 All other turbine parts. - All other turbine parts subjected to stress shall be designed to provide appropriate factors of safety based on the turbine manufacturer's experience. Stress values and resulting factors of safety are subject to NAVSEC approval upon request.

3.16 Clearance requirements. - Running clearances between turbine stationary and rotating parts shall be adequate to prevent rubbing during all specified operating conditions (see 3.12). Minimum "cold" clearances shall be as specified hereinafter except that consideration will be given to smaller clearances on a case basis where essentially duplicate machinery has operated satisfactorily at sea in Navy ships.

3.16.1 Blading clearances. -

3.16.1.1 Axial. - Axial clearances between bladed rotor and casing (at nozzle block, diaphragm or seal strips) shall be not less than 0.035 inch, with rotor hard up against the shoes in direction of minimum clearance.

3.16.1.2 Radial (shroud or tenon to casing). - Radial clearance between rotor blade shrouding (including tenon) and casing or diaphragm shall be not less than 0.125 inch.

3.16.1.3 Radial (seal strips). - Radial clearance for seal strips whether mounted in casing, diaphragm or as an integral part of shroud shall be not less than 0.001 inch per inch of diameter.

3.16.2 Packing (diaphragm, gland and dummy) clearances. - Radial clearances between packing rings and shaft shall (at installation) be not less than either 0.005 inch (tolerance included) or the clearance corresponding to 80 percent of "normal clearance" (clearance expected to exist after preliminary acceptance trials) whichever is larger.

3.16.3 Oil deflector clearances. - Radial clearances between labyrinth type oil deflectors and shaft shall be not less than 0.005 inch.

3.16.4 Heat shield (baffle) clearances. - Radial clearances between heat baffles and shaft shall be not less than 0.010 inch.

3.16.5 Clearance adjustment. - Provision shall be made to adjust the axial position of any rotor; however, such adjustment shall not be possible when turbine is rotating.

3.16.6 Clearance check. - Provision shall be made in each turbine to determine by use of a taper gage the blade axial clearance of at least one row of blading without lifting the casing.

3.17 Welding, brazing and allied processes. - Unless otherwise approved by NAVSEC, welding, brazing and allied processes shall be in accordance with MIL-STD-278.

3.18 Marking of parts. - Marking of parts shall be in accordance with MIL-STD-792 except that depth of penetration for low stress die stamps may be 0.020 inch on noncritical low-stressed surfaces. Stamping of castings permitted by MIL-STD-271 is acceptable.

3.19 Threaded fastenings. - Threaded fasteners shall conform to the specifications listed in table I, item (1), as applicable. The various types of screw threaded fasteners shall conform to American Standards Association standards.

3.19.1 Screw threads. -

3.19.1.1 Unified thread series. - Screw threads, except as specified in 3.19.2.3, shall be of the unified thread series in accordance with Handbook H28.

3.19.1.2 Coarse versus fine thread series. - The coarse thread series shall be used unless the component design indicates a necessity for the use of the fine thread series.

3.19.1.3 Eight-thread series. - For fasteners 1-inch diameter and larger, the eight-thread series shall be used wherever practicable.

3.19.1.4 Preferred thread-series. - In the selection of special threads, preference shall be given to the use of the 20, 28, 36, 44 and 56 thread series.

3.19.2 Class of fit. -

3.19.2.1 Class 2A-2B. - Class 2A-2B fit shall be used for the major portion of interchangeable screw thread fasteners.

3.19.2.2 Class 3A-3B. - Class 3A-3B fit shall be limited to applications where the necessity for accuracy of lead and angle of thread can be justified.

3.19.2.3 Class 5. - Class 5 interference fits when used shall conform to ASA Publication B1-12. Studs shall either be class 5 fit or be bottomed; however, details of bottoming shall be approved by NAVSEC.

3.19.3 General rules for applications. -

3.19.3.1 Regular versus heavy series. - Where necessary for purposes of bearing loads, pressure-tight flanges and other special applications, heavy series shall be used for 1 inch size and larger.

3.19.3.2 Thread engagement. - Thread engagement for studs and cap screws shall be not less than the nominal diameter. Threads of nuts shall be fully engaged. The maximum protrusion of the fastener from the face of the nut shall not exceed 1/2 of the nominal thickness of the nut.

3.19.3.3 Tapped holes. - Tapped holes for stud-bolts and cap screws shall be bottom tapped if the thickness of the remaining material is equal to or less than major diameter of the thread and in such instances they shall have full threads for the specified depth.

3.19.3.4 Fitted (body-bound) fastening. - Bolts in shear shall be fitted. Holes for body-bound fastenings shall be reamed with coupled parts in position, to dimensions that will assure a tight fit. Tolerances in table IV shall be used for body-bound bolts.

Table IV - Tolerances for body-bound fastenings

| Nominal bolt Size (inches) | Tolerances in inches | | |
|---|---|---|---|
| | Maximum clearance-body of bolt and hole (Plus) | Diameter of hole (Plus) | Body of bolt (Minus) |
| 1/4 to 3/8, incl. | 0.0015 | 0.0009 | 0.0006 |
| 7/16 to 11/16 | .0017 | .0010 | .0007 |
| 3/4 to 1- 1/8 | .0020 | .0012 | .0008 |
| 1-1/4 to 1- 7/8 | .0026 | .0016 | .0010 |
| 2 to 3 | .0030 | .0018 | .0012 |
| 3-1/4 to 4- 3/4 | .0036 | .0022 | .0014 |
| 5 to 7, incl. | .0041 | .0025 | .0016 |

3.19.3.5 Locking devices. - Nuts on moving parts, internal parts directly exposed to blade path, control mechanisms, and support structures shall be securely locked by lock washers or other means as approved by NAVSEC. Self-locking nuts conforming to MIL-N-24129 or MIL-N-25027 may be used. Locking wire shall not be used for securing nuts.

3.19.3.6 Internal bolting. - The use of internal bolts and studs in way of steam path shall be avoided to the maximum extent practicable without unduly complicating the design. NAVSEC approval is required for all instances where internal bolting is used. Where internal bolting must be removed to lift casing, a warning plate so stating shall be permanently attached to the casing and shall protrude beyond lagging.

3.19.3.7 Acceptable types of fasteners. - Wherever practicable, threaded fasteners shall be through bolts or through studs (2-nuts). Stud bolts (one nut) may be used. Where bottoming of stud bolts occurs, the thread fit shall be class 2A or class 3A. Class 5 interference fits shall not be bottomed. Tap screws or cap screws will be considered on a case basis.

3.19.3.8 Bolt heating. - Highly stressed studs 2 inches in diameter and larger in non-gasketed steam joints (such as casing joints and steam chest cover-joint) shall be drilled to permit the use of bolt heaters to obtain required stud extension without undue slugging and overtorquing. The corresponding cover nuts shall also be drilled to permit the use of extensiometers to determine stud extension.

3.19.3.9 Bolt heaters. - Electrical bolt heaters and extensiometers shall be furnished for class A (submarines) machinery. Cable assembly and grounding of bolt heaters shall be in accordance with MIL-C-15987. For classes B and C (surface ships), gas heaters may be used in lieu of electric heaters. Bolt heaters shall be designed with sufficient thermal capacity (based upon 15 minutes heating time per bolt) to produce required bolt extensions.

3.19.3.10 Stud removal. - An internal socket-head machined in end of stud or square end (or hex end) shall be provided to facilitate removal of one-nut studs 1 inch in diameter or larger where used in non-gasketed steam joints. At the manufacturer's option, stud removers (collet-type) may be furnished in lieu of the internal socket-head recess or external wrenching flats on end of one-nut studs.

3.19.4 Torque. - For critical applications such as steam joints and support structures, the threaded fasteners shall be tightened to specified tension by either elongation measurement or measuring flats. The turbine manufacturer shall establish these requirements and shall control adherence thereto during manufacture.

3.19.5 Pins and dowels. - Tapered pins and dowels shall be secured from backing out by staking or other locking devices approved by NAVSEC. Dowels and pins shall be provided with means of easy removal such as tapped holes, external wrenching or pulling heads or shouldered shanks.

3.20 Casings and steam chests. -

3.20.1 Materials. - Casings, steam chests, and bolting therefore shall be of materials specified in table I.

3.20.2 Steam chest. - The steam chest shall be integral with the turbine casing. Steam inlet pipe shall be attached to the side or end of chest and not interfere with removal of steam chest cover. The jount between steam chest cover and chest shall be metal-to-metal and shall be made-up in the same manner as the casing horizontal joint except that copaltite will not be approved as a sealing compound.

3.20.3 Construction. - Casings and steam chests construction may be cast, fabricated or combinations thereof.

3.20.4 Horizontal flange. - All casings shall be divided at the horizontal centerline.

3.20.4.1 Access for wrenching. - Sufficient clearance shall be provided around bolt heads and nuts to permit use of standard tools; however, where joint integrity would be compromised, the use of special tools (to be furnished with the turbine) to accommodate closer bolt spacing is acceptable.

3.20.4.2 Joint surface. - Flange faces shall be finished to parallel surfaces with a surface finish of 63 RHR or better. The sealing surface of each flange shall be a horizontal plane with no discontinuities or steps along the flange except at junction of vertical joints.

3.20.4.3 Flange chamfer. - Joint surfaces in way of flange bolts on studs shall be chamfered or counterbored.

3.20.4.4 Making-up joint. - Joints shall be made-up metal-to-metal at room temperature; however, flange faces may be coated with either a thin coating of bodied linseed oil, conforming to TT-L-201 (except that viscosity shall be Z-7, Z-8 or Z-9) or other sealing compounds as approved by NAVSEC. Technical data, test data and documented experience as available shall be submitted with a proposal to use other sealing compounds.

3.20.4.5 Pumping grooves. - Flange pumping grooves shall not be provided.

3.20.5 Bearing housings. - Bearing housings shall preferably be integral with the turbine casing. However, if the bearing housings are separate, a centering shoulder, spigot, radial keys, radial dowels or equivalent means shall be provided at the joint between housing and casing, and they shall be secured by through-bolts or studs. The space provided between bearing and glands shall be adequate to prevent leakage oil from entering the glands and gland steam blow from entering the bearings. Drain pockets and cavities between bearing and gland shall be avoided, so as to reduce the possibility of contamination of oil and condensate systems due to flooding of an improperly-drained pocket. When the use of a pocket is unavoidable, the cavity shall as deep as possible with maximum volume and shall be drained by a one-inch diameter (minimum) drain (or equivalent area with minimum dimension not less than 1/2 inch); such drains shall not be plugged, or otherwise restricted and outline drawing shall so indicate.

3.20.6 Vertical joints. - Casing may be in two sections longitudinally with a vertical joint; however, the vertical joint shall not require disassembly to lift the upper-half casing.

3.20.7 Four-way casing joint. - Where four-way casing joints cannot be avoided, flanges may incorporate saw-cuts from the outside of the flange to the bolt hole adjacent thereto.

3.20.8 Test connection. - Special test connections may be provided at manufacturer's option, however, such connections shall be closed by threaded plugs (taper or straight thread) or by blank flanges. Plugs, if used, shall be seal welded.

3.20.9 Exhaust flange. -

3.20.9.1 Making-up joint. - The joint between the turbine and condenser shall be metal-to-metal (using a suitable sealing compound) when condenser supports the turbine. Where condenser is hung from turbine, a sheet asbestos gasket of approximately 1/8 inch thickness will be used.

3.20.9.2 Flange drilling. - Where turbine and condenser are bolted directly together, their flanges shall be drilled by the respective manufacturers, except that holes for body-bound bolts will be finish-reamed by shipbuilder at installation. The condenser flange will be drilled to a template or jig to be furnished by the turbine manufacturer. Where turbine and condenser are connected by a flexible connection, instructions for drilling of flanges shall be determined in accordance with shipyard installation procedures.

3.20.9.2.1 Template for condenser flange. - The turbine manufacturer shall furnish a thin metal template (for a single propulsion unit order) or a drilling jig with hardened bushings (for a multiple propulsion unit order) to the condenser manufacturer for drilling the condenser flange. When the condenser manufacturer has drilled the condenser flange, the template will, at turbine manufacturer's option, be returned to the turbine manufacturer.

3.20.9.3 Responsibility for bolting. - Bolting and gasket (if required) will be furnished by condenser manufacturer except that cap screws or one-nut studs shall be furnished with the component tapped for same. The turbine and condenser manufacturer shall each be responsible for providing bolting and gasket (if required) where their respective components attach to a common flexible connection.

3.20.10 Casing lifting. -

3.20.10.1 Jacking bolts. - Flange jacking bolts shall be provided in location and spacing sufficient to permit readily breaking joints.

3.20.10.2 Diaphragm removal. - When upper-half casing is supported in the raised position and rotor is resting in bearings, it shall be possible to remove upper-half diaphragms; removal of all lower-half diaphragms shall be possible in this position or with casing and rotor supported in the raised position but not combinations of the two choices. Removal of horizontal joint studs to accomplish this will be satisfactory. However, this requirement for removal of diaphragms is waived if casing supports in excess of 36 inches in height are required to accomplish diaphragm removal.

3.20.10.3 Stud removal. - The design shall be such that dismantling or assembly does not require the removal of studs.

3.20.11 Lifting gear. - Lifting and handling gear (including flange jacking bolts) necessary for lifting all the turbines and rotors of one propulsion unit at one time in the ship constitutes one set of such gear. Lifting shall be possible when the ship has a list and trim of 5 degrees.

3.20.11.1 Materials for lifting and handling gear. - Lifting and handling gear shall be of steel except that aluminum may be used for casing supports and rotor guides.

3.20.11.2 Lifting and supporting upper-half casing. - The lifting gear set shall include at least three corner guide pins or posts, dowelled casing supports, special eye-bolts, and such other items as are necessary to lift and support the upper-half casing. Casing supports shall be 36 inches in height or of sufficient height to permit removal of diaphragms whichever is less unless limited by available clearance in engine room.

3.20.11.3 Lifting and supporting rotor. - The lifting gear set shall include rotor guides and saddle support assemblies, special eye-bolts, and any other special equipment necessary for lifting and supporting turbine rotors.

3.20.11.4 Shipbuilder-furnished lifting gear. - Traveler bars and trolleys, pulleys, deck-beam clamps, turnbuckles, shackles, hooks, chains, hoists, wire slings with thimbles, and spreader beams (for rotors) will be shipbuilder-furnished.

3.20.12 Inspection openings. -

3.20.12.1 Single-casing and L. P. turbines. - Manholes shall be provided on each side of single-casing turbines and L. P. turbines to permit visual inspection of uppermost tubes of condensers and the last rows of ahead and astern blading.

3.20.12.2 Cruising H. P. and I. P. elements. - Inspection openings shall be provided on cruising, H. P. and H. P.-I. P. casings to permit visual inspection of the last row of blading for each element contained therein.

3.20.12.3 Blade clearances. -An inspection opening shall be provided on each turbine casing (one in each end of double-flow L. P. and H. P.-I. P. turbines) to permit ready checking of axial blade clearance. Manhole and inspection opening covers may be used for checking clearances of H. P.-I. P. turbines and astern elements of L. P. turbines. Otherwise, plates or flanged nipples on outer casings for this purpose shall be used; pipe plugs will not be permitted.

3.20.13 Moisture separation and drainage. -

3.20.13.1 Internal moisture separation. - Provision shall be made for internal moisture separation in stages which normally operate in wet steam. Special requirement for internal moisture separators are as follows:

(a) Water dams. - Water dams, if used, shall be of corrosion-resistant alloy steel and shall be secured to casing by welding except for 12 chrome casings, in which case bolting is acceptable.
(b) Drain orifices. - Removable drain orifices shall be of corrosion-resistant alloy steel and shall be retained in casing by peening in addition to thread connection.
(c) Drain manifold. - Stage drains for saturated steam applications shall be drained externally and not collectively drained to condenser through exhaust opening.

3.20.13.2 Internal casing drainage. - Provision shall be made for thorough drainage of all parts of the casing. (Diaphragm grooves are not included.) Interstage drainage through diaphragms shall be by removable corrosion-resistant alloy steel orifices tapped in the upstream side of diaphragms and retained by peening. Sizing of orifices shall be such as to ensure against clogging.

3.20.13.3 External drains. - All external drains shall be manifolded to the maximum extent practicable except that HP steam chest drain shall be separate. The turbine manufacturer shall indicate to the shipbuilder which drains can be manifolded. Manifolding including valves, orifices, piping and traps, as applicable, will be furnished by the shipbuilder.

3.20.14 Steam shields. - Steam (or windage) shields shall be provided for the inactive portions of all ahead stages having partial admission. When shields are not integral with the casing, they shall be secured in a manner as approved by NAVSEC.

3.20.15 Steam deflectors. - Steam deflectors shall be provided to separate ahead and astern elements so as to prevent impingement of exhaust steam from one element on the other. The deflector may be forged integral with the rotor or be bolted to the casing. When separate, material shall be of a material similar to the adjacent casing and bolt-heads shall be recessed in counterbores and be peened over in at least three places.

3.20.16 Heat shields. - Heat shields between condenser and hot exposed surfaces of blade ring or casing in way of inlet pipe or belt are neither required nor desired. NAVSEC approval is required for their use. In this regard, attachment of heat shields by welding will not be approved.

3.20.17 Casing stay rods. - Casing stay rods shall be of similar material as the parts to which attached. The portion of stay rods subject to direct impingement of high velocity moisture shall be protected against erosion by either covering them with sleeves of erosion resistant material or other similar means.

3.20.18 Blade throw-out protection. - Each casing (in conjunction with its internal wheel casings, blade rings and diaphragms) shall be designed to contain blades which may, during overspeed, be thrown from any stage of the turbine. Particular attention is directed to last stages.

3.20.19 Identification plates. - Identification plates shall be furnished in accordance with format of figure titled "typical turbines" of MIL-P-15024. Where information thereon is confidential, the plates shall be shipped separately for attachment after turbines are installed in the ship.

3.21 Packing (gland, dummy and diaphragm). -

3.21.1 Materials. - Labyrinth packing and springs shall be of the materials specified in table I, items (o) and (p) respectively. Carbon packing rings will not be permitted.

3.21.2 Clearances. - Clearances shall be as specified in 3.16.2.

3.21.3 Design requirements. -

3.21.3.1 Type of packing. - All gland, dummy, and diaphragm packing shall be of the labyrinth type. "T" shape retaining shoulders are preferred to prevent cocking of the ring and to maintain steam seal. High-low step type labyrinth rings with long and short fins fitted radially to low and high shoulders machined on the rotor are preferred; however, other designs having good sealing efficiency will be approved when design considerations preclude the use of the high-low type. All packing rings shall have at least four segments per ring.

3.21.3.2 Fin design. - Packing rings shall be machined with integral fins thinned on the inner diameter to an axial dimension of 0.010 ± 0.005 inch.

3.21.3.3 Flexibility. - Each ring shall be spring backed to prevent radial movement. Springs may be either of the flat or coil type.

3.21.3.4 Rotation. - Each ring shall be secured against rotation or circumferential displacement in its groove while turbine is in operation.

3.21.3.5 Removability. - The turbine shall permit removal of at least two outer labyrinth packing rings at each end of each turbine without lifting the turbine casing. All rings which are lifted with upper-half turbine casing shall have the segments secured so as to prevent rings from falling out. After casing is lifted, it shall be possible to roll upper and lower ring segments out of their grooves without removing diaphragms or lifting the rotor.

3.21.3.6 Surface finish. - Steam seal surfaces shall have a surface finish of 63 RHR or less.

3.21.3.7 Marking of rings. - To insure correct installation, each seal ring shall be marked as follows:

(a) The mating surfaces of adjacent segments shall be match marked.
(b) Each ring with "T" shaped retaining shoulders and which can be improperly installed shall be stamped either with an arrow pointing aft or other marking to clearly indicate proper installation.

3.22 Bearings, journal and thrust. -

3.22.1 Materials. - Materials of all bearing parts shall be in accordance with table I.

3.22.2 Journal bearing. - Bearings shall be of the plain cylindrical, elliptical, multi-lobed or pivoted pad type. Axial or circumferential grooving, if required, will be permitted..

3.22.2.1 Loading. - Bearing load based on projected area shall be not greater than 250 psi under static load.

3.22.2.2 Wear pattern. - Load shall be distributed so as to produce an essentially rectangular wear pattern extending throughout the length of the bearing. Scraping following initial operation to obtain uniform patterns is permissible but shall not increase the original diametral clearance by more than 15 percent of the nominal clearance.. All contact shall be only in the middle 120 degree of arc in the lower half.

3.22.2.3 Clearance. - Design clearance shall be not less than 1.5 mils per inch of journal diameter.

3.22.2.4 Interchangeability. - Unless specifically approved otherwise by NAVSEC, bearings shall be interchangeable for port and starboard turbines forward and after ends. Doweling or equivalent shall be provided to prevent inadvertent assembly of a bearing in a location or position for which it was not intended.

3.22.2.5 Shell stiffness. - Bearing shells shall be of sufficient stiffness to prevent warping in service. Cast shells shall be stress relieved after rough machining and prior to final machining.

3.22.2.6 Rolling out bearing. - It shall be possible to remove each lower-half bearing without removing the rotor.

3.22.2.7 Lifting and handling bearings. - Provision shall be made for removal, lifting and handling of bearings as follows:

(a) Cap. - Each bearing cap shall either have integral lifting lugs or be tapped for lifting eyes which shall be so located as to prevent cocking when lifting the cap.

(b) Bearing shells. - Each half-shell weighing more than 35 pounds shall be tapped for one or more lifting-eyes. In addition, regardless of weight, each lower half-shell shall be tapped to facilitate removal, when rolling out around journal.

3.22.2.8 Reboring directions. - Each rebabbittable spherically-seated bearing and each sleeve bearing which is not bored concentric with the outer surface of the shell shall be provided with a concentric reference shoulder at each end for reboring. Unless otherwise marked on the bearing, the outside diameter of the shell will be used as the reference shoulder for boring.

3.22.2.9 Support. - Each bearing shall be supported by and contained in a housing consisting of a bearing pedestal and cover. Journal and thrust bearings shall be contained in a common housing. Bearings may be mounted in a fixed position or mounted to provide for self alignment by using a spherical seat or flexible supports. Spherical seats may be either loose or tight according to manufacturer's standard practice.

3.22.2.10 Boss for vibration pickup. - Each bearing cap shall be provided with a boss for mounting a vibration pickup (used in conjunction with at-sea vibration analysis and shop tests (see 4.6.3 and 4.5.6 respectively)). The boss shall be approximately a 2 inch square located at or near the vertical centerline of the cap with a 1/2 inch 28 thread hole 1/2 inch deep in the center of the boss. Mounting surfaces shall be machined flat and smooth to 125 RHR.

3.22.2.11 Bearing surfaces. -

3.22.2.11.1 Babbitt lining. - All friction or rubbing surfaces shall be lined with anti-friction metal (see table I, item (a)). Babbitt thickness shall be not less than 1/16 inch nor more than 3/16 inch.

3.22.2.11.2 Babbitting procedures. - Procedure for babbitting bearings shall be in accordance with NAVSHIPS 250-644-2 except that Bond tests are not required.

3.22.2.11.3 Surface finish. - Babbitt surfaces shall be finished to 32 RHR or less.

3.22.2.11.4 Edge relief and chamfer. - The babbitt shall be sufficiently relieved along the joint at bore to prevent babbitt carryover and scoring of journals.

3.22.2.11.5 Grooving. - End leakage of oil from multi-lobe fixed-pad and pivoted-pad bearings shall be controlled by a circumferential babbitted seal strip at each end of bearing. Circumferential drain groove(s) shall be provided at one or both ends of other type bearings, with drain areas equal to or greater than end leakage areas.

3.22.2.12 Depth micrometer measurements. - Provision shall be made to permit the use of micrometer depth gages for measuring wear of all journal bearings without removal of bearing cap. Holes for the depth gage shall be located such that they are not subjected to lube oil pressure during operation. Collar-type plugs shall be used to close the holes and shall be attached to the bearing cover by a short length of flexible chain to prevent loss when removed. The depth micrometer graduations shall increase as spindle is screwed down. Depth gage constants shall be stamped on small plates attached to each bearing cap by the manufacturer.

3.22.2.13 Rotor radial position setting. - Where adjustable seating shims or pads are used for fixed-position mounting of bearings, means for determining the radial position of the rotor shall be provided.

3.22.2.14 Crown thickness measurement. - Provision shall be made for measuring wear by the crown thickness method, as specified in 3.22.2.14.1 through 3.22.2.14.5.

3.22.2.14.1 Scribe lines on cylindrically-bored sleeve bearing. - Each sleeve-type bearing shell shall be considered as having a pressure bearing half and a non-pressure bearing half, when referred to ahead operation. At each end at the bearing, the non-pressure bearing half shall have a radial scribe line at the geometric center, and the pressure bearing half shall have, at each end, three radial scribe lines (the central scribe at the geometric center, and one on each side at an angle approximately 45 degrees). Both ends of bearing shall have an outside diameter machined to provide a reference surface for the micrometer.

3.22.2.14.2 Scribe lines on multi-lobed bearing types. - A radial line shall be scribed on each end of the bearing shell at the geometric center of each bearing surface arc whose center is displaced from the bearing center.

3.22.2.14.3 Scribe lines on fixed-pad bearings. - A radial line shall be scribed on each end of the bearing shell at the geometric center of the concentric arc of each pad.

3.22.2.14.4 Scribe lines on pivoted-pad (or shoe) bearings. - A radial line shall be scribed on each end of each pivoted-pad or shoe in line with the fulcrum or pivot point on the back of the pad or shoe.

3.22.2.14.5 Point of measurement. - The crown thickness of each sleeve type bearing shell and each pivoted shoe at the scribe points shall be measured from the end of the shell or shoe during assembly at a distance established by the manufacturer and shown in the technical manual and on applicable drawings.

3.22.2.14.5 Marking of constants. - Crown thickness constants shall be marked adjacent to scribed lines at both ends of bearing. For spare bearings, constants shall be stencilled by manufacturer prior to delivery.

3.22.3 Thrust bearings. - Unless otherwise approved by NAVSEC, the thrust bearing shall be located at the end subjected to the highest temperature during ahead operation. The thrust bearing shoes shall not be attached to, or derive support from, the journal bearing.

3.22.3.1 Type of thrust bearing. - Turbine thrust bearings shall be of the pivoted segmental-shoe type, designed to take thrust in both directions by locating equal size thrust elements on each side of a single thrust collar.

3.22.3.2 Load. - The thrust bearing shall be capable of absorbing any thrust loads which may be developed within the turbine during specified operation. In addition, the thrust bearing shall be sized to include ample capacity for absorbing loads corresponding to 25 percent (minimum) of the tangential driving force in the flexible coupling connecting turbines and gear. Unit loading excluding transients shall not exceed 400 psi under normal steady state conditions.

3.22.3.3 Housing. - The thrust bearing housing shall be integral with the journal bearing pedestal. Housing shall be sufficiently rigid to maintain axial clearances in turbine under load. A 1/8 to 3/16 inch permanently-open drain shall be provided from the lowest practicable part of the thrust cavity to insure drainage at shutdown.

3.22.3.4 Shims. - Liners or shims shall be fitted to permit adjustment of thrust clearance and of axial clearances within turbine. Stacking of shims is not permitted.

3.22.3.5 Collar. - A removable keyed thrust collar (key interference fit in shaft of minus 0.001 to minus 0.003 inch and clearance fit in collar of 0.001 to 0.003 inch) shall be provided, with a sliding fit (0.002 ± 0.001 inch loose) on the rotor, and a nut to secure the collar against the rotor shoulder. Sufficient room shall be incorporated in the design to permit slugging tight the securing nut, which shall have a right-hand thread. A positive means of locking thrust nut shall be provided; the use of a radial set screw is not acceptable. A thrust collar integral with a removable stub shaft is also acceptable.

3.22.3.6 Shoes. - Thrust shoes shall be of cast bronze or aluminum bronze, or forged or cast steel. Shoes shall be lined with babbitt. Dovetail grooves in shoes to anchor the babbitt are permitted but are not required. Babbitt surfaces shall be smoothly and accurately finished (32 RHR or less) to design dimensions and clearances.

3.22.3.7 Contact areas and bearing surfaces. - Friction and contact surfaces shall be smoothly and accurately finished. Surface finish and Brinell hardness requirements shall be as follows:

(a) Collar - 16 RHR or less (350 ± 50 Brinell minimum).
(b) Leveling plate contact areas - 32 RHR or less on surfaces in contact with shoes or base ring; 63 RHR or less on wing surfaces.
(c) Buttons - 32 RHR or less (550 ± 50 Brinell minimum).
(d) Base ring contact areas (or hardened inserts, where used) - 63 RHR or less.

3.22.3.8 Clearance. - The following formula shall be used as a guide in determining the design thrust oil clearance:

$$\text{Clearance} = 0.002 \text{ inch} + \left| \begin{array}{l} 0.001 \text{ inch per inch} \\ \text{of thrust collar diameter} \end{array} \right|$$

3.22.3.9 Wear measurement. - The detail drawing of the shoe shall indicate by note the place (thickness between button or other indicated surfaces on back of shoe and babbitted face of shoe) and design value of such a measurement, so that a micrometer check can be made to determine when to rebabbitt shoe.

3.22.4 RTE installation. - Each journal and thrust bearing for class A and B turbines shall be fitted with an electric resistance type temperature-sensing element referred to hereafter as RTE. There shall be one RTE in each journal bearing and in one shoe on each side of the thrust collar.

3.22.4.1 RTE. - The RTE (including wire and insulation) shall conform physically and electrically to MIL-T-22051.

3.22.4.2 Hole for RTE. - RTE'S shall be located at the geometric bottom center of bearing shell if this permits interchangeability of bearings. The RTE shall be installed in accordance with figure 4 in a radial hole in the bearing shell, with the sensing tip 1/16 inch below bearing surface, with bottom of RTE casing bottoming on shoulder in hole as shown.

3.22.4.3 Puddling RTE in bearing. - The RTE shall be fusion-bonded to surrounding bearing babbitt in accordance with an approved procedure, and bearing surface shall be restored.

3.22.4.4 RTE wire grooves and connection blocks. - The two wires attached to the RTE shall be brought through a radially-drilled 0.187 inch maximum diameter hole and channelled in a groove (approximately 1/8 inch X 3/16 inch connecting radial hole with a connection block (see figure 5) recessed in bearing edge or end at, or close to, the bearing partline. A hardening epoxy-resin shall be applied in groove to protect wiring. Both wires shall be soldered to the connection block (see figure 6).

3.22.4.5 Internal wires and cables. - Wiring between turbine bearing connection block and the casing (or bearing pedestal) wall shall be recessed in epoxy-resin-filled grooves, in holes, or in armored sheath to protect it against damage. This wiring shall be easily disconnected (mechanically or by melting soft solder) from the bearing connection block and shall penetrate the casing wall through an "AN" connector or equivalent (see figure 5).

3.22.4.6 Casing wall "AN" connector. - The design shall provide an "AN" connector in the casing (or bearing pedestal) wall to connect internal wiring with external wiring. "AN" connectors shall conform to MIL-C-5015. Location of "AN" connectors shall be such as to minimize possibility of damage to connector and cables attaching thereto. Wall shall be oil tight at penetration point.

3.22.4.7 RTE installation in pivoted-shoe bearings. - The procedures in 3.22.4.1 to 3.22.4.6 shall generally apply for installing RTE'S in pivoted-shoe bearings, except that RTE shall (for ahead operation) be installed close to the trailing edge of one lower shoe, and the bearing connection block shall be recessed in the edge or end of shoe on the pivot-line.

3.22.4.8 RTE installation in thrust bearing shoes. - The shoes closest to housing joint shall be so fitted with RTE'S to facilitate disassembly when shoes are removed for inspection and replacement. The RTE in each shoe shall be installed close to the trailing edge of shoe and outer diameter, and the bearing connection block shall be recessed in the edge of the shoe on the pivot-line. Figure 7 shows acceptable arrangements for a thrust-shoe RTE.

3.22.4.9 Caution plate. - A caution plate shall be permanently affixed to the external top of the bearing cap warning that the RTE wires to the bearings must be disconnected before rolling out the bearing.

3.22.4.10 Bearing monitor. - Bearing monitors will be furnished by the shipbuilder in accordance with MIL-T-15377.

C03362

3.22.5 Special tools. -

3.22.5.1 Bearing yokes and jack bolts. - The lifting gear set shall include yokes, jack bolts, and other special items necessary for removing the weight of rotors from lower-half bearings to permit removal of same from one propulsion unit.

3.22.5.2 Rotor jack. - A special device shall be furnished to provide for jacking rotor forward and aft to measure thrust clearance.

3.22.6 Oil deflectors. - Oil deflectors shall be provided to prevent leakage of oil from bearing housing. A steam shield shall also be provided to prevent gland steam from entering bearings. Deflectors shall be of a material specified in table I, item (c) and shall be removable.

3.23 Rotors. -

3.23.1 Materials. - Rotors for class A and B turbines shall be forged from a single billet conforming to materials specified in table I, item (r). Shrunk-on keyed wheels will be considered for class C turbines; however, specific NAVSEC approval is required.

3.23.2 Stresses. - Stresses shall be in accordance with 3.15.4.

3.23.3 Balancing. - Vibration limits and balancing requirements are as specified in 3.14.

3.23.4 Coupling flange. - Unless specifically approved otherwise by NAVSEC, the coupling flange on the drive end of each rotor shall be integral either with the rotor or with a stub shaft bolted to the rotor. Shrunk-on couplings will be considered only when other design considerations (such as obtaining a removeable thrust collar) favor its use. The turbine manufacturer shall collaborate with the manufacturer of the driven component to obtain mutually satisfactory coupling design and loads under normal and abnormal (reversals, maneuvering and non-extraction) conditions.

3.23.5 Surface finish. - The surface finish of the overall rotor shall be 125 RHR maximum except as follows (maximum RHR values).

(a) Bearing journals - 16 (axial and circumferential direction)
(b) Radii of equalizing holes - Polished to 63
(c) Fillets and radii - 63
(d) Axial blade grooves - 63
(e) Circumferential blade grooves - 63
(f) Load carrying surfaces of blade dovetail - 63

3.23.6 Bearing journals. - Special attention shall be paid to roundness and concentricity of journals. Deviation from true roundness shall not exceed 0.000050 inch where quiet operation is specified, and 0.0002 inch for all other applications. Deviation in true roundness is defined as the difference in radii of two concentric coplanar circles which just contain the measured profile of the journal surface.

3.23.7 Packing journals. - Packing journals shall be smooth or stepped as necessary to match packing teeth. The use of packing sleeves shrunk on or keyed to rotor is prohibited. Lands shall be sufficiently rugged to withstand contact both radially and axially with the fins of the packing rings. Circumferential grooves at each end of lands for diaphragm packing, and between lands of either each ring or group of rings of gland and dummy packing, are required to minimize heat distortion of rotor due to packing rubs.

3.23.8 Critical speeds. - The design of the rotors may be such that either the calculated or actual running first critical is within the operating range of turbine speeds.

3.23.9 Match marks. - At installation of the rotor, axial and circumferential position of the rotor relative to the casing shall be marked for future reference. These marks shall be accessible without lifting the casing but removal of bearing caps is acceptable. Circumferential identification shall either be a mark on coupling flange, an established relation of a balance hole to the casing or a similar means as approved by NAVSEC. Axial identification shall be at thrust collar end.

3.23.10 Rotor bores. - Rotors may be solid or bored; however, if bored, rotor ends shall be sealed in accordance with 4.4.5.2. The use of a bottle bore requires NAVSEC approval and will be considered only when the geometry of the rotor dictates its use.

3.23.11 Spare rotors. - Spare rotors shall be completely bladed and be ready for installation without further machining. Balancing is required and, unless specifically waived in the contract, the overspeed test of 4.5.4 shall be performed either in a similar casing for which rotor is intended or by use of a special testing facility.

3.24 Blading and seal strips. -

3.24.1 Materials. - Blades, locking pieces and pins shall be of material specified in table I, items (h) and (q) respectively.

3.24.2 Production method. - Impulse blades shall be machined (milled, cut, or broached) from bar stock. Reaction blades shall be machined, rolled or drawn. Other methods of production, including forging or precision casting, will be considered but shall be subject to NAVSEC approval.

3.24.3 Solid blades. - Vane shall be solid and shall be produced with blade base from same piece of blade stock; welding of vane to base is not permitted.

3.24.4 Edge radii. - Blades shall have vane edge radii equal to or greater than the minimum values shown on figure 8.

3.24.5 Surface finish. - All blading shall be free from imperfections. Steam flow surface in direction of steam flow and load carrying surfaces shall be finished to 63 RHR or better.

3.24.6 Stellite erosion shields. - Where the combination of moisture and tip speeds are such that erosion of blades may be a problem, blade inlet convex side shall be hard-faced with stellite brazed with a nickel rich silver-brazing alloy conforming to grade V of MIL-B-15395. Decision as to whether or not stellite shields are required will be based on previous operating experience under similar conditions for tip speeds in excess of 800 feet per second and moisture content of 10 percent or greater.

3.24.7 Contour of contact root surfaces. - Surfaces on blade roots which contact rotor shall be cut to the same radius as the corresponding rotor surfaces, except in those cases where the turbine manufacturer obtains approval of NAVSEC to use nonconforming geometry which has proven satisfactory in service.

3.24.8 Blade tenon. - Shrouding shall be attached to blades by riveted (peened) tenons; welding is prohibited. Hot peening is acceptable; however, temperature shall be controlled by positive means such as a surface pyrometer or tempil sticks.

3.24.8.1 Fillets. - Sharp corners between tenon and tip of blade and between vane and blade base shall be avoided by suitable filleting.

3.24.8.2 Tenon shape. - Tenons shall be of round cross section unless elliptical or kidney-shaped tenons are required due to either geometry or strength reasons.

3.24.8.3 Tenon height (before riveting). - To prevent over-riveting and cracking of button-head rivet edges and to provide a rivet head strength comparable with the blade tenon strength, the projection of tenon above top of shroud, before riveting, shall not exceed one-half the diameter of a round tenon or one-half times the minor axis of a kidney or elliptical tenon.

3.24.8.4 Tenon button-head. - The riveted tenon shall form a button-head on outer surface of shroud. Where holding power of tenon is adequate for required safety factors, the button-head and any excess shroud thickness may be machined off to provide flush tenon heads.

3.24.9 Shrouding. -

3.24.9.1 Materials for shrouding. - Shrouding shall be of the materials specified in table I.

3.24.9.2 Surface finish. - The surface finish of shrouding surface adjacent to blade passage shall be 63 RHR or better.

3.24.9.3 Number of blades per shroud strip. - Number of blades per shroud strip shall be as recommended by the turbine manufacturer and shall be indicated on the blade drawings.

3.24.9.4 Notch block gap. - The shroud strip segment may span the gap where a notch block is used (and the blade omitted). Where quietness of operation is a requirement, every effort shall be made to close this gap with a closing blade which can be shrouded.

3.24.9.5 Drilling or punching of shroud. - Shroud tenon holes may be drilled, milled or punched. When shrouds are milled or punched, each set of blades for stock shall include the necessary milling template or punches. Drilled or milled shrouding requires no annealing. All punched shrouds with thickness of 3/16 inch and larger shall be stress relief annealed after punching. All tenon holes shall have a chamfer or radius on both sides of the shroud and unless otherwise approved, shall be located directly from the bladed wheel, or from templates made or set therefrom; spare shroud bands shall be furnished without tenon holes, unless specifically approved otherwise for axial entry blades. A note on detail drawings shall indicate method of production and recommended method of installation showing or stating number of holes in each strip. If a choice of milling or punching shrouding for replacement blading exists, the drawing note shall so state.

3.24.9.6 Countersink for flush tenon. - Flush tenons will be permitted where depth of countersink in finish-machined shroud is not less than 25 percent of the tenon diameter and the countersink angle is not less than 60 degrees.

3.24.9.7 Contact area with vane tip. - Shrouding shall, at installation, have maximum bearing practicable against the end of blade vane. See 4.4.6.2 for limits in gap clearance.

3.24.9.8 End gap between adjacent shroud strips. - Shroud strips shall have sufficient end clearance to insure that, under maximum operating speed and temperature, they do not expand so as to touch each other and impose strain on blade tenons.

3.24.9.9 Bevel on sealing edge. - Shroud strips of more than 1/16 inch thickness used to seal axially, shall be beveled along the sealing edge. The bevels shall begin a distance from tenon holes at least equal to the maximum thickness of the strip and shall taper to approximately 1/32 inch edge thickness.

3.24.9.10 Slanted shrouding. - The installation of shrouding at an angle is permitted up to 15 degrees maximum angle with rotor axis.

3.24.9.11 Channel shrouding. - Channel shrouding is permitted only in conjunction with segmental blading.

3.24.10 Blade root fastenings in rotor. - Rotor blade root fastenings may be either radial-entry or axial-entry. Only mechanical attachment will be permitted. Only "T" or "Fir Tree" shaped roots will be permitted.

3.24.10.1 Axial entry blades. - For axial entry blades, non-hardened steel pins (of suitable size and shape to permit shearing when driving individual blades out of grooves) shall be provided to secure blades against movement in operation. Blades shall obtain necessary blade fit in blade grooves by filing metal ridge on bottom of blade root or by other suitable means. Where pitch of blades is adequately controlled, blades may be installed with clearance in the root; however, maximum movement as measured at the blade tenon shall not exceed 0.020 inch per inch of overall blade height for double tang roots and 0.010 inch per inch of overall blade height for triple tang roots.

3.24.10.2 Radial entry blades. - Radial entry blades shall be installed with a fit not exceeding plus or minus 0.0005 inch. This may be obtained by either filing or trimming a metal ridge on the blade or by use of calking strips. Calking strips shall be of the material specified in table I, item (j) and shall be rectangular or half-round pieces equal in length to the approximate thickness of the blade root. Locking pins for the notch block or closing blade shall be of the material specified in table I, item(q). The use of shims for circumferential fitting of blades will be considered subject to NAVSEC approval of the procedure.

3.24.11 Stationary blading. - Stationary blades for impulse stages and reaction stages (drum type construction) may be installed individually or as groups of blades. Intermediate segments and separate blade rings, shall be secured to the casing by either mechanical means, or calked in to a dovetail groove of the casing. Calking strips used for retaining the blades and intermediate segments in their grooves shall be of a material specified in table I, item (j).

3.24.12 Seal strips.-

3.24.12.1 Materials.- Materials for seal strips shall be in accordance with table I.

3.24.12.2 Axial seals.- Removable axial seal strips may be used in the first ahead control stage. Axial sealing in all other stages shall be obtained as an integral part of the blade and diaphragm geometry.

3.24.12.3 Radial seals.- Radial seals may be used in any ahead stage when necessary to meet the specified performance within the size limitation imposed or when improvement in performance obtained by their use is judged to be desirable by NAVSEC. If the turbine manufacturer desires to use radial seals, calculated performance data and other supporting information shall be forwarded for NAVSEC approval.

3.24.12.4 Approval of design.- Axial and radial seal strips shall be capable of being replaced and shall be secured by a method as approved by NAVSEC.

3.25 Nozzle blocks and diaphragms.-

3.25.1 Materials.- Materials for nozzle blocks, diaphragms, partitions and bolts shall be in accordance with table I. Crush pins shall be of corrosion-resistant material and may be attached by either welding or mechanical means.

3.25.2 Steam flow surfaces.- Steam flow passages shall be free from imperfections and shall have a surface finish of 63 RHR or better in direction of steam flow except for approach to throat section which may be 125 RHR maximum.

3.25.3 Construction.- Nozzle blocks and diaphragms shall be either fabricated, cast, or reamed construction.

3.25.4 Lifting and removal.- The upper-half of each diaphragm and nozzle block shall be lifted with the upper-half of the turbine casing. Each diaphragm half shall be drilled and tapped for one or more lifting eyes to facilitate lifting and handling. Each lower-half diaphragm shall be drilled and tapped at each joint part surface to provide a means for removing lower-half diaphragm (by pulling with eye-bolt or draw-bolt) when rolling out of casing groove.

3.25.5 Partitions.- Partitions shall be rolled, cast or machined. Partitions shall be in accordance with the requirements of 3.24 with trailing edges of partition vanes conforming to radii shown on figure 8. The following additional requirement applies to cast partitions:

> Precision-cast 13-chrome partitions may be used, provided each casting includes a partition integral with a thick band or ring segment at each end; such segments, when welded together to form heavy inner and outer bands or rings.

3.25.6 Nozzle block details.-

3.25.6.1 Securing block in casing.- Ahead and astern nozzle blocks shall be removable from casing. Welding of astern nozzle block to astern chamber or steam ring will be considered but NAVSEC approval is required. When bolts are used for this purpose, the bolt heads shall be recessed below the surface of the surrounding metal and be secured by either peening in at least three places, or by suitable shielding.

3.25.6.2 Nozzle bridges.- Adjacent arcs or groups of nozzles shall be bridged to minimize leakage.

3.25.7 Diaphragm details.-

3.25.7.1 Center-line support.- Each diaphragm shall be supported at its horizontal center-line in a manner which provides for adjustment at installation. Other means of support may be used on a case basis subject to NAVSEC approval.

3.25.7.2 Joint at split.- The joint between two diaphragm halves shall be tongued and grooved or keyed to minimize leakage through the joint.

3.25.7.3 Steam seal surface.- The surface finish of the axial sealing-face shall be 125 RHR or better.

3.25.7.4 Calking. - Calking strips used to retain nozzle blocks in casing grooves shall be of the materials specified in table I item (j) and shall be securely fitted to prevent their falling out or rotating in their grooves. Where inspection opening for taking blade clearance passes through an area where calking is located, the calking shall be tack welded to the groove on each side of the opening.

3.25.7.5 Repair parts. - Diaphragms furnished as repair parts shall be finish-machined and ready for installation, except that crushing pins shall be 1/8 inch oversize, or furnished long and short.

3.26 Onboard tools and maintenance parts. - Items listed in table V shall be furnished as applicable and shall be shown on NAVSHIPS 4786 form.

Table V - Onboard tools and maintenance parts

| Item | Quantity per ship | Reference |
|---|---|---|
| 1. Special tools (as applicable) 1/ For: | | |
| (a) Measuring crown thickness | 1 set | 3.22.2.14 |
| (b) Removing and setting overspeed devices | 1 set | 3.10.9 |
| (c) In-field balancing (weights not included) | 1 set | 3.14.4 |
| (d) Alignment of spherical seating bearings | 1 set | 3.22.2.9 |
| (e) Removing thrust collar | 1 set | 3.22.3.5 |
| (f) Taking thrust clearance | 1 set | 3.22.5.2 |
| (g) Unbolting and remaking casing flanges | 1 set | 3.19.3.10 and 3.20.4.1 |
| (h) Replacing stub shafts | 1 set | 3.22.3.5 |
| 2. Bearing yokes and jack bolts | 1 set | 3.22.5.1 |
| 3. Bolt heaters and extensiometers | 2 each size | 3.19.3.9 |
| 4. Blade clearance gage | 1 each size | 3.16.6 |
| 5. Depth micrometer gage | 1 each size | 3.22.2.12 |
| 6. Lifting gear | 1 set/shaft up to maximum of 2 sets | 3.20.11 |

1/ Special tools are defined as those items not listed in the Federal Supply Catalog (copies of this catalog may be consulted in the office of the Government inspector).

3.27 Repair parts. -

3.27.1 Onboard and stock repair parts. - Onboard repair parts shall be in accordance with table VI and will be either furnished with the turbine or procured separately by the inventory control point. Stock repair parts (shore-based) shall be handled in accordance with procedures of MIL-P-15137. Stock repair parts to be recommended are those parts which are long lead time replaceable items which will be needed for overhaul maintenance actions such as bladed rotors, nozzle blocks, diaphragms, blading, valves, valve seats, and valve lift rods.

Table VI - Onboard repair parts

| Item | Part(s) "complete sets" sufficient for one propulsion unit | Quantities of repair parts required based on number of propulsion units per ship (Port and starboard assumed identical) | | | | Factor code (NAVSEC use only) |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | |
| 1 | Bearings, sleeve (see note) | 1 | 1 | 2 | 2 | E |

C03367

Table VI - Onboard repair parts (Cont'd)

| Item | Part(s) "complete sets" sufficient for one propulsion unit | Quantities of repair parts required based on number of propulsion units per ship (Port and starboard assumed identical) | | | | Factor code (NAVSEC use only) |
|---|---|---|---|---|---|---|
| 2 | Gaskets (spiral wound) | 1 | 1 | 2 | 2 | E |
| 3 | Gland packing (including springs, spring retainers and pins) - lifting not required to replace | 1 | 1 | 2 | 2 | E |
| 4 | Gland seal regulator wearing and operating parts | 1 | 1 | 2 | 2 | E |
| 5 | Oil deflectors | 1 | 1 | 2 | 2 | E |
| 6 | Oil sight flow glasses | 1 | 1 | 1 | 1 | K |
| 7 | Overspeed mechanism bellows, springs and wearing parts | 1 | 1 | 2 | 2 | E |
| 8 | Rotor position indicator springs and wearing parts | 1 | 1 | 1 | 1 | K |
| 9 | Sentinel valve springs | 1 | 1 | 1 | 1 | K |
| 10 | Steam strainer pressure seal ring and gasket | 1 | 1 | 2 | 2 | E |
| 11 | Thrust bearing shoes, spacers, shims and oil seals | 1 | 1 | 2 | 2 | E |
| 12 | Valve operating gear wearing parts (pins, bushings, couplings, seals, springs, etc.) lift rod bushings and stems are not included | 1 | 1 | 2 | 2 | E |

NOTE: Where bearings are different for port and starboard, a "Complete Set" of repair parts shall consist of all the bearings necessary to replace all bearings on either propulsion unit.

3.27.1.1 Inventory control point. - Ships Parts Control Center (SPCC) Mechanicsburg, Pa. is the Inventory Control Point (ICP) for all repair parts.

3.27.2 Interchangeability - Repair parts and BUSHIPS special material shall be identical and interchangeable with their respective standard-installed parts, and shall be capable of being installed without any special fitting, machining, running-in, or other work, except as allowed below. The turbine manufacturer shall also notify NAVSEC or SPCC as applicable regarding interchangeability of parts being furnished to parts previously furnished or being furnished under other procurements.

(a) Exceptions on approved drawings. - Exceptions to above interchangeability requirements are permitted, if approved by Design Approval Activity and so noted on applicable drawings.

(b) Blading exception. - All blading material, except shrouding, shall be furnished completely finished and ready for use, except for design allowance if any on blade roots for fitting. Blade material which is to be installed in segmental form shall be furnished assembled in segments.
(c) Shrouding exception. - Shrouding shall be furnished cut to length, undrilled and unpunched for blade tenons. Surplus stock for axial trimming to obtain specified clearances is acceptable. Predrilled or prepunched shrouding for axial entry blades will be considered.
(d) Diaphragm crush pins. - Crush pins shall be fitted at installation.

3.27.3 Provisioning list. - NAVSHIPS 4786 and 4786A forms are required for all repair parts and shall be prepared in accordance with MIL-P-15137 except that the turbine manufacturer shall include in the lower right hand margin a drawing title block and revision column. The provisioning list shall be used as a drawing of onboard parts and may be used as packing and shipping list. Applicability of parts shall be indicated in remarks column.

3.28 Drawings and microfilm. - All drawings shall conform to MIL-D-963 except as modified hereinafter.

3.28.1 General requirements. -

3.28.1.1 Completeness. - Drawings shall be so complete in every detail as to permit installation, service maintenance repairs, and manufacture (without manufacturer's assistance) of all parts at a Naval shipyard.

3.28.1.2 Proprietary information and data. - If compliance with the requirement in 3.28.1.1 involves the revelation on drawings of proprietary information or data, then such information or data is required and shall be shown. Subject to negotiation on this point at the time of contract award, applicable "Rights in Data-Limited" clause or other designation shall be added to each drawing or document containing proprietary information or data.

3.28.1.3 Surface finish. - Surface finish, waviness and lay of working surfaces shall be designated in accordance with ASA B 46.1.

3.28.1.4 Manufacturer's use only notes. - Information intended for manufacturer's use only shall be so designated. Conversely, on a commercial drawing with wide usage, it is permissible to designate portions thereon "For Navy use Only". Where the manufacturer's process specification is required to manufacture the part, such specifications shall be included on the drawing list and be furnished on microfilm.

3.28.1.5 Dimensional tolerance. - Unless indicated by a note, legend or key on drawing, it will be assumed that all tolerances shown on drawing shall be complied with during manufacture and maintenance repair.

3.28.1.6 Weldment drawings. - Drawings showing welding and allied processes shall contain the following information:

(a) Materials to be welded and welding filler metals used, each to be identified by applicable (or nearest equivalent) government specification, and by commercial designations satisfactory to NAVSEC. A reference to a separate welding process document is acceptable.
(b) A statement that all welding is in accordance with MIL-STD-278. If any weldment deviates in any respect (joint design, heat treatment, inspection, and so forth) from this standard or constitutes a case not covered therein, such shall be detailed on the drawing.
(c) A general note similar to the following: (if applicable) "Geometry and dimensions for weld preparation and grooving on this and related drawings is for (manufacturer's name) use with welding procedure approved for his use. If welding is accomplished by others to a different procedure, weld preparation and grooving must be adjusted for compatibility with the welding procedure used.

3.28.1.7 Material identification. - Detail drawings shall, either on the drawings or separate list of material, reference government specifications for materials of all parts; except, that where there are no government specifications applicable for parts not specified herein, reference may be made to industry or technical society specifications or standards. Where material substitutions are made (see 3.4.2), drawings shall indicate the company material used and reference shall be made to "List of Preferred Materials"

and the drawing of material comparison sheets. Unless specifically waived by NAVSEC, it shall be understood that design is based upon the use of the indicated government materials which can be used to effect repair or replacement.

3.28.1.8 Subcontractor drawings.- Prime machinery contractors who purchase finished items from subcontractors shall use the subcontractor's drawing number as the single reference identification in all cases where the part(s) delineated thereon is (are) produced by the subcontractor. The prime machinery contractor shall not add his drawing number to the drawing, except as an unofficial reference outside the drawing border or margin.

3.28.2 Special drawing.- The drawing specified in 3.28.2.1 through 3.28.2.10 are required in addition to all drawings required for manufacture and assembly of the turbines.

3.28.2.1 Outline and arrangement drawing.- A turbine outline and arrangement drawing shall be furnished for each propulsion unit. When differences in port and starboard can be clearly shown by appropriate notes, one drawing is acceptable. The outline drawing shall contain, as applicable, the following, except that no information with a security classification shall be included:

- (a) Overall and principle dimensions of major components including height to lift casings to replace diaphragms; and so forth, complete listing of all turbine connections to systems, fittings, and other components; and applicable location, size, rating, and specifications of principle components. Reference to separate piping drawing is acceptable.
- (b) Curves or tables indicating design thermal movements and allowable forces and moments that can be imposed on turbine by external piping.
- (c) The amount and direction of cold springing of turbines supports, if required at installation, together with the maximum deflection anticipated under operating conditions; if none is required, so state.
- (d) Table of weights by components for lifting and handling purposes. Values shall be revised as necessary on final issue of drawing to reflect actual weights obtained by weighing parts of first unit delivered.
- (e) Seating arrangement (turbine on girder or pads) with foundation bolting indicated (quantity, size, location, type of fit, and so forth).
- (f) All openings for inspection or clearance measurement.
- (g) List of reference drawings, including reference to drawing list, sectional assembly, gland seal diagram, lube oil diagram, instrumentation drawing and piping drawings (if applicable).
- (h) When applicable, singled-up connections shall be shown in the normal operating condition.

3.28.2.2 Assembly drawing.- An assembly drawing shall be furnished for each turbine design and shall include the following (differences in port and starboard units may be shown by note in lieu of furnishing separate drawing):

- (a) Side elevation of upper and lower half turbine sectioned longitudinally.
- (b) End elevations at each end including a transverse section showing nozzle control valves including by-pass valves if applicable.
- (c) Principal parts shall be called out, and identified by name and material in a list of material, which may be integral with, or referenced on, the assembly drawing.
- (d) Rotor bore, if applicable.
- (e) Gland, dummy and diaphragm packing rings shall be numbered consecutively beginning at the thrust end.
- (f) Detail of overspeed protective devices, if applicable.
- (g) Representative views of inner casings, packing casings, astern chamber or steam ring and diaphragm support and retention features shall be shown by enlarged view or section.
- (h) Indicate gland seal, gland leak-off, oil supply and oil drain connections.
- (i) Indicate waste oil-and-water pockets (if applicable) and drainage of same.
- (j) Water removal features and casing drains shall be indicated.
- (k) Means of providing for longitudinal and radial expansion (flex-leg, keys, clearance bolts and so forth) of casing shall be shown or described by notes and sketches.
- (l) Longitudinal section of crossover pipe including expansion joint.

3.28.2.3 Clearance drawing and overhaul report form.- A combined clearance and overhaul report drawing shall be prepared for each turbine design; the drawing shall contain a longitudinal assembly view

of the rotor with detail views indicating "cold" clearances for parts as listed in 3.28.2.3.1 through 3.28.2.3.7 in tabular form with columns entitled "design" (values filled in) and blank spaces for "as found" and "as closed" clearances. Drawing shall indicate tolerances for installation and maximum allowable clearances for which replacement or reconditioning of parts is recommended. (See 3.18 for clearance requirements.)

3.28.2.3.1 Blading clearances. - Clearances (radial and axial) shall be shown for rotating blading at its closest approach to casing, diaphragm, nozzle block, seal strips and other non-rotating parts. The method, location of access, and position of rotor shall be indicated for taking blade clearance without lifting casing or disassembly of thrust bearing. A block for taper gage reading shall be included.

3.28.2.3.2 Bearing clearances. - Diametral clearances shall be shown for journal bearings. The clearance or fit between each bearing shell and its cap shall be indicated. Axial float of the thrust collar shall be shown with the rotor hard up against either set of shoes; however, the same position shall be used for all turbines of the propulsion unit.

3.28.2.3.3 Diaphragm and gland packing clearance. - Axial and radial clearances shall be shown for each labyrinth packing ring.

3.28.2.3.4 Oil seal clearance. - Radial clearances shall be shown for each oil ring.

3.28.2.3.5 Rotor radial position setting. - Where reference measurements are used for checking radial position of rotors utilizing bearings with adjustable seating pads, the radial reference measurements to be used as constants and method of measurement shall be shown.

3.28.2.3.6 Axial position. - Provision for determining axial position of rotor (see 3.23.9) shall be indicated.

3.28.2.3.7 Notes. - There shall be notes on the drawing similar to the following:

Note 1 - All radial and diametral clearances shown are with the rotor journals--- (manufacturer shall state here whether journals are concentric with casing bore or resting in the bottoms of bearings). Two or more radial clearances shall be shown for parts having their axes eccentric with rotor axis.

Note 2 - All clearances shown are "installation clearances", which should be used as a guide when blading, bearings, thrust shoes, packing rings or oil seals are reconditioned or replaced.

Note 3 - If applicable, include caution note regarding taking total float measurements which can damage packing teeth. If total float can be taken, show expected value.

3.28.2.4 Gland seal vent and drain diagram. -

3.28.2.4.1 Liaison with shipbuilder. - The turbine manufacturer shall collaborate with the shipbuilder as necessary to prepare a gland seal, vent and drain diagram.

3.28.2.4.2 Schematic. - This drawing shall indicate schematically the turbine connections for gland seal, leak-offs from glands and valve stems, and casing and chest drains. Piping shown, but not furnished by turbine manufacturer, shall be dotted or phantomed, while solid lines represent items and connections furnished with turbines.

3.28.2.4.3 Direction of flow. - The direction of flow in each line shall be indicated by an arrow or other means.

3.28.2.4.4 Connection sizes. - The size of each line and connection shall be indicated.

3.28.2.4.5 Flow data. - The values (seal and vent) of steam flow, air flow and temperature at each gland seal shall be tabulated for specified cruising power, full power, standby, and astern conditions. These values shall be normal clearance flows and shall be used for steam rate calculations and heat balance studies. Capacity of regulator and dump valve shall be shown. An ambient air temperature of 120°F shall be used for calculations.

3.28.2.4.6 Notes. - There shall be notes on the drawing similar to the following:

Note 1 - Flows shown correspond to the normal packing clearances which are expected to exist upon completion of PAT and are designated as normal clearance flows.

Note 2 - The capacity of the gland seal system, gland exhauster system, and leakoff piping shall be based upon "maximum clearance flows: (corresponding to "maximum clearances" which require replacement of packing due to excess leakage); these maximum flows, calculated for 2 pounds per square inch gage (psig) in the seal pocket and 5 inches of water vacuum in the leak-off pocket, are as follows: (manufacturer shall indicate values here).

3.28.2.5 Lube oil flow diagram. -

3.28.2.5.1 Liaison with shipbuilder. - The turbine manufacturer shall collaborate with the shipbuilder as necessary to prepare a lube oil feed and drain diagram.

3.28.2.5.2 Schematic. - The drawing shall indicate schematically bearing inlet and drain connections and, as applicable, oil connections to overspeed mechanisms, control mechanisms and gland seal regulator. Piping shown, but not furnished by the turbine manufacturer, shall be dotted or phantomed, while solid lines represent items and connections furnished with turbines. Size of each connection shall be shown.

3.28.2.5.3 Flow data. - Values of oil flow (gpm) shall be shown at each connection. Direction of flow shall be indicated by an arrow. By note or table, drawing shall also indicate conditions for which oil flows apply (state percent power, pressure and bearing clearance).

3.28.2.5.4 Bearing orifices. - Size and location of bearing orifices shall be indicated. Where orifices are integral with bearing shell, a note to this effect (giving a size) is satisfactory.

3.28.2.5.5 Oil pressure. - Drawing shall contain a table indicating bearing inlet normal oil pressure, minimum oil pressure and recommended pressures at which to set low pressure alarms.

3.28.2.6 Valve control drawing. - A combination isometric/schematic drawing of the valve control system shall be furnished. Drawing shall indicate valves and linkages and include information for setting and adjusting control mechanisms.

3.28.2.7 Instrumentation drawing. - An instrumentation drawing shall be furnished and shall contain an outline of the turbine (with cut-out views as necessary) indicating all points of instrumentation either furnished with the turbine or by shipbuilder. A table showing maximum expected values of temperature and pressure shall be provided. Sentinel valves (with settings given), rotor position indicator, sight flows, and bearing RTE's (include location of external connections) shall be included.

3.28.2.8 Drawing and microfilm list. - A combined drawing list and microfilm index is required, and all drawings applicable to the design shall be listed thereon. The list shall provide a complete "breakdown" by turbine units, with an alphabetized index thereunder by stage, subassemblies, and principal parts. It is the intent of this requirement to carry the part generation break-down to the detail drawings which support the alphabetized subassemblies and parts, even though many of these detail pieces and parts loose their identity in a fabricated or assembled entity. List of preferred materials and drawing number of comparison sheets shall be included.

3.28.2.9 Machinery variation summation drawing. - A machinery variation drawing shall be furnished for each class of ships. This drawing shall contain a post production summation of all types I and II variations, (see 3.32) and shall indicate for each variation a brief description of the deviation from the basic drawing, the serial number of unit affected, the hull number of the ship to which assigned, and the necessary correlation with special parts and repair parts which result from the variation.

3.28.2.10 Lifting arrangement drawings. - Drawings shall illustrate the use of lifting and handling gear furnished for rotor and casing. Weights of parts to be lifted or handled shall be shown.

3.28.3 Drawing approval. -

3.28.3.1 Drawing categories. - Drawings are divided into two categories as follows:

(a) Category I - Sub-assembly and detail drawings which have general application (classes A and C of MIL-D-963).

C03372

(b) Category II - Those drawings which apply only to specific applications (classes B and D of MIL-D-963).

3.28.3.2 Drawings requiring approval. - Based upon design approval (see 3.28.4), category I drawings shall be self-approved by the turbine manufacturer; category II drawings require approval by either NAVSHIPS or NAVSEC or a designated representative who will be the Design Approval Activity; however, in every case the following shall be approved by either NAVSHIPS or NAVSEC.

(a) Outline and arrangement drawing.
(b) Assembly drawing(s).
(c) Clearance drawing.
(d) Gland seal, vent and drain diagram.
(e) Lube oil flow diagram.
(f) Rotor assembly drawing(s).
(g) Valve control drawing.
(h) Crossover piping drawing (including expansion joint).
(i) Applicable drawings indicating radiographic inspection.
(j) Onboard repair parts list (provisioning list).
(k) Instrumentation drawing.
(l) Machining variation summary drawing.

3.28.3.3 Approval procedure. - The detailed procedure for submitting original and revised drawings for approval shall be as established subsequent to award and will be dependent upon the activities involved. A drawing submittal schedule shall be furnished by the turbine manufacturer (see 3.31). General requirements include the following:

(a) Thirty days (from receipt of drawings) shall be allowed for approval action.
(b) Two copies of each drawing shall be forwarded to NAVSEC, Design Approval Activity, and each shipyard involved. One copy of each drawing shall also be forwarded to each Supervisor involved.
(c) Drawings which have been revised solely to reflect approval comments shall be resubmitted for information only.

3.28.3.4 Approval responsibilities. - Approval action taken by NAVSEC, NAVSHIPS or its authorized representative shall not be construed to relieve the contractor from any contractual obligations regarding performance, reliability or other specification requirements.

3.28.3.5 Approval notation on drawings. - In lieu of validation of approved drawings, there shall be an approval notation made on each drawing in accordance with MIL-D-963, except that:

(a) Category I drawings shall bear a notation citing approval by a turbine manufacturer designated and NAVSEC approved engineer or specialist (qualified in engineering and drafting) who has design responsibility. Should there be any desire or justification for doing so, NAVSEC reserves the right to assume the responsibility or delegate same to a field activity without consent or prior notice. If such a review indicates that drawings are not adequate, the turbine manufacturer will be required to take appropriate action including a review of all drawings involved.
(b) Category II drawings shall bear a notation citing the approval letter.

3.28.4 Design approval. - In addition to drawing approval, design approval conferences shall be held to review the overall design to ensure that specifications are being followed and that the proposed design is acceptable to NAVSEC.

3.28.4.1 Design release conference. - As soon as practicable after award, the turbine manufacturer shall request a conference at NAVSEC (request to be forwarded via shipbuilder and cognizant supervisor if applicable) for the purpose of obtaining approval of basic design and ordering of material. Areas to be covered at the conference include but are not necessarily limited to the following; however, partial coverage of these items will be considered if necessary to grant timely approval of long lead time components. The

manufacturer shall prepare the minutes of the meeting and shall submit them to NAVSHIPS or NAVSEC, as applicable for confirmation. Submittal shall be via shipbuilder and supervisor, if applicable.

(a) Interchangeability of design or parts thereof to previously furnished designs.
(b) Materials of principal parts (minimum of items listed in table I) including identification of approved substitute materials proposed.
(c) Basic turbine design features.
(d) Predicted performance.
(e) Arrangement.
(f) Weights.
(g) Specification clarifications if applicable.
(h) List of internal bolting and means for locking same.
(i) Locking of external bolts and dowels for shock.
(j) Control system.
(k) Gland seal regulation system.
(l) Use of radial seals (provide information on expected performance gains).
(m) Need for stellite shields on blades.

3.28.4.1.1 Data to be furnished prior to conference. - At least three weeks prior to the conference the turbine manufacturer shall forward a proposed agenda with background information regarding items to be discussed. Preliminary drawings (such as the outline and arrangement drawing and sectional assembly drawings), material lists, technical data, and other documentation as necessary to permit review by NAVSEC prior to the conference shall be included.

3.28.4.2 Design review conferences. - Quarterly conferences shall be held to review the final turbine design and to discuss progress or problems that have arisen. Specific areas to be included (either separately or combined), are as follows:

(a) Strength of valve control system.
(b) Singling-up procedures.
(c) Shock testing.
(d) Performance testing.
(e) Blade testing.

As in the case of the design release conference, request for conference shall be made at least 3 weeks prior to the desired date and shall include a proposed agenda with supporting information. It is also intended that NAVSEC comments on drawing submittals be discussed at these conferences. Minutes shall be prepared and submitted for confirmation in the same manner as for design release conference (See 3.28.4.1).

3.28.5 Microfilm. -

3.28.5.1 Roll microfilm. - One roll of microfilm (or strip if applicable) of all drawings shown on the drawing list (see 3.28.2.8) shall be furnished in accordance with MIL-D-963 (type I, class I of MIL-M-9868). The first frame(s) shall consist of the drawing list with frame numbers added. The next frame(s) shall consist of a list of all drawings in numerical order of drawing number with frame number indicated. List of preferred material and comparison sheets do not need to be microfilmed.

3.28.5.2 Card-mounted microfilm. - Three complete sets of card-mounted microfilm shall be furnished in accordance with the following:

(a) Scope- A set shall cover all new and revised drawings (including material comparison sheets) for which aperture cards have not been previously furnished.
(b) Section. - Microfilm shall be type II class 2 in accordance with MIL-M-9868.
(c) Size and weight of card. - Size and weight of card shall be in accordance with the figure for aperture, card size and document image location of MIL-STD-804.
(d) Aperture opening on card. - Aperture opening on card shall be in accordance with the figure for aperture card size and document image location of MIL-STD-804.
(e) Information to be typed or printed on card. - Information to be typed and printed on card shall be in accordance with the figure for the engineering drawing card (Card Code A) shown in MIL-STD-804.
(f) Key punching. - The cards shall be key punched and interpreted in accordance with format A-engineering drawing card of MIL-STD-804. Field (K) control activity shall be punched HP. Fields (j) and (q) shall be left unpunched.

3.28.5.3 Distribution. - One set each shall be forwarded to:

(a) NAVSEC, Washington, D. C.
(b) SPCC Mechanicsburg, Pa.
(c) NAVSEC Division, Philadelphia, Pa.

3.29. Manuals. - Manuals shall conform to type I of MIL-M-15071 except as modified herein.

3.29.1 Outline of Manual. - The format for arrangement and content of manual shall be as indicated below. Within each section, subject matter shall be arranged by component assemblies and subassemblies insofar as practicable.

| FRONT MATTER | Page(s) |
|---|---|
| (a) Cover | - |
| (b) Title page | 1 |
| (c) List of serial numbers | 2 |
| (d) Approval and procurement record page | 3 |
| (e) Correction page | 4 |
| (f) General index | 5-99 |
| CHAPTER 1 - GENERAL INFORMATION AND DATA | 100-199 |
| Section 1 - General description of propulsion plant | 1xx |
| Section 2 - Turbine data and design parameters | 1xx |
| Section 3 - Weights of principal components, parts, and accessories | 1xx |
| Section 4 - List of materials of principal parts | 1xx |
| CHAPTER 2 - DETAILED DESCRIPTION | 200-299 |
| Section 1 - Description of turbines | 2xx |
| Section 2 - Description of related systems | 2xx |
| CHAPTER 3 - INSTALLATION | 300-399 |
| Section 1 - General instructions | 3xx |
| Section 2 - Alignment of turbines | 3xx |
| Section 3 - Connections to external systems | 3xx |
| CHAPTER 4 - OPERATION OF PLANT | 400-499 |
| CHAPTER 5 - MAINTENANCE | 500-599 |
| CHAPTER 6 - APPENDIX | 600-699 |
| Section 1 - List of drawings | 6xx |
| Section 2 - NAVSHIPS 4786 listing of onboard repair parts, wrenches and tools | 6xx |
| Section 3 - Fold-out figures | 6xx |
| Section 4 - Memorandum pages | 6xx |

3.29.2 General requirements. -

3.29.2.1 Scope. - The manual shall cover the turbine and accessories furnished with the turbine such as astern valve, gland seal regulators, main steam strainers, and so forth, as applicable. The main reduction gear shall be covered in a separate manual unless otherwise approved by NAVSEC.

3.29.2.2 Number of volumes. - Manuals shall, unless specifically waived, be single-volume for non-nuclear applications and two-volume for nuclear applications. Volume I of nuclear applications shall be confidential containing technical data (section 2 of Chapter 1, see 3.18). Volume II shall be unclassified.

3.29.2.3 Size. - Manual thickness shall not exceed 3 inches.

3.29.2.4 Federal stock numbers. - Stock numbers are not required to be included in the manual or on drawings contained therein; manual shall make a general reference to Ship's Allowance Part List for stock numbers and other provisioning data.

3.29.2.5 Photography. - The use of photography of the turbines and parts is required, to supplement description and maintenance sections.

3.29.2.6 Reference to Bureau of Ships manual. - References to Bureau of Ships manual may be made, but such shall be general and shall not refer to specific articles.

3.29.2.7 Printing. - Double-column printing (unjustified acceptable; that is, right margin may be uneven) is required for the text. The use of heavy or bold type or capital letters underlined for group and paragraph headings is desired to make the heading stand out.

3.29.2.8 Numbering. - A decimal system of numbering shall be used for the text. The decimal system consists of chapter number, section number, paragraph and sub-paragraph number.

3.29.2.9 Final manual. - The following requirements shall apply:

(a) Cover size. - Approximately 11 inches X 8-1/2 inches, with index margin tab allowance.
(b) Cover material. - 18-gauge vinyl (heat-sealed on 120-point Davey Board).
(c) Cover hinges. - Reinforced with nylon.
(d) Post spacing. - Three posts on centers approximately 4-1/2 inches.
(e) Binding. - Manuals shall have loose-leaf binding. Posts notched for slide-type retainer are preferred to threaded posts with screws for manual less than 1-1/2 inches in thickness. For manuals 1-1/2 inches to 3 inches in thickness, binders shall have expandable backbones with posts telescoping or alternately attached to binder back and front and shall be capable of being easily locked by slide bar, control lever, or push button.
(f) Identification. - Imprint face of cover and backbone. Ship class shall be indicated on backbone. Lettering shall be silk screening in gold or white.
(g) Margin tabs. - Hard durable tabs (on page-size separators and not protruding beyond binder edge) shall be provided as follows:

(1) Chapter. - A colored tab shall be used with either chapter name (abbreviated) or Arabic numeral for each chapter thereon.
(2) Foldout figures and drawings. - A white tab shall be used with Arabic numerals thereon for each foldout figure or drawing.

3.29.3 Detailed requirements. - Detailed requirements for manual contents (see 3.29.1) are specified in 3.29.3.1 through 3.29.3.7.

3.29.3.1 Front matter. - In addition to requirements of MIL-M-15071, a general index, which alphabetically lists all significant subjects by primary and secondary identifying words shall be furnished.

3.29.3.2 Chapter I - General information and data. -

(a) Section 1. - Section 1 shall briefly describe turbines, components furnished with turbines, all line shaft components in the plant (even if not furnished with the turbines) in sufficient detail to provide a clear overall picture of the plant and its use as an entity. Include statement regarding number of shafts and rotation.
(b) Section 2. - Section 2 shall contain design parameters and all of the technical data required under column 6 of table VIII except weights.
(c) Section 3. - Section 3 shall list weights of the total turbine, casing (complete, by halves), rotor (bladed), crossover assembly, principle accessories and onboard repair parts and tools. The manual text shall reference the lifting gear drawing foldout for applicable detail turbine weights.
(d) Section 4. - Section 4 shall consist of a list of materials for principal parts: table I shall be used as a guide for minimum content. The list shall indicate part, government specification (or government specification equivalent to material actually used), material actually used (identified by its designation or principal constituent elements, as in column 3 of table I), and any remarks or notes the manufacturer desires to add.

C03376

3.29.3.3 Chapter 2 - Detailed description. -

(a) Section 1. - Section 1 shall contain a detailed description of turbines, components thereof and equipment furnished with turbines. Partial-page sketches, illustrations and photographs in the text are required.
(b) Section 2. - Section 2 shall describe in detail all systems (such as controls) which are furnished with the turbines and general description of systems which relate to turbine design requirements or operation (main steam system is not included).

3.29.3.4 Chapter 3 - Installation: The following areas shall be covered:

(a) Alignment of turbine to gear.
(b) General instructions regarding connections to shipbuilder-furnished systems.

3.29.3.5 Chapter 4 - Operation. - Detailed turbine operating procedures shall be provided. The turbine manufacturer shall consult with the shipbuilder to the extent necessary when related systems are involved. Specific areas to be covered include the following as applicable:

(a) Warming-up procedures (state minimum time).
(b) Standing-by.
(c) Underway, maneuvering.
(d) Securing.
(e) Locked-shaft operation.
(f) Trail-shaft operation.
(g) Singled-up operation.
(h) Bowed-rotors.
(i) Astern operation.
(j) Extraction operation.
(k) Testing overspeed trip.

Within the above areas, include information on operational limitations, allowable bearing temperatures, minimum and maximum lube oil pressures and temperatures and other applicable safety precautions to provide specific guidance for operating the turbines. Include a trouble shooting chart or section covering vibration, loss of lube oil, failure of gland seal system, high temperatures, stuck valves, low vacuum and other abnormal conditions as applicable.

3.29.3.6 Chapter 5 - Maintenance. - Detailed maintenance procedures shall be included for the areas indicated below. (Note: This listing is not intended to be in order of manual coverage and is not necessarily all inclusive - other areas may require coverage on a case basis.) Frequency of inspections and maintenance actions should not be given unless specifically recommended to be different from requirements of Bureau of Ships Technical manual. Such cases shall be brought to the attention of the NAVSEC.

(a) Astern valves
(b) Bearings, journal. - Allowable clearances; spherical seats; depth gage and crown thickness measurements including limits for each; RTE installation; rebabbitting; bearing jacks; minimum journal diameter; bearing orifices.
(c) Bearings, thrust. - Clearance limits; method of taking thrust clearance; removal of thrust collars; locking device for thrust nut; refinishing of thrust collar; minimum thickness of collar which requires replacement; methods of taking total float including value or prohibition against doing so if applicable.
(d) Blading. - Reblading instructions (including removal of blades).
(e) Clearances. - Taper gauge readings including reference to radial position of rotor; use of overhaul report form including methods for taking clearances (upper and lower halves of casing).
(f) Control valves. - Inspection; repair, assembly.
(g) Control mechanism. - Disassembly and reassembly; locking devices; adjustment; caution note on disassembly of springs; greasing and lubrication requirements. (Include a drawing or table indicating specific areas involved.)
(h) Diaphragms. - Installation instructions including values for off-set if applicable; cover crush pins.
(i) Gland seal regulators. - Give normal pressures and action required when pressures are high; manual control of regulator; disassembly and reassembly including detailed setting instructions.

(j) Gland packing. - Clearance measurements with limits; repair to rings; replacement of rings with detailed installation procedures.
(k) Lifting casing and rotor. - Use of lifting gear; internal bolting; removal of diaphragms with casing and rotor on supports.
(l) Overspeed mechanism. - Disassembly and reassembly; specific setting instructions. Include pressure curve for oil impeller (see 3.10.9.2.1).
(m) Rotor position indicator. - Disassembly and reassembly; checking for correct setting; resetting.
(n) Steam joints. - Specific bolt tightening schedule using a drawing of turbine for reference; instructions for bolt tightening including value of pre-stress; bolt heaters.
(o) Sentinel valves. - Testing; removal and re-installation.
(p) Vibration. - Access for and method of installing infield balance weights; use of vibration bosses on bearing caps; allowable unbalance of rotor in ounce-inches.

3.29.3.7 Chapter 6 - Appendix. - Consideration will be given to deletion of the drawing list when excessive pages (more than 15 pages with condensed drawing sheets on each page) are involved. Fold-out figures in section 3 shall contain sufficient drawings to augment other chapters. The machining variation summary drawing (see 3.28.2.9) shall also be included.

3.29.4 Approval procedures. -

3.29.4.1 Conference on manual outline. - Prior to printing of preliminary manual, the turbine manufacturer shall request a conference at NAVSEC to review the general outline of the manual and of areas to be covered.

3.29.4.2 Preliminary manual. - The preliminary draft of the technical manual complete with figures and photographs shall be forwarded for approval by no later than 30 days after shipment of first unit. Distribution of the preliminary manual shall be made as follows:

2 copies to the Design approval activity (if other than NAVSEC) for comment.
3 copies to NAVSEC for approval
2 copies to the shipbuilder for information (and comment, if any).
2 copies for information to the Prospective Commanding Officer of each applicable ship; this distribution may be reduced for multi-ship procurements when it is known that delivery of final manuals will be at least 120 days prior to preliminary acceptance trials.

NAVSEC will (taking into consideration any comments received from the shipbuilder and design approval activity) mark-up one copy of the preliminary technical manual and return it to the turbine manufacturer with comments and directions relating to preparation of final manual.

3.29.4.3 Final manual. - Responsibility for preparing the final manual includes printing, binding and distribution. The quantity and distribution of technical manuals required will be as specified in the contract. Final manuals are required within 120 days after date of NAVSEC approval letter.

3.30 Technical data books. -

3.30.1 Data categories. - Technical data shall be categorized as shown in 3.30.1.1 through 3.30.1.3.

3.30.1.1 Category I data. - Category I data corresponds to and supplements category I drawings (see 3.28.3.1(a), and is similarly defined.

3.30.1.2 Category II data. - Category II data corresponds to and supplements category II drawings (see 3.28.3.1(b) and is similarly defined.

3.30.1.3 Category III data. - Category III data shall be safeguarded as commercially proprietary data to protect the manufacturer's commercial interests. Each data sheet in this category shall contain caution: "FOR NAVSEC USE ONLY (CODE 6641) - DO NOT MICROFILM OR OTHERWISE REPRODUCE WITHOUT CONSENT OF (NAME OF MANUFACTURER)---"

3.30.2 Content of data books. - Data books shall contain the following:

(a) All technical data previously furnished as bid data (table X and column 5 of table VIII).
(b) All data listed in column 7 of table VIII.

3.30.3 Data format and identification. - To the extent practicable, data sheets shall be kept to A-size (8 X 10-1/2 inches) sheets (with the exception of foldout sketches larger than A-size). Data sheets may (at manufacturer's option) be typewritten or handwritten and reproduced by photographic or offset methods and shall be contained in paper binders. Cover of binder shall indicate ship application involved. Each sheet shall be dated and identified as to category and data list item designation (see columns 1 and 2 of table VIII).

3.30.4 Submittal of data. - Data books shall be submitted as soon after award as available, (but no later than 90 days) and shall be as complete as practicable. Thereafter, data sheets (or pages) shall be submitted as prepared or revised. Distribution shall be in accordance with table VII.

Table VII - Identification and distribution of data books

| Data category | NAVSEC (Code 6641) (Direct mail) | Drawing Approval activity (*) | Each Applicable shipyard | Cognizant SUPSHIPS (for info) | NAVSEC Division Phila., Pa. |
|---|---|---|---|---|---|
| I | 3 | 0 | 0 | 0 | 1 |
| II | 3 | 3 | 3 | 1 | 1 |
| III | 3(**) | 0 | 0 | 0 | 0 |

(*) - Denotes field approval activity, if applicable (see 3.2.8.3.2).
(**) - Denotes use of registered mail.

3.30.5 List of technical data requirements. - Table VIII is a composite list of technical data requirements for technical manuals, technical data books and shows interrelationship with ordering data and bid data. The format for curves to be provided may vary from that specified upon NAVSEC approval.

Table VIII - List of technical data requirements

| Data category | Item number | Data description | Ordering data | To be furnished by manufacturer in: Bid or proposal | Manual book | Tech data book | Remarks |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| I | 1 | Blade path details (tabulation) by stages | | | | | |
| | | (a) Number of nozzle groups | - | - | - | x | |
| | | (b) Number of nozzles per group | - | - | - | x | |
| | | (c) Nozzles throat area per group | - | - | - | x | |
| | | (d) Nozzle block active arc (total) | - | - | - | x | |
| | | (e) Nozzle diaphragm height | - | - | - | x | |
| | | (f) Nozzle diaphragm throat area | - | - | - | x | |
| | | (g) Nozzle diaphragm active arc | - | - | - | x | |
| | | (h) Number of nozzle diaphragm partitions | - | - | - | x | |
| | | (i) Blades per row (and gaps at, and opposite notch) | - | - | - | x | |
| | | (j) Number shroud groups and blades per group | - | - | - | x | |
| | | (k) Tenon dimensions | - | - | - | x | |
| | | (l) Mean diameter bladed row | - | - | - | x | |
| | | (m) Blade height (excluding root and tenon) | - | - | - | x | |
| | | (n) Exhaust annulus area (at turbine exhaust flange) | - | - | - | x | |
| | 2 | Valve data (tabulation) | | | | | |
| | | (a) Number of valves | - | - | - | x | |
| | | (b) Size of each valve | - | - | - | x | |
| | | (c) Sequence of opening | - | - | - | x | |
| | | (d) Throat area each valve | - | - | - | x | |

Table VIII - List of technical data requirements, cont'd

| Data category | Item number | Data description | Ordering data | To be furnished by manufacturer in: Bid or proposal | Tech manual | Tech data book | Remarks |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| II | 1 | Material tabulation | x | x | x | x | Principal parts |
| | 2 | Life | x | - | - | x | --- |
| | 3 | Size and space | x | x | x | x | Outline drawing |
| | 4 | (a) Weight target (total) | x | - | - | - | |
| | | (b) Weight estimate (component and specific weight) | - | x | - | x | |
| | | (c) Weights (total and of principal parts) | - | - | x | - | |
| | 5 | Extraction and induction points (Give location and pressure and flow for each point) | x | x | x | x | |
| | 6 | Locked-shaft condition | x | - | x | - | |
| | 7 | Trail-shaft condition | x | - | x | - | |
| | 8 | Curves for correcting operating (trial) conditions to design conditions | - | - | - | x | See figure 10 |
| | 9 | Nomograph, relating expected variations in SHP, PRPM, pressure, temperature, vacuum | - | - | x | x | |
| | 10 | Rotor criticals (rigid bearing and running) | - | - | x | x | |
| | 11 | Tabulation of the following design operating conditions in approximately 5 knot intervals from 10 knots To F.P. (including cruising power) and astern steady state condition: | - | - | x | x | |
| | (a) | Propeller rpm | | | | | |
| | (b) | SHP/propeller shaft | | | | | |
| | (c) | Throttle flow (lb./hr) | | | | | |
| | (d) | Inlet steam conditions (pressure and temperature) | | | | | |
| | (e) | Steam rate (lb/SHP-hr) | | | | | |
| | (f) | Horsepower and rpm for each turbine | | | | | |
| | (g) | Stage pressures and temperatures at measured points | | | | | |
| | (h) | Exhaust vacuum temperature and moisture content | | | | | |
| | 12 | Tabulation of following data for each bearing: | - | - | x | x | |
| | | (a) Size (diameter and active length) | | | | | |
| | | (b) Projected area ($in^2$)(inside drain grooves) | | | | | |
| | | (c) Load (psi) on projected area | | | | | |
| | | (d) Oil required (gpm and press) at F.P. | | | | | |
| | | (e) Surface speed (rpm) at F.P. | | | | | |
| | | (f) Diametral clearance (minimum and maximum) | | | | | |
| | | (g) Location and size of orifices | | | | | |

Table VIII - List of technical data requirements, cont'd

| Data category | Item number | Data description | Ordering data | To be furnished by manufacturer in: Bid or proposal | Tech manual | Tech data book | Remarks |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | 13 | Operational limitations for principle parameters for which instrumented (pressure, temperature, prpm and so forth) | - | - | x | - | Table, curves or included in operation section of technical manual |
| | 14 | Curves, on a base of propeller rpm over entire operating range ahead, showing: (a) Turbine extraction and non-extraction steam rates (including all losses and all gland sealing steam) and flow indicating, valve points and assumed gear efficiencies at design points design points | x | x | x | x | Include Willans line |
| | | (b) Design vacuum and condition of exhaust steam at inlet to condenser | - | - | - | x | |
| | | (c) Maximum vacuum the turbines can usefully (and safely) employ | - | - | x | x | |
| | | (d) Gland sealing steam and leakoff quantities | - | - | x | x | |
| | | (e) Rate of lube oil circulation required by the turbines and an estimate of the required pressure on the bearing side of the metering orifices | - | - | x | x | |
| | | (f) Rate of heat removal required from the turbine lubricating oil | - | - | - | x | |
| | | (g) Stage pressures where measured (see table II) | - | - | x | x | |
| | 15 | Curves, on a base of propeller shaft revolutions per minute (p. r. p. m.) over the entire operating range ahead, showing SHP output at each turbine coupling | - | - | x | x | Horsepower values to be based on bull gear output |
| | 16 | Curves, on a base of p. r. p. m. between rated astern and rated ahead conditions showing the following torques during quick reversal from astern to ahead, and vice versa: (a) Available torque at each turbine coupling | - | - | x | x | Indicate flow and bowl pressure for astern torque curve and flow for ahead torque curve |
| | | (b) Available torque at bull gear coupling of reduction gear | - | - | x | x | |
| | 17 | Values for the following at specified rated astern conditions: | - | - | x | - | |
| | | (a) Estimated maximum temperature in ahead stage(s) (give location) | - | - | x | x | |
| | | (b) Steam flow and astern torque at zero or specified r. p. m. | x | - | x | x | |

C03381

Table VIII - List of technical data requirements, cont'd

| Data category | Item number | Data description | Ordering data | To be furnished by manufacturer in: Bid or proposal | Tech manual | Tech data book | Remarks |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | 18 | Torsional vibration analysis, curves and data (including $WR^2$, inertia, stiffness, speeds, etc.) for propulsion turbine-generators only | - | - | x | x | |
| | 19 | Curves, on a base of handwheel and lead screw turns of: | | | | | |
| | | (a) Valve lift | - | - | x | x | |
| | | (b) Estimated or actual turbine lead-screw torque | - | - | x | x | |
| | 20 | Mollier charts (FP and cruising power) | - | - | x | x | Show actual state lines |
| III | 1 | Curve of turbine efficiency versus turbine rpm | - | - | - | x | |
| | 2 | Creep and stress data | - | - | - | x | |
| | | (a) Curves of blade and rotor material rupture strength and creep (0.1 percent) strength versus temperature for 1,000, 10,000, 40,000, 60,000 and 100,000 hours | | | | | |
| | | (b) Bolt stress data | - | - | - | - | |
| | 3 | Blade and rotor tabulation (by stages) including: | | | | | |
| | | (a) Stage temperature (metal) | - | - | - | x | |
| | | (b) Material strength at temperature | | | | | |
| | | (c) Minimum factor of safety | | | | | |
| | | (d) Maximum or limiting value and direction of stress in rotor section (groove, disc, wheelneck, etc) and blading (tenon, vane, tang, hook, neck, shank, etc) | | | | | |
| | | (e) General notes stating: (1) Stresses are direct centrifugal unless otherwise indicated | | | | | |
| | | (2) Limiting or maximum stress and safety factors indicated are for rated F.P. ahead and highest prpm, unless otherwise stated | | | | | |
| | | (3) Ratio of allowable shear stress to tensile stress | | | | | |
| | 4 | Tabulation (by stages) of the following (0 to 130 percent full power rpm) | - | - | - | x | Format shall be as approved by NAVSEC Number of nozzles per diaphragm and number of blades per row shall be indicated |
| | | (a) Frequency evaluation of tangential, axial and torsional modes (in and out of phase) | | | | | |
| | | (b) Maximum vibration stress and location (tenon, vane, etc.) | | | | | |
| | | (c) Steam bending stress | | | | | |
| | | (d) Rpm(s) at which resonance occurs | | | | | |

C03382

Table VIII - List of technical data requirements, cont'd

| Data category | Item number | Data description | Ordering data | To be furnished by manufacturer in | | | Remarks |
|---|---|---|---|---|---|---|---|
| | | | | Bid or proposal | Tech manual | Tech data book | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | 5 | Campbell diagram for each stage where blades are excited by less than 7 times maximum rotational frequency (7/rev) | - | - | - | x | |

3.31 Reports. - A schedule for submission of the items listed below shall be prepared by the turbine manufacturer and shall be forwarded to the following within 120 days after award of contract:

NAVSEC - 3 copies
Design approval activity - 3 copies
Each shipyard concerned - 3 copies

The schedule shall list each item, indicate expected date for submission, and contains a column to be filled in when the item has been completed. Schedule shall be revised as necessary with final submittal to be used as a check on completion of the items involved. Items to be included, as applicable, are as follows:

(a) Drawings listed by title and drawing number if available - (see 3.28.3.2)
(b) Blade stress data - (see 3.15.2)
(c) Technical data books - (see 3.30)
(d) Technical manual (preliminary and final) - (see 3.28.4)
(e) Microfilm (reels and cards) - (see 3.28.5)
(f) Casing deflection test results - (see 4.5.3)
(g) Vibration test report - (see 4.5.6)
(h) Performance test agenda and report - (see 4.5.7.1)
(i) Blade vibration test agenda and report - (see 4.5.10)
(j) Handwheel test agenda and report - (see 4.5.9)

3.32 Equipment variations. - Any turbine component or part which, during production or prior to delivery, deviates in any way from contract specification requirements or contains variations from the standard production units which meet such specifications and conform to approved drawings, shall be classified and disposed of in accordance with the provisions set forth hereinafter. Specification requirements include, but are not limited to, the following:

(a) Applicable welding procedures approved by the Government.
(b) Applicable process procedures approved by the Government.
(c) Applicable materials approved by the Government.
(d) Drawings which require Government approval and those portions of contractor self-approved drawings which reflect specification requirements.

3.32.1 Classification. - Variations may result from manufacturing errors, choice or quality of materials or inadequate process or procedural controls. Variations involved are those which constitute deviations from specific requirements in the contract or applicable specifications, or which affect installation, maintainability, operation, safety of personnel or machinery, quantity or logistics of repair parts, interchangeability of equipment component, subassembly, or any part thereof or results in additional cost to the Government. Included are defects in material as determined by tests or revealed by radiography when such test or film is presented for government acceptance and are found to be in excess of limits permitted by applicable standards. These variations fall into two categories and are classified as follows:

(a) Type I - Deviations which involve non-conformance of equipment, material, or production process to a specific contractual requirement.
(b) Type II - Deviations which adversely affect the above parameters but are within specification requirements.

3.32.2 Disposition. - Disposition of the equipment variations shall be as follows:

(a) Sub-standard equipment. - Type I equipment variations which render the affected part or parts not suitable for Navy's intended use by reason of not meeting minimum requirements or standards shall be rejected, in accordance with terms of the contract, except on a case-basis when the government elects to accept such part or parts as suitably-modified non-standard equipment described hereinafter.

(b) Non-standard equipment. - When equipment with variations is determined to be suitable for the Navy's intended use either in the "as-is" or modified condition, such part or parts may be accepted as non-standard parts in accordance with the procedure set forth hereinafter.

3.32.3 Conditions for acceptance of parts having variations. -

(a) Type I. - These variations require contractual action and will be accepted solely at the discretion of the Contracting Officer of NAVSHIPS on a case basis.

(b) Type II. - These variations will be approved when all of the following conditions are met:

(1) Effect of the variation(s) is acceptable to the government.
(2) Rate of incidence of such variations is not unreasonable.

Where the nature of the variation(s), the quantity of similar variations, or repetition of the same variation are such as to indicate, in the judgment of the government, lack of proper or effective quality control of workmanship, such variation(s) may not be approved.

(3) Where parts involved are normally onboard repair parts, three of each such non-standard parts or sets of parts shall be furnished at contractor's expense, consisting of one of each as onboard repair parts and two of each as stock repair parts.
(4) Where parts involved are normally stock repair parts but not onboard repair parts, two of each such special parts or sets of parts shall be furnished at contractor's expense as stock repair parts.
(5) The repair parts furnished in accordance with (3) and (4) above shall consist of the lowest echelon of the parts required to compensate for the variation. For example, the major parts in which the basic error is made need not necessarily be furnished; if a rotor bearing journal is machined undersize necessitating the installation of a non-standard bearing, spare non-standard bearings shall be furnished, but a spare non-standard rotor need not be furnished.
(6) Separate provisioning documentation for non-standard repair parts shall be submitted in accordance with MIL-P-15137. The component involved shall be identified by ship, unit, component serial number, and shown at "NO CHARGE" in the documentation.
(7) An equipment variation summary drawing (see 3.28.2.9) together with certification that resultant special parts have been furnished, shall be submitted for all type II variations under each contract.
(8) Where the variation results in additional cost to the government to accommodate a non-standard GFM item, such as additional shipyard costs for installation, the contractor shall reimburse government for the total amount of such costs involved.

3.32.4 Procedure for approval of variations. - The following procedure shall be used for approval of variations:

(a) Type I and II variations shall be referred to NAVSEC for approval via the local Government inspector within thirty days after occurrence. Submittals shall be in the same manner as established for obtaining drawing approval which on shipbuilder furnished equipment, will require submittal via the shipbuilder and cognizant supervisor. Any work done on equipment with variations prior to obtaining government approval shall be at the contractor's risk.

(b) Each variation referred to NAVSEC shall be accompanied by a letter report containing:

(1) The contract number and item involved.
(2) The date on which the variation was discovered.
(3) The circumstances or conditions under which the variation occurred.
(4) A complete description (including sketch or drawing to scale) of the nature and extent of the variation.

(5) The corrective measures proposed.

a. For the part or parts containing variations.
b. To prevent the recurrence of similar variations.

(6) The effect of the variation (as corrected) on performance, endurance, stress levels, and parameters cited in 3.32.1, including:

a. Detailed engineering basis for acceptance.
b. Certification of the part or parts as corrected.

(7) Identification of the benefit to the government if variation is accepted as modified.

(c) Copies of all correspondence involving repair parts shall be forwarded to Ships Parts Control Center, Mechanicsburg, Pa.

3.32.5 Workmanship and quality control records. - Machining errors and equipment variations which are not classified as type I or II (see 3.32.3) (such as non-significant and non-critical deviations from drawing dimensions or tolerances for castings, forgings, weldments, connections, or machine-processed parts) do not require classification or approval by either NAVSEC or Government inspector; however, each such deviation shall be documented, and a copy shall be furnished to the local Government inspector. If the inspector considers that an unclassified deviation does involve contractual requirements, then such deviation shall be classified and treated in accordance with the foregoing paragraphs. When a repair restores a part to original drawing dimensions, but involves no change of materials and uses a previously-approved repair process, the local Government inspector shall approve such repair. There shall be periodic reviews between the manufacturer and the inspector on the accumulated incidents of machining errors for determination of corrective measures to improve workmanship. The frequency and timing of such meetings shall be as determined by the inspector.

4. QUALITY ASSURANCE PROVISIONS

4.1 Responsiblity for inspection. - Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified, the supplier may utilize his own facilities or any commercial laboratory acceptable to the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2 Quality control requirements. - The supplier shall provide and maintain a quality program acceptable to the Government. The program shall be in accordance with MIL-Q-9858 and shall be described formally in a quality control manual in sufficient depth to assure that technical and quality requirements will be met. The manual shall be submitted to the Government for determination of acceptability. Such determination will not preclude the request of the Government for additions, refinements or changes when evidence indicates the need for such action. Once the manual has been accepted, any subsequent changes shall be submitted to the Government for review. The contractor shall implement, as a minimum, the program described in the quality control manual. Conformance with these requirements shall not be construed as relieving the supplier of final responsibility to furnish equipment meeting specification requirements.

4.3 Material inspection. - Where substitute materials have been approved, inspection requirements of the substitute specification shall apply. Inspection of materials for parts not specified in table I shall be to the company's specification or standard even though identification by government or technical society specification is required (see 3.28.1.7). Any substitution of materials from those called for on drawings requires approval of the local Government inspector who shall refer questionable areas to NAVSEC for resolution.

4.4 Non-destructive inspections. -

4.4.1 Castings. - Castings shall be inspected in accordance with requirements of MIL-STD-278.

4.4.2 Welding, brazing and allied processes. - Examinations and test procedures for welding, brazing and allied processes shall conform to MIL-STD-278.

4.4.3 Piping. - Requirements of the applicable specifications and MIL-STD-278 apply except as follows:

(a) Small sections of low pressure piping (such as gland seal vents, valve stem leakoffs and lube oil) which are to be welded to nipples on turbine casing at assembly do not require hydrostatic tests. Magnetic particle inspection in lieu of radiography of welds is acceptable.

(b) All piping which is furnished in sections which will be fitted and welded to form final assembly by the shipbuilder and which will be hydrostatically tested by the shipbuilder does not require hydrostatic tests by the turbine manufacturer. Drawings shall clearly indicate which piping is to be tested in the field.

4.4.4 Nozzle blocks and diaphragms. - Nozzle blocks and diaphragms fabricated by welding shall be considered class M of MIL-STD-278. All welds shall be inspected by the magnetic particle method or by radiography (at manufacturers option) except that dye penetrant method is acceptable for non-magnetic welds.

4.4.5 Forgings. -

4.4.5.1 Ultrasonic inspection. - Rotors and large forgings shall be subjected to ultrasonic inspection in accordance with procedure of MIL-STD-271. Specific standards of acceptance shall be established by the turbine manufacturer and such standards shall be used during inspection of production rotors.

4.4.5.2 Boroscopic inspection. - If rotors are bored, they shall be examined for material flaws. After examination, bore shall be chemically cleaned, purged with an inert gas and sealed with air-tight plugs.

4.4.5.3 Heat stability test. - Requirements of MIL-S-860 apply for rotors except that the maximum deviation (following the second cold reading) of rotors for submarine applications shall not exceed 0.0005 inch.

4.4.6 Blading. - Each blade shall be inspected in all areas for flaws by either the Zyglo, dye-penetrant, magnetic-particle or fluorescent magnetic particle method. Geometry checks of tenons, vane and roots shall be performed to insure conformity to drawing requirements.

4.4.6.1 After assembly before shrouding. - After assembly of blading in rotor and before shrouding, blades shall be checked to insure that they are installed to drawing requirements.

4.4.6.2 After shrouding. - End gaps between shrouded groups and radial gaps (clearance between shroud and blade measured normal to tenon axis) shall be checked for conformance to drawing requirements. Approval of the manufacturer's engineering department and the Government inspector is required for either acceptance or re-peening of blading where radial gaps are in excess of 0.010 inch for cylindrical shrouds and 0.015 inch for conical (slant) shrouds. If clearances larger than these values are accepted, the maximum value for each stage so effected shall be recorded on the machinery variation summation drawing (see 3.28.2.9). The shroud shall bear against some portion of the vane of every blade being shrouded.

4.4.6.2.1 Acceptance test for tenon peening. - The turbine manufacturer shall prepare and submit for approval a tenon peening procedure. The procedure shall include standards of acceptance including sectioned pieces showing acceptable and non-acceptable peening. Workmen who will do peening shall each be qualified to the procedure by demonstrating that they can produce a minimum of 6 test pieces representative of normal blade/tenon design in accordance with the Standards of acceptance. Once a workman has been qualified, requalification is required only by direction of the Government inspector when there is evidence that the workmans work has been unacceptable.

4.4.6.3 After shop overspeed test. - Results of inspections required by 4.4.6.1 and 4.4.6.2 shall be checked after overspeed test. NAVSEC shall be notified of any indications of distress (deformed shrouds, pulled tenon heads, rubs, and so forth) which require corrective action and approval obtained prior to effecting repair or modifications.

4.4.7 As-shipped clearances. - After completion of all shop tests, complete clearance data shall be taken and recorded on the lifting record form (see 3.28.2.3). One copy each shall be forwarded to NAVSEC, building yard and ships.

4.4.8 Bearings and journals. - After completion of all shop tests, bearings (journal and thrust), thrust collar, thrust shoes, pads, oil deflectors, and journals shall be examined for damage. In the case of turbines for submarines or where special noise requirements have been imposed, journals shall not be reworked for appearance purposes only when it is evident that performance is not effected. Minor scraping of bearings

is also acceptable. During load or overspeed tests, RTE readings shall be recorded for information and for confirmation of proper installation.

4.4.9 Onboard tools. - All special tools which involve critical fits for proper usage shall be demonstrated by actual use on the turbine for which they are intended unless acceptability can be verified by dimensional checks of the applicable parts. Where special tools involve a procedure not previously used, such procedure shall be demonstrated on the first unit of a given design by using the tools provided.

4.4.10 Threaded fasteners and dowels. - All threaded fasteners and dowels shall be visually examined to ensure that required locking devices are properly installed. It shall be verified that steam joint bolting has been tightened to specified values in accordance with approved procedures. The use of helical screw thread inserts in accordance with MS 21208 to compensate for damaged threads is acceptable.

4.4.11 Labyrinth packing. - After completion of all shop tests, diaphragm and gland labyrinth packing rings shall be examined for damage. If damaged, they shall be either repointed or replaced as necessary. If examination of the packing rings during the manufacturing process reveals surface porosity or defects that are not detrimental to the service of the packing, such rings may be accepted on a case basis by the local Government inspector.

4.5 Tests. -

4.5.1 Hydrostatic tests. - Hydrostatic tests shall be performed as specified in 4.5.1.1 and 4.5.1.2.

NOTE: For pressure vessels which are so designed and supported that they cannot be safely filled with water, a pneumatic test may, subject to the approval of NAVSEC, be substituted, such tests and test procedures to conform to the requirements of section VIII of ASME Boiler and Pressure Vessel Code.

4.5.1.1 Casings. - All crossover pipes, moisture separators, strainer bodies, valves, steam chests and casings, including all fittings and connections subject to pressure, when furnished with the turbines, shall, unless otherwise specified in the contract or order, be tested hydrostatically to the following requirement. and drawings shall clearly indicate test zones and pressures. Pressure shall be determined as follows:

$$P_t = 1.5 \times P_o \times \frac{S_t}{S_o}$$

Where:

$P_t$ = Hydrostatic test pressure (never less than 30 psig nor more than that necessary to produce the minimum yield of the material).

$S_t$ = Allowable stress under test conditions based on ASME boiler code for material used (see section VIII of ASME Boiler and Pressure Vessel Code).

$S_o$ = Allowable stress at operating temperature based on ASME boiler code for material used (see section VIII of ASME Boiler and Pressure Vessel Code).

$P_o$ = Maximum operating pressure (setting of lowest steam generator safety-valve to be used for steam chests, excluding nozzle bowls).

4.5.1.2 Expansion joints. - Hydrostatic tests of expansion joints used in crossover pipes or terminal connections shall be conducted at a minimum of 1.25 times the maximum working pressure with equalizing rings or other devices used to prevent excessive movement.

4.5.2 Steam valve leakage test. - All nozzle control valves, by-pass valves, astern valves and other valves furnished with the turbine shall be subjected to a shop test to demonstrate steam tightness. Nozzle control valves and by-pass valves, if applicable, shall be tested in the steam chest. Test shall be conducted using steam at maximum design pressure and temperature (or maximum available in shop if less than design values and so approved by NAVSEC). Maximum leakage rate, as determined by measuring condensate from each valve shall not exceed 3 inch$^3$ per hour for each poppet type valve and shall not exceed 2.5 in.$^3$ per hour per inch diameter for check valves. Where there are two poppet type valves on the same seat (piggy back design), maximum leakage rate shall not exceed 5 inch$^3$ per hour. During this test, the valve chest cover shall also be checked to ensure that there is no leakage. Other types of leakage test will be considered but NAVSEC approval is required.

4.5.3 Casing deflection test. - When specified in contract, a deflection test of fabricated casings shall be conducted to demonstrate, insofar as practicable, that internal clearances are adequate to accommodate the deformations which occur under the pressure and temperature which will exist under the most severe operating conditions which can be simulated in shop. This test will be required only on the first unit of a given design. Test shall include instrumentation to indicate absolute movement of the thrust bearing housing and the casing surfaces from which nozzle blocks, gland and dummy packing, and oil seals derive support when the variations in pressure and temperature occur. The turbine manufacturer shall evaluate the data and submit it to NAVSEC for approval.

4.5.4 Overspeed test. - Each turbine shall be subjected to an overspeed test to check the strength and rigidity of all parts of the completed assembly and adequacy of internal clearances. Test shall be conducted for a minimum of 15 minutes at a speed 20 percent greater than nominal design full power rpm (see 3.12.2).

4.5.5 Check of overspeed mechanisms. - During the overspeed test, speed limiter and overspeed trip settings shall be checked at actuating speeds. Trip shall be checked 3 times and tripping speed shall be repeatable within plus or minus 2 percent.

4.5.6 Vibration test. - Vibration amplitudes at rotational frequency shall be recorded during the overspeed test at selected speeds up to the maximum rpm specified for full power (see 3.12.2). Speeds at which readings are to be taken shall include the rpm corresponding to specified endurance power, rpm at which running critical occurs and other rpms sufficient to obtain a descriptive curve of the vibration levels over the operating range. Maximum acceptable amplitudes, as measured on each bearing cap in the vertical direction, are shown on figure 3. If shaft motions are measured directly by probes on journal or other means, data shall be included in report of vibration results to be submitted to NAVSEC for information.

4.5.7 Performance test. -

4.5.7.1 By manufacturer. - When specified in the contract, the manufacturer shall conduct a performance test in accordance with NAVSEC approved agenda (typical agenda is shown on figure 9). Post maneuvering steam rates shall be used in determination of conformance to contract requirements.

4.5.7.2 By government. -

4.5.7.2.1 Units to be tested. - When turbines furnished are of type or a design whose performance has not been satisfactorily demonstrated, the NAVSEC reserves the right to divert the turbines (also gear and condenser) of the first propulsion plant delivered (starboard hand; unless otherwise specified) to a Government facility for a special performance test. In cases where doubt exists as to whether or not the turbine type or design being furnished has satisfactorily performed in service or on test, NAVSEC will be the sole judge, and its decision shall govern. NAVSEC will advise all parties concerned as early as practicable whether or not the option for test will be exercised.

4.5.7.2.2 Duration of test. - Test will not exceed 4 months, including erection, tear down and shipment.

4.5.7.2.3 Agenda. - Agenda for any tests authorized will be developed with the vendor, laboratory and NAVSEC.

4.5.7.2.4 Contractor's representatives during test. - Any expense incurred during test, or as a result of test, over and above the cost of test agenda approved and authorized by NAVSEC shall be borne by the contractor. The expenses of the contractor's representatives participating in or witnessing such test shall be borne by the contractor.

4.5.8 Lifting gear. - Lifting gear for each propulsion unit shall be fitted and demonstrated by the turbine manufacturer before delivery to the ship. Inclining of machinery to obtain list or trim effects is not required.

4.5.9 Handwheel torques. - When specified in contract, a test shall be conducted on the first propulsion unit to be delivered to demonstrate that operating torques at connection to shipbuilder system are within specification limits. Test shall be conducted using either actual or simulated steam loading. A torque characteristic curve under these conditions in both opening and closing directions shall be determined and forwarded for NAVSEC approval. Method of conducting test shall also be submitted for NAVSEC approval.

4.5.10 Blade vibration test. - When specified in contact, a blade vibration test shall be conducted to determine frequencies and stresses of one selected stage. Stage to be tested shall be as approved by NAVSEC and will be chosen considering calculated stresses, type of vibration mode, size, and similarity to other stages or designs. Test shall be conducted using either the actual turbine or a special test vehicle. Test agenda and instrumentation used shall be as approved by NAVSEC.

4.5.11 Differential expansion. - During the sea trials (preliminary acceptance or builders trials) of the first of a given design, the turbine manufacturer shall make provision for and shall obtain data on the relative position of rotor to casing of one L.P. turbine.

4.6 Shipboard tests (by shipbuilder). -

4.6.1 Lifting gear. - Lifting and handling gear shall be fitted to the turbines in the first ship of a machinery class at each building yard. Unbolting the horizontal joint flange is not required for this demonstration.

4.6.2 Singled-up test. - Special piping, blank flanges, valves, desuperheaters, orifices and such other fittings that are required for H.P. and L.P. turbine emergency singled-up operation shall be assembled and bolted in place on each ship. Operating test is required as follows for the first ship of each turbine design.

(a) H.P. turbine (dockside). - L.P. turbine shall be disconnected from the reduction gear and H.P. turbine operated for 1 hour at dockside at the highest practicable power.
(b) L.P. turbine (at-sea). - With H.P. turbine disconnected, the L.P. turbine shall be operated at sea for 2 hours at the power corresponding to the normal full power torque developed by the L.P. turbine. Immediately after this operation, the turbine shall be crashed astern, operated at full astern for 30 minutes and then crash ahead to the previously established maximum power and operate at that power for 15 minutes.

4.6.3 Vibration analysis. - During at-sea trials vertical vibration measurements shall be taken at each bearing cap. At approximately 5 knot intervals at 10 knots and above, readings shall be obtained at steady-state (15 minutes or more) ahead and astern operation and a curve of vibration amplitude (at turbine rotational frequency) versus shaft rpm for each bearing cap shall be plotted and forwarded to NAVSEC (3 copies) and the ship. At least three sets of readings shall be taken at each rpm to ensure that steady state vibration levels have been reached.

4.6.4 Performance trials. - The ability of the turbines to meet specified performance will be evaluated during at-sea trials of the ship and will normally include the following:

(a) 4 hours at F.P. ahead operation.
(b) A maximum of 1 hour at steady state astern speed or power whichever occurs first. For submarines and repeat designs, test will be 1/2 hour duration. Steady state astern may also be limited to the maximum rpm permitted by controllability of ship or rudder.
(c) Quick reversals from F.P. ahead to full astern and from full astern to F.P. ahead.
(d) Operation at partial loads including cruising power for sufficient time to check heat balance.
(e) Locked-shaft test.
(f) Trailing-shaft test.

5. PREPARATION FOR DELIVERY

5.1 Turbines, repair parts and tools. - Turbines, repair parts and tools shall be cleaned, preserved, packaged, packed and marked in accordance with MIL-P-17286, except that Tectyl 511M or equivalent shall be used to preserve the steam sides of the turbines. All turbines shipped to the ship-builder shall have the steam side preservation identified by a tag or stenciled note, such as "STEAM SIDE PRESERVED WITH (Commercial name)" on the turbine or shipping container.

5.2 Manuals. - Manuals shall be packed level C in accordance with MIL-M-15071.

5.3 Drawings. - Drawings shall be folded, packaged, packed and marked in accordance with MIL-D-963.

5.4 Microfilm. - Microfilm shall be packaged, packed and marked in accordance with MIL-M-9868.

6. NOTES

6.1 Intended use. - This equipment is intended for Naval service in ships and fleet auxiliaries, where it is expected to withstand continuous use for long periods, under Military service conditions, without benefit of overhaul. The equipment is vital; failure at a critical moment will immobilize a ship and jeopardize fleet operations. Emergency repairs afloat or at distant bases, can seldom be made with sufficient celerity to avoid serious interruption of ship and fleet operating schedules.

6.2 Ordering data. -

6.2.1 Specific application. - Since this specification is general in scope, the details listed in 6.2.2 should be specified in the contract or order. (It is not necessary to delete inapplicable portions of the basic specification.)

6.2.2 Detail requirements. -

(a) Title, number and date of this specification.
(b) Type and class of propulsion unit required (see 1.2). Specify flow arrangement, valve sequencing (if restricted for type III, see 3.5.5.5) and type of moisture separator as applicable.
(c) Materials, if other than specified in 3.4.
(d) Life if other than specified in 3.3.6.
(e) Arrangement of propulsion unit (provide applicable contract and guidance drawings) including:

  (1) Number of shafts per ship.
  (2) Detail arrangement of each propulsion unit if different from each other.
  (3) Type of reduction gear.
  (4) Type of coupling and clutch (if used).
  (5) If turbines are to be resiliently mounted and, if so, state type of mount that will be used and the location and limiting temperatures of non-metallic flexible connections to be used in shipbuilder systems.
  (6) Rake of each propulsion unit.
  (7) Space and arrangement limitations.
  (8) Associated systems as related to turbines.

(f) Type of condenser (fore-and-aft or athwartship) and method of supporting L. P. or single casing turbines (see 3.5 and 3.5.7). If condenser serves units other than propulsion turbines, so state and identify.
(g) Weight target or limitations. (See 3.3.7) (Break down by components).
(h) Shock requirements. (See 3.13).
(i) Extraction, induction or reheat points if any. (See 3.3.8).
(j) Speed, power, inlet steam conditions, condenser back-pressure, extraction pressure and flow, and required steam rates shall be specified by completing table IX and notes thereto. Identify endurance power. (See 3.12.2, 3.12.3, 3.12.4.1 and 3.12.9).

Table IX - Ordering data

| Column | (1) | (2) | (3) | (4) | (5) | (6) | (7) | | (8) |
|---|---|---|---|---|---|---|---|---|---|
| Ship speed (Knots) | Propeller shaft speed (prpm) | Propeller shaft power (SHP) | Steam at turbine inlet | | Condenser back-pressure "Hg Abs | Steam rate (#/SHP-Hr) | Extraction flow | | Remarks (if any) |
| | | | Press. (Psig) | Temp. (°F) | | Non-Extr. | #/Hr | Press. (Psig) | |
| 10 | | | | | | | | | |
| 15 | | | | | | | | | |
| 20 | | | | | | | | | |
| 25 | | | | | | | | | |
| 30 | | | | | | | | | |
| FP ahead | | | | | | | | | |
| FP astern | | | | | | | | | |

Notes to table IX:

1. Astern torque and flow. - Specify the minimum astern torque at propeller rpm and corresponding maximum allowable steam flow (see 3.12.4.1).
2. Locked-shaft condition. - Specify estimated rpm for driving shaft(s) (see 3.12.8).
3. Trailing-shaft operation. - Specify, if different from 3.12.7.
4. Exhaust pressure variation. - Specify expected variation in exhaust pressure (see 3.12.9.3).
5. Safety valve setting. - Specify lowest steam generator safety valve setting (see 4.5.1.1.).

(k) As applicable, specify main and standby sources and pressures available for lubrication system (see 3.8) and control oil (see 3.10.9.1).

(l) Specify onboard tools and repair parts with changes, (if any) to tables V and VI (see 3.26 and 3.27 respectively).

(m) Specify the following for technical manuals:

(1) Responsibility of turbine manufacturer for technical manual if other than that set forth in 3.29.4.
(2) Quantity of preliminary and of final technical manuals.
(3) Distribution.

(n) Specify the following if required for drawings and microfilm:

(1) Additional sets of card-mounted microfilm, and reels.
(2) Number of copies of drawings and to whom submitted.

(o) Any other items to be furnished with turbines in addition to those listed in 3.2.2.1.

(p) Specify type of gland seal regulating and control system if different from 3.9.1.

(q) Specify waivers, revisions and additional requirements including the following areas if applicable.

(1) Special control requirements (see 3.19).
(2) Provision for overspeed protection if other than in 3.10.9.
(3) Airborne and structureborne noise levels (see 3.14.8).
(4) Special reports in addition to those required in 3.31.
(5) Regulation for turbine-generator units (see 3.10.10).
(6) Any necessary information, such as intended use of ship that may be of significance to design.
(7) Pitch and roll time cycle (if required) (see table III).

(r) Specify whether or not the following tests are required and, if so, specify responsibilities, agenda, and so forth.

(1) Performance test by manufacturer (see 4.5.7.1).
(2) Performance test by Government laboratory (see 4.5.7.2).
(3) Casing deflection test (see 4.5.3).
(4) Blade vibration test (see 4.5.10).
(5) Handwheel torque test (see 4.5.9).

(s) Designate design approval activity if other than NAVSEC (see 3.28.3.4).

(t) Specify levels for preparation for shipment (see section 5).

(u) Specify engineering sources required to be furnished (see 3.2.3).

(v) Specify any special considerations that will influence award if different than that specify in 6.4.

6.3 Information required with proposal or bid. -

6.3.1 Quantity of bids or proposals. -

(a) For NAVSHIPS and NAVSEC Procurements. - Five complete copies of bid shall be submitted, unless otherwise stated in ordering data.

6.3.2 Data table. - The bid or proposal shall include a completed data table. Data table shall be as shown in table X herein. Where data is estimated, so state.

6.3.3 Drawings. - The bid or proposal shall include an outline drawing with dimensions and preliminary turbine longitudinal sectional assembly drawings with materials for principal parts. Drawings shall be to scale.

6.3.4 Other data and statements. - The bid or proposal shall include curves, tabulations, sketches, diagrams, statements and such other data as is indicated in column 5 of table VIII.

6.3.5 List of items to be furnished. - A list of items being furnished is not required if in accordance with the specifications; however, if such a list is included in the proposal or bid, it is mandatory that each item listed be identified with the applicable part of 3.2.2.1 and 6.2.2(q).

6.3.6 Repair parts interchangeability. - The bid or proposal shall contain a statement as to interchangeability of stock repair parts with other parts either in Naval Service or on order.

6.3.7 Exceptions to proposal. - The turbine manufacturer may, for reasons set forth in 3.3.7 either submit a non-conforming bid with exceptions listed, or he may submit a conforming bid and an alternate bid with his exceptions and recommended substitutions contained in the alternate bid.

6.4 Basis of award. - Award will normally be based on the minimum cost for a bid or proposal which meets the specifications; however, special considerations such as performance, improved overall total cost (considering stock repair parts, reliability and previous tests that have been conducted) may be used when so specified (see 6.2.2(v)).

6.5 CHANGES FROM PREVIOUS ISSUE. THE EXTENT OF CHANGES (DELETIONS, ADDITIONS, ETC.) PRECLUDE THE ANNOTATION OF THE INDIVIDUAL CHANGES FROM THE PREVIOUS ISSUE OF THIS DOCUMENT.

Preparing activity:
Navy - SH
(Project 2825-N045Sh)

Table X - Bid data

| Ship(s) | Mfgr | Contract NObs.____ PR Nr.____ | Mfgr. Reqn. or Order Nr. ____ | Turbine Type ____ Service Class ____ | Cost/Shaft $____ | LBS/SHP ____ LBS. | Date |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Unit | | Nr of Valves | | | Stages | | | Critical Speeds (Turbine RPM) | | Weight (lb) | | Overall Dimensions | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Turb. or Elem. | Type | Noz. | By-pass | Extr. | Nr. Stgs | SF. DF | Type (Curtis, Rat., Reaction) | Rigid Brg | Running | Access. Total | | Length (in) | Width (in) | Height (in) |
| CR. Turb. | IV | | | | | | | | | | | | | |
| H. P. Turb. | II, IV | | | | | | | | | | | | | |
| H. P. Elem. | III | | | | | | | | | | | | | |
| I. P. Elem. | III | | | | | | | | | | | | | |
| HP-IP Turb. | III | | | | | | | | | | | | | |
| Single-Cas. | I | | | | | | | | | | | | | |
| L. P. | II-IV | | | | | | | | | | | | | |
| Ast. Elem. | All | | | | | | | | | | | | | |
| Moist. Sep. | II-IV | | | | | | | | | | | | | |

| Item | Speed | 10 Knots | 15 Knots | 20 Knots | 25 Knots | 30 Knots | F. P. Ahead | F. P. Astern |
|---|---|---|---|---|---|---|---|---|
| Propeller | RPM | | | | | | | |
| | SHP | | | | | | | |
| CR. Turb. 1/ | RPM | | | | | | | |
| | SHP | | | | | | | |
| Single-Cas. Turb. 1/ | RPM | | | | | | | |
| | SHP | | | | | | | |
| HP Turb. 1/ | RPM | | | | | | | |
| | SHP | | | | | | | |
| HP-IP Turb. 1/ | RPM | | | | | | | |
| | SHP | | | | | | | |
| LP Turb. 1/ | RPM | | | | | | | |
| | SHP | | | | | | | |
| Ast. Element | RPM | | | | | | | |
| | SHP | | | | | | | |
| Inlet Steam | Press (psig) | | | | | | | |
| | Temp (°F) | | | | | | | |
| Condenser | "HgAbs | | | | | | | |
| Flange | Enthalpy (H) | | | | | | | |
| Steam Rate 1/ | LB/SHP-HR | | | | | | | |
| Steam Rate 2/ | LB/SHP-HR | | | | | | | |
| Eff. 3/ | Engine | | | | | | | |
| Eff. 4/ | Mech. | | | | | | | |

1/ Non-extraction 2/ Steam flow with specified extraction or induction
3/ Theor. SR/Expect. SR. 4/ 100 - Mech Losses* / SHP + Mech Losses' * incl. gear, brg & windgage

| Bearings (Journal & Thrust) @ F. P. | | | | | | |
|---|---|---|---|---|---|---|
| Locat. | Unit | Type | Brg Size (inches) | Span (inches) | Load (PSI) | Rub. Speed Ft/sec. |
| Fwd | | | | | | |
| Aft | | | | | | |
| Thr | | | | | | |
| Fwd | | | | | | |
| Aft | | | | | | |
| Thr | | | | | | |
| Fwd | | | | | | |
| Aft | | | | | | |
| Thr | | | | | | |

PERFORMANCE CURVES AND DATA SHEETS

| Mfgr Nr. | Category | Title |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

C03393

| ITEM | ACTION | FREQUENCY |
|---|---|---|
| 1. Bearings, journal | (a) Check for wear using depth micrometer. | Quarterly |
| | (b) Disassemble for inspection and take crown-thickness measurement. | At each regular overhaul |
| 2. Bearing oil seals | Inspect general condition and check clearance | When bearing is disassembled |
| 3. Bearings, thrust | (a) Verify clearance. | Semi-annually |
| | (b) Disassemble; assure collar is secured properly; measure shoe thickness. | At each regular overhaul. |
| 4. Gland packing (removable w/o lifting casing) | Remove; inspect rotor glands and check clearance. | At each regular overhaul |
| 5. Nozzle clearances | Take taper gage reading. | Annually |
| 6. Overspeed limiter and trip | (a) Check operation. | Minimum of quarterly |
| | (b) Confirm setting. | Annually |
| 7. Turbine internals | Inspect casing and blading that can be sighted for corrosion, erosion, or failures by entering exhaust casing manhole or sighting through inspection openings. Visually examine exhaust casing tie webs and struts for cracked welds. | Annually |
| 8. Turbine rotor | (a) Verify correct axial position by taking total float or other means (see technical manual) | At each overhaul |
| | (b) Inspect accessible balance weights for tightness. | At each regular overhaul |
| 9. Valves; by pass, transfer, extraction and drain | Remove valve bonnet, inspect seat and disc to insure that valve closes tightly. If practicable, tightness may be checked by pressure test. | At each regular overhaul |
| 10. Valves, (nozzle control) | Disassemble for examination of disc, seat, and operating mechanisms. | At each regular overhaul |
| 11. Valve control mechanisms | Insure proper lubrication | Weekly |

Figure 1 - Scheduled maintenance

C03394

Case MDL No. 875 Document 10106-1 Filed 07/26/16 Page 138 of 257

MIL-T-17600C(SHIPS)

72

HIGH IMPACT SHOCK DESIGN NUMBERS.

NOTES:

1. THE MACHINERY HOLD DOWN BOLTS, FEET, STRUCTURAL MEMBERS AND SUB-BASE OF THE MACHINERY SHALL BE DESIGNED TO WITHSTAND A LOAD (EQUAL TO THE WEIGHT OF THE UNIT MULTIPLIED BY ITS CORRESPONDING SHOCK DESIGN NUMBER FOR EACH OF THE THREE PRINCIPAL DIRECTIONS) APPLIED AT THE CENTER-OF-GRAVITY OF THE UNIT. EACH OF THE THREE PRINCIPAL DIRECTIONS OF LOADING SHALL BE CONSIDERED SEPARATELY. THE CALCULATED STRESSES FOR ANY DIRECTION OF LOADING SHALL NOT BE COMBINED WITH THE STRESSES FOR THE OTHER DIRECTIONS OF LOADING NOR WITH THE NORMAL OPERATING STRESSES.

2. THE SHOCK DESIGN NUMBER TO BE USED FOR THE INDIVIDUAL UNITS OF MACHINERY OR EQUIPMENT OF AN ASSEMBLY MOUNTED ON A COMMON SUB-BASE SHALL BE DETERMINED BY THE TOTAL WEIGHT OF THE ASSEMBLY AND APPLIED AS STATED IN NOTE 1.

3. THE ALLOWABLE STRESS SHALL BE THE STATIC YIELD STRENGTH OF THE MATERIAL.

SHOCK DESIGN NUMBER
140
130
120
110
100
90
80
70
60
50
40
30
20
10
0
—KEY—
A —— VERTICAL FOR ALL SHIPS & ATHWARTSHIPS FOR SUBMARINES
B - - - ATHWARTSHIPS FOR SURFACE SHIPS
C —-— FORE & AFT FOR ALL SHIPS
A
B
C
15
9
6
10
100
1,000
10,000
100,000
WEIGHT IN POUNDS

Figure 2 - High impact shock design

C03395

VERTICAL–DISPLACEMENT–AMPLITUDE PEAK TO PEAK

5.0
4.0
3.0
2.0
1.0
.7
.6
.5
.4
.3
.2
.01

"Z"
"Y"
"X"

CURVE "X"= VIBRATION LIMITS–NO LOAD SHOP TEST
CURVE "Y"= VIBRATION LIMITS–PAT AND FAT
CURVE "Z"= MAXIMUM VIBRATION LEVELS–OPERATING SHIPS–CORRECTIVE ACTION NORMALLY REQUIRED.

1000 2 3 4 5 6 7 8 9 10,000

RPM

Figure 3 - Propulsion turbine vibration limits - bearing cap

Case MDL No. 875 Document 10106-1 Filed 07/26/16 Page 140 of 257

MIL-T-17600C(SHIPS)

OVER TINNING
OR PLATING
A
18"
.0625 MAX.
1/8 MAX
.272
.278
.1875 MAX.
1/8
TIN OR GOLD PLATE
TIP AND O. D.
(A)
TYPE*
DIMENSION A
1C/1
.250 +0 -.005
1C/2
.375 +0 -.005
*SEE MIL-T-22051
RESISTANCE THERMOMETER PRIMARY ELEMENT
1/32 X 1/32 CHAMFER IN STEEL PLUS
45° CHAMFER IN BABBITT LAYER.
BABBITT LAYER
.275
.281
B
TYPE
DIMENSION B
1C/1
A + 1/16 = 5/16
1C/2
A + 1/16 = 7/16
BREAK
CORNER
CHAMFER
CORNER
(B)
.1875 (3/16" DRILL)
GROOVE FOR LEAD WIRES 1/8" X 3/16"
PUDDLE BABBITT OVER
ELEMENT AND BLEND
SURFACE
1/16
RETAIN LEAD WIRES IN
GROOVE WITH A POTTING
COMPOUND
(C)
FUSION ZONE

Figure 4 - Typical RTE installation in a bearing.

74

C03397

Case MDL No. 875 Document 10106-1 Filed 07/26/16 Page 141 of 257

MIL-T-17600C(SHIPS)

PARTING LINE
ARRANGEMENT "A"
PROVIDE RECESS OR HOLE WITH +.005 -.000 TOLERANCE OVER CONNECTION BLOCK DIMENSIONS.
CASING HOUSING
EXTERNAL WIRING
STRANDED INTERNAL WIRING (WITH TEFLON SLEEVES)
PARTING LINE
"AN" CONNECTOR
HP. FWD.
HP. AFT
HP. THR.
RTE LEAD WIRES
ARMORED CABLE TO MONITOR
TERMINAL BLOCK
ARRANGEMENT "B"

Figure 5 - Suggested RTE installation arrangements in journal bearings

75

C03398

Case MDL No. 875 Document 10106-1 Filed 07/26/16 Page 142 of 257

MIL-T-17600C(SHIPS)

4 RECESSES FOR STAKING OF BEARING BLOCK
WEBBING .078 WIDE, FULL HEIGHT
5/64
1/4
.620 O.D. MAX.
CAPTIVATED SOLDER TERMINALS (BRASS TINNED)
CONNECTION BLOCK (TEFLON) (See Note)
INSULATING PLATE (MICA)
1.000 O.D. MAX.
BRASS SOLDERING CUP (PRETINNED OR SILVER (OR GOLD) PLATED) (See Note)
.187 MAX.
RECESSED MICA DISC
MOLDED FIBERGLASS OR GLASS-FILLED TEFLON RESIN INSULATING BODY.
(2) #5-40 MTG SCREWS WITH LOCK PLATE
.218
.500
.687

Figure 6 - RTE connection blocks.

76

C03399

ARRANGEMENT "A"
DRILL 5/8"D X 3/16" DEEP HOLE FOR CONNECTION BLOCK
METAL PEENED OVER IN EACH QUADRANT

NOTES
1. RTE INSERTED FROM BABBITTED FACE OF SHOE (FIG. 4(C)).
2. CONNECTION BLOCK INSERTED FROM BACK OF SHOE WITH CIRCUMFERENCE TANGENT TO RTE LEAD-WIRE HOLE.
3. BACK OF SHOE GROOVED (FIG 4(B)) BETWEEN CONNECTION BLOCK AND EDGE OF SHOE AT PIVOT LINE.

ARRANGEMENT "B"
DRILL 5/8"D X 3/16" DEEP HOLE FOR CONNECTION BLOCK.
METAL PEENED OVER IN EACH QUADRANT

NOTES
1. RTE INSERTED FROM BABBITTED FACE OF SHOE (FIG. 4(C)).
2. CONNECTION BLOCK INSERTED RADIALLY INTO EDGE OF SHOE.
3. RTE LEAD WIRES SHALL BE RUN TO CONNECTION BLOCK THROUGH A DRILLED PASSAGEWAY OR GROOVES ON BACK OR EDGE (OR COMBINATION OF SAME).

Figure 7 - Suggested RTE installation in thrust bearing

C03400

| Vane width "W" | Min. value of "T" | Min. value of "A" | Radius "B" |
|---|---|---|---|
| Less than 3/4 | 0.012 | 0.006 | |
| 3/4 to 1 incl. | .015 | .0075 | See note 2 |
| Above 1 | .020 | .010 | |

NOTES: 1: Inner and outer surface of diaphragm and nozzle partition shall not be parallel at any point.
2: Radius "B" is not specified quantitatively, but this area shall be polished smooth. A definite break between planes will not be acceptable.

Figure 8 - Vane metal section (blading and partitions).

1. Performance. - Determine steam rate at each valve point, specified endurance power, full power and at ± 5 percent of endurance power. Rerun full power and endurance points after maneuvering and other tests.

2. Maneuvering:
   (a) Determine minimum warm-up time (corresponding to dockside conditions) which will permit unlimited operation of the unit at any power, including F.P. ahead and full astern.
   (b) Conduct crash reversals from ahead full power steady state conditions to full astern steady state and back to full power steady state. (Steady state conditions defined as stabilized temperature less than 5°F change in the turbine.)
   (c) Conduct 24 hour maneuvering test accelerating and decelerating ahead and astern at various power levels.

3. Astern Operation:
   (a) Determine steam rate at astern steady state condition.
   (b) Determine maximum torque capability under specified crash astern conditions.
   (c) Operate astern at specified steady state astern condition until temperatures stabilize in ahead elements.
   (d) Demonstrate 5 minute operation at maximum astern rpm.

4. Vibration. - Determine vibration levels at each brg. cap. (3 directions) during steady state conditions at performance check points.

5. Trailing shaft. - Determine maximum speed at which turbine can be trailed with varying degree of vacuum and at atmospheric condition.

6. Single-turbine operation. - Demonstrate operation of the turbines under singled-up condition. Determine limiting parameters of speed and pressure.

7. Bearings. - Measure temperatures by RTE's in journal and thrust bearings during all tests. Investigate minimum acceptable oil pressures for satisfactory operation. Measure quantity of oil to each bearing inlet. Determine effects of varying inlet oil temperature at 90°, 110°, 120° and 130°F.

8. Vacuum variations. - Determine limiting conditions under less than design vacuum.

Figure 9 - Typical agenda-propulsion turbine tests.

Case MDL No. 875 Document 10106-1 Filed 07/26/16 Page 146 of 257

MIL-T-17600C(SHIPS)

FIG (c) - CORRECTION FOR RPM
FIG (d) - CORRECTION FOR VACUUM
B.P. - IN. HG. ABS.
FIG (a) - CORRECTION FOR TEMPERATURE
TEMP °F
FIG (b) - CORRECTION FOR PRESSURE
INLET PRESS, PSIG

Figure 10 - Correction factors at constant valve settings (non-extraction operation)

80

C03403

INDEX

| | Paragraph number | Page number |
|---|---|---|
| Accessibility | 3.3.3 | 6 |
| Agenda for performance test | 4.5.7.1 and figure 9 | 65 |
| Ahead operation | 3.12.1 and 3.12.2 | 27 |
| Aperture cards (microfilm) | 3.28.5.2 | 51 |
| Applicable documents | 2. | 1 |
| Approval procedures: | | |
| Design | 3.28.4 | 50 |
| Drawings | 3.28.3 | 49 |
| Non-specified materials | 3.4.2.2 | 17 |
| Substitute materials | 3.4.2.1 | 16 |
| Technical manual | 3.29.4 | 55 |
| Variations | 3.32.4 | 61 |
| Arrangement | 3.5 | 17 |
| Assembly drawing | 3.28.2.2 | 47 |
| Astern element | 3.5.6 | 18 |
| Astern operation | 3.12.4 | 27 |
| Astern valve | 3.11.8 | 27 |
| Babbitting | 3.22.2.11 | 37 |
| Balance weights | 3.14.4.3 | 29 |
| Balancing: | 3.14 | 29 |
| Shop | 3.14.2 | 29 |
| Infield | 3.14.4 | 29 |
| Bar lift (control valves) | 3.11.7.5.1 | 26 |
| Bearing housings | 3.20.5 | 33 |
| Bearing (journal and thrust) | 3.22 | 36 |
| Bearing temperature limits | 3.8.8, 3.8.9 and 3.8.10 | 21 and 22 |
| Bid data | 6.3 | 68 |
| Blade thrown-out ring | 3.20.18 | 35 |
| Blade vibration test | 4.5.10 | 66 |
| Blading | 3.24 | 41 |
| Body-bound bolts | 3.19.3.4 | 32 |
| Bolt heaters | 3.19.3.9 | 32 |
| Bolting (requirements) | 3.19 | 31 |
| Bolting for exhaust flange | 3.20.9.3 | 34 |
| Bolting for foundations | 3.5.7.6 | 21 |
| Boroscopic inspection (rotors) | 4.4.5.2 | 63 |
| By-pass turbine: | | |
| External by-pass | 3.5.5.3 | 63 |
| Internal by-pass | 3.5.5.4 | 63 |
| Calking | 3.25.7.4 | 44 |
| Casing deflection test | 4.5.3 | 65 |
| Casing lifting | 3.20.10 | 34 |
| Casings | 3.20 | 33 |
| Cast iron | 3.4.1 | 16 |
| Chest, steam | 3.20.2 | 33 |
| Chocks | 3.5.7.5 | 19 |
| Class of threads | 3.19.2 | 31 |
| Class of turbines | 1.2 | 1 |
| Clearance drawings | 3.28.2.3 | 52 |
| Clearances | 3.16 | 30 |
| Compounds for making-up steam joints | 3.20.4.4 | 33 |
| Condenser supports | 3.5.7.3 | 19 |
| Conferences (design) | 3.28.4.1 and 3.28.4.2 | 50 and 51 |

INDEX, cont'd

| | Paragraph number | Page number |
|---|---|---|
| Control oil | 3.10.9.1 | 24 |
| Control system | 3.10 | 22 |
| Control system design details | 3.10.8 | 24 |
| Control valves | 3.11.7 | 26 |
| Correction planes for infield balancing | 3.14.4.1 | 29 |
| Cost | 3.3.4 | 7 |
| Coupling flange | 3.5.4 and 3.23.4 | 18 and 40 |
| Critical speeds | 3.23.8 | 40 |
| Cross-over pipe | 3.11.3 | 26 |
| Crown thickness measurements | 3.22.2.14 | 37 |
| Cruising power (definition) | 3.1.9 | 5 |
| Cruising turbine | 3.5.5.6 | 18 |
| Crush pins (diaphragms) | 3.25.1 and 3.27.2 | 43 and 45 |
| Data, bid | 6.3.2 | 68 |
| Data, technical | 3.30 | 55 |
| Definitions | 3.1 | 4 |
| Deflectors: | | |
| Oil | 3.22.6 | 40 |
| Steam | 3.20.15 | 35 |
| Depth micrometer | 3.22.2.12 | 37 |
| Design: | | |
| Approval | 3.28.4 | 50 |
| Approval activity | 3.28.3.2 | 50 |
| Release conference | 3.28.4.1 | 50 |
| Review conferences | 3.28.4.2 | 51 |
| Detail requirements | 6.2 | 67 |
| Diaphragm removal | 3.20.10.2 | 34 |
| Diaphragms | 3.25 | 43 |
| Differential expansion | 4.5.11 | 66 |
| Dowels | 3.19.5 | 32 |
| Drainage | 3.20.13 | 35 |
| Drawing approval | 3.28.3 | 49 |
| Drawings | 3.28 | 46 |
| Clearance | 3.28.2.3 | 47 |
| Gland seal | 3.28.2.4 | 48 |
| Instrumentation | 3.28.2.7 | 49 |
| List | 3.28.2.8 | 49 |
| Lube oil | 3.28.2.5 | 49 |
| Outline | 3.28.2.1 | 47 |
| Sectional assembly | 3.28.2.2 | 47 |
| Valve control | 3.28.2.6 | 49 |
| Ductile iron | 3.4.1 | 7 |
| Dummy packing | 3.21 | 35 |
| Dynamic analysis (shock) | 3.13 | 29 |
| Electric drive (control system) | 3.10.10 | 25 |
| Endurance power (definition) | 3.1.9 | 5 |
| Engineering services | 3.2.3 | 5 |
| Equipment required | 3.2 | 5 |
| Equipment variations | 3.32 | 60 |
| Erosion shields (blades) | 3.24.6 | 41 |
| Exceptions: | | |
| To proposal | 6.3.7 | 69 |
| To specifications | 3.3.9 | 7 |
| Exhaust flange | 3.20.9 | 33 |
| Expansion joints (cross-over pipe) | 3.11.3 | 26 |
| Extraction | 3.3.8 | 7 |

INDEX, cont'd

| | Paragraph Number | Page Number |
|---|---|---|
| Fitted bolts | 3.19.3.4 | 32 |
| Flanged connections (piping) | 3.11.2.2 | 26 |
| Forgings (inspection) | 4.4.5 | 63 |
| Foundation bolting | 3.5.7.6 | 19 |
| Foundations and supports | 3.5.7 | 19 |
| Full power (ahead) | 3.12.1 | 27 |
| Full power (astern) | 3.12.4.2 | 27 |
| Gages (pressure) | 3.7 | 19 |
| Girders (support) | 3.5.7.1 | 19 |
| Gland packing | 3.21 | 35 |
| Gland seal and vent systems | 3.9 | 22 |
| Gland seal regulators | 3.9.1 | 22 |
| Gland seal vent and drain diagram | 3.28.2.4 | 48 |
| Government inspector (definition) | 3.1.10 | 5 |
| Grease fittings | 3.8.11 | 22 |
| Handwheel: | | |
| Ahead | 3.10.5 | 23 |
| Astern | 3.10.6 | 23 |
| Requirements | 3.10.4 | 23 |
| Torque test | 4.5.9 | 65 |
| Heat shields | 3.20.16 | 35 |
| Heat stability test (rotor) | 4.4.5.3 | 63 |
| Horizontal point | 3.20.3 | 33 |
| Hot spot temperature | 3.7.3 | 21 |
| Hydrostatic tests | 4.5.1 | 64 |
| Identification plates | 3.20.19 | 35 |
| Induction | 3.3 | 6 |
| Infield balancing requirements | 3.14.4 | 29 |
| Inspection: | | |
| Non-destructial | 4.4 | 62 |
| Openings | 3.20.12 | 34 |
| Inspector (definition) | 3.1.10 | 5 |
| Instrumentation | 3.7 | 19 |
| Instrumentation drawing | 3.28.2.7 | 49 |
| Insulation | 3.6 | 19 |
| Interchangeability: | | |
| Repair parts | 3.27.2 | 45 |
| Turbines | 3.3.2 | 6 |
| Intermediate segments | 3.24.11 | 42 |
| Internal bolting | 3.19.3.6 | 32 |
| Inventory control point | 3.27.1.1 | 45 |
| Items furnished: | | |
| By shipbuilder | 3.2.2.2 | 6 |
| With turbine | 3.2.2.1 | 5 |
| Jacking bolts for casing | 3.20.10.1 | 34 |
| Joint: | | |
| Horizontal | 3.20.4 | 33 |
| Vertical | 3.20.6 | 33 |
| Journal: | | |
| Bearings | 3.22.2 | 36 |
| Roundness | 3.23.8 | 40 |
| Labyrinth packing | 3.21.3.1 | 36 |
| Lagging | 3.6 | 19 |

C03406

INDEX, cont'd

| | Paragraph number | Page number |
|---|---|---|
| Life | 3.3.5 | 7 |
| Lifting gear | 3.20.11 | 34 |
| List of preferred materials | 3.4.2.1.1 | 17 |
| List, of ship | 3.12.10 | 28 |
| Locked shaft operation | 3.12.8 | 28 |
| Locking devices (bolting) | 3.19.3.5 | 32 |
| Longitudinal vibration | 3.14.6 | 29 |
| Lube oil flow diagram | 3.28.2.5 | 49 |
| Lube oil temperature limits | 3.8.8 and 3.8.9 | 21 and 22 |
| Lubrication system | 3.8 | 21 |
| Machining variations | 3.32 | 60 |
| Maneuvering | 3.12.5 | 27 |
| Margin (power) | 3.3.6 | 7 |
| Markings of parts | 3.18 | 31 |
| Match marks (rotor to casing) | 3.23.9 | 40 |
| Material: | | |
| Comparison sheets | 3.4.2.1.2 | 17 |
| Identification on drawings | 3.20.13 | 35 |
| Inspections | 4.3 | 62 |
| Substitutions | 3.4.2 | 16 |
| Materials | 3.4 | 7 |
| Microfilm | 3.28 | 46 |
| Moisture separation (internal) | 3.20.13 | 35 |
| Moisture separator | 3.11.5 | 26 |
| Nil-ductility requirements | Table I, note 1 | 8 and 16 |
| Nodular iron | 3.4.1 | 7 |
| Non-destructive tests (NDT) | 4.4 | 62 |
| Noise | 3.14.8 | 30 |
| Nozzle: | | |
| Blocks | 3.25 | 43 |
| Bowl pressure taps | 3.7.7 | 21 |
| Control valves | 3.10.8.1 and 3.11.7 | 24 and 26 |
| Nuclear steam applications | 3.4.1.1 | 16 |
| Oil deflectors | 3.22.6 | 40 |
| Oil system | 3.8 | 21 |
| Onboard repair parts | 3.27 | 44 |
| Onboard tools | 3.26 | 44 |
| Operating conditions | 3.12 | 27 |
| Ordering data | 6.2 | 67 |
| Orifices for bearings | 3.8.4 | 21 |
| Outline drawing | 3.28.2.1 | 47 |
| Overhaul report form | 3.28.2.3 | 47 |
| Over-ride feature | 3.10.9.5 | 25 |
| Overspeed: | | |
| Protection | 3.10.9 | 24 |
| System shop test | 4.5.4 | 65 |
| Test of rotors | 4.5.5 | 65 |
| Trip | 3.10.9.3 | 24 |
| Packing: | | |
| Gland, dummy, diaphragm | 3.21 | 35 |
| Journals | 3.23.7 | 40 |
| Peening qualification | 4.4.6.2.1 | 63 |
| Performance test | 4.5.7 | 65 |

C03407

INDEX, cont'd

| | Paragraph Number | Page Number |
|---|---|---|
| Pins and dowels | 3.19.5 | 32 |
| Piping | 3.11 | 25 |
| Piping reactions | 3.11.2.1 | 26 |
| Pitch (of ship) | 3.12.10 | 28 |
| Power assist (control system) | 3.10.2 | 23 |
| Power: | | |
| Ahead | 3.12.1 | 27 |
| Astern | 3.12.4.2 | 27 |
| Preparation for delivery | 5. | 66 |
| Preservation | 5.1 | 66 |
| Pressure measurements | 3.7 | 19 |
| Pressure variations: | | |
| Exhaust | 3.12.9.3 | 28 |
| Inlet | 3.12.9.1 | 28 |
| Propulsion unit (definition) | 3.1.8 | 5 |
| Provisioning list | 3.27.3 | 46 |
| Pumping grooves | 3.20.4.5 | 33 |
| | | |
| Quality assurance provisions | 4. | 62 |
| Quality control system | 4.2 | 62 |
| Quick reversal requirements | 3.10.7 | 24 |
| | | |
| Rake (of ship) | 3.5 | 17 |
| Reactions, piping | 3.11.2.1 | 25 |
| Reheat | 3.3.8 | 7 |
| Reliability | 3.3.1 | 6 |
| Repair or variations | 3.32.5 | 62 |
| Repair parts | 3.27 | 44 |
| Reports | 3.31 | 60 |
| Resonances | 3.14.8 | 30 |
| Roll of ship | 3.12.10 | 28 |
| Rotation | 3.5.1 | 17 |
| Rotor bores | 3.23.10 | 40 |
| Rotor position indicator | 3.7.4 | 21 |
| Rotors | 3.23 | 40 |
| RTE | 3.22.4 | 39 |
| RTE temperature limits | 3.6.10 | 22 |
| | | |
| Seal strips | 3.24.12 | 42 |
| Sealing compound | 3.20.4.4 | 33 |
| Sentinel valves | 3.11.6 | 26 |
| Series parallel turbine | 3.5.5.5 | 18 |
| Shaft identification | 3.5.2 | 17 |
| Shock | 3.13 | 29 |
| Shrouding | 3.24.9 | 41 |
| Sight flow (bearings) | 3.8.7 | 21 |
| Single casing turbine | 3.5.5.1 | 18 |
| Singling-up: | | |
| Control | 3.10.11 | 25 |
| Operation | 3.12.6 | 27 |
| Special tools | 3.26 | 44 |
| Speed limiter | 3.10.9.2 | 24 |
| Stamping of parts | 3.18 | 31 |
| Standardization | 3.3.2 | 6 |
| Stay rods | 3.20.17 | 35 |
| Steam: | | |
| Chest | 3.20.2 | 33 |
| Conditions | 3.12.9 | 28 |

C03408

INDEX, cont'd

| | Paragraph Number | Page Number |
|---|---|---|
| Steam, cont'd: | | |
| Deflectors | 3.20.15 | 35 |
| Rates | 3.12.3 | 27 |
| Shields | 3.20.14 | 35 |
| Stellite shields (blades) | 3.24.6 | 41 |
| Stopping capability | 3.12.4.1 | 27 |
| Straight-through turbine | 3.5.5.2 | 18 |
| Strainer, steam | 3.11.4 | 26 |
| Stress criteria and limits | 3.15 | 30 |
| Stud removal | 3.19.3.10 | 32 |
| Studs | 3.19 | 31 |
| Supports | 3.5.7 | 19 |
| Surface finish: | | |
| Blades | 3.24.5 | 41 |
| Diaphragms | 3.26.7.3 | 43 |
| Drawing requirements | 3.28.1.3 | 46 |
| Journal bearing babbitt | 3.22.2.11.3 | 37 |
| Nozzle partitions | 3.25.2 | 43 |
| Packing rings | 3.21.3.6 | 36 |
| Rotors | 3.23.5 | 40 |
| Shrouding | 3.24.9.2 | 41 |
| Steam joints | 3.20.4.2 | 33 |
| Thrust bearing parts | 3.22.3.7 | 38 |
| Technical data books | 3.30 | 55 |
| Technical manuals | 3.29. | 52 |
| Technical manual approval | 3.29.4 | 55 |
| Temperature: | | |
| Limits (bearings) | 3.8.8, 3.8.9 and 3.8.10 | 21 and 22 |
| Measurements | 3.7 | 19 |
| Variations (steam) | 3.12.9.2 | 28 |
| Template: | | |
| Condenser flange | 3.20.9.2.1 | 34 |
| Coupling flange | 3.5.4 | 18 |
| Tenons (blades) | 3.24.8 | 41 |
| Test connections (casing) | 3.20.8 | 33 |
| Tests | 4.5 | 64 |
| Thermometers | 3.7 | 19 |
| Thread engagement | 3.19.3.2 | 31 |
| Threaded fasteners | 3.19 | 31 |
| Throttle valve | 3.10.10.1 | 25 |
| Thrust: | | |
| Bearing | 3.22.3 | 38 |
| Collar | 3.22.3.5 | 38 |
| Shoes | 3.22.3.6 | 38 |
| Torque: | | |
| Ahead handwheel | 3.10.5.2 | 23 |
| Astern handwheel | 3.10.6.2 | 23 |
| Locked shaft | 3.12.8 | 28 |
| Stopping | 3.12.4.1 | 27 |
| Trail shaft operation | 3.12.7 | 28 |
| Trim (of ship) | 3.12.10 | 28 |
| Trip (overspeed) | 3.10.9.3 | 24 |
| Types of turbines | 1.2 and 3.5.5 | 1 and 18 |
| Ultrasonic inspection (rotors) | 4.4.5.1 | 63 |

INDEX, cont'd

| | Paragraph Number | Page Number |
|---|---|---|
| Validation of drawings | 3.28.3.5 | 50 |
| Valve leakage tests | 4.6.2 | 64 |
| Valve seats | 3.11.7.2 | 26 |
| Valves: | | |
| Ahead control | 3.11.7 | 25 |
| Astern | 3.11.8 | 28 |
| Sentinel | 3.11.6 | 26 |
| Transfer | 3.11.7.1 | 26 |
| Trip throttle | 3.10.10.1 and 3.11.7.1 | 25 and 26 |
| Variations: | | |
| Exhaust pressure | 3.12.9.3 | 28 |
| Inlet pressure | 3.12.9.1 | 28 |
| Inlet temperature | 3.12.9.2 | 28 |
| Machining | 3.32 | 60 |
| Vertical joints | 3.20.6 | 33 |
| Vibration requirements | 3.14 and figure 3 | 29 and 73 |
| Vibration test: | | |
| Sea trials | 4.6.3 | 66 |
| Shop | 4.5.6 | 65 |
| Weight | 3.3.7 | 7 |
| Welding | 3.17 | 31 |
| Weldment drawings | 3.28.1.6 | 46 |
| Workmanship | 3.32.5 | 62 |

C03410

C03411

# SPECIFICATION ANALYSIS SHEET

Form Approved
Budget Bureau No. 119-R004

INSTRUCTIONS

This sheet is to be filled out by personnel either Government or contractor, involved in the use of the specification in procurement of products for ultimate use by the Department of Defense. This sheet is provided for obtaining information on the use of this specification which will insure that suitable products can be procured with a minimum amount of delay and at the least cost. Comments and the return of this form will be appreciated. Fold on lines on reverse side, staple in corner, and send to preparing activity *(as indicated on reverse hereof)*.

SPECIFICATION

ORGANIZATION *(of submitter)* | CITY AND STATE

CONTRACT NO. | QUANTITY OF ITEMS PROCURED | DOLLAR AMOUNT $

MATERIAL PROCURED UNDER A

☐ DIRECT GOVERNMENT CONTRACT ☐ SUBCONTRACT

1. HAS ANY PART OF THE SPECIFICATION CREATED PROBLEMS OR REQUIRED INTERPRETATION IN PROCUREMENT USE?

A. GIVE PARAGRAPH NUMBER AND WORDING.

B. RECOMMENDATIONS FOR CORRECTING THE DEFICIENCIES.

2. COMMENTS ON ANY SPECIFICATION REQUIREMENT CONSIDERED TOO RIGID

3. IS THE SPECIFICATION RESTRICTIVE?

☐ YES ☐ NO (IF "YES", IN WHAT WAY?)

4. REMARKS *(Attach any pertinent data which may be of use in improving this specification. If there are additional papers, attach to form and place both in an envelope addressed to preparing activity)*

SUBMITTED BY *(Printed or typed name and activity)* | DATE

FOLD

DEPARTMENT OF THE NAVY
NAVAL SHIP ENGINEERING CENTER
WASHINGTON, D. C. 20360

OFFICIAL BUSINESS

POSTAGE AND FEES PAID
NAVY DEPARTMENT

COMMANDER, NAVAL SHIP ENGINEERING CENTER
ENGINEERING METHODS AND STANDARDS DIVISION
DEPARTMENT OF THE NAVY
WASHINGTON, D. C. 20360

FOLD

C03413

9-29-01

MIL-STD-769B(SHIPS)
3 January 1966

SUPERSEDING
MIL-STD-769A(SHIPS)
23 April 1963

MILITARY STANDARD

# THERMAL INSULATION REQUIREMENTS FOR MACHINERY AND PIPING

852

FSC 5640

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 19:29:8 GMT

H

MIL-STD-769B ■■ 9999911 0339651 342 ■■

MIL-STD-769B(SHIPS)
3 January 1966

DEPARTMENT OF THE NAVY

BUREAU OF SHIPS

WASHINGTON, D. C. 20360

Thermal Insulation Requirements for Machinery and Piping
MIL-STD-769B(SHIPS)

1. This standard has been approved by the Bureau of Ships, and is published to establish the requirements for thermal insulation for machinery and piping on Naval ships.

2. Use of this standard by activities under the cognizance of the Bureau of Ships shall be mandatory effective on the date of issue.

3. Recommended corrections, additions, or deletions including improvements in the procedures described herein, and changes in this standard which can result in less costly installations without sacrificing the level of quality desired should be addressed to the Chief, Bureau of Ships, Department of the Navy, Washington, D. C. 20360.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512602
Not for Resale,2005/6/9 19:29:9 GMT

CONTENTS

| | | Page |
|---|---|---|
| 1. | SCOPE | 1 |
| 2. | REFERENCED DOCUMENTS | 1 |
| 2.1 | Specifications and drawing | 1 |
| 2.2 | Other publications | 2 |
| 3. | GENERAL REQUIREMENTS | 2 |
| 4. | MATERIALS AND THICKNESSES | 2 |
| 4.1 | Minimum thicknesses | 2 |
| 4.2 | Special conditions | 2 |
| 4.3 | Adhesives | 3 |
| 4.4 | Finishing cements | 3 |
| 4.5 | Metal lagging | 3 |
| 5. | RE-USABLE COVERS | 4 |
| 5.1 | Hot-surface insulation covers | 4 |
| 5.2 | Construction | 4 |
| 5.3 | Fabrication, piping components | 4 |
| 5.4 | Fabrication, machinery and equipment | 10 |
| 6. | INSTALLATION | 10 |
| 6.1 | Hot-surface insulation | 10 |
| 6.1.1 | Pipe and tubing | 10 |
| 6.1.2 | Piping components | 10 |
| 6.1.3 | Machinery and equipment | 11 |
| 6.1.4 | Boiler uptakes | 11 |
| 6.2 | Antisweat insulation | 11 |
| 6.3 | Refrigerant insulation | 11 |
| 6.4 | Weather deck hot piping insulation | 12 |
| 6.5 | Metal lagging | 13 |
| 6.6 | Painting | 13 |
| 7. | NOTES | 13 |

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/8/9 19:29:8 GMT

TABLES

| | | Page |
|---|---|---|
| Table I. | Schedule of approved insulation and lagging materials | 5 |
| Table II. | Insulation thicknesses for hot piping, compounded or fibrous, conforming to MIL-I-2781 | 6 |
| Table III. | Thickness of insulation conforming to MIL-P-15280 and MIL-I-22344 for hot piping | 7 |
| Table IV. | Thickness of insulating tape conforming to MIL-I-15349, for 1/4 to 3/4 inch size hot piping | 7 |
| Table V. | Thickness of insulating materials for hot surfaces of machinery and equipment up to 850°F | 7 |
| Table VI. | Thickness of insulating materials for hot surfaces of machinery and equipment over 850°F | 8 |
| Table VII. | Thickness of refrigerant insulation for piping | 8 |
| Table VIII. | Thickness of refrigerant insulation for machinery and equipment (exclusive of vapor barrier) | 8 |
| Table IX. | Thickness of antisweat insulation (exclusive of vapor barrier) | 9 |
| Table X. | Nominal thicknesses of insulation for weather deck hot piping | 9 |

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 18:29:8 GMT

1. SCOPE

1.1 The purpose of this standard is to amplify the general requirements for insulation of piping, machinery, uptakes, and mechanical equipment covered in the General Specifications for Ships of the U. S. Navy or in ships specifications.

2. REFERENCED DOCUMENTS

2.1 The issues of the following documents in effect on the date of invitation for bids or request for proposal, form a part of this standard to the extent specified herein:

SPECIFICATIONS

FEDERAL --

- T-T-931 - Twine, Cotton, Mattress.
- HH-C-466 - Cloth, Glass, Coated (for Membrane Waterproofing and Built-Up Roofing).
- HH-I-551 - Insulation Block, Pipe Covering and Boards, Thermal (Cellular Glass).
- QQ-S-775 - Steel Sheets, Zinc-Coated.
- QQ-W-343 - Wire - Electrical And Non-Electrical, Copper (Uninsulated).
- QQ-W-390 - Wire, Nickel-Chromium-Iron Alloy.
- SS-C-192 - Cement, Portland.
- SS-C-466 - Cloth, Thread, and Tape, Asbestos.
- TT-P-26 - Paint, Interior, White and Tints, Fire-Retardant.
- TT-P-320 - Pigment, Aluminum; Powder and Paste, for Paint.
- UU-T-106 - Tape, Pressure-Sensitive Adhesive, Masking, Paper.

MILITARY

- MIL-C-788 - Cloth, Brattice, Cotton, Fire-Resistant.
- MIL-I-2781 - Insulation, Pipe, Thermal.
- MIL-I-2818 - Insulation Blanket, Thermal, Fibrous Mineral.
- MIL-I-2819 - Insulation Block, Thermal.
- MIL-C-2861 - Cement, Insulation, High-Temperature.
- MIL-C-2908 - Cements, Finishing, Insulation.
- MIL-A-3316 - Adhesives, Fire-Resistant, Thermal Insulation.
- MIL-P-15006 - Paper, Sheathing, Fire-Resistant and Water-Repellent.
- MIL-I-15091 - Insulation Felt, Thermal, Asbestos Fiber.
- MIL-A-15199 - Adhesive, Asbestos Cloth to Pipe, Insulation.
- MIL-P-15280 - Plastic Foam, Unicellular, Sheet and Tubular Form, Elastomeric.
- MIL-P-15328 - Primer, Pretreatment (Formula No. 117 for Metals).
- MIL-I-15349 - Insulation Tape, Thermal.
- MIL-I-15475 - Insulation Felt, Thermal, Fibrous Glass, Semirigid.
- MIL-I-16411 - Insulation Felt, Thermal, Glass Fiber (for Temperatures Up To 1200 Degrees F.)
- MIL-A-18065 - Adhesives, High Initial Bond.
- MIL-B-19564 - Bedding Compound, Thermal Insulation Pipe Covering.
- MIL-C-19565 - Coating Compounds, Thermal Insulation Pipe Covering - Fire-, and Water-Resistant; Vapor-Barrier and Weather-Resistant.
- MIL-F-20077 - Felt, Asbestos, Roll.
- MIL-C-20079 - Cloth, Glass, Tape, Textile, Glass: and Thread, Glass.
- MIL-I-22023 - Insulation Felt, Thermal and Sound Absorbing Felt, Fibrous Glass, Flexible.
- MIL-I-22344 - Insulation, Pipe, Thermal, Fibrous Glass.
- MIL-C-22395 - Compound, End Sealing, Thermal Insulation Pipe Covering - Fire-, Water-, And Weather-Resistant.
- MIL-I-23128 - Insulation Blanket, Thermal, Refractory Fiber, Flexible.

BUREAU OF SHIPS

General Specifications for Ships of the U. S. Navy.

856

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 19:29:8 GMT

DRAWINGS

BUREAU OF SHIPS
5000-S5103-841336 - Piping, Boiler Soot Blower, Typical Installation.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications. - The following document forms a part of this specification to the extent specified herein. Unless otherwise indicated the issue in effect on date of invitation for bids shall apply.

AMERICAN SOCIETY FOR TESTING AND MATERIALS
ASTM - A167 - Specification for Corrosion-Resisting Chromium-Nickel Steel Plate, Sheet and Strip.
ASTM - 209 - Specification for Seamless Carbon-Molybdenum Alloy-Steel Boiler and Superheater tubes.

(Application for copies should be addressed to the American Society for Testing and Materials, 1916 Race Street, Philadelphia 3, Penn.)

(Technical society and technical association specifications and standards are generally available for reference from libraries. They are also distributed among technical groups and using Federal agencies.)

3. GENERAL REQUIREMENTS

3.1 General requirements such as definitions, basic applications, and reasons for insulating are covered in the General Specifications for Ships of the U. S. Navy or in ships specifications, Section 9390-2. Thermal insulation and acoustic absorptive treatment of compartments, ventilating ducts and trunks are covered in the appropriate sections of the above specifications.

3.2 Minor deviations in installation which meet the intent of the requirements specified herein may be approved by the cognizant Supervisor of Shipbuilding, U. S. Naval shipyard, or the Bureau of Ships. (A copy of all such changes shall be forwarded to the Bureau of Ships, Code 648).

4. MATERIALS AND THICKNESSES

4.1 Minimum thicknesses. - Tables 1 to 10, inclusive specify materials for insulation and lagging and the minimum acceptable thicknesses for the temperature ranges listed.

4.2 Special conditions. - The following special conditions supplement or modify the selection of materials or thicknesses specified, when applicable:

(a) The insulation thickness on soot blower piping between the root valve and the soot blower heads shall be reduced from that indicated for a system normally operating at the same temperature as follows:

(1) Where double layer insulation is used, only the inner (high temperature) insulation thickness layer need be installed.
(2) Where the insulation consists of a single uniform thickness layer, only one-half the total specified thickness need be installed.

(b) The insulation thickness for hot water systems operating at a normal maximum temperature of 150°F. may be 1/2 inch thick for pipe sizes up to 3/4 inch i.p.s., in accordance with MIL-I-2781.

(c) Where double layer construction consisting of two classes of insulation is specified in table II, the higher temperature class insulation may be furnished in a uniform single thickness equal to the total thickness specified, if single layer construction is considered desirable. Where single layer construction is used in lieu of double layer construction, suitable expansion joints to permit thermal movement of the piping, without opening of insulation joints, must be provided.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 19:29:6 GMT

(d) Where considered desirable, higher temperature classes of insulation may be used where lower temperature classes are specified provided they are satisfactory in all other respects (e.g. where class b of MIL-I-2781 is specified, class d or e may be used or where class c is specified, class f may be used).
(e) Compounded type insulation conforming to MIL-I-2781, grade I, (calcium silicate only) or cellular glass insulation conforming to HH-I-551 shall be used on hot piping requiring insulation that will be exposed to the weather, and shall conform to the thicknesses specified in table 10.
(f) Elastomeric foamed plastic insulation, MIL-P-15280, may be used for machinery and equipment applications up to 180°F; 1/2 inch minimum thickness.
(g) Where HOT SURFACE insulation thicknesses are not specified, such as for refractory fiber insulation felt, MIL-I-23128, and special applications, the following shall be used as a guide in determining acceptable thicknesses.

Insulation thickness shall be sufficient to:

(1) Reduce the insulation surface temperature to 150°F or below, where personnel can normally contact these surfaces.
(2) Prevent the transfer of heat to surrounding areas which would be objectionable to personnel or adversely affect other components.
(3) Prevent transfer of heat which would otherwise reduce the efficiency or effectiveness of the system or component.

(h) Where operating temperatures are normally between 125°F. and 150°F. and the omission of insulation will not adversely affect operating efficiency, non-metallic lagging only may be applied where necessary, to protect personnel from contact with hot metal surfaces.

4.3 Adhesives. - The following adhesives shall be used for fastening cloth and tape lagging:

| Type of lagging | Specification |
|---|---|
| Asbestos | MIL-A-15199[1/] or MIL-A-3316, type II |
| Fibrous glass | MIL-A-3316, type I or type II |

1/ Not applicable for cementing to fibrous-glass insulation.

4.4 Finishing cements. - Where finishing cement is specified any of the following materials are acceptable subject to any material limitations for the proposed application:

(a) Finishing cement, MIL-C-2908, type II.
(b) High-temperature insulating cement, MIL-C-2861, when used under asbestos cloth.
(c) A mixture of 80 percent high-temperature insulating cement, MIL-C-2861, and 20 percent portland cement, SS-C-192.

4.5 Metal lagging. - Where metal lagging is required, any of the following materials are acceptable, except for uptake applications (see 6.1.4):

| Sheet material | Specification | Nominal thickness Inch |
|---|---|---|
| Hot-dipped galvanized steel | QQ-S-775 | 0.014 |
| Aluminum | ASTM 209, Alloy 6061 | .030 |
| Corrosion-resistant steel (CRES) | ASTM A167, AISI type 304 | .014 |

858

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 19:29:8 GMT

5. RE-USABLE COVERS

5.1 Hot-surface insulation covers. - In order to insure that the pipe covering will not interfere with the servicing of a takedown joint where a re-usable cover is installed, the permanent insulation shall stop short of the takedown joint and a short removable and re-usable section of insulation shall be installed between the permanent insulation and the takedown joint. The insulation joint formed by the permanent and re-usable sections may be square, or at an angle of 45 degrees; the joint, however, shall be tight, without any gaps between the two sections and shall incorporate means to prevent dislodging the insulation sections. Re-usable covers are not required on systems insulated with elastomeric foamed plastic insulation (MIL-P-15280).

5.2 Construction. - For sizes larger then 2 inches i.p.s., valve bonnets and valves having takedown joints at the ends shall be fitted with re-usable covers such that the bonnet joint may be removed independently of the valve covering. Valves 2 inches i.p.s. and under shall be fitted with separate covers as indicated above, or covers of a one-piece design such that they may be wrapped around the entire valve body and clipped or otherwise secured just below the handwheel.

5.3 Fabrication, piping components. - For piping components except as otherwise specified, any one of the following methods of fabrication is acceptable:

5.3.1 Covers may be made in two halves of thermal insulating felt enclosed in asbestos cloth. Each half cover shall be sewn and quilted with wire-inserted asbestos yarn conforming to SS-C-466, form II, (for machine sewing, if desired, this yarn may be constructed with the three monel wires twisted together first, and the three asbestos threads twisted around the outside of the wire) or fastened with mechanical stapling in a manner to provide a uniform thickness, strength and rigidity.

5.3.1.1 Covers for use at temperatures of 850°F. and below shall be filled with insulation felt (see table I). Wire-inserted asbestos cloth, SS-C-466, grade AAA-M, shall be used on the inside surface of covers for valves larger than 2 inches i.p.s. For valves 2 inches i.p.s. and smaller, grade AAA shall be used on inside surface of covers. For 500°F. and below, asbestos cloth, SS-C-466, grade AA, shall be used on outside surface of covers; grade AAA cloth shall be used above 500°F.

859

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512602
Not for Resale,2005/8/9 19:29:6 GMT

Provided by IHS
No reproduction or networking permitted without license from IHS

Table I - Schedule of approved insulation and lagging materials.[1/]

| Service | Temperature Range (°F.) | Pipe and Tubing | | Valves and Fittings | | Flange Joints | | Machinery | |
|---|---|---|---|---|---|---|---|---|---|
| | | Insulation | Lagging | Insulation | Lagging | Insulation | Lagging | Insulation | Lagging |
| Gases Steam Hot water Oil | 125 to 1200 | MIL-I-2781 MIL-I-15349 (750°F. Max.) MIL-I-22344 (370°F. Max.) MIL-P-15280 (180°F. Max.) | SS-C-466 MIL-C-20079 | MIL-I-2781 MIL-I-2819 MIL-I-16411 MIL-I-15091, type A MIL-C-2861, MIL-I-22344 (370°F. Max.) MIL-P-15280 (180°F. Max.) MIL-I-23128 | SS-C-466 MIL-C-20079 | MIL-I-2781 MIL-I-2819 MIL-I-16411 MIL-I-15091, Type A MIL-C-2861 MIL-I-22344 (370°F. Max.) MIL-P-15280 (180°F. Max.) MIL-I-23128 | SS-C-466 MIL-C-20079 | MIL-I-2819 MIL-I-16411 MIL-I-15091, type A MIL-I-2818 MIL-C-2861 MIL-I-22023 (370°F. Max.) MIL-I-23128 MIL-P-15280 (180°F. Max.) | SS-C-466 MIL-C-20079 |
| Cold water Chilled Water | 28 to 99 | MIL-I-15091 MIL-I-2781 MIL-I-22344 MIL-P-15280 HH-I-551 | SS-C-466 MIL-C-20079 MIL-P-15006 MIL-C-788 | MIL-I-15091 MIL-I-2781 MIL-I-22344 MIL-I-2819 MIL-P-15280 HH-I-551 | SS-C-466 MIL-C-20079 MIL-P-15006 MIL-C-788 | MIL-I-15091 MIL-I-2781 MIL-I-22344 MIL-I-2819 MIL-P-15280 HH-I-551 | SS-C-466 MIL-C-20079 MIL-P-15006 MIL-C-788 | MIL-I-15091 MIL-I-22023 MIL-I-2819 MIL-P-15280 HH-I-551 | SS-C-466 MIL-C-20079 MIL-P-15006 MIL-C-788 |
| Refrigerant | -20 to 60 | HH-I-551 MIL-P-15280 | SS-C-466 MIL-C-20079 MIL-C-788 | HH-I-551 MIL-P-15280 | SS-C-466 MIL-C-20079 MIL-C-788 | HH-I-551 MIL-P-15280 | SS-C-466 MIL-C-20079 MIL-C-788 | HH-I-551 MIL-P-15280 | SS-C-466 MIL-C-20079 MIL-C-788 |

1/ Additional materials are covered in 4.5 (metal lagging); 6.1.4 (boiler uptakes); 6.2 (securing antisweat insulation); 6.4.1 (weather deck hot piping).

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 18:23:8 GMT

MIL-STD-769B ■ 9999911 0339658 717 ■

Table II - Insulation thicknesses for hot piping, compounded and fibrous conforming to MIL-I-2781

| Pipe size (inches i.p.s.) | Temperature range (degrees F.) | Class[1/] | | Nominal thickness (inches) | | |
|---|---|---|---|---|---|---|
| | | Inner layer | Outer layer | Inner layer | Outer layer | Total |
| 1/2, 1-1/2 | 125-388 | b, c | -- | 1 | -- | 1 |
| | 389-500 | b, c | -- | 2 | -- | 2 |
| | 501-750 | c, d | -- | 2 | -- | 2 |
| | 751-950 | e, f | -- | 2 | -- | 2 |
| | 951-1050 | e, f | b, c | 2 | 1-1/2 | 3-1/2 |
| 2, 2-1/2 | 125-338 | b, c | -- | 1-1/2 | -- | 1-1/2 |
| | 339-388 | b, c | -- | 2 | -- | 2 |
| | 389-500 | b, c | -- | 3 | -- | 3 |
| | 501-750 | c, d | -- | 3 | -- | 3 |
| | | c, d | b, c | 1-1/2 | 1-1/2 | 3 |
| | 751-900 | e, f | b, c | 1-1/2 | 1-1/2 | 3 |
| | 901-1050 | e, f | b, c | 2 | 1-1/2 | 3-1/2 |
| 3 through 4-/12 | 125-338 | b, c | -- | 1-1/2 | -- | 1-1/2 |
| | 339-388 | b, c | -- | 2 | -- | 2 |
| | 389-500 | b, c | -- | 3 | -- | 3 |
| | 501-750 | c, d | -- | 3 | -- | 3 |
| | | c, d | b, c | 1-1/2 | 2 | 3-1/2 |
| | 751-900 | e, f | b, c | 1-1/2 | 2 | 3-1/2 |
| | 901-950 | e, f | b, c | 2 | 1-1/2 | 3-1/2 |
| | 951-1050 | e, f | b, c | 2-1/2 | 1-1/2 | 4 |
| 5, 6 | 125-338 | b, c | -- | 1-1/2 | -- | 1-1/2 |
| | 339-388 | b, c | -- | 2 | -- | 2 |
| | 389-500 | b, c | -- | 3 | -- | 3 |
| | 501-750 | c, d | -- | 3 | -- | 3 |
| | | c, d | b, c | 1-1/2 | 2 | 3-1/2 |
| | 751-900 | e, f | b, c | 1-1/2 | 2 | 3-1/2 |
| | 901-950 | e, f | b, c | 2 | 1-1/2 | 3-1/2 |
| | 951-1050 | e, f | b, c | 3 | 2 | 5 |
| 7 | 125-338 | b, c | -- | 1-1/2 | -- | 1-1/2 |
| | 339-388 | b, c | -- | 2-1/2 | -- | 2-1/2 |
| | 389-500 | b, c | -- | 3 | -- | 3 |
| | 501-750 | c, d | -- | 4 | -- | 4 |
| | | c, d | b, c | 1-1/2 | 2 | 3-1/2 |
| | 751-900 | e, f | b, c | 1-1/2 | 2 | 3-1/2 |
| | 901-950 | e, f | b, c | 2 | 2 | 4 |
| | 951-1050 | e, f | b, c | 3 | 2 | 5 |
| 8 and larger | 125-338 | b, c | -- | 1-1/2 | -- | 1-1/2 |
| | 339-388 | b, c | -- | 2-1/2 | -- | 2-1/2 |
| | 389-500 | b, c | -- | 3 | -- | 3 |
| | 501-750 | c, d | -- | 4 | -- | 4 |
| | | c, d | b, c | 2 | 2 | 4 |
| | 751-900 | e, f | b, c | 2 | 2 | 4 |
| | 901-950 | e, f | b, c | 2-1/2 | 2 | 4-1/2 |
| | 951-1050 | e, f | b, c | 3 | 2 | 5 |

1/ Does not include finishing cement.

861

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512602
Not for Resale,2005/6/9 19:29:8 GMT

Table III - Thickness of insulation conforming to MIL-P-15280 and MIL-I-22344, for hot piping.

| Temperature range (°F.) | Specification | Thickness |
|---|---|---|
| | | Inch |
| 125 to 180 | MIL-P-15280 or MIL-I-22344 | 1/2 |
| 181 to 250 | MIL-I-22344 | 1/2 |
| 251 to 300 | MIL-I-22344 | 3/4 |
| 301 to 370 | MIL-I-22344 | 1 |

Table IV - Thickness of insulating tape conforming to MIL-I-15349, for 1/4 to 3/4 inch size hot piping.

| Temperature range (°F.) | Pipe size | Nominal thickness |
|---|---|---|
| | | inch |
| 125 to 250 | 1/4, 3/8 | 3/8 |
| 251 to 750 | 1/4, 3/8 | 7/8 |
| 125 to 250 | 1/2, 3/4 | 3/4 |
| 251 to 388 | 1/2, 3/4 | 1 |

Table V - Thickness[1/] of insulating materials for hot surfaces of machinery and equipment up to 850°F.

| Temperature range (°F.) | Nominal Thickness (inches) | | |
|---|---|---|---|
| | Glass fiber felt MIL-I-16411, Type II Refractory Fiber Blanket MIL-I-23128 Grade A | Asbestos felt MIL-I-15091 Insulation Block MIL-I-2818 Mineral Fiber Blanket MIL-I-2818 Glass Fiber Felt MIL-I-16411 Type I | Insulating cement MIL-C-2861 |
| 125 - 338 | 1 | 1 1/2 | 1 1/2 |
| 339 - 388 | 1 1/2 | 2 1/2 | 2 1/2 |
| 389 - 500 | 2 | 3 | 3 |
| 501 - 750 | 2 1/2 | 3 1/2 | 4 |
| 751 - 850 | 3 | 4 1/2 | 5 |

1/ Does not include finishing cement.

862

Provided by IHS
No reproduction or networking permitted without license from IHS
Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 19:29:8 GMT

Table VI - Thickness[1/] of insulating materials for hot surfaces of machinery and equipment over 850°F.

| Temperature range (°F.) | Thickness (inches) | | | | |
|---|---|---|---|---|---|
| | Single felt material | Combination of two felt materials | | | Block |
| | MIL-I-16411 Type II MIL-I-23128 Grade A | Inner layer MIL-I-16411 Type I or II | Outer layer MIL-I-15091 Type A | Total | MIL-I-2819 |
| 851-900 | 4 | 2 | 3 | 5 | 4 1/2 |
| 951-1050 | 4 | 2 | 3 | 5 | 5 |
| 1051-1200 | | | | | |

1/ Does not include finishing cement.

Table VII - Thickness of refrigerant insulation for piping.

| Pipe size (inches) | Temperature range (°F.) | Cellular glass HH-I-551 Nominal 1/ thickness (inches) | | Plastic foam, MIL-P-15280 thickness, (inches) | |
|---|---|---|---|---|---|
| Up to 1-1/4 | -20 to -1 | 2-1/4 | 1-1/2* | 1-1/2 | 1* |
| | 0 to 40 | 2 | 1-1/4* | 1 | 3/4* |
| 1-1/2 to 2-1/2 | -20 to -1 | 2-1/2 | 1-3/4* | 1-1/2 | 1 |
| | 0 to 40 | 2-1/4 | 1-1/2* | 1 | 3/4* |
| 3 to 5 | -20 to -1 | 3 | 2* | 1-1/2 | 1* |
| | 0 to 40 | 2-3/4 | 1-3/4* | 1 | 3/4* |

1/ By nominal thickness is meant a thickness which is approximate and should only be used as a guide in determining actual thickness requirements.
* Thickness for application in air-conditioned spaces only.

Table VIII - Thickness of refrigerant insulation for machinery and equipment (exclusive of vapor barrier).

| Temperature range (°F.) | Thickness (inches) | | | |
|---|---|---|---|---|
| | Foam plastic MIL-P-15280 | | Cellular glass, HH-I-551 | |
| 0 to 35 | 3 | 1* | 5 | 1-1/2* |

*Thickness for application in air conditioned spaces only.

863

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/6/9 19:29:6 GMT

Table IX - Thickness of antisweat insulation (exclusive of vapor barrier).

| Temperature range (°F.) | Machinery and equipment | | | Piping | | |
|---|---|---|---|---|---|---|
| | Material specification | Thickness (inches) | | Material specification | Thickness (inches) | |
| 28 to 99 | MIL-I-15091<br>MIL-I-2819<br>HH-I-551<br>MIL-I-22023<br>MIL-P-15280 | 1-1/2<br><br><br>1<br>3/4 | 3/4*<br><br><br>1/2*<br>1/2* | MIL-I-15091<br>MIL-I-2781<br>MIL-I-2819<br>HH-I-551<br>MIL-P-15280<br>MIL-I-22344 | 1<br><br><br><br>3/4 | 1/2*<br><br><br><br>1/2* |

* Thickness for application in air-conditioned spaces only.

Table X - Nominal thicknesses of insulation for weather deck hot piping.

| Pipe size (inches i.p.s.) | Calcium silicate, MIL-I-2781<br>Cellular glass, HH-I-551 |
|---|---|
| | Inches |
| 1/4 to 3 | 1-1/2 |
| 3-1/2 to 6 | 2 |
| Over 6 | 2-1/2 |

5.3.1.2 Covers for use at temperatures above 850°F. shall have filling consisting of inner layers of fiber-glass felt, MIL-I-16411, or refractory fiber felt, MIL-I-23128, and outer layers of asbestos felt, and shall be covered on the inside surface and on the ends with nickel-chromium alloy wire mesh, QQ-W-390 (or wire-inserted asbestos cloth, SS-C-466, grade AAA-M, for services up to 950°F.) and on the outside surface with grade AAA asbestos cloth. Asbestos roll felt, MIL-F-20077 1/8 inch thick, may be inserted between the asbestos felt and the asbestos cloth if considered necessary to retain the cylindrical shape of the cover.

5.3.1.3 Hard asbestos millboard, 1/4 inch thick, enclosed in asbestos cloth of the type used on the outside cover, shall be sewn on ends of covers for strength and rigidity. When a more flexible cover is desired, such as when space limitation would not permit installation of the more rigid type, the millboard will not be required. When the flange diameter is larger than the outside diameter of the adjacent pipe covering, build-up pieces made of asbestos felt encased in asbestos cloth, SS-C-466, grade AAA shall be stitched to inside of cover. Halves of covers shall be fastened together by 1/16-inch diameter galvanized, or other corrosion resistant, wire rope laced through brass or galvanized steel hooks or rings, or fastened by brass snap fasteners. Fastenings shall be securely attached to cloth lagging.

5.3.1.4 Preformed fibrous glass valve or fitting covers may be used when temperatures are in the 125-370°F. range. These shall be of the same thickness as the adjacent pipe covering. Such covers, when used, shall be lagged independently of the pipe covering and in a manner which will facilitate removal and replacement.

5.3.2 Covers may be made of segments of block insulation or preformed pipe insulation, having the same thickness as that on the adjacent piping. Blocks shall be securely wired to frames of 1/2 inch square mesh, Number 18 gage (0.049-inch diameter) galvanized steel wire. Wire mesh frames inside and outside of blocks shall have ends bent over and joints secured with Number 18 gage black annealed iron wire woven through the mesh. Insulating cement compatible with the material of the blocks shall be troweled smoothly over all surfaces of the wire mesh. Asbestos roll felt may be used to build up covers when the flange diameter is larger than the outside diameter of the adjacent pipe covering. Cover shall be tightly and smoothly lagged to envelop the outside and ends. For temperatures of 500°F. and below asbestos cloth lagging conforming to SS-C-466, grade AA, shall be used; grade AAA cloth shall be used above 500°F. Lagging may

Provided by IHS
No reproduction or networking permitted without license from IHS
Sold to:MCCAFFERY & ASSOCIATES INC, 01512602
Not for Resale,2005/6/9 19:29:8 GMT

be cemented or sewn on, except ends of covers shall always be sewn. Where double layer insulation is used the two sections of the cover shall be fitted together with a scarfed joint. Such joints shall be straight and true to reduce heat loss. Bands, eyelets, or locks of galvanized steel, or lacing with hooks, rings, washers, and wire shall be used to secure the covers.

5.3.3 When installing the above covers, spaces between inner surfaces of covers for flanges and other irregular surfaces shall be filled with pieces of insulation felt. Asbestos felt may be used when temperatures are 850°F. or less. Fibrous glass felt in accordance with MIL-I-16411 or MIL-I-23128, grade A may be used when temperatures are 1200°F. or less. Felt shall be packed loosely enough to preserve air cell structure and tightly enough to prevent air circulation.

5.4 Fabrication, machinery and equipment. - For re-usable covers for machinery and equipment, either of the following methods of fabrication is acceptable.

5.4.1 Covers may be similar to the flexible asbestos felt or fiber-glass felt type described for piping components.

5.4.2 Covers may be made in sections formed of insulating block held together with wire and adhesive cement, covered with 1/2-inch thickness of finishing cement, and lagged. Lacing with hooks, rings, washers, and wire, or brass snap fasteners shall be used to secure the covers.

5.4.3 Semi-removable turbine casing flange covers may be installed as an alternate for removable covers specified above. The permanent insulation shall be run to the casing flange allowing bolt removal space. The flange and bolts are then covered with asbestos cloth, wire inserted asbestos cloth or incolen wire mesh, as required by operating temperature, which shall be secured to the bolts with wire. The flange may now be insulated with fibrous glass felt MIL-I-16411, asbestos felt MIL-I-15091, mineral wool felt MIL-I-2818 or insulation block MIL-I-2819 to the required thickness and shape; the insulation is then lagged with asbestos cloth. This cloth shall be carried over the outer edge of the permanent insulation and secured with adhesive. The semi-removable cover shall then be sealed and painted.

6. INSTALLATION

6.1 Hot surface insulation. -

6.1.1 Pipe and tubing. - Each layer of molded insulation shall be installed with joints butted together. Where two layers are used all joints shall be staggered. Not less than three fastenings shall be used for securing each 3-foot section of insulation. Fastening shall be Number 18 gage minimum (0.049-inch diameter) annealed black or hot-dipped galvanized iron wire or flat steel bands. Except as otherwise specified, lagging shall be installed over the insulation.

6.1.1.1 The installation of soot blower piping insulation shall be in accordance with drawing 5000-S5103-841336.

6.1.2 Piping components. - For valves, fittings, and accessories, welded and brazed fittings including unions may be insulated and lagged similarly to adjacent piping.

6.1.2.1 Block, felt, blanket insulating materials, or molded pipe insulation secured with hot-dipped galvanized iron wire, may be used. When insulating felts are used above 850°F. the inner layer shall be fiber-glass felt conforming to MIL-I-16411 or refractory fiber felt, MIL-I-23128. Galvanized iron wire netting, Number 18 gage minimum (0.049-inch diameter), shall be spread over the insulating material and secured with wire. Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting. A 1/2-inch thickness of finishing cement shall then be applied. Insulating material shall be the same thickness as that on adjacent piping.

6.1.2.2 For components 3-1/2 inch i.p.s. and smaller, insulating cement only conforming to MIL-C-2861, may be applied to a thickness 1/2 inch less than the adjacent pipe insulation. A 1/2 inch thickness of finishing cement shall be applied over the insulating cement.

6.1.2.3 Re-usable covers shall be fitted where required.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512602
Not for Resale,2005/6/9 19:29:8 GMT

6.1.3 Machinery and equipment. - For machinery and equipment, block, felt, or blanket insulating materials of the required thickness shall be secured with hot-dipped galvanized iron wire. Galvanized iron wire netting 1-inch mesh and Number 18 gage minimum (0.049-inch diameter) shall be spread over the surface and secured by wire. Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting.

6.1.3.1 When no insulating cement has been specified, a 1/2-inch thickness of finishing cement shall be applied.

6.1.3.2 When an insulating cement has been specified it shall be applied in successive layers, 1/2 inch to 1 inch in thickness, until the total thickness specified has been reached. Wire netting, similar to that used for covering the insulating materials, shall be installed between layers. A 1/2-inch thickness of finishing cement shall be applied over the last layer of insulating cement.

6.1.3.3 Lagging shall be installed over finishing cement. Re-usable covers shall be installed where required.

6.1.3.4 Clips, hooks, or other fastenings for securing insulation or lagging shall not be brazed or welded to nonferrous parts of distilling plants or deaerating feed tanks.

6.1.4 Boiler uptakes. - For boiler uptakes the thermal insulation shall be 2 inches thick. Either mineral wool felt, MIL-I-2818, or fibrous glass sheet, MIL-I-15475, may be used. If acoustic absorptive treatment is found to be necessary to decrease the noise level the insulation thickness shall be increased accordingly.

6.1.4.1 Metal lagging for uptakes shall be galvanized sheet steel conforming to QQ-S-775, not less than 1/32 inch thick.

6.1.4.2 Insulation and lagging is not required on uptakes above the weather deck, except where the transfer of heat, to spaces adjacent to the uptake area, would be objectional.

6.2 Antisweat insulation (cold and chilled water service). -

6.2.1 Molded pipe covering, cellular glass, water repellent asbestos felt, or fibrous glass insulation shall be secured with Number 18 gage minimum (0.049 inch diameter) hot-dipped galvanized iron wire, soft annealed copper wire, QQ-W-343, wire inserted asbestos yarn, or glass thread, MIL-C-20079, spirally wound on 1-inch centers. One layer of water repellent and flameproof sheathing paper, MIL-P-15006, shall be wrapped tightly around the insulation and secured with cotton twine, T-T-931, glass thread, MIL-C-20079, or 1-inch wide tape, UU-T-106. All joints of the paper shall be lapped and sealed with adhesive cement, MIL-A-3316, type II. The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II. The water repellent paper may be eliminated on cellular glass where the insulation surface is suitable for the effective application of vapor barrier compound MIL-C-19565.

6.2.2 Application of a vapor barrier is not required on elastomeric foamed plastic insulation, MIL-P-15280, nor is lagging required except in areas where such insulation would be subject to damage.

6.3 Refrigerant insulation. -

6.3.1 Cellular glass insulation shall be coated on all surfaces with vapor barrier compound, MIL-C-19565, type II at the time of installation. Insulation shall be installed with staggered end joints. On horizontal pipes the longitudinal joints shall be at the top and bottom. Insulation shall be secured with number 18 gage minimum (0.049 inch diameter) copper-covered steel wire or 1 inch wide tape, UU-T-106, on 9 inch centers. The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.

6.3.2 Elastomeric foamed plastic, MIL-P-15280 may be applied in 1/4 inch minimum thickness layers as necessary to build up the required thickness (type II, form 1 or 2). All longitudinal and butt joints shall be staggered. All joints and lagging, if required (see 6.2.2), shall be secured with adhesive cement in accordance with paragraph 3.7 of MIL-P-15280.

866

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512602
Not for Resale,2005/6/9 18:29:8 GMT

6.4 Weather deck hot piping insulation. -

6.4.1 Calcium silicate or cellular glass insulation for piping exposed to the weather shall be installed as follows:

(a) Preliminary preparation of piping.

(1) All surfaces to be clean, dry, and free of scale and grease.
(2) Fittings, valves, flanges, pipe supporting clamp, and at least 3 inches of adjacent pipe shall be painted as follows: Apply one coat pretreatment formula 117, MIL-C-15328. After this coat dries, apply two coats of aluminum paint made by mixing two pounds of aluminum paste, TT-P-320, type II, class B, with each gallon of phenolic varnish.

(b) Installation on pipes.

(1) The bore, butt ends, and longitudinal joint surfaces of cellular glass insulating material shall be coated not more than 1/16 inch thick with commercial bedding compound, in accordance with MIL-B-19564, at time of installation. Bedding compound is not required with calcium silicate pipe covering.
(2) Longitudinal joints on horizontal piping shall be on top and bottom of pipe.
(3) Insulation shall be secured tightly to pipe with 1/2-inch wide U.S. Standard 22 gage galvanized steel bands on 9-inch centers. Steel bands shall be placed over a layer of fibrous glass tape, MIL-C-20079, class c, which has been dipped in the commercial finishing compound in accordance with MIL-C-19565 type I. Steel bands shall be wrapped with a layer of masking tape, UU-T-106, type II.
(4) Completely coat insulation with commercial finishing compound, in accordance with MIL-C-19565, using about 2 gallons per 100 square feet. Wrap on tightly one layer of open weave fibrous glass cloth, HH-C-466, or knitted fibrous glass tape, MIL-C-20079, and then apply another coating of above-specified finishing compound, using about 4 gallons per 100 square feet. After this coat has set apply a second coat of finishing compound using the same quantities.
(5) Where insulation is stopped off on the piping, sufficient mineral wool, MIL-I-2818, shall be tightly tied in place with galvanized iron wire over a heavy coating of the above-specified commercial bedding compound, to provide a tapered portion from insulation surface to pipe surface. The ends of the insulation shall be tapered at a 30-degree angle with the pipe. The tapered ends of the insulation shall be smoothed with insulation cement in accordance with MIL-C-2861. The cement covered tapered ends, after drying thoroughly, shall be coated with approximately a 1/8 inch thick tack coat of end sealing compound in accordance with MIL-C-22395. The sealer compound shall extend onto the pipe for at least 3 inches. A single layer of grade D, class 2 asbestos cloth lagging, in accordance with SS-C-466, shall be applied over the insulation and secured at longitudinal lap joint with type II adhesive cement in accordance with MIL-C-3316. The asbestos lagging cloth shall be tailored to fit the contour of the ends of the insulation by cutting and removing wedge-shaped sections of the cloth. The remaining ends of the cloth shall be embedded in the tack coating of sealer compound and shall be attached to the pipe with a single 1/2 inch wide galvanized steel band. A 3/16 inch layer (approximately) of sealer compound shall be troweled to a smooth finish over the cloth covered ends of the assembly. A smooth finish may be obtained by brush coating or hand rubbing the sealer compound with a suitable solvent. After 72 hours of drying at ambient temperature, the asbestos cloth of the assembly shall be given two brush coats of water- and weather-resistant coating compound in accordance with MIL-C-19565. The waterproofing compound shall extend halfway down the tapered ends of the assembly. The waterproofing compound shall be air dried 24 hours between applications.

(c) Installation on fittings, flanges, and valves.

(1) Before applying flange insulation weather deck piping shall be tested and secured in the following manner: After specified tests are completed, weather deck piping shall be subjected to alternate periods of full operating pressure, allowing pipe to come to maximum temperature; and then to zero gage pressure allowing pipe to cool to ambient temperature.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01S12802
Not for Resale,2005/6/9 19:29:8 GMT

MIL-STD-769B ■■ 9999911 0339666 873 ■

MIL-STD-769B(SHIPS)
3 January 1966

These cycles shall be repeated a sufficient number of times, tightening and adjusting flanges where necessary until no leaks can be detected.

(2) Fittings, flanges, and valve covers shall be ship-fabricated from sections of molded pipe covering or cellular glass block cemented together with adhesive cement, MIL-A-18066, class 1.

(3) Permanent covers for fittings and valves shall be fitted snugly to fittings and adjacent pipe covering using the same materials and methods as outlined for pipe covering. Voids between insulation and fitting shall be filled with tightly packed mineral wool, MIL-I-2818.

(4) Where specified, rigid-type portable flange covers shall extend over the adjacent pipe covering 1-1/2 times the thickness of the insulation. The two halves of the cover should be coated and lagged separately, using the same materials and procedure as outlined for pipe covering. The galvanized steel bands used to secure the two halves together and to the adjacent pipe covering shall be applied over the lagging and then coated with the above-specified finishing compound.

(d) Installation around supports and hangers.

(1) Remove only enough insulation from butt edges to provide a snug fit around support brackets or hanger rods. Fill all voids between insulation and support with tightly packed mineral wool, MIL-I-2818, to within 1/4 inch from insulation surface. Fill remainder of space with end sealing compound in accordance with MIL-C-22395 overlapping generously both the support member and the adjacent insulation. Lag and coat with same method and materials as adjacent piping.

6.5 Metal lagging.- Metal lagging shall be installed with lap joints, secured with hardened self-tapping screws or metal bands. Joints shall be arranged in a manner which will facilitate run-off of impinging liquids.

6.6 Painting. - All cloth and tape laggings shall be painted after installation with one coat of fire-retardant white paint, TT-P-26, if necessary for appearance. Elastomeric foamed plastic insulation MIL-P-15280 shall not be painted except where necessary for appearance. (For material and application requirements, see Section 9190-1 of the General Specifications for Ships of the U. S. Navy or ships specifications.)

7. NOTES

(Copies of this standard for military use may be obtained as indicated in the foreword to, or the general provisions of, the Index of Military Specifications and Standards.)

Both the title and the identifying number should be stipulated when requesting copies of Military Standards.

Preparing activity:
Navy - SH
(Project 5640-N031SI

868

13

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512802
Not for Resale,2005/5/9 19:29:6 GMT

MIL-M-15071E(SHIPS)
15 April 1962
SUPERSEDING
MIL-M-15071D(SHIPS)
6 June 1961
MIL-M-16616(SHIPS)
4 February 1956

# MILITARY SPECIFICATION

## MANUALS, EQUIPMENT AND SYSTEMS

1. SCOPE

1.1 Scope. - This specification sets forth Bureau of Ships requirements for manuals necessary for installation, operation, maintenance, and repair (without the services of manufacturer's representatives) of equipment and systems.

1.2 Classification. - Manuals shall be of the following types, as specified (see 6.1):

Type I - Electrical and mechanical equipment manuals.
Type II - Electronic and specialized equipment manuals.
Type IIa - Experimental equipment manuals.
Type III - Systems manuals.

2. APPLICABLE DOCUMENTS

2.1 The following documents, of the issue in effect on date of invitations for bids, form a part of this specification to the extent specified herein:

SPECIFICATIONS

MILITARY
MIL-D-963 - Drawing, Electrical, Hull and Mechanical Equipment for Naval Shipboard Use.
MIL-M-21741 - Manual, Technical, Maintenance Standard Book.
MIL-D-23140 - Drawing, Installation Control and Preliminary Data (for Electronic and Related Equipment).

STANDARDS

MILITARY
MIL-STD-12 - Abbreviations for Use on Drawings and in Technical-Type Publications.
MIL-STD-15-1 - Graphical Symbols for Electrical and Electronic Diagrams, Part 1.
MIL-STD-15-2 - Electrical Wiring Symbols for Ships' Plans, Part 2.
MIL-STD-15-3 - Electrical Wiring Symbols for Architectural and Electrical Layout Drawings, Part 3.
MIL-STD-16 - Electrical and Electronic Reference Designations.
MIL-STD-17 - Mechanical Symbols.
MIL-STD-806 - Graphic Symbols for Logic Diagrams.

PUBLICATIONS

DEPARTMENT OF DEFENSE
DD Form 441 (Attachment) - Industrial Security Manual for Safeguarding Classified Information.

BUREAU OF SHIPS
NAVSHIPS 250-000 - Bureau of Ships Technical Manual
NAVSHIPS 94500 - Preparation Guide for Electronic Equipment Technical Manuals.
NAVSHIPS 900,000.102 - Handbook of Electronic Circuits.

(Copies of specifications, standards, and publications required by contractors in connection with specific procurement functions may be obtained from the bureau or activity concerned or as directed by the contracting officer.)

2.2 Other publications. - The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids shall apply.

AMERICAN STANDARDS ASSOCIATION (ASA)
Y14.15 - Electrical Diagrams.

(Applications for copies should be addressed to the American Standards Association Inc., 10 East 40th Street, New York 16, N.Y.)

OFFICIAL CLASSIFICATION COMMITTEE
Uniform Freight Classification Rules.

(Applications for copies should be addressed to the Official Classification Committee, 1 Park Avenue at 33rd Street, New York 16, N.Y.)

FSC 7610

THIS DOCUMENT CONTAINS 18 PAGES.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01473982
Not for Resale,2001/0/4 20:22:11 GMT

EXHIBIT
F



## 3. REQUIREMENTS

3.1 Level of writing. - As a general guide, the level of writing should be that for a high school graduate having specialized training as a technician through Navy training courses. Operating instructions shall be written to the level of an operator having previous experience in the operation of similar or related equipment. The level of writing for other portions of the manual shall be to that of a technician having previous maintenance experience with similar or related equipment. These manuals are required to be written to the level of understanding of a Navy Technician Third Class. Technical manuals for experimental equipment (type IIa) should be written to the level of understanding of an engineer. To help contractors determine the nature, content and level of training given in the Navy Class A schools, manufacturers may request Inspectors of Naval Material to requisition training material on loan for the duration of the need.

3.2 References. - The Bureau of Ships Technical Manual, NAVSHIPS 250-000, describes the theory, operation and maintenance of many equipments and systems. Common electronic circuits are described in the Handbook of Electronic Circuits, NAVSHIPS 900,000.102. Accordingly, it will not be necessary to repeat this type of data in equipment or systems manuals except by reference. New or unique applications shall be fully described, to acquaint the technician with their principles of operation and maintenance.

3.3 Contents. - Manuals shall contain the following data, as applicable, arranged in an appropriate order to provide adequate instruction for installation, operation and maintenance of the equipment or system:

Front matter
General information
Installation
Operation
Trouble shooting
Maintenance
Parts list
Index

3.3.1 Front matter. - Standard front matter, listed in the normal sequence of appearance, shall consist of the following:

3.3.1.1 Cover and title page. - The cover shall contain the information shown in figure 1. The title page shall contain the information shown in figure 2.

3.3.1.2 Approval and procurement record page. - For type I manuals only, the approval and procurement record (APR) page shall follow the title page, and shall conform to figure 3.

3.3.1.3 List of effective pages. - The list of effective pages shall list all pages of the manual and shall indicate the issue information of each page (see 3.10.2.3). In multi-volume manuals, this page shall be included in volume 1 only.

3.3.1.4 Table of contents. - The table of contents shall list all primary divisions (chapters, sections, and paragraphs), with their corresponding page numbers. In multi-volume manuals, volume 1 shall contain a complete table of contents for all volumes; each subsequent volume shall contain its own table of contents.

3.3.1.5 List of illustrations. - The list of illustrations shall contain a complete listing of figures, titles, and page numbers. In multi-volume manuals, volume 1 shall contain a complete list of illustrations; each subsequent volume shall contain its own list of illustrations.

3.3.1.6 List of tables. - The list of tables shall contain a complete listing of all tables, titles, and page numbers. In multi-volume manuals, volume 1 shall contain a complete list of tables; each subsequent volume shall contain its own list of tables.

3.3.2 General information. - The manual shall include an over-all description of the functions and purpose of the equipment. This information is intended for use at the command level and others requiring a general summary of the equipment or system and its performance, advantages and limitations. It should not include information on operation and maintenance.

3.3.2.1 Description. - The functioning of the equipment or system as a whole and of its interrelated units shall be described. The functional description shall be non-technical in nature and shall describe the intended use (why, where, when, and with what), capabilities, and limitations of the equipment or system. Text covering physical descriptions or structural arrangements shall be brief, with special attention given to avoiding the inclusion of unnecessary or repetitious details that are easily illustrated. If the manual covers more than one model equipment or system, a statement or table pointing out the differences shall be provided. A list of equipment supplied, together with the approximate volume, weight, and over-all dimensions of each unit, if applicable, shall also be included. A list of equipment or publications required but not supplied and a compilation of quick reference data shall also be included. The quick reference data shall consist of pertinent technical or design characteristics of the equipment. Examples of such data are:

(a) Descriptive (nameplate) data necessary to identify manufacturer, type, model,

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433812
Not for Resale,2004/6/4 20:22:11 GMT

(b) Functional characteristics, such as:
 Power requirement
 Types of operation
 Power output
 Frequency
 Pulse characteristics
 Sensitivity; selectivity
(c) Capabilities, such as:
 Rated ranges
 Coverage
 Resolution
 Accuracy
(d) Rated outputs, such as:
 Wattages
 Voltages
 Horsepower
 Gallons per minute
(e) Special characteristics, such as:
 Operating temperatures
 Heat dissipation per unit
 Pressure
 Humidity
 Tolerances
(f) Other pertinent characteristics

3.3.3 Installation. - Installation information, as necessary to summarize installation drawings (conforming to MIL-D-963 or MIL-D-23140, as applicable), such as: site selection, unpacking and handling (where abnormal procedures or precautions are required), preparation of foundations, power requirements, mechanical assembly procedures, mounting instructions, bolting diagrams, safety precautions or guards, grounding and bonding, clearances for access, ventilation, motion under shock, methods of testing to assure satisfactory installation, and other recommendations for reduction of electrical or radio interference shall be provided. Information shall also be included to describe and illustrate, as necessary, the procedures to prepare the equipment for reshipment, taking into account complicated disassembly or dismantling procedures and known requirements for special handling of the equipment.

3.3.4 Operation. - Operating instructions shall include routine and emergency procedures (manual, automatic, local, and remote), safety precautions, quantitative and qualitative limits to be observed in the starting, operating, stopping, or shutting down of the equipment or systems. Where operating procedures or adjustments are to be performed in a specific sequence, step-by-step procedures shall be given; tables or charts, as necessary, are preferred for the presentation of such procedures. Adequate illustrative material shall supplement the text, to identify and locate all operating control and indicating devices. Tables which present the function of each operating control and indicating device, as well as the normal in-use position or indication, shall be included. Operating and stand-by cycling time for maximum over-all equipment life shall also be included. Emergency operating instructions shall describe procedures to be followed when normal operation is not possible because of emergency conditions, such as: power failure, "battle short" operation, control air failure, lube-oil failure, partial failure of equipment, and so forth.

3.3.4.1 Operator's maintenance. - It is the intent of this specification that the operator's information include any maintenance procedures within the capability of an operator. This capability is limited to procedures governing periodic inspection, cleaning, servicing, preservation, lubrication, adjustment, and minor parts replacement (fuses, dry batteries, indicator lamps, and so forth) which do not require the need for internal alignment or complex adjustment.

3.3.5 Trouble shooting. - The manual shall provide the maintenance technician with adequate details for quickly and efficiently locating the cause of an equipment malfunction. The discussions shall contain concise information (to the extent needed) on how the equipment operates. The discussions shall be in order of operational or data sequence, as applicable. Block diagrams, simplified schematic diagrams of electrical, mechanical, hydraulic, pneumatic, and electronic circuits or systems, performance curves, and nomographs shall be used to support the discussions wherever necessary. Trouble-shooting information required to localize any trouble to a particular functional division (or unit) shall be included, to serve as a guide in isolating faults.

3.3.6 Additional specific requirements for types I, II, and III manuals are set forth in paragraphs (3.4), (3.5) and (3.6), respectively.

3.3.7 Parts list. - The parts list shall include identification data covering all maintenance parts, to facilitate ready identification of the parts for replacement and ordering purposes. Standard hardware, structural parts, or other parts which have no maintenance significance shall not be listed. A brief introduction and the applicable tables listed below shall be included:

3.3.7.1 List of units. - The units shall be listed by unit number in numerical order; the list shall also indicate the quantity per equipment and the official name and designation.

3.3.7.2 Maintenance parts list. - The maintenance parts list shall list all of the units and their maintenance parts. The listing shall be arranged by units in numerical sequence. Maintenance parts for each unit shall be listed alphabetically-numerically by class of part following the unit designation:

(a) The tabulation shall consist of the following data: reference designation (military

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01453952
Not for Resale,2004/8/4 20:22:11 GMT

or commercial, as applicable) and the name and description of the parts, keyed to an illustration. (If a cross reference list to provide parts location data is included with the repair material, the parts list can omit cross reference to an illustration.) Those parts which are not covered by military designation shall include sufficient characteristics to allow identification of the part within the equipment.

(b) A separate list of any special tools supplied with the equipment shall be provided at the end of the parts list tabulation.

3.3.7.3 List of manufacturers. - A list of manufacturers shall be supplied unless the manufacturers are identified within the parts list tabulation by name and not by code.

3.3.8 Index. - An alphabetical index by subject shall be included if the manual contains more than 100 pages. In multi-volume manuals, the index shall be included in volume 1 only.

3.3.9 User activity comment sheet. - The manual production source shall include in each bound copy of final equipment and systems manuals one user activity comment sheet. This sheet shall be located immediately following the last page of each manual. In multi-volume manuals the sheet shall be located immediately following the last page of each volume. *Figure 4 shall be used as reproduction copy for the* production of these sheets.

3.4 Specific requirements for type I manuals. -

3.4.1 Maintenance and repair. -

3.4.1.1 Preventive maintenance. - Instructions shall include all maintenance procedures, inspections, tests, and adjustments which should be performed periodically under shipboard conditions for the purpose of preventing failure or impairment of the equipment. A one page summary and time schedule for maintenance procedures, including a check-off table where appropriate, shall be provided. The summary sheet shall identify any items required by the Navy, as indicated at time of approval action, to be included in the ship's permanent history cards. Where necessary, instructions shall include procedures for obtaining access to the sub-components for maintenance. Maintenance instructions shall include, where appropriate, but shall not be limited to the following:

(a) A tabulation of periodic, routine, mechanical, and electrical tests and checks which should be accomplished regularly to show that subcomponents are operating properly and to insure continuity of service at optimum performance.

(b) Table or charts, including "wear-limit" charts when appropriate, to indicate what is to be done, when it is to be done based on inspection, and how to do it.

(c) Utilization of the test facilities which may be incorporated in the various components.

(d) Instructions for the care, inspection, and cleaning of all pertinent parts.

(e) Instructions stressing the importance of properly maintaining all safety devices and interlocks provided to prevent damage to equipment or injury to personnel.

(f) Instructions on lubrication at shipboard operating temperatures shall be provided as applicable, preferably in chart form. They shall include information regarding lubrication recommended by the manufacturer and the type of lubricant to be used. Lubricants shall be described by symbol number, Federal stock number, Military specification and industry standard numbers where applicable and known.

(g) Instructions on in-place-balancing or other means of reducing noise level if equipment specifications and shipboard application require quiet operation.

3.4.1.2 Trouble shooting, overhaul and repair. - Instructions shall include all information necessary to permit a technician to locate trouble, and to make repairs, adjustments and conduct tests of each component, assembly or sub-assembly of the equipment. The following shall be included:

(a) Trouble shooting guides for the localization of faults giving possible sources of trouble, the symptoms, probable cause, and instructions for remedying the faults.

(b) Complete instructions on signal tracing for electric circuits, use of special test instruments and unusual servicing techniques.

(c) Ample figures and sectional views giving details of mechanical assemblies, and simplified schematic diagrams of electrical, mechanical, hydraulic and pneumatic circuits. Figures contained elsewhere in the manual may be used and referred to under this heading without duplicating them.

3.5 Specific requirements for type II manuals. -

3.5.1 Preparation guide. - NAVSHIPS 94500 provides guidance as to a desired level of organizing, illustrating, and expressing technical material required by this specification. Any major deviation from this guide shall be approved by the bureau or agency concerned.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01439832
Not for Resale,2004/4/4 20:22:11 GMT

3.5.2 Trouble shooting. -

3.5.2.1 Trouble-shooting guides for localizing faults, giving sources of trouble, the symptoms, and probable cause, and instructions for remedying the faults shall be included for equipment or systems if adequate historical data is readily available.

3.5.2.2 Trouble shooting where adequate historical data is not readily available shall be based on the following "logical trouble-shooting procedure" (see 6.2):

(a) Step 1 - Symptom recognition. - The technician must be able to recognize when the equipment is malfunctioning or when performance has deteriorated beyond acceptable limits. This requires that the technician have available data similar to the following:
 (1) Expected performance or design characteristics for the equipment as a whole.
 (2) Performance limits for individual units of an equipment.
 (3) Other factors which can cause a deterioration in equipment performance but are not the direct result of an equipment malfunction.

(b) Step 2 - Symptom elaboration. - After a trouble has been verified, the technician must use the available aids designed into the equipment to further define the trouble. As an aid to this step, the technician needs:
 (1) A list of all front panel indicating devices (listing normal indications) and the controls which govern their operation.
 (2) A list of all critical adjustments or alignment procedures which affect equipment operation.
 (3) Programmed or automatic testing procedures.

(c) Step 3 - Listing probable faulty function. - After the technician has further defined the equipment trouble, he makes several "logical choices" covering the general location of the trouble, based upon the symptoms, his knowledge of the equipment, and the information available in the manual. In making these "logical choices", the technician will limit the location of the fault to those functional divisions which, if defective, could reasonably cause the trouble. For this he needs:
 (1) A complete functional description of the equipment, and a detailed description of the operation of each functional division of the equipment and an explanation of critical circuits and reasons for adjustments.
 (2) Block diagrams of the equipment broken down into its functional divisions.

(d) Step 4 - Localizing the faulty function. - After "Choosing" the functional division that could be faulty, the technician performs certain tests or checks which will either eliminate or pinpoint the functional division under consideration. In order to perform these tests, the technician needs:
 (1) A list of test equipment and any special tools required.
 (2) A complete and comprehensive servicing block diagram for each functional division of the equipment.
 (3) Illustrations calling out significant test-point locations.

(e) Step 5 - Localizing trouble to the assembly (or circuit). - After the faulty functional division has been isolated, further "logical choices", together with additional tests and checks, enable the technician to isolate and pinpoint the part(s) causing the trouble. In order to accomplish this degree of isolation, the technician needs:
 (1) An over-all equipment schematic diagram, or, if the equipment is large or complex, individual unit schematics.
 (2) A listing of pertinent measurements (end play, backlash, clearances, temperatures, resistances, waveforms, and so forth) to be used as they apply in checking individual assembly or circuit conditions.
 (3) Illustrations showing the location of all parts.

(f) Step 6 - Failure analysis. - This is simply a review step in which the technician retraces the procedures he used in arriving at the corrective measure he is about to take. It allows the technician to broaden his background by giving him practice in determining the effect of the faulty part on the functional division, and on the equipment.

3.5.3 Maintenance. -

3.5.3.1 Preventive maintenance. - All preventive maintenance procedures that must be performed by a maintenance technician, tests, inspections, and adjustments which should be performed periodically to maintain proper operation shall be included if they are not described in a separate maintenance publication (such as a Maintenance

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433882
Not for Resale,2000/3/4 20:22:11 GMT

Standards Book as covered by MIL-M-21741). The instructions shall include, where appropriate:

(a) A maintenance procedures summary and time schedule chart.
(b) A tabulation of periodic performance, mechanical and electrical tests and checks, cleaning and inspections, and lubrication. Each of the checks or procedures shall be properly illustrated, and a regular time interval of performance shall be established (such as daily, weekly, monthly, and so forth). Acceptable limits of performance shall also be included within the tabulations. In general, the information shall indicate when it is to be done, what is to be done, how to do it, and the expected result.
(c) Lubrication instructions shall include manufacturer's recommendations on types of lubricant to use, specific time intervals for lubrication, and, where necessary, any special instructions covering lubricating procedures. Lubricants shall be identified by military or commercial standard numbers, as available.
(d) Cleaning instructions shall include information on the types of solvents to use and the cleaning periods. The cleaning solvents shall be identified by military or commercial standard numbers, as available.

3.5.3.2 Repair. - Instructions shall be provided for the removal, repair, adjustment, and replacement of all items which are within the ability of a technician to perform. Schematic diagrams of electrical, mechanical, hydraulic, pneumatic, and electronic circuits; parts location illustrations or other methods of parts location information; photographs, inter-connection cabling, piping plans, intra-rack wiring data (diagrams or tabular listings), and exploded and sectional views giving details of mechanical assemblies shall be provided, as necessary, to supplement the text. For mechanical items, information on tolerances, clearances, wear limits, maximum bolt-down torques, and in-place balancing or other means of reducing noise level shall be supplied. Information on the use of special tools and test equipment supplied with the equipment, as well as any cautions or warnings which must be observed to protect personnel and equipment, shall also be covered. The presentation should be arranged on a unit-by-unit basis; however, extensive material, procedures, or illustrations which are common to more than one assembly or sub-assembly need not be repeated, but may be referenced.

3.5.4 Operators' handbook. - When the thickness of the manual exceeds approximately 1/2 inch, the operators' information required in 3.5.4 shall be bound as a separate "Operators' Handbook". When bound separately, the standard front matter specified in 3.5.1 shall be included in the handbook.

3.6 Specific requirements for type III manuals. - Systems manuals shall contain data required for type I or type II manuals arranged in an appropriate order to provide system oriented instructions for overall operation, checkout, and maintenance of the system. Detailed requirements for these manuals shall be as specified in the contract, order, or ship specification. Parts lists of units involved with systems not already covered in equipment manuals shall be included.

3.7 Format. -

3.7.1 Volumes. - When the thickness of a manual exceeds approximately 2 inches, the manual shall be divided functionally into volumes and chapters or sections, as necessary, to provide easy handling and to present orderly instructions.

3.7.2 Text. - The text shall be specific, concise, and clearly worded to be readily understandable by personnel involved in the operation, maintenance, and repair of the equipment.

3.7.3 Emphasis. - The Bureau of Ships is mainly interested in the adequacy and completeness of contents and the clarity and readability of the information rather than the format. The manual shall be oriented toward operation, maintenance and repair of the equipment by the forces afloat, without the services of a manufacturer's representative. The portions devoted to descriptive matter and theory shall be limited to those which are essential to a proper understanding of the equipment for satisfactory operation, maintenance and repair. The text need not duplicate information which is adequately shown on the photographs, drawings and illustrations incorporated in the manual.

3.7.4 Security classification. - The security classification of a manual shall be as designated by the bureau or agency concerned. The Security Requirements Check list DD Form 254, which constitutes a part of the contract for all classified material, identifies and indicates the classified features. All pages of classified manuals shall be marked in accordance with Industrial Security Manual for safeguarding classified information. Whenever possible, the installation, operation, and parts list information shall be kept unclassified.

3.7.4.1 Additional security markings. - When a manual contains information of a higher classification than that of the equipment it concerns, the appropriate classification of all classified data

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01431882
Not for Resale,2004/8/4 20:12:11 GMT

contained within that manual shall be identified by a classification letter(s) enclosed in parentheses (see 3.7.4.2) and positioned as follows:

(a) Paragraphs and subparagraphs. - At the beginning and end of the text.
(b) Tables and illustrations. - At the upper-left and lower-right corners.
(c) Subjects and titles. - At the end of the subject or title.

3.7.4.2 Classification letters. - The classification letters assigned to the various levels are: (TS) Top Secret, (S) Secret, (C) Confidential, and (CMH) Confidential--Modified Handling Authorized, and (CRD) Confidential Restricted Data. Although it is not intended that each and every item of information bear a classification letter, the letter (U) shall be used to denote unclassified data when so directed by the bureau or agency concerned.

3.7.5 Notes, cautions, and warnings. - Notes, cautions, and warnings shall be used to emphasize important and critical instructions, consistent with the need. Notes, cautions, and warnings shall immediately precede the applicable instructions, and shall be selected in accordance with the following:

(a) "NOTE" - Concerns an operating procedure or condition which should be highlighted.
(b) "CAUTION" - Concerns an operating procedure or practice, which if not strictly observed, will result in damage to or destruction of equipment.
(c) "WARNING" - Concerns an operating procedure or practice which, if not strictly observed, will result in injury to personnel or loss of life.

3.7.6 Numbering and identification. - Any chapter, section, page, and paragraph numbering system is acceptable if it facilitates adequate indexing and location of information.

3.7.7 Illustrations. - Illustrations perform the function of graphically presenting required information. They shall be so planned and laid out as to portray complete pertinent information in a clear and accurate manner. Contractors may use available illustrations (photographs, diagrams, and so forth) prepared for other publications if the illustrations conform to this specification.

3.7.8 Abbreviations. - Abbreviations for use on drawings shall conform to MIL-STD-12, or MIL-D-963, as applicable.

3.7.9 Graphical symbols. - For type I manuals, use graphical symbols from MIL-D-963. For type II manuals, use graphical symbols for electronic diagrams from MIL-STD-15-1; electronic wiring equipment symbols from MIL-STD-15-2; electronic wiring symbols for architectural and electronic layout drawings from MIL-STD-15-3; mechanical symbols from MIL-STD-17; and logic diagram symbols from MIL-STD-806. For required details on the application of graphical symbols refer to ASA Y14.15.

3.7.10 Reference designations. - Electronics reference designations shall conform to MIL-STD-16.

3.8 Production. -

3.8.1 Detail materials, reproduction procedures and assembly shall be approved at time of submission of manuscript for approval. Acceptable production details are set forth in this specification. Alternate methods will be approved if equivalent performance and durability are provided.

3.8.2 Use of color. - Color shall only be used to clarify functional operations. Such methods as cross-hatching or shading shall be used in lieu of color when there will be no loss in comprehension. Color shall not be used for backgrounds or for other decorative purposes. If color is used, a legend shall be included to explain the colors used. Colors shall be held to a minimum.

3.8.3 Typography. - It is not the intent of this specification to state the different methods or composing equipment to be used, but rather to state the results required. All manuals are subject to 35mm microfilming. Letters, lines, and symbols shall be of a uniform contrast throughout the publication. Blurred or smudged printing or drop-out of characters or lines shall be cause for rejection. Characters shall be no smaller than 8-point type. When revisions are made, the typography shall conform as nearly as possible to the original manual. Preferred typography is set forth in table I.

(a) Table I indicates the final point size of the type. When oversize pages are used for composition, the type shall approximate these sizes when reduced.
(b) The type families listed below are most preferred, and can be closely matched by cold composition processes:

Book face (Roman)

| | |
|---|---|
| Garamond | Bookman |
| Century | Modern Roman |
| Modern | Baskerville |

(c) Leading and spacing may be relaxed where circumstances require such alterations.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433882
Not for Resale,2014/8/4 10:22:11 GMT

Table I—Typography

| Use | Type Face and Point Size | Capitalization | Leading | Spacing Between Lines |
|---|---|---|---|---|
| Security classification | Same type family as text, 14 pt | Capitals | 6 pt | |
| Body text | Book face (roman), 10 pt | Capitals and lower case | 1 pt | 12 pt preceding illustration or following figure title |
| Chapter and section titles | Same as body text | Capitals | 6 pt | 48 pt following marginal copy, text, or illustration |
| Primary side heads | Same as body text | Capitals | 2 pt | 6 pt preceding or following text |
| Subordinate side heads | Same as body text | Capitals | 1 pt | 6 pt preceding or following text |
| Marginal copy | Same as body text | Capitals and lower case | Solid | |
| Tables: Titles | Same as body text | Capitals | 2 pt | 6 pt to preceding text and following rule |
| Column heads | Same as body text | Capitals | | |
| Body | Same as body text | Capitals and lower case | 1 pt | 6 pt preceding bottom rule or following headings |
| Parts listing | Book face (roman) 8 pt, or EAM print-out | Capitals and lower case | 1 pt | 6 pt preceding bottom rule or following headings |
| Note (word only) | Same as body text | Capitals and lower case | | 4 pt preceding and and following text (text of Note set same as body text) |
| Caution (word only) | Same as body text | Capitals | | Same as for Notes |
| Warning (word only) | Same as body text | Capitals | | Same as for Notes |
| Figure titles | Same as body text | Capitals and lower case | 2 pt | 6 pt following illustration |
| Keys or legends | Same as body text | Capitals and lower case | 1 pt | 6 pt following figure title or following illustration |
| Footnotes | Same as body text | Capitals and lower case | 1 pt | Fit to space available |

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01493060
Not for Resale,2004/9/4 20:22:11 GMT

3.8.4 Layout. - Recommended page layout is set forth below:

(a) Single pages. - The preferred layout follows:

| Page size (inches) | Columns | Column Width (picas) | Gutter Width (picas) | Binding Edge (picas) | Image* Depth (picas) |
|---|---|---|---|---|---|
| 8-1/4 x 10-3/4 | 1 | 42 | --- | 7 | 60 |
| 7-3/4 x 10-1/4 | 1 | 39 | --- | 6 | 57 |
| 8-1/4 x 10-3/4 | 2 | 20 | 2 | 7 | 60 |
| 7-3/4 x 10-1/4 | 2 | 19 | 1-1/2 | 6-1/2 | 57 |
| 3-3/8 x 6-3/4 | 1 | 20 | --- | 5 | 31-1/2 |

* Exclusive of security classification and page numbers.

Blanks and spaces shall be avoided except on fold-ins. The first major division of the publication (chapter or section) shall begin on a new odd page.

(b) Fold-ins. - Fold-in pages shall be used only for diagrams, drawings, and charts which cannot be reduced for satisfactory presentation on a single page, or when frequent reference is required from other pages of the book. Page-size aprons are required. When fold-in pages are used, they should be held to a two-page fold-in whenever practicable, and shall not exceed an overall length of 34 inches from the binding edge, including the apron. The apron may contain information pertaining to the diagram, drawing or chart.

3.8.5 Illustrations. - Illustrations shall be prepared by the most economical method which will result in clear, legible illustrations.

(a) Lettering. - Lettering height in final reproduced form shall not be less than 0.060 inch.

(b) Continuous-tone artwork. - Continuous-tone artwork (photographs and renderings) shall provide a clear definition of shapes, tonal values, and surface texture. The subjects shall be well-lighted, detailed, and brilliant.

(c) Line artwork. - Line artwork shall be prepared with line weights of sufficient strength to reproduce sharply and clearly at the final reproduction size, and shall be suitable for reduction to 35mm microfilm.

3.8.6 Paper stock. - Paper stock for text pages and fold-ins shall be as follows:

(a) Lithography. - Paper stock shall be white offset book, free from unbleached or ground woodpulp, and shall have a substance weight of not less than 100 pounds per 1000 sheets, basis 25 by 38 inches.

(b) Letterpress. - Paper stock shall be equivalent to white supercalendered book, the content of which shall not exceed 5 percent unbleached chemical wood or ground woodpulp, the remainder to be bleached chemical woodpulp, and shall have a substance weight of not less than 90 pounds per 1000 sheets, basis 25 by 38 inches.

3.8.7 Cover stock. - Cover stock shall be of plastic or pressboard. Information to be imprinted on the covers shall not be stamped in gold or any other metal foil. Cover colors for unclassified manuals shall be of any color except red or yellow. Covers for CONFIDENTIAL manuals shall be red. Covers for SECRET and TOP SECRET manuals shall be yellow.

3.8.8 Binding. - Manuals shall be prepared in looseleaf form, and shall facilitate the insertion of replacement pages. Commercial metal-type fasteners are to be used. The manual pages shall be punched or drilled as follows (all dimensions in inches):

| Hole-type binders | 4-3/8 x 6-3/4 | 7-3/4 x 10-1/4 (8-1/4 x 10-3/4) |
|---|---|---|
| Number of holes | Two | Three |
| Hole size | 1/4 | 1/4 |
| Distance, center-to-center | 4-1/2 | 4-1/4 |
| Distance to binding edge | 5/16 | 7/16 |

| Multi-slot binders | | |
|---|---|---|
| Number of slots | Twelve | Eighteen (Nineteen) |
| Slot size | 3/16 x 5/16 | 3/16 x 5/16 |

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433582
Not for Resale,2004/04 20:22:11 GMT

Multi-slot binders (cont'd)

| | | |
|---|---|---|
| Distance, center-to-center | 9/16 | 9/16 |
| Distance to binding edge after trim | 3/16 | 3/16 |

Punching or drilling of revision pages shall be the same as for the original manuals. Fillers shall be used to build up binding edge to same thickness as right-hand edge of manuals.

3.8.9 Preliminary, experimental manuscript and service test manuals. -

3.8.9.1 Typography. - Manuals shall be typewritten, single-spaced. The copy shall be such that clear, readable reproductions may be obtained. Any method of duplication which will provide the necessary quantity of black legible copies will be acceptable. When the method of duplication permits, the manual shall be reproduced on both sides of the paper.

3.8.9.2 Layout. - Layout shall conform to the requirements for final manuals (see 3.8.4) except that horizontal and vertical folds are acceptable on fold-in pages.

3.8.9.3 Illustrations. - Illustrations for preliminary, experimental manuscript and service test manuals shall be prepared by the most economical method which will result in clear, legible illustrations when reproduced.

3.8.9.4 Paper and cover stock. - Any good-quality paper stock which is suitable for the intended method of reproduction will be satisfactory for text and fold-in pages. Cover stock satisfactory for the intended use is acceptable; however, the color shall conform to the requirements for final manuals (see 3.8.7).

3.8.9.5 Binding. - Binding shall conform to the requirements for final manuals (see 3.8.8). Covers need not include any printed matter (other than the security classification) if suitable cut-out windows are provided.

3.9 Applicability of manuals. -

3.9.1 Identical manuals. - When a manual that is already available is applicable in its entirety to the equipment being procured, the applicability is to be extended to include the additional ships by the contractor issuing a new approval and procurement record page.

3.9.2 Modified manuals. - When existing manuals are applicable to the equipment being procured except for minor differences, the contractor shall modify the manual to cover the differences by the issue of a revision.

3.10 Revisions. -

3.10.1 Changes. - Information amending, correcting or modifying a manual shall be issued either as a temporary or permanent change. Change numbers will be assigned by the bureau or agency concerned when the submitted review copy is returned to the contractor.

3.10.1.1 Temporary changes. - Temporary changes shall be supplied when there is insufficient time to publish the information in the manual prior to delivery of the equipment, when making minor pen-and-ink corrections, or when revising preliminary manuals (see 3.11.3). A temporary change shall consist of detailed instructions for revising the manual.

3.10.1.1.1 Instructions. - The instruction portion of a temporary change shall be prepared as follows:

(a) The publication number and the temporary change (T-) number shall appear in the upper left-hand corner of each page.
(b) The total number of pages shall be indicated on the first page only.
(c) The security notice shall appear on the first page of all classified temporary changes (see figure 1).
(d) A statement shall be made indicating when the temporary change is in effect. If it supersedes an earlier temporary change or permanent change, a statement to that effect shall be given.
(e) A statement shall be made indicating the purpose of the change and the extent (or conditions of application) to which it applies.
(f) Instructions shall be given for making specific pen-and-ink corrections. The instructions shall be terse, yet clear. Illustrations and diagrams shall be used where needed. Specific data to be changed shall be set off in quotation marks. Pen-and-ink changes shall not be allowed when the time required is more than one minute per page and where the space available does not permit the insertion without affecting the clarity of the text.
(g) Instructions shall be given for inserting new or revised pages, for the disposition of superseded material, and for correcting the list of effective pages.
(h) The instructions shall be followed by a statement that the temporary change

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433182
Not for Resale,2004/8/4 20:29:11 GMT

shall be inserted in the manual immediately behind the front cover, preceding any previous changes.

(i) Printed matter shall be arranged on the pages so that none of the copy will be obscured when the pages are inserted into the affected publication.

3.10.1.1.2 Production of temporary changes. - Temporary changes shall be produced by the most economical method.

3.10.2 Permanent changes. - A permanent change shall consist of detailed instructions and revised pages for revising the manual. If more than 25 percent of the total pages of the manual (or volume if the manual consists of more than one volume) is affected, the manual (or volume) shall be issued as a completely revised manual (see 3.10.4). If, as a result of an equipment change, a manual covers only modified items or material, a note shall be included in the first paragraph of the instruction sheet to the effect that maintenance support activities should not dispose of the superseded pages until it can be established that all of the equipment population has been modified. Other activities should update their publications when the modification has been accomplished. If an equipment change does not affect the entire equipment population, the change shall be prepared in such a manner that the manual will describe both the affected and the unaffected equipment.

3.10.2.1 Instructions. - A permanent change shall include and supersede all previous changes. A permanent change shall include an instruction sheet prepared to the same requirements as a temporary change (see 3.10.1.1), and shall contain the following:

(a) A new cover (for each volume affected) if the change includes too many new pages to fit in the original cover.
(b) A revised title page, including the original date of the publication and the date of the change. When approved by the bureau or agency concerned, the title page may be revised by pen-and-ink corrections.
(c) A revised list of effective pages. When a new title page is not required, the list of effective pages may be revised by pen-and-ink corrections.
(d) Instructions for inserting the new or revised pages.
(e) Instruction for disposing of superseded pages.
(f) Revised pages of the table of contents, list of illustrations, list of tables, index, and so forth, when applicable.

3.10.2.2 Copy, serial, or register numbers. - Changes for non-registered publications shall not bear copy, serial, or register numbers.

3.10.2.3 Issue information. - Changed pages shall include the number of the change of which they are a part. For example: If a page is revised in Change 3, "CHANGE 3" shall be substituted for the publication issue information (Change 1, and so forth) in lower binding-edge corner of the page. On unrevised sides of revised pages, the number of the change in which they were first issued (such as Change 1) shall be included, as applicable.

3.10.2.4 Production of permanent changes. - Permanent changes shall be produced in the same method as the manual.

3.10.3 Parts list revisions. - Corrections or additions to parts lists tables shall be made either by revised pages or by providing supplementary tables, provided that such tables do not exceed 25 percent of the size of the parts list. In subsequent revisions, the parts list tables shall be revised until they exceed 25 percent of the parts list. When more than 25 percent of the parts list is affected, the list shall be completely revised or corrected by a permanent change (see 3.10.2). Supplementary tables shall appear at the front of the parts list tabulation. The style and format shall be equivalent to that of the basic parts list. The supplementary parts list shall have a note equivalent to the following included in the introduction:

> "This parts list has been corrected by means of the following supplementary tables. For any given item, always refer first to the appropriate supplementary table, since it completely supersedes any corresponding listing in the basic table. If no information is shown for a given item, refer to the basic table for the required information."

3.10.3.1 The supplementary parts lists shall be entitled: "SUPPLEMENTARY PARTS LIST". If applicable, each table of the supplementary parts list shall be numbered the same as the basic parts list, followed by the letter "A". All supplementary parts lists for previous changes shall be incorporated in the new supplementary parts list.

3.10.4 Revised manuals. - A revised manual shall be supplied when the number of pages required to supply corrected and additional information for the manual is more than 25 percent of the total pages of the manual (or volume). This includes pages affected by the current change (including backup pages), plus pages affected by previous changes.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433862
Not for Resale,2004/8/4 20:22:11 GMT

3.11 Approval. -

3.11.1 Basic equipment manuals. - Whenever an equipment lends itself to the preparation of a manual covering a family of equipments of the same basic design, and one which can be made applicable to specific equipments of that design by completing sheets and blanks, the contractor may submit to the Bureau of Ships four copies of the basic manual, together with examples of the completing sheets and blanks which will represent the detailed information to be provided for a specific equipment. Approval of such a manual will be by the Bureau of Ships only, and once approved, the basic manual shall not be modified without the approval of the Bureau of Ships. At the time of manual approval, the Bureau will assign a NAVSHIPS number to the basic manual and forward one copy to the cognizant inspector for future comparison and inspection with manuals furnished for specific equipments. If any subsequent issue of a basic manual is not equivalent to the approved manual, such approval may be withdrawn. Once approval of such a manual is granted for a particular basic design of equipment (and size range, if appropriate), the basic manual with the specific detailed information required for the unit of the family being furnished shall be supplied in the quantities required by the order, without further approval. Copies of the manual prepared for the specific equipments shall be marked by the contractor with the publication number of the basic manual, followed by a "-1", "-2", and so forth. Each dash number shall be assigned numerically by the contractor for each specific equipment of that family.

3.11.2 Specific equipment manuals. - Manuals for a specific equipment that are not prepared from a basic manual shall be approved by the Bureau of Ships or its field representative. (The term "field representative" is limited to field representatives of the Bureau of Ships, that is, Supervisors of Shipbuilding, USN, U.S. Naval Shipyards; and Industrial Managers, USN.) Once such a manual has been approved by the Bureau of Ships or its field representative, the manual shall not be modified without approval of the Bureau.

3.11.2.1 Manuals for a specific equipment not previously approved shall be submitted for approval to the appropriate activity, as follows:

(a) Manuals procured under Bureau of Ships contracts. - The contractor shall forward four copies of the manual to the Bureau of Ships for approval.

(b) Manuals procured under contracts issued by Naval activities. - The contractor shall forward four copies to the Naval activity for approval.

(c) Manuals procured for the Bureau of Ships by a commercial activity (such as a private shipbuilder). - The contractor shall forward four copies of the manual to the commercial activity for approval of both the commercial activity and the cognizant Bureau of Ships representative.

3.11.2.2 The Bureau of Ships will assign a publication number to each specific equipment manual as follows:

(a) Manuals procured under Bureau of Ships contracts. - The publication number will be included in the Bureau of Ships approval letter.

(b) For manuals procured for the Bureau of Ships by Naval or commercial activities, the contractor shall request a publications number from the ordering activity at the time of submission for approval.

3.11.3 Preliminary manual approval. - When there is insufficient time to permit approval by the bureau or agency concerned and still provide manuals with the first equipment delivered, a review copy shall be submitted to the cognizant Government inspector for approval.

3.11.3.1 The review copy shall be submitted (prior to shipment of the first equipment) to the Government inspector simultaneously with four copies of the manual to the bureau or agency concerned. Publications numbers for preliminary manuals shall be requested from the local Navy representative.

3.11.3.2 A self-addressed (contractor) postal card containing information equivalent to the notice indicated below shall be attached to the title page of all preliminary manuals which accompany equipment.

> IMPORTANT NOTICE: This is a preliminary manual for (insert nomenclature of equipment), publication (insert number), supplied under contract (insert number). A copy of the FINAL manual will be forwarded when published. Return this card IMMEDIATELY, indicating ship or shore activity and mailing address.

When postal cards are received by the contractor after shipment of the bulk quantity of manuals has been completed, they shall be forwarded to the cognizant Government inspector with a request to process the cards into the supply system.

3.11.4 Revisions. - Four copies of changes or revised manuals shall be submitted to the bureau or agency concerned for approval and assignment of a publication number. However, temporary changes

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433882
Not for Resale,2004/8/4 20:22:11 GMT

are approved by the Government inspector only. Publication numbers of temporary changes shall be obtained from the bureau or agency concerned prior to publication.

3.12 Quantity and distribution. - The quantity of manuals shall be as specified in the contract, order or ship specification. Unless otherwise specified, the contractor shall be responsible for the distribution of all manuals procured on the contract or order.

3.12.1 Preliminary manuals. - The quantity shall be 2 per equipment, and a bulk quantity up to the bulk required for final manuals. The actual quantity to be supplied will depend upon the need at the time and the expected delay in production of final manuals. Distribution will be as directed. Distribution of bulk shall be not later than two weeks prior to the shipment of the first equipment.

3.12.2 Revisions. - The quantity of changes or revised manuals shall be as specified in the contract, order or ships specification. The distribution of such material shall be to all activities receiving the original manual and in the same quantity or as directed by the bureau or agency concerned.

3.12.3 Replenishment material. - One glossy, unscreened photographic print of each half-tone illustration used in manuals shall be furnished, along with two copies of the final manual. This material shall be forwarded as directed, with a covering letter advising that the material is for replenishment purposes.

3.14 Reproduction rights. - Reproduction rights shall be as established by the provisions of the contract pertaining to data or copyright. When material is copyrighted, the publication shall include a statement adjacent to the copyright notice as to the rights of the Government thereunder.

4. QUALITY ASSURANCE PROVISIONS

4.1 The supplier is responsible for the performance of all inspection requirements as specified herein. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure that supplies and services conform to prescribed requirements.

4.2 Inspection. - Manuals shall be inspected to determine compliance with the requirements of this specification, and for equivalence with the approved manuscript (sample manual or basic manual) and the approval letter.

4.3 Content. - The content of the manual shall be checked against the equipment being furnished to assure that it depicts accurately and adequately the equipment and the operating and maintenance procedures required.

5. PREPARATION FOR DELIVERY

5.1 Packaging and packing. -

5.1.1 Individual and multi-volume manuals. - Individual copies and multi-volume manuals shall be packed to preclude the possibility of damage in transit. Multi-volume manuals shall be furnished as complete sets except for the manuals shipped for stock. Stock copies of identical volumes shall be packed and shipped in common container(s).

5.1.2 Manuals shipped with equipment. - When copies of the manual are packed with the equipment, they shall be packed within the shipping container holding the main unit of equipment. The manuals shall be so placed that they are readily accessible prior to removing the equipment, and shall not be placed within the vapor-proof barrier material used to enclose the equipment. Manuals accompanying equipment shall be packaged in a waterproof container. The invoice, packing list or bill of lading shall include the publication number of the manuals, and the quantity; it shall also indicate which container includes the manual.

5.1.3 Bulk shipment. - Manuals shipped in bulk shall not be individually wrapped. Containers shall comply with the Uniform Freight Classification Rules or other carrier regulations, as applicable to the mode of transportation.

5.2 Marking. - On bulk shipments, interior packages and exterior shipping containers shall be marked with the following information for each item enclosed, except for shipment of an individual copy or an individual set of manuals:

Box (number) of (number) (to be listed on multiple container shipments)
Publication number
Quantity (in package)
Contract or order number

The words "FOR STOCK" shall be marked on the package or packages destined for stock. The publication numbers shall be indicated on the shipping documents. When a contract or order requires manuals having different publication numbers, the stock copies of each manual number shall be shipped separately. All bulk shipments shall be in accordance with security requirements.

6. NOTES

6.1 Ordering data. - Procurement documents shall specify the following:

(a) Title and number of this specification
(b) Security classification (see 3.7.4)

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433552
Not for Resale,2004/8/4 20:22:11 GMT

(c) Quantity of manuals (revisions or APR pages) required (see 3.12, 3.12.1)

6.2 The purpose of the detail requirements for the "logical trouble-shooting procedure" is to insure that the maintenance technician will have sufficient trouble-shooting information to enable him to efficiently locate equipment troubles, using the steps outlined. The objective of the method is to develop the technician's ability to decide what checks should be performed and where to make them. The information presented in the manual should not act as a "crutch" for the technician, but rather should serve as one of his most important maintenance tools.

6.3 Applicability of manuals. - Copies of manuals previously supplied covering a specific equipment *in its entirety, required for ship(s) and* local use, shall be requisitioned from stock by the cognizant Naval supervising activity.

6.4 Manuals procured by other activities for the Bureau of Ships. - The field approving activities shall obtain publication numbers from the Bureau of Ships by *one of the following methods:*

(1) Submit two copies of the manual either prior to or subsequent to the review and approval.

(2) Permit the contractor to forward two copies of the manual to the Bureau of Ships simultaneously with the copies for approval.

(3) In urgent cases, submit a letter containing the nameplate data of the equipment, the ship applicability, and the contract or order data.

6.4.1 Regardless of the method used for obtaining publication numbers, the accompanying *letter shall state the expected delivery date of the* final manuals and the quantity of manuals being furnished for stock.

Notice. - When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related *Government procurement operation*, the United States Government thereby incurs no responsibility nor any obligation whatsoever, and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder *or any other person or corporation, or conveying* any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Preparing activity:
Navy - Ships
(Project 7610-N0016Sh)

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433062
Not for Resale,2004/9/4 20:22:11 GMT

SECURITY CLASSIFICATION

*(Publication number)*

VOLUME *(number)*

TYPE OF PUBLICATION

*for*

NOMENCLATURE

OF EQUIPMENT(U)

*(Manuals Bearing Classified Restricted Data Only)*

RESTRICTED DATA

"This document contains restricted data as defined in the Atomic Energy Act of 1954. Its transmittal or the disclosure of its contents in any manner to an unauthorized person is prohibited."

*(Other Classified Manuals)*

"This document contains information affecting the national defense of the United States within the meaning of the Espionage Laws, Title 18, U.S.C., Sections 793 and 794, the transmission or the revelation of which in any manner to an unauthorized person is prohibited by law."

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS

SECURITY CLASSIFICATION

Figure 1. Sample Cover

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01433012
Not for Resale,2004/8/4 20:22:11 GMT

SECURITY CLASSIFICATION

*(Publication number)*

VOLUME *(number)*

TYPE OF PUBLICATION

*for*

# NOMENCLATURE OF EQUIPMENT(U)

For classified manuals, place applicable automatic, time-phased downgrading and de-classification notice here.

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS

SECURITY CLASSIFICATION

*Publication: (DATE)*
*Change (number): (DATE)*

Figure 2. Sample Title Page

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01439882
Not for Resale,2004/8/4 20:22:11 GMT

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01453989
Not for Resale,2004/8/4 23:32:11 GMT

Approval Authority shall include the applicable letters or correspondence granting approval in conformance with approval procedures.

Remarks space shall be used for necessary comments and the inclusion of information regarding the extension of a manual by minor revisions.

Certification: One of the following certification paragraphs shall be typed in this space, as appropriate:

Basic equipment manuals.

It is hereby certified that NAVSHIPS ______ is identical to the basic manual NAVSHIPS ______ approved by the approval data shown above except for the detailed information required for the equipment provided under contract or purchase order ______

Specific equipment manuals.

It is hereby certified that NAVSHIPS ______ to be provided under contract or purchase order ______ has been approved by the approval data shown above.

For identical manuals covering basic equipment and specific manuals.

It is hereby certified that the manuals to be provided under contract or purchase order ______ are exactly identical to NAVSHIPS ______ approved by authority of approval data shown above.

For basic equipment manuals covering specific equipment and specific equipment manuals which have been previously distributed but required minor modification.

It is hereby certified that the manuals to be provided under contract or purchase order ______ are exactly identical to NAVSHIPS ______ approved by the approval data shown above except for the necessary modification as shown in the above remarks space.

NOTE: This page may be typed and reproduced by any economical method and shall be included in specific equipment manuals and copies of final manuals.

APPROVAL AND PROCUREMENT RECORD PAGE

APPROVAL DATA FOR: NAVSHIPS ______
TITLE OF MANUAL:

APPROVAL AUTHORITY:

| CONTRACT OR PURCHASE ORDER | SHIPS APPLICABLE | QUANTITY OF MANUALS | QUANTITY OF EQUIPMENT | BUILDING YARD |
|---|---|---|---|---|
| | | | | |

REMARKS:

DATE ______

CERTIFICATION:

MANUFACTURER'S SIGNATURE
MANUFACTURER'S NAME AND ADDRESS
FEDERAL CODE NUMBER (HOME OFFICE)

CHANGE NO.

Figure 3 Approval and procurement record page.

MIL-M-15071E(SHIPS)

NAVSHIPS NO.__________ USER ACTIVITY COMMENT SHEET. Vol. No.__________

(Fold on dotted lines on reverse side, staple in corner, and send to Bureau of Ships, Code 240, Washington 25, D. C.)

PROBLEM AREA:

Both sides of this form to be reproduced locally as required.

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01483612
Not for Resale,2007/9/4 20:22:11 GMT

**DECLARATION OF LAWRENCE STILWELL BETTS, MD, PhD**

I have been asked by legal counsel to expand my discussion of several areas which I have previously addressed in trial and deposition testimony, and in prior declarations, affidavits, and reports. To this end, I, Lawrence Stilwell Betts, MD, PhD, CIH, FACOEM, declare that:

1. I retired from the United States Navy as a Captain in 2001, and now have a very active professional practice in science and medicine based in Poquoson, Virginia. As reflected in my Curriculum Vitae (Betts, 2012), I am the President of my own medical and scientific practice. I routinely consult on, or work with, difficult and complex medical cases where treatment, or exposure or possible consequences of exposure, are in question. My professional associations include a wide variety of government, industry, and professional organizations, as well as academically – and privately – practicing professionals. I also teach, mentor, perform research, develop prevention and treatment protocols, and write medical articles and text chapters. I am a Clinical Professor at the Eastern Virginia Medical School where I have had a continuous academic relationship and have been teaching toxicology, previously with the approval of the US Navy while I was on active duty, since 1979. I serve on several national committees addressing broad, as well as specific, issues in occupational and environmental health. I am board certified in both occupational medicine by the American Board of Preventive Medicine, and in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene. Together with the late W. Clark Cooper, MD, and Mitchel R. Zavon, MD, I am one of the original three "medical scientists" to have ever been elected to Fellowship in both the American College of Occupational and Environmental Medicine and the American Industrial Hygiene Association; a fourth, Sidney Siu, MD, was recently added to this short list of physicians who are also Certified Industrial Hygienists, in 2012. The anticipation, recognition, evaluation, and control of hazardous conditions are the fundamentals of industrial hygiene and my practice of preventive medicine and public health. The emphasis of my entire career has been the prevention of illness and the promotion of health through the application of the professional tools of my scientific and medical knowledge and experience. After my retirement from the US Navy, I was presented the VADM Richard A. Nelson Award for my career contributions to Navy and Marine Corps readiness through leadership in prevention of disease and promotion of health.

2. During my Navy career, I was assigned to billets with professional duties and increasing responsibilities, initially as a scientist in industrial hygiene and toxicology, and later as an occupational and environmental medicine physician and medical toxicologist. I became one of the first physicians to qualify and be designated a Surface Warfare Medical Department Officer (SWMDO). I have spent time at sea on a large number of United States Navy and United States Naval ships and I have worked in and directed occupational health programs at Naval shipyards, air rework facilities, weapons stations, and other major shore facilities in the San Francisco Bay area and the Tidewater area of Virginia. I served as a physician on the USS KITTY HAWK (CV-63) during her extensive Service Life Extension Program (SLEP) in the Philadelphia Naval Shipyard from 1987 to 1989. Based upon my scientific and medical training, and experience as a Navy officer for three decades, and now as an active governmental consultant for over a decade, I am generally familiar with the industrial products that were used by the Navy and in maritime work environments, both ashore and afloat. I am also familiar with the history and practice of the Navy occupational health program from its early days before World War II until the present time. During the four decades of my professional life, I have also become familiar with, and evaluated occupational exposures to, asbestos-containing and other materials used in the electrical trades, aircraft and aerospace industries, nuclear power facilities, and several other trades and industrial/commercial activities which are not unique to the Navy or maritime industries.

3. Based upon my scientific and medical training, and experience as a US Navy officer for three decades, I am familiar with the Navy mission, the Navy command structure for Navy active duty and civil service personnel, the maritime work environments, both ashore and afloat, and the industrial products and equipment that were used in shipbuilding applications. I am also familiar

EXHIBIT
G
tabbies

with the history and practice of the Navy occupational health program from its early days before World War II until the present time.

4.  I have been asked by counsel to address the following issues based upon my knowledge, experience, and research, and to report my findings and conclusions:

   a.  **What are the fundamental missions of the United States Navy (US Navy; Navy) and the Navy Medical Department, and how is the Navy organized to fulfill those missions?**

   b.  **What role did asbestos (primarily as used in thermal insulation products) play in Navy and maritime shipbuilding and maintenance during the period from before WWII through the enactment and implementation of the Occupational Safety and Health Act (PL-91-596) in the 1970s and thereafter?**

   c.  **What did the Navy and other Federal Government Departments and Agencies, private shipyards and employers, as well as organized labor, know regarding the health hazards of asbestos during this time period? Additionally, how did this knowledge affect the use and handling of asbestos during the post-OSHA era?**

   d.  **Was there additional occupational health information about asbestos, available during the relevant periods of time, which should have been provided by an equipment manufacturer or vendor supplying a product to the Federal Government in accordance with specifications, or to a private industrial or maritime employer, that would have meaningfully enhanced existing knowledge, and that would have been likely to alter established specifications, policies, and procedures regarding the use of asbestos-containing products and materials?**

   e.  **In fulfilling its mission, did the Navy engage in "risk-balancing" between issues critical to mission success and the risks of asbestos exposure to the health of Navy Department personnel – both active duty and civilian?**

   f.  **Whether, and to what extent, Navy and shipyard personnel during the 1940s through the 1970s typically were exposed to meaningful amounts of inhalable asbestos dust onboard ships?**

5.  I have based my professional opinions contained in this report on my Navy and professional knowledge arising from my training, education, and experience as a scientist, physician, and, now retired, senior United States Navy officer, as well as my extensive research regarding the knowledge of, and response to, asbestos hazards within the Navy and shipyards specifically, and more generally within the scientific and medical communities at large.

## MISSION AND ORGANIZATION OF THE US NAVY AND NAVY MEDICAL DEPARTMENT

6. Although the wording of the mission has changed and evolved over time, the Navy currently describes its mission as the following:

> ***"The mission of the Navy is to maintain, train and equip combat-ready Naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas."*** (USN, 2010)

The Navy's mission is carried out as an integral part of the overall strategy of the Department of Defense:

> ***"Current U.S. defense strategy calls for continuing to shape the strategic environment to advance national interests, maintaining the capability to respond to the full spectrum of anticipated current threats, and preparing for the threats of tomorrow. Implementation depends on the fundamentals of military power: quality people, ready forces, and superior organization, doctrine, and technology. The challenge is to construct an effective defense establishment with limited financial resources in accordance with Department of Defense guidance."*** (NAS, 1998)

In order to fulfill its mission, the Navy must be authorized the funds and personnel to develop and maintain resources – the technology, equipment, conditions – to enable its forces. The Navy maintains a ready and capable force in mind, spirit, and equipment so that personnel are able to respond, when called upon, to a variety of events. In addition to actual combat with a hostile enemy, the Navy must also be able to respond to natural disasters, humanitarian situations, and political events. When not responding to actual combat, the Navy devotes its assets (people, equipment, and funds) to maintaining a state of preparedness and readiness which allows it to be adroit in responding to any mission. Whether at war or in peace, the Navy is always engaged in or preparing for its role in National defense.

7. The ultimate role of the Navy is the projection of force upon the seas as the naval warfare service branch of the armed forces. To this end, the Navy must maintain a constant state of readiness. This is achieved through the maintenance and preparation of ships, aircraft, and equipment, and supporting the shore activities, as well as the personnel manning and operating these activities. The preparation is accomplished through such activities as maintaining and repairing ships, aircraft and other equipment; health promotion and maintenance; equipping and training personnel; developing new technologies – both defensive and offensive; logistics; and budgeting. Without logistics and other support activities, combatant forces (ships, aircraft and personnel) cannot sustain a mission.

8. Even before the United States entered WWII, the Navy Medical Department's express mission was:

> ***"To keep as many men at as many guns as many days as possible."***
> (BuMED, 1941)

Currently, this mission statement is not as "combat specific" as manning guns, but still the Navy's Medical Department's primary mission is stated as:

> ***"OUR MISSION IS FORCE HEALTH PROTECTION. As the preeminent maritime medical force deployed with our Navy and Marine Corps warriors throughout the world, we are capable of supporting the full range of operations from combat to humanitarian assistance. We are further capable***

> ***of providing superior state of the art in-garrison health and preventive care for active duty personnel, our families and those who have worn the cloth of our nation – our retirees."*** (BUMED, 2009)

In support of the Navy's mission, the Medical Department promotes and maintains the health of personnel through the care and treatment of sick and injured members of the Naval service and its civil service employees; prevention and control of diseases and injuries; promotion of physical fitness; as well as performing training and research programs. If people cannot operate the equipment or otherwise perform their duties, ships could not get underway, aircraft could not fly, and other vital operational aspects of the Navy's mission could not be performed in support of national defense.

9. Under civilian leadership (the President, the Secretary of Defense, and the Secretary of the Navy), the Chief of Naval Operations (CNO) is the senior Naval officer with responsibility for every aspect of the overall operations of the Navy. The CNO is a four-star admiral and is responsible to the Secretary of the Navy for the command, utilization of resources, and operating efficiency of the operating forces of the Navy and of the Navy shore activities assigned by the Secretary. As a member of the Joint Chiefs of Staff (JCS), the CNO is the principal Naval adviser to the President and to the Secretary of the Navy on the conduct of war and is the principal adviser and Naval executive to the Secretary on the conduct of activities of the Department of the Navy. Assistants include the Vice Chief of Naval Operations (VCNO), the Deputy Chiefs of Naval Operations (DCNO), the Assistant Chiefs of Naval Operations (ACNO), and a number of other ranking officers. These officers and their staffs are collectively known as the Office of the Chief of Naval Operations (OPNAV). In addition to the "war fighting members" of the office of CNO, the Navy Surgeon General (SG) and others, such as the Chief of Chaplains and Chief of Information Dominance, also serve to advise the CNO in matters under their cognizance. The SG serves a dual role in the Navy as both the principal advisor to the CNO on medical matters and also the head of the Navy's medical department (Chief, Bureau of Medicine and Surgery (Ch, BUMED)). The CNO may consult with the SG on medical matters; however, the final determination on overall operational strategy and mission achievement rests solely with the CNO (subject to consent of civilian leadership) (USN, 2010).

10. Prior to the 1970s, the Navy's health and safety functions were separately operating components. This initially started in 1917 with the establishment of the safety engineer at shipyards, and then later with the establishment of medical officers at shipyards in the 1920s. The fundamental advisory role of the Navy Medical Department was "medicine" or "health" – not physical safety (such as prevention of trips and falls; "guards" for tool safety). The "Basic Rule of Responsibility" states (CNO,1953):

> ***"Safety is a command function. Responsibility for the safety of personnel is vested in the commanding officer."***

The complete text of this rule not only appears in Chapter 1, but is reprinted on the title page of each chapter of the 1953 "United States Navy Safety Precautions".

11. The Naval chain of command is the Service's delineation of "authority, responsibility, and accountability" extending from top Navy civilian leadership (Secretary of the Navy) through all levels of Naval command or "supervision", and to all Navy personnel. From the day of entry into Navy service, all Navy personnel are taught and must strictly adhere to the chain of command. Using the chain of command, all personnel receive their orders (assignments) and supervision from their immediate senior or "supervisor" in the chain of command. This command structure is important to fulfilling the Navy's mission because it (a) defines authority and responsibility from the most senior to the most junior person in the Service; (b) establishes administration, support, communication, and discipline; and (c) organizes forces to carry out operations. The importance of the chain of command to the Navy's mission is demonstrated by the applicable disciplinary actions for Navy personnel who fail to carry out lawful orders from a senior within the chain of

command. A significant breach in the chain of command could endanger personnel or equipment, mission completion or success and, ultimately, the national defense.

12. It is ultimately the Commanding Officer's responsibility to ensure that all personnel and equipment, which includes ships, aircraft, and other physical resources, are prepared to operate and perform their functions in support of their assigned mission. The maintenance of good order and discipline is essential to the Commanding Officer's ability to meet his/her responsibilities. If Navy personnel do not follow the military chain of command and perform duties as directed by his/her operational superior, or if civilian "third-parties" are permitted to interfere with the Navy command structure, Navy operations and mission could be endangered. This is simply because the Commanding Officer would not have confidence that his/her orders would be followed and, ultimately, that the Navy's mission objectives would be met.

13. As I discuss more fully below, the Navy established a comprehensive occupational health program that operated within the overall chain of command to communicate medical and hazard information. Whether onboard combatant vessels or in Navy yards or other shore facilities, the Commanding Officer is charged with protecting the health of all Naval personnel and civilian employees (as appropriate) under his/her command. Navy Medical Department officers working under a Commanding Officer have the responsibility for identifying and communicating information regarding occupational health hazards.

## HISTORY OF KNOWLEDGE AND CONTROL OF ASBESTOS HEALTH HAZARDS BY THE US NAVY, AND IN US SHIPYARDS

14. With respect to naval and maritime activities, as well as general industry in the United States, the US Navy and the US Public Health Service (USPHS; PHS) have cooperated in evaluating asbestos exposures and developing exposure control methods for almost three-quarters of a century. The US Public Health Service was established by Congress in 1798 as the provider of health services for the US Merchant Marines – initially as the Marine Hospital Service; later the Public Health and Marine Hospital Service; and currently the Public Health Service. At the request of the North Carolina State Board of Health and their Industrial Commission, the US Surgeon General assigned Dr. WC Dreessen and his co-workers from the Public Health Service to perform the first such evaluation of the developing asbestos textile industry in the United States. (Dreessen, 1938). Dr. Dreessen, together with another senior physician in the Public Health Service, Dr. RR Sayers, disseminated these findings at the American Public Health Association meeting in 1938, and later published them in the *American Journal of Public Health* in 1939 for the general scientific and medical communities. Later, at the joint request of the US Navy and the US Maritime Commission, Dr. Dreessen worked with Prof. Philip Drinker and Dr. WF Fleischer, a Navy physician, on an asbestos exposure evaluation and development of asbestos exposure control methods and medical practices for employees at a private US shipyard. (Dreessen and Fleischer, 1944) A discussion of "what and when" the US Navy was aware of regarding the health hazards associated with asbestos and the need to control exposure to airborne asbestos fibers is thus forever intertwined with the "what and when" of the US Public Health Service's parallel awareness and understanding regarding the protection of the health of the general public – and civilian mariners.

15. The Navy's development of nuclear power for ship propulsion systems in the late 1940s led to a close working relationship and the sharing of information between the US Navy and the US Atomic Energy Commission (AEC) – as well as the Public Health Service. The AEC later "evolved" into the Nuclear Regulatory Commission (NRC), the Energy Research and Development Administration (ERDA), the Department of Energy (DOE), and the National Nuclear Security Administration (NNSA). These organizational entities always had a close working relationship with the Navy's Bureau of Ships (BuSHIPS) and the Office of Naval Reactors. A close relationship still exists today between the US Navy and non-Navy ("civilian") Governmental

Departments and Agencies through the Navy-Department of Energy Naval Nuclear Propulsion Program. A working relationship also existed between major US Governmental Departments and Agencies and the energy utilities with respect to occupational health and safety. This relationship was enhanced by the presence of two notable individuals: Admiral HG Rickover, USN and HE Stokinger, PhD. ADM Rickover served in joint and overlapping assignments with the US Navy and the early AEC--such as in his roles in the Division of Reactor Development at the AEC and as Director of the Naval Reactors. These roles led to his direct involvement with both the development of the Navy's first nuclear-powered vessel, the submarine USS NAUTILUS which was commissioned in 1954, and also the Shippingport Atomic Power Station which powered up on December 18, 1957 as the first commercial, pressurized water reactor nuclear power plant. Dr. Stokinger served initially in the Industrial Hygiene Section on the Manhattan Project with the Atomic Energy Commission, and later, in 1951, be became the Chief Toxicologist for the newly created Division of Occupational Health of the US Public Health Service. Dr. Stokinger continued with the Public Health Service until well after the enactment of the Occupational Safety and Health Act in 1970 and the establishment of the National Institute for Occupational Safety and Health (NIOSH). He served on the American Conference of Governmental Industrial Hygienists (ACGIH) Threshold Limit Value (TLV) Committee for twenty-five years--fifteen of those years as the Chair. The US Navy had representation in the ACGIH and also on the TLV Committee. As discussed throughout this report, the Navy's knowledge of the applications and hazards of asbestos represented what was available and known by other Federal Departments and Agencies

16. The Navy and the Maritime Commission's use of asbestos onboard ships generally, and on steam systems specifically, was not by chance, nor based on any requirements of the Navy's equipment manufacturers and vendors. The use of asbestos was based upon necessity. Due in large part to the association of one notable individual, Professor Philip Drinker of the Harvard School of Public Health – and who also served as the Chief Health Consultant for the US Maritime Commission, the knowledge and experience possessed by the Navy regarding the use of asbestos since its early use in steam-generating systems, as well as the hazards and means of controlling those hazards, was shared and held by other Federal Departments and Agencies. As discussed in their landmark paper addressing the use of asbestos in the Navy, Fleischer and coworkers (1946) wrote with the permission of the Navy:

> ***"An important ingredient of pipe covering material used on U.S. Navy vessels is amosite.... The chief reasons for the wide use of amosite felt and pipe covering in naval work are its low thermal conductivity, light weight, strength and refractoriness. When the felt and pipe covering were first developed, we were still building vessels under the Washington Treaty of Limitations in Tonnage, and every pound saved meant that much more armor, guns or ammunition for a given displacement, to say nothing of more economic operation for the weight involved in insulation.***
>
> ***Amosite pipe covering weighs about 14 pounds per cubic foot, with a temperature limit of 750 F, as compared to magnesia with a weight of 16 pounds per cubic foot, and a temperature limit of 500 F, High temperature amosite pipe covering weights about 18 pounds per cubic foot as compared to 26 pounds per cubic foot for other high temperature insulations. Because of the lower conductivity and the higher temperature limit of the amosite type, less of it need be used in combination covering than other types of insulations.***
>
> ***The development of amosite felt started in 1934 when a need existed to secure a thermal insulation lighter in weight and thermally more efficient than the materials (blocks and cement or asbestos blankets) which were then being used on destroyer turbines. The Navy approved the type***

***developed by a manufacturer in September, 1934. Originally amosite was used only for turbine insulation, but it proved so satisfactory that its field of application enlarged to include insulation of valves, fittings, flanges, etc. From the initial destroyer, it has been used on almost all the destroyers built since that time and on all other combat vessels built since before the War.***

***Pipe covering was a later development in late 1935 and early 1936. Due to the manufacturing problems involved, it took a longer time to evolve into a satisfactory shape, and its first use on naval vessels was in 1937. Since that time its use has spread markedly and it was used on the great majority of naval combat vessels built during World War II.***

***Water-repellent amosite felt was developed during the early part of 1942, as a replacement for hair felt in the insulation of cold water lines to prevent sweating. Hair felt had the disadvantage of being combustible and as it was organic, when it became wet it moulded or rotted and could harbor vermin. At this time fires on board certain naval vessels convinced the Navy of the desirability of eliminating any combustible material from on board ship. Eventually water-repellent amosite was made in strips of 50 foot lengths and of suitable width to enclose the circumference of the pipe and enclosed in an extremely light-weight muslin to facilitate handling and reduce the dust, which the water-repellent agent accentuated."***

17. The US Navy and the US Maritime Administration ("MARAD"; the US Maritime Commission became MARAD under the Department of Commerce in 1950 when its Government-owned shipping interests and operations transferred to this newly-established Administration) specified the types of thermal insulation and lagging for piping and machinery, as noted in the military specifications used for vessels constructed under US Navy and the Maritime Administration contracts for boilers, machinery and piping (MIL-B-18381(SHIPS) (Boilers, Steam, High Pressure Naval Propulsion) and (MIL-STD-769 (Military Standard – Thermal Insulation Requirements for Machinery and Piping)), and for steam propulsion turbines (Mil-T-17600 series (Turbines, Steam, Propulsion)) for vessels built under contract for the US Government. In accordance with these military specifications and the specific contracts that I have seen, external thermal insulation for equipment like boilers and turbines, and the associated appurtenances and piping is provided initially by the shipbuilder, and later upon maintenance or overhaul, the external insulation is provided by the activity performing the work – the Navy or shipyard/repair facility – in accordance with Navy specifications. The composition and thickness of external thermal insulation, if required by Navy specifications for a specific thermal application of a valve or fitting, are provided in the "General Specifications for Machinery of Vessels of the United States Navy" (Section S39-2; 1951; later Chapter 39 Bureau of Ships Technical Manual of 15 April 1959 and Chapter 9390 of the same Manual dated 5 Jan 1965) (BUSHIPS, 1951; 1959; 1965). The General Specification, dated 8 December 1951, specifically addresses the type and thickness of external thermal insulation (block, felt, and blanket) applied to turbines and other equipment and serves as the basic reference for ship design, building, and repairing activities. It would also be the basic reference cited in an equipment manual. Starting in the mid-to-late1960s, the Navy specifications for the composition of thermal insulation materials changed – some asbestos-containing thermal insulation materials were no longer used, while the asbestos content of others was reduced. (Turnbull, 1969; OiC NAVSEC, Philly, 1969; COMNAVSEC, 1971; COMNAVSHIPSYSCOM, 1971; COMNAVSEC, 1972; COMNAVSEASYSCOM, 1975) During this period of time, additional Federal, as well as Navy, safety and health requirements were enacted to control the exposure to airborne asbestos fibers and meet Federal pollution control statutes.

In addition to thermal insulation, the US Navy also specified the types and styles of materials

which were used for packing and gasket applications, as well as the types and applications of electrical products used on vessels of the US Navy. The packing and gasket specifications, and their unique Navy symbols which are used to identify and order approved products for specific applications, are given in the "Standard Plan Application of Packings and Gaskets" (Bureau of Ships, Navy Department, 1945), and are discussed in Chapter 95 of the "Bureau of Ships Technical Manual (NAVSHIPS 250-000; Chapter 95; 1959). Packings and gaskets were specifically required by paragraph 95.3: "PROPRIETARY BRANDS, AVOID REFERENCE TO" and reads:

> ***"Packing and gaskets shall be ordered by Navy symbol number or applicable specification, and not by brand name."***

The use of non-friable asbestos-containing materials in gaskets, packings, wire and cable, as well as in other Navy electrical system applications where the asbestos was "embedded" and not friable, did not present an "inhalation exposure hazard" to asbestos fibers under normal conditions of handling and use. This determination was based upon data and professional opinions dating back to World War II, and re-confirmed through the work of more current investigators. (Liukonen et al., 1978; Mowat et al., 2005; Williams et al., 2007)

The Occupational Health and Safety Administration (OSHA) and the US Environmental Protection Agency (EPA) interpret the term "friable". Under OSHA, "friable" is defined as:

> ***"C. The potential for an asbestos-containing product to release breathable fibers depends largely on its degree of friability. Friable means that the material can be crumbled with hand pressure and is therefore likely to emit fibers. The fibrous fluffy sprayed-on materials used for fireproofing, insulation, or sound proofing are considered to be friable, and they readily release airborne fibers if disturbed. Materials such as vinyl-asbestos floor tile or roofing felt are considered non-friable if intact and generally do not emit airborne fibers unless subjected to sanding, sawing and other aggressive operations. Asbestos-cement pipe or sheet can emit airborne fibers if the materials are cut or sawed, or if they are broken."***

A similar definition is used by the EPA under the "National Emission Standards for Hazardous Air Pollutants" (NESHAP) regulations initially published in 1973:

> ***"Friable asbestos-containing material (ACM), is defined by the Asbestos NESHAP, as any material containing more than one percent (1%) asbestos as determined using the method specified in Appendix A, Subpart F, 40 CFR Part 763, Section 1, Polarized Light Microscopy (PLM), that, when dry, can be crumbled, pulverized or reduced to powder by hand pressure." (Sec. 61.141)*** [EMPHASIS ADDED]

When the health standard for asbestos enacted under the Occupational Safety and Health Act of 1970 was published separately as the "Asbestos Standard" in 1972, the requirements for labeling or a warning notification did not apply to all asbestos-containing products – it excluded non-friable asbestos-containing materials such as these (DoL, 1972):

> ***"(2) Caution labels--(i) Labeling. Caution labels shall be affixed to all raw materials, mixtures, scrap, waste, debris, and other products containing asbestos fibers, or to their containers, except that no label is required where asbestos fibers have been modified by a bonding agent, coating, binder, or other materials so that during any reasonably foreseeable use, handling, storage, disposal, processing, or transportation, no airborne***

***asbestos concentrations of asbestos fibers in excess of the exposure limits prescribed in paragraph (b) of this section will be released."*** [EMPHASIS ADDED]

Section (b) of this 1972 Standard reads:

> ***"(b) Permissible exposure to airborne concentrations of asbestos fibers-- (1) Standard effective July 7, 1972. The 8-hour time-weighted average airborne concentrations of asbestos fibers to which any employee may be exposed shall not exceed five fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section."*** [EMPHASIS ADDED]

As defined under OSHA and the EPA, it is not the mere presence of asbestos in a material – it is the so-called "asbestos-containing material" or "ACM" which is regulated by the material's asbestos content (greater than 1%) and potential to release airborne asbestos fibers (greater than 5 microns in length) in excess of the asbestos PEL. The representation and claim that an individual was "exposed to asbestos" based solely upon a material's composition is non-sensical in terms of scientific or probabilistic reality – and under reasonable thinking.

18. The United States Navy recognized that the inhalation of asbestos fibers in sufficient amounts (dose = concentration x time) could result in pulmonary disease since at least the early 1920s and had an active program to identify hazardous exposures and to prevent exposures leading to recognized health effects. In the "Instructions to Medical Officers (Notes on Preventive Medicine for Medical Officers, United States Navy)", asbestos was listed as one of the many inorganic and organic dusts that could cause pulmonary disease. (Dublin, 1922) Dublin also recognized several methods to prevent the inhalation of these dusts including: the use of water to control the release of dust; the use of local exhaust systems to remove the dust at the point of origin; the use of inclosing (sic) chambers; and the use of respirators and helmets. He stated: ***"No one of these can apply to all conditions, but the particular method to be used must be adapted to the peculiarities of the process."*** From the extensive list of inorganic, as well as organic, dusts and ***"occupations which offer such exposure"***, it is obvious that his perception of dust control was based upon the avoidance of recognizable disease, and not the mere presence of a given, or visible, amount of dust being generated.

19. The United States Navy expanded the scope of its asbestos hazard control program by including the enlisted corpsmen of the medical department in the hazard control process. In the "Handbook of the Hospital Corps" (United States Navy, 1939), the Bureau of Medicine and Surgery discussed the organization used for disease and injury prevention in the United States Navy, and took a lead position in the prevention of industrial diseases:

> ***"The government having passed such laws must therefore lead the way in protecting its own employees.... An organization has been set up in the Navy to protect its personnel, both civilian and naval, a safety engineer is provided, who acts directly under the Assistant Secretary of the Navy. He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations, and the like. He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities. A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented. Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization. It is essential that each of these***

> *members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of medical personnel for such purposes. Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea. In each of these places a variety of health hazards exist. It is therefore necessary that these personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.*
>
> *In all navy yards, the Commandant is the head of the organization. He is responsible to the Navy Department for the protection of the employees, as well as the naval personnel, under his command. He is familiar with the nature of the work being performed by the employees at his station and on the health and accident hazards presented. Accordingly, he appoints, as the working head of the organization, a safety officer or a safety engineer, as he is better known. The safety engineer must be of sufficient rank to have become familiar with the various trades in a navy yard, a knowledge of machinery, a man of cooperative ability and well liked, and having sufficient knowledge of safety devices and appliances to intelligently make inspections and recommend proper protective measures. His duties are primarily, to prevent accidents and promote healthy working conditions. It is his duty to inspect all working places, make a general survey of all mechanical conditions and to recommend the addition of all necessary safety appliances for the protection of the workers.*
>
> *The Commandant further assigns a medical officer to act as advisor to the safety engineer. The medical officer must be of the same qualifications as the safety engineer, with the addition that he must be thoroughly versed in the diseases connected with Industry... It is well for members of the Hospital Corps to understand the nature of these duties in order that they may be of assistance to him in the performance of these duties: ... He acts as consultant to the safety engineer in all matters pertaining to the general welfare and health of the employees. Hygiene and sanitation are his important duties. He must interest himself in the employees and instruct them in the everyday principles of personal hygiene and self preservation. He must instruct the employees in safety measures and encourage them to cooperate in protective measures. They must be made "safety conscious" or "safety minded". The morale must be kept up....*
>
> *The medical officer must inspect all working places in order to have a better understanding as to the actual conditions under which the men work. He must make appropriate recommendations to improve deficiencies noted and must then see that these recommendations are carried out."*

The text further notes that the safety engineer is assisted by other personnel:

> *"The safety engineer is assisted in his work by the foremen of the shops and in some instances by safety committees in each shop elected by the employees. These men or committees are generally chosen from among the older employees and from men who have considerable experience in their trade... The organization of the medical advisor is composed of junior medical officers, dental officers, to some extent, members of the Hospital Corps, and of nurses. The duties of the hospital corpsmen are to assist the*

> ***medical officer in his inspections, assist in the treatment of the injured and to prepare the necessary reports and returns in cases of accident, occupational disease, and the physical examination of employees."***

A similar organization is described for ***"... a battleship or in other places."***

To this end, the enlisted Hospital Corpsmen were informed of the hazards presented by asbestos and instructed to ***"... locate these hazards and afford protection accordingly."*** Two of the hazards that the Hospital Corpsmen were specifically instructed to evaluate in a questionnaire (inspection or survey form) were:

> ***"What precautions are exercised to prevent damage from pipe covering compounds?"***
>
> ***"What asbestos hazards exist?"***

Also, the Hospital Corpsman was instructed to help keep the workforce healthy:

> ***"Proper working places must be provided and maintained. Hygienic and sanitary conditions must be kept on a high plane. All moving parts of machinery must be guarded, goggles provided for workers required to use them; helmets and masks for sand blasters; proper ventilation for the chrome workers; masks for asbestos workers; protection for workers in x-ray and radium; protective gloves, shoes, and other garments for foundry workers, and other means of protection too numerous to mention here must be available and used. Special physical examinations must be made of all sand blasters, asbestos handlers, those exposed to radium and its compounds, lead workers, those engaged in dusty or smoky trades, handlers of T.N.T. and other explosives, etc., to prevent the occurrence of the diseases associated with those trades from injuring the men."***

20. This type of active assessment, evaluation, and recommendation for control was embraced by senior United States Navy officers. In his memorandum to the Manager of the Navy Yard, Boston, Captain HE Jenkins, MC, USN (Jenkins, 1939) discussed his findings and recommendations from his survey of the pipe covering shop and work shack at that yard. Although he stated that the health hazards to personnel were very remote, based upon his evaluation of the amount of dust released, Captain Jenkins recommended that a dust respirator and gloves be worn to supplement the ***"conscientiously and intelligently enforced"*** practice of wetting down insulating material. Captain Jenkins also addressed the impractical use of respirators during shipboard lagging operations and recommended sufficient wetting to prevent dust generation as far as practicable. Less than one week later, CDR CD Headlee, USN (1939), issued a "Production Division Notice (Number 996)" implementing these recommendations. Captain EW Brown, MC, USN (1941), in the "Annual Report of the Surgeon General, US Navy to the Secretary of the Navy" and in the scientific publication of his presentation made to the Fifth Annual Meeting of the Air Hygiene Foundation of America (1941), discussed the findings of his medical survey at the New York Navy Yard. Captain Brown, recognized as the founder of the Navy's formal occupational health program, assessed asbestos exposure and medical findings of eleven workers at the New York yard. With knowledge of occupational exposure to silica and its delayed clinical findings, and under the conditions that he observed, Captain Brown found no indication of pulmonary disease in these workers at that time. He noted that wet methods and local exhaust ventilation were implemented, and that the workers wore a respirator ***"during the dustiest aspect of the process."*** He stated that similar findings were reported in two other yards and recommended that the study be extended to all men in this trade. These references further demonstrate that senior Navy personnel actively monitored and controlled the Navy policy regarding disease and injury prevention, and were indeed the leaders in field assessment and control of occupational health hazards, including asbestos.

21. When quantitative assessment (counting) of asbestos particles in air was available, the Navy followed the recommendations of the United States Public Health Service. Based upon the findings of Dreessen and coworkers' (1938) study of asbestosis in the textile industry prepared by direction of the United States Surgeon General, the United States Navy accepted an exposure level of 5 million particles per cubic foot (5 MPPCF) as the time-weighted average (TWA) for occupational exposure. Dreessen and coworkers concluded:

> ***"It would seem that if the dust concentration in asbestos factories was kept below 5 million particles (the engineering section of this report has shown how this may be accomplished), new cases of asbestosis would probably not appear."***

This TWA is the average airborne concentration of asbestos particles to which an individual could be exposed in an eight hour period. Shorter periods of higher concentrations were acceptable as long as the average exposure calculated over eight hours did not exceed the TWA.

22. As Navy Medical Department personnel, when Captains Jenkins and Brown encountered asbestos exposure conditions that were not fully satisfactory and required changes, they made recommendations for correction of the exposure conditions to higher line (command) authorities. In both of these instances, only a qualitative assessment was made and actual exposure levels were not determined. Captain Brown (1941) performed a further medical assessment and found no significant clinical findings in the limited number of workers observed during the relatively short, post-exposure period. The Navy's occupational health program was based upon internal support for the identification and control of occupational health hazards. In order to develop a sufficient cadre of physicians and scientists, the Navy developed training programs with Columbia University's DeLamar Institute of Public Health and the Harvard School of Public Health. By the end of World War II, over one hundred physicians, scientists, and engineers had been trained in occupational health at these two leading institutions of US public health.

23. In 1936, the United States Congress recognized that it was in the national interest to build and maintain a strong merchant marine fleet and passed the Merchant Marine Act in 1936 (US Congress, 1936) in order:

> ***"To further the development and maintenance of an adequate and well-balanced American merchant marine, to promote the commerce of the United States, to aid in the national defense..."***

To this end, Title 1: Declaration of Policy; Section 101 of this Act establishes the policy of the US Government in maritime matters:

> ***"It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine***
> ***(a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service on all routes essential for maintaining the flow of such domestic and foreign water-borne commerce at all times***
> ***(b) capable of serving as a naval and military auxiliary in time of war or national emergency,***
> ***(c) owned and operated under the United States flag by citizens of the United States insofar as may be practicable, and***
> ***(d) composed of the best-equipped, <u>safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel</u>. It is hereby declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine."*** [EMPHASIS ADDED]

24. The "Minimum Requirements for Safety and Health in Contract Shipyards" ("Minimum Requirements") were drafted in 1942 by representatives from labor management committees, labor unions, management of private shipyards, insurance companies, the United States Maritime Commission, and the United States Navy. When approved by the US Navy and the US Maritime Commission in early 1943, compliance with these standards was expected in shipyards:

> ***"Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum standards which bear the approval of the Navy Department and Maritime Commission, and each is requested to give full cooperation to the consultants on health and safety who will be charged with the coordination and supervision of the safety and health program of the two agencies.***
>
> ***H-13. A Guide for Prevention of Industrial Disease in Shipyards***
>
> ***13.1 Eight common types of disease and methods for their prevention are given in the following sections. Help in applying these methods will be given by the local Safety Department and by safety and medical consultants of the Navy Department and the Maritime Commission.***
>
> * * * * *
>
> ***13.7 Asbestosis***
>
> ***a. Sources: In general, any job in which asbestos dust is breathed. For example:***
>
> | ***Job:*** | ***When Material Is:*** |
> |---|---|
> | ***Handling*** | ***Asbestos*** |
> | ***Sawing*** | ***Asbestos mixtures*** |
> | ***Cutting*** | |
> | ***Molding*** | |
> | ***Welding rod salvage*** | |
>
> ***b. Job can be done safely with:***
>
> ***1. Segregation of dusty work and,***
> ***2. (a) Special ventilation: hoods enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or***
> ***(b) Wearing of special respirators***
> ***3. Periodic medical examination"***

25. Less than six months after these "Minimum Requirements" were issued, the Secretary of the Navy (Forrestal, 1943) reaffirmed these requirements for all private shipyards having Navy contracts. Although the "Minimum Requirements" did not provide a specific occupational exposure value for asbestos, they gave general requirements for safe (healthful) shipyard operations. The Navy's occupational health team was responsible for assisting in interpreting the standards for implementation at Navy and contract yards throughout the country. Any significant inspection findings, whether favorable or adverse, were to be discussed first with the shipyard management, thus allowing management the opportunity to take corrective action for imminent dangers. The actual written report was to be submitted in draft form to the regional director of the Maritime Commission for final typing. Until the enactment of OSHA, these early nationally recognized safety and health standards initiated under the "Minimum Requirements" continued in effect at private US shipyards through the updated requirements of the Walsh-Healey Public Contracts Act (US Cong,1936) and the "Safety and Health Regulations for Ship Repairing" (DoL, 1960).

26. In addressing exposure to asbestos, Philip Drinker, then Chief Health Consultant for the United

States Maritime Commission, and Professor in the Harvard School of Public Health program that was training the Navy physicians, scientists, and engineers, recommended an occupational exposure level of 5 MPPCF (Drinker, 1944). This is the same value as recommended by Dreessen and coworkers of the US Public Health Service (1938) to prevent the development of disease. The shared and jointly-held knowledge among various Federal Departments and Agencies regarding asbestos health hazards, as well as the need and methods to control these hazards were well-established.

27. In January, 1945, Philip Drinker (1945) informed Captain TJ Carter, MC, USN, Bureau of Medicine and Surgery, of a potentially serious health risk from asbestos dust exposure at the Bath Iron Works. He was concerned that similar risks might be found in other yards where the same type of pipe covering was used. In this letter, Professor Drinker stated that the manufacturers of the asbestos insulation materials used at Bath would:

> ***"... be glad to get out a brief statement of precautions which should be taken in light of their own experience and that they would inform their competitors that I had asked them to do so. I understand that neither the Navy nor Maritime wants any change in the specifications as the performance with the present materials is entirely satisfactory. From a health standpoint we do not believe any specification changes are needed."***

Drinker recommended that a study be performed to evaluate asbestos exposure and disease among workers, and stated that ***"Admiral Mills agreed that such studies would be wise before Navy or Maritime accepted this asbestosis risk as being significant in our general ship construction program."*** Four shipyards in the Northeast, two contract yards (New York Shipbuilding in Camden, NJ and Bethlehem Steel Fore River in Quincy, MA) and two US Navy yards (Boston NSY and Brooklyn NSY), were selected for this study of exposure levels and health status; additional dust exposure data were provided by the Portsmouth Naval Shipyard. The study, conducted by Fleischer, Viles, Gade, and Drinker--also called the "Fleischer-Drinker study" – was promptly undertaken and reported in September, 1945 (Fleischer et al., 1946). The results of this study reaffirmed the Navy's position on adherence to an occupational exposure level of 5 MPPCF. The conclusions were:

> ***"1. The character of asbestos pipe covering on board naval vessels is such that conclusions drawn from other asbestos industries such as textiles, cannot be applied.***
>
> ***2. The operations of band saw cutting, grinding, cement mixing, and installation aboard ship should be equipped with exhaust ventilation to keep the total dust concentration low.***
>
> ***3. The incidence of asbestosis among pipe coverers in the shipyards studied was low, 0.29 per cent or 3 cases out of 1074.***
>
> ***4. Since each of the 3 cases of asbestosis had worked at asbestos pipe covering in shipyards for more than 20 years, it may be concluded that such pipe covering is not a dangerous trade."***

The results of this well-designed study, measuring actual asbestos exposure values and performing health assessments on the exposed workers, became established as Navy policy. The Navy adopted a recommended "maximum allowable concentration (M.A.C.)" value for asbestos of 5 MPPCF. This was the same value discussed by Dreessen and coworkers (1938) when assessing the asbestos textile industry with much longer daily exposure periods and primarily the chrysotile type of asbestos. It is also the value recommended by the National Conference of Governmental Industrial Hygienists in 1942, and later adopted by the American Conference of

Governmental Industrial Hygienists (ACGIH) in 1946. Among the members of the ACGIH in 1946, a private professional organization which did not offer membership to individuals affiliated with industry, were three representatives of the Navy Department and forty-two representatives from the United States Public Health Service. At this point in time, Professor Drinker was an associate member of the ACGIH representing one of the educational institutions – Harvard University. Since there were no federal, state, or local occupational exposure standards, the Navy used the occupational exposure level that the best scientific and medical evidence supported. In 1955, the Navy adopted the "Threshold limit values for toxic materials" developed by the American Conference of Governmental Industrial Hygienists as a basic reference and ***"to provide guidance toward the reduction of potential health hazards encountered in the industrial environment for both military and naval civilian personnel."*** The Navy (BUMED, 1955) recognized that:

> ***"[The] threshold limit values should be used as a guide in the control of health hazards and should not be regarded as fine lines between safe and dangerous combinations. The most desirable levels in all cases are those approaching zero, but practical considerations frequently require the acceptance of higher levels which are safe, but not ideal."***

Moreover, the Navy recognized that:

> ***"[The] threshold limit values ...are based on the best available toxicological information, long-term industrial experience, and experimental studies. In as much as these values are constantly being reevaluated, revisions or additional will be made as further information becomes available."***

28. The "Bureau of Ships Technical Manual, Chapter 51: Boilers (BuSHIPS, 1955)" addresses the engineering and operating aspects of boilers and establishes Navy policy in these areas. Although this official publication does not address all medical aspects of the Navy's occupational health program, in Section 51-43, it specifically states precautions for work inside the furnace of a steam generator under "Examination and Cleaning of Firesides":

> ***"The use of a respiratory mask for toxic dust during cleaning operations is required to prevent any toxic effect of the dust on personnel."***

This brief note of requirement did not discuss the various components of the toxic dust – nor all aspects of the Navy's occupational health program discussed above. From the industrial hygiene perspective at the time, the primary dusts of concern in the furnace of a Naval steam generator were crystalline free silica and carbon/carboniferous residue from the incomplete combustion of fuel; other less significant particulates included metallic oxides, asbestos, and asbestos decomposition products. The requirements for a Navy gas-free engineer to assess and authorize controlled entry with appropriate safety equipment into a closed space, such as tanks, voids, and "cold" boilers, is contained in The "United States Navy Safety Precautions, OPNAV 34P1" (CNO, 1953).

29. The Commander, Long Beach Naval Shipyard, and his management, production, and medical staffs, including the Industrial Hygiene Department, were exemplary in controlling occupational exposures through direct involvement and coordination with civilian shipyard workers, organized labor officials, and the Commanding Officers and crews onboard ships undergoing maintenance and repair. In May 1947, CAPT TP Wynkoop, USN, the Shipyard Commander, wrote an open memorandum for "Commanding Officers of Ships" regarding "Safety practices of fleet personnel at this Shipyard" (Wynkoop, 1947). This Memorandum was later published in the Navy-wide publication: "Safety Review" in July, 1947, and states:

> ***"In accordance with instructions, issued by the Bureau of Ships and the Office of Industrial Relations in the Secretary's Office, it is requested that***

> ***commanding officers of ships in the shipyard take steps to insure that military personnel aboard their ships conform to Shipyard safety practices when performing work within the Shipyard. The Safety of naval personnel is no less important than that of civilian personnel."***

To this end, CAPT Wynkoop established a liaison between each ship's force via an appointed safety officer and the Yard Safety personnel; provided for a visit by a Yard Safety inspector upon arrival in the Yard to deliver and discuss pertinent safety orders; provided for additional consultation and advice via the Yard's Safety Superintendent; and made the loan of safety equipment, including respiratory protection, available to ships. He additionally wrote:

> ***"Commanding officers are urged to make full use of available safety equipment and technical advice in performing ships force work to the end that accidents to naval personnel may be minimized, if not eliminated within the shipyard."***

The level of occupational safety and health leadership and involvement demonstrated by this Shipyard continued with many highpoints. Mr. OW Meeker (Master, Shop 56, Long Beach Naval Shipyard) told the assembled representatives of the major Navy shipbuilding and repair facilities at the First Shop 56 Masters' Conference of Pipe and Copper Shop Master Mechanics' Conference held at the Boston Naval Shipyard in May, 1957 (Meeker, 1957), that he, even as a non-medical professional, recognized the potential hazard of prolonged inhalation of significant concentrations of airborne asbestos fibers:

> ***"The most apparent symptom of asbestosis is lethargy or a lack of vitality. What we suspect to be lead in the posterior might well be asbestos in the lungs.***
>
> ***... Remove the cause by substituting other products such as Armaflex and StaFoam for asbestos whenever possible. However, this will take some doing.***
>
> ***In the meantime, the answer is wearing of respirators by all who handle asbestos products. To many the very idea of wearing respirator (sic) is repugnant. However, a respirator on the face is preferable to asbestos in the lungs. Therefore, gentlemen, ours definitely is the important and difficult task of providing and installing effective insulating materials aboard Naval Vessels. Moreover, this task must be accomplished without sacrificing our workmen in the process."***

A Navy study of pipecoverers performed by the Industrial Hygienist at this same shipyard and reported in January, 1959 (Anon, 1959), concluded:

> ***"The work habits, personnel protection and working environment of these men are not of desirable standards. These conditions, plus their increasing years of exposure and the medical study, indicates the need for corrective action."***

In order to achieve compliance with existing Navy occupational health policy, the Secretary for the Asbestos Union at Long Beach Naval Shipyard (Local #20), Mr. Webster Ay, was kept involved with asbestos program developments throughout this period of time. In an April 1957, letter from the Yard Industrial Hygienist, Mr. JR Sheehan, Mr. Ay was informed about medical developments to maintain and improve the health of workers in the "dusty trades", and his cooperation was sought (Sheehan, 1957). The use of ventilation and respiratory protection was encouraged for his members. As a demonstration of this cooperation between management and

workers, Mr. Ay co-developed the nationally-circulated "Grim Reaper" poster with Mr. CV Krieger, the Shipyard Safety Superintendent (Sickles, 1961):

**"Is your FUTURE...With Him (the Grim Reaper) ... Or Them (your Family)? WEAR YOUR RESPIRATOR"**

Later, the civilian Navy industrial hygienist at Long Beach Naval Shipyard, Mr. WT Marr, further wrote on the hazards of, and controls for, asbestos insulation work by shipyard insulators onboard ships. (Robbins and Marr, 1962; Marr, 1964) This cooperation between management and labor in promoting worker safety and health reflects the level of involvement between the unionized asbestos workers (Association of Heat and Frost Insulators and Asbestos Workers) who were affiliates of the American Federation of Labor-Congress of International Organizations (AFL-CIO) and the US Government. During this period, the AFL-CIO developed a close relationship with Irving J. Selikoff, MD for the assessment and control of occupational illnesses arising from exposure to asbestos by members of this organization.

30. The recognition of the potential hazard created by exposure to significant concentrations of airborne asbestos fibers was also evident at the Boston Naval Shipyard since the late 1930s. As mentioned above, there is documentation that the senior Navy Medical Department representative at the Boston Naval Shipyard (CAPT HE Jenkins, MC, USN) performed site evaluations to assess inhalation of airborne asbestos fibers as far back as 1939. (Jenkins, 1939) Captain Jenkins noted the use of the ***"conscientiously and intelligently enforced"*** practice of wetting down insulating material in the production shop. He recommended that this practice be extended to shipboard operations in order to prevent dust generation as far as practicable as the use of respirators was impractical in such settings. The shipyard management agreed and promptly issued a Production Notice which made these medical recommendations mandatory. (Headlee, 1939) As noted above, the Boston Naval Shipyard was one of the two Navy yards surveyed in the Fleischer-Drinker Study published in 1946. The results of this study supported the Navy's program for asbestos control which was aimed at controlling release of asbestos fibers to levels below which were deemed to be hazardous – that is, below 5 MPPCF. The Boston yard continued its contributing role to the Navy's asbestos control program by hosting the "Pipe and Copper Shop Master Mechanics' Conference" at the Boston Naval Shipyard in 1957. Mr. George P. Chamberlain, Master Pipefitter and Coppersmith (Shop 56) at the Boston Yard, served as the Conference Chairman. In his "Travel Report" submitted by Mr. EB Stecher from the Navy Bureau of Ships (Stecher, 1957), Mr. Stecher reflected upon some of the comments made by Meeker, but he felt that compelling workers to wear respirators had been unsuccessful in the past, and that material substitution was the only method which offered complete resolution of the health hazard from asbestos:

> ***"Considerable discussion took place regarding asbestosis (silicosis). This is still an acute problem in many of our Yards. It was pointed out that regardless of the instructions, the insulation men will not wear masks especially when installing insulation aboard ships. The only solution appears to be to find an insulation that is not a health hazard."***

However, in his statement regarding his idea for resolution of the asbestos inhalation hazard, Mr. Stecher failed to consider the obvious necessity of dealing with the problem at hand – namely, the asbestos-containing materials which were used extensively onboard Navy ships of the era and work which needed to be currently accomplished while providing adequate protection for workers. Meeker also sought suitable replacement materials, but made that consideration when he said:

> ***"In the meantime, the answer is wearing of respirators by all who handle asbestos products. To many the very idea of wearing respirator (sic) is repugnant. However, a respirator on the face is preferable to asbestos in the lungs."***

Mr. Ernani Storlazzi, CIH (Retired) in his Declaration dated October 8, 2008, testified that he was initially assigned to the Boston Yard as an active duty Navy officer and that he then continued as a civil service industrial hygienist from 1946 until the Boston Naval Shipyard closed in 1974. During that period dating back to the mid-1940s, he states that information regarding the potential hazards of asbestos and the proper means of control were available to workers in the Boston yard:

> ***"During my entire tenure at the Boston Naval Shipyard, I was mindful of potential asbestos dust hazards. The standard operating practice at the Boston Naval Shipyard was to survey various shops and ships under repair, including the pipecovering shop, on an intermittent basis. Whenever such surveys revealed potential hazards, the workers and/or their superiors would be advised as to appropriate precautions to take. This included routinely instructing the workers in the pipecovering shop that they should take precautions regarding heavy asbestos dust exposures. This included instructing the workers to utilize respirators, to implement local exhaust procedures and/or to use wet down techniques. In short, the state of the art precautions of the time were communicated to the workers and management in the Boston Naval Shipyard."***

He further adds that such information and programs were widely disseminated throughout the US Naval establishment:

> ***"From my own observations at the Boston Naval Shipyard and from information regarding other shipyards across the country, knowledge regarding the potential hazards of asbestos exposure were well-known throughout the shipyard work force. Undoubtedly, anyone engaged as a pipecoverer should have been well aware of such information, and tradesmen in other occupations had every opportunity to gain similar knowledge. Starting in the earliest years, some of the workers were utilizing respirators. Additionally, starting in the earliest years, some operations would be segregated and marked off to keep uninvolved workers away from the potential exposures. By the late 1960s, the vast majority of insulation workers were utilizing dust masks on at least a part time basis. Information regarding asbestos hazards was readily available to anyone in the shipyards. Additionally, over the years, this information had been communicated throughout the Naval community at various levels. I have no doubt that many, many officers and men in the United States Navy were fully informed regarding asbestos dust hazards from the earliest 1940s to all times thereafter.***
>
> ***During my entire time with the Navy, both as a uniformed officer and subsequently as a civilian employee, I believe that I was well informed and well educated regarding my professional field of industrial hygiene. At all times, I felt that I was properly informed regarding the state of the art pertaining to asbestos dust and its potential hazards. Likewise, I believe my colleagues in the Navy, across the country, were similarly well informed."***

Mr. Storlazzi's Declaration is supported by the Memorandum from Mr. GP Chamberlain dated 1 October 1962. Mr. Chamberlain (the Pipe and Copper Shop Conference Chairman in 1957, noted previously) states that the purpose of this Memorandum addressing "Respiratory Protection for Pipecoverers" is:

> ***"To disseminate instructions concerning the safety requirements which are mandatory for all personnel working with asbestos insulating material."***

Mr. Chamberlain notes that asbestos dust counts were obtained during routine practices in the shop and onboard ships during the period of May to June, 1962. The results of these surveys prompted him to re-direct pipecoverer supervisors to again emphasize asbestos control procedures and ensure specified types of respiratory protection for dusts were assigned to pipecoverers onboard ship and that they were worn when asbestos-containing materials were being handled and a hazardous level of respirable dust was generated. He further directs that:

> ***"e. Care shall be exercised to control the formation of dust at all times. Old insulation material shall be placed in suitable containers as it is removed and not dropped or left lying on the ... [ ILLEGIBLE] ... shall be removed to a weather deck promptly.***
> ***f. Following insulation removal work, the deck shall be cleaned of all accumulated dust to prevent further contamination of the work area.***
> ***g. Where a large quantity of asbestos insulation is to be removed within a confined space, arrangements shall be made to assure that adequate exhaust ventilation is provided...***
> ***4. Compliance with the safety requirements herein described is mandatory on the part of all personnel concerned."***

Mr. Meeker, Mr. Chamberlain, and Mr. Storlazzi each realized that constant oversight and periodic reemphasizing of the asbestos handling and control requirements were essential when the potential for a hazardous level of respirable asbestos dust was present under shipyard working conditions. Finally, in 1969, the Navy determined that the only practical method of controlling exposure to hazardous levels of asbestos dust throughout the Navy was to make a concerted and directed effort to use substitute thermal insulation products manufactured either without asbestos, or using insulation materials with a lower content of asbestos and noted:

> ***"Since individual habits of workman play a large role in their exposure patterns, observations of their practices have been included in this survey. Most insulation workers are aware that exposure to asbestos dust, even in low concentrations, is hazardous but they also feel that the hazards are unavoidable and must be accepted as part of the occupation. Moreover, a recently published survey conducted by a naval shipyard aboard selected ships has revealed that, although dust respirators have been required during installation and ripout of asbestos , 76% of the workers did not use them. In fact 50% did not possess respirators even though they were readily available in central tool rooms. This lack of worker discipline and the seriousness of the lung effects of asbestos could be the main deciding factors for considering the elimination of asbestos as a lagging material and as a cement on piping, ducts, and boilers and thus reduce and eradicate the reported incidence of asbestosis ranging from up to 21% among shipyard insulation workers."***

31. An early example of the many safety handbooks issued by the Navy as aids in safety indoctrination and accident prevention is the Bureau of Ordnance's "Safety Handbook for Pipefitters" issued on January 7, 1958. This handbook provides, in part:

> ***"Asbestos. Asbestos dust is injurious if inhaled. Wear an approved dust respirator for protection against this hazard."***

32. In 1959, the Navy, the Coast Guard, the Maritime Administration, and maritime industrial employers, as well as trade associations and labor organizations, were involved in the development of the standards which led to the "Safety and Health Regulations for Ship Repairing" (DoL, 1960). These Regulation were mandatory for all maritime repair and construction activities:

> ***"... safety and health regulations that have been determined by the Secretary of Labor to be reasonably necessary to protect the life, health and safety of employees engaged in longshoring, ship repairing, and related employments covered by Section 41 of the Longshoremen's and Harbor Workers' Compensation Act, as amended.***
>
> ***...***
>
> ***These regulations are mandatory with respect to employers subject to the Act, and affected persons should familiarize themselves with the contents of this publication. In this connection, Bureau personnel concerned with the administration of these regulations will extend all possible assistance."***

In these regulations, the Department of Labor (DoL) also adopted the occupational exposure level of 5 MPPCF for asbestos and required the use of respiratory protection at private longshoring, ship repairing, and related employments when indicated:

> ***"Protection against particulate contaminants not immediately dangerous to life. (1) When employees are exposed to unsafe concentrations of particulate contaminants, such as dusts and fumes, mists and fogs or combinations of liquids, they shall be protected by either and air line or filter respirators, except as otherwise provided in regulations of this part."***

For comparison to the degree of risk and hazard, the Department of Labor also used the occupational exposure level of 5 MPPCF as the same absolute value for high "free" crystalline silica dust (greater than 50% free silica). The silica value is also the same value established by the ACGIH in 1942 and promulgated in 1946. These nationally-enforced regulations, as well as the requirements of the Walsh-Healey Public Contracts Act, were applicable to private (non-government owned) shipyards.

33. The use of the 5 MPPCF level as the occupational exposure value continued to be generally accepted by professionals practicing occupational health in the United States. This occupational exposure value, and the widespread use of asbestos, continued in the Navy until the late 1960s when the scientific and medical communities (Selikoff 1965, 1967) and the United States Navy (Turnbull, 1969; OiC NAVSEC, Philly, 1969; COMNAVSEC, 1971; COMNAVSHIPSYSCOM, 1971; COMNAVSEC, 1972; COMNAVSEASYSCOM, 1975) had evidence that it was not sufficient to adequately control the health effects of exposure. This level was then changed, by the fledgling Occupational Safety and Health Administration (OSHA), to a time-weighted average of 12 fibers per cubic centimeter (12 f/cc) in May, 1971 and then to an Emergency Temporary Standard (ETS) of 5 f/cc in December, 1971. On June 7, 1972, the Federal asbestos regulations "Part 1910—OCCUPATIONAL SAFETY AND HEALTH STANDARDS: Standard for Exposure to Asbestos Dust" was published permanently reducing the permissible exposure limit of a time-weighted average to 5 f/cc. The new Federal standard also contained an extensive asbestos control program which was required of all employers. This "OSHA Asbestos Standard" which was quite similar to the Navy instruction released by the Navy the previous year (February, 1971): "NAVSHIPSINST 5100.26: Control of Asbestos Exposure Hazards" (DoN, 1971).

34. The Navy's sophistication regarding asbestos hazards in the 1960s was thus at the the cutting edge of then existing science and medicine. Captain NE Rosenwinkel, MC, USN, representing the Navy's Surgeon General and the Bureau of Medicine and Surgery, provided information regarding the Navy's knowledge of asbestos hazards to shipyard employees for inclusion in a statement issued by Rear Admiral JJ Stilwell, USN, of the Shipyard Management Directorate, Naval Sea Systems Command in 1968 (Rosenwinkel,1968):

> ***"The United States Navy is well aware of the hazards of asbestos to its employees engaged in ship construction and ship repair at naval shipyards. Hazard control measures implemented by the shipyard medical departments and safety divisions are in accordance with accepted standards of industrial hygiene practices in the United States. Stringent***

> ***efforts are directed at keeping the concentration of airborne asbestos dust below the level recommended by the American Conference of Governmental Industrial Hygienists. An energetic periodic physical examination program insures the health of personnel exposed to this hazard."***

35. During the late 1960s, the state-of-the-art regarding the known health hazards of asbestos changed both inside and outside the Navy – as well as other US Government Departments and Agencies and private employers. Procedures to control asbestos exposures were made more stringent as the accepted – and now legally enforced – occupational exposure levels were reduced. Insulation manufacturers started including precautionary statements on their packaging in the early to mid-1960s. Asbestos exposure and control were being addressed at different levels of command throughout the Navy. The Naval Ship Engineering Center was searching for substitutes for thermal insulation products which could meet the rigorous engineering requirements for shipboard applications: ***"Letter inquiries addressed to the Naval Shipyards resulted in 100% responses, whereas those addressed to private shipyards failed to elicit replies from Newport News Shipbuilding and Drydock Co. and Ingalls Shipbuilding Corp. However, General Dynamics, Lockheed Shipbuilding and Bath Iron Works responded to our inquiry."*** (COMNAVSEC, 1969). A meeting between senior engineering, safety, and medical personnel was held to evaluate possible methods for reducing exposure and to make recommendations to the Chief of Naval Operations. (Turnbull, 1969) Major Navy shipyards were sharing their research on asbestos exposure and control measures. (Mangold, 1970) Private contract shipyards were similarly controlling asbestos exposures and seeking suitable substitutes that were acceptable to the Navy and the Maritime Administration.

36. As mentioned, it was not until 1971 that statutory "permissible exposure limits (PELs)" became nationally established (and mandatory) under the Occupational Safety and Health Act (PL 91-596). These standards and their specific requirements applied to the employer, as the source of control of safety and health hazards in the workplace. Although these national standards applied to shipyards and other industries using asbestos, they did not directly apply to active duty Navy personnel and military unique settings. However, under a series of Executive Orders, the Navy maintained an occupational health and safety program consistent with OSHA requirements. At the time of enactment in 1971, the PEL for asbestos was initially 12 fibers per cubic centimeter (f/cc). However, based upon the evolving and current scientific and medical recommendations by the time of enactment, the Occupational Safety and Health Administration (OSHA) emergently lowered the PEL to 5 f/cc (ceiling value of 10 f/cc) in late 1971, with a permanent standard of 2 f/cc becoming effective in 1976. The 1971 OSHA "Asbestos Standard" specifically addressed labeling of asbestos-containing materials based upon friability and the potential release of asbestos fibers into the air which would exceed the permissible exposure limit:

> ***"(2) Caution Labels.***
>
> ***(i) Labeling. Caution labels shall be affixed to all raw materials, mixtures, scrap, waste, debris, and other products containing asbestos fibers, or to their containers, except that <u>no label is required where asbestos fibers have been modified by a bonding agent, coating, binder, or other material so that during any foreseeable use, handling, storage, disposal, processing, or transportation, no airborne concentrations of asbestos in excess of the exposure limits prescribed in paragraph (b) of this section will be released</u>."(OSHA, 1971)*** [EMPHASIS ADDED]

As discussed previously, based upon the permissible exposure limit criteria at the time that OSHA was enacted in 1970, non-friable asbestos-containing components used for electrical and fire retardant properties in insulation applications, as well as typical gasket and packing materials, did not require labeling due to their composition and friability. Even before this period, these types of materials were not considered to present any hazard during routine use and handling (Fuller, 1945). In 1975, OSHA recognized sufficient medical and scientific evidence of human carcinogenicity

to recommend the reduction of the permissible exposure limit to 0.2 f/cc. After legal challenges, OSHA reduced the PEL to 0.2 f/cc in 1986, and further reduced it to its current value of 0.1 f/cc in 1994. Requirements from the highest levels of authority in the United States Navy established the permissible occupational exposure levels and control methods as they changed during this post-OSHA era. (DoN, 1971; BUMED, 1973; OPNAV, 1974) The Navy took further additional steps to eliminate the use of ***"asbestos in ship construction and maintenance, and to direct actions which will further reduce asbestos exposure"*** through its Asbestos Elimination/ Substitution Personnel Protection Program (COMNAVSEASYSCOM, 1975).

37. The Navy has continued to follow the policy of using occupational exposure levels based upon the best available scientific and medical information (BUMED, 1955). The federal PELs, established by the Occupational Safety and Health Act of 1970, were generally based upon the American Conference of Governmental Industrial Hygienists' Threshold Limit Values (TLVs) published in 1968. Due to statutory requirements, changes to the limited number of chemical PELs have generally been slow. PELs have been changed for a relatively few chemicals since the enactment of OSHA in 1970. The TLVs are periodically reviewed and an updated list is published annually. The TLVs more closely reflect the current state of knowledge and professional practice in occupational health. The Navy continues to use the most appropriate occupational exposure levels in the assessment of exposures and follows the requirements stated in the Chief of Naval Operations Instruction "OPNAVINST 5100.23F" (CNO, 2002) to provide workplaces that reflect the state-of-the-art knowledge and technology, consistent with its defined mission:

> ***"The maintenance of a safe and healthful workplace is a responsibility of commands throughout the Navy. A successful Navy Occupational Safety and Health (NAVOSH) program, one that truly reduces work-related risks and mishaps, results only when support and commitment to the program permeate every level of an organization. Within the Navy, the Chief of Naval Operations (CNO) has overall responsibility for the NAVOSH program and implements the program through the chain of command. Line management is responsible for the maintenance of safe and healthful working conditions."***

38. The Navy's modern safety program started in 1917 with safety engineers assigned to each naval shipyard. This initial program was expanded in 1922 with safety programs for civilian employees being introduced at all naval activities (NAVEDTRA, 1993). The Navy's Safety Program was driven from the highest level of authority and operational command – the Chief of Naval Operations (CNO). The "United States Navy Safety Precautions," OPNAV 34P1, was signed out by the Acting Secretary of the Navy, CS Thomas, on 8 June 1953 (CNO, 1953). In his "charge" written in this instruction, Mr. Thomas states:

> ***"The safety of its personnel and the preservation of its materials have always been a major concern of the Navy Department. Evidence of this is the provision in Article 0406 of U.S. Navy Regulations, that "Each Naval Technical Assistant shall prepare and issue to the Naval Establishment the safety precautions, and instructions pertaining thereto, which are necessary or appropriate in connection with matters under his technical direction."***
>
> * * *
>
> ***"In recognition of the burden of responsibility which a commanding officer has for the personnel and material under his command, a governing article, 01104 Basic Rule of Responsibility, has been included to allow for adjustments to local conditions and unusual circumstances. The complete text of this article not only appears in Chapter 1, but is reprinted on the title page of each chapter of the book."***

The "Basic Rule of Responsibility" states:

> ***"Safety is a command function. Responsibility for the safety of personnel is vested in the commanding officer. Because these safety precautions apply only to usual conditions, commanding officers or others in authority may find it necessary to issue special precautions to their commands to cover local conditions and unusual circumstances. In addition to the posting of appropriate precautions, careful instruction and indoctrination of all personnel are necessary to ensure effective compliance with these precautions."***

The Navy's comprehensive Safety Program was in existence before the Second World War and it continues to this day through the "Safety Precautions for Shore Activities" (initially OPNAV 31P1: United States Navy Safety Precautions (CNO, 1953); later NAVSO-2455 (OCMM, 1965): now NAVMAT P-5100 series (NAVMAT, 1970)) and "Safety Precautions for Forces Afloat": OPNAVINST 5100.19 series (CNO, 1973), and the "NAVOSH (Navy Occupational Safety and Health) Program Manual": OPNAVINST 5100.23 series (initially CNO, 1983). The "Naval Ships' Technical Manual (NSTM)" chapter on thermal insulation: "Chapter 9390: Thermal Insulation" was specifically revised to stress "Safety Precautions for Asbestos" in July 1972 and address the Navy's increased vigilance in controlling asbestos exposure onboard ship. The initial Navy-wide Safety Program combined both shore and shipboard environments (CNO, 1953):

> ***"2. Shipboard Safety. In most instances the hazards involved and the applicable precautions for a given type of work are the same whether the work is done afloat or ashore. Precautions afloat are therefore not presented separately from precautions ashore except when they concern specific shipboard activities or conditions."*** [EMPHASIS ADDED]
>
> ...
>
> ***"Delegation of Authority. While the commanding officer cannot delegate the responsibility for the safety of personnel under his jurisdiction, he may delegate his authority to the executive officer and other subordinates to ensure that all prescribed precautions are understood and strictly enforced."*** [EMPAHASIS ADDED]
>
> ...
>
> ***"11312 Certification of Closed Compartments***
> ***1. Entry into Closed or Poorly Ventilated Spaces. No person shall enter any closed compartment or poorly ventilated space in any naval unit including naval or Navy operated vessels unless and until a "gas-free" certificate has been issued by the safety engineer or his authorized representative to certify that the danger of poisoning or suffocation of personnel, or the danger of ignition or explosion of flammable gases has been eliminated or reduced to the lowest practical minimum.***
> ***2. Entry in Emergencies. In case of emergency, when it is necessary to send a man into a compartment or tank not certified as being gas-free or as containing sufficient oxygen, the man shall be equipped with an air-line mask or an oxygen rescue breathing apparatus."*** [EMPHASIS ADDED]
>
> ...
>
> ***" 11322 Definition of terms***
> ***1. Closed Compartments or Poorly Ventilated Spaces are any spaces that are not well ventilated, or which have been closed for any appreciable length of time. Unventilated storerooms, blisters, double bottoms, tanks, cofferdams, pontoons, voids, idle furnaces, cold boilers, etc., are typical."*** [EMPHASIS ADDED]
>
> ...

> ***"Do not clean chips from the surface of machines with compressed air or with hands. A brush or hook should be used."***
>
> ***...***
>
> ***"The cleaning of one's clothes with compressed air is prohibited."***
>
> ***...***
>
> ***"Compressed Air. Compressed air shall never be blown towards anyone, used for cleaning of personal clothing, or used to cool a person off."***

39. In order to coordinate sharing of occupational health information between organizationally distinct, and geographically distant, naval activities, the Bureau of Medicine and Surgery instituted the quarterly publishing of occupational health reports: "Occupational Health Hazards" during World War II. These reports were initially received by the Bureau of Medicine and Surgery from all field commands staffed with occupational health professionals, condensed, and redistributed to all the submitting commands (BUMED, 1955; 1959, 1961a, and 1961b). Later, the Navy Environmental Health Center continued this function until the late 1990s when electronic information sharing made the earlier process obsolete. These reports demonstrate that the sharing of industrial hygiene and other occupational health information and services between commands throughout the Navy was common since early in World War II.

40. Based on my education, training, and experience, it is my professional opinion that the Navy, the Maritime Commission, and other Federal Departments and Agencies were well aware of the health hazards associated with the use of asbestos from the early 1920s, consistent with the evolving state of knowledge at a given time. The Navy's extensive asbestos control program was the best in the Nation – controlling exposure to airborne asbestos fibers to a level below that known to be associated with either asbestosis or lung cancer – the only two asbestos-related pulmonary diseases known before 1960. Hueper, writing on occupational and environmental cancers in 1966, added mesothelioma to the cancers associated with clinical asbestosis, and notes the lack of long-term medical and pathological studies involving individuals exposed to asbestos dust. Although the control of asbestosis was accepted as also controlling the potential for further development of either lung cancer or mesothelioma, more data and analyses were needed at that time (Hueper, 1966).

> ***"Since the presence of asbestosis has usually been considered the prerequisite for the subsequent development of a carcinoma of the lung or of a mesothelioma of the pleura or of the peritoneum, these deficiencies in the available information tend to impair a clear demonstration of the real scope of the existing associations between the two conditions. A second difficulty encountered in reliably assessing the extent and degree of lung cancer hazards of asbestotics is represented by the fact that there has occurred in the past a confusing duplication in reporting cases of asbestosis cancers."***

The Navy's and, similarly, the US Maritime Commission's decisions to use asbestos-containing materials were based upon operating requirements and missions in light of the known health hazards at the various periods of time. The Navy had a longstanding and notable occupational safety and health program that addressed asbestos and many other health hazards, and that provided exposure control recommendations and methods that were consistent with the state-of-the-art knowledge in science and medicine. The Navy operated under the premise that control of the exposure to asbestos fibers could essentially eliminate the hazard of a material considered essential for sustained Navy operations. Using established scientific and medical knowledge, the Navy developed an active program to control the release of asbestos fibers in dusty operations, as well as, to monitor the health of workers at risk. Indeed, the very first articles associating "by-stander" exposure with asbestos were not published until 1965, and the exposure situations were different from those in the US Navy (Newhouse and Thompson, 1965a; 1965b). The landmark study of Fleischer-Drinker, reported in 1945, confirmed the general thought that exposures in the Navy to asbestos containing materials could be controlled and health effects could be limited by medical surveillance. Navy

industrial programs were directed at controlling what was considered significant releases of dust. During the period from about 1938 through the later 1960s, the widely accepted occupational exposure level was 5 MPPCF. In the mid-to-late 1960s, the Navy led the way in assessing asbestos exposure of personnel and developing a program and process to eliminate the material based upon new scientific and medical information that was becoming available.

41. To the extent that the equipment and product manufacturers with which I am familiar ever delivered equipment to the US Government for use on vessels constructed for the US Navy and the Maritime Commission/Administration, the US Government had already recognized that the prolonged inhalation of sufficient concentration of respirable asbestos fibers could result in pulmonary disease. Indeed, this knowledge was held by the US Government prior to the period of construction of ships in the 1940s (Dublin, 1922; Jenkins, 1939; Bureau of Medicine and Surgery, 1939). Based upon that scientific and medical knowledge, the US Government, generally, and the US Navy, specifically, by the early-to-mid 1940s had already developed an active and robust program to control exposure to airborne asbestos fiber concentrations at levels recognized to be harmful, and medically monitored personnel exposed to those levels. Additionally, the Navy established engineering control procedures (including isolation, exhaust ventilation, wet methods, and process changes to minimize dust release) and training, and required the use of respiratory protection for personnel considered to be at risk of excessive exposure during dusty operations (Dublin, 1922; Brown, 1941; Forrestal, 1941; Knox, 1941). These dusty operations primarily arose from the handling and use of the friable asbestos used in thermal insulation applications. Control of exposure to asbestos fibers based upon the concentration and duration – sufficient to prevent asbestosis – was considered by medical authorities, both international and domestic, to concomitantly control the (then believed) causal relationship between asbestosis and pulmonary cancers. (Smith, 1952; Doll, 1955; Hueper, 1966) Indeed, the levels discussed in the landmark studies by Merewether and Price (1930a, 1930b, 1933a, 1933b, 1934) to prevent the development of asbestosis were actually far above the occupational exposure level of 5 MPPCF used by the US Navy. Thus, by controlling the exposure of personnel to asbestos fibers and preventing the development of asbestosis, the Navy, based upon the consensus of the scientific and medical communities of the day, *de facto* controlled the potential for the development of respiratory cancers. It is further worth noting that, at this time period, the Navy and other US Government Departments and Agencies, and the scientific and medical communities in general, were ***not*** seeking to control the smoking of tobacco products as the significant cause of the rising lung cancer rate.

42. Under the accepted occupational exposure "guideline levels" of the time period before the enactment of OSHA (there were no national, statutory occupational exposure levels (OELs)), there was absolutely no hazard created by the handling and use of asbestos in gasket and packing applications in naval steam systems – or likewise – in non-friable, asbestos-containing electrical insulating components. The potential release of respirable asbestos fibers was, and still is, minimal from these sources (Liukonen et al, 1978), as well as in cable, wire, and other electrical applications – such as bound phenolic resins and "fish paper" insulation – based upon my own personal knowledge and professional experience, as well as the many studies cited by Mowat et al., 2005, and Williams and coworkers, 2007. Many Navy and other published studies have confirmed that the greatest potential for exposure to airborne asbestos fibers onboard ship comes from the uncontrolled application and removal of thermal insulation, not the handling of gaskets and packings, or wire, cable, and other electrical components. (Robbins and Marr, 1962; Marr, 1964; Harries, 1971; Liukonen et al, 1978; Mowat et al., 2005; Williams et al, 2007; Hollins et al, 2009) Attention to even the potential for release of asbestos fibers from non-thermal insulation materials only arose as the permissible exposure limit (PEL) for asbestos decreased dramatically following the enactment of the Occupational Safety and Health Act in 1970, and the environmental controls of the "US Environmental Protection Agency National Emission Standard for Asbestos" (US Congress, 1971) and the Toxic Substances Control Act (TOSCA) (USEPA, 1976) regulated asbestos as a controlled environmental pollutant. Prior to that period in the early to mid-1970s, the Navy and contract shipyards (and other federal and state entities) were using 5 million particles per cubic foot (5 MPPCF) as the occupational exposure level for asbestos;

environmental releases into air, water, and land were not regulated. It was not until the accepted occupational exposure levels of the post-OSHA period decreased that the possible release and exposure to asbestos fibers from the handling of gaskets and packings at concentrations approaching the new OEL became a concern. Prior to the 1990s, the Navy study by Liukonen and coworkers (1978) at the Puget Sound Naval Shipyard (PSNSY) stands out as one of the few, and best known, evaluations of such materials. This study demonstrated that gaskets did not present an asbestos hazard under normal conditions to individuals who were directly working with such materials.

43. Similarly, Captain JC McArthur, USN, addressing a Congressional subcommittee on behalf of the Navy, noted in 1978 (McArthur, 1978):

> ***"In addition to thermal insulation, other shipboard asbestos applications include those products which can be found in general use by industry and in homes and office buildings. Floor tiles, various gaskets and valve stem packings and galley range insulation are just a few examples. However, this asbestos is in a bonded or contained form and routine careful handling would preclude emissions of potentially hazardous levels of airborne fibers."***

Again, at the time that this official statement was made by CAPT McArthur in 1978, the permissible exposure limit (PEL) of 2 fibers per cubic centimeter had been established under the Occupational Safety and Health Act of 1970 (US Congress, 1970). This level was also used by the United States Navy at that time. This level of 2 f/cc was significantly lower than the OEL used by the US Navy during the period from the 1940s through the late 1960s – 5 million particles per cubic foot (5 MPPCF; approximately 30 f/cc).

44. An earlier study performed at the same Puget Sound Naval Shipyard (Mangold et al, 1970) evaluated asbestos controls and the prevalence of clinical findings associated with uncontrolled exposure to airborne asbestos fibers. It must be emphasized that Mangold's study was conducted among a population of shipyard workers who had their total period of employment before the strictly-mandated exposure controls and permissible exposure limits were established under the Occupational Safety and Health Act of 1970. Furthermore, personnel listed under the various trades were included in the study based upon their current working position – not their past occupational history; this is an important confounder. These federal employees ("civil servants") were shipyard craftsmen who worked daily in specific trades building, repairing, overhauling, and modernizing Navy ships – their tasks and duties were not equivalent to those of the Sailors who primarily operated and maintained that shipboard equipment at sea-but rather, their shipyard duties represented the extreme in an exposure analysis. Mangold's study identified 22 of 104 pipecoverers (21.2%) with "positive chest x-rays" which were suggestive of prolonged asbestos exposure, whereas only 6 of 765 pipefitters (0.8%) had such findings. The former group was responsible for insulating pipes and equipment on a daily basis; the latter group was comprised of individuals who routinely worked with bare, uninsulated metal piping and equipment. In contrast, shipboard repair of thermal insulation by Navy Machinist's Mates was normally restricted to minor patching under usual operating circumstances (Bureau of Naval Personnel, 1958):

> ***"MAINTENANCE AND REPAIR VALVES AND PIPING:***
> ***Aboard ship you are responsible for the routine maintenance of valves, and piping assemblies in your assigned spaces. In addition, the qualifications for advancement in rating require that you know how to make minor repairs to insulation or lagging in piping; how to reface valve seats and disks; and how to repack high-pressure valves. Unless the piping system and valves are in good condition, the connected units of equipment and machinery cannot be operated efficiently, and the safety of the ship's personnel may be imperiled."***

This restriction was due to the scope of what could be repaired at sea, the limited availability of parts and insulating materials, and/or the need for heavy equipment or specialized tools to perform major repairs. Additionally, the Navy developed "portable" or "removable" pads, or "insulation blankets", for use on access portals or surfaces/areas when frequent access was required. This reduced exposures to asbestos dust which resulted from removing and replacing hard covering (block/pipecovering and cement (mud)).

Navy Boilermen (BTs) were also expected to perform similar minor repairs on such piping as part of their routine duties. (BuPERS, 1956)

> ***"As a Boilerman, you will be required to install or patch insulation and lagging on steam lines and on other fireroom piping. It is important for you to know what materials are suitable for the various services and to know how to apply these materials.***
>
> ***In general, the materials used to insulate piping include the insulating material proper the lagging or covering and the fastenings which are used to hold the insulation and lagging in place. In some instances the insulation is covered by material which serves both as lagging and as fastening."***
>
> ***...***
>
> ***"Insulating materials must always be selected with regard to the temperatures to which they will be exposed. In addition to the actual insulating characteristics of the material such characteristics as structural strength, resistance to shock and vibration, chemical stability, fire-resistance, and ease of application and repair must be considered. Insulating materials commonly used on high-temperature piping include magnesia-asbestos composition, mineral or rock wool, asbestos, fibrous glass and several types of insulating cements."***
>
> ***...***
>
> ***"Asbestos is used for many insulating purposes and is provided in various forms Asbestos cloth is used as lagging over insulating material on valves fittings flanges and pipes. Asbestos felt is used for both low-temperature and high temperature insulation. Flameproof asbestos in the form of soft flexible sheet is used for lagging and insulation where space does not permit thicker or more rigid forms of insulation."***

While performing such minor and occasional tasks involving external thermal insulation, the exposure of Sailors – either Machinist's Mates or Boilermen – to airborne asbestos fibers was not considered to be excessive. Again, under shipyard or "tender" conditions where there could be a substantial amount of such work being performed, strict dust controls were mandated. However, when considering the actual time and duration of these limited and infrequently-performed tasks while underway at sea, or in port by the ship's crew, the total exposure (dose = concentration x time) to airborne asbestos fibers was not considered by Navy occupational health professionals to be excessive or hazardous. (BuMED, 1961a) When possible, control of fiber release during the dustiest task of removal would be aided through the application of water – however, in some emergent conditions when hot steam system components required immediate attention, the use of such wet methods could be catastrophic.

In Mangold's study of personnel who had been working under the historically less restrictive occupational exposure guidelines of 5 MPPCF that were followed during the decades preceding his study reported in 1970, marine machinists and machinists had "positive chest x-rays" in 0 of 490 (0%) and 1 of 536 (0.2%), respectively. These two groups comprise the trades that would most commonly work directly with equipment located in shipboard machinery spaces – such as valves, pumps, and turbines. The "boilermakers" in this study (tradesmen actually constructing, making major repairs, and re-building boilers – not operating and maintaining them like Navy

Boilermen – had "positive chest x-rays" in 4 of 115 (3.5%). At this point in time, the association of a shipyard "Boilermaker's" tasks with only occasional work with asbestos-containing materials and the excessive risk of developing an asbestos-related disease were just beginning to be appreciated (Mangold et al., 1968, Mangold 1969c, Selikoff, et al., 1979). There were 574 individuals included in the category of "electrician"; there were no individuals with "positive" chest x-ray findings in this large group. As a control or comparison group in this study, 1 of 420 clerical workers (0.2%) had a "positive chest x-ray". The "marine machinists" (also called "outside machinists") performing tasks like removing and replacing shipboard machinery, had "positive chest x-rays" in 1 of 536 (0.2%) – similar to that of the control group of clerical workers. For comparison with active duty US Navy personnel, the "corresponding" shipyard job categories and day-to-day responsibilities of shipyard workers differed significantly from these Sailors with respect to intensity, duration, and frequency of potential airborne asbestos exposure. Navy Machinist's Mates (MMs), Boilermen/Boiler Tenders/Boiler Technicians (BTs), and Enginemen (ENs) primarily operated the machinery, and performed limited maintenance and repairs when necessary in order to keep the ship operating. Major repair operations were restricted to yard periods, or, when necessary, periods of availability with a Navy tender using skilled personnel and specialized tools and equipment. The differences in the type of work and exposure to asbestos fibers between shipyard workers and operators are discussed and accounted for by Williams and co-workers (2007). Table I is derived from Mangold and co-workers, 1970):

**TABLE I: INCIDENCE OF POSITIVE CHEST X-RAY FINDINGS IN OCCUPATIONAL GROUPS**

| Occupational Group | No. of Persons In Group | No. With Pos. X-Ray Findings | Percent Having Pos. X-Ray Findings |
|---|---|---|---|
| **Shipfitters** | 890 | 6 | 0.7 |
| **Sheetmetal Workers** | 489 | 6 | 1.2 |
| **Forge Workers** | 32 | 0 | 0.0 |
| **Welders** | 998 | 11 | 1.1 |
| **Machinists** | 536 | 1 | 0.2 |
| **Marine Machinists** | 490 | 0 | 0.0 |
| **Boilermakers** | 115 | 4 | 3.5 |
| **Electricians** | 574 | 0 | 0.0 |
| **Pipe Coverers & Insulators** | 104 | 22 | 21.2 |
| **Pipefitters** | 765 | 6 | 0.8 |
| **Shipwrights & Joiners** | 228 | 0 | 0.0 |
| **Electronics Mechanics** | 280 | 0 | 0.0 |
| **Painters** | 263 | 4 | 1.5 |
| **Riggers** | 664 | 1 | 0.1 |
| **Temp Service Mechanics** | 143 | 1 | 0.7 |
| **Clerical workers** | 420 | 1 | 0.2 |

Due to the potential for shipyard insulation workers to experience frequent, intense, and prolonged periods of direct work with asbestos-containing materials in the shipyard setting, the emphasis of the Navy's program, as well as the programs established under US statutes, such as the Walsh-Healey Act (1936) and the "Safety and Health Regulations for Ship Repairing" (1960), were principally directed at shipyard exposures to airborne asbestos fibers for both the employed

civilian personnel in their daily tasks – as well as active duty Sailors during shipyard periods as discussed by Wynkoop (1947) and Franklin (1964). The multiple "components" of the Navy asbestos control program, as well as the program required under the "Safety and Health Regulations for Ship Repairing" (DoL, 1960) existed to control and minimize untoward exposure to airborne asbestos fibers from thermal insulation materials. Control of exposure was effected through the adoption of an occupational exposure level (OEL) based upon the best available scientific and medical information at the time; establishment of the methodology to evaluate exposures; use of industrial hygiene control measures (local exhaust ventilation; wet methods); use of personal protective equipment including respiratory protection, product substitution; periodic medical evaluations; recordkeeping; and local training and awareness programs – all required, as necessary, based upon the potential for the release of asbestos fibers from friable materials.

45. The review by Dr. PRD Williams and co-workers (2007), as well as the large studies of US Navy shipyard workers conducted by Mangold and co-workers (1970) and British dockyards by Harries (1968; 1971), discuss the traditional tasks and practices which resulted in airborne asbestos fiber exposures of electricians – a trade that was not considered to be at risk from working with asbestos-containing materials during the pre-OSHA period. The airborne asbestos fiber concentrations were less than the recommended exposure guidance level (pre-OSHA) or statutory occupational exposure limit (post-OSHA) during the various time periods until 1976, when the OSHA Asbestos PEL became 2.0 f/cc. Prior to 1976, airborne asbestos concentrations to electricians were not generally thought to result in clinically significant exposures. As the OSHA Permissible Exposure Limit (PEL) was lowered after 1970, the responsibilities of the employer were defined while the widespread dissemination of information concomitantly occurred. The April, 1971 issue of "The Electrical Workers' Journal" contains an article on the newly promulgated "Occupational Safety and Health Act" and states that:

> "***AFL-CIO President George Meany termed the Occupational Safety and Health Act "a long step down the road toward a safe and healthful work place," but he stressed that "achievement of that goal will not be automatic." He warned that labor will keep a watchful eye on the enforcement machinery, stressing that, it it doesn't work effectively, "we will immediately petition Congress to strengthen and improve it."*** (Pillard, 1971)

Mr. V Cohn's 1972 Washington Post article reflects the knowledge of the nation's largest federation of unions – it is titled: "AFL-CIO Warns on Asbestos Cancers". The International Brotherhood of Electrical Workers (IBEW) was an affiliate of the AFL- CIO. The June, 1973 issue of "The Electrical Workers' Journal" contains an article detailing "The Target Health Hazards" under OSHA – which lists "Asbestos" prominently as the first of the five nationally-targeted health hazards. This article even lists the applications of asbestos under:

> ***"Where is it? The heat-resistant properties of asbestos have led to many uses – for example, protection against fire, insulation, brake and clutch linings, building materials, filter materials, and in plastics. The raw material and end-products are found nearly everywhere."***

This article also lists the hazard and health consequences of asbestos exposure. The June, 1978 issue of "The Electrical Workers' Journal" contains another article dealing with Asbestos Related Diseases. Dr. Irving Selikoff, writing in "The Asbestos Worker" (for the Association of Heat and Frost Insulators and Asbestos Workers – another affiliate of the AFL-CIO) discusses "New Mask Undergoes Field Test" in the May, 1969 issue and his efforts to find an air-filtering respirator which is both suitable, as well as acceptable, to insulation workers.

46. The information possessed by the US Navy, the Maritime Administration, and other Federal Departments and Agencies with respect to the specification and use of asbestos, and the health

hazards associated with its use onboard US vessels, far exceeded any information that possibly could have been provided by an equipment manufacturer. An equipment or product manufacturer had absolutely no authority, responsibility, or control over the US Navy or private workplace, or the respective personnel – all essential aspects in hazard communication and control. The Navy had long recognized and accepted the responsibility of command, or the "employer's role" as the controller of the workplace, in the practice of occupational safety and health. This was also recognized under the Occupational Safety and Health Act; the Act was put into effect through the employer – with the adherence of the employee. It must be noted that the asbestos-related and other standards of the Occupational Safety and Health Act of 1970 were mandatory for all private employers including shipyards; OSHA did not include Executive Branch Federal workers nor the military. However, under Section 6 of this Act, Federal Departments and Agencies were directed to establish and maintain comprehensive and effective occupational safety and health programs consistent with the standards of the Act. Additionally, Presidential directives (Executive Orders) were issued in 1971 (EO 11612), 1974 (EO 11807), and 1980 (EO 19126) requiring each Federal Department or Agency to comply with the OSHA standards. A series of wide-reaching Navy directives, referenced above, were promulgated to meet these requirements. It is obvious that, based upon the knowledge at any given point in time, the Navy and the Maritime Administration were fully aware of the health hazards of asbestos and had programs dating back before World War II to control exposure of personnel and monitor their health; and that this knowledge persists through the present day. The knowledge of the hazards created by the use of asbestos containing materials was weighed with respect to the vital benefits provided by its use. The Navy controlled asbestos exposure consistent with the then current state of accepted scientific and medical knowledge balanced by needs for national defense. The Navy's asbestos control program, at all times discussed above, was multifaceted and complex, and included hazardous process identification, engineering controls, use of alternative materials in accordance with Navy specifications and contract requirements, personal protective equipment, training and education, and medical surveillance – all when indicated by the level of exposure to airborne asbestos fibers. A mere warning statement, possibly confusing and always superfluous – and perhaps even incorrect and in direct opposition to established Navy policy and procedures – would have added nothing to the Navy's existing occupational health program for the control of asbestos exposure to the hazardous concentrations universally accepted at various points in time from the 1920s until the present time. However, in the mid-1960s, primary asbestos manufacturers of thermal insulation materials began placing a warning on their friable thermal insulation products (Johns-Manville, 1964); this label contained information similar to that later required for such friable products under the Occupational Safety and Health Act asbestos standard (DoL, 1972). Additionally, it must be remembered that the Navy's occupational health program existed through periods of war and military conflicts and was an additional consideration in the decision-making process at all levels of the Navy command structure.

47. Concomitant with the dissemination of information within the Navy and the Federal Government, as alluded to briefly above, labor unions also were involved with advocating and ensuring compliance with the new Federal standards (Cohn, 1972). Dr. IJ Selikoff, a physician deeply interested in the identification of risks and exposures among a much more intensely-exposed group – namely the insulation workers in the United States, worked closely with the AFL-CIO's affiliate, the Association of Heat and Frost Insulators and Asbestos Workers, during the 1960s and 1970s to assess asbestos exposures, confounding factors, and the development of disease. In 1965, Dr. Selikoff writing with Churg and Hammond noted.

> ***"Scattered case reports have previously been recorded of neoplasms among insulation workers, including both lung cancer and mesothelioma of both the pleura and peritoneum. A lung cancer has also been reported in a workman in a factory making asbestos insulation. However, these reports, while interesting and valuable, could not establish an association between the two conditions."***

In that same year, Hammond (1965) commented on the level of inhalation asbestos exposure of full-time insulation workers who experienced daily exposures to levels of airborne asbestos fibers also far greater than those of sailors "steaming ships" and performing occasional work on steam systems with external, asbestos-contain insulation:

> ***"I believe that there was hardly anybody a few years ago who would have suspected that there was a lung cancer risk in this group of insulation workers. These men were not asbestos weavers nor asbestos miners, and nobody at that time had suggested an increased risk at all for insulation workers."***

Dr. Selikoff further noted that the association between general shipyard work performing non-routine work with insulation, and the potential for the development of asbestos-related lung disease was not recognized before 1968:

> ***" In 1968, the possibility that asbestos-associated disease might be an important problem of shipyard workers was suggested." (Selikoff, et al., 1979)***

In his address to the delegates of the Twenty-first Convention of the Association of Heat and Frost Insulators and Asbestos Workers in 1967, Dr. Selikoff noted that cigarette smoking was a major factor in the development of lung cancer. At this time, Dr. Selikoff also noted that mesothelioma was a very rare disease which may also be related to some types of asbestos exposure among insulators.

> ***"Also, by the way, I did not see a cancer of the lung in an asbestos worker who smoked cigars or an asbestos worker who smoked pipes, if he didn't smoke cigrettes at the same time. If levity were in order at this time, I perhaps should say, "Put that in your pipe and smoke it." (Laughter.)"***
>
> ...
>
> ***"And something else: There is a very rare disease-and you can break your teeth on this one-called mesothelioma. Nobody knows too much about it. I will tell you why nobody knows about it. Because it has been so rare that it is not even coded by the U.S. Bureau of Statistics. It is not separately coded in the International Classification of Causes of Death. It is very rare, so rare that at my hospital, from 1930 to 1960, we only saw three cases, and we have a huge hospital, very active."***

In 1965, Newhouse and Thompson (1965a, 1965b) reported cases of asbestos-related disease in individuals who were identified as not having worked directly with asbestos-containing materials. These "bystander" exposures were scientifically untested and unique with respect to the type of asbestos (crocidolite or amosite) – and this conclusion was not universally held by major asbestos researchers (Hueper, 1966). Selikoff, in responding during the "*Symposium on Asbestosis*", published as "Pneumoconiosis: Proceedings of the International Conference, Johannesburg, 1969", stated that he had contacted Dr. Newhouse to advise her that he had reservations regarding the current scientific ability at this time to justify giving an estimate of the risk associated with indirect "environmental exposure" of bystanders or family member and stated:

> ***"It may be very much overrated. All we can say at this time is that there is a significant occupational risk. We have yet no cohort studies on how many people have been exposed in neighbourhood areas or in family exposures. It probably is very much less than we think.***
>
> ***...Therefore, unless we can identify true absence of occupational exposure, we have to regard labels of pure family or neighbourhood exposure with caution.***
>
> ***I think that this is very important. All of us are faced with a very practical problem. What exactly is the exposure with which asbestos disease is associated? We must define this. At the present time, our definition is only that, in specific industrial circumstances, a significant risk occurs. This, I think, can be controlled if we put our minds it. On the other hand, much more data are necessary before we can label the magnitude of non-occupational exposures with any degree of accuracy."*** (Selikoff, 1970)

In sum, the scientific and medical data of the period extending through the mid-1960s had not even identified a risk of cancer – specifically mesothelioma – in individuals who were occasionally handling and working with asbestos-containing materials, or those having exposures to inhalable asbestos at low or intermittent levels compared to the widely-accepted occupational exposure level of 5 MPPCF. This conclusion is fully supported by the leading asbestos-disease investigators of the era – for example Irving J. Selikoff, MD, writing reflectively with DH Lee, MD in 1979:

> ***"The decade of the 1960s provides a convenient time at which to terminate a historical view of asbestos disease. With admirable hindsight from the late 1970s we can see that the essential evidence had already been reported, but not yet assembled or vested with sufficient credibility to be entirely convincing. With few exceptions, the evidence at that time rested on scattered reports of small numbers of cases, and the cases themselves suffered from being either selected or simply those that happened to come to the attention of the reporter. The population base from which the cases came was seldom mentioned. The significance of pleural changes and the occurrence of mesothelioma in persons without a distinct history of exposure remained in considerable doubt. The idea that asbestos could be at least a cofactor in the production of bronchogenic carcinoma was far from fully accepted. That parenchymal asbestosis was very likely to occur in those who had been exposed to heavy dosage in the early years of the industry was clear enough, but what effect environmental controls that had been introduced in the late 1930s might have upon its future prevalence was unknown. The possibility that quite low dosages might have grave consequences 30 or more years after first exposure was still unproven.***
>
> ***Many things were needed to confirm the suggestions that were emerging from the studies up to that time. Most importantly, systematic epidemiologic investigation was needed of large cohorts drawn from various types of industry, with the inclusion of adequate control populations. Some of these were already organized, but it was too early for the results to be meaningful. We now know that much of the negative evidence stemmed from coming to conclusions prematurely, before the slow processes of carcinogenesis had had a chance to make themselves evident. We now know also that reduction of heavy exposures that lead to early death would reveal such slowly developing diseases as mesothelioma and bronchogenic carcinoma with increasing clarity. But foreknowledge was not available at the time, although some investigators suspected that the auguries were not good. More sophisticated and sensitive ways of recognizing the disease processes at an early stage, before the appearance of marked radiographic changes, were badly needed. A series of international conferences, some already in the planning stages, were to accelerate these developments greatly. Those who felt that it was an exciting time were not to be disappointed. The excitement has not even yet been entirely dissipated."***

This conclusion is also supported by the earlier articles which were published by Dr. Selikoff in the mid-1960s (Selikoff, Churg, Hammond, 1964; Selikoff, Churg, Hammond, 1965; and Selikoff, 1967).

## WHAT COULD AN EQUIPMENT MANUFACTURER HAVE TOLD THE US NAVY, OR ANY INDUSTRIAL OR COMMERCIAL CUSTOMER?

48. When addressing what asbestos-related information an equipment or product manufacturer or vendor could have provided to the US Navy, the Maritime Administration, or a Department or Agency of the Federal Government, or to any industrial or commercial customer, that it did not already have and consider in its specification and use of asbestos-containing materials, one must realize what was known about the health hazards of asbestos and when it was known.

49. The United States Government's and the US Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art. During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos containing products used on or in equipment on United States Navy ships known by an equipment manufacturer that was not known by the United States Government and the United States Navy. The expected, routine use and handling of asbestos-containing materials during normal shipboard operations simply presented no significant hazard that was understood by science and medicine of the time period – much less a "special hazard". "Toxicity" is a property inherent in all chemicals as a consequence of its concentration. In the practice and application of toxicology, it is well known that ALL chemicals are toxic as a consequence of dose (Paraselsus [1493-1541]: "*Sola dosis facit venenum*"—"Dose alone makes the poison") and that "hazard" is a consequence of how a chemical is used. All chemicals under certain conditions can cause harm to a living organism. So, all chemicals may present a hazard under certain conditions. The "conditions of use" and "exposure", and the realization that harm can result define a "hazard" – and the need to control it. A "special hazard" would then be one that is extraordinary, or extremely severe or not expected. Exposure to airborne asbestos fibers of a sufficient concentration for a sufficient period of time could cause fibrosis and damage the lung (asbestosis). The Navy's knowledge and "occupational health program" to control excessive exposure to asbestos predates even the scientific or medical proof that asbestos could cause lung fibrosis by Cooke in 1924, and the use of the term "asbestosis" by Sir Thomas Oliver in 1925. In 1922, the potential for this inorganic dust to cause harm was recognized by Dublin in his "Notes on Preventive Medicine for Medical Officers, United States Navy" and Navy physicians were given a precautionary notice. In this document, Dr. Dublin addresses asbestos exposure as one of the "Occupational Hazards and Diagnostic Signs: A Guide to Impairments to be Looked for in Hazardous Occupations."

50. By the 1950s, control of exposure to airborne asbestos fibers based upon the concentration and duration – sufficient to prevent asbestosis – was considered by medical authorities, both international and domestic, to concomitantly control the (then believed) causal relationship between asbestosis and pulmonary cancers. (Smith, 1952; Doll, 1955; Hueper, 1966) The association of one type of amphibole asbestos with the development of a rare and uncommon type of cancer, mesothelioma, was not demonstrated until several years later with the work of Wagner and his coworkers in 1960. (Wagner et al, 1960) Wagner and coworkers established the association of mesothelioma with a specific type of asbestos, crocidolite, under conditions which were totally different than those found in naval applications or onboard ship – and to a chemically different form of asbestos. The proven association of amosite (the type of asbestos used extensively for thermal insulation on Navy combatant vessels of this period) and mesothelioma was not established until the work of Selikoff and his associates in 1972 (Selikoff et al, 1972). Throughout the period from 1950 until the mid-60s, limiting exposure to airborne asbestos fibers to levels below those which would cause asbestosis, would concomitantly control the development of cancer – either lung cancer or malignant mesothelioma. Federal programs were based upon this sound, and widely held concept.

51. With the increasing use of asbestos in World War II, the Navy expanded its occupational health programs for asbestos and other chemical, physical, and biologic agents which were consistent with the state-of-the-art for each of these potential hazards at that time; these wartime programs were discussed by Captain Brown in 1941. Philip Drinker, writing as the United States Maritime Commission's Chief Health Consultant to the Navy's Bureau of Ships in 1945, recommended that 5 MPPCF be used as the industrial hygiene control level – even before that level was formally recommended by the American Conference of Governmental Industrial Hygienists in 1946. This is the same value that was used as the occupational exposure level in the noteworthy "Fleischer-Drinker study" published in 1946. This study measured total dust, and asbestos dust, in four US Navy shipyards and onboard ships during various operations, and also evaluated medically-associated outcomes.

52. In one of his early roles as a consultant to the US Maritime Commission and working before

the "Minimum Requirements" were enacted in early 1943, Philip Drinker, then at Harvard School of Public Health, led five US Navy officers in the performance of a general Industrial Health Survey of the Bath Iron Works in September, 1942. (Drinker, 1942) This survey reviewed the industrial shore facilities and ships under construction. The ventilation in the Pipe Covering Shop was qualitatively assessed and recommendations were offered :

> ***"The conditions in this shop present a very real asbestosis hazard and immediate steps should be taken to segregate the most dusty processes into a well ventilated area. Local exhaust ventilation of proper design should be installed; however, if conditions can not be completely controlled in this manner, then suitable dust respirators should be worn by the workers. Periodic physical examinations of the chests of all workers should be made. Every six months is a reasonable interval."***

During this survey in 1942, Drinker and his team noted that a variety of respirators were available for issue, at no cost, in the Tool Room. It was further noted that a program for the repair, cleaning, and sterilization for these respiratory protective devices was in place.

53. In December, 1944, WC Dreessen (a "Surgeon-grade officer" with the US Public Health Service and lead author in the earlier US Surgeon General's Report: Public Health Bulletin No. 241) and Lieutenant Commander WE Fleischer, USNR (a Navy physician assigned to the US Maritime Commission's East Coast Regional Construction Office and lead author in the later "Fleischer-Drinker Report"), formally investigated Bath Iron Works (BIW) regarding "Asbestosis from Amosite Pipe Covering at Bath Iron Works". The BIW shipyard was now performing work under the statutory "Minimum Requirements for Safety and Industrial Health at Contract Shipyards" (1942). As the Chief Health Consultant of the US Maritime Commission, Drinker directed this investigation as his office had ***"heard that there was concern among the pipe covering crews who feared that the amosite was causing some respiratory troubles."*** In the report of their findings, these US Government representatives provided the following:

> ***"1. Provide adequate ventilation at all points where dust is created when handling Asbestos Products and Diatomaceous Earth Products capable of producing Silicate dust.***
> ***2. Require all employees to wear suitable approved respirator when engaged in any work where there could be exposure to Asbestos Dust.***
> ***3. Provide pre-employment medical examination of the chest area for those who are employed in work where there is exposure to Asbestos Dust. (The purpose of the pre-employment examination is to eliminate prospective workers who have respiratory ailments or who are susceptible to respiratory ailments.***
> ***4. Provide periodic medical and chest examinations for all employees engaged in work where there is an exposure to Asbestos Dust. It is suggested that such periodic medical and X-ray examinations be made at intervals of at least every six months."*** (Dreessen and Fleischer, 1944)

In follow-up reports of total and asbestos dust counts at BIW, the US Maritime Commission industrial hygienist performing the microscopic analysis discussed his findings (Thompson; 1945):

> ***"In all counts except those taken in cutting asbestos, there appeared to be a great deal of material about 1 micron in diameter and of a very uniform size. This did not appear to be in the least fibrous, and I suspect it may be particles of cement which are used in the mixture. Certain of the basic materials used contain large quantities of diatomite."***

Dr. CR Williams (1945) performed petrographic analyses of these dust samples at his Harvard School of Public Health laboratory. His results confirm that general area dust onboard ships has

variable concentrations of total and respirable asbestos – with the vast majority of dust in non-amosite cutting operations comprised of materials other than asbestos.

54. The Navy's occupational health program not only addressed asbestos exposure, but it had a significant medical component which contributed to advancing the state-of-the-art knowledge. In 1955, Mr. JR Sheehan, an industrial hygienist at the Long Beach Naval Shipyard, wrote to Mr. Webster Ay, the Secretary of the Asbestos Union #20 at that Yard (and one of the individuals involved in the production of the "Grim Reaper" Poster used nationally for asbestos hazard recognition and control since the 1950s), to inform him of the availability of a new medical test being developed by Hurley Motley, MD (at the University of Southern California) to measure early pulmonary function changes and encouraged its acceptance and use among the Yard's asbestos workers, pipe coverers, and insulators. This type of test later became commonly used as it was more sensitive than chest radiography in detecting early lung changes from dust exposure. In addition to industrial hygiene engineering controls, the Navy also developed task specific training for individuals potentially exposed to levels of asbestos exceeding 5 MPPCF.

55. By the 1960s, the then-recognized hazards of asbestos were becoming known within the relevant industries – that is to say, the manufacturers and major users of asbestos thermal insulation. The best scientists of the era were beginning to recognize the association between chronic asbestos exposure among insulation workers and the newly-recognized disease mesothelioma (Selikoff, Churg, Hammond, 1965). At the same time, the major thermal insulation manufacturers began placing asbestos safety caution labels on the packaging of their insulation products – Johns Manville in 1964 and Owens-Corning Fiberglas in 1967. The national insulators' union, and industry, began a major nationwide push to educate thermal insulation workers about the hazards of asbestos. (Selikoff, 1967) Still, the federal government, virtually every state in the Nation, and the world's entire scientific and medical communities universally followed 5 MPPCF as an acceptable continuous, daily occupational exposure level for asbestos. This was a level of exposure associated with asbestos textile manufacturing, career insulation workers, and virtually no one else. Individuals operating equipment with asbestos-containing thermal insulation, or those working with or handling non-friable, asbestos-containing materials in the performance of their duties were not considered to be at risk of developing any asbestos-related disease based upon their types of exposures – and the associated level, duration, and frequency of these exposures. Therefore, they were not typically provided with warnings about asbestos hazards that were thought applicable only to unrelated trades with much more intense exposures – unless the asbestos exposure and release conditions warranted such a warning – such as those found during a shipyard overhaul period – and that warning was associated with processes involving external thermal insulation containing asbestos and not the handling and use of gasket and packing materials, or electrical components. This practice was fully consistent with the state-of-the-art as discussed above by Dr. Irving Selikoff. No additional warning by a manufacturer and/or vendor of equipment (like turbines, boilers, valves, pumps, or electrical equipment), was going to change this well-accepted fact – until the period of OSHA with new scientific and medical information and correspondingly massively increased attention and research on this national "Target Health Hazard" (DoL, 1972). Under OSHA, the statutory, "Permissible Exposure Limits" for asbestos were appropriately lowered as the developing state-of-the-art knowledge indicated the need. Further Federal regulations and mandatory controls were enacted in the early 1970s; these regulations were placed on the employer of the workplace, or the business entity generating asbestos-containing waste, and covered literally all aspects of asbestos use, exposure, and disposal.

56. The occupational exposure level of 5 MPPCF continued to be used by the Navy, as well as other Federal agencies and many states, through the 1960s. However, this long-held "acceptable" occupational exposure concentration was re-evaluated in light of evolving scientific and medical knowledge and underwent incrementally significant reductions following the enactment of the Occupational Safety and Health Act in 1970. (US Congress, 1970) A national, statutory occupational exposure level, now called the "permissible exposure limit (PEL)", did not exist until the promulgation of the Occupational Safety and Health Act, and later as published

under the asbestos dust standards (DoL, 1972). Although when enacted, this national legislation specifically excluded military personnel in unique military workplaces and also did not address occupational health and safety during wartime or military conflict conditions, it did include private shipyards and all personnel working in those yards, as well as other industrial and commercial sites and facilities. The Navy had also adopted its own exposure standards (prior to OSHA) based upon the same occupational exposure levels later established as statutory limits under OSHA (BuMED, 1955; DoN, 1971; BuMED, 1973, and OPVAV, 1974). As mentioned previously, the Navy also took further additional steps to eliminate the use of asbestos as a thermal insulation through its "Asbestos Elimination/ Substitution Personnel Protection Program". (COMNAVSEASYSCOM, 1975)

57. Similarly, under the US Environmental Protection Agency National Emission Standard for Asbestos (US Congress, 1971); National Emission Standard for Hazardous Air Pollutants for Asbestos – "Asbestos NESHAP" (EPA, 1973); and the Toxic Substances Control Act (TOSCA) (USEPA, 1976), asbestos became regulated as a controlled environmental pollutant. Even then, operators of equipment in occupational settings were not, under normal working conditions, expected to be at risk of exposure to asbestos dust levels in excess of the existing PEL. And, to the extent that specific working conditions at a specific workplace did create such a risk, under OSHA, the duty of educating, protecting, and warning the worker fell explicitly upon the employer, as well as the manufacturers of the asbestos materials at issue. Trade unions also became involved. The AFL-CIO – the federation of labor organizations which worked closely with Irving J Selikoff, MD to evaluate and control the hazards of asbestos exposure among their workers was also very active in the development of national labor legislation. The AFL-CIO President, George Meany, called the Occupational Safety and Health Act passed in 1970 ***"...a long step ... toward a safe and healthy workplace."*** (New York Times, 1970). When President Nixon signed this milestone Act of 1970, George Meany and other labor figures were present at the ceremony held at the Labor Department. As the control of exposure to asbestos was one of the five major health hazards targeted by this new legislation (DoL, 1972), the labor unions became even more active in identifying excessive asbestos exposures in the workplace and educating their members regarding asbestos hazards and the means of controlling exposure. This union activity actually dated back to the early 1960s. (Sickles, 1961; 1962) Under OSHA, the employers, unions, as well as workers themselves, were all considered to be the important components in maintaining safe and healthful workplaces. Most certainly, shipyard labor unions were very involved in the enactment and enforcement of these standards.

58. Indeed, the Navy stayed abreast of developments regarding the hazards of asbestos and developed sound approaches to the control of exposure to excessive asbestos fiber levels, as evidenced by several programs at various shipyards during the pre-OSHA period before 1970. In the late-1950s, Mr. WT Marr at Long Beach Naval Shipyard, where CAPT Wynkoop, USN had appropriately directed the attention of the Commanding Officers of ships entering the shipyard to the hazards of the overhaul period and provided support personnel and personal protective equipment in 1947, was investigating alternate sampling and measurement techniques for the evaluation of asbestos – well before the change from a methodology using particle counting to one evaluating fiber length and concentration. The "Grim Reaper" poster emphasizing the need for insulators to wear a respirator when working with asbestos was a product of unionized labor and the safety department at this yard in the early 1960s. At the Boston Naval Shipyard, Mr. Storlazzi was continuing to practice state-of-the-art occupational health and industrial hygiene which had been started by CAPT Jenkins in the late 1930s. One of the earliest commissioned Industrial Hygiene Officers in the Navy, Mr. Seymore Levinson, continuing the work in which he was trained in 1942, directed the industrial hygiene program at the Norfolk Naval Shipyard in the 1960s where he provided exposure assessments and recommendations at this facility. (Levinson, 1965; 1967; 1969)

59. The Puget Sound Naval Shipyard (PSNSY) had a well-established occupational safety and health program which included an asbestos control program. As practiced throughout the Navy, this program was based upon the worker's exposure potential. Mr. CW Richards was the

representative from Puget Sound Naval Shipyard in attendance at the Navy-wide "Pipe and Copper Shop Master Mechanics Conference" held in Boston in 1958. At PSNSY, specific program documentation dates back to the "General Safety Rules Manual" promulgated in 1950. (PSNSY, 1950) In this Manual, the following is stated:

> ***"Wherever there are fumes, irritating vapors or heavy dust present in the atmosphere, respiratory equipment is necessary for your protection. Consult your supervisor for advice on any problem that may arise. (See Section N, Rules on Personal Health.)***
> ***"N4. Wear dust type or air-fed respirators for chipping red lead paint, handling amosite or insulating materials, while dressing abrasive wheels, while working exposed to dust from sand blast operations (wet or dry), and for any other dusty process where effective ventilation cannot be obtained."*** [EMPHASIS ADDED]

The potential hazards of asbestos were recognized by both tradesmen and occupational health personnel. In addition to providing an overview of insulating materials, the Master Mechanic of the Pipe Covering and Insulation Shop (Shop 56; PC&I) manual on "Marine Pipe Covering and Insulation" adopted in May, 1961 addressed worker safety training.

> ***"Marine Pipe Covering and Insulating" has been assembled through the research efforts of Shop 56 under the direction of the Master Mechanic.***
>
> ***Utilization of this technical trade manual in the field of pipe covering and insulating will improve the vocational and production skills of our present craftsman as well as to "afford intangible benefits in training of new employees.***
>
> ***Chapters I through III will present an interesting introduction to our Navy's magic fibers" which make possible unlimited operating temperatures and pressures in such critical piping as HIGH PRESSURE STEAM propulsion while affording maximum protection to our operating personnel.***
>
> ***Chapters IV through VI will introduce Pipe Covering and Insulating tools, machinery, and insulating material with their layout and installation.***
>
> ***Chapters VII through X will afford intangible technical data for reference or application.***
>
> ***It is with the profound interest and best wishes of our trade we present this manual."*** [EMPHASIS ADDED]

This 1961 Manual also provided handling guidance for insulation materials in order to minimize the generation of dust, as well as requiring the use of respiratory protection when appropriate. Using lay terminology and basic medical concepts, the Shop's Master forcefully addresses his supervisors and tradesmen:

> ***"Characteristics of the pipe covering and insulating operations in the shipbuilding industries are such that proper personal safety precautions must be adhered to at all times. Each individual pipe coverer and insulator employee is required to check out and use a respirator when working in insulating areas where there is any danger from exposure to harmful insulating dusts. Supervisors should ensure that their men are properly protected at all times with proper safety equipment and adequate***

> ***ventilation. Supervisors are not relieved of responsibility by merely instructing their men to use safety equipment, they are obliged to follow up and ensure that protective measures have been implemented for their crew's health and welfare.***
>
> ***Industrial dusts of all forms have long been thought of as a production evil. Sometimes taken quite seriously, and sometimes taken with a grain of salt, or we might add sardonically, with a micron of silicosis.***
>
> ***Proper control of all harmful industrial dusts can be obtained only through the combined efforts of the workers and management working together to minimize exposures to critical dust and fumes.***
>
> ***The "old timer" or "smart character" may look on humorously as an informed and cooperating worker carefully adjusts his respirator before ripping off reams of amosite or asbestos piping insulation preparatory to a piping alteration. However, it will be the cooperating worker who will have the healthier pair of lungs at the end of the day.***
>
> ***While "Pneumoconiosis" is the technical term applicable for such infections as "Miner's Asthma", "Miner's Phythisis,"(sic) " "Grinder's Rot," (sic) and many others, "Asbestosis" and "Silicosis" are the two most harmful and common lung infections of the pipe covering and insulating trade.***
>
> ***...***
>
> ***The infectious characteristics of insulating materials, such as diatomaceous earth (a form of amorphous Silica), asbestos dust, glass or rock wool, and Magnesia, are harmful and do damage to the respiratory system when breathed in excessive and constant amounts."*** [EMPHASIS ADDED]

The Shop's Master used a hand-drawn picture of the human lungs and airways to stress his point of physiologic fragility and the need to comply with safety and health precautions:

> ***"An example of the lung structure with its delicate parts has been included to stress the importance of proper safety or health precautions while performing pipe covering and insulating operations."*** [EMPHASIS ADDED]

The Puget Sound Naval Shipyard's asbestos control program had many other notable developments. Mr. CA Mangold and the occupational health staff at the Puget Sound Naval Shipyard were also very active at this time developing worker education programs while controlling excessive exposure to airborne asbestos fibers in accordance with Navy instructions and statutory Federal requirements as they were promulgated. (PSNSY, 1950; Mangold, 1965; PSNSY, 1966; Mangold, 1967; Mangold, 1968; Mangold, 1969a,b; BUMED, 1969; Barboo, 1969; McBratney, 1969; Mangold, 1970; Beckett, 1976) Training lectures, such a "Practical Industrial Hygiene and Toxicology" were developed for employees and presented by the Industrial Hygiene Department . (PSNSY, 1965) Technical guides for ventilation (Mangold, 1967; Mangold, 1969a) and respiratory protection (PSNSY, 1966) were also developed by the Industrial Hygiene Department to aid supervisors in the performance of the safety aspects of their positions. Concerned about their medical monitoring findings in light of the industrial hygiene data for the insulators and other industrial trades at the PSNSY, the Medical Department not only informed the workers of their concern (Mangold, 1969a,b; PSNSY, 1969), but also took the initiative to disseminate their findings to other occupational health professionals both inside (Manning, 1968; McBratney, 1969; Mangold et al., 1970) and outside of the Navy (Mangold et al, 1968). The final

report of Mangold and his coworkers work on "Asbestos Exposure and Control at Puget Sound Naval Shipyard" (1970) was approved and released by the shipyard Commander, RADM EW Petrovik, USN in March, 1970. This Program was highlighted by the Navy Bureau of Medicine and Surgery for its excellence, and photographic images of shop and ship asbestos control measures in use at Puget Sound Naval Shipyard were put on display at the Bureau in Washington, DC. The information distributed to occupational health personnel throughout the Navy. (Barboo, 1969)

60. The Navy also took further additional steps to eliminate the use of asbestos as a thermal insulation through its "Asbestos Elimination/Substitution Personnel Protection Program" (COMNAVSEASYSCOM, 1975; COMNAVSEASYSCOM, 1976). As the general state-of-the-art medical knowledge regarding the inhalation of asbestos fibers evolved, as well as the development and availability of suitable substitute non-asbestos materials progressed, the Navy adopted a measured program to replace asbestos thermal insulation. As Vice Admiral Bigley, speaking for the Chief of Naval Operations, acknowledged in his letter dated 5 January 1979 to the General Accounting Office (Bigley, 1979):

> ***"In the case of insulation specifications, changes were made as early as 1971 to specify that the Navy wanted materials with little or no asbestos. By late 1973, these specifications had been changed to call for asbestos-free materials. The fact, however, that these product specifications were changed to call for asbestos-free materials does not mean that ship-builders must stop using asbestos products. Many ship-sets of asbestos containing products, purchased to earlier versions of the product specification had already been bought and in some cases installed. Tens of thousands of pounds of asbestos products remained in warehouses, aboard ships, and in shipyards, in active use. With no positive action by the Navy, many additional years would pass before the asbestos products were exhausted. Although, in some cases, separate action by some Navy components resulted in the asbestos-free products being used prior to 1973 or 1974, the overall Navy policy prohibiting the use of such material could not be promulgated until we had some assurance that it could be followed. By 1975, asbestos-free materials were generally available to all Navy agencies and the no-asbestos policy statement, NAVSEAINST 5100.2 of 24 October 1975 issued."***

Admiral Bigley further noted that although ship purchase contract specifications were changed for some ship classes in 1971, the change for all ships classes was not accomplished until later:

> ***". . . Ships well under construction and already insulated at that time continued through to delivery as late as May 1978 with asbestos insulation. Consequently some ships were delivered with asbestos thermal insulation since 1973."***

Admiral Bigley (1979) further addressed the removal of asbestos from existing shipboard installations:

> ***"Regarding removal of all asbestos aboard Naval vessels, Navy policy has required replacement of asbestos insulation with substitute material when insulated equipment and machinery are repaired. Recently, this policy has been modified to require, in addition, selective replacement of asbestos insulation in those high-maintenance areas where repairs may be anticipated during the subsequent operating cycle of the vessel. During the next five years, implementation of this policy will result in the removal of all shipboard thermal asbestos except that 30 to 50 percent which is normally untouched during the life of the ship.***

*The concept of a one-time total asbestos removal on all ships has been-under intensive review to determine if such a policy revision is technically and economically feasible. Initial analysis does not justify such a policy change. While there is no intention to conduct a trade-off of human health for maintenance and repair funds, the funds involved are substantial. As indicated above, the estimated cost to reinsulate just three classes of ships (frigates, destroyers, and submarines) is $965.13 million. It is reasonable to assume that the estimated cost for total asbestos replacement in 'all ships will approach two billion dollars. The-true cost is likely to increase significantly because of delay and disruption effects, increased overhead charges due to longer overhauls, and increased shipyard manning to handle the added work. This enormous cost is not the only reason that the Navy has not adopted a one-time total asbestos removal policy. Other factors which support the present policy are the following:*

*a. During the life of a ship, 30 to 50 percent of the total asbestos insulation will never be touched except for painting or making minor repairs to the lagging cover material. Measurements show that operating ships equipped with asbestos insulation have airborne asbestos levels at or below 0.1 fibers per cubic centimeter. This value is comparable to the ambient level reported for the City of Philadelphia by Dr. Irving Selikoff, a well known asbestos expert. Therefore, on the basis of existing information, a properly maintained and operating ship should not present an active asbestos hazard.*

*b. The Navy requires and enforces stringent asbestos work standards which control exposure of workers to asbestos dust during ship repair. By minimizing the amount of asbestos work done, the potential exposure, residual dust, and overhaul cost are minimized.*

*c. Fibrous glass and calcium silicate products are being used as asbestos replacements. The National Institute for Occupational Safety and Health has recommended controls for fibrous glass work that are nearly identical to the controls now imposed for asbestos work. It seems reasonable to assume that if the Institute recommends nearly identical controls for two similar substances, comparable hazards could be known or suspected. Therefore, it is not at all certain that wholesale replacement of asbestos products gains any medical advantage at all.*

*d. Despite the enormous cost, replacement of asbestos thermal insulation in ships will not eliminate asbestos exposure of civilian and military Navy personnel. According to the National Institute for Occupational Safety and Health, asbestos dust is everywhere. Low but easily measurable levels of airborne asbestos dust are found in the air of cities throughout the country, much of it generated by automotive brake and clutch linings. Asbestos is used in so many products that most of the U. S. populace unknowingly encounters it daily."*

61. As discussed previously, the potential exposure of active duty Sailors to significant levels of asbestos fibers was only recognized under unusual conditions – such as periods in which ships were "in the yard" for overhaul or undergoing significant maintenance or repair (Wynkoop, 1947). Similarly, based on the state-of-the-art in industrial hygiene and occupational medicine available

at the time, the duties that were thought to put civilian shipyard workers at risk for potentially significant asbestos inhalation exposures were largely limited to prolonged installation and removal projects by workers in the pipecovering trade (insulators). The Navy had both a well-based and well-established program for the control of the hazards of asbestos based upon the state-of-the-art, and, in consideration of its responsibility for national defense, made appropriate and informed decisions to specify and use asbestos for Navy ships. These programs were appropriately delivered through the Commanding Officers of each Naval activity – the individuals with ultimate Navy authority and responsibility. There was not an equipment manufacturer, nor a vendor, in a position to offer better advice to the US Navy before the enactment of the Occupational Safety and Health Act in 1970. And after 1970, and through the present time, the Navy's occupational health program continues to reflect the state-of-the-art in national safety and health policy and procedures, and to maintain readiness for national defense.

## DISCUSSION AND ANALYSIS OF RISK-BALANCING BY THE NAVY RELATIVE TO ASBESTOS EXPOSURES AND THE HEALTH OF NAVY DEPARTMENT PERSONNEL

62. The Navy weighed its knowledge of the hazards created by the use of asbestos containing materials against the vital operational benefits provided by its use. The Navy controlled asbestos exposure consistent with the then current state of accepted scientific and medical knowledge balanced by needs for national defense throughout the various periods of its use. The Navy's asbestos control program, at all times discussed above, was multifaceted and complex, and included hazardous process identification, engineering controls, use of alternative materials in accordance with Navy specifications and contract requirements, personal protective equipment, training and education, and medical surveillance – all when indicated by the level of exposure to airborne asbestos fibers.

63. In all, it was the Navy (or analogously Coast Guard and Coast Guard personnel), with Congressionally-designated authority for operating and controlling the shipboard and activity/facility environments, workplaces, and types of materials, methods, and tasks to which Navy Sailors were assigned and where civilian personnel worked. The Navy accepted this role and responsibility in the performance of its mission. The Navy established and followed an occupational health program that protected its personnel – its most vital resource – so that they could carry out their tasks in support of the Navy's mission. Without its Sailors, a ship would be nothing more than an object either moored to a pier or floating aimlessly upon the sea; without its ships – and its Sailors – there would be no Navy. The Navy's civil service personnel were no less expendable as essential participants in maintaining the Navy's state of readiness.

64. As discussed above, Sailors in the engineering ratings "steam the ship" by operating the equipment. While it is certainly true that maintenance and minor repairs are performed, the vast majority of time is spent operating the various steam-driven equipment. The major units of propulsion machinery onboard a Navy warship (along with their appurtenances and associated equipment like piping and valves) are specifically designed to be highly reliable pieces of equipment which require nominal maintenance during normal operation. During the periods relevant to this report, the types of tasks which were routinely performed by shipboard personnel while operating this equipment were not considered by Navy occupational health professionals to result in exposure to asbestos fibers which would exceed the allowable occupational exposure level; they were not considered to be hazardous tasks – at least with respect to asbestos. To the extent Sailors experienced any exposures to asbestos-containing materials associated with equipment during their normal duties onboard ship, except in exceptional circumstances, these would typically have been medically and clinically insignificant and well below the allowable permissible exposure limits of the period. The major contribution to meaningful asbestos concentrations onboard a Navy ship of this era was from amosite asbestos fibers released from friable thermal insulation used on piping and other steam systems throughout the ship. However, even these airborne fiber levels were well below the accepted exposure levels of the period and

not considered to be hazardous to personnel.

65. Navy and civilian personnel working onboard ships and other vessels obviously worked around various equipment ranging in size from the very small – to the enormous. However, except in exceptional circumstances, Navy Sailors operating and maintaining equipment while performing accepted work practices would not typically have been exposed to airborne levels of asbestos fibers arising from gaskets, packings, or insulation on any piece of equipment which exceeded the accepted occupational exposure levels at the time. If exposure to airborne asbestos fibers was expected to exceed the accepted occupational exposure level at any given period in time, both during the pre-OSHA and post-OSHA periods, personal protection and other industrial hygiene controls were required. It should be noted that the equipment used in a Navy ship's machinery spaces – like turbines, boilers, pumps, valves, etc. – are typically shipped and installed without external thermal insulation. If thermal insulation was required by Navy specifications, the external insulation was provided and installed by the shipbuilder or repair activity after initial installation.

66. The presence and content of asbestos in thermal insulation, as well as gaskets and packings and other materials used in naval construction, is variable. Unless qualitatively and quantitatively determined in a scientific manner, the presence, type, and concentration of asbestos cannot be determined in either the material or in the air. From the industrial hygiene standpoint of controlling potential hazardous inhalation exposure to asbestos, it may be assumed that much of the thermal insulation and other materials, such as gaskets and packings, used in the construction and maintenance of naval vessels contained asbestos roughly during the era of the 1940s through the 1960s; however, only proper evaluation and determination by trained and qualified individuals can scientifically and conclusively make the determination. Without such evaluation, it cannot be known whether and to what extent the products, and the "dust" purportedly identified by witnesses not trained in applicable industrial hygiene methods, actually contained asbestos.

67. The Navy's total occupational health program operated within the Navy organizational structure (chain of command) and was designed to maintain functionality in the completion of the Navy's mission while controlling untoward exposure to airborne asbestos fibers to all Naval and civilian personnel. The ability of the Navy to operate and fulfill its mission rests upon many critical elements, the greatest of which are its Sailors. However, real world considerations such as funding, political and other current events, and natural and man-made catastrophes also impact senior Navy leadership's final decision in all matters. By the very nature of the Navy's mission, it is a combatant force and the Navy's leaders ("war fighters") must thoughtfully elect to place Sailors "in harm's way" to protect the country and its vital interests – as directed by President. Although these actions may result in casualties or death of Navy personnel, these types of decisions must be made for the good of our Country – its daily existence, its defense, and its survival. The Navy's occupational health program, including its asbestos exposure control program for over the vast majority of the 20th Century, was directed at maintaining a fit and healthy fighting force in support of accomplishing the Navy's mission and maintaining its combatant and support vessels, aircraft, missiles and other essential equipment – as well as providing essential occupational health resources for its civilian personnel.

68. As the occupational exposure level for exposure to airborne asbestos fibers decreased over the period of the late 1960s, and more so in the early 1970s under OSHA, the Navy and private, regulated shipyards and other industries further increased their vigilance for the control of exposure and instituted further industrial hygiene controls including: the substitution of asbestos in thermal insulation where possible; use of products containing lower amounts of friable asbestos; increased training; control of potential exposure to asbestos fibers of non-involved or unprotected personnel; posting of a warning; and the designation and education of individuals specially trained and equipped to handle asbestos in order to minimize the release of asbestos fibers. The use of asbestos-containing products has continuously decreased since the late 1960s and the potential for direct and background exposure has concomitantly decreased. The

increased control of potential exposure to respirable asbestos fibers was performed by the Navy while it still maintained a fighting force and provided for the Country's national defense. In addition to the post-OSHA regulations, as a matter of practicality and economic necessity, regulated industries also followed the trend of removing and replacing, or encapsulating/ enclosing, potentially friable asbestos sources and materials. After the late 1960s, the composition of any thermal insulation, construction, or other previously known asbestos-containing product cannot be assumed.

69. As described above, the expertise of the Navy, with respect to the specification and use of asbestos, and the health hazards associated with its use onboard Navy vessels, far exceeded any information that possibly could have been provided by an equipment manufacturer. Additionally, the boiler, turbine, electrical, and auxiliary equipment manufacturers have absolutely no authority, responsibility, or control over the operating workplace or personnel – both essential aspects of hazard communication. Concomitant with the huge increase in shipbuilding during World War II, the Navy developed a robust and multi-faceted occupational health program which addressed many health risks. Over a quarter-of-a-century before the enactment of the Occupational Safety and Health Act of 1970 (US Cong, 1970; PL 91-596), the Navy had an asbestos control program in place which contained most of what was later required for non-military workplaces under this first national legislation controlling occupational exposure to asbestos. The Navy's program far exceeded the mere provision of a warning placard or note in an instruction or operation manual. The major aspects of the Navy asbestos control program existed before OSHA and have continued, with modifications, to remain consistent with the evolving state-of-the-art knowledge and statutory requirements of OSHA. The Navy's early program included the:

(1) adoption of an occupational exposure level (five million particle per cubic foot (5 MPPCF);
(2) establishment of the methodology to evaluate exposures;
(3) training and equipping an occupational health team with state-of-the-art knowledge and equipment;
(4) development and specification of engineering and administrative controls where required;
(5) establishment of a proactive medical surveillance program applying SOTA monitoring techniques incorporating pulmonary function testing to detect early changes with greater sensitivity than using chest radiographs alone (chest radiographs reveal later-developing changes);
(6) the wearing of approved respiratory protection for tasks performed when exposure levels were expected to exceed the accepted, "time-weighted average" concentration;
(7) recordkeeping; and
(8) training (hazard awareness) – and later more requirements were added consistent with the developing state-of-the-art and Federal and Navy requirements.

70. The Navy controlled exposure to asbestos consistent with the then current state of accepted scientific and medical knowledge balanced by needs for national defense. Sailors did not have the option to avoid exposure to asbestos-containing products or environments in which asbestos was used while on active duty. Certainly, Navy vessels built and/or overhauled in the 1940s through the 1970s often contained large amounts of asbestos which covered steam-driven equipment and thousands of feet of thermal-insulated pipes. These insulated lines traversed the entire vessel including non-engineering work spaces, as well as eating and berthing spaces.

71. In light of the Navy's knowledge regarding the potential asbestos-related health hazards from exposure since the 1920s (well before the large increase in specification by Navy designers, architects, and engineers), and the known military and technologic benefits or advantages afforded by the use of asbestos as thermal insulation and in other applications, the Navy made an informed decision to use asbestos-containing products. The Navy was fully cognizant of potential

health hazards when it specified use of asbestos in applications critical to national defense and the conduct of war. To insure that the health of military and civilian personnel was maintained, the Navy established a sound, premier state-of-the-art occupational health program to control the recognized, potential health hazard.

72. To carry the concept involving the offering of a written warning by an equipment manufacturer further, as the Navy had determined what an "acceptable asbestos exposure" was, the Navy would not, nor could not, allow each sailor to make an additional determination of what constituted an acceptable exposure on an individual basis. This is not only true for determining whether or not one would accept an asbestos exposure, but also all of the dozens of other daily potentially hazardous exposures (including to an armed enemy) that confront personnel. Navy specifications or instructions, as well as my decades of experience as an officer rising to the rank of Navy Captain, do not support the notion that manufacturers of equipment were free to provide additional warning information about hazards associated with products – especially those (like insulation) that they typically neither manufactured nor supplied.

73. Based upon review of many documents regarding the Navy's hazard communication program, and based on my career experiences as an Industrial Hygiene Officer and a physician in the Navy dating back to 1972, and personal knowledge of the Navy's hazard communication program and Naval practices generally, it is indisputable that uniformity and standardization of any communication, and in particular safety information, are crucial to the operation of the Navy. The Navy had a sound, occupational health and safety program based upon its requirements and conducted in accordance with Navy regulations, instructions, and operational necessities. Simply, the Navy could not operate if various personnel were trained differently and received additional, inconsistent information from different manufacturers.

74. For example, SECNAV Instruction 5100.8 ("Uniform Labeling Program - Navy, 26 September 1956) – which is an internal Navy directive from the Secretary of the Navy directing Navy personnel, not manufacturers of material or equipment, of the manner in which to carry out their obligations – Para.1 states: ***"The purpose of this Instruction is to standardize labeling requirements for hazardous chemical products during usage..."***

75. Further to this goal of standardization, the Navy itself undertook the responsibility of developing, promulgating, and enforcing safety precautions for equipment maintenance. Indeed, the instructional manual provided to all new Navy Sailors (Bluejackets' Manual, 1965) provided:

> ***"Your CO has been assigned safety as one of the functions of his command. He, your XO, your department head, division officer and petty officers are required to see to it that their men are instructed in appropriate safety precautions. These officers are required to make sure that each of their men know and practice safety precautions.***
>
> ***...***
>
> ***Navy Bureaus and Offices study the equipment for which they are responsible and then publicize the safety precautions to be followed. Safety precautions that are instrumental in avoiding preventable accidents and maintaining a healthy work environment have been gathered into a publication entitled 'Safety Precautions, Department of the Navy.'"***

These Navy safety instructions referenced (Department of the Navy Safety Precautions, NAVSO P-2455, 1965) in this Bluejackets' Manual specifically set forth the Navy's official procedures for asbestos safety:

***"Exposure to asbestos dust is usually encountered in the installation, repair, and removal of insulating pipe covering used principally aboard ship. The following precautions should be taken in any dust making operations involving asbestos products:***

> ***a. Provide permanent general ventilation in areas where dust producing operations are usually performed.***
>
> ***b. Install exhaust hoods over saws and other dust making machine tools.***
>
> ***c. Require workers to wear dust respirators where dusty operations cannot be adequately ventilated.***
>
> ***d. Use industrial vacuum cleaners in lieu of dry sweeping of floors and other surfaces."***

As discussed previously, as the state-of-the-art of asbestos hazard awareness developed within the medical and scientific community, these procedures were repeatedly superseded by ever more sophisticated Navy asbestos safety policies (NAVSHIPSINST 5100.26: "Control of Asbestos Hazards", COMNAVSHIPSYSCOM, 1971; Naval Ships Technical Manual, Ch. 9390: "Thermal Insulation, Safety Precautions for Asbestos," 1972; OPNAVINST 5100.19: "Safety Precautions for Forces Afloat, CNO, 1973; COMNAVSEASYSCOM, 1975).

76. In contrast, the Navy promulgated detailed specifications regarding the content of equipment manufacturer technical manuals – with specific examples of safety instructions that should be included (Military Specification – Technical Manuals for Mechanical and Electrical Equipment, MIL-M-15071 (SHIPS)). Similarly, the Navy promulgated detailed specifications for the form and content of information plates to be displayed on shipboard equipment (Military Specification – Identification Plates, Information Plates and Marking Information for Identification of Electrical, Electronic, and Mechanical Equipment, MIL-I-15024 (Ships). These two specifications specifically governing the content of written materials – including safety instructions dealing with operation and maintenance – to be provided by military equipment vendors are both completely silent regarding asbestos. However, such countless equipment manuals, identification/ information/markings provided under contract terms by numerous manufacturers were reviewed, accepted, and used by the Navy for decades. It is obvious that these were not the methods nor instruments chosen by the Navy to control exposure to airborne asbestos fibers--this was a health-related matter addressed and controlled via another preferred route.

77. Indeed, any additional warning about the hazards of asbestos by an equipment manufacturer – beyond those already provided and enforced by the Navy – would have been only partial in scope, as well as inherently redundant and possibly inconsistent with the Navy's own position and training. In the heat of battle, there is simply no time to be interpreting inconsistent hazard labels.

78. It has been my understanding, which has been supported by my experience, that literally all Navy sailors serving on ships in the WWII era and through the late 1960s knew and/or assumed that the high temperature thermal insulation used on naval steam system pipes and equipment contained "asbestos". The exact type and composition of the thermal insulation may not have been known, but the use of asbestos for such application was so universal that identification of external thermal insulation on such hot steam system lines and equipment that the insulation was usually assumed to be "asbestos" – even in instances where it was replaced with fibrous glass, mineral wool, or other non-asbestos materials, or used as a minor component in an "85% Mag" product (85% magnesia:15% "asbestos"). This was still the practice when I was commissioned in 1972. As a fundamental aspect of Navy training and practice, dust control and a high level of general cleanliness, even in the engineering spaces, were routinely maintained as part of the standard Navy shipboard environment--spaces were kept "shipshape".

79. At most, an equipment manufacturer could merely have told personnel to follow the Navy's own mandates for handling asbestos. Potentially redundant information is not informative, and diverts attention from hazards inherent in the equipment, and would certainly become obsolete. For example, the life expectancy of propulsion equipment onboard ship is many years, while military specifications and program emphasis (such as the Navy's asbestos hazard communication program) change much more frequently and have evolved over the years to keep pace with scientific developments and changes in materials. Static warnings about asbestos hazards provided with equipment intended to operate for decades would have been outdated and inaccurate almost immediately.

80. There are additional, sound reasons why the Navy did not want unsolicited and potentially inconsistent warning information from equipment manufacturers regarding asbestos insulation (or any other product) which was provided by other vendors or contractors. If every equipment manufacturer (and conceivably even the pipe and structural steel manufacturers) provided its own warning about asbestos insulation that might be used on or around its product, inconsistent warnings from these various sources would certainly have resulted. And, keep in mind, many other hazardous substances (e.g. boiler feed water chemicals, fuels, solvents, heavy metals) are used in conjunction with the multitudes of equipment on a ship. If each was to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances.

81. Moreover, materials like external thermal insulation are periodically removed and replaced, and some types of insulation used by the Navy on equipment were non-asbestos (e.g., fiberglass blankets). Warning about asbestos on equipment where insulation – initially asbestos in the 1940s or 50s – was later replaced with non-asbestos insulation – in the 1960s or 70s – would simply be wrong. Military specifications for thermal insulation over time allowed an assortment of materials – as determined by a number of critical design and materiel availability parameters. As early as 1952, MIL-I-16411A addressed a non-asbestos thermal insulation felt that was suitable for use on steam turbines and other machinery and equipment operating at temperatures to 1,200°F – if selected by the naval design engineers and builders. After delivery of the equipment, how would the equipment supplier know what insulation material would be used in future repairs, overhauls, and conversions made one, two, or more decades in the future?

82. MIL-M-15071D, para. 3.3.1 makes it clear that equipment manufacturers' manuals must first be approved by the Bureau of Ships and ***the "manual shall not be modified without approval of the Bureau of Ships."*** Thus the Navy and/or its agents reviewed and approved the content of all equipment vendor manuals. In all cases, it was the Navy that exercised final discretion over what warnings to provide, or not provide, in equipment technical manuals. Moreover, it cautions: ***"Notes, cautions, and warnings should be used to emphasize important critical instructions. The use should be as sparing as is consistent with real need."*** This specification applies to risks inherent in the operation of the equipment; unsolicited and gratuitous warnings about the possible use of materials made and sold by others do not comport with this specification. The concepts of "safe", "hazardous", and "toxicity" have changed over the past decades. Specifically, as late as 1964, the American College of Chest Physicians in its treatise on "Asbestosis" noted: ***"Asbestos is not currently considered a toxic substance since it does not produce systemic poisoning."***

83. Lastly, but importantly, equipment manufacturers are not subject matter experts regarding the health effects or industrial hygiene controls associated with the use of asbestos-containing insulation materials in naval applications. It is unreasonable to speculate that the Navy would have accepted "helpful comments" from a vendor or equipment manufacturer concerning a material or substance provided by another vendor or supplier in which it was not a subject matter expert. And in any event, the Navy already had this specific expertise, and more – and understood its own basis for specifying asbestos-containing products onboard ship. The Navy already had a robust and encompassing occupational health program, working in concert with the Navy's operational, engineering, and maintenance and repair facilities, that far exceeded just the

mere labeling of a material. This program included aspects appropriate for the degree of recognized hazard at various times including training, engineering controls, medical examinations, provision of personal protective equipment, and the use of alternative products when possible. It is thus not surprising that the Navy, with its inherent authority used its discretion, consistently reviewed and approved manuals for thousands of pieces of shipboard equipment without redundant - and potentially inaccurate and conflicting – "asbestos warnings".

84. The naval or military setting is unique and distinct, and although management structure is generally similar, the command hierarchy of rank is well-defined and the authority of the Commanding Officer approaches absolute. This authority is based in Federal statute, as well as in Navy Regulations and Instructions. Over time, there have been evolutionary changes in these to incorporate changing societal values, but the authority of the individual in command remains constant. When routine "orders" are given, prompt and appropriate response is expected. The failure to obey a lawful order is a punishable offense, and depending upon the situation (war time, national emergency, misconduct), the punishment can be severe. Individual freedoms that are common to civilians are not as universally applied to military members, or even civilians working onboard Navy ships in Federal and private shipyards. Civil liberties indeed exist, but they are tempered to the strict Uniform Code of Military Justice (UCMJ) and the requirements for national security. To suggest that a government contractor supplying equipment used in a critical shipboard propulsion system had the autonomy to place whatever instructions it wanted onboard Navy warships, or other naval vessels – as simply as commercial manufacturers might add a label to a consumer product – is misleading and false.

## PRIVATE EMPLOYER RESPONSIBILITIES

85. Prior to the enactment of the Occupational Safety and Health Act of 1970, the universally-recognized occupational exposure level in the United States for airborne asbestos particles (not fibers) was 5 million particles per cubic foot (5 MPPCF) or equivalent to approximately 30 fibers per cubic centimeter (30 f/cc). This level had been previously widely-accepted by health professionals and regulators in the United States since the late 1930s.

86. When OSHA first regulated asbestos in 1971 under authority of section 6(a) of the Occupational Safety and Health Act, it also adopted this value which existed as the Federal standard for asbestos under the Walsh-Healey Public Contracts Act . On May 29, 1971, the initial OSHA Permissible Exposure Limit (PEL) of 12 fibers per milliliter (or cubic centimeter ("12 f/cc" greater than 5 microns in length by phase contrast magnification)), or "equivalent" of 2 million particles per cubic foot ("2 MPPCF" by impinger samples counted by light-field techniques) was published. An "Emergency Temporary Standard (ETS)" for exposure to "asbestos dust" was promulgated on December 7, 1971, which reduced this value to 5 f/cc (with a 10 f/cc ceiling limit not to exceed 15 minutes in 1 hour for up to 5 hours/day). This ETS was in response to a petition by the Industrial Union Department of the American Federal of Labor-Congress of Industrial Organizations (AFL-CIO). The major shipyard workers' unions were affiliates of the AFL-CIO.

87. In June 1972, OSHA promulgated these limits in a final rule: "Standard for Exposure to Asbestos Dust" (DoL, 1972). The control of asbestos exposure to US workers was one of the five "Target Health Hazards" established under OSHA: (DoL, 1972b)

> ***"Focusing upon the need to create healthful working conditions, the Occupational Safety and Health Administration in January 1972, initiated the Target Health Hazards Program. The emphasis is on five hazardous workplace substances:***

1. ***ASBESTOS***
2. ***LEAD***
3. ***SILICA***
4. ***COTTON DUST***
5. ***CARBON MONOXIDE*** [EMPHASIS ADDED]

***WHAT ARE APPROVED LEVELS? OSHA's permissible level is 5 fibers per milliliter greater than 5 microns in length for an eight-hour, time-weighted average airborne concentration. This may be increased to 10 such fibers per milliliter for no more than 15 minutes per hour, up to five hours per eight-hour day. Imminent danger situations are generally not applicable. Any exposure greater than permissible levels for unprotected or improperly protected workers is considered a serious violation."***

88. In July, 1976, the OSHA PEL for asbestos was decreased from 5.0 f/cc to 2.0 f/cc; the ceiling concentration remained the same at 10 f/cc. At that point in time, even with a lower Permissible Exposure Limit, operators of equipment in typical shipboard settings and those operating and maintaining equipment which incorporated bound or non-friable asbestos materials were not, under normal working conditions, expected to be at risk of exposure to asbestos dust levels in excess of the existing Permissible Exposure Limit. These Federally-mandated permissible exposure limits (and corresponding Navy-directed occupational exposure limits), as well as all of the requirements for an "asbestos program" were in effect throughout the United States – and, of course, in a unionized shipyard facilities. In 1986, with considerable "fanfare", OSHA further reduced the Permissible Exposure Limit to one-tenth of its previous value – the Permissible Exposure Limit became 0.2 f/cc. This statutory limit remained in effect until 1994, when the Permissible Exposure Limit was further reduced to its present value of 01. f/cc. During the development and evolution of the "Asbestos Standard" over time, the National Institute for Occupational Safety and Health (NIOSH) provided the scientific and medical "technical" support to OSHA; NIOSH was staffed with commissioned officers and civilians working for the Public Health Service. To the extent that specific working conditions at a specific workplace did create a risk based upon the airborne concentration of asbestos fibers and other use and exposure parameters, the Navy, as well as Federal laws, initially the WHPCA and "Safety and Health Regulations for Ship Repairing", and later OSHA, the duty of educating, protecting, and warning the worker fell explicitly upon the employer (or the Commanding Officer in the Navy or Coast Guard) – as well as the manufacturers of the asbestos materials at issue.

89. Additionally, the new environmental release and disposal requirements under the Environmental Protection Agency's (EPA) "National Emission Standard for Hazardous Air Pollutants for Asbestos (Asbestos NESHAP)" in 1973 also had to be concomitantly fulfilled. (US Congress, 1970b; EPA, 1973) As discussed elsewhere in this report, the evolving "Asbestos Standard" and other statutory requirements enacted under the Occupational Safety and Health Act applied to the Navy and the Coast Guard via a series of Executive Orders; they were implemented by a series of specific Departmental and service instructions which were carried out via the Commander/ Commanding Officer and chain-of-command. Processes and conditions which were "military unique" were specifically excluded; however, general Navy and private shipyard operations were directed to be consistent with OSHA and EPA requirements as they pertained to the handling, use, management, storage, and disposal of asbestos-containing materials.

90. Because of the risk created from having a large number of workers and a large amount of asbestos-containing materials present, civilian shipyards were specifically-targeted industries for the OSHA and EPA regulators regarding all aspects of asbestos use, handing, and disposal. Additionally, inspecting officials of the US Coast Guard, as well as privately employed individuals working in shipyards and onboard ships during construction, repair, or overhaul, were subject to the provisions of the Occupational Safety and Health Act. OSHA inspectors could go onboard

vessels for inspections, but they were equally concerned about all shipyard safety and health conditions.

91. Any safety and health program must surely "start at the top" and include all levels of employees including management. The Navy's (and all US Governmental Departments' and Agencies') overarching Safety and Health Program includes and involves all levels of personnel from the highest levels of command (management) and supervision to the "deckplates" – the entry-level and unskilled enlisted and civilian personnel in the Navy Department.

92. As discussed throughout this report, the Navy had its own occupational health program which started before– well before the Occupational Safety and Health Act of 1970 (OSHA) – and continues to this date operating independently under Department of Defense Directives now as the Navy's Safety and Occupational Health Program. The Navy's program to control asbestos has always been the "State-of-the-Art ". As discussed previously, prior to the enactment of OSHA in 1970 and its statutory implementation in 1971, employment conditions at private facilities, such as shipyards and other industrial sites, were regulated under state and local laws, and, where applicable, Federal legislation ("Minimum Requirements" (1942) – updated for shipyards through the periodically revised and amended requirements of the Walsh-Healey Public Contracts Act (1936) and the "Safety and Health Regulations for Ship Repairing" (DoL, 1960)). The "Safety and Health Regulations for Ship Repairing" enacted in 1960 (DoL, 1960) state:

> ***"… safety and health regulations that have been determined by the Secretary of Labor to be reasonably necessary to protect the life, health and safety of employees engaged in longshoring, ship repairing, and related employments covered by Section 41 of the Longshoremen's and Harbor Workers' Compensation Act, as amended."***

These regulations were mandatory with respect to employers. Similarly, the numerous asbestos control requirements and health program aspects under OSHA were specifically directed to the employer and the workplace – not equipment manufacturers or suppliers. The scope of the OSHA asbestos regulations for employers was vast and the requirements were very specific. In a manner similar to the position accepted and taken by the Government, the employer, or controller of the workplace, had full responsibility for the control of occupational health hazards arising in or from the workplace. Under OSHA, it is the employer that has responsibility for providing a workplace that is free from recognized hazards (US Congress, 1970) and following the asbestos dust standards (DoL, 1972). Each employee also had responsibilities.

> *"(a) Each employer –*
>
> ***(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;***
> ***(2) shall comply with occupational safety and health standards promulgated under this Act.***
>
> ***(b) Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this Act which are applicable to his own actions and conduct." [EMPHASIS ADDED]***

OSHA was enacted:

> ***"To assure safe and healthful working conditions for working men and women; by authorizing enforcement of the standards developed under the Act; by assisting and encouraging the States in their efforts to assure safe and healthful working conditions; by providing for research, information, education, and training in the field of occupational safety and health; and for other purposes."***

93. It was the employer, not the manufacturer of equipment used in a workplace, who was given the responsibility to control exposure to respirable asbestos fibers. Any worker's excessive occupational exposure after the enactment of OSHA was a likely result of a failure of the employer's specifically OSHA-mandated comprehensive asbestos control program (or the Navy's program), and not from any purported lack of a warning by equipment manufacturers and suppliers.

## CONCLUSIONS

94. As discussed throughout this report, the US Navy had a longstanding program to prevent excessive exposure to airborne asbestos fibers based upon the best available knowledge – it was the state-of-the-art. This program was initially directed at preventing the only known illness directly caused by excessive exposure to inhaled asbestos fibers – the clinical disease called "asbestosis". The association between this clinical disease "asbestosis" (not merely "exposure to asbestos") and lung cancer was not generally accepted until Doll's published work in 1955. The disease "mesothelioma" was not associated with different exposure conditions to one type of asbestos (crocidolite) until Wagner's publication in 1960. Until the middle of the 1960s, the development of mesothelioma was also associated only with the presence of asbestosis. Lastly, it was not until 1972 that exposure to amosite asbestos was demonstrated to cause mesothelioma by Selikoff and his coworkers. The Government's initial program was directed at preventing lung fibrosis – asbestosis-the recognized precursor of lung cancer and mesothelioma during that period. That was the state-of-the-art practiced throughout the Nation and the world at that time. After the late 1960s, the Navy and the remainder of the Federal Government paralleled the statutory requirements of the Occupational Safety and Health Act – and in many instances the Navy had more strict requirements which had to be met by the "operational Navy".

95. Throughout the time periods discussed herein – but especially for all occupational exposures after the enactment of the Occupational Safety and Health Act of 1970 – the employer and controller of the workplace was required to have an effective program for the control of exposure to regulated asbestos-containing materials. It was the employer and the employee – not the equipment manufacturer, that were responsible for safety and health in the workplace. For realistic delivery of OSHA-mandated workplace occupational safety and health programs at industrial facilities, all levels of management and supervision were involved. The Navy not only closely followed this mandate, it stood as a model for control of exposure and modification of the workplace. The Navy's "first-level supervisors" were the Chiefs and senior Petty Officers, and they were extremely important in monitoring the day-to-day adherence to mandatory safety and health regulations – while accomplishing the Navy's essential mission in National defense. The control of occupational exposure to asbestos was one of the five national "Target Health Hazards" established by OSHA in 1972. It was the Navy's "Number One" occupational safety and health program – starting in early 1971 with a redoubling of prior efforts. Environmental controls dealing with the content, labeling, handling, and disposal of asbestos-containing materials were also established under the Environmental Protection Agency (USEPA, 1973, 1975, 1976). The operational Navy also followed these requirements.

96. The presence and content of asbestos in various materials, including thermal insulation, gaskets, packings, and other materials used in naval, marine, and industrial applications, were variable, but generally decreasing over the period of the 1950s through the 1970s. Additionally, the friability of these materials varied considerably. Unless a material is qualitatively and quantitatively analyzed in a scientific manner, the presence, type, and concentration of asbestos cannot be determined in either the material or in the air. The release of friable asbestos fibers into the air can only be determined through sampling and analysis of air samples. The mere "observation" that one can see a large particle of dust does not confirm that respirable-size asbestos fibers of any significant concentration would be inhaled. Visible dust is not necessarily "respirable" dust – and "respirable" dust is not necessarily all asbestos. Duration and frequency of exposures are also important in assessing asbestos exposure. From the industrial hygiene

standpoint of controlling potential hazardous inhalation exposure to asbestos, it may be assumed that much of the thermal insulation and other materials, such as gaskets and packings, used in the construction and maintenance of naval vessels, as well as industrial facilities, contained asbestos during the era of the 1940s through the mid-1970s – and later; however, only proper analysis and determination by trained and qualified individuals are scientifically conclusive. Without such evaluation, it cannot be known whether, and to what extent, the products and the "dust", purportedly identified by individuals not trained and not utilizing applicable industrial hygiene methods, actually contained asbestos.

97. Based upon my decades of experience as an industrial hygienist and physician in the Navy, as well as the available scientific and medical literature and known incidence of former Navy personnel with asbestos-related diseases, it can be stated with some certainty that personnel working in Naval and private shipyards and onboard Navy ships during the 1940s through the 1960s, and sometimes even into the 1970s, experienced what is today understood to be clinically meaningful exposures to asbestos dust – from both the general background level onboard a Navy vessel of the era, as well as when performing tasks on thermally-insulated surfaces.  During this time period, the scientific and medical data indicated that controlling inhalation of asbestos fibers to levels below those which caused asbestosis effectively guarded personnel from the subsequent development of asbestos-related cancers.  Typical shipboard exposure levels of this era were not considered to be excessive or causally involved with the development of asbestos-related lung disease by the contemporary occupational health professionals.  The largest, and most significant, source of friable asbestos fibers from thermally-insulated surfaces onboard ships of those periods would be the pipecovering on the thousands of feet – literally miles – of piping.  It is practically impossible to make any other definitive statement regarding the specific source(s) of a particular individual's significant exposures to respirable asbestos fibers onboard ship.  More importantly, using the ungrounded and unsubstantiated assumption that each and every fiber contributes to the development of a cancer and actually causes the cancer is – from a scientific standpoint – meritless.  The probabilistic "cause" in the development of a cancer, such as malignant mesothelioma, is based upon the source(s) that meaningfully contribute to an individual's effective "dose" – the dose is the amount which contributes to the risk that the "causal fiber" will reach the target cell and cause uncontrolled or unabated cellular changes which actually lead to the cancer.  In retrospect, it must be realized that there were an extremely huge number of these individual asbestos fibers in the air using the scientifically-based, recommended exposure values developed and accepted by the scientific and medical communities, and used by the Navy and numerous other federal agencies and states during these various periods.  The initial occupational exposure level of 5 MPPCF (30f/cc) equates to 1,059,300,000 asbestos fibers in each cubic meter of inhaled air (5 MPPCF x  6f/MPPCF x 35.31 cu ft/cu m); this equates to over 8 billion fibers inhaled daily (x 8 cu m/day max inhaled) by an individual before the enactment of the Occupational Safety and Health Act in 1970.  The currently mandated OSHA Permissible Exposure Level of 0.1 f/cc (greater than 5 microns in length) for asbestos has been in effect since 1994.  Under this PEL, there can still be up to 100,000 such sized fibers in each cubic meter inhaled, and up to 800,000 fibers can inhaled each day.  Identifying the likely source of the causal fiber was, and remains, difficult and practically impossible.  Also, it must be noted that not every asbestos fiber in an asbestos-containing material is released (friable) or inhaled (breathed in).  Furthermore, not every fiber which is inhaled is "respirable" (brought into the lungs) and retained in the body, and finally reaches the site where the tumor develops.  If each and every asbestos fiber contributed to the development of malignant mesothelioma, then one would expect the presence of many individual tumors arising from the enormous number of inhaled fibers. Generally, in the vast majority of cases, to the extent there exists any identifiable source of significant exposure to respirable airborne asbestos fibers onboard any ship of an era, including the general ship-wide background levels, the external thermal insulation on the piping would be that source – and by far the largest amount of friable asbestos material used onboard ships of the corresponding era.

98. Federal Department s and Agencies, such as the Navy, Coast Guard, Public Health Service, and Labor,  had total control over its hazard communication program at all times relevant to this

discussion, including control over the content -- and methods of delivery – of safety instructions and warning provided to personnel. The Government exercised its discretion in this respect by balancing the priorities of operational necessity, the health and safety of personnel, as well as other practical and logistical considerations. The Navy, in particular, itself implemented a state-of-the-art occupational safety and health safety program that included asbestos. It thus chose to provide consistent, uniform instruction to sailors and shipyard workers, rather than delegating the task to a myriad of vendors with incomplete information, no control of the workplace, little knowledge of mission requirements, and who were not subject matter experts on asbestos hazards. It is unreasonable to conclude that the Navy would have appreciated or accepted gratuitous advice from equipment manufacturers about hazards associated with products (like insulation) that they did not manufacture, and about which the Navy was already well aware. Finally, in light of all the evidence regarding the Government's existing knowledge and robust program to prevent exposures, and other Federal and state regulations requiring the protection and education of employees, it is impossible to imagine how a mere warning on a piece of metal equipment or product could possibly have meaningfully affected personal actions, and precluded exposures to airborne asbestos fibers, years and often decades, after the product was sold.

99. My scientific and medical opinions stated herein are based upon my education and training as a scientist and as a physician; my personal and professional experiences as a certified industrial hygienist and a board-certified occupational medicine physician; my operational and industrial experiences from my total Navy career; my research and review of historical documents regarding the Navy's knowledge as well as the scientific and medical communities' knowledge of the hazards of asbestos; and my communications with industrial hygienists and physicians who worked for the Navy and Public Health Service dating back to the early 1940s. These opinions are all stated within a reasonable degree of scientific, medical, and professional certainty.

Lawrence Stilwell Betts, MD, PhD

12 Apr 2013
Date

**References**

1. American Conference of Governmental Industrial Hygienists (ACGIH): Maximum Allowable Concentration of Air Contaminants for 1946. Proceedings of the Eighth Annual Meeting of the American Conference of Governmental Industrial Hygienists. Pages 54-55. Chicago, IL. April 7-13, 1946.

2. Anon. Study of Pipefitters and Insulators and their Working Environment. Long Beach Naval Shipyard. January, 1959.

3. Betts LS: Curriculum vitae of Lawrence Stilwell Betts, MD, PhD, CIH, FACOEM dated January, 2011.

4. Bigley TJ: Letter to R. Hughes, Assistant Director of U.S. General Accounting Office. 5 Jan 1979.

5. Brown EW: Hazard of Asbestos. In Annual report to the Surgeon General, U.S. Navy for Calendar Year 1939. 1939.

6. Brown EW: Industrial Hygiene and the Navy in National Defense. In the Proceedings of the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc. 77- 85, 1940.

7. Brown EW: Industrial Hygiene and the Navy in National Defense. War Medicine, 3-14, November 13, 1941.

8. Bureau of Engineering: General Specifications for Machinery; Subsection S62-2—Electric Cables. Navy Department. 1925.

9. Bureau of Engineering: Supplemental General Specification for Machinery; Cables, Electric, Insulated, Water, Heat, and Flame Resistance (Shipboard Use). Navy Department. 1937.

10. Bureau of Medicine and Surgery (BuMED): Handbook of the Hospital Corps. United States Navy Department. US Gov Printing Office, Washington, 1939.

11. Bureau of Medicine and Surgery (BuMED). United States Navy Medical Department. Mission Statement. 1941.

12. Bureau of Medicine and Surgery (BuMED): Bureau of Medicine and Surgery Instruction 6270.3, SUBJ: Threshold limit values for toxic materials-Table of Threshold Limit Values, 7 Nov 55.

13. Bureau of Medicine and Surgery (BuMED): Industrial Health Reports (NAVMED 576); Occupational Health Hazards—July through September, 1955. Department of the Navy. 13 Jan 1955.

14. Bureau of Medicine and Surgery (BuMED): Occupational Health Reports; Occupational Health Hazards; Release Number 20. January thru April, 1959. Department of the Navy. 15 Jul 1959.

15. Bureau of Medicine and Surgery (BUMED): Occupational Health Reports; Occupational Health Hazards; Release Number 26. July thru September 1960. Department of the Navy. 1 Feb 1961a.

16. Bureau of Medicine and Surgery (BuMED): Occupational Health Reports; Occupational Health Hazards; Release Number 27. October thru December 1960. Department of the Navy. 1 May 1961b.

17. Bureau of Medicine and Surgery (BuMED): Asbestos; measures for control of. BUMED Instruction BUMEDINST 6260.14. Department of the Navy. 7 Jun 1973.

18. Bureau of Medicine and Surgery (BuMED): Navy Medicine Strategic Plan. Navy Medicine Mission. 2009.

19. Bureau of Naval Personnel (BuPers): Boilerman 3&2, 1956

20. Bureau of Ordnance (NAVORD): Safety Handbook for Pipefitters. NAVORD Instruction 5100.21 of 7 Jan 1958). Department of the Navy. 1958.

21. Bureau of Ships (BuSHIPS): Ad Interim Specification 15C1 (INT): Cable, Electric, Heat and Flame-Resistant for Electric Propulsion. 2 Jan 1940.

22. Bureau of Ships (BuSHIPS): Memo to all Commandants and supervisors of shipbuilding regarding "Minimum Requirements". 19 November 1943.

23. Bureau of Ships (BuSHIPS): Standard Plan Application of Packings and Gaskets. B-153. Alt 4. Navy Department. 30 Oct 1945.

24. Bureau of Ships (BuSHIPS): Operation Manual--Main Propulsion Plant: DD445 and 692 Classes and Converted Types. Revision 1. Jan. 1946 (Initially classified as "Restricted")

25. Bureau of Ships (BuSHIPS): General Specifications for Machinery for Vessels of the United States Navy-- Thermal Insulation for Machinery and Piping. Department of the Navy. Section S39-2. 8 Dec 1951.

26. Bureau of Ships (BuSHIPS): MIL-T-17600 series-Military Specification—Turbines, Steam, Propulsion (For Naval Shipboard Use). Series (1953).

27. Bureau of Ships (BuSHIPS) Manual, Chapter 51: Boilers. Navy Department. 1955.

28. Bureau of Ships (BuSHIPS): Bureau of Ships Technical Manual; Chapter 95 (NAVSHIPS 250-000; Chapter 95). 1959.

29. Bureau of Ships (BuSHIPS): Bureau of Ships Technical Manual: Chapter 9390. Thermal Insulation. Supersedes Chapter 39 of 15 Apr 59 -- dtd 5 Jan 65.

30. Carter J; President of the United States: Occupational Safety and Health Programs for Federal Employees. Executive Order 12196. February 26, 1980.

31. Chamberlain, Respiratory Protection for Pipecovers, BNSY, 1962

32. Chief, Naval Material (NAVMAT): Safety Precautions for Shore Activities; NAVMAT P-5100. March, 1970.

33. Chief of Naval Operations (CNO): OPNAV 34P1 of 1953. Naval Material Command, Headquarters. Department of the Navy: United States Navy Safety Precautions. 1953.

34. Chief of Naval Operations (CNO): OPNAVINST 5100.19 of 23 Feb 1973. Safety Precautions for Forces Afloat. Department of the Navy. 1973.

35. Chief of Naval Operations (CNO): OPNAV Instruction 6260.1, Subj: Control of asbestos exposure to naval personnel and environs. Department of the Navy. April 9, 1974.

36. Chief of Naval Operations (CNO): "Currents: BUMED Guidance on Asbestos-Related Health

Problems. In "ALL HANDS". Number 737. June, 1978.

37. Chief of Naval Operations (CNO). United States Navy Instruction. Navy Occupational Safety and Health Program Manual. OPNAVINST 5100.23 series. F-15 July 2002

38. Cohn V: AFL-CIO Warns on Asbestos Cancers. In the Washington Post. March 16, 1972.

39. Commander, Naval Safety Center (COMNAVSAFCEN). "Asbestos Exposure". In LIFELINE"— a Navy Safety Publication; Vol 2; No. 6; November-December 1973

40. Commander, Naval Ship Systems Command (NAVSHIPSYSCOM): Reduction of Asbestos Hazard. NAVSHIPS Notice 9390 of 23 February 71.

41. Commander, Naval Ship Systems Command (NAVSHIPSYSCOM) by JW Dolan dtd 10 May 1972 re: Use of Insulation Materials with High Asbestos Content in Naval Shipyards. 1972.

42. Commander, Naval Ship Systems Command (NAVSHIPSYSCOM): Naval Ships' Technical Manual: Chapter 9390; Thermal Insulation. NAVSHIPS 0901-390-0002. 1 July 1972.

43. Commander, Naval Sea Systems Command (COMNAVSEASYSCOM): Asbestos Elimination/Substitution/Personnel Protection Program. NAVSEAINST 5100.2 of 24 Oct 1975.

44. Commander, Naval Sea Systems Command: Asbestos Elimination/Substitution/Personnel Protection Program. Ltr to Distribution List. 28 Jul 1976.

45. Commander, Naval Ship Engineering Center (COMNAVSEC): Letter to Commander, Naval Ship Engineering Center, Philadelphia Division on Hazards of Asbestos. 7 April 1969.

46. Commander, Naval Ship Engineering Center (COMNAVSEC): ltr regarding Program to reduce hazards associated with Shipboard Thermal and Acoustical Insulation Systems. 24 Nov 71.

47. Cooke WE: Fibrosis of the Lungs due to the Inhalation of Asbestos Dust. BMJ. P 147. July 26, 1924.

48. Department of Defense (DoD): DoD Instruction 6055.1; "DoD Occupational Safety and Health Program". 19 Aug 1998.

49. Department of Labor (DoL); Mitchell JP, Secretary): Safety and Health Regulations for Ship Repairing as published in the Federal Register. 1960.

50. Department of Labor: The Target Health Hazards, 1972

51. Department of Labor. Occupational Safety and Health Standards, 1971 - 1974

52. Department of the Navy (DoN). New York Navy Yard. Annual Report of the Industrial Health Office for the Year Ending December 31, 1942. 1943.

53. Department of the Navy (DoN). NAVSHIPS Instruction 5100.26, Subj: Asbestos Exposure Hazards; control of; dated Feb. 9, 1971.

54. Doll R: Mortality from Lung Cancer in Asbestos Workers. J Ind Med. 12:81-86, 1955.

55. Dreessen WC, Dallavalle JM, Edwards TI, Miller JW, Sayers RR: A Study of Asbestos in the Asbestos Textile Industry. Division of Industrial Hygiene. National Institutes of Health. Public Health Bulletin No. 241, August, 1938.

**56.** Drinker, P: Industrial Health Survey of the Bath Iron Works Corporation, 1942

**57.** Drinker, P: Memo re Inspections and Reports

**58.** Drinker P: Letter to Bureau of Ships, Navy Department. (Attn: Captain Ingram) from Chief Health Consultant, United States Maritime Commission. January 8, 1944.

**59.** Drinker P: Letter to Bureau of Medicine and Surgery (Attn: CAPT Thomas J. Carter) from Chief Health Consultant, US Maritime Commission. January 31, 1945.

**60.** Dublin, LL: Occupation Hazards and Diagnostic Signs: A guide to impairments to be looked for in hazardous occupations. In Notes on Preventive Medicine for Medical Officers, United States Navy: Instructions to Medical Officers. US Naval Med Bull, 17(5):883-914, 1922.

**61.** Edwards CW: Marine Pipe Covering and Insulating. PRODDEPTBREM P-4100(1). Shop 56. Puget Sound Naval Shipyard. May, 1961.

**62.** Environmental Protection Agency (EPA): National Emission Standard for Hazardous Air Pollutants for Asbestos (Asbestos NESHAP). 38 FR 8820. April 6, 1973.

**63.** Fleischer WE, Viles FJ, Gade RL, Drinker, P.: A Health Survey of Pipe Covering Operations in Constructing Naval Vessels. J Ind Hyg. 28:9-16, 1946.

**64.** Ford G; President of the United States: Occupational Safety and Health Programs for Federal Employees. Executive Order 11807. September 28, 1974.

**65.** Forrestal JV: Memo to the Chief of the Bureau of Ships from Secretary of the Navy. Joint Navy-Maritime Commission project with respect to Safety and Industrial Health in private shipyards having Navy Contracts;--,Failure of certain yards to cooperate. July 7, 1943.

**66.** Franklin J: Overhaul: Wet Slips and Dry Docks. in *All Hands*. No. 571. August ,1964.

**67.** Harries, PG: Asbestos Hazards in Naval Dockyards, Annals of Occ Hyg, vol.11, pp 135-145, 1968.

**68.** Harries PG: Asbestos Dust Concentrations in Ship Repairing: A practical approach to improving asbestos hygiene in naval dockyards. Ann Occ Hyg 14: 241-254, 1971.

**69.** Headlee CD: Productions Division Notice No. 996 in response to Jenkins HE memo of 10 July 1939. Subj: Hazards to Health—insulating materiel and its handling. 18 July 1939.

**70.** Hollins DM, Paustenbach DJ, Clark K, Mangold CA: A Visual Historical Review of Exposure to Asbestos at Puget Sound Naval Shipyard (1962–1972). Journal of Toxicology and Environmental Health, Part B, 12:124–156, 2009.

**71.** Hueper WC: "Occupational and Environmental Cancers of the Respiratory System " in Recent Results in Cancer Research. 1966.

**72.** Jenkins HE: Memo to The Manager of the Yard, Navy Yard Boston. Subj: Hazards to Health of Insulation Materiel. 13 July 1939.

**73.** Johns-Manville Corporation: Purchase Specification. Warning Label for Thermobestos Products. September 10, 1964.

**74.** Keenan JD: International Brotherhood of Electrical Workers Looks at Accident Prevention. Secretary-Treasurer, IBEW, AFL-CIO. In National Safety Congress Transactions. Labor

Safety. Vol. 13. Chicago. 1969.

**75.** Knox, Frank (Secretary of the Navy): Memo to Commandants and Commanding Officers, Shore Establishments, SUBJ: Industrial Health Program in Naval Industrial Shore Establishments. October 22, 1941.

**76.** Lane FC: Ships for Victory. A History of Shipbuilding Under the U.S. Maritime Commission in World War II. The Johns Hopkins University Press. Baltimore. 1951-reprint 2002.

**77.** Lee DHK and Selikoff IJ: Historical Background to the Asbestos Problem. Environ Res 18:300-314, 1979.

**78.** Levinson, Seymour: Memo to Group Master Outfitting re: Report on Dust Counts during Shipboard Asbestos Work. June, 1965.

**79.** Levinson, Seymour: Memo: Insulation Block Operations, 16 Jun 1967.

**80.** Levinson, Seymour: Asbestos dust findings during rip out aboard ships; report of June 23, 1969.

**81.** Liukonen LR, Still KR, Beckett RR: Asbestos Exposure from Gasket Operations. Naval Regional Medical Center, Bremerton, WA. May, 1978.

**82.** Mangold CA, Beckett RR, and Bessmer DJ: Asbestos Exposure and Control at Puget Sound Naval Shipyard. March, 1970.

**83.** Marr WT: Response ltr from Johns-Manville Corporation regarding validity of present techniques for evaluating asbestos contamination. June 22, 1959.

**84.** Marr WT: Asbestos Exposure During Naval Vessel Overhaul. Am Ind Hyg Assoc J: May-June 264-268, 1964.

**85.** McArthur JC: Statement before Subcommittee on Compensation, Health, and Safety. United States Congress. 13 Nov 1978.

**86.** Meeker OW: Boston Naval Shipyard: First Shop 56 Masters' Conference/Pipe and Copper Shop Master Mechanics' Conference. Boston Naval Shipyard. May 8-10, 1957

**87.** Merewether ERA and Price CW: Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry. HM Stationery Office. 1930a.

**88.** Merewether ERA and Price CW: The Occurrence of Pulmonary Fibrosis and other Pulmonary Affections in Asbestos Workers. J Ind Hyg (6) XII: 239-257, June 30, 1930b.

**89.** Merewether ERA: A Memorandum on Asbestos. Tubercle 69-81, Nov., 1933a.

**90.** Merewether ERA: A Memorandum on Asbestos. Tubercle 100- 118, Dec., 1933b.

**91.** Merewether ERA: A Memorandum on Asbestos. Tubercle 152-159, Jan., 1934

**92.** Military Specification: Turbines, Steam, Propulsion (for Naval Shipboard Use); MIL-T-17600 (SHIPS) of 26 June 1953; 1 March 1955; 6 Oct 1955; Amend 19 Dec 1955.

**93.** Military Specification: Boilers, Steam, High Pressure, Naval Ship Propulsion (MIL-B-18381) of 12 April 1956.

**94.** Military Specification: Identification Plates, Information Plates and Markings (MIL-I-15024), 1952

**95.** Military Specification: Insulation Felt, Thermal, Glass Fiber (MIL-I-16411), 1951

**96.** Military Specification: Manual, Service (Instruction Books) for Shipboard Electrical and Mechanical Equipment (MIL-M-15071D) of 6 June 1961.

**97.** Military Standard 769: Thermal Insulation Requirements for Machinery and Piping, 1967

**98.** Mowat: Occupational Exposure to Airborne Asbestos from Phenolic Molding Material (Bakelite) During Sanding, Drilling, and Related Activities, 2005

**99.** National Academies of Science (NAS). Recapitalizing the Navy: A Strategy for Managing the Infrastructure (1998). Committee on Shore Installation Readiness and Management. Naval 42 Studies Board. Commission on Physical Sciences, Mathematics, and Applications. National Research Council. 1998.

**100.** Naval Education and Training Command (NAVEDTRA). Naval Safety Supervisor. NAVEDTRA 12971. June 1993.

**101.** Naval Ships' Technical Manual. Thermal Insulation. Chapter 9390. NAVSHIPS 0901-390-0002. of 1 July 1972.

**102.** Navy Fleet Material Support Office (NFMSO): Consolidated Hazardous Items List (CHIL). NAVSUP P-4500 of 1 Oct 1969.

**103.** Neil R: Planned Maintenance—"Here's How It Works" A description of the Planned Maintenance System Manual in All Hands, No. 571, August, 1964.

**104.** Newhouse ML and Thompson H: Mesothelioma of pleura and peritoneum following exposure to asbestos in the London area. Br J Ind Med 22:261–69, 1965.

**105.** Newhouse ML, Thompson H: Epidemiology of mesothelial tumors in the London area. Ann N Y Acad Sci 132:579–88, 1965-66.

**106.** Nixon, Richard; President of the United States: Occupational Safety and Health Programs for Federal Employees. Executive Order 11612. July 26, 1971.

**107.** Office of Civilian Manpower Management (OCMM): Safety Precautions for Shore Activities. Department of the Navy. NAVSO P-2455. April 1965 with chg 1 of June 1967.

**108.** Officer-in-Charge, Naval Ship Engineering Center, Philadelphia Division (OiC NAVSEC, Philly): Letter to the Commander, Naval Ship Engineering Center on Survey of Hazards of Asbestos, final report of NAVSECPHILADIV Project FA-287. 24 September 1969.

**109.** Oliver T: Some dusty occupations and their effects upon the lungs. J Roy Sanitary Inst 46:224–30, 1925-26.

**110.** Pillard CH (Edit): "Occupational Safety and Health Act Becomes Effective" in The Electrical Workers' Journal. The Official Publication of the International Brotherhood of Electrical Workers. Vol 70; No. 4. April, 1971.

**111.** Pillard CH (Edit): "The Target Health Hazards" in The Electrical Workers' Journal. The Official Publication of the International Brotherhood of Electrical Workers. Vol 72, No. 6. June, 1973.

**112.** Pillard CH (Edit): "Asbestos Related Disease" in The Electrical Workers' Journal. The Official Publication of the International Brotherhood of Electrical Workers. Vol 77, No. 6. June, 1978.

**113.** Puget Sound Naval Shipyard (PSNSY): Practical Industrial Hygiene and Toxicology. Lecture Series Outline. Industrial Hygiene Division. Medical Department. 1965.

**114.** Puget Sound Naval Shipyard (PSNSY): General Safety Rules, 1950

**115.** Puget Sound Naval Shipyard (PSNSY): Respirators – A Supervisor's Guide, 1966

**116.** Puget Sound Naval Shipyard (PSNSY): Temprary Ventilation – A Supervisor's Guide, 1967

**117.** Puget Sound Naval Shipyard (PSNSY): Edwards memo re: wearing respirators, 1969

**118.** Puget Sound Naval Shipyard (PSNSY): McBratney memo re: combating hazards attending use of insulating materials

**119.** Puget Sound Naval Shipyard (PSNSY): Mangold, Beckett & Bessmer, Asbestos Exposure to Pipe Coverers and Insulators at PSNSY, 1968

**120.** Puget Sound Naval Shipyard (PSNSY): Edwards memo re: respirators, 1969

**121.** Robbins HM and Marr WT: Asbestosis. Safety Review 19(1): 10, 1962.

**122.** Roosevelt FD: Presidential Proclamation 2413. "An Act to Expedite the Strengthening of the national Defense". July 2, 1940.

**123.** Roosevelt FD: ltr to Navy Admirals re: need to increase merchant shipping dtd 30 Apr 1941.

**124.** Roosevelt FD: SECRET ltr to RADM ES Land re: increased shipbuilding in war effort dtd January 3, 1942

**125.** Rosenwinkel, NE: Memo to about Asbestos hazard of shipyard workers to be included in a statement issued by Rear Admiral J. J. Stilwell, December 6, 1968.

**126.** Secretary of the Navy (SECNAV) Instruction 6260.3□□ 5100.8 Uniform labeling program for hazardous industrial chemicals and materials" of 24 September 1956.

**127.** Selikoff IJ: Address to the Delegates of the Twenty-first Convention of the Association of Heat and Frost Insulators and Asbestos Workers. Chicago, IL. September, 1967.

**128.** Selikoff IJ, Churg J, Hammond EC: Asbestos Exposure and Neoplasia. Asbestos Worker 16(9), 5-9, 1964 (Nov)—reprinted from JAMA 188: 22-26, 1964.

**129.** Selikoff IJ, Churg J, Hammond EC: The Occurrence of Asbestosis among Insulation Workers in the United States. Annals NY Acad Sci. 132:139-155, 1965.

**130.** Selikoff IJ: Insulation Hygiene Progress Reports—"New Mask Undergoes Field Test" in The Asbestos Worker. Vol 17. No.7. May, 1969.

**131.** Selikoff IJ, Hammond EC. Churg J: Carcinogenicity of Amosite Asbestos. Arch Environ Heal 25(3):183-186, 1972.

**132.** Selikoff IJ, Lilis R, Nicholson WJ: Asbestos Disease In United States Shipyards. Ann N Y Acad Sci 330: 295-311, 1979.

**133.** Selikoff IJ: In Pneumoconiosis: Proceedings of the International Conference, Johannesburg 1969. Shapiro HA: Ed. Oxford University Press. 1970.

**134.** Sheehan JR: ltr to Webster Ay (Asbestos Union Local #20) re: use of spirometry in early detection of asbestosis of 15 Apr 1957

**135.** Sickles CW, Editor: "Grim Reaper" Awareness Advertisement in The Asbestos Worker. Vol 15, Number 17. November, 1961.

**136.** Sickles CW, Editor: Selikoff speech at 20th Annual Convention of Asbestos Workers

**137.** Smith WE: Survey of some current British and European studies of occupational tumor problems. Arch. Ind. Hyg 5:242-263, 1952.

**138.** Stecher: Report on Travel, Naval Shipyard Pipe Shop Masters Conference, 1957

**139.** Storlazzi Declaration, 11.08.08

**140.** Turnbull A: Memo for the Assistant Chief of Naval Operations (Safety), Op-098, Subj: Meeting on Asbestos Dust Control. 5 May 1969.

**141.** United States Congress: Walsh-Healey (Public Contracts) Act; 41 U.S.C. 35 et seq. 1936.

**142.** United States Congress; 76th Congress: Selective Service and Training Act of 1940. Chapter 720. 16 Sep 1940.

**143.** United States Congress; 91st Congress, S. 2193 Public Law 91– 596. Occupational Safety and Health Act of 1970. December 29, 1970.

**144.** United States Congress; 97th Congress: PART 61—National Emission Standards For Hazardous Air Pollutants: Asbestos (36 FR 5931; Mar. 31, 1971).

**145.** United States Environmental Protection Agency: Toxic Substances Control Act (TOSCA). 1976.

**146.** United States Naval Institute: The Bluejackets Manual, 1965

**147.** United States Navy Department and United States Maritime Commission: Minimum Requirements for Safety and Industrial Health in Contract Shipyards. US Government Printing Office, Washington, 1943.

**148.** United States Navy. Mission Statement; Organization. Official web site. 2010.

**149.** Wagner: Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province, 1960

**150.** Williams PRD, Phelka AD, Paustenbach: A Review of Historical Exposures to Asbestos among Skilled Craftsmen (1940-2006). J Toxicol Envir Health Pt B Crit Rev 10(5):319-377,2007.

**151.** Wynkoop TP: "Terminal Island Naval Shipyard – Memorandum for Commanding Officers of Ships". NAVEXOS P-52. Safety Review 4(7): 9, 1947.

**152.** American College of Chest Physicians. Committee on Occupational Diseases of the Chest: "Asbestosis": Report of the Section on Nature and Prevalence Diseases of the Chest. Chest 45: 107-111, 1964.

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Bobbie Zeringue, Aaron Zeringue, Rob Zeringue, and Harris Zeringue

**DEFENDANTS**
See Attached Exhibit A

**(b)** County of Residence of First Listed Plaintiff Jefferson Parish, Louisiana
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant New York Corporation
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Attached Exhibit A

Attorneys *(If Known)*
See Attached Exhibit A

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☒ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Federal Officer Removal Statute, 28 U.S.C. § 1442
Brief description of cause:
Asbestos-related personal injury claim

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*:
JUDGE DOCKET NUMBER

DATE
07/08/2016

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

# CIVIL COVER SHEET EXHIBIT A

| **Plaintiffs** | **Counsel** |
|---|---|
| Bobbie Zeringue, Aaron Zeringue, Rob Zeringue, and Harris Zeringue | Damon R. Pourciau<br>Pourciau Law Firm<br>2200 Veterans Memorial Blvd. Ste. 210<br>Kenner, Louisiana 70062<br>T: 504-305-2375<br><br>And<br><br>Scott M. Galante<br>Galante & Bivalacqua LLC<br>650 Poydras St., Ste. 2615<br>New Orleans, Louisiana 7013<br>T: 504-3052375 |
| **Defendants** | **Counsel** |
| General Electric Company | John J. Hainkel, III<br>Angela M. Bowlin<br>Kelsey A. Eagan<br>Frilot LLC<br>1100 Poydras St., Ste. 3700<br>New Orleans, La 70163<br>T: 504-599-8000 |
| Taylor-Seidenbach, Inc. | C. Kelly Lightfoot<br>Richard J. Garvey, Jr.<br>Edward J. Lassus<br>Hailey, McNamara, Hall, Larmann, & Papale, LLP<br>Suite 1400, One Galleria Blvd.<br>P.O. Box 8288<br>Metairie, Louisiana 70001<br>T: 504-836-6500 |
| Reilly-Benton Company, Inc. | Thomas L. Cougill<br>Jamie M. Zanovec<br>Jennifer D. Zajac<br>Jennifer H. McLaughlin<br>Willingham, Fultz & Cougill, LLP<br>5625 Cypress Creek Pkwy, 6th Floor<br>Houston, Texas 77069<br>T: 713-333-7600 |
| Huntington Ingalls Incorporated (f/k/a | Gary A. Lee<br>Richard M. Perles |

| | |
|---|---|
| Northrop Grumman Shipbuilding, Inc.) | Daphne M. Lancaster<br>M. Scott Minyard<br>Barbara B. O'Donnell<br>Lee, Futrell, & Perles LLP<br>201 St. Charles Ave., Ste. 4120<br>New Orleans, Louisiana 70170<br>T: 504-569-1725 |
| Foster Wheeler Boiler Corporation | Has not yet appeared in state court action |
| Westinghouse Electric Company (Delaware), LLC | Has not yet appeared in state court action |
| Allis-Chalmers Corporation | Has not yet appeared in state court action |
| Asbestos Corporation, Ltd. | Has not yet appeared in state court action |
| Bell Asbestos Mines, Ltd. | Has not yet appeared in state court action |
| Cleaver-Brooks Sales and Service, Inc. | Has not yet appeared in state court action |
| CSR, Ltd. | Has not yet appeared in state court action |
| Crane Co. | Has not yet appeared in state court action |
| Fidelity and Casualty Insurance Company of New York (as the insurer of Wayne Manufacturing Company) | Has not yet appeared in state court action |
| Flowserve US, Inc. (a/k/a Worthington Pump, Inc.) | Has not yet appeared in state court action |
| Hopeman Brothers, Inc. | Has not yet appeared in state court action |
| Liberty Mutual Group, Inc. (as the insurer of Wayne Manufacturing Company) | Has not yet appeared in state court action |
| The McCarty Corporation | Has not yet appeared in state court action |
| Metropolitan Life Insurance Company | Has not yet appeared in state court action |
| Owens-Illinois, Inc. | Has not yet appeared in state court action |

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Bobbie Zeringue, Aaron Zeringue, Rob Zeringue, and Harris Zeringue

**DEFENDANTS**
See Attached Exhibit A

**(b)** County of Residence of First Listed Plaintiff: Jefferson Parish, Louisiana
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: New York Corporation
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Attached Exhibit A

Attorneys *(If Known)*
See Attached Exhibit A

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☒ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
Federal Officer Removal Statute, 28 U.S.C. § 1442
Brief description of cause:
Asbestos-related personal injury claim

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*:
JUDGE ____________ DOCKET NUMBER ____________

DATE: 07/08/2016
SIGNATURE OF ATTORNEY OF RECORD: [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# CIVIL COVER SHEET EXHIBIT A

| **Plaintiffs** | **Counsel** |
|---|---|
| Bobbie Zeringue, Aaron Zeringue, Rob Zeringue, and Harris Zeringue | Damon R. Pourciau<br>Pourciau Law Firm<br>2200 Veterans Memorial Blvd. Ste. 210<br>Kenner, Louisiana 70062<br>T: 504-305-2375<br><br>And<br><br>Scott M. Galante<br>Galante & Bivalacqua LLC<br>650 Poydras St., Ste. 2615<br>New Orleans, Louisiana 7013<br>T: 504-3052375 |
| **Defendants** | **Counsel** |
| General Electric Company | John J. Hainkel, III<br>Angela M. Bowlin<br>Kelsey A. Eagan<br>Frilot LLC<br>1100 Poydras St., Ste. 3700<br>New Orleans, La 70163<br>T: 504-599-8000 |
| Taylor-Seidenbach, Inc. | C. Kelly Lightfoot<br>Richard J. Garvey, Jr.<br>Edward J. Lassus<br>Hailey, McNamara, Hall, Larmann, & Papale, LLP<br>Suite 1400, One Galleria Blvd.<br>P.O. Box 8288<br>Metairie, Louisiana 70001<br>T: 504-836-6500 |
| Reilly-Benton Company, Inc. | Thomas L. Cougill<br>Jamie M. Zanovec<br>Jennifer D. Zajac<br>Jennifer H. McLaughlin<br>Willingham, Fultz & Cougill, LLP<br>5625 Cypress Creek Pkwy, 6th Floor<br>Houston, Texas 77069<br>T: 713-333-7600 |
| Huntington Ingalls Incorporated (f/k/a | Gary A. Lee<br>Richard M. Perles |

| | |
|---|---|
| Northrop Grumman Shipbuilding, Inc.) | Daphne M. Lancaster<br>M. Scott Minyard<br>Barbara B. O'Donnell<br>Lee, Futrell, & Perles LLP<br>201 St. Charles Ave., Ste. 4120<br>New Orleans, Louisiana 70170<br>T: 504-569-1725 |
| Foster Wheeler Boiler Corporation | Has not yet appeared in state court action |
| Westinghouse Electric Company (Delaware), LLC | Has not yet appeared in state court action |
| Allis-Chalmers Corporation | Has not yet appeared in state court action |
| Asbestos Corporation, Ltd. | Has not yet appeared in state court action |
| Bell Asbestos Mines, Ltd. | Has not yet appeared in state court action |
| Cleaver-Brooks Sales and Service, Inc. | Has not yet appeared in state court action |
| CSR, Ltd. | Has not yet appeared in state court action |
| Crane Co. | Has not yet appeared in state court action |
| Fidelity and Casualty Insurance Company of New York (as the insurer of Wayne Manufacturing Company) | Has not yet appeared in state court action |
| Flowserve US, Inc. (a/k/a Worthington Pump, Inc.) | Has not yet appeared in state court action |
| Hopeman Brothers, Inc. | Has not yet appeared in state court action |
| Liberty Mutual Group, Inc. (as the insurer of Wayne Manufacturing Company) | Has not yet appeared in state court action |
| The McCarty Corporation | Has not yet appeared in state court action |
| Metropolitan Life Insurance Company | Has not yet appeared in state court action |
| Owens-Illinois, Inc. | Has not yet appeared in state court action |