EXHIBIT "A"

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**Apr 08, 2009**

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

FILED
CLERK'S OFFICE

IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI)
 Joseph A. Matuska, et al. v. ABB, Inc., et al.,   )
  D. New Jersey, C.A. No. 2:09-193     )
 Gerald L. Hoffeditz, et al. v. AM General, LLC, et al.,  )
  D. New Jersey, C.A. No. 2:09-257     )

MDL No. 875

## ORDER LIFTING STAY OF CONDITIONAL TRANSFER ORDER

  A conditional transfer order was filed in these actions (*Matuska* and *Hoffeditz*) on March 4, 2009. Prior to expiration of that order's 15-day stay of transmittal, plaintiffs in *Matuska* and *Hoffeditz* filed notices of opposition to the proposed transfer. Plaintiffs subsequently failed to file the required motion and brief to vacate the conditional transfer order.

  IT IS THEREFORE ORDERED that the stay of the Panel's conditional transfer order designated as "CTO-319" filed on March 4, 2009, is LIFTED. These actions are transferred to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407 being conducted by the Honorable James T. Giles.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

Certified as a true copy on
This Date:
By

EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GERALD L. HOFFEDITZ, ET AL.,  :    CONSOLIDATED UNDER
                              :    MDL 875
                              :
       Plaintiffs,            :
                              :    Transferred from the District
                              :    of New Jersey
   v.                         :    (Case No. 09-00257)
                              :
                              :
AM GENERAL, LLC, ET AL.,      :
                              :    E.D. PA CIVIL ACTION NO.
                              :    2:09-70103
       Defendants.           :

**FILED**

JUL 2 9 2011

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

**O R D E R**

**AND NOW**, this **28th** day of **July, 2011**, it is hereby **ORDERED**

that the Motion for Summary Judgment of Defendants Arvin-Meritor,

Inc. and Rockwell International Corp. (doc. no. 60) is **DENIED**.[1]

---

[1]     Plaintiffs filed this action on November 5, 2008 in the
New Jersey Superior Court after Gerald Hoffeditz was diagnosed
with mesothelioma on or about May 5, 2008.  This case was removed
to the United States District Court for the District of New
Jersey on or about January 16, 2009.  This case was transferred
to the United States District Court for the Eastern District of
Pennsylvania on or about June 10, 2009 as part of MDL-875.
Plaintiffs allege that Mr. Hoffeditz was exposed to asbestos when
he worked as a mechanic and heavy equipment repairer and helper
at the Letterkenny Army Depot in Chambersburg, Pennsylvania.
Additionally, Plaintiffs allege that Mr. Hoffeditz was exposed to
asbestos-containing material when he performed maintenance on his
personal automobiles.  Plaintiffs assert that Mr. Hoffeditz was
exposed to asbestos in axles, parking brakes, and transfer cases
manufactured by Arvin-Meritor, Inc. and Rockwell International
Corp. on 2½ and 5 ton military trucks manufactured by AM General
LLC while working at the Letterkenny Army Depot.  Defendants
assert that they are entitled to summary judgment pursuant to the
sophisticated user and government contractor defenses.

## I.   LEGAL STANDARD

### A.   Summary Judgment Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

### B.   The Applicable Law

Plaintiffs filed their claim in New Jersey; however, all of Mr. Hoffeditz's alleged exposures occurred in Pennsylvania and the parties agreed to follow Pennsylvania law for purposes of this motion. This Court will therefore apply Pennsylvania law.

#### 1.   Sophisticated User Defense under Pennsylvania Law

In Phillips v. A-Best Products Co., the Supreme Court of Pennsylvania, in dicta, noted that the sophisticated user defense, Restatement (Second) of Torts § 388, may apply to strict liability claims. 665 A.2d 1167, 1170 (Pa. 1995). As the court resolved the case on other grounds, it noted that "[a]n analysis of whether a § 388 defense may be raised in a strict liability action must thus await a future case." Id. at 1172. After Phillips, the United States District Court for the Eastern

District of Pennsylvania noted that the "sophisticated user defense is available only in cases involving negligent failure to warn, and not in products liability actions premised on strict liability." Alexander v. Morning Pride Mfg., Inc., 913 F. Supp. 362, 371-72 (E.D. Pa. 1995).

      2.   Government Contractor Defense

To satisfy the federal contractor defense, a defendant must show that (1) the United States approved reasonably precise specifications for the product at issue; (2) the equipment conformed to those specifications and; (3) it warned the United States about the dangers in the use of the equipment that were known to it but not to the United States. Boyle v. United Technologies Corp., 487 U.S. 500, 512 (1988). The third prong may also be established by showing that the government "knew as much or more than the defendant contractor about the hazards" of the product. See Beaver Valley Power Co. v. Nat'l Engineering & Contracting Co., 883 F.2d 1210, 1216 (3d Cir. 1989). As to the first and second prongs, in a failure to warn context, it is not enough for defendant to show that a certain product design conflicts with state law requiring warnings. In re Joint E. & S.D.N.Y. Asbestos Litig., 897 F.2d 626, 630 (2d Cir. 1990). Rather, the defendant must show that the government "issued reasonably precise specifications covering warnings-specifications that reflect a considered judgment about the warnings at issue." Hagen v. Benjamin Foster Co., 739 F. Supp. 2d 770, 783 (E.D. Pa. 2010) (Robreno, J.) (citing Holdren v. Buffalo Pumps, Inc., 614 F. Supp. 2d 129, 143 (D. Mass. 2009)). Government approval of warnings must "transcend rubber stamping" to allow a defendant to be shielded from state law liability. Hagen, 739 F. Supp. 2d at 783.

## II.  MOTION FOR SUMMARY JUDGMENT OF ARVIN-MERITOR, INC. AND ROCKWELL INTERNATIONAL, CORP.

As to the sophisticated user defense, Defendants argue that the Army was aware of the dangers of asbestos and thus it was reasonable for Defendants to rely on the Army to warn its personnel of these dangers. (Def.'s Mot. Summ. J. at 2.) Plaintiff asserts that Pennsylvania has not recognized the sophisticated user defense.

As to the government contractor defense, Defendants cite to the testimony of Mr. Ketcham and Mr. Rink.  Defendants present

evidence that government contractors, such as Defendants, worked closely with the Army to construct products in accordance with government specifications. (Id. at 3-4.) The Army ran tests on Rockwell products and these products were different from axles, transfer cases, and parking brakes which Rockwell sold commercially. (Id. at 4-5.) The Army developed training manuals used by personnel who maintained military vehicles and "[t]hese manuals contained safe work practices that were to be followed and warned of potential health and safety hazards, including working with and around asbestos-containing products." (Id. at 5.) OSHA published warnings about the dangers of asbestos in 1972, so the Army was aware of these dangers at least by that time. (Id.) Rockwell was not aware of these dangers until the 1970s and Arvin-Meritor was unaware of these dangers until the late 1970s. (Id. at 5-6.) The Army had complete control over warnings, including asbestos-related warnings. (Id. at 6.)

Plaintiff presents evidence to refute Defendant's evidence as to the government contractor defense. Plaintiff asserts that Mr. Ketcham's declaration, which Defendant relies on, is insufficient to entitle Defendant to summary judgment. Colonel Stoddart did not testified as to whether the Army ever required the use of asbestos in Defendants products or whether the Army specified warnings for asbestos. (Pl.'s Resp. at 16.) Defendant "has failed to produce a single Army specification that even mentions the use of warnings in general – let alone a specification that deals specifically with asbestos-containing brake or gasket related warnings. . . ." (Id. at 18.) Plaintiff presents evidence that Defendant was a member of various trade associations and had greater knowledge about the dangers of asbestos than the Army.

As to the sophisticated user defense, Pennsylvania has not explicitly recognized this defense for failure to warn claims premised on strict liability. Moreover, even if this defense was recognized in Pennsylvania for strict liability claims, Plaintiff has raised a genuine issue of material fact as to whether the Army or Defendants had greater knowledge about the dangers of asbestos. Accordingly, Defendant's Motion for Summary Judgment is denied as to the sophisticated user defense.

As to the first prong of the government contractor defense, Defendant has presented evidence that the Army had specifications for Defendants products and that these included specifications concerning warnings. Plaintiff argues that Defendants cannot

point to any specification that dealt with warnings.  As to the
second prong of the <u>Boyle</u> test, Plaintiff argues that since no
Army specification dealt with warnings, Defendants cannot show
that they conformed to any specification which required that they
place or not place warnings on their products.  As to the last
prong of the <u>Boyle</u> test, Defendant points to evidence that the
Army was aware of the dangers of asbestos at least by 1972, when
OSHA publicized warnings about the dangers of asbestos.
Plaintiff points to evidence that the Defendants were members of
the various trade associations and would have been aware of the
dangers of asbestos prior to this time.  Accordingly, Defendants
is not be entitled to summary judgment on these issues since
Plaintiff has raised a genuine issue of material fact under the
first prong of the <u>Boyle</u> test that the Army did not provide
reasonably precise specifications as to warnings on Defendants'
products.  As to the third prong, Plaintiff has also raised a
genuine issue of material fact as to whether Defendants had
greater knowledge than the Army about the dangers of asbestos.

E.D. PA NO. 2:09-70103

**AND IT IS SO ORDERED.**

**EDUARDO C. ROBRENO, J.**

EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS        :        Consolidated Under MDL
LIABILITY LITIGATION (No. VI)   :        875
                                :
GERALD AND JUDITH               :
HOFFEDITZ                       :

        v.                      :        Case No.   09-70103

VARIOUS DEFENDANTS              :        Transferred from the
                                         District of New Jersey
                                         (Case No. 09-cv-257)
                                :

**FILED**

**AUG 1 1 2011**

**MICHAEL E. KUNZ, Clerk**
**By_____Dep: Clerk**

## SUGGESTION OF REMAND

**AND NOW**, this **10th** day **August, 2011**, it is hereby
**ORDERED** that, upon review of the above captioned case under MDL-
875 Administrative Order no. 18 (01-md-875, doc. no. 6197), the
Court finds that, as to the above-captioned case:

  a.) Plaintiff has complied with MDL-875 Administrative
  Orders 12 and 12A.

  b.) Parties have completed their obligations under the Rule
  16 order issued by the Court.

  c.) All discovery has been completed.

  d.) Settlement conferences have been held in front of the
  Honorable Magistrate Judge M. Faith Angell, and these
  negotiations have been exhausted as to the remaining viable
  defendants.

1

e.) The Court has adjudicated all outstanding motions.[1]

f.) The Court finds that this case is prepared for trial without delay once on the transferor court's docket.

g.) The remaining viable Defendants in this case to be pursued at trial are:

      i.   AM General LLC

      ii.  Arvin-Meritor Inc.

      iii. Cummins, Inc.

      iv.  Ford Motor Company

Accordingly, the Court **SUGGESTS** that the below-listed cases should be **REMANDED** to the United States District Court for the District of New Jersey for resolution of all matters pending within this case except punitive damages.[2]

---

[1]    The Court denied without prejudice Defendants' Joint Motion for Summary Judgment Based on the Lack of Admissible Expert Testimony as to Causation.

    This Court has jurisdiction over all "coordinated or consolidated pretrial proceedings." See 28 U.S.C. § 1407(a). It is well-established that "great weight" is given to a transferee judge's determination that remand is appropriate, as it is within the transferee judge's discretion to determine when "he or she perceives his or her role to have ended." In Re Baseball Bat Antitrust Litigation, 112 F. Supp. 2d 1175, 1176 (J.P.M.L. 2000) (internal citations and modifications omitted).

    As Defendants' motion concerns the sufficiency of Plaintiffs' medical causation experts, the Court finds that the motion is more appropriate for adjudication by the trial judge in the instant case.

[2] The Court finds that the issue of punitive damages must be resolved at a future date with regard to the entire MDL-875 action, and therefore any claims for punitive or exemplary

Alternatively, parties in the below-listed cases have **seven (7) days** within which to consent to a trial before an Article III or Magistrate Judge in the Eastern District of Pennsylvania. In such an event, if consent is granted, a trial will be scheduled within sixty (60) days, at a date convenient to the parties in Philadelphia, Pennsylvania, and the Suggestion of Remand will be vacated.

**AND IT IS SO ORDERED.**

EDUARDO C. ROBRENO, J.

---

damages are hereby **SEVERED** from this case and retained by the Court within it jurisdiction over MDL-875 in the Eastern District of Pennsylvania. See In re Collins, 233 F.3d 809, 810 (3d Cir. 2000)("It is responsible public policy to give priority to compensatory claims over exemplary punitive damage windfalls; this prudent conservation more than vindicates the Panel's decision to withhold punitive damage claims on remand."); See also In re Roberts, 178 F.3d 181 (3d Cir. 1999).

EXHIBIT "D"

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**                                MDL No. 875

### (SEE ATTACHED SCHEDULE)

### CONDITIONAL REMAND ORDER

The transferee court in this litigation has, in the actions on this conditional remand order: (1) severed all claims for punitive or exemplary damages; and (2) advised the Panel that coordinated or consolidated pretrial proceedings with respect to the remaining claims have been completed and that remand to the transferor court(s), as provided in 28 U.S.C. §1407(a), is appropriate.

IT IS THEREFORE ORDERED that all claims in the action(s) on this conditional remand order except the severed damages claims be remanded to its/their respective transferor court(s).

IT IS ALSO ORDERED that, pursuant to Rule 10.2 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the transmittal of this order to the transferee clerk for filing shall be stayed 7 days from the date of this order. If any party files a notice of opposition with the Clerk of the Panel within this 7–day period, the stay will be continued until further order of the Panel. This order does not become effective until it is filed in the office of the Clerk for the United States District Court for the Eastern District of Pennsylvania.

IT IS FURTHER ORDERED that, pursuant to Rule 10.4(a), the parties shall furnish the Clerk for the Eastern District of Pennsylvania with a stipulation or designation of the contents of the record to be remanded and all necessary copies of any pleadings or other matter filed so as to enable said Clerk to comply with the order of remand.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

Inasmuch as no objection is
pending at this time, the
stay is lifted.

Aug 24, 2011

CLERK'S OFFICE
UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                          MDL No. 875

### SCHEDULE FOR CRO

| TRANSFEREE | | | TRANSFEROR | | | CASE CAPTION |
|---|---|---|---|---|---|---|
| DIST | DIV. | C.A.NO. | DIST | DIV. | C.A.NO. | |
| PAE | 2 | 10–78939 | ALN | 2 | 10–00021 | Harvey Lee Montgomery, et al. v. Long–Lewis, Inc., et al. |
| ~~PAE~~ | ~~2~~ | ~~09–70093~~ | ~~ALN~~ | ~~4~~ | ~~05–02466~~ | ~~Charles Richard Archer, et al. v. Mead Corp., et al.~~ Opposed 08/24/2011 |
| ~~PAE~~ | ~~2~~ | ~~09–70094~~ | ~~ALN~~ | ~~4~~ | ~~05–02472~~ | ~~Rebekah Riggs, etc. v. Mead Corp., et al.~~ Opposed 08/24/2011 |
| ~~PAE~~ | ~~2~~ | ~~09–70095~~ | ~~ALN~~ | ~~4~~ | ~~05–02473~~ | ~~Alford McGuffie v. Mead Corp., et al.~~ Opposed 08/24/2011 |
| PAE | 2 | 10–69385 | CAC | 2 | 10–01081 | Michael Langlois, et al. v. A.W. Chesterton Co., Inc., et al. |
| PAE | 2 | 07–73489 | NCW | 1 | 07–00314 | Evelyn Mattox, etc. v. American Standard, Inc., et al. |
| PAE | 2 | 09–70103 | NJ | 2 | 09–00257 | Gerald L. Hoffeditz, et al. v. AM General, LLC, et al. |
| PAE | 2 | 09–93731 | VAE | 4 | 09–03268 | Charles King v. Amchem Products, Inc., et al. |

Exhibit "E"

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JUDITH L. HOFFEDITZ, Individually And As Executrix Ad Prosequendum For The Estate of GERALD L. HOFFEDITZ, | : : : : | |
| Plaintiff, | : : | Civil Action No. 09-0257 |
| v. | : : | OPINION |
| AM GENERAL, LLC, individually and as successor-in-interest to AM General Corporation, *et al.*, | : : : : | |
| Defendants. | : : | |

**CECCHI, District Judge.**

## I.   INTRODUCTION

This matter comes before the Court upon the joint motion of Defendants ArvinMeritor, Inc., Rockwell International Corporation,[1] AM General, LLC, Cummins, Inc., Ford Motor Company, and Honeywell, Inc. to exclude the evidence and testimony put forth by Plaintiff Judith Hoffeditz's[2] expert, Dr. Jacqueline Moline.  ECF No. 113.  The Court held a *Daubert* hearing, after which, Defendants filed their joint motion.[3]  The Parties have also submitted numerous letters to the Court.  Over the course of several rounds of briefing before multiple judges, it appears that

---

[1] ArvinMeritor is successor-in-interest to the former automotive segment of Rockwell.

[2] Although this action was filed jointly by Gerald and Judith Hoffeditz, Gerald Hoffeditz passed away during the pendency of this action, at which point Judith Hoffeditz was substituted as Plaintiff, individually and as executrix of Mr. Hoffeditz's estate.

[3] This Opinion deals only with the motion to exclude the report and testimony of Dr. Moline, not with the previously filed summary judgment motion.

the positions of the Parties have evolved as the case has progressed and the surrounding case law has changed. Accordingly, in considering this motion, the Court will consider the Parties' arguments in light of the representations that they made to the Court during the February 10, 2017 conference and their subsequent letters. In particular, given Defendants' representations that only specific causation is in dispute, the Court will limit its opinion to that issue. *See, e.g.*, ECF Nos. 147, 149, 150.[4]

## II.    FACTUAL BACKGROUND

Beginning in 1968, Mr. Hoffeditz worked as a mechanic and heavy equipment repairer at the Letterkenny Army Depot, where he repaired transmissions, brake parts, and gaskets on large military trucks that allegedly contained asbestos. These trucks were assembled by AM General by purportedly using axles, transfer cases, and emergency parking brakes from Rockwell and engines allegedly supplied by Cummins. Mr. Hoffeditz may have been exposed to asbestos as early as 1962, however, while performing maintenance on his personal automobiles, including several vehicles manufactured by Ford. Mr. Hoffeditz was diagnosed with mesothelioma on April 28, 2008 and subsequently passed away.

## III.    LEGAL STANDARD

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). The admissibility of such expert testimony is governed by *Daubert v.*

---

[4] Although ArvinMeritor's March 3, 2017 letter states the Court must determine whether Dr. Moline may testify as to "general causation," ECF No. 146 at 3, the substance of the letter addresses questions of specific causation.

*Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. For expert testimony to be admitted: "(1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, *i.e.*, reliability; and (3) the expert's testimony must assist the trier of fact, *i.e.*, fit." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (internal citation, quotation marks, and brackets omitted).

To be qualified, the witness must possess specialized expertise. A broad range of knowledge, skills, and training qualify as specialized expertise. *Schneider ex rel. Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782–83 (3d Cir. 1995) (finding, in a mesothelioma case, that "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate").

In evaluating the reliability of a proffered expert's testimony, the Third Circuit has emphasized that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (internal citation omitted). An expert must base his opinion "on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Id.* (quoting *Daubert*, 509 U.S. at 590). "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended,* 199 F.3d 158 (3d Cir. 2000). "Recognizing that the 'inquiry as to whether a particular scientific technique or method is reliable is a flexible one,' the [Third Circuit] has identified a nonexhaustive list of eight factors that courts may address in determining whether an expert's methodology is reliable."

3

*Steele v. Aramark Corp.*, No. CIV. 09-4340 JBS/JS, 2012 WL 1067879, at *15 (D.N.J. Mar. 29, 2012) (quoting *Paoli*, 35 F.3d at 742).[5]

With respect to fit, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact by establishing a valid scientific connection to the pertinent inquiry. *Schneider*, 320 F.3d at 404; *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 595 (D.N.J. 2002). Although the admissibility of expert testimony is a procedural question governed by Rule 702 and federal law, this Court may also consider state substantive law governing Plaintiff's burden of proof in establishing causation. *See Paoli*, 35 F.3d at 750–52, n.31 (explaining that, in making admissibility determinations, a federal court may consider state substantive law relating to a plaintiff's burden of proof). The Parties agree that Pennsylvania law rather than New Jersey law applies to this case. *See, e.g.*, ECF Nos. 113-5, 146, 147, 149, 150. The Pennsylvania Supreme Court recently clarified the relevant substantive law in *Rost v. Ford Motor Co.*, 151 A.3d 1032 (Pa. 2016). It explained that in the context of asbestos liability litigation, "to create a jury question [as to proximate (or substantial factor) causation], a plaintiff must adduce evidence that exposure to defendant's asbestos-containing product was sufficiently 'frequent, regular, and proximate' to support a jury's finding that defendant's product was

---

[5] Those factors are: (1) whether the methodology can and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the methodology; (4) whether the technique has been generally accepted in the proper scientific community; (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods that have been established to be reliable; (7) the degree to which the expert is qualified; and (8) the non-judicial uses to which the technique has been put. *Paoli*, 35 F.3d at 742. However, as the Supreme Court noted in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999), "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."

substantially causative of the disease." *Id.* at 1044. The court also explained that while "expert testimony based upon the notion that 'each and every breath' of asbestos is substantially causative of mesothelioma will not suffice to create a jury question on the issue of substantial factor causation," *id.*, the law does not preclude experts from testifying "that every exposure [to asbestos] cumulatively contributes to the total dose," *id.* at 1045.

## IV.    DISCUSSION

### A.    Qualification

To the extent Defendants contend Dr. Moline is not qualified to testify as an expert in this case,[6] the Court rejects that argument. Given Dr. Moline's extensive qualifications in the fields of Occupational and Environmental Medicine (including a medical degree from the University of Chicago, a residency at Yale University, a residency in Occupational and Environmental Medicine at Mount Sinai School of Medicine, and a professorship at the Hofstra University School of Medicine), her study of asbestos (including research at Mount Sinai Medical Center with Dr. Irving Selikoff, one of the leading experts in the field of Occupational Medicine), and her work with "hundreds" of mesothelioma patients, the Court finds Dr. Moline is qualified to testify as an expert in this case.

### B.    Reliability and Fit

Having reviewed Dr. Moline's affidavit and observed her testimony at the *Daubert* hearing, the Court concludes that the methodology Dr. Moline applied was reliable and would assist the trier of fact. In reaching her conclusion on issues of causation, Dr. Moline considered a variety of

---

[6] While Defendants have previously suggested Dr. Moline is not qualified, *see* ECF No. 47 at 6, ECF No. 55 at 4, they do not appear to advance this argument in the instant motion. Nevertheless, the Court addresses this issue for the sake of completeness.

methodologies established in the literature for determining whether exposure to a chemical compound has caused a particular disease. Dr. Moline explained that four questions should be asked in order to establish causation: (1) does the substance cause the disease? (2) was the patient exposed to a dose of the substance that has been shown to cause the disease? (3) is there an appropriate latency between the exposure and the disease? and (4) does the patient have the disease? Dr. Moline then assessed each of these questions, considering a variety of publications, including peer-reviewed articles, and factual evidence relating to Mr. Hoffeditz's exposures to Defendants products and his medical history. Dr. Moline also considered alternative known causes of mesothelioma and excluded them based on Mr. Hoffeditz's medical and occupational history.

The primary dispute between the Parties involves Dr. Moline's answer to the second question, in which she concluded that through his exposure to Defendants' products, Mr. Hoffeditz was exposed to a dose of asbestos that has been shown to cause mesothelioma. Specifically, Defendants assert that in reaching this conclusion, Dr. Moline relies on an impermissible "each and every breath" theory of causation, which has been held insufficient to establish substantial factor causation under Pennsylvania law. Because, as explained below, Dr. Moline did not rely on an "each and every breath" theory of causation, but instead considered Mr. Hoffeditz's specific exposure to Defendants' products and the work he did with those products, the Court concludes that Dr. Moline's testimony is sufficiently reliable.

As Defendants acknowledge, Dr. Moline has not expressly stated that "each and every breath" of asbestos is substantially causative. Instead, Defendants point to statements by Dr. Moline that, *inter alia*, "there is no safe level of asbestos," ECF No. 113-11 at ¶ 56(c) ("Moline Aff."), and that "[t]he inhalation of *all* asbestos fibers . . . increases the risk of developing an asbestos-related disease," Moline Aff. ¶ 36, and argue that "[t]he 'cumulative exposure' theory

6

[relied upon by Dr. Moline] is just another semantic way of describing the same inadmissible 'every exposure' theory." ECF No. 113-1 at 4 n.3. Therefore, Defendants argue that under Pennsylvania state law, Dr. Moline's testimony cannot establish causation, and under *Daubert* should not be admitted. Defendant Ford made a nearly identical argument regarding Pennsylvania law in *Rost*. The Pennsylvania Supreme Court rejected Ford's argument and made clear that while reliance on an argument that asserts that "'each and every breath' of asbestos is substantially causative" is impermissible, that does not bar an expert from testifying to the underlying fact "that every exposure [to asbestos] cumulatively contributes to the total dose," *id.* at 1045.[7]

Rather than relying on the theory that "each and every breath" of asbestos was a proximate cause of Mr. Hoffeditz's mesothelioma, Dr. Moline considered Mr. Hoffeditz's actual exposure to Defendants' products and his occupational history generally, Moline Aff. ¶¶ 61-65, and his lack of exposure to other causes of mesothelioma. She then concluded that these exposures were significant. In doing so, she looked at Mr. Hoffeditz's answers to interrogatories, his deposition transcript, and his medical records, to determine his exposure. 12/11/13 Tr. 82:1-14. To determine Mr. Hoffeditz's exposures from different Defendants' products were "significant," Dr. Moline considered the amount and type of work performed with different products and compared them to studies considering individuals working in similar capacities or analysis of similar products.[8] *See, e.g.,* 12/11/13 Tr. 91:1-94:8 (discussing other studies and case reports finding that the type of

---

[7] Instead, as Defendants have repeatedly acknowledged "mesothelioma is a dose-response disease," ECF No. 115 at 5; *see, e.g.,* ECF No. 113-3 at 17, so increases in exposure increase the likelihood of getting the disease.

[8] The Court notes that Judge Robreno, who handled this case as part of the multi-district litigation, has already found that there was sufficient factual evidence in the record as to Ford and Cummins to support a conclusion that Mr. Hoffeditz's exposure to their products had sufficient "frequency, regularity and proximity." ECF No. 113-5; ECF No. 114 Ex. E.

asbestos in Defendants' products could give rise to mesothelioma); 12/11/13 Tr. 12 104:2-110:15 (discussing case studies, articles, and government reports concluding that exposure to asbestos containing brakes can give rise to disease, including after the brakes have been used and comparing that literature to the types of work Mr. Hoffeditz did); 12/11/13 Tr. 120:21-122:1 (discussing her review of Mr. Hoffeditz's occupation history and her determination that he would not have had asbestos exposures from other activities); 12/11/13 Tr. 124:24-125:22 (comparing the time between Mr. Hoffeditz's exposure to Defendant's products and his development of mesothelioma to typical latency periods); 12/13/13 Tr. 64:19-65:8 (considering the number of Ford vehicles Mr. Hoffeditz had worked on); 12/13/13 Tr. 102:11-108:5 (discussing the types of activities Mr. Hoffeditz testified were performed on gaskets and comparing to other studies on different types of asbestos containing gaskets); 12/13/13 Tr. 112:1-113:6 (discussing the types of activities Mr. Hoffeditz testified that he performed on brakes). This is precisely the type of analysis that at least one defendant has suggested should be performed. *See* ECF No. 146 at 3 (explaining that a "'more conventional route of using the scientific method to establish specific causation" is "by presenting a reasonably complete occupational history and providing some reasonable address of potential sources of exposure other than a particular defendant's product" (*quoting Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 54 (Pa. 2012)).

While Defendants have pointed to specific cases in which they believe Dr. Moline has improperly relied on studies and reports that are improper or contradicted by other studies, Dr. Moline offered competent criticisms of the studies Defendants cite in opposition to her opinion. Thus, the Court finds these contradictions are best addressed through cross-examination. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence."). Similarly, to the extent Defendants argue Dr. Moline should not have relied studies and reports considering related products to reach conclusions about Defendants' products, (e.g., considering studies on steam gaskets in assessing Mr. Hoffeditz's exposures to engine gaskets), this is best addressed through cross-examination and the presentation of contrary evidence.

Finally, to the extent Defendants argue Dr. Moline's testimony should not be admitted because she did not quantify Mr. Hoffeditz's exposure from each Defendant's products, they have failed to articulate how this indicates a lack of reliability or fit. As other courts have noted, in personal injury cases, "[a] quantitative dose calculation . . . may in fact be far more speculative than a qualitative analysis," because as a practical matter, the specific data needed to establish precise quantitative values for exposure are not tracked or maintained in many cases. *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, No. 2:10CV143, 2014 WL 814878, at *14 (W.D. Pa. Feb. 27, 2014); *accord Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 931 (8th Cir. 2001) ("[I]t was not necessary that Bonner's experts quantify the amount of FoamFlush to which she was exposed in order to demonstrate that she was exposed to a toxic level of BLO." (citation omitted)). Here, as set forth above, Dr. Moline has assessed Mr. Hoffeditz's exposure from Defendants' products based on his reports of the types of activities that he engaged in. The Court concludes that Dr. Moline's testimony may be considered.

## V.   CONCLUSION

Having determined that Dr. Moline is qualified to testify as to the relevant matters and that her testimony is sufficiently reliably and will assist the trier of fact, the Court concludes that

Defendants' Motion is DENIED.  An appropriate ORDER will accompany this opinion.

DATED: _August 4, 2017_


_____
CLAIRE C. CECCHI, U.S.D.J.

Exhibit "F"

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JUDITH L. HOFFEDITZ, Individually And As Executrix Ad Prosequendum For The Estate of GERALD L. HOFFEDITZ, | : | |
| Plaintiff, | : | Civil Action No. 09-0257 |
| v. | : | **ORDER** |
| AM GENERAL, LLC, individually and as successor-in-interest to AM General Corporation, *et al.*, | : | |
| Defendants. | : | |

**CECCHI, District Judge.**

This matter comes before the Court upon the submissions by the parties regarding expert-related issues and the scheduling of a trial date.  ECF Nos. 155, 156, 157, 159.  The Court also held a telephone conference with the parties on May 3, 2018 to discuss expert issues, motion practice, and the trial schedule.  Having considered the parties' submissions and having discussed the matter with the parties, the Court enters the following Order:

**IT IS** on this 3rd day of May, 2018,

**ORDERED** that any supplemental expert reports shall be served by **June 15, 2018**; it is further

**ORDERED** that any rebuttal expert reports shall be served by **July 16, 2018**; it is further

**ORDERED** that expert discovery shall close on **September 7, 2018**; it is further

**ORDERED** that any motions *in limine* shall be served by **October 19, 2018**; it is further

**ORDERED** that oppositions to motions *in limine* shall be served by **November 2, 2018**; it is further

1

ORDERED that replies in support of motions *in limine* shall be served by **November 9, 2018**; it is further

ORDERED that oral argument regarding the motions *in limine* shall be heard on **November 20, 2018** at **9:30 a.m.**; it is further

ORDERED that a Final Pretrial Conference shall take place on **December 12, 2018** at **11:30 a.m.**; and it is further

ORDERED that the trial shall commence on **January 9, 2019** at **9:30 a.m.**

**SO ORDERED.**

**HON. CLAIRE C. CECCHI**
**United States District Judge**

Exhibit "G"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | Consolidated Under MDL-875 |
| LIABILITY LITIGATION (No. VI) | : | |
| | : | |
| GERALD and JUDITH HOFFEDITZ | : | |
| | : | Transferred from the |
| | : | District of New Jersey |
| v. | : | (No. 09-cv-257) |
| | : | |
| | : | |
| VARIOUS DEFENDANTS | : | E.D. Pa Case No. 09-cv-70103 |

### ORDER

**AND NOW**, this **31st** day of August, **2018**, it is hereby
**SUGGESTED** that the punitive damage claim previously severed on
August 12, 2011 when the Court suggested the case be remanded (ECF
No. 164) be **REMANDED** to the District of New Jersey for resolution
as the trial judge sees fit.[1]

---

[1]     The MDL Panel remanded the merits claims in this case to
the District of New Jersey on August 24, 2011. However, this Court
severed and retained the punitive damage claim per the Court's
policy for all land-based MDL-875 cases. The case is largely ready
for trial in the transferor court, with a trial date set for
January 9, 2019.

        In that MDL-875 is largely resolved and this case is the
last transferred case left in the MDL with a severed punitive
damage claim, this Court sees no need to retain the claim. The
purpose of retaining the punitive damage claims was to facilitate
a global resolution of the punitive damage issues in all MDL-875
cases after resolution of their merits. With only one severed
punitive damage claim remaining, the Court concludes that the
public policies for severing and retaining the claims discussed in
In re Collins, 233 F.3d 809 (3d Cir. 2000), no longer apply.
Specifically, there is no longer a danger that "multiple judgments
for punitive damages in the mass tort context against a finite
number of defendants with limited assets [will] threaten fair
compensation to pending claimants and future claimants who await
their recovery, and [will] threaten the economic viability of the
defendants." In re Collins, 233 F.3d at 812 (quoting the Report of
the Judicial Conference Ad Hoc Committee on Asbestos Litigation at

It is hereby further **ORDERED** that AM General's motion to dismiss (ECF No. 173) is **DENIED**. As stated, the transferor court is now in the best position to adjudicate all remaining punitive damage claims.


**AND IT IS SO ORDERED.**



  /s/ Eduardo Robreno
**EDUARDO C. ROBRENO,   J.**

_____

32 (March 1991)).

The Court concludes that, for purposes of judicial efficiency, the best course of action is for the transferor court to adjudicate the merits of the case as well as the punitive damage claim in due course.

2

Exhibit "H"



**Cardno
ChemRisk**

Shaping the Future

June 29, 2018

Cardno ChemRisk

Brandy Harris
Reilly, McDevitt & Henrich, P.C.
3 Executive Campus
Suite 310
Cherry Hill, NJ 08002

231 Front Street
Suite 212
Brooklyn, NY 11201
USA

Phone:  415 618 3218
Fax:     412 281 6999
www.cardno.com

Subject:      Expert Opinion Letter in the matter of Gerald L. Hoffeditz and Judith L.
              Hoffeditz vs. AM General, LLC, et al. *(regarding Arvin-Meritor, Incorporated, f/k/a
              Arvin Industries, as successor-in-interest to Rockwell International Automotive)*

www.cardnochemrisk.com

Dear Ms. Harris:

I have prepared the attached report in response to the request for my retention in the
Gerald Hoffeditz matter made by your firm on February 19, 2018. The first set of case
materials was received for my review on February 20, 2018.

It is my understanding that I have been retained by counsel to offer my opinions
concerning Mr. Hoffeditz's alleged exposure to asbestos while performing heavy truck
repair work, as well as the likelihood of adverse health effects given these exposures. In
addition, I will address issues regarding known health effects of asbestos and the use of
asbestos in heavy vehicle friction products. I have been retained to specifically discuss
potential exposure from asbestos-containing materials sold by Rockwell.

In this report, I provide a brief description of my background and areas of expertise
relating to this matter, including a discussion of my knowledge of industrial hygiene,
toxicology, exposure, and risk assessment.

Respectfully,

Brent L. Finley, Ph.D., DABT
Managing Principal Health Scientist

**Expert Report of**
**Brent L. Finley, Ph.D., DABT**

*Expert Opinion Letter in the matter of Gerald L. Hoffeditz and Judith L. Hoffeditz vs. AM*
*General, LLC, et al. (regarding Arvin-Meritor, Incorporated, f/k/a Arvin Industries,*
*as successor-in-interest to Rockwell International Automotive)*

Prepared for:

Brandy Harris
Reilly, McDevitt & Henrich, P.C.
3 Executive Campus
Suite 310
Cherry Hill, NJ 08002

Prepared by:

Brent Finley, Ph.D., DABT
Cardno ChemRisk®
231 Front Street
Suite 212
Brooklyn, NY 11201

June 29, 2018

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 1

## I.     EXPERIENCE

I am a board-certified toxicologist with over 30 years of experience conducting and managing studies involving chemical exposure and human health risk assessment. I have a bachelor's degree in Biological Sciences from Cornell University and a Ph.D. in Pharmacology/Toxicology from Washington State University. I am a principal at Cardno ChemRisk, a consulting firm providing state-of-the-art toxicology, industrial hygiene, epidemiology, and risk assessment services to organizations that face public health, occupational health, and environmental challenges. Over the last 15 years, I have authored over 400 health risk assessments related to the presence of chemicals in consumer products, foods, the environment, the workplace, households, and other settings. I have published over 60 peer-reviewed articles describing the health risk assessment of dioxins, polychlorinated biphenyls (PCBs), chromium, chlorinated solvents, and latex allergens. I have also published 13 papers specifically relating to the topic of asbestos exposure and health effects: (1) *Environmental and Occupational Health Hazards Associated with the Presence of Asbestos in Brake Linings and Pads (1900 to Present): A "State-of-the-Art" Review*, emphasizing state-of-the-art health risk issues associated with brake work during the 1900-1990 time frame, (2) *An Evaluation of the Historical Exposures of Mechanics to Asbestos in Brake Dust*, focusing on exposures to asbestos resulting from brake work in the 1960s through 1990s in the United States and Europe, (3) *Cumulative Asbestos Exposure for US Automobile Mechanics Involved in Brake Repair (circa 1950s-2000),* estimating cumulative lifetime exposure to chrysotile asbestos experienced by brake mechanics in the U.S. from 1950 to 2000, (4) *An Evaluation of Reported No-Effect Chrysotile Asbestos Exposures for Lung Cancer and Mesothelioma* (5) *An Updated Evaluation of Reported No-Observed Adverse Effect Levels for Chrysotile Asbestos for Lung Cancer and Mesothelioma*, (6) *Exposure to Chrysotile Asbestos Associated with Handling, Unpacking, and Repacking Boxes of Automobile Clutch Discs*, examining historical short-term and workday airborne asbestos exposures associated with handling clutch products, (7) *Exposure to Chrysotile Asbestos Associated with Unpacking and Repacking Boxes of Automobile Brake Pads and Shoes*, examining historical short-term and workday airborne asbestos exposures associated with handling brake materials, (8) *A State-of-the-Science Review of the Potential Health Hazards Associated with Asbestos in Shielded Metal Arc Welding Rods in the United States*, evaluating historical data to assess the risk of developing asbestos-related diseases as a result of welding rod use, (9) *An Evaluation of Short-Term Exposures of Brake Mechanics to Asbestos during Automotive and Truck Brake Cleaning and Machining Activities*, evaluating the available short-term asbestos air sampling data for vehicle mechanics collected during the cleaning and machining of vehicle brakes, (10) *Potential Health Hazards Associated with Exposures to Asbestos-Containing Drywall Accessory Products: A State-of-the-Science Assessment,* evaluating the risk of developing asbestos-related diseases as a result of handling or otherwise being in the vicinity of others working with joint compound and other drywall accessory products, (11) *Evaluation of Tremolite Asbestos Exposures Associated with the Use of Commercial Products,* evaluating the exposure-response relationship for tremolite asbestos and mesothelioma in high exposure settings (mining) and to develop estimates of tremolite asbestos exposure for various product use scenarios, (12) *Malignant pleural mesothelioma in U.S. automotive mechanics: Reported vs. expected number of cases from 1975 to 2007,* comparing the number of malignant pleural mesothelioma cases reported in the U.S. literature among auto mechanics between 1975 and 2007 to an expected value derived from estimated numbers of current and former auto mechanics, and (13) *Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology*, examining the incidence of pleural mesothelioma among cosmetic talc miners and millers and patients who received talc pleurodesis treatments. I have taught risk assessment courses at universities, have given numerous invited lectures, and have served on several risk assessment expert panels. I

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 26

IV.     OVERVIEW OF OPINIONS

My opinions are as follows:

1)     The physico-chemical nature of asbestos greatly influences the risk of developing asbestos-related diseases, such as mesothelioma.

2)     It has been well established in the exposure assessment and epidemiological literature that garage mechanics are not at an increased risk of developing mesothelioma as a result of working with friction products. This is primarily due to the fact that (1) only chrysotile asbestos was used in the manufacture of automotive brakes, manual clutches (clutches), and gaskets; (2) the chrysotile fibers in brake and clutch wear debris were very short in length and were present at very low concentrations; and (3) chrysotile asbestos exposures associated with brake, clutch, and gasket servicing activities were very low. Mr. Hoffeditz's alleged exposure to asbestos while conducting vehicle and refurbishment repair work was not a contributing factor to the development of his mesothelioma.

3)     Mr. Hoffeditz's mesothelioma would likely have been caused by exposures to amphibole asbestos that he is unaware of, did not recall, or did not describe in his deposition testimony, and not as a result of his exposure to asbestos from vehicle repair work. Specifically, Mr. Hoffeditz was possibly exposed to amphibole-containing insulation while working as a heavy mobile equipment repairer and mechanic at Letterkenny from 1968 to 1993.

4)     At no point in time has the weight of evidence indicated that automotive or heavy truck and equipment brakes, clutches, or gaskets required an asbestos warning label.

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 27

## V.    OPINIONS

The substance of my opinions is as follows:

**1)    The physico-chemical nature of asbestos greatly influences the risk of developing asbestos-related diseases, such as mesothelioma.**

### a)    The Importance of Asbestos Fiber Type

Understanding differences in fiber type is critical to any asbestos health risk assessment. There are two major classes of asbestos: serpentine (e.g., chrysotile) and amphibole (e.g., amosite, crocidolite and tremolite) (IARC 1977). As described in detail below, it has long been understood that the amphiboles are far more potent than chrysotile at inducing mesothelioma and lung cancer. Some recent analyses have suggested that chrysotile may not even be a risk factor for mesothelioma (e.g., Hodgson et al. 2005; Yarborough 2006).

Chrysotile asbestos has less disease-producing potential than amphibole asbestos. Differences in fiber type potency are primarily due to differences in physico-chemical properties that result in a much higher degree of biopersistence for amphibole fibers. Chrysotile fibers form large parallel sheets that are rolled up like a carpet to create the 'curly' fibrous nature of chrysotile. Amphibole fibers are arranged in long linearly double organized chains, which tend to make these fibers straighter and physically harder than chrysotile fibers (Bernstein et al. 2006; Shukla et al. 2003a). The sharp, needle-like amphibole structures are more difficult to clear from the lung via macrophage engulfment or the mucociliary escalator. In addition, chrysotile fibers are easily depleted of critical components of their structure (e.g., magnesium and other cations) at low pH inside macrophages, thereby weakening the fibers, facilitating their destruction, and subsequently reducing their residence time in the lung (Jaurand et al., 1977; Roggli and Brody, 1984). Amphibole fibers are far more resistant to this type of leaching and therefore have a much longer residence time (Jaurand et al., 1977; Roggli and Brody, 1984; Hesterberg et al., 1998). As such, the biological half-life of inhaled amphibole asbestos fiber types is in the range of years to decades, whereas the half-life of chrysotile is only days to weeks (de Klerk et al. 1996; Finkelstein et al. 1999; Bernstein et al. 2006).

Iron content appears to influence the pathogenic potency of asbestos, via generation of reactive oxygen species (ROS). The iron-catalyzed generation of ROS damages cellular macromolecules, such as DNA, lipids and proteins, and has also been shown to initiate signal transduction pathways linked to apoptosis, inflammation, and proliferation (Aust et al. 2011; Shukla et al. 2003a). In addition to the direct reaction of bound iron on the fiber surface, chelators within the cell have the ability to mobilize iron from the fibers, thus allowing the iron to diffuse throughout the cell. The rate of iron mobilization is dependent upon a number of factors, including surface area, crystalline structure, surface structure, and overall iron content (Aust et al. 2011). Lund and Aust (1990) demonstrated that the rate of mobilization is greater for crocidolite and amosite than for chrysotile. Additionally, the iron content of asbestos is "highest in the amphiboles" with crocidolite and amosite containing up to 27 percent iron by weight; chrysotile asbestos contains only "trace or minor" amounts of iron (Aust et al. 2011, p. 55). The extent of ROS generated by a fiber is dependent upon the ionic state of surface bound and mobilized iron (Shukla et al. 2003a). Zalma et al. assessed the oxygen-reducing potential of iron-containing minerals and

demonstrated that those minerals with $Fe^{2+}$ iron, such as crocidolite, are generally more active than those containing $Fe^{3+}$ iron (Zalma et al. 1987). Shukla et al. ranked the ability of asbestos fibers to generate hydroxyl radicals as: "crocidolite > amosite > tremolite > anthophyllite > chrysotile" (Shukla et al. 2003a, p. 1119). Furthermore, Aust et al. noted that "[l]ittle" iron was mobilized from long or short fiber chrysotile (Aust et al. 2011, p. 59).

Wagner (1965) was the first to note the apparent differences between crocidolite and chrysotile potency when they reported the observation that mesothelioma cases were quite common near crocidolite mines, but were absent in populations living and working near chrysotile mines (Wagner 1965). From the mid-1970s through the early-1990s, numerous epidemiology studies of asbestos-exposed cohorts described substantially higher disease rates in cohorts exposed to a mixture of fiber types (or predominantly amphiboles) versus those observed in cohorts exposed to predominantly chrysotile (Enterline et al. 1973; McDonald et al. 1977; Meurman et al. 1974; Acheson et al. 1981; Acheson et al. 1982; Weiss 1977; McDonald et al. 1982; McDonald et al. 1984a; Thomas et al. 1982; Newhouse et al. 1989; Piolatto et al. 1990; Ohlson et al. 1985; Gardner et al. 1986).

### U.S. Regulatory and Non-Governmental Agencies

To date, regulatory agencies and other organizations have not established fiber-specific occupational or environmental standards for the different asbestos fibers. However many groups have acknowledged that differences in fiber potency exist.

OSHA has repeatedly opined that amphibole asbestos is more potent than chrysotile. For example, OSHA acknowledged that "the evidence tend[ed] to show that crocidolite, for instance, is more harmful than chrysotile" in the 1972 standard (OSHA 1972, p. 11318). However, the agency noted that for "[r]easons of practical administration," a single standard for exposure was applied "to all workplaces exposed to any kind, or mixture of kinds, of asbestos" (OSHA 1972, p. 11318). In 1986 and 1992, OSHA continued to hold the position that it would be "highly impractical" and "infeasible" to require employers to distinguish among fiber types in their measurement programs, and therefore upheld a single exposure standard for all asbestos fiber types (OSHA 1986, p. 22682; 1992).

The American Conference of Governmental Industrial Hygienists (ACGIH) proposed and adopted unique TLVs for crocidolite, amosite, and chrysotile, with amphiboles having lower allowable exposure guidelines than chrysotile in 1978 and 1980, respectively (ACGIH 1978, p. 62; 1980). ACGIH's currently maintained opinion was declared again in 2001 when it was reported that there was "sufficient evidence to show that for a given level of exposure, the risk of developing mesothelioma is far greater with crocidolite and amosite than with chrysotile" (ACGIH 2001, p. 6; 1991).

The U.S. EPA has long recognized evidence of differences in potency between fiber types. This agency reported in 1986 that "some differences exist among the major reports by different national organizations on the relative carcinogenicity of different asbestos fiber types" (USEPA 1986, p. 176). In the 1989 Federal Register, it was reported that "EPA d[id] recognize that some evidence exist[ed] indicating that amphiboles may be more potent in inducing mesothelioma than chrysotile" (USEPA 1989, p. 29470). It was specifically noted that epidemiological evidence suggested that "crocidolite is more potent than chrysotile in inducing pleural mesothelioma" (USEPA 1989, p. 29470). In 2003, the U.S. EPA contracted the preparation of a technical support document for a

protocol to assess asbestos-related risk (Berman et al. 2003). The authors of this protocol concluded from exposure-response modeling of epidemiology studies that "the best estimate of the coefficient (potency) for chrysotile is only 0.0013 times that for amphibole and the possibility that pure chrysotile is non-potent for causing mesothelioma cannot be ruled out by the epidemiology data" (Berman et al. 2003, p. 1.4). Peer reviewers of the report unanimously agreed that the epidemiology literature reviewed in the document provided compelling evidence that amphibole asbestos has far greater potency for mesothelioma induction than does chrysotile (ERG 2003b). Based on a recent, more detailed update by these same researchers, it was stated that "best estimates for the relative potency of chrysotile ranged from zero to about 1/200th that of amphibole asbestos" (Berman et al. 2008a, p. 49; 2008b). At this time, the U.S. EPA has not yet chosen to regulate fibers separately.

*International Agencies*

In October 1972, the Advisory Committee on Asbestos Cancers held committee meetings regarding cancers and exposure to asbestos dust (ACAC 1973). In the 1973 report to the Director of the International Agency for Research on Cancer (IARC), the committee reported that the epidemiological evidence "show[ed] that there are clear differences in risk with type of fibre and nature of exposure" (ACAC 1973, p. 11). It was clarified that the "risk is greatest with crocidolite, less with amosite and apparently less with chrysotile" (ACAC 1973: p. 11). In 1986, the World Health Organization (WHO), with joint sponsorship of the United Nations Environment Programe and the International Labour Organization, published the Environmental Health Criteria for Asbestos and Other Natural Mineral Fibres (WHO 1986). After a review of the literature, it was concluded that the "available evidence suggests a substantial difference between chrysotile and the amphiboles (especially crocidolite) in their capacity to cause mesothelioma" which could be attributed to differences in physical fiber dimensions, increased peripheral deposition, and longer tissue persistence for amphibole exposure (WHO 1986, p. 64). Likewise, in the 1989 IARC Scientific Publication by Commins it was reported that recent epidemiological studies on workers exposed to predominantly chrysotile asbestos suggested "no or a possible very low risk …for mesothelioma" and that diseases such as mesothelioma were instead "very significantly associated with exposure to the other (amphibole) forms of asbestos" (Commins 1989, p. 479). It was further noted that the risk data provided by WHO were "conservatively cautious," in that "exposure to chrysotile ha[d] been assigned precisely the same risk as the potentially much more dangerous (from the point of view of developing mesothelioma) crocidolite and other amphibole forms" (Commins 1989, p. 482). In 2000, WHO continued to conservatively assign the same risk to all forms of asbestos while acknowledging that there was "evidence that chrysotile is less potent than amphiboles" (WHO 2000, p. 128). IARC still holds the opinion that "there is considerable evidence that the potency for the induction of mesothelioma varies by fibre type, and in particular that chrysotile asbestos is less potent than amphibole forms of asbestos" (IARC 2012, p. 238).

Hodgson and Darnton (2000) of the Health and Safety Executive (United Kingdom) reported that "the exposure specific risk of mesothelioma from the three principal asbestos types is broadly in the ratio of 1:100:500 for chrysotile, amosite and crocidolite respectively" at exposure concentrations typical of occupational cohorts (p. 565). These same researchers assigned chrysotile "zero weight" in their estimates of future asbestos-related mesotheliomas in the United Kingdom (Hodgson et al. 2005, p. 590).

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 30

In summary, with respect to fiber type:

- It has long been known that chrysotile asbestos is less potent than the amphiboles at inducing mesothelioma.
- The reduced potency of chrysotile (relative to the amphiboles) is largely due to differences in physico-chemical characteristics.
- It is debatable whether chrysotile even causes mesothelioma.

### b) The Importance of Asbestos Fiber Length

Understanding the toxicological properties of different fiber lengths is very important in this case, as it has been known for decades that short asbestos fibers, especially short chrysotile fibers, have little to no disease-producing potential.

*Toxicological Studies*

Beginning in the early 1970s, Stanton and colleagues conducted a series of animal exposure experiments with asbestos and non-asbestos fibers and ultimately concluded that fibers less than or equal to 8 μm in length (and with diameters of less than 1.5 μm) are inactivated by phagocytosis and thus have little or no mesotheliogenic potential (Stanton 1973; Stanton et al. 1977; Stanton et al. 1981). In 1988, Lippmann reported that mesothelioma induction is most closely associated with the number of fibers longer than ~5 μm and thinner than ~0.1 μm (Lippmann 1988). Following an analysis of fiber length distribution data from rat inhalation studies using amosite, brucite, chrysotile, crocidolite, erionite and tremolite as test materials in 1994, Lippmann also concluded that the concentration of fibers longer than either 10 or 20 μm in length is a better predictor of tumor yield than is the concentration of fibers longer than 5 μm (Lippmann 1994).

In 1995, Berman et al. evaluated data from 13 rat inhalation bioassays in which the animals were exposed to nine different types of asbestos dusts (Berman et al. 1995). The authors concluded that structures contributing to lung tumor risk appeared to be long (≥ 5 μm) and thin (0.4 μm) fibers. Furthermore, they noted that potency appeared to increase with increasing length, with structures longer than 40 μm being approximately 500 times more potent than those between five and 40 μm in length. These researchers suggested that structures less than 5 μm in length did not contribute to lung tumor risk. In addition, modeling results reported by Miller et al. (1999) indicated that the concentration of fibers longer than 20 μm and thinner than 1 μm in diameter is most influential in determining the tumorigenic potential of fibers. Ilgren and Chatfield (1997, 1998) did not report any incidences of fibrosis or lung tumors with short fiber preparations of chrysotile (Coalinga mine) in a lifetime inhalation study in F344 rats, while significant tumor induction and fibrosis were observed following exposure to long fiber preparations (UICC/B). Perhaps most importantly, Wagner (1990) reported no cases of mesothelioma among the 24 rats exposed by inhalation to shortened erionite and almost a 100% incidence of mesothelioma among the 27 rats exposed to longer-fiber erionite. This finding is of particular interest because long erionite fibers are thought to be one of the most, if not the most, potent inducers of mesothelioma. The Wagner (1990) study suggests that short fibers will not cause mesothelioma regardless of the potency of longer fibers of the same fiber type. Indeed, to the best of my knowledge there are no published inhalation studies showing an increased incidence of mesothelioma in animals exposed to fiber grades with fiber length distributions primarily < 5 μm.

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 31

As Grade 7 chrysotile was used in friction products, those studies investigating the toxic potential of this material are of particular relevance to this case. Processed chrysotile is classified by length in seven basic grades according to the Quebec Standard Dry Classification Method – the most widely accepted grading system for length characterization of chrysotile asbestos fibers (Bowles 1959; Virta 2002, 2005; Chrysotile Institute 1981). This classification or grading system separates the milled fibers into five grades (3 to 7) based on size, with Grade 3 fibers the longest and Grade 7 fibers the shortest (Jolicoeur et al. 1992). Chronic inhalation studies with Grade 7 chrysotile consistently demonstrate its lack of disease-causing potential. Specifically, Wagner et al. (1980) exposed rats via inhalation to Grade 7 chrysotile fibers for three, six, and 12 months for 7.5 hours/day, five days/week with a 12 month follow-up and reported that none of the study animals exposed to Grade 7 chrysotile developed mesothelioma. The airborne fiber concentration (reported as fibers longer than 5 μm by PCM) measured in the exposure chamber 'dust clouds' during this study was 1,020 fibers/cc, which was well above fiber concentrations measured in even the dustiest asbestos industries. In 1985, Platek et al. published a study in which both rats and primates were exposed to Grade 7 chrysotile (median fiber length of 0.67 μm) at a concentration of 0.8 fibers/cc (reported as fibers longer than 5 μm by PCM) for 7 hours/day, five days/week, for 18 months (Platek et al. 1985). At the end of the exposure period, the rats were observed for six months and the primates were followed for ten months prior to being transferred to a contractor for an eleven-year observation period (Stettler et al. 2008). The authors reported that there was no evidence of treatment-related fibrosis or tumors in the rats at any time point up to and including the terminal sacrifice and also noted no evidence of treatment-related fibrosis in the monkeys ten months after cessation of exposure. The lung burden findings demonstrated that, despite the lack of disease, the animals had in fact experienced a significant amount of deep lung deposition of mostly short (<5 μm) chrysotile fibers. At 18 months, the lungs of the rats contained approximately 300 million chrysotile fibers per gram of lung tissue, as measured by TEM, and the mean percentage of fibers greater than 5 μm in the lungs was 7.7%. After six months post-exposure, the mean fiber burden in the rats was approximately 200 million fibers/g of lung tissue and the mean percentage of fibers greater than 5 μm in length was 12.6%. In the monkeys, approximately 300 million chrysotile fibers/g of lung tissue were found in the lungs at the 28-month biopsy and 5.8% of the fibers were greater than 5 μm in length. After 11.5 years, the mean lung burden in the remaining monkeys was approximately 60 million fibers/g and 35% of the retained fibers were longer than 5 μm (Stettler et al. 2008).

*Government Agencies and Expert Panels*

In 2002, the Agency for Toxic Substances and Disease Registry (ATSDR) sponsored the convening of an expert panel to address the influence of fiber length on asbestos-related health effects (ATSDR 2002). These panelists were asked to comment on the physiological fate, as well as non-carcinogenic and carcinogenic health effects associated specifically with asbestos and synthetic vitreous fibers less than 5 μm in length. One of the panelists described two studies that evaluated cohorts occupationally exposed to a short asbestiform material (cummingtonite-grunerite) predominately less than 5 to 10 μm in length in which no evidence of increased cancer mortality was documented (Higgins et al. 1983; McDonald et al. 1978). Another panelist described at least three well-conducted case-control studies examining the distribution of fiber lengths among individuals who died from mesothelioma; these studies demonstrated that any risk associated with fiber retention was accounted for by retention of long amphibole fibers (McDonald et al. 1989; Rogers 1990; Rodelsperger et al. 1999). Overall, the ATSDR-sponsored "panelists agreed that there is a strong weight of evidence that asbestos and SVF [short vitreous fibers] shorter than 5 μm are unlikely to cause cancer in humans" based on "findings from epidemiologic studies, laboratory animal studies, and *in vitro* genotoxicity studies, combined with the lung's ability to clear short fibers" (ERG 2003a, p. vi).

Despite the clear consensus within both the scientific and regulatory community regarding the lack of carcinogenic potency of short fibers, some researchers have reported that short chrysotile fibers are the predominant type of fiber found in human lung and mesothelial tissue and should therefore be considered carcinogenic (Suzuki et al. 2005; Suzuki et al. 2001). Plaintiffs' experts in friction litigation have often used the findings of these studies to assert that there is sufficient pathologic evidence of the importance of short fiber chrysotile as a cause of mesothelioma (Egilman 2009). However, there are significant flaws with these analyses and the studies have been criticized by the scientific community (Case 1994; ERG 2003b). One of the panelists on the above mentioned ATSDR-sponsored expert panel "concluded that the publication of concern (Suzuki and Yuen 2001) is seriously flawed and ... recommended [that it] should be excluded from EPA's analyses" (ERG 2003b, p. 3-16). The primary criticism of the study was the use of a non-standard digestion technique involving water, without any controls. It was noted that the water may have contained large amounts (> 30,000 fibers/L) of small asbestos fibers. Another panelist agreed that the fibers detected in the study may have resulted from contamination during the digestion process. Most importantly, however, is the fact that there are no epidemiological studies that appear to support the hypothesis that exposure to short fiber chrysotile increases the risk of a mesothelioma.

As noted previously, the U.S. EPA contracted the preparation of a technical support document to establish a protocol to assess asbestos-related risk (Berman et al. 2003). Based on modeling results presented in the technical support document, the authors concluded that the best estimate of risk for mesothelioma for fibers between 5 and 10 μm in length is one three-hundredth of the risk assigned to fibers longer than 10 μm. Further, the best estimate of the potency of fibers shorter than 5 μm is zero for mesothelioma. The authors also explained that "results from [their] review of the supporting literature suggest that the optimum cutoff for increased potency occurs at a length that is closer to 20 μm than 10 μm" (Berman et al. 2003, p. 7.61). The expert panel convened to evaluate and comment on the technical support document and agreed that the "risk for fibers less than 5 μm in length is very low and could be zero" (ERG 2003b, p. viii).

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 33

In summary, with respect to fiber length:

- It has been consistently demonstrated that fibers (of any type) less than 5 μm in length have little to no disease-causing potential.
- A 2003 U.S. EPA expert panel has suggested that even fibers up to 10 μm and perhaps up to 20 μm in length may not cause disease.
- Inhalation studies conducted with very high doses of short fiber chrysotile (≤ 5μm in length) have reported no increased respiratory disease incidence in the exposed animals despite very high lung fiber burdens.

2)    It has been well established in the exposure assessment and epidemiological literature that garage mechanics are not at an increased risk of developing mesothelioma as a result of working with friction products. This is primarily due to the fact that (1) chrysotile asbestos was used in the manufacture of automotive brakes, manual clutches (clutches), and gaskets (2) the chrysotile fibers in brake and clutch wear debris were very short in length and were present at very low concentrations, and (3) chrysotile asbestos exposures associated with brake, clutch, and gasket servicing activities were very low. Mr. Hoffeditz's alleged exposure to asbestos while conducting vehicle repair and refurbishment work was not a contributing factor to the development of his mesothelioma.

a)    *Only chrysotile asbestos was used to manufacture automotive brakes and manual clutches*

The distinction between chrysotile and amphibole fibers is important in this case because chrysotile asbestos was used in the manufacture of automotive friction products such as brakes and manual clutches (Langer et al. 1982; Cohen et al. 2008). Amphibole fibers (e.g., amosite, crocidolite, and tremolite) were not desirable for use in the manufacture of brake pads, partly because the presence of the harsh amphiboles in these products could lead to "scoring of the metal" (Rosato 1959, p. 114; Roberts et al. 1982; Sheehy et al. 1989).

It has been reported that some of the Canadian chrysotile mines which supplied materials used for friction products contained trace amounts of tremolite (a non-commercial amphibole) asbestos (Williams-Jones et al. 2001; Gunter et al. 2007; Lajoie et al. 2003), and as a result it has been suggested (primarily by plaintiffs' experts in friction litigation) that amphibole 'contamination' of the chrysotile used to manufacture friction products could have resulted in significant amphibole exposures to brake mechanics. However, numerous studies employing sensitive bulk analytical techniques have failed to detect amphibole fibers in asbestos-containing friction products (Weir et al. 2001; Blake et al. 2003; RJ Lee Group Inc. 2004; Cohen et al. 2008; Jiang et al. 2008; Madl et al. 2008; Van Orden 2009; Boelter et al. 2003). For example, Weir et al. (2001) used PLM, in accordance with NIOSH (National Institute for Occupational Safety and Health) 9002, to conduct bulk analyses of six pairs of brake shoes (manufacturers not reported) and reported that chrysotile was the only fiber type present at concentrations ranging from 50 to 65% (Weir et al. 2001). In 2004, the R.J. Lee Group reported only chrysotile asbestos in clutch plates acquired from 15 vehicles made by six manufacturers (RJ Lee Group Inc. 2004). Moreover, after analyzing 15 clutches (removed from 7 passenger vehicles, 4 light-duty trucks, 2 passenger vans, 1 school bus, and 1 dump truck) in 2008, Cohen et al. reported that only chrysotile asbestos was detected in the clutch plates (Cohen et al. 2008). Likewise, my colleagues and I have recently analyzed

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 34

105 asbestos-containing brakes and 24 asbestos-containing manual clutches (see Table I) and found that none contained measurable levels of amphibole fibers using PLM according to NIOSH 9002 with an estimated limit of detection (LOD) of 1% (NIOSH 1994; Jiang et al. 2008).

*Table Ia. Bulk Analyses of Asbestos-Containing Friction Products: Brake Pads*

| Sample | N | Chrysotile (%) | Amphibole (%) |
|--------|---|----------------|---------------|
| Brand 1 | 5 | 37-45 | ND |
| Brand 2 | 18 | 24-42 | ND |
| Brand 3 | 20 | ND-33 | ND |
| Brand 4 | 8 | NA-43 | ND |
| Brand 5 | 1 | 33 | ND |
| Brand 6 | 2 | 24-34 | ND |
| Brand 7 | 2 | 27-41 | ND |
| Brand 8 | 4 | 22-40 | ND |
| Brand 9 | 2 | 41-45 | ND |

NA = Not Available; ND = Non-Detect

*Table Ib. Bulk Analyses of Asbestos-Containing Friction Products: Brake Shoes*

| Sample | N | Chrysotile (%) | Amphibole (%) |
|--------|---|----------------|---------------|
| Brand 1 | 1 | 41-52 | ND |
| Brand 2 | 1 | 34 | ND |
| Brand 3 | 1 | 37-42 | ND |
| Brand 4 | 2 | 22-60 | ND |
| Brand 5 | 1 | 78 | ND |
| Brand 6 | 4 | 5-47 | ND |
| Brand 7 | 17 | 20-47 | ND |
| Brand 8 | 7 | 29-52 | ND |
| Brand 9 – Relined | 1 | 37 | ND |
| Brand 10 – Relined | 1 | 32-39 | ND |
| Brand 11 - Re-Manufactured | 4 | NA-49 | ND |
| Brand 12 – Relined | 1 | 24-25 | ND |
| Brand 13 – Relined | 1 | 31-45 | ND |
| Brand 14 – Relined | 1 | 24-27 | ND |

NA = Not Available; ND = Non-Detect

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 35

*Table Ic. Bulk Analyses of Heavy Equipment Asbestos-Containing Brake Pads and Shoes*

| Sample | N | Chrysotile % | Amphibole % |
|---|---|---|---|
| *Brake Component* | | | |
| Tractor Brake Pads | 10 | 30 | ND |
| Wheel Loader Brake Pads | 4 | 25-35 | ND |
| Track Dozer Brake Lining | 2 | 35 | ND |
| Motor Grader Brake | 3 | 35-40 | ND |
| Track Loader Brake | 2 | 25-35 | ND |
| Motor Grader Brake Shoe | 1 | 15 | ND |
| Motor Grader Brake Lining | 4 | 15 | ND |
| Dozer Brake Lining | 2 | 85-95 | ND |
| Dozer Brake Band Lining | 4 | 15-25 | ND |
| Wheel Loader Brake Pad | 4 | 20 | ND |
| Wheel Loader Brakes | 8 | 20 | ND |
| Track Loader Brake Band | 6 | 30 | ND |
| Track Loader Brake Lining | 4 | 25-35 | ND |
| Track Loader Brake | 1 | 25 | ND |

ND = Non-Detect

*Table Id. Bulk Analyses of Asbestos-Containing Friction Products: Clutch Discs*

| Sample | N | Chrysotile (%) | Amphibole (%) |
|---|---|---|---|
| Brand 1 | 7 | 25-48 | ND |
| Brand 2 | 5 | 26-48 | ND |
| Brand 3 | 5 | 23-47 | ND |
| Brand 4 | 7 | 20-52 | ND |

ND = Non-Detect

Of particular relevance to this case is a recent toxicological study performed using dust created by the arc grinding of chrysotile-containing brake pads (referred by the authors as "brake dust"), brake dust with added grade 5R04 chrysotile, and South African crocidolite (Bernstein et al. 2014; Bernstein et al. 2015). Rats were exposed via inhalation to brake dust, brake dust with added grade 5R04 chrysotile, and crocidolite for six hours per day over a five day period with 91 and then 365 days of follow-up; the airborne fiber concentrations measured in the exposure chamber during this study were 3.6 f/cc for fibers ≥ 20 μm in length for the brake dust group, 189 f/cc for fibers ≥20 μm in length for the brake dust and 5R04 chrysotile group, and 93 f/cc for fibers ≥ 20 μm in length for the crocidolite group. The authors reported that the long chrysotile fibers (> 20 μm) cleared quickly with estimated half-lives (through 365 days post exposure) of 29 and 42 days for the brake dust and the brake dust with added grade 5R04 chrysotile, respectively (Bernstein et al. 2015). In contrast, the estimated half-life of the long crocidolite fibers was greater than 1,000 days. Furthermore, while no significant pathological response was observed in the brake dust and chrysotile/brake dust exposure groups through 365 days post exposure, the crocidolite "initiated

a rapid inflammatory response" and "induc[ed] a significant increase in fibrotic response" in the lung parenchyma and the pleura (Bernstein et al. 2014, p. 28; Bernstein et al. 2015, p. 20).

In summary:

- Historically, only chrysotile asbestos was used to manufacture automotive brakes and manual clutches.
- Analyses of numerous unused asbestos-containing brakes and clutches and samples collected during repair of vehicles with asbestos-containing friction products have confirmed the absence of detectable amphibole fibers.

### b)   The vast majority of the chrysotile fibers associated with friction products are too short to cause disease

While there is considerable variation in fiber length within each subtype of asbestos fibers, amphibole fibers tend to be longer than chrysotile fibers. As noted earlier, the chrysotile used in molded brake linings and clutches was typically short-fiber Grade 7 chrysotile (Pigg 1994). Recent electron microscope analyses suggest that a vast majority of the fibers in Grade 7 chrysotile are < 5μm in length. Specifically, Brorby et al. (2008) evaluated the fiber length distribution of three samples of Grade 7 chrysotile (Jeffrey Mine (JM) 7RF3, JM 7R05 and Brazilian CB7RP) using TEM. A majority (> 90%) of the observed chrysotile structures were less than 5 μm in length and relatively few structures (< 0.2%) were greater than 40 μm in length (Brorby et al. 2008). Hence, the vast majority of the chrysotile fibers used to manufacturer friction products was generally too short (< 5 to 10 μm) to cause disease.

Further, it is well established that nearly all of the asbestos fibers in brake or clutch materials were degraded to even shorter lengths due to the high temperatures and pressures applied to the brake or clutch face during typical vehicle use. The resulting degradation material is commonly referred to as 'wear debris,' and this debris constituted a majority of the asbestos-containing airborne material during brake or clutch servicing. It has been known since the 1970s that approximately 97 to 99% of the intact chrysotile fibers in wear debris are less than 5 μm in length, with the vast majority of these fibers being shorter than 1 μm (see Table II) (Hatch 1970; Anderson et al. 1973; Rohl et al. 1976; Roberts et al. 1982; Cha et al. 1983; Williams et al. 1982; Rodelsperger et al. 1986; Rodelsperger 1987; Sheehy et al. 1989; Rohl et al. 1977). Rohl et al. (1976) concluded that optical fiber counts and electron microscopic fiber size distribution data indicate that the "chrysotile fiber population generated by brake wear is a strongly skewed one, with almost all fibers concentrated in the smaller than 5 μm region" (p. 116).

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 37

*Table II. Asbestos Fiber Length in Wear Debris*

| Findings | Reference |
|---|---|
| Of asbestos fibers detected during use of compressed air, vast majority (~94%) were between 2 and 5 µm in length | (Hatch 1970) |
| Largest observed asbestos fiber found on the "normal use" filters was ~ 1.2 µm long and was consistent with the longest fiber detected in the background samples | (Anderson et al. 1973) |
| Greater than 80% of chrysotile were less than 0.4 µm in length | (Rohl et al. 1977) |
| Fiber lengths ranged from 0.24 to 1.8 µm in brake dust samples | (Roberts et al. 1982) |
| Asbestos fibers in brake emissions had a median length of 0.5 µm | (Williams et al. 1982) |
| Average fiber length of asbestos detected in brake emissions during simulated downtown driving activities was 0.54 µm | (Cha et al. 1983) |
| 99% of fibers in brake drum dust were < 5 µm | (Rodelsperger et al. 1986) |
| No fibers were greater than 10 µm in length in blow-out dust samples | (Rodelsperger 1987) |
| TEM analyses showed that 49 of 57 personal samples collected in the breathing zone of mechanics contained asbestos fibers 5 µm or shorter | (Sheehy et al. 1989) |

In summary:

- The vast majority of chrysotile fibers in unused friction products and especially in friction-product wear debris are too short to cause disease (< 5 to 10 µm in length).

c) **Encapsulated Friction Products**

When evaluating the health hazard associated with asbestos-containing products, products are categorized in two ways: those containing free fibers and those containing encapsulated fibers. Brakes and gaskets are considered encapsulated asbestos-containing products because of the binding agents found in these materials (Kelleher et al. 1983). Specifically, asbestos fibers found in gaskets are bound with rubber or other binders, while "wire-cored asbestos yarn impregnated with drying oils and bituminous material" was used in friction products for vehicle brakes (Kelleher et al. 1983; Sheehy et al. 1989, p. 2).

During the 1970s, several researchers and agencies noted that encapsulated asbestos products, including brakes and gaskets, posed little health risk. For example, in 1970, Selikoff noted, "[i]t is known that a large proportion—something over 50%—of the asbestos used in this country for the past 40 years has gone into the construction industry in one form or another. It is fortunate that the greatest part of this has been in products in which asbestos is 'locked in'—that is, it is bound with cement or plastics or other binders so that there is no release, certainly no significant release,

of asbestos fiber in either working areas or general air" (Selikoff 1970, p. 164). In 1971, Harries concluded that asbestos reinforced plastics found in bearing materials and brake linings posed "[n]o health hazard except if these materials are ground or worked" (Harries 1971, p. 249). The International Agency for Research on Cancer (IARC) in 1972 described asbestos as "a vital part of the composition of friction material ... without any apparent risk to the general public" and stated that there was "no conceivable health risk in the use of asbestos-based gasket materials" (Lindell 1973, p. 325). In the same proceedings, IARC stated that "only a tiny fraction of the asbestos in brake-linings is released to the air as airborne particles in their original form as the brakes wear" (Lindell 1973, p. 325). The limited potential for release of fibers from friction products and gaskets was also acknowledged in 1972 by OSHA, when encapsulated products were exempted from asbestos labeling requirements (OSHA 1972). This exemption applied to products that would not release fibers in excess of the PELs "during any reasonably foreseeable use, handling, storage, disposal, processing, or transportation" (OSHA 1972, p. 11321). This exemption still exists today (OSHA 1994).

In 1978, Selikoff and Lee published a comprehensive review on asbestos (Selikoff et al. 1978). As stated in the preface, this review was based upon "extensive observation and research" and the conclusions drawn by the authors were based upon the "evidence that has built up over the years" and "believed to represent the ones most justified by what we now know" (Selikoff et al. 1978, p. xv, xvii). In that text, the authors stated that there were no wear-resistant materials available to act as suitable substitutes for asbestos-containing bearing materials and brake linings and heat-resistant materials for asbestos gaskets and that these asbestos-containing materials did not pose health hazards, except if ground or worked (Selikoff et al. 1978).

### d)   Chrysotile Asbestos Concentrations in Friction Wear Debris

Automotive friction products manufactured in the U.S. contained approximately 20 to 60% chrysotile asbestos beginning in the early 1900s (Paustenbach et al. 2003). However, as noted above, during the high temperature and pressure of the braking process, the asbestos fibers degrade into 'wear debris,' thereby allowing only a very small percentage of the chrysotile fibers to remain intact. Wear debris is also referred to as 'forsterite.' Beginning in the late 1960s, a number of researchers from the U.S. Public Health Service, the U.S. Environmental Protection Agency and the Ford Motor Company observed that forsterite had a chemical composition similar to chrysotile, but found that the material was amorphous and nonfibrous. More importantly, these researchers consistently reported that only a very small fraction (typically less than 1%) of the wear debris actually contained asbestos fibers when methods preferred by the Occupational Safety and Health Administration (OSHA) were used (see Table III) (Lynch 1968; Hickish et al. 1970; Luxon 1970; Jacko et al. 1973; Rowson 1978; Williams et al. 1982; Cha et al. 1983; Sheehy et al. 1989; Anderson et al. 1973; Boelter et al. 2007; Blake et al. 2008; Rohl et al. 1977; Rohl et al. 1976; Davis et al. 1973; Blake et al. 2003). Care needs to be taken in comparing the results of the various studies, however, because they all used slightly different methods to determine the percentage of chrysotile in the wear debris.

**Expert Report of**
**Brent L. Finley, Ph.D., DABT**
**June 29, 2018**
**Page | 39**

*Table III. Composition of Friction Wear Debris*

| Measurement Technique | Findings | References |
|---|---|---|
| TEM for total dust* using a friction machine and dynamometer; analyzed both drum brakes and clutches | < 1% free fiber released under typical conditions (one sample had < 5%; two high-temp. samples had 10-15 %) | (Lynch 1968) |
| Microscopy of drum dust and airborne dust | < 1% chrysotile | (Hickish et al. 1970) |
| XRD for drum dust | 1-3% chrysotile | (Luxon 1970) |
| Electron microscopy for drum dust | < 1% chrysotile | (Davis et al. 1973) |
| TEM for airborne dust using dynamometer | < 0.05% released as asbestos fibers | (Anderson et al. 1973) |
| PCM and TEM for total dust collected while driving | Average = 0.23% asbestos Range = 0.003-1.65% | (Jacko et al. 1973) |
| XRD for drum dust | Average = 2.4% Range = 0.5-15.1% | (Rohl et al. 1977) |
| TEM for airborne dust and X-ray diffraction of brake wear debris | TEM: < 0.5% (chrysotile was found in one microscopic field) XRD: chrysotile not detected | (Rowson 1978) |
| PCM and TEM for airborne dust using a dynamometer | Average = 0.029% asbestos Range- 0.001-0.19% | (Williams et al. 1982) |
| TEM for airborne dust using a dynamometer | Average= 0.02% chrysotile Range = 0.0005-0.14% | (Cha et al. 1983) |
| TEM for drum dust | Average = 0.02% chrysotile Range = < 0.1 to 1% | (Sheehy et al. 1989) |
| PLM for brake debris | Non-detect or < 1% chrysotile | (Boelter et al. 2007) |
| PLM for dust scraped from the seams of the clutch facing and debris removed from the bell housing | 5% chrysotile from the clutch disc face debris; no detection of asbestos fiber from the bell housing residue | (Blake et al. 2008) |

*Total dust comprises airborne, drum, and settled debris; XRD = X-Ray Diffraction

Similar to brake wear debris, it has been known for decades that asbestos levels in clutch wear debris are very low. In the aforementioned Lynch study, for example, no detectable fibers in clutch wear debris were found following normal driving conditions (Lynch 1968). More recently, Boelter and Spencer (2003) examined clutch wear debris from the master clutch and the clutch plate of a bulldozer as part of their study on heavy equipment friction materials and found that it contained < 1% chrysotile asbestos. Additionally, in 2004, the RJ Lee Group assessed the asbestos content of clutch wear debris from the bell housing of eleven automobiles known to have asbestos-containing clutches (RJ Lee Group Inc. 2004). The results reflected an upper value of 0.4% chrysotile asbestos by weight and no chrysotile was reported in several samples. Furthermore, in 2008, Cohen et al. analyzed the asbestos content of the wear debris in the bell housing surrounding clutches from 12 vehicles and reported an average of 0.1% chrysotile asbestos by weight (Cohen et al. 2008).

It is also worth mentioning that an evaluation by Langer (2003) has suggested that the heat generated by the braking process may also reduce the biological activity of chrysotile fibers embedded in the resin material of the brakes and clutches. As a result, Langer noted that "exposure to brake wear debris... may be associated with little to no risk of asbestos disease" (Langer 2003, p. 76).

In summary:

- The chrysotile content of brake and clutch wear debris is very low, most often less than 1%.
- The small percentage of asbestos fibers that remain in wear debris may be biologically inactive or have much less reactivity due to effects of high temperatures associated with the normal braking process.

## e)   Potential Chrysotile Exposures During or Following Vehicle Repair Work

Generally speaking, there are essentially four routes by which chrysotile fibers in brake materials, manual clutches, or gaskets might become airborne: 1) through suspension of wear debris, 2) during grinding, sanding, or relining of a new brake pad or lining (clutches and gaskets were not sanded or ground), 3) while opening a box of new brake pads/linings, clutches, or gaskets, or 4) as a result of "take-home" exposures while laundering the clothes of a mechanic.

Mr. Hoffeditz reportedly worked as a heavy equipment repairman and helper at Letterkenny Army Depot from 1968 to 1993 (Hoffeditz 1/7/2009: p. 170-171; Int. #6). According to his testimony, Mr. Hoffeditz cleaned engine blocks from 1968 to 1969, worked in the optics department from 1969 to 1973, rebuilt engines from 1973 to 1975 or 1976, worked on Detroit Diesel engines in the 1970s, worked in the electronics department from 1981 to 1986, and rebuilt transmissions from 1986 to 1993 (Hoffeditz 1/7/2009: p. 175-176, 186, 189-190, 194, 196, 198, 204-205; Hoffeditz 1/8/2009: p. 264-265, 300, 324, 327; Hoffeditz 1/9/2009: p. 478-479).

Mr. Hoffeditz recalled that he worked on two-and-a-half and five-ton Army trucks from AM General (Hoffeditz 1/7/2009: p. 207-209, 223-224; Hoffeditz 3/17/2009: p. 12). He recalled that the two-and-a-half-ton trucks potentially had a six-cylinder Hercules engine, the five-ton trucks had six-cylinder Cummins engines, and "[a]ll the components" of the transmissions on both trucks were Rockwell brand (Hoffeditz 1/9/2009: p. 498, l. 20-21, p. 499).

was determined to be between 0.5 and 2.6 fibers/cc-year (tremolite asbestos-equivalent; RR=4.5 [95% C.I. = 0.8 – 24.6] based on Larson et al. (2010). Using measured and estimated airborne tremolite asbestos concentrations for simulated and actual product use, along with the assumption that tremolite asbestos comprised 1% of all automotive friction products, we conservatively estimated that the 95th percentile cumulative tremolite asbestos exposure for vehicle mechanics would be 0.028 fibers/cc-year (Finley et al. 2012b). The cumulative tremolite exposure estimates for vehicle mechanics are far below the tremolite LOAELs derived in Finley et al. (2012b), therefore, it is irrelevant whether or not brake pads may have contained trace levels of tremolite.

### h)    Epidemiologic Studies of Vehicle Mechanics

Since the 1980s, numerous epidemiologic studies have evaluated whether vehicle mechanics (or motor, automobile or garage mechanics) are at an increased risk of mesothelioma (pleural or peritoneal) (McDonald et al. 1980; Teta et al. 1983; Spirtas et al. 1985; Teschke et al. 1997; Woitowitz et al. 1994; Agudo et al. 2000; Hessel et al. 2004; Milham et al. 2001; Olsen et al. 1987; Jarvholm et al. 1988; NIOSH 2002; Hansen et al. 2003; Rolland et al. 2010; Rake et al. 2009; Rolland et al. 2005; Coggon et al. 1995; Hodgson et al. 1997; Roelofs et al. 2013; Goodman et al. 2004; Wong 2001; Garabrant et al. 2016). There is great variability in study design, study population, location and duration of employment as a vehicle mechanic among these published studies. Given the consistency of findings, the weight of evidence supports that those employed in this occupation are not at any increased risk of mesothelioma due to their work with friction products.

Among these studies are three meta-analyses that have independently evaluated the body of epidemiologic evidence regarding vehicle mechanics (Wong 2001; Goodman et al. 2004; Garabrant et al. 2016). Wong (2001) included six case-control studies that evaluated mesothelioma among auto/vehicle mechanics and reported a meta- relative risk estimate of 0.90 (95% confidence interval [CI]: 0.66, 1.23). The author concluded that "auto mechanics do not have an increased risk of malignant mesothelioma as a result of exposure to asbestos fibers from brake linings" (Wong 2001, p. 170). Goodman et al. (2004) reported meta-relative risk estimates of mesothelioma for garage mechanics among Tier I (higher quality) and Tier II (lower quality) studies of 0.92 (95% CI: 0.55,1.56) and 0.81 (95% CI: 0.52, 1.28), respectively. In a recently published follow-up study, Garabrant et al. (2016) reported similarly tiered risk estimates (i.e. Tier I, Tier II, and Tier III) based on study quality as well as a brake work-specific risk estimate. The reported risk estimates were as follows: Tier I ($n=5$): 0.76 (95% CI: 0.46-1.25), Tier II ($n=5$): 1.09 (95% CI: 0.76-1.58), Tier III ($n=6$): 0.73 (95% CI: 0.49-1.08), and brake work-specific ($n=4$): 0.64 (95% CI: 0.38-1.09). The authors of the initial and follow-up study also concluded that garage mechanics, including those involved with brake repair, are not at increased risk of mesothelioma. Additionally, population-based case-control studies from Denmark, Great Britain, and France report no statistically significant increased risk of mesothelioma among motor vehicle mechanics or those who worked with asbestos-containing friction products (Hansen et al. 2003; Rake et al. 2009; Rolland et al. 2010).

Additionally, NIOSH (2011) maintains the National Occupational Mortality Surveillance (NOMS) database on their website, which reports the results of surveyed associations of cause-specific mortality and occupation and/or industry among the 28 states that participated in the program for at least two years between 1984 and 1998. There is no evidence of increased mortality from cancer of the pleura among 112,008 male (white and black) "vehicle and mobile equipment

mechanics and repairers" tracked in this database (NIOSH 2011). A recent update expanded the NOMS database to include deaths that occurred in 23 states during the years 1999, 2004 to 2005, and 2007 (NIOSH 2014). Similarly, there is no evidence of increased mortality from cancer of the pleura or mesothelioma among white and black male "vehicle and mobile equipment mechanics and repairers" included in the database (NIOSH 2014).

A recent study of mesothelioma and employment in Massachusetts reported a statistically significant measure of association (standardized morbidity odds ratio or SMOR) among those categorized as "automobile mechanics" or employed in the industry of "automotive repair or related services" and mesothelioma (Roelofs et al. 2013). While it is well understood by the scientific community that evidence of an association should not be interpreted as evidence of a causative effect (Petitti 1991), this finding is clearly an anomaly when considering the more than 20 epidemiology studies showing no increased risk of mesothelioma for vehicle mechanics. There are significant limitations inherent in the study as a result of the quality of the data and the methodologies used to analyze them. Given the limitations, it is my opinion that this study cannot be interpreted as evidence to support that vehicle mechanics are at any increased risk of mesothelioma.

Despite the overall findings of the epidemiologic studies, some investigators have reported that individual case reports (or the sum of individual case reports) are sufficient evidence of an increased risk of mesothelioma among automotive mechanics (Lemen 2004). These reports [e.g., (Leigh et al. 2003; Lemen 2004)] fail to address a fundamental question: do the cases of mesothelioma published in case reports represent a statistically significant increase in the observed number of cases compared to the expected number of cases that result from spontaneous occurrence of disease? Moreover, summaries of selected case reports lack a control population and other epidemiologic study design features that are considered 'the gold standard' for assessing causation. Furthermore, although the vast majority of mesotheliomas in adult males in the U.S. are a result of significant amphibole asbestos exposure (primarily via exposure to amosite-containing insulation), no effort appears to have been made by Lemen (2004) to assess possible exposures to amphibole forms of asbestos in the occupational histories of the cases compiled. My colleagues and I recently published a study specifically designed to address information lacking in the Lemen (2004) analysis (Finley et al. 2012b). The purpose of our analysis was to compare the reported number of mesothelioma cases in U.S. auto mechanics between 1975 and 2007 to an expected value derived from general population rates and labor statistics data. For each case, the presence or absence of confounding factors, such as known or suspected amphibole asbestos exposures from other occupations, and quality of diagnostic clinical information was evaluated. We identified from the published literature a total of 169 unique cases of mesothelioma reported between 1975 and 2007 among individuals that performed at least some work as a "mechanic" (as compared to Lemen's reported 165 cases). Of these cases, 106 were assumed to have been likely employed as an automotive mechanic for some period of time (i.e., minimum employment duration was not established). Over 20 of these cases were likely to have experienced significant amphibole exposures in high risk occupations.

In an effort to put the findings of case reports into perspective, researchers must take the background rate of mesothelioma into account to assess the number of 'idiopathic mesothelioma' cases which occur spontaneously and with no identifiable history of asbestos exposure. It is acknowledged in the scientific literature that the background rate of mesothelioma is known to occur at a fairly consistent rate in the general population (Huncharek 2002; Ilgren et al. 1991; McDonald 1985; McDonald et al. 1994; Price et al. 2004; Walker et al. 1983). Most recently, Moolgavkar et al. (2009) determined that the background rate of spontaneous pleural

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 53

mesothelioma in the U.S. is between two and three cases per million individuals per year. Using the Current Population Survey (CPS) data collected by the U.S. Bureau of Labor Statistics and U.S. Bureau of the Census, my colleagues and I estimated that the total number of auto mechanics for the 1975 to 2007 timeframe ranged from 4.4 to 5.5 million per year, for a total of approximately 172 million person-years (Finley et al. 2012a). Using the "background" incidence rates of two and three cases per million individuals per year (i.e., two and three cases per 1 million person-years), in conjunction with a cumulative population (current + former population) of 172 million person-years, an estimated 344 and 515 non-asbestos-related mesothelioma cases would be expected to have occurred among auto mechanics during the 1975 to 2007 timeframe, respectively. Our findings indicate that the number of observed cases of mesothelioma among individuals that performed at least some form of work as a "mechanic" (e.g., 169 cases) represented less than half of the "background" cases that would have occurred in the absence of asbestos exposure. When the analysis was refined to consider only cases involving professional automotive mechanics, the number of "observed" cases represented 31% and 21% (106/344 and 106/515) of the number of expected cases for the two background rates, respectively (Finley et al. 2012a).

In summary, the number of mesothelioma cases reported in the literature among U.S. auto mechanics is far less than the expected number of spontaneous or idiopathic occurrences of disease in this population. Contrary to the assertions in Lemen (2004), it is clearly possible that the number of reported cases among vehicle mechanics could easily be due to chance alone. These findings are consistent with the numerous epidemiology studies previously referenced and discussed, all of which report no increased risk of pleural mesothelioma in vehicle mechanics. As such, these analyses of the available epidemiological data demonstrate that employment as a motor vehicle mechanic or brake repair worker does not increase the risk of developing mesothelioma.

In summary:

- The available epidemiological evidence suggests that employment as a career vehicle mechanic does not increase the risk of developing mesothelioma.
- Although case reports have described cases of mesothelioma among mechanics, the number of cases is far less than the expected number resulting from the background rate of spontaneous mesotheliomas.
- The vehicle repair and refurbishment work Mr. Hoffeditz performed would not have increased his risk for developing his disease.

3)   Mr. Hoffeditz's mesothelioma would likely have been caused by exposures to amphibole asbestos that he is unaware of, did not recall, or did not describe in his deposition testimony, and not as a result of his exposure to asbestos from vehicle repair work. Specifically, Mr. Hoffeditz was possibly exposed to amphibole-containing insulation while working as a heavy mobile equipment repairer and mechanic at Letterkenny from 1968 to 1993.

Mr. Hoffeditz may have experienced asbestos exposure throughout his lifetime that he was either unaware of, did not recall, or did not describe in his deposition testimony. For example, Mr. Hoffeditz worked at an unspecified mobile home company assembling Celotex ceiling assemblies and installing insulation, as well wiring new homes during his employment at Kennedy & Pentz

where he worked around Owens Corning insulation; however, details specific to that work was not provided in the case materials.

Additionally, Mr. Hoffeditz indicated that Letterkenny Army Depot, specifically building 37 and the assembly area, contained heated piping that "all had asbestos insulation" (Hoffeditz 1/8/2009: p. 338, p. 339, l. 10). He confirmed that he "might have" witnessed frayed or crumbly pipe insulation associated with steam pipes located in building 37 or "[a]ll the heat plants" at Letterkenny (Hoffeditz 1/8/2009: p. 395, l. 19). Further, according to the U. S. Environmental Protection Agency (EPA) Phase I Environmental Baseline Survey (EBS) for Letterkenny Army Depot, asbestos-containing pipe insulation was detected in and removed from buildings 14, 37, 51, 350, and 370, asbestos-containing tank insulation was detected in buildings 37 and 350, and asbestos-containing duct insulation was detected in and removed from building 350 (EPA Phase I, 1996, Appendix C, Appendix E). Removal occurred during the on-base abatement program beginning in 1989 (EPA Phase I, 1996, p. 5-5).

Furthermore, according to Mr. Geist's testimony, he worked as a guidance repair technician, quality assurance inspector, and a calibrator at Letterkenny Army Depot from 1961 to 1989 (Geist 8/11/10: p. 15, 67-68, 72-74; Geist 8/30/10: p. 340-342). He testified that he observed other workers handling or working with pipe and wall insulation on a "regular basis" during his career at Letterkenny; he estimated that this work occurred "twice a week" (Geist 8/31/10: p. 521, p. 522, l. 7). He stated that, when he worked as a quality insurance inspector in different warehouses between 1985 and 1989, he observed piping that was "covered with… a lot of asbestos" and he described the conditions inside the warehouses as "awful[ly] dusty" (Geist 8/11/10: p. 73, l. 12-13, 15; Geist 8/30/10: p. 341-342). Moreover, he recalled that he saw asbestos insulated piping located in Building 2, Building 431, Building 370, Building 350, and Building 51 (Geist 8/31/10: p. 508, 510-511, 514, 516-518). He indicated that workers performed "a lot of modification on the ceilings" in Building 370 and Building 51, which involved work with pipe insulation and rafter insulation (Geist 8/31/10: p. 514, p. 515, l. 5-6, p. 518).

In addition, Mr. Geist reportedly observed workers cutting and applying "big sheets" of insulation on the "sides" of the walls in Building 431 and Building 350 (Geist 8/31/10: p. 512, l. 20, 24, p. 513, 517-518). He described that the workers glued tabs, then "pushed the insulation up against the wall" and put tabs to hold the insulation in place (Geist 8/31/10: p. 512, p. 513, l. 5-6). He testified that the workers cut the insulation to fit (Geist 8/31/10: p. 513). Further, he noted that there was also wall insulation in Building 370; however, it was unclear if he observed workers performing work with this insulation (Geist 8/31/10: p. 516).

Butnor et al. (2003) conducted lung fiber analyses on individuals with malignant mesothelioma for which chrysotile in brake dust was the only known asbestos exposure. The authors found that in every case that had elevated lung fiber levels, elevated levels of commercial amphiboles were detected. Butnor et al. (2003), in part, attributed this finding to recall bias for events that occurred decades previously, indicating that "this may explain the absence of reported exposures to commercial amphiboles in our study" (Butnor et al. 2003, p. 328). Furthermore, the authors concluded that "the presence of elevated commercial amphiboles in the lungs of some brake workers indicates that unrecognized asbestos exposure through other forms of employment plays a confounding role in the development of [malignant mesothelioma] in this population. Other cases have tissue asbestos contents indistinguishable from background controls and may be considered to be spontaneous or idiopathic" (Butnor et al. 2003, p. 329).

More recently, Liu et al. (2018) performed a re-evaluation of the database of lung asbestos fiber levels in brake workers who passed away from mesothelioma. The authors identified 21 cases of brake repair workers who passed away from mesothelioma, which included 10 cases that were previously reported by Butnor et al. 2003, five additional cases reported by Marsh et al. 2011, and six new cases that have not been previously analyzed (Marsh et al. 2011; Butnor et al. 2003; Liu et al. 2018). Liu et al. (2018) performed several statistical analysis to evaluate the relationship between lung fiber concentrations of non-commercial amphiboles (TAA) and commercial amphiboles (AC) and duration of exposure. Results from the study reported a positive relationship between the lung concentration of the TAA and AC fibers among the 21 brake workers with mesothelioma, which the authors noted were consistent with the findings reported by Marsh et al. (2011) for the first 15 cases. Additionally, no statistically significant positive relationship was reported between the exposure to TAA and duration of employment for brake workers (Liu et al. 2018). The authors concluded that these results showed that "exposure to commercial amphibole asbestos from some unrecognized source, and not chrysotile derived from friction products, is related to mesothelioma observed among the brake workers" evaluated in this study (Liu et al. 2018).

In summary, Mr. Hoffeditz may have experienced asbestos exposure throughout his lifetime that he was either unaware of, did not recall, or did not describe in his deposition testimony. If Mr. Hoffeditz's pleural mesothelioma is asbestos-related, it is far more likely to have been associated with his occupational exposures to amphibole exposure that he did not recall, than his exposure to chrysotile asbestos-containing friction products while he performed automotive repairs.

**4)   At no point in time has the weight of evidence indicated that automotive or heavy truck and equipment brakes, clutches, or gaskets required an asbestos warning label.**

In my review of the early literature on asbestos, several points deserve mention, and are enumerated in Section (a) below. Issues related to obligation to warn are enumerated in Section (b) below.

### a) Factory workers vs end-users

First, it is clear that pre-1960 studies on asbestos established that certain types of asbestos in sufficient doses could cause asbestos-related disease; all of these studies involved relatively high exposures in manufacturing settings. Second, these early manufacturing studies included workers who would have handled raw asbestos fibers, which would not be the case for end users such as garage mechanics. Third, while some early studies did evaluate brake grinding operations, such studies focused solely on factory settings where the volume, duration and frequency of brake lining grinding were substantially greater than that taking place in brake shops. Fourth, scientists and government officials were not focusing on the possible health hazard to end-users like brake mechanics during this time period due to the obviously lower concentrations of dust and the decreased frequency of exposure. Substantial concerns about end-users were not raised until about the mid-1960s following reports from Mt. Sinai Hospital (these studies examined insulators, not vehicle mechanics), at which point studies of brake mechanic exposures began.

Expert Report of
Brent L. Finley, Ph.D., DABT
June 29, 2018
Page | 56

### b) Obligation to Warn

As detailed earlier in my report, at no point in time has the weight of scientific evidence indicated that garage mechanics are at an increased risk of asbestos-related disease. Further, OSHA concluded in 1972 that "no label is required where asbestos fibers have been modified by a bonding agent, coating, binder, or other material so that during any reasonably foreseeable use, handling, storage, disposal, processing, or transportation, no airborne concentrations of asbestos fibers in excess of the exposures limits ... will be released" (OSHA 1972, p. 11321). This labeling exemption applies to brakes, clutches, and gaskets because of the encapsulated nature (e.g., modification with binder or resin) of asbestos in these products and because asbestos concentrations associated with use of these products were consistently below contemporaneous OSHA standards. This exemption still exists today (OSHA 1994).

## VI.    CLOSING COMMENTS

I submit these opinions to a reasonable degree of scientific certainty and am prepared to support them in both deposition and/or courtroom testimony.  I may supplement this report if additional information becomes available or I am asked to address other issues.

Respectfully,

_____
Brent L. Finley, Ph.D., DABT
Managing Principal Health Scientist

June 29, 2018
Date

Exhibit "I"

James McCluskey, MD, MPH, PhD, FACOEM
18432 Eastwyck Drive
Tampa, FL 33647
Email: jimmccluskey@att.net
Phone – (813) 505-6709  Fax – (866) 615-0928

June 29, 2018

Mr. David T. Manning, Paralegal
Reilly, McDevitt & Henrich, P.C.
3 Executive Campus, Suite 310
Cherry Hill, NJ 08002
Email: dmanning@rmh-law.com
Phone: (856) 317 – 7180  Fax: (856) 317 – 7188

Re: Gerald L. Hoffeditz and Judith L. Hoffeditz, Plaintiffs, vs. AM General, LLC et al., Defendants

Dear Mr. Manning:

You asked that I review the available documents in this case, as well as the medical and scientific literature, in order to ascertain whether there is any relationship between Mr. Gerald L. Hoffeditz' diagnosis of right-sided, epithelioid variant malignant pleural mesothelioma, and possible exposure to ArvinMeritor, Incorporated (f/k/a Arvin Industries, Incorporated, as successor-in-interest to Rockwell International Automotive) products.

**MATERIALS REVIEWED:**
In the course of preparing this report, I had the opportunity to closely examine a volume of medical records and ancillary materials, including the following:

1. Medical Records of Drs. Ziv Gamliel and Mark J. Krasma (Thoracic Surgery) – St. Joseph Medical Center, University of Maryland  (Towson, Maryland)
2. Medical Records of Dr. John F. Robinson (Oncology) – Summit Cancer and Hematology Services, Summit Health, John L. and Cora I. Grove Cancer Center (Chambersburg, Pennsylvania)
3. Medical Records of Dr. Gregory P. Brown (Pulmonary) – Pulmonary Associates of Chambersburg, Ltd.
4. Medical Records of Dr. David A. Guthrie (General Surgery) – South Central Surgical Associates, Summit Health (Chambersburg, Pennsylvania)
5. Medical Records of Dr. Amatul B. Khalid (Internal Medicine) – Chambersburg Medical Associates, Summit Health (Chambersburg, Pennsylvania)
6. Medical Records of Dr. Mark F. Yurek (Family Practice)
7. Medical Records of Dr. Farooq Khokhar (Gastroenterology) – Chambersburg Gastroenterology Associates ( Chambersburg, Pennsylvania)
8. Medical Records of Dr. Louis L. Glass (Urology) Urology Associates of Chambersburg, P.C. (Chambersburg, Pennsylvania)

1

10. Elimination of other possible causes (confounders) or risk factors.

Acceptance of the Hill criteria in determining general causation (i.e., evaluating epidemiological data) is widespread. For example, in 1987, the World Health Organization published the Hill criteria as the necessary elements for establishing potential cause and effect relationships for chemically induced health effects reported in epidemiological studies. The International Agency for Research on Cancer (IARC) listed the Hill criteria as the "criteria for causality" when evaluating epidemiological studies (IARC, 1994). The United States Environmental Protection Agency (USEPA) utilizes the Hill criteria when evaluating epidemiological data to determine if a chemical is, or is not, a carcinogen. Numerous textbooks on epidemiology, such as those authored by Monson (1980), Mausner and Kramer (1985), and Hernberg (1992), advance the Hill criteria as the methodological basis for analyzing epidemiological studies for cause and effect relationships. Faustman and Omenn (1995) in the textbook *Casarette & Doull's Toxicology: The Basic Science of Poisons* (5th edition), adopt the Hill criteria as the methodology for evaluating cause and effect relationships when analyzing epidemiological studies. Finally, a number of occupational medicine textbooks describe the Hill criteria as the method by which epidemiological evidence is evaluated (Sacks and Schenker, 1990; Eisen and Wegman, 1994; Frumkin, 1994; Sullivan, 1992)). Thus, the scientific, medical, and regulatory communities clearly recognize and utilize the Hill criteria as the cornerstone of general causation analysis.

It has been reported in the available testimony that Mr. Gerald L. Hoffeditz worked with and/or around gaskets and friction materials associated with Rockwell International Automotive transmissions, transfer cases and axles, during his employment at the Letterkenny Army Depot from 1968 – 1993.   Although it is possible that some vehicle parts in the past may have contained encapsulated chrysotile asbestos within various friction and gasket materials, there is no objective information in this case to verify that: 1) Mr. Gerald L. Hoffeditz was exposed to any Rockwell International Automotive-produced or sourced parts, and 2) assuming that he may have had direct or indirect exposure to a product(s) made or sourced from Rockwell International Automotive, the "Rockwell" vehicle part(s) actually contained asbestos.   With that said, regardless of Mr. Hoffeditz' actual exposure (direct or indirect) to Rockwell International Automotive-produced or sourced vehicle products, there is a substantial database of epidemiologic literature that directly addresses the potential risk for mesothelioma development in automotive mechanics and garage workers (Agudo, 2000; Aguilar-Madrid, 2010; Carlos-Rivera, 2009; Coggon, 1995; Drever, 1995; Garabrant, 2015; Goodman, 2004; Gustavsson, 1990; Hansen, 1989; Hessel, 2004; Hodgson, 2005; Jarvholm, 1988; Kelsh, 2007; Laden, 2004; McDonald, 1980; McElvenny, 2005; Merlo, 2010; Miham, 2001; NIOSH, 2002; Olsen, 1987; Petersen, 1980; Peto, 2009; Rake, 2009; Roelofs, 2013; Rolland, 2005; Rolland, 2006; Rolland, 2010; Rushton, 2010; Spirtas, 1994; Spirtas, 1985; Teschke, 1997; Teta, 2004; Teta, 1983; Van den Borre, 2015; Woitowitz, 1994; Wong, 1992; Wong, 2001). There is no scientifically reliable evidence to suggest that mechanics, who may have worked a full career with a variety of automotive parts and/or products, are at an increased risk of developing either pleural or peritoneal mesothelioma due to this possible exposure. This data is further substantiated by the industrial hygiene and scientific literature which clearly indicates that automotive/truck/heavy equipment maintenance and repair involving friction products does not result in "biologically" significant potential exposures to asbestos.

In addition to the lack of reliable epidemiological evidence to suggest that mechanics are at an increased risk of developing either pleural or peritoneal mesothelioma due to friction and gasket product exposure, it is noteworthy that chrysotile asbestos in friction products was found in a bound resinous matrix. Also, most chrysotile "asbestos" fibers found in friction product dust has withstood multiple forces, including extreme heating and shear forces during their liberation from the brake pad or clutch. This phenomenon was documented in two SAE reports in 1973, titled *Brake and Clutch Emissions Generated During Vehicle Operation* (Jacko, 1973), and *Asbestos Emissions from Brake Dynamometer Tests* (Anderson, 1973), respectively. Anderson et al. found that <0.02% of brake lining wear debris was identifiable asbestos fibers, while Jacko et al. found an average ~99.7% of asbestos was converted to non-fibrous wear debris. In a 2003 article, Langer summarized the various forces and their effects, particularly the loss of structural water, accompanying crystalline structure degradation, surface modifications, change in biological activity and reduction in fiber length of chrysotile in friction products. It was particularly noteworthy that chrysotile disproportionately loses biological activity at temperatures between 150 to 500°C, all of which are below the olivine transformation point of 810 – 820°C. Forsterite, a non-asbestiform olivine mineral, is the resulting product at the olivine transformation point. In addition, all water molecules are driven off of chrysotile fibers at temperatures of 650±20°C. Typically, temperatures at the "rubbing interface" of a brake pad reach up to 650°C, and in localized "hot spots" may reach temperatures as high as 1000°C. However, even if released asbestos fibers do not reach the olivine transformation point, there is very likely a reduction in biological activity due to surface changes, reduced water content and shear forces that cause small fiber lengths. Rohl et al. examined measured fiber lengths in brake drum dust by TEM and found that 56-99% of the fibers were <0.4 μm in length (Rohl, 1976). In addition, very few of the fibers examined were ≥5μm in length. Thus, it is critical to understand that simply finding chrysotile "fibers" in brake dust does not mean that it will be biologically active, much less that they will have the potential to cause adverse health outcomes (Langer, 2003).

Multiple studies have found that direct work with, as well as handling and installation of friction products does not generate amounts of respirable chrysotile at levels shown to increase the risk for mesothelioma (Weir, 2001A; Blake, 2003; Paustenbach, 2003; Paustenbach, 2004; Finley, 2007; Madl, 2008; Richter, 2009). In addition, it has been found that manipulation of new brake pads through both grinding and drilling generates fibers that, for the most part, remain bound to the underlying resinous pad matrix. (Weir, 2001B) This article suggests that these processes do not generally release fibers that are "aerodynamically clean", and thus drilling and grinding processes are not an important source of respirable asbestos fibers. Once again, these findings concur with the epidemiologic data that has consistently failed to show any increased risk for malignant mesothelioma development in brake workers and/or automotive mechanics potentially exposed to dust from friction products through all manner of activities, including handling, sanding, grinding, removal, etc.

Similar to the various human studies regarding exposure to chrysotile-containing brake dust, animal studies have also demonstrated the lack of a pathological response to chrysotile and/or forsterite-containing brake dust inhaled into the lungs of rats (Bernstein, 2014 and Bernstein, 2015).

In addition to friction products associated with Rockwell International Automotive heavy truck manual transmissions, it has been alleged that Mr. Hoffeditz removed and replaced various gaskets associated with "Rockwell" transmissions, transfer cases and axles during his lengthy

employment at the Letterkenny Army Depot. With that said, even if he did happen to have exposure (direct or indirect) to encapsulated vehicle gasket products, and they contained asbestos, the gaskets would not have been expected to release a significant dose of "free" asbestos fibers. Prior to the preparation of this report, I had the opportunity to closely review the various literature articles and historical work-practice studies related to work with asbestos-containing encapsulated gasket and packing materials (Blake, 2006; Boelter, 2011; Boelter, 2002; Cheng, 1991; Fowler, 2000; Hatfield, 2003; Liukonen, 1978; Liukonen, 2005; Longo, 2002; Madl, 2007; Madl, 2015; Mangold, 1982a; Mangold, 1982b; Mangold, 1983; Mangold, 1985; Mangold, 1989a; Mangold, 1989b; Mangold, 1989c; Mangold, 1989d; Mangold, 1989e; Mangold, 1989f; Mangold, 1989g; Mangold, 1989h; Mangold, 2006; Mangold, 1991; McKinnery, 1992; Millette, 1993; Millette, Fall 1995; Mowat, 2007; Paustenbach, 2006; Paustenbach, 2004; Sheehan, 2010; Spence, 1996 Spencer, 1998; Spencer, 2001, Spencer, 2003 and Williams, 2003). There is no objective evidence to suggest that Mr. Gerald L. Hoffeditz had a biologically "significant" asbestos exposure (direct or indirect) due to any possible exposure to asbestos – containing gaskets produced or supplied by Rockwell International Automotive. Furthermore, this possible exposure did not contribute to, or cause any disease process.

Although there are a number of known and/or suspected causes of mesothelioma, amphibole asbestos exposure remains the accepted cause in the majority of cases. Additional agents that are known to cause, or may cause mesothelioma include: ionizing radiation (De Bruin, 2009; Gilks, 1988), chemotherapy (Melato, 2001), chronic pleural inflammation (Hillerdal, 1985), recurrent peritonitis, thorium dioxide and possibly SV40 virus (Gazdar, 2002), among others. In addition, it is noteworthy that mesothelioma cases have been found in children, who did not have either a known history of exposure to asbestos and/or an appropriate latency period (Brenner, 1981; Cioffredi, 2009; Fraire, 1988; Kauffman, 1964; Khan, 1997 and Moran, 2008). Nevertheless, there is also a sizeable portion of cases that are considered to be idiopathic, or spontaneous due to the fact that there is no recognized or known asbestos exposure (Spirtas, 1994). Moolgavkar and colleagues estimated the background rate of mesothelioma at ~3 per 10,000 (Moolgavkar, 2009). In comparison, Price and Ware estimated the combined background lifetime probability of developing pleural and peritoneal mesothelioma at 3.6 per 10,000 (Price, 2004).

It is important to recognize the fact that many individuals have historically had "unrecognized" exposure to asbestos. In addition, recall of distant events, such as exposures and exact work details, tend to diminish over time. Rake et al. directly addressed this issue in former "construction" trade workers in the 2009 article, as follows:

*The ORs within each occupational exposure category were lower but still substantially increased even in men who recalled no substantial asbestos exposure, suggesting that many were exposed indirectly or could not identify the asbestos materials they handled. Most people report their own and their parents' occupations correctly many years later (Berney and Blane, 1997), but recall of past asbestos exposure shows poor reproducibility at re-interview (Holmes and Garshick, 1991)....*

*The increased risk for medium-risk industrial work reflects widespread and often unrecognized contact with asbestos in metalworking, electrical trades and assembly line work.*

In a 2003 article, Butnor and colleagues addressed the phenomenon of unrecognized asbestos exposure, particularly related to brake workers, when they examined 10 cases of malignant mesothelioma (Butnor, 2003).  Not only did they conclude that friction product exposure is unlikely to contribute to the development of malignant mesothelioma, they also noted the following:

*The presence of elevated commercial amphiboles in the lungs of some brake workers indicates that unrecognized asbestos exposure through other forms of employment plays a confounding role in the development of MM in this population.*

In a 2011 follow-up article to the Butnor findings, Marsh et al. re-examined the original ten brake worker cases, as well as an additional five cases.  They concluded that, "elevated lung levels of tremolite in the lungs of brake repair workers with elevated levels of amphiboles arose from concurrent exposures to commercial amphibole and chrysotile asbestos in occupational settings other than brake repair work" (Marsh, 2011).

## CONCLUSIONS:

From my training and experience, I am familiar with the literature that describes the scientific methodology required to determine the specific cause of a disease or ailment. This same methodology should be rigorously applied in order to establish a causal link between any exposure and an alleged disease or ailment. The application of this methodology allows one to distinguish a result that occurs spontaneously, from those which may result from a known exposure. If this methodology is not followed, arbitrary and incorrect causal associations may be asserted because of individual bias, confounders and failure to use a precise and objective comparison. The evaluation of a causal relationship between a specific cause and a specific disease outcome in an individual should include the following information:

1. Evidence of exposure to the specific compound.
2. The exposure must result in a dose of the specific compound.
3. The dose must be sufficient to cause the specific ailment.
4. The specific ailment is caused in humans by the specific compound in question.
5. The ailment is temporally eligible to have been caused by the exposure.
6. The alleged effect(s) is biologically plausible.
7. Confounding factors have been eliminated as possible causes of the ailment.

As stated above, there is no scientifically reliable evidence to suggest that Mr. Gerald L. Hoffeditz' diagnosis of right-sided malignant pleural mesothelioma was either caused, or contributed to by working with Rockwell International Automotive-produced or sourced vehicle parts and/or supplies. The scientific literature clearly indicates that automotive maintenance and repair involving a variety of automotive parts, including friction and gasket products, does not result in "biologically" significant exposures to asbestos. Most importantly, there is no scientifically reliable epidemiologic evidence that garage workers and/or mechanics working on a regular and prolonged basis with chrysotile-containing friction products and gaskets are at an increased risk of developing pleural or peritoneal mesothelioma, over that encountered in the general population.

19

Although I do not believe that exposure to Rockwell International Automotive-produced or sourced vehicle products caused or contributed to Mr. Gerald L. Hoffeditz' diagnosis of malignant pleural mesothelioma, the actual causal agent is not overtly clear. With that said, it is possible that we simply have an incomplete exposure history, and this gentleman had an unknown historical, biologically significant exposure to amphibole asbestos, at a level known to cause malignant pleural mesothelioma, during his lifetime.

It was noted in the case documents that Mr. Hoffeditz was possibly exposed to thermal system insulation during his employment history. Work with and around commercially applied asbestos insulation is known to have potentially involved very high exposures to asbestos, particularly amphibole fibers. The medical and scientific literature clearly documents the high exposure levels, as well as the elevated risk for the development of mesothelioma as a result of working with commercially applied thermal asbestos insulation, including the work of Selikoff and others at Mount Sinai in the United States (Balzer, 1968; Elmes, 1971; Elmes, 1977; Hammond, 1965; Hodgson, 1986; Jarvholm, 1998; Langlands, 1971; Lilis, 1987; Ribak, 1988; Ribak, 1989; Seidman, 1990; Selikoff, 1964; Selikoff, 1965; Selikoff, 1965; Selikoff, 1979; Selikoff, 1991; Ulvestad, 2004 and Wallace, 1971).

All of the opinions as contained in this report are expressed to a reasonable degree of medical certainty.

I reserve the right to amend this report if further information should become available.

Sincerely,

James McCluskey, MD

James McCluskey, MD, MPH, PhD, FACOEM

20