IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:   MDL-875                              :         01-MD-00875
Asbestos Product Liability Litigation   :

### SUGGESTION OF TERMINATION OF MDL-875

On July 29, 1991, the Judicial Panel on Multidistrict Litigation ("JPML" or the Panel) centralized these proceedings and assigned them to the Eastern District of Pennsylvania. For the reasons set forth in the explanatory note filed together herewith, it is thus **SUGGESTED**:

1. MDL-875 be terminated effective November 1, 2022.

2. All remaining cases currently in the MLD-875 docket, cases over which the Eastern District of Pennsylvania has exercised original jurisdiction, will remain in the Eastern District of Pennsylvania.

3. Other than those cases identified in paragraph 2 above, there are no remaining cases in the MDL-875 docket.

Accordingly, this Court recommends to the Judicial Panel on Multidistrict Litigation that the litigation known as "In re: The Federal Asbestos Product Liability Litigation," bearing MDL-875, be terminated. The Clerk of the United States District Court for the Eastern District of Pennsylvania has closed all of the master MDL-875 dockets. Should the JPMDL accept this Court's recommendation to terminate the multidistrict litigation proceeding, and any party subsequently files in or removes to a United States District court any new claim related to this proceeding over which the Eastern District of Pennsylvania cannot exercise original jurisdiction, the Court would welcome transfer of any such action to this Court for further proceedings given the Court's familiarity with this litigation.

IT IS SO ORDERED,

On this 18th day of August 2022

*Eduardo C. Robreno*
_____
Honorable Eduardo C. Robreno
District Court Judge

IN THE UNTED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYVANIA

IN RE:   MDL-875                                :           01-MD-00875
Asbestos Product Liability Litigation       :

Explanatory Note in Support of
Suggestion of Termination of MDL-875

On July 29, 1991, the Judicial Panel on Multidistrict Litigation ("JPML" or the Panel) centralized these proceedings and assigned them to the Eastern District of Pennsylvania. This Court now recommends that the Panel implement the Suggestion and terminate MDL-875 effective November 1, 2022.

\* \* \*

"[The use of Asbestos] is a tale of danger known it in the late 1930's [with] exposure inflicted upon millions of Americans in the 1940's and 1950's, injuries that began to take their toll in the 1960's and a flood of lawsuits in the 70's."[1]

This is the story of how the federal judiciary confronted this crisis:

I.   The Medical – Legal Crisis[2]

1.   The Medical Crisis:

Asbestos was known as a "miracle substance" because of its unique properties; it can withstand punishing forces of fire and corrosion while also being versatile to weave into textiles, automobile brakes and turbines. American manufacturers first used it in the 1870's. Its use increased over time in all phases of the economy. Individuals are at risk of asbestos inhalation when the fibers become "friable" or damaged and begin floating through the air in sufficient

---

[1] **Georgine v. Amchem Prod., Inc.** 83 F.3d 610, 618 (3d Cir. 1196)
[2] This summary is taken largely, although, slightly edited and updated from The Honorable Eduardo C. Robreno "The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm? 23 Widener L.J. 97 (2013)"

1

quantity. Millions of Americans became exposed to asbestos. Because asbestos-produced disease have latency periods anywhere from ten to forty years, the extend of the crisis did not become known and persisted for decades.

2. <u>The Legal Crisis</u>:

The legal consequences of widespread asbestos exposure first became apparent in the 1970's and can be traced to the Court of Appeals for the Fifth Circuit's decision in *<u>Borel v. Fibreboard Paper Products, Corp.</u>*[3], which recognized a strict liability theory in asbestos claims. By 1991, there were over 700,000 personal injury cases pending in federal and state courts.

3. <u>The Federal Judiciary's Initial Response</u>:

Forced with an increased number of filings, a number of courts began to pursue innovative methods for handling the crisis. They included standardized case management procedures, consolidation of cases, certification of classes, use of claim and issue preclusion and various forms of ADR. Notwithstanding those efforts and given the large number of cases being filed, the crisis remained unabated.

4. <u>Birth of MDL-875</u>:

In 1991, eight experienced federal district court judges, with significant asbestos dockets wrote to the Panel urging consolidation of all federal action asbestos cases into one judicial district. The Panel, which on five different occasions previously declined to centralize all asbestos cases in one forum, did so this time, initially transferring 26,000 cases to Judge Charles R. Weiner in the Eastern District of Pennsylvania. This number would increase exponentially over the years.

---

[3] 493 F.2d 1076,1092 (5th Circ. 1973)

5. <u>The National Class Action</u>:

Shortly after the transfer, Judge Weiner undertook to achieve a global solution. A steering committee of plaintiffs appointed by Judge Weiner reached an agreement with a group of twenty companies covering claims and potential claims of up to 2 million individuals who had been exposed to asbestos products manufactured by these companies. Judge Weiner conditionally certified an opt out class. After multiple hearings, the objections to the settlement were overruled. On appeal the Third Circuit reversed and ultimately, the Supreme Court found that the sprawling class certified by Judge Weiner did not satisfy the requirements of Rule 23. At the time the Supreme Court expressed concerns over the manageability of such mixed and large class, specifically in the treatment of future claimants. The Supreme Court's decision largely doomed this search for an overarching, universal solution through the class action mechanism.

6. <u>The Legislative Fix</u>:

With the failure of the judicial effort to aggregate all asbestos litigation into a class action forum, the focus shifted to the search for a legislative solution. Numerous bills were introduced in Congress which sought to create a central fund by pooling together available insurance coverage and developing a common method of adjudication. These efforts ultimately failed to gain sufficient support from the various stakeholders. The Congressional Budget Office estimated that the fund would need approximately 140 million dollars to pay all future legitimate asbestos claims. Later, at the suggestion of Pennsylvania Senator Arlen Spector, Third Circuit Chief Judge Edward R. Becker conducted a series of meetings with the principal stakeholders seeking a national solution which would be implemented throughout legislation. This effort also failed.

II. <u>New Paradigm</u>

By 2009, the need for a new judicial-business model had become apparent. Changing conditions in law and culture throughout the country facilitated the development of such model including:

1. - The tort reform movement and changes in state law,
    - Aging asbestos population,
    - Resulting bankruptcy of nearly all asbestos manufactures,
    - Fraud in many medical diagnostic reports produced by claimants,
    - The emergence of peripheral defendants who did not manufacture asbestos, but included asbestos as a component in their final products,
    - Rise of bankruptcy trust.

2. <u>One Plaintiff – One Claim</u>:

On October 1, 2008, the Panel designated the undersigned to preside over MDL-875. After nearly 20 years of litigation, it appeared that the search for a universal solution through the aggregation of claims whether through the courts or legislation had failed. The MDL court concluded:

"Aggregation stopped progress in individual cases where the parties worked on global solutions. Once the global solutions proved unfeasible, the parties did not return to the task of processing the cases individually. Ultimately, neither the court, nor the parties were ready, willing or able to move cases to trial and settlement. This stage of litigation led some litigants to refer to MDL-875 as a "black hole", where cases disappeared forever from the active dockets of the court."

In light of that experience, the MDL court determined each case would be "disaggregated" or "deconstructed", into the lowest common denominator and process as "one plaintiff – one claim". Placing each case on a separate scheduling order demonstrates a commitment to systematic differential diagnostic – one size did not fit all.

Administratively, the cases were to proceed as follows:

a. The presiding judge would serve as the adjudicator of legal issues and case-wide administrator. Four experienced magistrate judges were assigned to MDL-875. Each

4

magistrate judge would be responsible for a number of cases, usually grouped by region, over which the individual magistrate judge would have day-to-day responsibility for discovery and possible settlement.   A former law clerk to Judge Weiner became a full-time law clerk in charge of administration setting up hearings, answering queries about logistics and scheduling. One additional law clerk was assigned to the presiding judge to assist in research and writing of orders and opinions.

      b.      To keep track of the cases, the Clerk of Court established a general docket (MDL-875) as well as individual dockets for each case.  In turn, within the general dockets, the cases were divided into land dockets and maritime dockets depending on where the exposure is alleged to have occurred, given the difference between maritime law which applied to exposures at sea, and state substantive law for exposures on land.

      c.      The task of communicating with thousands or litigants required the development of a website with word search capability in which the court posted current developments, schedule of cases, provided the practice and procedures of the court and served as a depository of all of the Court's orders and opinions. Along with the website, the court relied on a steering committee of an equal number of plaintiffs' and defendants' attorneys to communicate with the parties regarding general issues of administration.

      d.      Finally, the Court adopted and published written procedures to be followed on settlement conferences, motion practice and scheduling of trials which guided counsel in making their strategic decisions in each case.

3. <u>Seven Steps to Resolution</u>:[4]

With these general principles and practices in place, a seven-step process was implemented to resolve each case:

    a. <u>Transfer of case and file to E.D. of PA.</u>

Although the MDL-875 cases were transferred to E.D. of PA in 1991, the case files had remained with the transferor courts. By order of the court all files were transferred to the E.D. of PA. Since many of the files were still in paper form (over 50,000 case files in the maritime docket), all files were scanned and filed on ECF providing electronic access to the records to all the court and the parties.

    b. <u>Severance of all cases</u>[5]

Certain counsel for the plaintiffs had the practice of filing multi-plaintiff complaints, some in the hundreds against dozens of defendants. Under this practice, it was virtually impossible for the Court to decipher which claims by which plaintiff were directed to which defendant and over what period of time. The Court ordered each case with multiple plaintiffs to be severed into individual cases, with separate numbers, with each complaint identifying which claims were directed to which defendants.

---

[4] Not every idea to improve the Administration of the cases worked. The MDL-875 court tried to have the parties argue their summary judgment before a panel of 3 magistrate judges instead of the district court. This approach did not work and the parties nearly always filed objections to the panel's decision. The court appointed the late Professor McGovern as "remand special master" to assist the transferor court in the handling of remanded cases. The transferor courts did not become interested in this approach. Finally, to alleviate the work load requirements accompanying the remand of large number of cases, the Committee of Intercircuit Assignments agreed to provide a volunteer judge to handle asbestos cases on remand to the transferor courts. Except on one or two occasions, there was no interest in this offer by the Committee on Intercircuit Assignments.

[5] All claims for punitive damages were severed from the case, <u>In Re: Collins</u>, 233 F.3d 809, 810 (3d. Circ. 2000). Ultimately, no plaintiff proceeded on any claim for punitive damages, nor were any ever awarded.

c. <u>Lone Pine type order</u>

In each case, once severed, the plaintiff was required to submit medical diagnostic reports "upon which the plaintiff now relies for the prosecution of the claims so as to withstand a dispositive motion". The court required that the medical report be based on "medically accepted principles and practices and or statements from a reputable medical organization…"

d. <u>Show cause hearings</u>

Once the case was disaggregated into a single case, it was listed for a status and scheduling conference and show cause hearing. Prior to the hearing, counsel was asked to advise the court against which individual defendant it intended to proceed. At the conclusion of the hearing, each case was placed in one of the following tracks:

Track A: Plaintiff who voluntarily chose not to proceed. These cases were closed.

Track B: Plaintiff who produced evidence of exposure but whose compliance to produce diagnostic reports was challenged by defendants.

Track C: Plaintiff alleged compliance with the court's diagnostic report order and was not challenged by defendants.



e. <u>Discovery & Summary Judgment</u>

Each case not dismissed was placed on a scheduling order providing for discovery, exchange of expert reports, and briefing on summary judgment.

At the conclusion of the discovery period the parties were permitted to and almost always filed motions for summary judgment. The court scheduled a hearing (except in unusual circumstances) within 30 days of briefing being completed and committed to issuing a decision within 10 days of the hearing.



f.  **Trial or remand**

Parties which survived summary judgment would then be remanded if they satisfied the following conditions: a) had provided an acceptable diagnostic report; b) the plaintiff was alive; c) settlement prospects were exhausted; d) no motions were pending; e) the plaintiff was prepared for trial in transferor court and f) the transferor court's docket was not congested.

If the case was remanded, the court provided the transferor court with a Remand Memorandum summarizing the status of the case including identification of viable claims and defendants. The parties were also afforded the opportunity to try the case in the E.D. of PA (subject to a Lexecon waiver) but none ever did.

g.  **The legal architecture**

The MDL court decided all summary judgment motions unless they involved an unsettled or novel issue of state law. The purpose of deciding literally hundreds of motions at the MDL level, was to provide predictability on both the procedural and substantive issues. Issues of federal procedure included personal jurisdiction, choice of law, co-worker testimony, sham affidavits, fraudulent joinder, remand standards under government contractor defense and summary judgment standards. Issues of substantive state law included product identification, statute of limitations, one-two disease rule, premises liability, successor liability, diagnostic medical requirements, and statue of repose. Issues of maritime law included bare metal defense, sophisticated user, and sovereign immunity.

### III: The Experience of Disaggregation

1. <u>Results</u>[6]

Since the implication of the plan of the MDL court in 2008, MDL-875 has adjudicated the following number of cases:

| <u>Filed</u>[7] | <u>Closed</u> | <u>Remand</u> | <u>Pending</u>[8] |
|---|---|---|---|
| *192,128* | *188,585* | *3,518* | *22* |

2. <u>The MARDOC litigation</u>

Beginning in the 1980's, an Ohio law firm began filing cases in the Northern District of Ohio on behalf of the merchant mariners who claimed to have been injured while working on commercial vessels on the Great Lakes. Ultimately over 50,000 of these cases were centralized to MDL-875. Because the injuries claimed were controlled by maritime law and involved a set of different lawyers than the land-based cases, the MDL court created a separate docket for administrative purpose. Under the leadership of Magistrate Judge Elizabeth Hey, a series of administrative orders, similar in context to those issued in the land-based cases, were issued ultimately resulting in the adjudication in the MDL of all but approximately 300 cases, which were remanded to the Northern District of Ohio.

3. <u>CVLO litigation</u>

A Chicago based law firm initially filed more than 5,000 asbestos cases in the mid-west resulting from asbestos exposures. These cases were assigned to senior Judge Lowell A. Reed, Jr. Judge Reed implemented procedures similar to those instituted in the land and MARDOC context. By requiring plaintiffs to identify their disease conditions, damages and work and medical history, ultimately this process ultimately resulted in the voluntary dismissal of approximately 3,000 cases.

---

[6] See JPML MDL-875 Statistics.
[7] Transferred or original jurisdiction.
[8] In the 22 cases pending, the E.D. of PA court exercised original jurisdiction. All other cases have been remanded or closed.

After the retirement of Judge Reed, the cases were referred to Magistrate Judge David R. Strawbridge. Judge Strawbridge implemented an aggressive discovery protocol which had the effect of screening out for insufficient showing of injury or causation a great many of the cases. The enforcement of the protocol along with regular in-person management conferences, oral arguments and motions and settlement conferences resulted in the disposition of all but 150 cases. The balance of the cases were remanded to the transferor courts.

4. <u>Railroad Brake Litigation</u>

Approximately 3,300 cases were filed by one law firm in the Northern District of Virginia. The cases involved individual claims of exposure to asbestos on locomotive and passenger cars. The court appointed Bruce Lassman, Esquire, a former law clerk to Judge Charles R. Weiner, as a special master. After a series of conferences with counsel, it was determined that the key issue in all of the cases was whether the claimed exposure fell within the Virginia product liability statute and if so, whether they were preempted by federal law. Ultimately, the Supreme Court affirmed the decision of the MDL court that the Virginia statute was preempted, and 3,300 cases were dismissed.

5. <u>Mass screening cases</u>

Following Judge Jack's decision in the Silica case, finding fraud by certain screening doctors in providing diagnostic reports, defendants issued Rule 45 subpoenas requesting supporting documentation of the screening doctors in certain of the asbestos cases. Judge Strawbridge, who was supervising discovery of these cases, ordered the deposition of Dr. Segura, a leading physician retained by plaintiffs' counsel, and who had produced a large number of diagnostic reports. After the objections to Judge Strawbridge's order were overruled by the MDL court, the plaintiff voluntarily dismissed all cases where Dr. Segura was the medical provider who had issued the diagnostic reports.

6. <u>End of the tag-a-long</u>

In December 2011, the MDL court suggested to the Panel, an end of tag-a-long centralization of asbestos cases. The MDL court pointed out that the backlog of cases had been largely eliminated and that the remaining cases were proceeding on scheduling orders, and that the number of asbestos cases filed annually stood at approximately 400 per year throughout the entire federal system, a number well within the capacity of federal district courts to adjudicate without undue burden.

\* \* \*

## *LESSONS LEARNED AND UNLEARNED*

Thirty years, 180 thousand plus cases, and hundreds of thousands of individual claims later, it would be useful to extract some lessons from the federal courts' entanglements with asbestos litigation. Yet, any lessons must be drawn with great caution save, as in the case of generals fighting the next war on the basis of obsolete lessons learned from the last one, we risk drawing the wrong conclusions.

And yet, some limited lessons can be drawn, which, if applied under appropriate circumstances, can serve as guideposts for the litigation of large mass tort cases in the future, whether in national or state MDL's.

A. <u>If We Build It, They Will Come</u>

Regardless of the amount of judicial effort and resources, unless the court establishes a toll gate at which entrance to the litigation is controlled, non-meritorious cases will clog the process. Therefore, courts must establish procedures by which, at an early point, each plaintiff is required to provide facts which support the claim through expert diagnostics reports or risk dismissal of the case.

12

B. <u>One Plaintiff-One Claim</u>

Aggregation will not work in all cases. In large tort cases, consider whether each case is to be 'disaggregated' or 'deconstructed' into the lowest common denominator. The purpose is to separate each case, and within each case, each claim against each defendant to stand on its own merit. Early in the litigation, defendants should be provided the opportunity to file dispositive motions addressed to their specific circumstances. This bifurcation or trifurcation of trials should be avoided.

C. <u>MDL Litigation is Part of a Continuum</u>

The objectives of the MDL process are best served by a commitment of the MDL courts to address pretrial issues, but promptly remand cases to the transferor court once the goal of addressing pretrial issues including exploring settlements of individual cases has been achieved.

D. <u>Waiting for Superman: The Failure of Aggregation</u>

In many cases, the consolidation or aggregation of large numbers of cases distorts the litigation and the settlement process. Aside from the significant due process issues raised by forcing parties to litigate or settle cases in groups, aggregation promotes the filing of cases of uncertain merit. The incentive becomes the number of cases that can be filed, not the relative merit of the individual case. Additionally, while the court searches for global solutions, the individual cases are not attended to by either the court or the individual lawyers. Since litigation or settlement is to be determined in mass, or at least in groups, there is no perceived need by the parties to litigate each case separately. While the parties wait for 'superman' to resolve the litigation, the cases linger.

E. <u>It Takes A Village: The Need for Judicial and Administrative Resources</u>

Trial judges in general, and federal district court judges in particular, are by their nature and culture lone wolves who act alone in the execution of their duties. A trial judge, unlike an appellate one, does not need 'a second vote' to issue a decision or to overrule an objection.

13

Additionally, under the now well-established individual docket system in the federal courts, each individual federal district judge manages his/her own docket, setting trial, discovery, and other administrative deadlines at his or her own discretion. This general philosophy is not congruent with the administrative responsibilities of a large MDL. While, of course, the adjudicating role remains the sole responsibility of the MDL district judge, the duties and burden of administrating a large MDL must be shared with other judicial officers and retained professionals. Therefore, the court must recruit and rely upon magistrate judges, special masters, other administrative personnel, the Clerk's Office staff, IT specialists, and law clerks for the administration of the case.

F.  **Let the Lawyers be Lawyers: The Procedural Road Map**

Counsel in a large MDL need a clear road map of litigation. Written procedures for motion practice, trial or remands, and settlement to assist the parties must be adopted. Once these procedures are established, strict and faithful enforcement of the procedures supply the discipline needed to manage a large number of individual cases. The procedures are to be widely publicized on both the court's and commercial web sites.

G.  **Let the Judge be the Judge: The Need for Legal Architecture**

The court must provide timely legal guidance to the substantive and procedural issues by ruling and issuing opinions on matters before the court. This body of law provides counsel with a predictable path on which to formulate and execute their individual litigation strategy. These decisions are to be made widely available on both the court's and commercial web sites.

H.  **No Agenda: A Win-Win for Plaintiffs-Defendants**

In the MDL context, two perceptions may undermine the litigants' confidence in the process. On the part of the plaintiffs, the belief is that the agenda behind the process is designed to simply 'clean house' by dismissing cases or depriving litigants of the opportunity to present their cases to a jury. On the other hand, the belief on the part of defendants that the MDL process is designed to coerce settlements or to deprive them of the right to assert legitimate

14

defenses. Under a 'one-plaintiff-one-claim' process, case outcomes benefit both plaintiffs and defendants. Defendants see a decline in the number of claims which they have to defend, due to an early assessment of the merit of each claim with a concomitant reduction of costs of defense. Conversely, plaintiffs see the more meritorious claims move to the head of the line, as unmeritorious claims are dismissed and removed from the docket. Both sides see the benefits and are prepared to support the court's plan.

* * *

The Asbestos saga in the federal court is now at an end. Except for the individual asbestos cases in the respective federal courts, there is no longer a need for centralization. Relatively few new cases are currently filed in the district courts, and the medical-legal "crisis" and "elephantine" dockets have disappeared. Though the journey has been long and costly, if substantial justice for the litigants has been achieved, in a manner consistent with public policy, the journey will have been worthwhile.

# APPENDIX – I

# JPML MDL-875

# Litigation Statistics Chart

CM/ECF for JPML (LIVE)-JPML Litigation Statistics by District Report    https://jpml-ecf.sso.dcn/cgi-bin/JPMLDistLitigStatsReport.pl?1927753...

Case 01-MDL-00875-ER Document 10966-1 Filed 08/30/22 Page 18 of 20
Case MDL No. 875 Document 10656-1 Filed 02/21/22 Page 18 of 19

| United States Judicial Panel on Multidistrict Litigation | Report Date: 7/18/2022 |

# Litigation Statistics by District

[Copy MDL Caption to Clipboard](#)

**MDL No. 875 - IN RE: Asbestos Products Liability Litigation (No. VI)**
**Status:** Transferred on 07/29/1991
**Citation:** 771 F.Supp. 415
**Transferee District:** PAE    **Transferee Judge:** Eduardo C. Robreno
**Transferee Master Docket Number:** 2:91-md-875
**Staff Attorney:** NBS

| CIRCUIT | DISTRICT | CIVIL ACTIONS | | | 1404 Transfers | 1407 Remands | Total Pending | Tr'e Severed Case Count |
|---|---|---|---|---|---|---|---|---|
| | | Transferred | Tr'e District | Closed | | | | |
| 11 | Alabama Middle | 16 | | 15 | | 1 | 0 | |
| 11 | Alabama Northern | 145 | | 139 | | 6 | 0 | |
| 11 | Alabama Southern | 101 | | 101 | | | 0 | |
| 09 | Alaska | 152 | | 150 | | 2 | 0 | |
| 09 | Arizona | 371 | | 363 | | 8 | 0 | |
| 08 | Arkansas Eastern | 70 | | 67 | 2 | 1 | 0 | |
| 08 | Arkansas Western | 16 | | 14 | | 2 | 0 | |
| 09 | California Central | 124 | | 111 | | 13 | 0 | |
| 09 | California Eastern | 15 | | 14 | | 1 | 0 | |
| 09 | California Northern | 595 | | 457 | | 138 | 0 | |
| 09 | California Southern | 63 | | 62 | | 1 | 0 | |
| 10 | Colorado | 252 | | 251 | | 1 | 0 | |
| 02 | Connecticut | 1429 | | 1414 | | 15 | 0 | |
| 03 | Delaware | 47 | | 39 | | 8 | 0 | |
| DC | District of Columbia | 45 | | 44 | | 1 | 0 | |
| 11 | Florida Middle | 350 | | 345 | | 5 | 0 | |
| 11 | Florida Northern | 22 | | 18 | | 4 | 0 | |
| 11 | Florida Southern | 311 | | 304 | | 7 | 0 | |
| 11 | Georgia Middle | 53 | | 53 | | | 0 | |
| 11 | Georgia Northern | 370 | | 363 | | 7 | 0 | |
| 11 | Georgia Southern | 1307 | | 1154 | 1 | 152 | 0 | |
| 09 | Guam | 1 | | 1 | | | 0 | |
| 09 | Hawaii | 204 | | 203 | | 1 | 0 | |
| 09 | Idaho | 88 | | 87 | | 1 | 0 | |
| 07 | Illinois Central | 1079 | | 1051 | 11 | 17 | 0 | |
| 07 | Illinois Northern | 1126 | | 1088 | | 38 | 0 | |
| 07 | Illinois Southern | 499 | | 483 | | 16 | 0 | |
| 07 | Indiana Northern | 1182 | | 1176 | | 6 | 0 | |
| 07 | Indiana Southern | 1603 | | 1598 | | 5 | 0 | |

Case 2:01-md-00875-ER Document 10966-1 Filed 08/30/22 Page 19 of 20

| 08 | Iowa Northern | 32 | | 31 | | 1 | 0 | |
|---|---|---|---|---|---|---|---|---|
| 08 | Iowa Southern | 962 | | 952 | 9 | 1 | 0 | |
| 10 | Kansas | 182 | | 179 | | 3 | 0 | |
| 06 | Kentucky Eastern | 203 | | 189 | | 14 | 0 | |
| 06 | Kentucky Western | 272 | | 241 | | 31 | 0 | |
| 05 | Louisiana Eastern | 329 | | 302 | 3 | 24 | 0 | |
| 05 | Louisiana Middle | 158 | | 148 | 2 | 8 | 0 | |
| 05 | Louisiana Western | 267 | | 266 | | 1 | 0 | |
| 01 | Maine | 573 | | 563 | | 10 | 0 | |
| 04 | Maryland | 1352 | | 1302 | 2 | 48 | 0 | |
| 01 | Massachusetts | 3063 | | 3063 | | | 0 | |
| 06 | Michigan Eastern | 482 | | 471 | | 10 | 1 | |
| 06 | Michigan Western | 35 | | 35 | | | 0 | |
| 08 | Minnesota | 400 | | 393 | 3 | 4 | 0 | |
| 05 | Mississippi Northern | 124 | | 124 | | | 0 | |
| 05 | Mississippi Southern | 2157 | | 2150 | | 7 | 0 | |
| 08 | Missouri Eastern | 229 | | 218 | | 11 | 0 | |
| 08 | Missouri Western | 146 | | 143 | 1 | 2 | 0 | |
| 09 | Montana | 191 | | 188 | | 3 | 0 | |
| 08 | Nebraska | 179 | | 179 | | | 0 | |
| 09 | Nevada | 161 | | 156 | | 5 | 0 | |
| 01 | New Hampshire | 129 | | 129 | | | 0 | |
| 03 | New Jersey | 415 | | 391 | | 24 | 0 | |
| 10 | New Mexico | 315 | | 292 | | 23 | 0 | |
| 02 | New York Eastern | 1695 | | 1672 | | 23 | 0 | |
| 02 | New York Northern | 620 | | 553 | | 67 | 0 | |
| 02 | New York Southern | 4904 | | 4863 | 1 | 40 | 0 | |
| 02 | New York Western | 467 | | 466 | | 1 | 0 | |
| 04 | North Carolina Eastern | 667 | | 659 | | 8 | 0 | |
| 04 | North Carolina Middle | 585 | | 576 | | 9 | 0 | |
| 04 | North Carolina Western | 1318 | | 1285 | | 33 | 0 | |
| 08 | North Dakota | 170 | | 9 | | 161 | 0 | |
| 09 | Northern Mariana Islands | 4 | | 4 | | | 0 | |
| 06 | Ohio Northern | 47392 | | 45199 | 23 | 2168 | 2 | |
| 06 | Ohio Southern | 163 | | 161 | | 2 | 0 | |
| 10 | Oklahoma Eastern | 30 | | 30 | | | 0 | |
| 10 | Oklahoma Northern | 628 | | 620 | | 8 | 0 | |
| 10 | Oklahoma Western | 161 | | 159 | | 2 | 0 | |
| 09 | Oregon | 189 | | 188 | | 1 | 0 | |
| 03 | Pennsylvania Eastern | | 83659 | 83519 | 10 | 108 | 22 | 68419 |
| 03 | Pennsylvania Middle | 243 | | 243 | | | 0 | |
| 03 | Pennsylvania Western | 341 | | 328 | 1 | 12 | 0 | |
| 01 | Puerto Rico | 8 | | 8 | | | 0 | |

CM/ECF for JPML (LIVE)-JPML Litigation Statistics by District Report   https://jpml-ecf.sso.dcn/cgi-bin/JPMLDistLitigStatsReport.pl?1927753...

Case MDL No. 875 Document 10966-1 Filed 08/30/22 Page 20 of 20
Case 2:01-md-00875-ER Document 10966 Filed 02/30/22 Page 19 of 19

| 01 | Rhode Island | 287 | | 281 | | 6 | 0 | |
|----|---|---|---|---|---|---|---|---|
| 04 | South Carolina | 2329 | | 2261 | | 68 | 0 | |
| 08 | South Dakota | 6 | | 6 | | | 0 | |
| 06 | Tennessee Eastern | 243 | | 242 | | 1 | 0 | |
| 06 | Tennessee Middle | 79 | | 79 | | | 0 | |
| 06 | Tennessee Western | 78 | | 78 | | | 0 | |
| 05 | Texas Eastern | 5343 | | 5335 | 1 | 7 | 0 | |
| 05 | Texas Northern | 1399 | | 1397 | | 2 | 0 | |
| 05 | Texas Southern | 851 | | 844 | 1 | 6 | 0 | |
| 05 | Texas Western | 60 | | 58 | | 2 | 0 | |
| 10 | Utah | 347 | | 332 | | 15 | 0 | |
| 02 | Vermont | 2 | | 2 | | | 0 | |
| 03 | Virgin Islands | 110 | | 103 | | 7 | 0 | |
| 04 | Virginia Eastern | 11254 | | 11240 | | 14 | 0 | |
| 04 | Virginia Western | 389 | | 357 | 31 | 1 | 0 | |
| 09 | Washington Eastern | 141 | | 141 | | | 0 | |
| 09 | Washington Western | 340 | | 334 | | 6 | 0 | |
| 04 | West Virginia Northern | 23 | | 22 | | 1 | 0 | |
| 04 | West Virginia Southern | 660 | | 658 | | 2 | 0 | |
| 07 | Wisconsin Eastern | 587 | | 564 | | 23 | 0 | |
| 07 | Wisconsin Western | 293 | | 267 | | 26 | 0 | |
| 10 | Wyoming | 71 | | 70 | | 1 | 0 | |
| | **Report Totals:** | **108,469** | **83,659** | **188,483** | **102** | **3,518** | **25** | **68,419** |
| | **Please note that claims counts will be off by the number of claims left in Transferee Severed Parent Cases.** | | | | | | | |

## Explanatory Note

According to the Clerk of U.S. District Court for the Eastern District of Pennsylvania, a review of the cases in the Southern District of New York, the Northern District of Ohio, the Eastern District of Michigan, the District of the Virgin Islands and the Western District of Louisiana shows that since January 1, 2010 through June 30, 2022 statistics on asbestos litigation involving maritime issues shows a total 62,857 cases (involving 1,408,541 claims) have been transferred to PAE and a total of 63,380 cases (involving 713,960 claims) have been terminated nationwide. The statistics on land-based cases for all district courts for the same time period involved 25,347 cases (involving 741,635 claims) have been transferred to PAE and a total of 76,850 cases (involving 3,444,373 claims) have been terminated nationwide.